2013-1452, -1488, 2014-1147

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ALPS SOUTH, LLC,

*Plaintiff-Cross Appellant*,

v.

THE OHIO WILLOW WOOD COMPANY,

*Defendant-Appellant*.

———————————————

Appeals from the United States District Court for the
Middle District of Florida in Case No. 08-CV-1893, Judge Mary S. Scriven

———————————————

## CORRECTED NON-CONFIDENTIAL BRIEF OF DEFENDANT-APPELLANT

John D. Luken
Joshua A. Lorentz
Brian S. Sullivan
DINSMORE & SHOHL, LLP
255 E. Fifth St., Suite 1900
Cincinnati, Ohio  45202
Tele:  513.977.8564
John.Luken@Dinsmore.com
Joshua.Lorentz@Dinsmore.com
Brian.Sullivan@Dinsmore.com

*Attorneys for Defendant-Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## ALPS SOUTH, LLC v. THE OHIO WILLOW WOOD COMPANY

### Nos. 2013-1452, -1488 and 2014-1147

## CERTIFICATE OF INTEREST

Counsel for Appellant The Ohio Willow Wood Company certifies the following:

1.  The full name of every party or amicus represented by me is: The Ohio Willow Wood Company

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: N/A

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: N/A

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**DINSMORE & SHOHL, LLP**
John D. Luken
Brian S. Sullivan
Joshua A. Lorentz
Nita L. Hanson

**STANDLEY LAW GROUP LLP**
Jeffrey S. Standley
F. Michael Speed, Jr.
James Kwak
Michael Stonebrook
Matthew W. Upton

**HILL WARD & HENDERSON P.A.**
Benjamin H. Hill, III
Patrick J. Risch

Date: February 27, 2014          Respectfully submitted,

_/s/ John D. Luken_____
John D. Luken

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................v

TABLE OF ABBREVIATIONS ........................................................ viii

STATEMENT OF RELATED CASES ..................................................ix

STATEMENT IN SUPPORT OF ORAL ARGUMENT ......................xi

JURISDICTIONAL STATEMENT .......................................................1

INTRODUCTION ..................................................................................3

STATEMENT OF THE ISSUES ON APPEAL .......................................4

STATEMENT OF THE CASE................................................................6

       A.     The Accused Products ...............................................6

       B.     The '109 Patent...........................................................7

       C.     Alps's Lawsuit ...........................................................8

       D.     The Trial....................................................................15

       E.     Post-Trial Motions ...................................................19

       F.     OWW's Redesign .....................................................20

SUMMARY OF ARGUMENT .............................................................23

STANDARD OF REVIEW ...................................................................25

ARGUMENT.........................................................................................26

     I.     ALPS LACKS PRUDENTIAL STANDING .....................26

     II.    THE JURY DID NOT HAVE A LEGALLY SUFFICIENT BASIS FOR FINDING THAT HAMMOND DID NOT ANTICIPATE THE ASSERTED CLAIMS. ......................31

       A.     Hammond and Debbaut Must be Considered as a Single Reference. .............................................................32

       B.     Hammond thus Discloses Every Element of the Asserted Claims. ......................................................................33

III.   EVEN IF HAMMOND, INCORPORATING DEBBAUT, DID NOT ANTICIPATE, THE COMBINATION OF THE TWO MAKES ALL ASSERTED CLAIMS OBVIOUS............................38

    A.   A Skilled Artisan Would Have Been Motivated to Combine Hammond and Debbaut. ...........................................39

    B.   A Skilled Artisan Would Have Been Motivated to Combine the '708 Patent and Kuraray Materials. ...................40

    C.   Mr. Chen's Purported Unexpected Results Do Not Support Non-Obviousness. ......................................................42

IV.   THE DISTRICT COURT ERRED IN FINDING THAT OWW WILLFULLY INFRINGED. ...............................................................44

    A.   The District Court Erred in Ignoring the Objective Prong of Seagate.....................................................................................45

    B.   The Record is Clear That There Was No Objectively High Likelihood of Infringement.............................................47

    C.   Since the Willfulness Finding Was Error, the Enhancement of Damages, Finding of an Exceptional Case, and Award of Attorney Fees Must Be Reversed. ...........49

V.   THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A PERMANENT INJUNCTION.......................................49

    A.   Alps Had to Show That the Features Covered by the '109 Patent are Important to Consumer Demand. ...........................50

    B.   Alps Did Not Demonstrate a Causal Nexus. ............................51

VII.  THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING OWW IN CONTEMPT OF THE PERMANENT INJUNCTION. ....................................................................................53

    A.   Analysis of Colorable Differences Focuses on "How the Patentee in Fact Proved Infringement" at Trial.......................54

    B.   OWW Redesigned its Products in View of What Alps and Inventor Chen Had Consistently Represented to be the Scope of Claims 1–3. ...........................................................55

C.    The Advanced Gel Products are More Than Colorably
       Different from the Original Gel Products Irrespective of
       Alps's Previous Positions Regarding the Scope of Claims
       1–3 ......................................................................................... 57

D.    The District Court Incorrectly Construed the Dispositive
       Claim Language. .................................................................... 60

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................. 62

The material omitted on page 7 contains confidential financial information and confidential licensing information; the material omitted on page 9 contains confidential licensing information; the material omitted on page 20 contains proprietary technical information; the material omitted on page 21 contains proprietary technical information; the material omitted on page 28 contains confidential licensing information; the material omitted on page 57 contains proprietary technical information.

# TABLE OF AUTHORITIES

## Cases

A123 Sys. v. Hydro-Quebec, 626 F.3d 1213 (Fed. Cir. 2010).........................28, 30

Abbott Laboratories v. Diamedix Corp., 47 F.3d 1128 (Fed. Cir. 1995)..........28, 30

Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272
(Fed. Cir. 2000) .....................................................................................32, 33

Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp., 604 F.3d
1354 (Fed. Cir. 2010) ....................................................................................28

Am. Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350
(Fed. Cir. 1984) .............................................................................................32

Apple Inc. v. Samsung Elecs. Co., 695 F.3d 1370 (Fed. Cir. 2012) .......................50

Apple Inc. v. Samsung Elecs. Co., 735 F.3d 1352 (Fed. Cir. 2013) .................50, 52

Bard Peripheral Vascular, Inc., v. W.L. Gore & Assoc., Inc.,
682 F.3d 1003 (Fed. Cir. 2012).......................................................25, 45, 47, 48

Brown & Williamson Tobacco Corp. v. Philip Morris, Inc., 229 F.3d 1120
(Fed. Cir. 2000) .............................................................................................39

Budinich v. Becton Dickinson & Co., 486 U.S. 196 (1988) ...................................2

Cont'l Can Co. USA v. Monsanto Co., 948 F.2d 1264 (Fed. Cir. 1991)...............37

Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090 (Fed. Cir. 1998) ..............29

Fieldturf, Inc. v. Southwest Rec. Indus., 357 F.3d 1266 (Fed. Cir. 2004)..............27

GAF Bldg. Materials Corp. v. Elk Corp. of Dallas, 90 F.3d 479
(Fed. Cir. 1996) .............................................................................................32

Glaxo Inc. v. Novopharm Ltd., 52 F.3d 1043 (Fed. Cir. 1995)..............................38

Grupo Dataflux v. Atlas Global Grp., L.P., 541 U.S. 567 (2004).........................30

Harari v. Lee, 656 F.3d 1331 (Fed. Cir. 2011) ...............................................25, 33

i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831 (Fed. Cir. 2010). ...................1, 49

In re Malagari, 499 F.2d 1297 (C.C.P.A. 1974) ....................................................32

In Re Seagate Technology, LLC, 497 F.3d 1360 (Fed. Cir. 2007) (en banc)..19, 44,
45, 47

Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363 (Fed. Cir. 2008)....................26

Int'l Gamco, Inc. v. Multimedia Games, Inc., 504 F.3d 1273
(Fed. Cir. 2007) ........................................................................26, 27

Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc.,
248 F.3d 1333 (Fed. Cir. 2001), cert. denied, 534 U.S. 895 ...............27

Keene Corp. v. United States, 508 U.S. 200 (1993)..................................30

Kinetic Concepts, Inc. v. Smith & Nephew, Inc., 688 F.3d 1342 (Fed. Cir. 2012)
........................................................................................25, 39

Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362 (Fed. Cir. 2000) .................62

KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398 (2007)..................................44

Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp., No. 2012-1014, 2014
U.S. App. LEXIS 3176 (Fed. Cir. Feb. 21, 2014) (en banc)...............26

Majorette Toys (U.S.) Inc. v. Darda, Inc., 798 F.2d 1390 (Fed. Cir. 1986)...........1,2

Matthews Int'l Corp. v. Biosafe Eng'g, LLC, 695 F.3d 1322 (Fed. Cir. 2012)......30

Mentor H/S, Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016
(Fed. Cir. 2001) ..................................................................30

Mollan v. Torrance, 22 U.S. 537 (1824).................................................29

nCube Corp. v. Seachange Int'l Inc., 732 F.3d 1346
(Fed. Cir. 2013) ........................................................26, 54, 58, 59

Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826 (1989). ...........................31

Orion IP, LLC v. Hyundai Motor Am., 605 F.3d 967 (Fed. Cir. 2010)................25

Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348 (Fed. Cir. 2007)....................42

Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329 (Fed. Cir. 2008) ...............25

Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372 (Fed. Cir. 2000) ....................27

Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49
(1993)..................................................................................47

Propat Intern. Corp. v. Rpost, Inc., 473 F.3d 1187 (Fed. Cir. 2007)......................28

Randall May Int'l, Inc. v. DEG Music Prods., Inc., 378 Fed. App'x 989 (Fed. Cir.
2010)....................................................................................2

Ritchie v. Vast Res., Inc., 563 F.3d 1334 (Fed. Cir. 2009) .............................44

Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538 (Fed. Cir. 1995) (en banc)...............52

Robert Bosch, LLC v. Pylon Mfg. Corp., 719 F.3d 1305 (Fed. Cir. 2013) (en banc)
....................................................................................1

Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc., 620 F.3d 1305 (Fed. Cir. 2010)..........................................................................................................48

TiVo Inc. v. EchoStar Corp., 646 F.3d 869 (Fed. Cir. 2011) (en banc)......54, 55, 57

Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10 (Fed. Cir. 2012) .......................................................................................31, 40, 42

## Statutes

28 U.S.C. §1291…………………………………………………………………1

28 U.S.C. §1292…………………………………………………………………1,2

28 U.S.C. §1295…………………………………………………………………1

28 U.S.C. §1331…………………………………………………………………1

28 U.S.C. §1338…………………………………………………………………1

35 U.S.C. §102…………………………………………………………………40

## TABLE OF ABBREVIATIONS

| ABBREVIATION | TERM |
|---|---|
| '109 Patent | United States Patent No. 6,552,109 |
| '254 Patent | United States Patent No. 5,153,254 |
| '708 Patent | United States Patent No. 5,336,708 |
| Advance Gel | OWW's redesigned gel products |
| Alps | Alps South, LLC |
| Debbaut | European Patent Application 0108518 |
| Hammond | International Publication No. WO 93/23472 |
| Original Gel | OWW's original Alpha Liner products which OWW began selling in 1996 |
| OWW | The Ohio Willow Wood Company |
| PTO | United States Patent and Trademark Office |
| SEBS | poly(styrene-ethylene-butylene-styrene) block copolymers |
| SEEPS | poly(styrene-ethylene-ethylene-propylene-styrene) block copolymers |
| SIB | styrene isoprene/butadiene block copolymers |

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Fed. Cir. R. 47.5(a), the Court should note that this same civil action was previously before this Court, *Alps South, LLC v. The Ohio Willow Wood Company*, Case No. 2013-1122. On April 11, 2013, the Court granted the motion of Alps South, LLC ("Alps") to dismiss the appeal as premature because, among other things, a motion for A permanent injunction was pending.

Following issuance of the permanent injunction, Ohio Willow Wood ("OWW") timely filed a notice of appeal which was assigned no. 13-1452. Alps ALSO filed a notice of appeal, which was assigned no. 13-1488. Those two appeals were consolidated to proceed as no. 13-1452, -1488. Since motions of the type enumerated in Fed. R. App. P. 4(a)(4) had been filed in the trial court, this Court deactivated those appeals on July 8, 2013. Following resolution of the Rule 4(a)(4) motions, and, after the trial court extended the permanent injunction to OWW's redesigned products and found OWW in contempt, OWW filed an amended notice of appeal and a third notice of appeal, which were assigned no. 14-1147. On January 10, 2013, the Court granted OWW's motion to reactivate appeals 13-1452, -1488, having already *sua sponte* consolidated appeals 13-1452, -1488 with appeal 14-1147 for both briefing and argument.

Pursuant to Fed. Cir. R. 47.5(a), the Court should note that a case styled *The Ohio Willow Wood Company v. Alps South, LLC* is pending in the Middle District

ix

of Florida, Case No. 8:13-cv-01267, which may be directly affected by this Court's

decision in the pending appeal.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

In light of the significance of the issues to be decided, OWW respectfully requests oral argument of this appeal.

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has appellate jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291, 1292(c)(2), and 1295(a)(1).

This Court has jurisdiction even though the amount of attorney fees and post-trial damages (and any multiplier) remain unquantified. 28 U.S.C. § 1292(c)(2) gives this Court exclusive jurisdiction "of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable … and is final except for an accounting." "Accounting" includes the calculation of final damages as well as the determination of willfulness. *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1317, 1319 (Fed. Cir. 2013) (en banc). Willfulness is a prerequisite to enhanced damages. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir. 2010). Thus, the remaining determination as to post-trial damages and any enhancement does not preclude appellate review of the issues raised in this appeal.

This conclusion does not change because the district court has awarded but not yet quantified attorney fees. *See Majorette Toys (U.S.) Inc. v. Darda, Inc.*, 798 F.2d 1390, 1391-92 (Fed. Cir. 1986); *see also Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202-03 (1988) ("[A] decision on the merits is a 'final decision'…

whether or not there remains for adjudication a request for attorney's fees…."). Indeed, this Court may review the district court's decision to award attorney fees even though the sum has yet to be quantified. *See Majorette Toys,* 798 F.2d at 1391("[S]uch quantification will be irrelevant if on appeal this Court determines that it was an abuse of discretion to award attorney fees at all."); *Randall May Int'l, Inc. v. DEG Music Prods., Inc.*, 378 Fed. App'x 989, 995 (Fed. Cir. 2010) (characterizing *Majorette Toys* as concluding that, where "jurisdiction existed under § 1292(c)(2) because there *had* been a judgment of infringement in the court below, this court also had jurisdiction under that statute to hear the appeal on the matter of attorneys' fees which had not yet been accounted"). For the same reasons, this Court has jurisdiction to review the determinations of willfulness and enhanced damages.

## **INTRODUCTION**

In this case, Alps South, LLC ("Alps") sued the Ohio Willow Wood Company ("OWW") for patent infringement. The district court committed several serious errors that warrant reversal. First, the trial court permitted Alps, an exclusive licensee, to cure what the court correctly recognized to be a lack of prudential standing by retroactively amending its license agreement with the patent owner, even though this Court has never allowed an exclusive licensee to cure such a deficiency through anything other than the joinder of the patent owner.

The court also failed to ensure that that the jury's verdict was supported by legally sufficient evidence. At trial, OWW's expert explained in detail both how each element of the asserted claims was disclosed in a single prior art reference and why a skilled artisan would have been motivated to combine the teachings of several prior art references to achieve the claimed invention. In contrast, Alps' expert offered purely conclusory assertions. The court nevertheless denied OWW's renewed motion for JMOL on invalidity, without identifying any specific evidence that supported the jury's findings that the asserted claims were not anticipated or obvious.

Similarly, in denying OWW's renewed motion for JMOL on willful infringement, the court ignored its responsibility under *Seagate* to ascertain, as a matter of law, whether OWW's actions were objectively reckless. Since OWW

asserted multiple reasonable defenses, the finding of willfulness was error, as were the enhanced damages and award of attorney fees that flowed from that finding.

The court also ignored this Court's recent *Apple* decisions when it issued a permanent injunction against continued infringement without even addressing the requirement for a causal nexus between Alps's alleged irreparable harm and the infringement.

Finally, contrary to *TiVo*, when Alps moved to hold OWW in contempt of that injunction for selling a redesigned product, the court improperly permitted Alps to advance an infringement theory different from that raised at trial, and it adopted Alps' novel and incorrect construction of claim language that had been added during reexamination and was not previously construed, even though this construction contradicted the prior positions of Alps, its expert, and the inventor.

## STATEMENT OF THE ISSUES ON APPEAL

1.    Whether the district court erred in concluding that a purportedly retroactive amendment to the license between Alps and the patent owner was sufficient to cure Alps's lack of prudential standing.

2.    Whether the court erred in denying OWW's renewed motion for JMOL of anticipation, where the only limitation that Alps's validity expert identified as missing in a prior art reference is indisputably present via incorporation of material from another reference.

3.      Whether the court erred in its conclusion of non-obviousness where Alps's expert offered vague conclusions but did not challenge OWW's expert's specific testimony that there was a motivation to combine and that the results claimed were not unexpected.

4.      Whether the court erred in denying OWW's renewed motion for JMOL on willful infringement without addressing the "objective recklessness" prong of *Seagate*, where OWW raised reasonable defenses; and whether the court therefore erred in doubling damages, declaring this case exceptional, and awarding attorney fees.

5.      Whether the court abused its discretion in granting a permanent injunction without addressing the existence of a nexus between Alps's purported irreparable harm and OWW's infringement.

6.      Whether the court abused its discretion in finding OWW in contempt of the permanent injunction by entertaining an infringement theory that was not at issue during trial and by finding infringement based on an incorrect claim construction.

## STATEMENT OF THE CASE

### A.    The Accused Products

Defendant-Appellant The Ohio Willow Wood Company ("OWW") and Plaintiff-Appellee Alps South, LLC ("Alps") make and sell prosthetic devices. The products at issue are prosthetic "liners."  A liner resembles a tube sock that is worn over the residuum of an amputated limb and acts as a cushioning layer between the residual limb and the prosthetic leg or arm, which is usually made from a hard material like metal or plastic.  The gel portion of liners can be made from a variety of materials like silicone or urethane gel.  The accused products are "thermoplastic gel" liners; a fabric is coated on the inside with thermoplastic gel, which reduces shock to the residual limb from the amputee's movement and thus improves comfort and safety.

OWW launched the accused liners, sold under the trademark "Alpha," in 1996. JA012834.  Before the company entered the prosthetic liner market, most of its revenue (as much as 65 percent) came from prosthetic "socks," which are also used for cushioning but are typically made from wool and are not coated with gel. JA012828–29.  OWW had made prosthetic socks since the 1920s but sold its prosthetic sock unit to finance development and production of the Alpha Liners. JA012831–32.

Alpha Liners proved immensely successful upon their release—by 2012, OWW was selling about ███████ units annually. JA012852. They were so popular with prosthetists and amputees that Alps and others soon copied them. Throughout the 1990s, Alps made and sold silicone liners. JA012145. In 1997, Aldo Laghi, Alps's CEO, contacted John Chen (the named inventor for the patent in suit) and expressed interest in licensing Chen's patented "SEBS" gel. Dr. Laghi sent Chen ████████████████████████████████████████████ ████████████████████████████████████ JA026055. Alps secured a license for Chen's SEBS gel, but soon abandoned SEBS and instead proceeded, like OWW, with "SEEPS" gel in its liners. JA012205. Alps brought its first gel liner to market in 1999. JA012204. Alps's sales of gel liners eventually eclipsed its sales of silicone liners; today, Alps sells as many gel liners as OWW. JA012146, 012237.

## B.    The '109 Patent

In 1996, the same year that OWW introduced the Alpha Liner, Inventor Chen filed the application that eventually issued as U.S. Patent No. 6,552,109 (the "'109 Patent") in April 2003. JA012461–62, JA000201. The invention disclosed in the '109 Patent is directed not to a prosthetic liner, but rather to composite articles of a gel and a substrate material such as fabric. JA000201. Chen asserted that his invention was limited to the combination of SEEPS gel and a piece of

fabric or another material. JA011991–92. However, Mr. Chen admitted that he did not invent SEEPS gel, which was known in the prior art. JA012011. Indeed, the district court, Alps, and Alps's expert all agreed that Mr. Chen did not invent the SEEPS polymer, the gel, or the substrate fabric of the invention. JA012294, JA012540.

Shortly after the '109 Patent issued in 2003, Chen offered to license it to OWW. JA035256. Believing the patent as issued to be invalid (a belief validated during reexamination when the PTO rejected as invalid all original claims of the patent), OWW declined. JA035271. Years later, on August 31, 2008, Alps took a license from Chen's holding company, even though, as Dr. Laghi admitted, Alps had by then been selling gel liners covered by the claims of the '109 Patent for over five years with no license. JA012221–22.

## C. Alps's Lawsuit

Dr. Laghi testified that Alps took a license to the '109 Patent because it had become involved in litigation brought by OWW "and we didn't want to get involved in anymore patent litigation." JA012222–23.[1] Despite this stated

---

[1] In 2004 and 2005, OWW sued Alps for infringing two patents directed to fabric covered gel liners.

purpose of avoiding litigation, only 24 days later, Alps filed this suit against OWW.[2] JA000383.

### 1. The License Agreement

On October 28, 2009, OWW moved to dismiss for lack of prudential standing. JA000609–615. The August 2008 "Patent Sale and License Agreement" (the "Original License") between Alps and Mr. Chen's patent holding company, Applied Elastomerics, Inc. ("AEI") granted Alps a license to the '109 Patent(and others), but ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[2] The original complaint asserted infringement of the '109 Patent. JA 000383. Alps subsequently amended to add two other patents, but only claims 1-3, 5- 6 and 11-12 of the '109 Patent \were presented to the jury. JA000275.

███████████████████████████████████

█████████████████

On January 28, 2010, five days before the hearing on this motion, Alps and AEI signed an "Amended Patent Sale and License Agreement" (the "Amended License") that purported to give Alps more rights and be retroactively effective as of the date of the Original License. JA018396–422. Judge Covington, then presiding, denied OWW's motion, concluding that each agreement gave Alps standing. JA000023–24. Before trial, the case was transferred to Judge Scriven, who *sua sponte* revisited standing. She concluded that the Original License did not give Alps prudential standing. JA014135. However, while recognizing that this Court had never permitted a licensee to cure a standing deficiency other than by joining the patent owner, she held that the Amended License retroactively cured Alps's lack of standing. *Id.* She expressly invited Alps to join AEI as a party to clear up any uncertainty over standing, *id.*, but Alps has never done so.

### 2.    The Reexamination

OWW requested an *ex parte* reexamination of the '109 Patent. JA000533. This case was not stayed. JA002982. Within five weeks, the PTO granted the request; within another eight weeks, it rejected as invalid all of the claims of the patent. JA002606-19, 000774.

As discussed above, the '109 Patent is directed to composite articles of thermoplastic gel and a substrate material such as fabric. The gel is made by mixing one or more polymers with mineral (or "plasticizing") oil in a ratio of 100 parts by weight (pbw) polymer to 300–1,600 pbw oil (below, the "polymer-to-oil-ratio" limitation). JA000202. The originally issued claims 1–3 required hydrogenated **S**tyrene **I**soprene/**B**utadiene block copolymer(s) (a "hydrogenated SIB" or "hydrogenated SIBs") to be used in this gel. For example, claim 1 recited in relevant part a "composition" made from:

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) and from

(ii) about 300 to about 1,600 parts by weight of a plasticizing oil ….

JA000210. In contrast, originally issued claims 5, 6, and 12 (dependent on claims 1–3) and independent claim 11 recited poly(**S**tyrene-**E**thylene-**E**thylene-**P**ropylene-**S**tyrene), or "SEEPS," as the polymer(s) in this gel. JA000211–212. SEEPS is a species of hydrogenated SIB; every SEEPS is a hydrogenated SIB, but not every hydrogenated SIB is SEEPS. JA002729. Moreover, a hydrogenated SIB is either SEEPS or another polymer; a hydrogenated SIB cannot be a mixture of SEEPS and something else. JA002729. Like claims 1–3, then, claims 5, 6, 11, and 12 also required the polymer(s) in the gel to be hydrogenated SIB(s), but were limited to a particular species of hydrogenated SIB.

11

Following rejection of the original claims, Chen amended all claims to require the gel to be "physically interlocked" with the substrate material. JA003716–22. He also amended claims 1–3 to add—immediately following the phrase "hydrogenated [SIB](s)"—the phrase "comprising poly(styrene-ethylene-ethylene-propylene-styrene)" ("comprising SEEPS"). JA003716–17. For example, amended claim 1 recited in relevant part:

(i)  100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) *comprising poly(styrene-ethylene-ethylene-propylene-styrene)* and from

(ii)  about 300 to about 1,600 parts by weight of a plasticizing oil ….

Chen insisted that this change was not narrowing, presumably because his intent had been to limit the "hydrogenated [SIB](s)" in original claims 1–3 to SEEPS all along. JA003726.

The PTO rejected as invalid all of the amended claims. JA006897. Claims 1–3, 5, 6, 11, and 12 (those asserted against OWW) were rejected, along with others, as obvious over the combination of PCT Publication No. WO 93/23472 ("Hammond") and Chen's U.S. Patent No. 5,153,254 ("'254 Patent"). JA006902. Hammond discloses gels made with Septon 4055, a SEEPS polymer, and plasticizing oil. JA006902–03. The '254 Patent discloses SEBS gel and the forming of composite articles of the gel and a substrate material. JA006903–04. Since Hammond expressly states that his SEEPS gel improves upon SEBS gel, the

PTO concluded it would have been obvious to replace the SEBS gel in the composites taught in the '254 Patent with Hammond's SEEPS gel. JA006904.

European Patent Application Publication No. 0108518A2 ("Debbaut"), another prior art reference, discloses composites articles of a gel (an "encapsulate") and a support material like fabric or open-cell foam. JA006906–07. The PTO rejected several claims as obvious over the combination of Hammond, Debbaut, and the '254 patent. JA006905. Hammond expressly incorporates the disclosures of Debbaut by reference ("the disclosures of [Debbaut and another reference] are both incorporated herein by reference" JA026500), but the examiner did not consider Hammond and Debbaut together as a single anticipatory reference. During trial, however, both validity experts agreed that Hammond incorporates Debbaut in its entirety, and the court held that they are a single reference. JA013299–300.

Following rejection of the amended claims, Chen requested an interview. JA013978. He offered a demonstration and argued that it showed that his invention's composites of SEEPS gel and fabric were unexpectedly much more resistant to shear stress than prior art composites. JA012031. He compared a composite of SEEPS gel and cotton fabric and a composite of SEBS gel and the same cotton fabric. JA013979. Chen asked the examiners to try to rupture each sample by hand. *Id.* They agreed that the SEEPS gel-fabric composite was

stronger. JA013990. He tested each sample using a "Humdinger," a spinning toy operated by repeated hand-pulling of a pair of twisting strings. JA013978–79. On average, rupturing the SEEPS gel-fabric composite required at least 704 percent more string-pulls. JA013995.

The PTO required Chen to submit a written declaration detailing his evidence. Table IV, on page 22 of his 23-page declaration, showed results of shear testing performed on samples of "non-composite" gel (free from any substrate). JA013977–99. It showed that non-composited SEEPS gel did not rupture until after at least 630 percent more string-pulls than non-composited prior art SEBS gel. JA013998. Mr. Chen did not explain this during the demonstration, so the PTO did not ask why it would have been unexpected that his composite of SEEPS gel and fabric were 704 percent more shear resistant than a composite of SEBS gel and that same fabric, given that non-composited SEEPS gel was already 630 percent more resistant to shear than non-composited SEBS gel and that Hammond had already disclosed the improved strength of SEEPS gel itself.

A reexamination certificate issued on July 5, 2011. JA000213. The PTO cited the "unexpected resistance to sheer [sic]" of SEEPS gel-fabric composites as the reason for allowance. JA007945. On April 29, 2012, the court found that the amendments substantively changed the claims and granted OWW summary judgment on absolute intervening rights. JA000084.

### D. The Trial

Trial began on April 30, 2012. Alps's expert, Dr. Jerry Atwood, testified that the accused "Original Gel" Alpha Liners ("Original Gel" is used here to distinguish the products at issue during trial from the redesigned "Advanced Gel" products, discussed below, that were the subject of the contempt proceeding) satisfied the polymer-to-oil-ratio limitation of the asserted claims because they incorporated a gel made from 100 pbw SEEPS to 400 pbw oil. JA012308, 012310. OWW admitted that these liners used Septon 4055 and Septon 4033 SEEPS polymers, which together totaled 100 pbw SEEPS to 400 pbw oil. While it would later become critical in the contempt hearing, during trial it did not matter whether the "comprising [SEEPS]" amendment narrowed claims 1–3 to require every "hydrogenated [SIB]" to comprise SEEPS (*i.e.*, to *be* SEEPS), such that claims 1–3 would require 100 pbw SEEPS to 300–1,600 pbw oil, or only to require that the mixture of hydrogenated SIBs include some amount of SEEPS (100 pbw hydrogenated SIBs, some part of which must be SEEPS, to 300–1,600 pbw oil). The gel in the products at issue at trial was made with 100 pbw SEEPS to 400 pbw oil, so they met the ratio required in claims 1–3 under either of the constructions at issue in the later contempt hearing.

Asked to explain the phrase "100 parts by weight of one or a mixture of two or more of a hydrogenated [SIB](s) *comprising [SEEPS]*" in claim 1, Dr. Atwood

15

testified that the mixture "could be 100 parts [by] weight of one, namely the SEEPS polymer, or it could be a mixture of two or more similar polymers." JA012290–91. "100 parts by weight," he continued, "refers to, in its essential feature, the SEEPS polymer."

OWW's validity expert, Dr. Lynn Walker, testified that the asserted claims are anticipated by Hammond. JA013082. She identified that Hammond incorporated the disclosures of Debbaut and then explained how each element of every asserted claim was disclosed in Hammond. JA013046, 013931–40. She testified that Hammond discloses a gel made from Septon 4055 SEEPS and mineral oil in a ratio that anticipates the ratio claimed in the '109 Patent and that Hammond directs the reader to use his gel in Debbaut's composite articles of gel and a support material such fabric or open-cell foam. JA013041–43, 013049.

Dr. Atwood agreed that Hammond incorporated the disclosures of Debbaut in their entirety, stating that he "understood [Hammond] to mean that he wanted to incorporate the entirety of these patent applications [Debbaut and another application]." JA013270–71. The only element that he suggested was missing in Hammond was the use of the gel in a composite article. JA013269. However, he did not dispute that Debbaut teaches gel-fabric composites or explain why, given that Debbaut is incorporated in Hammond, that element was missing from Hammond. (The district court held that, given the testimony of both experts,

16

Debbaut was incorporated in Hammond. JA013299–300. In view of this, OWW moved for judgment as a matter of law on anticipation, JA013322, but the court denied the motion without stating reasons. *Id.*)

Dr. Walker also testified that the asserted claims are obvious. She testified that, even if Hammond and Debbaut were viewed as separate references, one would be motivated to combine them since Hammond expressly directs the reader to use his SEEPS gel in one of Debbaut's composites. JA013120. Dr. Atwood did not specifically address this testimony saying only that it would not have been obvious to combine Hammond with "any other reference." JA013274. Asked what factors he considered in reaching that conclusion, Dr. Atwood said his "general knowledge of the field[,] the testimony of Mr. Chen and especially the fact that Mr. Chen testified … that he specifically revealed the Hammond patents to the PTO" during reexamination, though he did not explain how any of these supported conclusion. *Id.*

Dr. Walker also testified that the asserted claims were obvious over the combination of U.S. Patent No. 5,336,708 ("'708 Patent," a continuation-in-part of Chen's '254 Patent, JA026537) and materials published by Kuraray, the manufacturer of Septon 4055 SEEPS. JA013082. Like the '109 Patent, the '708 Patent discloses composites articles of thermoplastic gel, also made from 100 pbw polymer to 300–1,600 pbw oil, and fabric, except the block copolymer recited in

the '708 Patent is SEBS (neither expert identified any other differences). JA013059–60; JA026546–47. The Kuraray materials identify Septon 4055 as a newly available block copolymer. JA013062, 018750. Dr. Walker testified that, once they were published, one would have been motivated to replace the SEBS polymer in the invention disclosed in the '708 Patent with the newly available SEEPS block copolymer. JA013087.

Dr. Atwood said that the asserted claims were not obvious over the combination of the '708 Patent and the Kuraray materials because the '708 Patent "claims composite articles based on SEBS, not SEEPS gels." JA013275. He did not explain why one would not have been motivated to combine the teachings of the '708 Patent with the disclosures of the Kuraray materials.

Finally, Dr. Walker testified that Chen's demonstration did not show unexpected shear resistance, because Chen's data showed that composited SEEPS gel (SEEPS gel physically interlocked with fabric) outperformed composited SEBS gel only marginally better than *non*-composited SEEPS gel outperformed non-composited SEBS gel. JA013142, 013151–52. Dr. Atwood did not challenge this.

The jury found that the Original Gel products infringed the asserted claims, that the claims were not invalid, and that OWW's infringement was willful. The jury awarded Alps $3,983,512 in reasonable royalty damages. JA000307.

### E.     Post-Trial Motions

After the trial, OWW filed a renewed motion for judgment as a matter of law on invalidity and willfulness.  JA013894–929.  Regarding invalidity, OWW cited Dr. Walker's testimony that Hammond and Debbaut, considered together as a single anticipatory reference disclose every element of the asserted claims. JA013902–10, 013931–40.  OWW pointed out that Dr. Atwood did not explain the basis for his statement that Hammond (incorporating Debbaut) did not anticipate.

OWW cited Dr. Walker's testimony that one would have been motivated to combine Hammond and Debbaut (because Hammond directs one to do so) as well as the teachings of the '708 Patent and the Kuraray materials (because the '708 Patent taught the use of block copolymers in gel-fabric composites and the Kuraray materials described the Septon 4055 SEEPS as a newly available block copolymer).  JA013915–16.  OWW stressed that Dr. Atwood did not specifically address Dr. Walker's testimony regarding the motivation to combine.   JA013917.

As to willful infringement, citing *In Re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc), OWW argued that there had been no objectively high risk of infringement of a valid patent.  JA013896.

The district court denied OWW's motion.  JA000106.  The court stated there was "record evidence" from which a reasonable jury could conclude that the asserted claims were not invalid, without specifically identifying any.  JA000110.

The court held that OWW had willfully infringed, although it failed to address *Seagate*'s objective component. JA000110–11. Based on this finding, the court enhanced damages (doubling the damages award), found this case to be exceptional, and granted Alps's motion for attorney fees. JA000126–000129.

On May 9, 2013, 12 months after the trial, without acknowledging the recent *Apple* decisions requiring (as part of the *eBay* analysis) a casual relationship between the defendant's infringement and plaintiff's purported irreparable harm, the court granted Alps's motion for a permanent injunction. JA000117–24. The court did not address any causal nexus between sales Alps lost to competition from OWW and OWW's alleged infringement, JA000119–20, even though the court had found during the trial that a causal link between Alps's sales and any infringement was "speculation." JA012805.

### F.    OWW's Redesign

As discussed in OWW's motion to this Court for a partial stay pending appeal (Dkt. 33-1), following trial, OWW introduced the redesigned "Advanced Gel" Alpha Liner products. ███████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████ JA016938–39.

OWW carried out the redesign in view of Alps's consistent representations that all of the asserted claims, including claims 1–3 as amended, required 100 pbw SEEPS to 300–1,600 pbw mineral oil. Even before "comprising SEEPS" language was added to claims 1–3 (that is, before claims 1–3 mentioned SEEPS), Alps argued during the *Markman* proceeding that the term "hydrogenated [SIB]" should be construed essentially as "SEEPS," such that claims 1–3 would require 100 pbw SEEPS to 300–1,600 pbw oil. JA002710. As discussed above, during trial, Alps's expert testified that claims 1–3 required 100 pbw SEEPS to 300–1,600 pbw oil.

On May 23, 2013, Alps moved to hold OWW in contempt of the recently-issued injunction, asserting that the redesigned products infringe. JA014472–86. Alps primarily argued that ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ The district court's contempt order declined to address this factual issue. JA000182.

Alps's fallback argument, to which it devoted roughly one page, was that the redesigned products infringed claims 1–3 ████████████████████ JA0144822–83. For the first time, Alps asserted that claims 1–3 required only a minimal amount of SEEPS, provided it is in a mixture of 100 pbw hydrogenated

21

SIBs to 300–1,600 pbw oil. *Id.* The court had never addressed this claim construction issue.

In response, OWW pointed to Dr. Atwood's unequivocal testimony that all of the asserted claims, including 1–3, require 100 pbw SEEPS to 300–1,600 pbw oil. JA016391. OWW also argued that the phrase "comprising [SEEPS]" modifies the immediately preceding phrase "hydrogenated [SIB](s)," such that every hydrogenated SIB in a mixture has to comprise SEEPS. JA016403. Under this view, because a hydrogenated SIB is either is SEEPS or is not SEEPS (that is, because it cannot include both SEEPS and another polymer), "a hydrogenated [SIB](s) comprising [SEEPS]" means "a hydrogenated SIB which is SEEPS or hydrogenated SIBs which are SEEPS."

On November 1, 2013, after a half-day hearing, the court held OWW in contempt. JA000161. In the subsequently issued order, the court stated that, as long as the redesigned products contained some SEEPS, no matter how little, and the ratio of all hydrogenated SIBs collectively fell within the claimed range, the Advanced Gel products not only infringed but were also not more than colorably different from the Original Gel products. JA000182.

On November 7, the court held a hearing on sanctions. JA000163. It required OWW to pay into court 20 percent of its Advanced Gel sales revenues, appointed a receiver to oversee OWW, ordered OWW to sequester all Advanced

Gel products, and required OWW to seek permission from Alps (or failing that, the court) before making any new redesigned products. On November 12, the court issued an order restating these sanctions and extending the injunction to Advanced Gel products. JA000188–90.

## SUMMARY OF ARGUMENT

I.      The district court did not have jurisdiction over this action. When it filed the complaint, Alps lacked standing to sue without joining AEI, the patent owner, because the Original License included a field of use restriction and left other significant rights with AEI. This deficiency could be cured only by joining AEI; the subsequent purportedly retroactive Amended License could not confer the requisite standing.

II.     The Court should reverse the denial of OWW's renewed JMOL on anticipation. Alps's expert's conclusory assertions were insufficient to support the verdict. He agreed with OWW's expert that Hammond incorporates Debbaut by reference, and the court so held. Alps's expert did not dispute that Debbaut teaches the use of gels in composite articles, so that Debbaut supplies the only element that he suggested as missing in Hammond.

III.    Alternatively, the Court should reverse the district court's conclusion of non-obviousness, as it lacks any factual support. Even if Hammond does not anticipate, one would have been motivated to combine Hammond and Debbaut. The

23

inventor's purported evidence of unexpected results cannot overcome the overwhelming prima facie case of obviousness, because the superior shear resistance of his composites with Hammond's SEEPS gel and fabric was completely expected in view of the superior shear strength of Hammond's gel alone.

IV.    The Court should reverse the finding of willful infringement.  The district court erroneously failed to address *Seagate*'s objective prong, a legal question that must be decided by the court.  OWW's defenses were more than reasonable, precluding a finding of objective recklessness.  Therefore, the district court's award of enhanced damages, finding of an exceptional case, and award of attorney fees should be reversed as well.

V.    The district court abused its discretion in issuing a permanent injunction without addressing, much less finding, the existence of a causal nexus between Alps's alleged lost sales—the sole basis for its finding of irreparable harm—and OWW's infringement.

VI.    The Court should find that the district court abused its discretion in finding OWW in contempt, improperly entertaining a new infringement theory and finding infringement was based on an erroneous claim construction.

## STANDARD OF REVIEW

Jurisdictional issues are reviewed *de novo*. *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1335 (Fed. Cir. 2008).

Anticipation is a question of fact reviewed for substantial evidence when tried to a jury. *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir. 2010). However, incorporation by reference is a question of law. *Harari v. Lee*, 656 F.3d 1331, 1334 (Fed. Cir. 2011). The jury's conclusion on obviousness, a question of law, is reviewed without deference, and the underlying factual findings are reviewed for substantial evidence. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356–57 (Fed. Cir. 2012).

The objective recklessness prong of *Seagate* is a question of law reviewed *de novo*. *Bard Peripheral Vascular, Inc., v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1007-08 (Fed. Cir. 2012).

The grant of injunctive relief is reviewable for abuse of discretion. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008). A district court abuses its discretion when it exercises that discretion based upon an error of law. *Id.*

Whether there are colorable differences between two devices and whether a device infringes are questions of fact reviewable for clear error. *nCube Corp. v. Seachange Int'l Inc.*, 732 F.3d 1346, 1349 (Fed. Cir. 2013). Claim construction is

a question of law reviewed *de novo*. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, No. 2012-1014, 2014 U.S. App. LEXIS 3176, at *49–50 (Fed. Cir. Feb. 21, 2014) (en banc).

## ARGUMENT

## I.  ALPS LACKS PRUDENTIAL STANDING.

Having recognized that Alps lacked prudential standing to sue without AEI and that this Court has allowed such a failure to be corrected only by joinder of the patent owner, the district court erred by holding that the post-complaint amended agreement could retroactively give Alps prudential standing.  JA014135.

An exclusive licensee suing for a patent infringement case must satisfy both constitutional and prudential standing.  *Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1348 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 895.  Prudential standing requires an exclusive licensee to have "all substantial rights" to the patent.  *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1276 (Fed. Cir. 2007).  An exclusive licensee without all substantial rights can only bring suit as a co-plaintiff with the patentee.  *Fieldturf, Inc. v. Southwest Rec. Indus.*, 357 F.3d 1266, 1268 (Fed. Cir. 2004).  "Whether a party has standing to sue is a question that [this Court] reviews *de novo*."  *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000).

OWW moved to dismiss for lack of prudential standing because the Original License did not vest Alps with substantial rights. JA000609-18. Shortly before the hearing on the motion, Alps and AEI entered into the Amended License, purporting to give Alps additional rights retroactively back to the date of the Original License. JA018396-422. Judge Covington held that Alps had standing under both agreements. JA000023-24. Shortly before trial, Judge Scriven revisited standing, correctly finding "there was not prudential standing … at the time the action was instituted." JA014135. Recognizing "that prudential standing can be cured by adding a party," she encouraged Alps to join AEI, but she incorrectly held that Alps's lack of prudential standing could also be cured retroactively by the Amended License. *Id.*

While this Court has identified rights to be examined in determining whether "substantial rights" have been transferred, *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360-61 (Fed. Cir. 2010), it has clearly held "an exclusive field of use licensee does not have standing to sue in its own name without joining the patent owner…." *Int'l Gamco*, 504 F.3d at 1279. In *Gamco*, this Court "unequivocally determined the rights of an exclusive field of use licensee with respect to standing" and reversed the denial of a motion to dismiss, finding that the "prudential standing requirement compels an exclusive licensee with less than all substantial rights, such as a field of use license, to join

27

the patentee before initiating suit." *Id.* at 1276, 1278. *See also A123 Sys. v. Hydro-Quebec*, 626 F.3d 1213, 1217-18 (Fed. Cir. 2010). Here, the Original License ███████████████████████████████████████████ ███████ JA018364. Alps lacked prudential standing to sue without joining AEI for this reason alone.

Even if this were not dispositive, AEI nevertheless lacked prudential standing. In *Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128 (Fed. Cir. 1995), prudential standing was lacking where the licensor, like AEI, retained substantial rights ████████████████████████████████████████ ███████████████████████████████████████████ 47 F.3d at 1132.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ JA018371, JA018373. *See also Propat Intern. Corp. v. Rpost, Inc.,* 473 F.3d 1187, 1191-92 (Fed. Cir. 2007) (emphasizing the responsibility to maintain patents as an indication of ownership rights).

The Amended License could not cure Alps's lack of prudential standing. The way to cure lack of prudential standing is joinder of the patentee. *See A123 Sys., Inc.*, 626 F.3d at 1217, 1219. "[T]he rule that an exclusive licensee who does

not have all substantial rights in a patent must join the patent owner is derived from the statute that defines what parties have standing to sue for patent infringement." *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1018 (Fed. Cir. 2001). The district court recognized that this Court has never permitted a licensee to cure lack of prudential standing by entering a post-complaint amended agreement "and relate it back to the original complaint," but thought that this was an issue of first impression: "I don't believe [it] has been decided by any binding authority." JA014135. That is not the case.

In *Enzo APA & Son, Inc. v. Geapag A.G.,* 134 F.3d 1090 (Fed. Cir. 1998), licensees attempted to cure their lack of standing pursuant to a retroactive agreement. *Id.* at 1092. This Court addressed "whether an oral exclusive license or a nunc pro tunc license executed after suit is brought, or some combination of the two, can confer standing," and concluded that they could not, holding "that under any of these circumstances the holder of title [of the patent] must be joined in order to confer standing." *Id.* at 1093.

Even if this were a question of first impression, this Court should follow the "time-of-filing" rule applicable to other jurisdictional defects, under which post-complaint facts cannot retroactively create jurisdiction. Diversity jurisdiction "depends upon the state of things at the time of the action brought." *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570-71 (2004) (quoting *Mollan*

*v. Torrance*, 22 U.S. 537 (1824)). "[T]he policy goal of minimizing litigation over jurisdiction is thwarted whenever a new exception to the time-of-filing rule is announced, arousing hopes of further new exceptions in the future." *Id.* at 580-81. *See also Keene Corp. v. United States*, 508 U.S. 200, 207 (1993); *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 831 (1989).

This Court has followed the time-of-filing rule where the patent issued after the suit was filed, as "[l]ater events may not create jurisdiction where none existed at the time of filing." *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 483 (Fed. Cir. 1996). "[W]hether an exclusive licensee has sufficient rights" to have prudential standing "is jurisdictional…." *Mentor H/S,* 240 F.3d at 1019; *see also Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1331 (Fed. Cir. 2012) (quoting *Grupo Dataflux,* 541 U.S. at 570-71 ("jurisdiction of the court depends upon the state of things at the time of the action brought")).

Alps chose not to use the liberal joinder rules, which provide the means to cure jurisdictional deficiencies under the time-of-filing rule. *See, e.g., Grupo Dataflux,* 541 U.S. at 572; *Newman-Green,* 490 U.S. at 832. This Court has identified joinder as the alternative to dismissal for lack of prudential standing. *See, e.g., A123 Sys.,* 626 F.3d at 1219-20; *Mentor H/S,* 240 F.3d at 1019; *Abbott Labs.,* 47 F.3d at 1133.

Allowing an amended agreement to retroactively convey prudential standing would improperly alter "the state of things" at the time of the complaint. An exclusive licensee without substantial rights must join the patentee or face dismissal. Alps, encouraged by the district court to join AEI, did not do so. Its post-complaint agreement cannot cure its lack of prudential standing. The judgment below should be vacated and the case below dismissed.

## II.    THE JURY DID NOT HAVE A LEGALLY SUFFICIENT BASIS FOR FINDING THAT HAMMOND DID NOT ANTICIPATE THE ASSERTED CLAIMS.

Both validity experts agreed that Hammond incorporates Debbaut, JA013046, 013271, leading the district court to hold that Debbaut's disclosures are part of Hammond. JA013299–300. Alps's expert did not dispute that Hammond discloses SEEPS gel. He asserted that Hammond does not anticipate because it does not teach composite articles of gel physically interlocked with a substrate material, but he did not dispute that Debbaut (incorporated by Hammond) discloses just such composites. JA013269. His purely conclusory statement is not a reasonable basis for the jury's finding of no anticipation. *See Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 23–24 (Fed. Cir. 2012) (reversing denial of JMOL on anticipation where accused infringer's expert explained how every element of the claim was disclosed in prior art reference and the only rebutting

testimony was an expert's "conclusory" testimony that the elements "aren't taught" in the reference).

In denying OWW's renewed motion for judgment as a matter of law, the district court pointed to no evidence that supported the jury's verdict, instead simply noting that overcoming the presumption of validity presents a "high burden." JA000110. While deference is due to the PTO, "no such deference is due with respect to evidence it did not consider." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984). The PTO did not consider Hammond and Debbaut as a single anticipatory reference. Purported unexpected results (the sole basis for the PTO's allowance of the claims) and other secondary considerations are irrelevant to anticipation. *See In re Malagari*, 499 F.2d 1297, 1302 (C.C.P.A. 1974). The court's deference to the PTO was misplaced.

## A. Hammond and Debbaut Must be Considered as a Single Reference.

A claim is anticipated if, within the four corners of a single, prior art document every element of the claimed invention is described, "either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). "Material not explicitly contained in the single, prior art document may still be considered for purposes of

anticipation if that material is incorporated by reference into the document." *Id.* "Whether material is incorporated by reference is a question of law." *Id.* at 1283. "[T]he standard is whether one reasonably skilled in the art would understand [the host document] as describing with sufficient particularity the material to be incorporated." *Harari v. Lee*, 656 F.3d 1331, 1334 (Fed. Cir. 2011).

Both experts agreed that Hammond fully incorporated Debbaut. The district judge court asked Alps's expert about Hammond's statement "the compositions of this invention have numerous uses … for example as illustrated in [Debbaut and another European patent application] (the disclosures of which are both incorporated herein by reference)." He replied that Hammond "wanted to incorporate the entirety of these patent applications." JA013270–71. The court properly held that "the entire thing [Debbaut] is incorporated by reference," because "that's what Dr. Walker said, that's what Dr. Atwood said. Both are the only people in the room ordinarily skilled in the art." JA013299–300.

## B. Hammond thus Discloses Every Element of the Asserted Claims.

Dr. Walker, OWW's expert, testified how each element of each asserted claim was disclosed in Hammond. JA013931–40. She showed that Hammond teaches a thermoplastic gel made from Septon 4055 SEEPS and plasticizing oil, in a ratio (100 pbw SEEPS to 300–5,000 pbw oil) that anticipates that claimed in the

'109 Patent (100 pbw SEEPS to 300–1,600 pbw oil). JA013041–45. This went unchallenged by Dr. Atwood.

Dr. Walker also showed that Hammond discloses composites of SEEPS gel physically interlocked with a substrate material because Hammond says that the gel can be used in Debbaut's composite articles. JA013045–46. Debbaut is directed to "protective covers for substrates, for example, electrically conductive substrates." JA026515. The cover is a composite article of gel and a support material, resembling an Ace bandage that can be wrapped around an electrical connection enclosure to protect it from the elements and can be easily removed if needed. JA026517, 013051. The gel (the "encapsulant") of the composite article is made by combining a polymer with plasticizing oil. JA026519. Debbaut discloses several suitable support materials, including a woven or non-woven fabric made from natural or synthetic fibers (glass, metal, or organic polymer fibers), as illustrated in its Figure 5, a cross-section of the composite.



*Fig. 5.*

JA026534. Reference 52 indicates the gel; reference 54 indicates the fabric. Dr. Walker testified that one of ordinary skill would understand that, to make the sealant illustrated in Figure 5, one would "take a piece of fabric and pour [Hammond's] molten gel onto it or pour the melt at high temperature and allow it to solidify into a gel." JA013050. The gel and the fabric would physically interlock, yielding a gel-fabric composite. *Id.*

Figure 4 shows a cross-section of another composite article, comprising the gel and a sheet of porous, organic-polymer foam:



*Fig. 4.*

JA026534. References 46 and 44 are the gel and sheet of foam, respectively. Dr. Walker testified that one would understand to "take a piece of foam and … pour molten gel over it and allow it form a gel foam composite." JA013049. She testified that "[t]he gel would be able to flow into the interstices of the foam when it was a melt, so it would be mechanically interlocked and physically interlocked." *Id.*

Dr. Atwood did not challenge this testimony regarding Debbaut; he offered no testimony whatsoever regarding what Debbaut disclosed, stating only that Debbaut was considered by the PTO during reexamination. JA013271–72. He did not address the PTO's failure to consider Debbaut together with Hammond as a single anticipatory reference.

In opposing OWW's renewed motion for judgment as a matter of law, Alps suggested, with no supporting testimony from Dr. Atwood, that, even if Debbaut is part of Hammond, Hammond purportedly does not state that SEEPS gel would be melted before being applied to a substrate. JA014021. However, a reference can anticipate even if it does not expressly disclose a limitation, because "[t]he disclosure need not be express, but may anticipate by inherency where it would be appreciated by one of ordinary skill in the art." *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995).

Dr. Walker provides ample unrebutted evidence that the missing descriptive matter is necessarily present in Hammond and would be so recognized by a skilled artisan. The gel used in Debbaut's composite articles is not made from a thermo*plastic* polymer like SEEPS, but a gel made from a thermo*set* polymer (such as polyurethane). JA013133, 026519. Thermoplastics begin as solids, but when heated become liquid; once cooled, they regain their solid form; if reheated, they will melt back into a liquid (they are "heat reversible"). Thermosets begin as

36

liquids, but once cured by heat remain in a permanent solid state (and so are not heat reversible). To prepare the composite article in Debbaut's Figure 4 using a thermoset gel, for example, one would knife-coat a sheet of porous foam with a mixture of polyurethane (a thermoset polymer) and plasticizing oil and would then cure the composite in an oven at 100ºC (as opposed to pouring molten gel over the foam and letting it cool). JA026528–29.

Dr. Walker's unrebutted testimony was that a person of ordinary skill in the art would easily understand that, to use Hammond's thermoplastic SEEPS gel in the composite articles described in Figures 4 and 5 of Debbaut, one would first have to melt the gel— "[t]hat is why you use thermoplastics, you heat them up"— then pour it over Debbaut's fabric or porous foam sheet and let it cool. JA013135– 36. Given Hammond's explicit invitation to use SEEPS gel in Debbaut's composites, a skilled artisan would know exactly what to do, because the *only* way to adhere thermoplastic gel to a piece of fabric or foam is to heat the gel, pour the gel over the substrate, and let it solidify. *Id.* Hammond thus anticipates, because the very nature of thermoplastics "make[s] clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *See Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

In denying OWW's renewed motion as to anticipation, the district court identified no evidence that supported the jury's verdict, asserting simply that OWW failed to meet its burden and that the PTO had considered all of the prior art relied on by OWW. JA000110. The court did not address that the PTO failed to consider Hammond and Debbaut as a single anticipatory reference, or that purported evidence of unexpected results—the PTO's *sole* basis for allowing the claims—cannot save the claims under §102. As a matter of law, Hammond incorporates Debbaut. As such, the unrebutted evidence below is that Hammond anticipates the asserted claims. The district court should have entered judgment as a matter of law for OWW.

## III. EVEN IF HAMMOND, INCORPORATING DEBBAUT, DID NOT ANTICIPATE, THE COMBINATION OF THE TWO MAKES ALL ASSERTED CLAIMS OBVIOUS.

Even if Hammond did not anticipate the asserted claims, they would still be invalid for obviousness. Every element of Chen's purported invention—"the gel composite with a fabric," as he described it—is disclosed in the prior art. JA011911. Kuraray invented and patented SEEPS polymers. Hammond disclosed a thermoplastic gel made by mixing SEEPS with mineral oil. Debbaut and Chen's '708 Patent taught composite articles of gel physically interlocked with a substrate material. Dr. Walker's unrebutted testimony established that a skilled artisan would have been motivated to combine the prior art teachings in the very fashion

38

claimed by the '109 Patent. It would have been obvious to use Hammond's SEEPS gel in one of Debbaut's composites, as Hammond invited one to do just that in plain and unambiguous language. JA013120. It would have been obvious to replace the prior-art SEBS block copolymer in the '708 Patent with the newly available Septon 4055 SEEPS block copolymer. JA013087. Dr. Atwood's purely conclusory assertions provided no basis for the jury's conclusion of non-obviousness.

The district court was required to assess the jury's conclusion on obviousness, a question of law, without deference, and to ensure that the jury's underlying factual findings were supported by substantial evidence. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356–57 (Fed. Cir. 2012). The court did neither. It pointed to no facts supporting the jury's conclusion of non-obviousness, instead repeating the presumption of validity and OWW's "high burden." JA000110. The district court's conclusion of non-obviousness should be reversed.

### A. A Skilled Artisan Would Have Been Motivated to Combine Hammond and Debbaut.

Even if the disclosures of Debbaut were not a part of Hammond, it would have been obvious to combine their teachings. A motivation to combine references "may flow from the prior art references themselves…." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000). Here,

such motivation unmistakably flows from Hammond, which directs one to Debbaut and explains that Hammond's compositions "have numerous uses … for example as illustrated in [Debbaut and another European patent application]." JA026500. As Dr. Walker testified, a skilled artisan would be motivated to combine Hammond and Debbaut because "Hammond told you to." JA013120. Given Hammond's express invitation, the motivation to combine is overwhelming.

Dr. Atwood did not directly address much less rebut this testimony. He merely asserted that one of ordinary skill would not be motivated to combine Hammond with "any other reference." JA013274. Asked for support, Dr. Atwood offered his "general knowledge of the field[,] the testimony of Mr. Chen and especially the fact that Mr. Chen testified … that he specifically revealed the Hammond patents to the PTO" during reexamination. *Id.* He did not explain how any of this negated a motivation to combine Hammond with Debbaut or any other reference. His conclusory testimony was inadequate to support the jury's conclusion of non-obviousness. *See Whitserve*, 694 F.3d at 23–24.

## B. A Skilled Artisan Would Have Been Motivated to Combine the '708 Patent and Kuraray Materials.

Like the '109 Patent, the '708 Patent is directed to composites of thermoplastic gel physically interlocked with various substrate materials, including fabric. JA026546–47. Its gel is also made from 100 pbw polymer to 300–1,600 pbw oil, though the polymer is SEBS. *Id.* SEEPS and its predecessor SEBS share

many chemical properties; most fundamentally, both are hydrogenated block copolymers. As Dr. Walker's unrebutted testimony established, once SEEPS was invented and introduced to the market in the early 1990s, one of ordinary skill would have been motivated to replace the SEBS of the '708 Patent with the newly available SEEPS to achieve the invention claimed by the '109 Patent. JA013087.

At trial, excerpts from the deposition of Dr. Brian Champan, a Kuraray representative, were read into the record. He testified that Kuraray invented and patented the Septon 4055 SEEPS, made it commercially available in 1991 or 1992, and released it specifically to gain market share from the manufacturer of SEBS, which then had a "pseudo monopoly on the block copolymer market." JA013024– 25. Kuraray specifically targeted the "gel products" industry. JA013025.

As Dr. Walker explained, the August 1991 Material Safety Data Sheet ("MSDS") for Septon 4055 identified it as a hydrogenated block copolymer, which would have signaled to a skilled artisan that Septon 4055 was a new alternative to SEBS block copolymers. JA018750. Dr. Walker testified that, by August 1994, the effective filing date of the asserted claims, the superior properties of SEEPS had become well-known to one of ordinary skill in the art, JA013080, pointing to the extensive discussion in Hammond of the advantages of Septon 4055 gel over SEBS gels. JA013054, 026504. Confronted with the Septon 4055 MSDS, identifying it as an alternative to SEBS block copolymers, a skilled artisan would

have been motivated to substitute the Septon 4055 SEEPS for the SEBS block copolymers recited in the '708 Patent. JA013087. This would achieve the same invention claimed by the '109 Patent: a composite of thermoplastic gel physically interlocked with a substrate material (such as fabric), the gel being made from 100 pbw SEEPS to 300–1,600 pbw plasticizing oil. Improvements due to "routine experimentation with different standard grades of a material used in a product – standard in the sense that their properties, composition, and method of creation are well known, making successful results of the experimentation predictable"—are obvious. *Ritchie v. Vast Res., Inc.*, 563 F.3d 1334, 1337 (Fed. Cir. 2009).

In response, Dr. Atwood asserted that the '708 Patent did not render the claims obvious because "[i]t claims composites based on SEBS, not SEEPS." JA013275. He addressed none of Dr. Walker's detailed analysis. His conclusory and unsubstantiated assertion is again insufficient to support the jury's conclusion of non-obviousness. *See Whitserve*, 694 F.3d at 23–24.

### C.    Mr. Chen's Purported Unexpected Results Do Not Support Non-Obviousness.

Where the prima facie case of obviousness is overwhelming, evidence of unexpected results is not availing. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007) ("[T]he record establishes such a strong case of obviousness that [the] alleged unexpectedly superior results are ultimately insufficient."). This is such a case. Even if it were not, unexpected results do not save the asserted

42

claims. The superior shear resistance of SEEPS gel-fabric composites relative to SEBS gel-fabric composites was far from unexpected. As Chen knew but did not explain to the PTO, Hammond's SEEPS gel is itself far more resistant to shear than SEBS gel. One would naturally expect a piece of cotton fabric coated with Hammond's SEEPS gel to have a comparable advantage over a piece of that same fabric coated with SEBS gel. Chen's demonstration simply validated this expectation.

Chen coated one piece of cotton fabric with Hammond's SEEPS gel and another with SEBS gel. The fabric coated with Hammond's Septon 4055 SEEPS gel was 704 percent more shear resistant. JA013995. However, as Dr. Walker testified (to which Alps's witnesses did not respond), "[y]ou can't compare the composites without knowing what the gels would do. You have to know what both things [would] do to know if [the composite] acted better than the parts." JA013142. Chen's data on this (which he did not mention during the demonstration and then buried on the next to the last page of his 23-page declaration) showed that Hammond's SEEPS gel was itself 630 percent more shear resistant than SEBS gel. JA013998. The SEEPS gel-fabric composite's 704 percent improvement over SEBS composites was little better than Hammond's non-composited SEEPS gel's 630 percent improvement over SEBS. As Dr. Walker testified, "if you're going to make a composite and you composite it with

43

similar fabric, then that composite will have to be at least 630 percent better with the SEEPS gel [than with SEBS gel], and for it to be unexpectedly better, it's going to have to be more better [sic] than that." JA013151–52.

"[A] combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). Chen's combination of two "familiar elements"—Hammond's SEEPS gel and cotton fabric—according to a known method yielded predictable results. The district court's conclusion of non-obviousness is without support and should be reversed.

## IV. THE DISTRICT COURT ERRED IN FINDING THAT OWW WILLFULLY INFRINGED.

The district court's finding of willful infringement (on which its award of enhanced damages, finding that this is an exceptional case, and award of attorney fees were based) was fatally flawed. It ignored objective recklessness, a question of law for the court under the two-part test for willful infringement of *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). The jury could at most address the second, subjective prong of *Seagate*. OWW advanced reasonable defenses to liability which made it clear, as a matter of law, that the first prong of *Seagate* is not met here. The district court's ruling on willfulness did not even mention *Seagate,* much less conduct the required objective recklessness inquiry. JA000106-112. If this Court does not reverse on standing, invalidity, or

noninfringement, the willfulness determination below must be reversed, and with it the resulting enhancement of damages, finding that this is an exceptional case, and award of attorney fees.

### A. The District Court Erred in Ignoring the Objective Prong of *Seagate.*

To establish willful infringement, a patentee must show "that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Seagate*, 497 F.3d at 1371. "If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk … was either known or so obvious that it should have been known to the accused infringer." *Id.* Both prongs must be met; the question is not posed in the alternative. *Id.*

*Seagate's* objective first inquiry is a question of law, separate from a jury's determination of subjective willfulness under the second prong. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1006-08 (Fed. Cir. 2012). "[T]he ultimate legal question of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent should always be decided as a matter of law by the judge," and it is then "subject to *de novo* review." *Id.*, at 1007-08.

The district court failed to address *Seagate's* objective prong. In its renewed motion for judgment as a matter of law, OWW pointed out the *Seagate* willfulness

test and the requirement that the court assess whether a reasonable defense had been offered. JA013917-24, JA013896. The district court's order denying that motion neither acknowledged the two-step analysis of *Seagate* nor attempted to fulfill the court's obligation under *Bard* to determine whether the objective prong was satisfied. JA000110-11.

Instead, the court dedicated five sentences to willfulness, two suggesting that willfulness flows from infringement itself and three addressing the subjective element:

> OWW's final contention is that the jury's willfulness findings essentially build upon its infringement findings that were unsupported. However, if the jury's finding of infringement is upheld, as it is here, the willfulness findings follow *a fortiori* on this record. The evidence at trial, as catalogued in ALPS'S Response in Opposition (Dkt. 364 at 14-18), was more than adequate to demonstrate willful infringement. Evidence of OWW's pattern of behavior and intent to infringe and of its admission that it continued to infringe even after reissuance of the '109 Patent and that its principal did nothing in response to demands to either purchase a license or stop infringing was more than sufficient to support a finding of willfulness. Certainly, the Court cannot find that no reasonable jury could have so concluded.

JA000110-11. Focusing on whether OWW's "pattern of behavior," "intent," or actions could support the jury verdict addresses only the *subjective* prong of Seagate. The court's failure to even address objective recklessness requires reversal.

**B.     The Record is Clear That There Was No Objectively High Likelihood of Infringement.**

As a matter of law, OWW asserted reasonable defenses to liability, including significant (indeed, meritorious) questions about the validity of the '109 Patent. Alps never sought a preliminary injunction, either when it filed the suit or after the reexamination certificate was issued.[3]  The first prong of *Seagate* was not met here.

*Seagate's* objective recklessness prong cannot be met when "a reasonable litigant could realistically expect success on the merits."  *See Bard*, 682 F.3d at 1007 (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) ("*PRE*")).  "'If an objective litigant could reasonably conclude that the suit is reasonably calculated to elicit a favorable outcome,' it is not objectively baseless."  *Id.*  (quoting *PRE*, 508 U.S. at 51).  "Thus, the question on appeal often posed is whether a defense or noninfringement theory was 'reasonable.'"  *Id.* at 1006.

---

[3]  This Court has recognized that "a patentee who does not attempt to stop an accused infringer's activities" by means of a preliminary injunction may be precluded from recovering enhanced damages for willful infringement based on conduct that occurred after the complaint.  *Seagate*, 497 F.3d at 1374.

OWW's defenses on anticipation and obviousness are certainly more than "reasonable."[4]  OWW did not have to prevail on these defenses.  A reasonable defense to infringement or validity is sufficient to defeat the objective prong of the willfulness inquiry.  *See Bard*, 682 F.3d at 1005-6; *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.,* 620 F.3d 1305, 1319 (Fed. Cir. 2010).  *Spine Solutions* is particularly instructive.  Medtronic had "raised a substantial question" as to obviousness because the combination of prior art offered by Medtronic's expert "plainly discloses all of the claimed limitations."  620 F.3d at 1319.  Even though the Court found support in the record to uphold the jury's implicit finding that one skilled in the art would not have found the combination obvious, "Medtronic was not objectively reckless in relying on the defense." *Id*.

As a matter of law, OWW's anticipation and obviousness defenses preclude a finding of objective recklessness under *Seagate*, requiring the district court's finding of willful infringement to be reversed.

---

[4]  Indeed, Alps moved for summary judgment twice as to anticipation, JA004621-26, JA008994-98; and obviousness, JA004626-4629, JA008999-9003.  The district court concluded that reasonable jurors could find for OWW on each.  *See* JA000048, JA000051, JA000072, JA000078, JA000088.  That the jury later ruled for Alps on these issues does not turn OWW's arguments, which precluded summary judgment for Alps, into something objectively reckless.

### C. Since the Willfulness Finding Was Error, the Enhancement of Damages, Finding of an Exceptional Case, and Award of Attorney Fees Must Be Reversed.

Based on the finding of willful infringement, the Court awarded Alps enhanced damages. JA000126-27. As the finding of willful infringement must be overturned, the Court's award of enhanced damages must also be vacated. *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir. 2010) ("A finding of willful infringement is a prerequisite to the award of enhanced damages"). The district court's finding this case to be exceptional and its award of attorney fees were also based solely upon the determination of willful infringement, JA000128-29, and they should be reversed as well.

## V. THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A PERMANENT INJUNCTION.

Ignoring this Court's instruction that irreparable harm requires proof of a causal nexus between the alleged harm and the infringement, the district court issued an injunction without addressing the existence of a nexus between Alps's alleged lost sales—the sole basis for the court's finding of irreparable harm—and the infringement. This alone is an error of law that warrants vacating the injunction. But remand for further consideration is unnecessary, because the district court had already found the requisite causal link between Alps's alleged lost sales and OWW's infringement to be missing when it granted OWW's JMOL on Alps's lost profits claims, describing Alps's evidence of causation as pure

"speculation." JA012805. The injunction should be reversed. *See Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) *("Apple II")*.

**A.    Alps Had to Show That the Features Covered by the '109 Patent are Important to Consumer Demand.**

To prove irreparable harm, a patentee must establish "a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple II*, 695 F.3d at 1374. This requires proof that "the infringing feature drives consumer demand for the accused product." *Id.* at 1375. The patentee must show a "connection between the patented feature and demand for [the accused] products"; specifically, that the "specific patented [feature] is an important driver of consumer demand." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1364–65 (Fed. Cir. 2013) ("*Apple III*"). This prevents "leverag[ing of the] patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Apple II*, 695 F.3d at 1375.

The '109 Patent's "inventive contribution," if any, is very limited. The sole reason given by the PTO for patentability was the purportedly "unexpected" shear resistance or durability of the SEEPS gel-fabric composites relative to the prior art. JA007945. Alps did not show this durability to be an "important driver" of consumer demand for OWW's products. *See Apple III*, 735 F.3d at 1365.

Consumer demand for prosthetic liners is driven by many factors. Silicone liners are the most durable but may cause skin problems. JA012109. Urethane gel

liners are softer and more comfortable but less durable and may also cause skin problems without proper lubrication.  JA012111–12.  Thermoplastic gel liners are more comfortable than both silicone and urethane gel liners, but less durable.  JA012109.  Quality of the fabric, thickness of the gel, the method of suspending the prosthetic leg or arm, and price also influence consumer choice.  For patients with irregularly shaped residual limbs, fit may be most important, as these patients have to order custom-made liners (which OWW makes and Alps does not).  JA012117.  While Alps need not exclude all of these factors as reasons for consumer demand for OWW's products, the complexity of consumer choices illustrates the difficulty of Alps's burden.

## B.  Alps Did Not Demonstrate a Causal Nexus.

While Mr. Chen, Dr. Atwood, and Dr. Laghi touted the "revolutionary" impact of Chen's invention, the record is devoid of evidence linking consumer demand for OWW's products to a patented feature.  Neither of Alps's economic damages experts did any independent analysis of consumer demand.  Its royalty expert simply assumed that consumer demand is driven by "what Dr. Atwood said or what has been testified to."  JA012646.  Alps's lost profits expert testified he did not even consider whether consumer demand was driven by the patented invention—he "[did not] think that's important." JA012589.

There was testimony from James McElhiney, a prosthetist and amputee, that OWW's SEEPS gel liners are more comfortable than silicone liners. JA012125–26. However, isolated quotations from consumers praising covered features "do not begin to prove that those particular features drive consumer demand in any more than an anecdotal way." *See Apple III*, 735 F. 3d at 1366 (quoting the district court opinion). Moreover, McElhiney praised OWW's liners for their improved comfort (which he attributed to the softness of SEEPS gel), not for superior durability—here, the supposed basis for patentability. This testimony therefore does not even begin to demonstrate that the patented invention is an "important driver" of consumer demand.

The district court's own findings affirmatively show there is no nexus. During trial, the court granted judgment for OWW on Alps's lost profits claim. JA012805. "To recover lost profits damages the patentee must show a reasonable probability that 'but for' the infringement, it would have made the sales that were made by the infringer." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc). The patentee must establish at least a "reasonable probability" of causation. *Id.* To show the nexus needed to secure an injunction, the patentee likewise has to demonstrate a causal "connection between the patented feature and demand for [the accused] products." *Apple III*, 735 F. 3d at 1364.

Since the two showings present essentially the same causation threshold, Alps's failure to make one precludes it from making the other.

The district court characterized the connection between Alps's evidence of lost sales and OWW's alleged infringement as pure "speculation." JA012805. It found that "there is no way that anyone could conclude how much of the market would go to a silicone-produced product or stay with a gel-produced product," JA012805, a consequence of Alps's failure to present evidence that the specific patented features are important to consumers. The court pointed out that Alps did not even attempt to do a market study. JA012806.

Because "the causal nexus inquiry is … part of the irreparable harm calculus," the court abused its discretion in finding irreparable harm without even addressing OWW's argument that a causal nexus was lacking. Indeed, Alps's failure to establish lost profits precluded, as a matter of law, a finding of irreparable harm on the basis of lost sales. The permanent injunction should be reversed.

## VII. THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING OWW IN CONTEMPT OF THE PERMANENT INJUNCTION.

The district court erred in finding OWW's redesigned products to be no more than colorably different from the adjudged infringing products. The court improperly permitted Alps to raise a new infringement theory, even though, unless the patent owner can prove infringement under the same theory as at trial, the

53

redesigned product is more than colorably different. Alps depended on a new construction of the relevant claim language that was plainly inconsistent with Alps's previous positions throughout this litigation. Adjudicating the merits of Alps's novel infringement position in a summary contempt proceeding was improper. Finally, even if the court did not err in addressing infringement, its conclusion that the redesigned products infringe was clearly erroneous, as the court misconstrued the dispositive claim language.

## A. Analysis of Colorable Differences Focuses on "How the Patentee in Fact Proved Infringement" at Trial.

On a contempt motion, the moving party has to prove by clear and convincing evidence "both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (en banc). "[T]he colorable-differences standard focuses on how the patentee in fact proved infringement, not what the claims require." *nCube Corp. v. Seachange Int'l Inc.*, 732 F.3d 1346, 1351 (Fed. Cir. 2013). This separation of the two prongs of *TiVo* protects the values of notice and procedural fairness by "keeping contempt suitably limited." *Id.* Colorable-differences analysis begins with identifying "those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims." *TiVo*, 646 F.3d at 882. Where one or more of those elements has

54

been modified or removed, the court must determine whether that modification is significant. *Id.* When the differences are "significant," the newly accused product must be deemed more than colorably different. *Id.*

### B. OWW Redesigned its Products in View of What Alps and Inventor Chen Had Consistently Represented to be the Scope of Claims 1–3.

The district court paid no attention to how Alps "in fact proved infringement" at trial, instead permitting Alps to advance an infringement theory that was both new and plainly contrary to Alps's position throughout this litigation (as well as the inventor's statements throughout prosecution) on the scope, meaning, and purported grounds for patentability of the asserted claims. For the court to accept Alps's novel theory during the contempt hearing, rather than to adjudicate its merits in the separate declaratory judgment action that OWW had filed, was error.

Before the contempt proceedings, Alps had always urged that the asserted claims of the '109 Patent, including claims 1–3, require 100 pbw SEEPS to 300–1,600 pbw oil. At trial, Dr. Atwood testified that "100 parts by weight" of claim 1 "refers to, in its essential feature, the SEEPS polymer." JA012291. He testified that the "only major difference" difference between claims 1 and 11 is "the source of the SEEPS polymer": claim 11 is limited to the Septon 4055 and Septon 4033 SEEPS polymers manufactured by Kuraray, while "[c]laim 1 just wants the SEEPS

polymer regardless" of the manufacturer. JA012337–38. This cannot be reconciled with Alps's position in the contempt proceeding that claim 1 may be infringed with less than 100 pbw SEEPS to 300–1,600 pbw oil.

Dr. Atwood's trial testimony was consistent with Alps's earlier position and Chen's statements during prosecution. When construed before trial, the claims did not yet have the amendments added during reexamination. Thus, claims 1–3 did not have the "comprising [SEEPS]" language, but recited only hydrogenated SIBs. Alps, however, argued that "hydrogenated [SIB](s)" should be construed essentially as "SEEPS," such that claims 1–3 would require 100 pbw SEEPS to 300–1,600 pbw oil. JA002710. Indeed, when Chen amended the claims during reexamination, he insisted that the "comprising [SEEPS]" language did not narrow the claims. JA003726.

OWW redesigned its products in view of this position that all of the asserted claims required 100 pbw SEEPS to 300–1,600 pbw oil. OWW eliminated Septon 4055 altogether and reduced the amount of Septon 4033, replacing them with non-SEEPS hydrogenated SIBs (*i.e.*, J-Series). JA016938–39. As a result, the amount of SEEPS fell from 100 pbw SEEPS to 400 pbw oil in the products at issue during trial to 100 pbw SEEPS to 2,600 pbw oil, below the required ratio. *Id.*

During the contempt hearing, however, Alps opportunistically advanced a new claim construction, arguing for the first time that claims 1–3 only require

56

*some measurable amount* of SEEPS, provided it is part of a mixture of 100 pbw hydrogenated SIBs to 300–1,600 pbw oil. JA014482–83. Without acknowledging that this presented a new issue from trial or that Alps' argument contradicted its earlier position, the district court accepted it, holding that "[w]hether the J-Series contained in the Advance Gel Products is a SEEPS copolymer is a distinction without a colorable difference because these products contain Septon 4033, a SEEPS copolymer." JA000182.

This was an abuse of discretion. Contempt is inappropriate where there is "a fair ground of doubt as to the wrongfulness of the defendant's conduct." *TiVo*, 646 F.3d at 881-882. OWW's ███████████████████████████████ ███████████████████████████████████████████ raised at least "a fair ground of doubt" as to whether they infringe. The district court's addressing that question in a contempt proceeding denied OWW the appropriate notice before it could be held in contempt and undermined "the policy that legitimate design-around efforts should always be encouraged as a path to spur further innovation." *Id.* at 883.

### C. The Advanced Gel Products are More Than Colorably Different from the Original Gel Products Irrespective of Alps's Previous Positions Regarding the Scope of Claims 1–3.

Even if Alps's contempt-induced claim construction was merely novel (as opposed to also contradicting how Alps and the inventor had consistently

characterized the claims before the contempt motion), the court's contempt finding was still an abuse of discretion.  As *nCube* made clear, the patent owner cannot advance a new infringement theory in a contempt motion, as the focus is on "how the patentee in fact proved infringement" at trial, not "what the claims require." 732 F.3d at 1351.

In *nCube*, Claim 4 of a patent on a "video-on-demand" technology recited a method for retrieving and transporting data between a client and a server, requiring, inter alia, an "upstream physical address" to be updated in a "connection service table." *Id.* at 1348.  SeaChange's accused ITV system utilized a series of identifiers, or data fields containing certain addressing information. *Id.*  At trial, ARRIS singled out the ClientID, an identifier situated in the system's Connection Table and proved that it met the "upstream physical address" limitation.  *Id.* Following a verdict of infringement, SeaChange redesigned the ITV system by moving the ClientID from the Connection Table to elsewhere. *Id.* at 1349.  ARRIS moved to hold SeaChange in contempt. *Id.* at 1348.  The ClientID no longer met the "upstream physical address" limitation (it was now updated *outside* the Connection Table), but ARRIS argued that the redesigned system infringed and was no more than colorably different because the SessionID, another identifier in the Connection Table, also met the "upstream physical address" limitation (since it too contained the "MAC address"). *Id.* at 1350-51.

ARRIS argued that changing the infringing system Connection Table "with the two MAC addresses" to a modified system's "with only one" was insignificant. *Id.* at 1351. This Court, however, noted that, "for this argument to hold sway, the MAC address must be the portion of the ClientID that meets the upstream physical address limitation," but at trial ARRIS "never called out the MAC address as the infringing aspect" of the ClientID and instead relied on the ClientID as a whole to prove infringement. *Id.* While ARRIS was "under no obligation to prove every possible avenue of infringement at trial," it could not raise a new infringement theory in a contempt proceeding. *Id.*

*nCube* is on point. Just as ARRIS's trial proof focused on the ClientID, Alps's trial proof that together Septon 4055 and Septon 4033 in the Original Gel products met the "polymer-to-oil-ratio" limitation was that each is SEEPS (the polymer Alps's expert described as the "essential feature" and the "essential polymer component" of the invention). JA012291. Just as *nCube's* ClientID no longer met the "upstream physical address" limitation, the ratio of the remaining SEEPS to oil (100 pbw SEEPS to 2,600 pbw oil) in the redesigned products is far below what the claims require. Just as ARRIS asserted for the first time in its contempt motion that something other than the ClientID satisfied the relevant limitation, Alps's contempt motion asserted for the first time that something other than SEEPS (a non-SEEPS hydrogenated SIB) counts toward "100 parts by

weight" of claims 1–3.  The district court improperly ignored *TiVo*'s separation of the colorable-differences and infringement prongs, focusing on "what the claims require" instead of how Alps "in fact proved infringement" at trial.  Its finding that the redesigned Advanced Gel products are no more than colorably different from the Original Gel products was clearly erroneous.

### D.  The District Court Incorrectly Construed the Dispositive Claim Language.

Even if Advanced Gel products were no more than colorably different from Original Gel products, the district court's contempt finding was still in error because the redesigned products do not infringe claims 1–3.  Its claim construction that "comprising [SEEPS]" modifies "one or a mixture" instead of "hydrogenated [SIB](s)" is not only grammatically incorrect but would improperly broaden the claims to cover mixtures of hydrogenated SIBs having a *single molecule* of SEEPS.

The written description states that the "the invention comprises" gels made from "100 parts by weight of one or more hydrogenated [SIBs] *of the formula* [SEEPS]" to 300–1,600 pbw oil. JA000203 (emphasis added).  Nowhere does it describe a gel composition made from 100 pbw hydrogenated SIBs to 300–1,600 pbw oil in which the hydrogenated SIBs are anything other than SEEPS.

The prosecution history also supports OWW's construction.  During reexamination, the PTO rejected all claims.  JA000778.  In response, Chen

amended the claims to include the "comprising [SEEPS]" language, insisting that this language did not narrow the scope of the claims, JA003726, as he believed that claims 1–3 had required SEEPS all along.  For Chen, then, claims 1–3, both before *and after* the amendment, required 100 pbw SEEPS to 300–1,600 pbw oil.  The PTO still rejected the amended claims as obvious. JA006897.  It noted "no evidence, commensurate in scope with the composite article of the claims, demonstrating unexpected results."  JA006942.  In response, Chen conducted his demonstration.  Critically, *all* of the polymers in Chen's "representative" SEEPS gel-fabric composite were SEEPS.  JA008529–30.  The SEEPS-only sample is what Chen considered to be evidence "commensurate in scope" with the claims. This demonstration of purportedly unexpected results was the PTO's sole reason for allowing the claims.  JA007945. By broadening the scope of the amended claims to cover gel-fabric composites having any measurable amount of SEEPS, the district court's construction would gut the PTO's reason for allowing the claims.

During the contempt hearing, Alps defended its construction on the basis of claim differentiation.  JA017812.  Alps pointed the district court to claim 11, which expressly requires 100 pbw SEEPS (specifically, Septon 4055 or Septon 4033) to 300–1,600 pbw oil, and asserted that OWW's construction of claim 1 would render claim 11 redundant.  *Id.*  In fact, Dr. Atwood explained the difference

61

between claims 1 and 11.  Claim 11 is limited to the Septon 4055 and Septon 4033 SEEPS polymers manufactured by Kuraray, while "[c]laim 1 just wants the SEEPS polymer regardless" of the manufacturer. JA012337–38.  This confirms OWW's construction of the SEEPS language in claims 1-3.  In any event, the written description and prosecution history can overcome any presumption arising from the doctrine of claim differentiation.  *See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000).  Here, the written description and Chen's comments during reexamination establish that claims 1–3 require 100 pbw SEEPS to 300–1,600 pbw oil.

The district court's contempt finding should be revered, as it was an abuse of discretion under *Tivo* and *nCube* and it was based on an incorrect claim construction.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For all of the above reasons, OWW respectfully requests that this court reverse the judgment below and enter judgment for OWW for lack of prudential standing and invalidity of the asserted claims; reverse the judgment below and enter judgment for OWW that there was no willful infringement and judgment denying Alps's requests for enhanced damages, determination that this case is exceptional, and attorney fees; reverse the injunction below, or, in the alternative,

vacate it and remand; and reverse the order below holding OWW in contempt and the associated contempt sanctions.

Dated:  February 27, 2014                    Respectfully submitted,

                                             /s/ John D. Luken
                                             John D. Luken
                                             Joshua A. Lorentz
                                             Brian S. Sullivan
                                             DINSMORE & SHOHL, LLP
                                             255 E. Fifth St., Suite 1900
                                             Cincinnati, Ohio  45202
                                             Tele:  513.977.8564
                                             John.Luken@Dinsmore.com
                                             Joshua.Lorentz@Dinsmore.com
                                             Brian.Sullivan@Dinsmore.com

                                             *Attorneys for Defendant-Appellant, The Ohio Willow Wood Company*

2013-1452, -1488, 2014-1147

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ALPS SOUTH, LLC,

*Plaintiff-Cross Appellant*,

v.

THE OHIO WILLOW WOOD COMPANY,

*Defendant-Appellant*.

_____

Appeals from the United States District Court for the
Middle District of Florida in Case No. 08-CV-1893, Judge Mary S. Scriven
_____

## PUBLIC ADDENDUM TO BRIEF OF DEFENDANT-APPELLANT

John D. Luken
Joshua A. Lorentz
Brian S. Sullivan
DINSMORE & SHOHL, LLP
255 E. Fifth St., Suite 1900
Cincinnati, Ohio 45202
Tele: 513.977.8564
John.Luken@Dinsmore.com
Joshua.Lorentz@Dinsmore.com
Brian.Sullivan@Dinsmore.com

*Attorneys for Defendant-Appellant*

Material has been deleted from the JA00182-3. This material was redacted by the court below at the time of issuance of the opinion.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ALPS SOUTH, LLC,**
**a Florida limited liability company,**

      **Plaintiff,**

**v.**                     **Case No. 8:08-cv-1893-T-33MAP**

**THE OHIO WILLOW WOOD**
**COMPANY, an Ohio corporation,**

      **Defendant.**

_____/

## ORDER

THIS cause is before the Court on Defendant, The Ohio Willow Wood Company's ("OWW"), Motion to Dismiss for Lack of Standing (Dkt. 31). The Court reviewed both the Motion to Dismiss, as well Alps South, LLC's ("Alps") Response (Dkt. 34), and heard oral argument regarding the same on February 3, 2010. Based thereon, the Court finds the following:

The Patent Act provides that a patentee shall have remedy by a civil action for infringement of its patent, and the Patent Act defines the term "patentee" to include not only the patentee to whom the patent was issued, but also the successors in title to the patentee. The title to a patent may be transferred, as provided by law, which states that a patentee may grant and convey an exclusive right under his application for patent, or patents, to the whole or any specific part of the United States. When a patentee transfers all substantial rights under a patent, the transferee may effectively be deemed the patentee under the statute with standing to bring an infringement action in its own name. Restorative Products, Inc. v. MMAR Med. Group, Inc., 1996 WL 221786, *3 (April 29, 1996 M.D. Fla.); Applied Interact, LLC v. Vermont Teddy Bear Company, Inc., 2005 WL 1785115, *3 (July 28, 2005 S.D. N.Y.).

The substantial rights to a patent include the right to exclude others from making, using, or selling the invention in the United States, the right to transfer, and the right to sue. An exclusive licensee that has not been assigned all substantial rights in a patent can only bring suit as a co-plaintiff with the patentee in order to have standing.

Alps and Applied Elastomerics, Inc. entered into a Patent Sale and License Agreement ("Agreement") on August 31, 2008, under which Alps is named the exclusive licensee of the patents at issue in this case. The Agreement provides Alps with the substantial rights of excluding others and the rights to transfer and sue while Applied Elastomerics, Inc. retained or reserved some rights. The rights retained or reserved are not substantial enough under the language of the agreement or case law construing similar agreements to require that Applied Elastomerics, Inc. be joined as a co-plaintiff.

Alps and Applied Elastomerics, Inc. also entered into an Amended Agreement on January 28, 2010, with an effective date of August 31, 2008. Under the Amended Agreement, Alps clearly possesses the substantial rights to proceed without Applied Elastomerics in this case.

It is hereby

**ORDERED, ADJUDGED and DECREED** that:

1.    Defendant The Ohio Willow Wood Company's Motion to Dismiss for Lack of Standing (Dkt. 31) is **DENIED**.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, on the 11th day of February 2010.

Virgini m. Hernonly Coving

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

2

Copies to:

Counsel of Record

3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**HONORABLE MARY S. SCRIVEN**

| | |
|---|---|
| CASE NO.  8:08-cv-01893-MSS-MAP | DATE: April 24, 2012 |
| TITLE:  ALPS South, LLC v. The Ohio Willow Wood Company | |
| TIME: 10:05AM-12:05PM/1:20-2:35PM | TOTAL:  3 hours and 15 minutes |
| Courtroom Deputy: Anaida Vizza | |
| Court Reporter: Janie Gibbs | |
| Counsel for Plaintiff(s):  Ronald Christaldi, Mindi Richter , and Jason Stearns | |
| Counsel for Defendant(s):  F. Michael Speed, Jeffrey Standley  and Patrick Risch | |

### *CLERK'S MINUTES: PROCEEDINGS OF*
### *HEARING ON STANDING*

10:05AM Court called to order. Proffer by Mr. Christaldi. Proffer by Mr. Speed.

12:05 PM Lunch recess.

1:20 PM   Court back in session. Mr. Christaldi believes that standing is a technical issue, and requests that this matter proceed to trial on Monday or soon thereafter. Mr. Speed requests that the Court find that the Plaintiffs have no standing and that adding a party cannot cure or provide a remedy. The Court finds that the amended agreement cured the prudential standing issue. The Plaintiff, at their discretion, may move for leave to file an amended complaint. In the event that leave is granted to file an amended complaint, trial in this matter would be continued. Parties inform the Court that they are ready to proceed to trial on Monday April, 30, 2012. The Court will set aside 7 days for this trial (3.5 days per side); the trial will be in recess on Tuesday, May 8, 2012. Parties are to exchange their witness and exhibit list 24-48 hours prior to trial commencing.

2:35 PM Court is adjourned.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ALPS SOUTH, LLC,

                    Plaintiff,

-vs-                                              Case No.  8:08-cv-1893-T-35MAP

THE OHIO WILLOW WOOD COMPANY,

                    Defendant.
_____/

## JUDGMENT IN A CIVIL CASE

    **IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of Plaintiff ALPS and against Defendant OWW on the issue of inequitable conduct.

Date:   July 16, 2012

                          SHERYL L. LOESCH, CLERK

                          By:    B. Sohn, Deputy Clerk

Copies furnished to:

Counsel of Record

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)  **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

    (b)  **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)  **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)  **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5**: The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)  **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.  **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

    (a)  **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

    (b)  **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c)  **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d)  **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e)  **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.  **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant

4.  **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Rev.: 4/04

-2-

JA000099

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ALPS SOUTH, LLC,**

Plaintiff,

-vs-                                                        Case No.  8:08-cv-1893-T-35MAP

**THE OHIO WILLOW WOOD COMPANY,**

Defendant.

_____/

## AMENDED JUDGMENT IN A CIVIL CASE

On May 10, 2012, the issues of whether OWW infringed the '109 patent; whether OWW willfully infringed the '109 patent; and whether the '109 patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration. On May 11, 2012, the jury found that OWW did infringe the '109 patent, OWW willfully infringed the '109 patent, and the '109 patent was valid. The Court, upon the close of the evidence, took the defense of inequitable conduct under consideration. On July 13, 2012, the Court ruled that OWW has not demonstrated by clear and convincing evidence that Mr. Chen engaged in inequitable conduct during the original prosecution of the '109 patent or the reexamination of the '109 patent.

Upon consideration of the foregoing, **IT IS ORDERED** that Judgment is entered for the Plaintiff, **ALPS SOUTH, LLC** and against the Defendant, **THE OHIO WILLOW WOOD COMPANY** with respect to the '109 Patent as to the issues of infringement; willful infringement; and validity due to anticipation or obviousness by prior art. Judgment is entered in the amount of $3,983,512.00.

**IT IS FURTHER ORDERED** that Judgment is entered for the Plaintiff, **ALPS SOUTH, LLC** and against the Defendant, **THE OHIO WILLOW WOOD COMPANY** with respect to the '109 Patent as to the issue of inequitable conduct.

Date:  July 19, 2012

SHERYL L. LOESCH, CLERK

By: /s/A. Vizza, Deputy Clerk

Copies furnished to:

Counsel of Record
Unrepresented Parties

## CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. Section 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

   (b) **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. Section 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d) **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5:** The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

   (a) **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b) **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c) **Fed.R.App.P.4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d) **Fed.R.App.P.4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e) **Fed.R.App.P.4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant

4. **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Rev.: 4/04

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ALPS SOUTH, LLC,**

Plaintiff,

-vs-                                    Case No. **8:08-cv-1893-T-35MAP**

**THE OHIO WILLOW WOOD COMPANY,**

Defendant.

_____/

## SECOND AMENDED
## JUDGMENT IN A CIVIL CASE

On May 10, 2012, the issues of whether OWW infringed the '109 patent; whether OWW willfully infringed the '109 patent; and whether the '109 patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration. On May 11, 2012, the jury found that OWW did infringe the '109 patent, OWW willfully infringed the '109 patent, and the '109 patent was valid. The Court, upon the close of the evidence, took the defense of inequitable conduct under consideration. On July 13, 2012, the Court ruled that OWW has not demonstrated by clear and convincing evidence that Mr. Chen engaged in inequitable conduct during the original prosecution of the '109 patent or the reexamination of the '109 patent.

Upon consideration of the foregoing, **IT IS ORDERED** that Judgment is entered for the Plaintiff, **ALPS SOUTH, LLC** and against the Defendant, **THE OHIO WILLOW WOOD COMPANY** with respect to the '109 Patent as to the issues of infringement; willful infringement; and validity due to anticipation or obviousness by prior art, non-

enablement and written description. Judgment is entered in the amount of $3,983,512.00.

    **IT IS FURTHER ORDERED** that Judgment is entered for the Plaintiff, **ALPS SOUTH, LLC** and against the Defendant, **THE OHIO WILLOW WOOD COMPANY** with respect to the '109 Patent as to the issue of inequitable conduct.

Date:  July 31, 2012

                                          SHERYL L. LOESCH, CLERK

By: _____

              /s/A. Vizza, Deputy Clerk

Copies furnished to:

Counsel of Record
Unrepresented Parties

## CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. Section 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

   (b) **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. Section 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d) **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5:** The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

   (a) **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing. Special filing provisions for inmates are discussed below.

   (b) **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c) **Fed.R.App.P.4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d) **Fed.R.App.P.4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e) **Fed.R.App.P.4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant

4. **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Rev.: 4/04

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ALPS SOUTH, LLC, a Florida**
**Corporation,**

      **Plaintiff,**

**v.**

                                **Case No. 8:08-cv-1893-T-35-MAP**

**THE OHIO WILLOW WOOD**
**COMPANY, an Ohio Corporation,**

      **Defendant.**

_____/

**ORDER**

    **THIS CAUSE** comes before the Court for consideration of The Ohio Willow

Wood Company's ("OWW") Renewed Motion for Judgment as a Matter of Law, or in the

Alternative, Motion for a New Trial, or for Remittur (Dkt. 356) and Alps South, LLC's

("ALPS") Response in Opposition. (Dkt. 364)  For the reasons that follow, the Court

finds that the jury's verdict in relation to infringement, willful infringement, damages and

validity is supported by the evidence presented at trial and there is no basis to conclude,

as OWW urges, that no reasonable jury could have reached the verdict rendered in this

case.  Accordingly, OWW's Renewed Motion for Judgment as a Matter of Law, or in the

Alternative, Motion for a New Trial, or for Remittur (Dkt. 356) should be and hereby is

**DENIED**.

  **I.  BACKGROUND**

    ALPS initiated this action alleging OWW infringed U.S. Patent Nos. 6,552,109

(the "'109 Patent") and 6,867,253 (the "'253 Patent") (collectively "patents-in-suit").

(Dkt. 35) OWW filed a two-count counterclaim seeking a declaratory judgment that (1) OWW did not infringe on the patents-in-suit; (2) the patents-in-suit are invalid and unenforceable; and (3) the patents-in-suit are unenforceable due to the inequitable conduct of the inventor, Mr. Chen. (Dkt. 39)

During the litigation, the patents-in-suit were submitted for re-examination and the patents-in-suit were reissued by the United States Patent and Trademark Office ("PTO"). A Re-examination Certificate was issued on the '253 Patent on June 7, 2011. (Dkt. 185-4) A Re-examination Certificate was issued on the '109 Patent on July 5, 2011. (Dkt. 175)

The jury trial began in this action on April 30, 2012. During the trial, all the asserted claims related to the '253 patent were dismissed. On May 10, 2012, the issues of whether OWW infringed the '109 Patent; whether OWW willfully infringed the '109 patent; and whether the '109 Patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration. On May 11, 2012, the jury found that OWW did infringe Claims 1-3, 5, 6, 11 and 12 of the '109 Patent, OWW willfully infringed the '109 Patent, and the '109 Patent was valid.

## II.  LEGAL STANDARD

Rule 50 of the Federal Rules of Civil Procedure ("Rule 50") allows the Court to grant a motion for judgment as a matter of law ("JMOL Motion") if a party has been fully heard on an issue during a jury trial, and the Court finds that no reasonable jury would have had a legally sufficient evidentiary basis to find for the non-moving party on that issue. Fed. R. Civ. P. 50(a)(1). In considering a JMOL Motion, the court must "consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the

JA000107

nonmoving party . . . [and] in this light, [determine whether] there was any legally sufficient basis for a jury to find in favor of the nonmoving party." Powell v. Home Depot, U.S.A., Inc., 663 F.3d 1221, 1228 (Fed. Cir. 2011)(quoting Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc., 615 F.3d 1352, 1360 (11th Cir. 2010)). The Court does not "make credibility determinations or weigh the evidence." Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 724 (11th Cir. 2012). However, "credence [is given] to evidence supporting the nonmoving party's case, as well as 'uncontradicted and unimpeached' evidence supporting the moving party, 'at least to the extent that that evidence comes from disinterested witnesses." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 503 U.S. 133, 150-51 (2000)).

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Court has discretion to grant a new trial if the verdict appears to be against the weight of the evidence, the damages are excessive, there are substantial errors in admission or rejection of evidence or instructions to the jury, or that, for other reasons, the trial was not fair to the movant. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940). Although a court may exercise its discretion in determining whether to grant a new trial, it cannot displace a jury's verdict merely because it disagrees with it or because a contrary verdict may have been equally supportable. Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1310 (Fed. Cir. 2011).

3

## III.   DISCUSSION

### A. Judgment as a Matter of Law

Against Rule 50's high standard, OWW asserts four grounds to overturn this verdict.  First, it claims that the '109 Patent was not infringed because the '109 patent required a level of crystallinity (20%) of the challenged polymer component, which it claims was not proven by ALPS to have been met by OWW's infringing products. Second, it claims that no reasonable jury would have had a legally sufficient evidentiary basis to find for ALPS on the issue of whether the claims of the '109 patent were anticipated by the Hammond Reference (i.e. International Publication No. WO 93/23472), which incorporated by reference European Patent Application 0108518 to Debbaut or prior art of the inventor, Mr. Chen.  Third, OWW argues that no reasonable jury would have had a legally sufficient evidentiary basis to find the '109 patent nonobvious.  Fourth, OWW argues that it is entitled to a directed verdict on willfulness.

The Court, having considered each of these contentions at trial and on this renewed motion, again finds that OWW's motion should be **DENIED**.  First, with regards to OWW's first contention, nowhere in the claims of the '109 patent is there a requirement for 20% crystallinity in the gel polymer used in the composite. Even though there was evidence regarding a crystallinity requirement of the gel polymer the jury was apparently not persuaded by the evidence or the arguments made by Defendant to determine that Defendant did not infringe the '109 Patent.  Thus, any challenge grounded in the failure of ALPS to prove up the crystallinity of the OWW's offending product or the jury's failure to conclude that the '109 patent was not infringed in the absence of proof of 20% crystalinity in the infringing product must fail.

4

Second, there was record evidence from which the jury, like the PTO, could have concluded that the '109 patent was not anticipated by or rendered obvious by the Hammond Reference and any patent incorporated therein. Certainly, OWW has not shown on this motion that no reasonable jury could have found that OWW failed to meet its high burden of showing by clear and convincing evidence that the '109 Patent was either anticipated by or rendered obvious by the Hammond Reference or other prior art of Mr. Chen's inventions, specifically U.S. Patent No. 5,336,708. Particularly, as ALPS asserts: "Every piece of alleged prior art that OWW pointed to during trial for its obviousness defense was already considered by the PTO during prosecution and/or the reexamination. When the prior art has been considered by, and rejected, by the USPTO, it is even more difficult to overcome the presumption of nonobviousness." (Dkt. 364 at 10)(citing Hewlitt-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1467 (Fed. Cir. 1990)). Where, as here, the patent has also been upheld through a reexamination, OWW's burden of proving invalidity was more difficult to sustain. See PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1304 (11th Cir. 2008)("When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job.").

OWW's final contention is that the jury's willfulness findings essentially build upon its infringement findings that were unsupported. However, if the jury's finding of infringement is upheld, as it is here, the willfulness findings follow *a fortiori* on this record. The evidence at trial, as catalogued in ALPS' Response in Opposition (Dkt. 364 at 14-18), was more than adequate to demonstrate willful infringement. Evidence of

5

OWW's pattern of behavior and intent to infringe and of its admission that it continued to infringe even after reissuance of the '109 Patent and that its principal did nothing in response to demands to either purchase a license or stop infringing was more than sufficient to support a finding of willfulness. Certainly, the Court cannot find that no reasonable jury could have so concluded.

### B. New Trial

In the alternative to its request for judgment as a matter of law OWW seeks a new trial. OWW's request for a new trial essentially reasserts its claims for judgment as a matter of law in that it is based largely on the contention that the '109 Patent is obvious and any contrary judgment would work a manifest injustice. Because the Court has already concluded that the evidence could reasonably support the jury's verdict on this issue and the other issues raised, this claim fails.

Likewise, OWW's assertion that the damages verdict is excessive and warrants a new trial on damages fails. ALPS offered factual evidence and expert testimony on this issue. Its expert witness, Mr. Oscher, whose credentials were largely unassailed, testified that in his opinion a reasonable royalty in this case should be in the range of 15% to 20%. (Dkt. 372 at 63) In determining what a reasonable royalty should be in this case, Mr. Oscher applied the 15 well established factors first set forth in <u>Georgia–Pacific Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), for determining a reasonable royalty in a hypothetical negotiation between a patent holder and infringer of his patent. In his testimony, Mr. Oscher addressed each of the factors and explained his opinion regarding its impact on the hypothetical negotiation between ALPS and OWW. Although Defendant OWW offered a different hypothesis through a different

6

expert, the jury apparently accepted Mr. Oscher as more credible. As noted, the Court's role here is not to reweigh the evidence or substitute its judgment for that of the jury's; but rather, the "court must draw all reasonable inferences in favor of the nonmoving party." Reeves, 530 U.S. at 150. If the Court, constrained to that level of review, determines the verdict to be supportable by the evidence, it must leave the verdict intact. Accordingly, the Court finds that no new damages determination or remittitur is appropriate against this verdict.

## IV.    Conclusion

Upon consideration of the foregoing, it is hereby **ORDERED** that The Ohio Willow Wood Company's Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for a New Trial, or for Remittur (Dkt. 356) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida this 13th day of November 2012.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
  All Counsel of Record
  All *Pro Se* parties

7

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ALPS SOUTH, LLC, a Florida**
**Corporation,**

     **Plaintiff,**

**v.**

                              **Case No. 8:08-cv-1893-T-35-MAP**

**THE OHIO WILLOW WOOD**
**COMPANY, an Ohio Corporation,**

     **Defendant.**

_____/

## <u>ORDER</u>

**THIS CAUSE** comes before the Court for consideration of The Ohio Willow

Wood Company's ("OWW") Motion for Equitable Intervening Rights (Dkt. 355) and Alps

South, LLC's ("ALPS") Response in Opposition.  (Dkt. 363)  Upon consideration of all

relevant filings, case law, and being otherwise fully advised, the Court hereby **DENIES**

OWW's Motion for Equitable Intervening Rights (Dkt. 355), as described herein.

OWW contends that it is entitled to equitable intervening rights.   Plaintiff objects

citing OWW's adverse jury verdict, which found OWW liable for willful infringement, and

citing the absence of proof of actual losses that would be sustained upon a failure to

obtain equitable intervening rights.

35 U.S.C. § 252 provides, in pertinent part, that:

A reissued patent shall not abridge or affect the right of any person or
that person's successors in business who, prior to the grant of a reissue,
made, purchased, offered to sell, or used within the United States, or
imported into the United States, anything patented by the reissued
patent, to continue the use of, to offer to sell, or to sell to others to be
used, offered for sale, or sold, the specific thing so made, purchased,

offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

35 U.S.C. § 252. This second paragraph of section 252 establishes two separate and distinct defenses under the doctrine of intervening rights: absolute intervening rights and equitable intervening rights. BIC Leisure Prods., Inc. v. Windsurfing Intern, Inc., 1 F.3d 1214, 1220 (Fed. Cir. 1993). The Court has the discretion to grant the accused infringer "equitable intervening rights" to the "continued manufacture, use, or sale of additional products covered by the reissue patent when the [accused infringer] made, purchased, or used identical products, or made substantial preparations to make, use, or sell identical products, before the reissue date." Id. at 1221.

Factors district courts may consider to ascertain whether application of equitable intervening rights is warranted are

(1) whether substantial preparation was made by the infringer before the reissue; (2) whether the infringer continued manufacturing before reissue on advice of its patent counsel; (3) whether there were existing orders or contracts; (4) whether non-infringing goods can be manufactured from the inventory used to manufacture the infringing product and the cost of conversion; (5) whether there is a long period of sales and operations before the patent reissued from which no damages can be assessed; and (6) whether the infringer made profits sufficient to recoup its investment.

2

<u>Visto Corp. v. Sproqit Technologies, Inc.</u>, 413 F. Supp. 2d 1073, 1090 (N.D. Cal. 2006) (citing <u>Seattle Box Co. v. Indus. Crating & Packing, Inc.</u>, 756 F.2d 1574, 1579 (Fed. Cir. 1985)).

Against this framework, OWW asserts that it had invested approximately two years of product testing and development into the accused products before manufacturing and selling the accused products in 1996. OWW asserts it invested in the development of intellectual property by filing numerous patent applications directed towards its prosthetic liner technology. Further, OWW asserts that the equipment used to make the accused products was specially designed and it has invested in an addition to its factory to support the manufacturing of the accused products. Moreover, OWW asserts that it pays the individual it contends is the inventor of the accused products a substantial amount in royalties annually.

OWW's contention that it is entitled to equitable intervening rights fails. First, as a willful infringer, as found by the jury in this case, it has unclean hands. Specifically, the jury determined that OWW willfully infringed the '109 patent. The evidence supporting this finding was substantial. It is axiomatic that equity demands that "[one] who seeks equity must do equity," OWW is not entitled to equitable relief, such as equitable intervening rights. As the Federal Circuit explained in <u>Shockley v. Arcan, Inc.</u>, 248 F.3d 1349 (Fed. Cir. 2001), because the infringer "did not have clean hands, the district court did not abuse its discretion in declining to exercise its equitable powers on [the infringer's] behalf. Equity's 'unclean hands' doctrine demands that '[one] who seeks equity must do equity.'... The record, with its finding of willful infringement, amply supports the district court's discretion to deny [the infringer] access to equity." <u>Shockley</u>,

JA000115

248 F.3d at 1361 (quoting <u>Mfrs.' Fin. Co. v. McKey</u>, 294 U.S. 442, 449 (1935)); <u>see also</u> <u>Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.</u>, 563 F.3d 1358, 1373 (Fed. Cir. 2009).

Second, the totality of the factors as applied to this record militates against OWW's entitlement to equitable intervening rights. OWW has produced evidence that it has made substantial preparation of the accused products prior to the '109 Patent reissuance. This evidence, however, is heavily outweighed by the fact that OWW's president testified that OWW's profits in the year prior to trial were sufficient to recoup its investment costs for the manufacture and production of the gel and fabric composite liners it sold. (Dkt. 392 at 52-53)("Q. Okay. Did Ohio Willow Wood realize a profit last year from its sale of gel and fabric composite liners? A. Yes. Q. Was that profit sufficient enough to recoup its investment in manufacturing and production of those liners? A. Yes.") OWW's recoupment weighs against its entitlement to equitable intervening rights. Further, OWW presented no evidence of existing orders or contracts that would be impacted if OWW were denied equitable intervening rights.

Upon consideration of the foregoing, it is hereby **ORDERED** that The Ohio Willow Wood Company's Motion for Equitable Intervening Rights (Dkt. 355) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida this 19th day of March 2013.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
  All Counsel of Record
  All *Pro Se* parties

4

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ALPS SOUTH, LLC, a Florida**
**Corporation,**

      **Plaintiff,**

v.

                                     **Case No. 8:08-cv-1893-T-35-MAP**

**THE OHIO WILLOW WOOD**
**COMPANY, an Ohio Corporation,**

      **Defendant.**
_____/

**<u>ORDER</u>**

      **THIS CAUSE** comes before the Court for consideration of Alps South, LLC's ("ALPS") Motion for a Permanent Injunction (Dkt. 323) and The Ohio Willow Wood Company's ("OWW") Response in Opposition. (Dkt. 331)  Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court hereby **GRANTS in part and DENIES in part** ALPS's Motion for a Permanent Injunction (Dkt. 323), as described herein.

**I.   BACKGROUND**

      ALPS initiated this action alleging OWW infringed U.S. Patent Nos. 6,552,109 (the "'109 Patent") and 6,867,253 (the "'253 Patent") (collectively "patents-in-suit"). (Dkt. 35)  OWW filed a two-count counterclaim seeking a declaratory judgment that (1) OWW did not infringe on the patents-in-suit; (2) the patents-in-suit were invalid and unenforceable; and (3) the patents-in-suit were unenforceable due to the inequitable conduct of the inventor, Mr. Chen.  (Dkt. 39)

During the litigation, the patents-in-suit were submitted for re-examination and were reissued by the United States Patent and Trademark Office ("USPTO"). A Re-examination Certificate was issued on the '253 Patent on June 7, 2011. (Dkt. 185-4) A Re-examination Certificate was issued on the '109 Patent on July 5, 2011. (Dkt. 175)

The jury trial began in this action on April 30, 2012. During the trial, all the asserted claims related to the '253 patent were dismissed. On May 10, 2012, the issues of whether OWW infringed the '109 Patent; whether OWW willfully infringed the '109 patent; and whether the '109 Patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration. On May 11, 2012, the jury found that OWW did infringe claims 1-3, 5, 6, 11 and 12 of the '109 Patent; that OWW willfully infringed the '109 Patent; and, that the '109 Patent was valid.

Now, ALPS seeks an order permanently enjoining OWW from making, using, selling, offering for sale, or importing into the United States any product infringing on the claims 1-3, 5, 6, 11, and 12 of the '109 Patent from the date of the Order granting a permanent injunction through the date that the '109 Patent expires on August 11, 2014. Further, Plaintiff seeks to enjoin any party who obtains any such product from OWW from using, selling or offering to sell, or importing into the United States any infringing OWW product.

## II. LEGAL STANDARD

Under the Patent Act, a district court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. A party seeking a permanent injunction in a patent infringement case must demonstrate:

2

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  The decision to grant or deny a permanent injunction "is an act of equitable discretion by the district court." Id.

## III. DISCUSSION

### A.  Permanent Injunction

#### i.  Irreparable Injury and Adequacy of Remedies Available at Law

ALPS argues that it is sustaining irreparable injury as a result of OWW's infringement.  As evidence of this irreparable injury, ALPS asserts that (1) OWW's infringement of the '109 Patent "is a clear abridgement" of a property right; (2) it has lost and is losing market share as a result of OWW's infringement; (3) it and OWW are direct competitors and distribute their products through the same channels of distribution; and (4) OWW's "low quality products" continue to damage ALPS's reputation.

On the other hand, OWW contends the following factors show that ALPS is not being irreparably injured by OWW: (1) the pre-existing license of the '109 Patent to Silipos, Inc., a direct competitor of ALPS; (2) the existence of other competitors in the market selling gel-fabric liners; (3) the lack of evidence to substantiate its claim that it is losing sales due to OWW's infringement; (4) the success of OWW's products is not correlated to the features claimed by the '109 Patent; and (5) ALPS's delay in licensing the '109 Patent and bringing suit against OWW.

3

JA000119

The evidence demonstrates that ALPS and OWW are direct competitors competing in the same market. (Dkt. 302 at 7-8, Dkt. 390 at 48)  This direct competition strongly weighs in favor of the assertion of ALPS that it will suffer irreparable injury without an injunction.  See Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.").  The Court finds that the evidence of Silipos, Inc.'s role as a competitor and other purported competitors is insufficient to overcome ALPS's showing of irreparable injury.  See Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1328 (Fed. Cir. 2008) ("A plaintiff's past willingness to license its patent is not sufficient per se to establish lack of irreparable harm if a new infringer were licensed.").  Accordingly, the Court concludes there is sufficient evidence to demonstrate that ALPS has suffered and will continue to suffer irreparable injury without injunctive relief.

Further, the Court finds that monetary damages will not fully compensate ALPS's injury.  ALPS has presented evidence that OWW provides a lower quality product to the market which has created a perception in the market that silicone liners are better than thermoplastic gel liners. (See Dkt. 301 at 64-65; Dkt. 302 at 31-32)  This perception impacts ALPS's ability to market and sell its product.  The difficulty in determining ALPS's loss of business opportunity or loss of goodwill based on this perception is a sufficient basis to conclude that the remedies at law would be inadequate to compensate ALPS for OWW's infringement.

4

### ii. Balance of Hardships

ALPS argues that the balance of hardships weighs in its favor of a permanent injunction. ALPS asserts that as a result of OWW's infringement ALPS is (1) losing sales; (2) being deprived of market share; (3) being deprived of funds necessary for further research and development; and (4) suffering reputational loss in relation to its products. OWW, however, contends that the balance of hardships weighs in its favor because it has invested substantially in the research and development of the infringing products and an injunction could put OWW out of business entirely.

"A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one." Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1156 (Fed. Cir. 2011). Moreover, "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986). The Court finds that OWW's hardship from investing in the infringing products does not outweigh the hardship to ALPS if OWW is permitted to continue competing against OWW. Thus, the Court concludes that the balance of hardship weighs in favor of granting a permanent injunction.

### iii. Public Interest

OWW contends a permanent injunction would disserve the public interest because it would create "consequential medical, practical, and economic issues for a large number of amputees who utilize OWW's Alpha Liner Products." (Dkt. 331 at 17) OWW asserts that "[b]ecause fit of the prosthetic solution is so critical, amputees

currently using the Alpha Liner products would be forced to return [ ] their prosthetics to be refitted for a different prosthetic solution were the [OWW] Alpha Liner to become unavailable." (Dkt. 331 at 18-19)

"As a general matter, the public maintains an interest in protecting the rights of patent holders, and the '[s]uccessful exploitation' of the patent by the infringer does not allow the infringer to avoid a permanent injunction." Enpat, Inc. v. Budnic, 6:11-cv-86-PCF-KRS, 2011 WL 1196420, at *5 (M.D. Fla. March 29, 2011) (quoting Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 704 (Fed. Cir. 2008)). While an amputee may have to return prosthetic devices to be refitted with another liner from a different manufacturer, there is no evidence that the amputee would experience any substantial inconvenience, additional costs or adverse consequences. Thus, the Court finds that the public interest would not be disserved by an injunction.

Accordingly, after considering the equitable factors, the Court concludes that the balance of equities warrants a permanent injunction.

**B. Scope of the Permanent Injunction**

The Court now will determine the scope of the permanent injunction. ALPS seeks a permanent injunction enjoining OWW from making, using, selling, offering for sale, or importing into the United States any product infringing on the claims 1-3, 5, 6, 11 and 12 of the '109 Patent **and** any party who obtains any such product from OWW from using, selling or offering to sell, or importing into the United States any infringing OWW product.

"As a general matter, a court may not enjoin a non-party that has not appeared before it to have its rights legally adjudicated." Additive Controls & Measurement Sys.,

6

Inc., 154 F.3d 1345, 1351 (Fed. Cir. 1998).  "[T]he extent to which a federal injunction applies to non-parties is governed by Federal Rule of Civil Procedure 65(d)."  Id. at 1355.  Thus, an injunction may only bind the parties, "the parties' officers, agents, servants, employees, and attorneys;" and "other persons who are in active concert or participation with [them]" as long as they "receive actual notice of it by personal service or otherwise."  Fed. R. Civ. P. 65(d)(2).

ALPS seeks to enjoin any party who obtains any product infringing on the claims 1-3, 5, 6, 11 and 12 of the '109 Patent from OWW from using, selling or offering to sell, or importing into the United States any infringing OWW product.  To the extent that the party being sought to be enjoined is not OWW's officers, agents, servants, employees, or attorneys or a party in active concert or participation with OWW, the Court is not authorized to enjoin that party because that party has not appeared before this Court to have its rights legally adjudicated.  Accordingly, the Court will only enjoin those non-parties that are described in Rule 65 of the Federal Rules of Civil Procedure 65.

## IV. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1.  Alps South, LLC's Motion for a Permanent Injunction (Dkt. 323) is **GRANTED in part and DENIED in part**.

2. Ohio Willow Wood Company and all of its agents, officers, servants, employees, successors, assigns, attorneys, and all other persons acting in concert or participation with Ohio Willow Wood Company, are **PERMANENTLY ENJOINED and RESTRAINED** from making, using, selling, offering for sale, or importing into the United States any product infringing on

7

the claims 1-3, 5, 6, 11, and 12 of U.S. Patent No. 6,552,109. This injunction is effective from the date of this Order through August 11, 2014.

3. To the extent that Plaintiff seeks to enjoin any party who obtains any infringing OWW product from using, selling or offering to sell, or importing into the United States any infringing OWW product, Plaintiff's request is **DENIED**.

4. Alps South, LLC's Motion to Strike Exhibits Submitted with OWW's Response in Opposition to Motion for Permanent Injunction (Dkt. 341) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida this 9th day of May 2013.

**MARY S. SCRIVEN**
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:
   All Counsel of Record
   All *Pro Se* parties

8

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ALPS SOUTH, LLC, a Florida**
**Corporation,**

      **Plaintiff,**

**v.**

                            **Case No. 8:08-cv-1893-T-35-MAP**

**THE OHIO WILLOW WOOD**
**COMPANY, an Ohio Corporation,**

      **Defendant.**

_____/

<u>**ORDER**</u>

**THIS CAUSE** comes before the Court for consideration of Alps South, LLC's

("ALPS") Motion For Enhanced Damages, Attorneys' Fees, Supplemental Damages,

Costs and Interest (Dkt. 343-3) and The Ohio Willow Wood Company's ("OWW")

Response in Opposition. (Dkt. 348)  Upon consideration of all relevant filings, case law,

and being otherwise fully advised, the Court hereby **GRANTS in part and DENIES in**

**part** ALPS' Motion For Enhanced Damages, Attorneys' Fees, Supplemental Damages,

Costs and Interest (Dkt. 343-3), as described herein.

**I.  BACKGROUND**

ALPS initiated this action alleging OWW infringed U.S. Patent Nos. 6,552,109

(the "'109 Patent") and 6,867,253 (the "'253 Patent") (collectively "patents-in-suit").

(Dkt. 35)  OWW filed a two-count counterclaim seeking a declaratory judgment that (1)

OWW did not infringe on the patents-in-suit; (2) the patents-in-suit are invalid and

unenforceable; and (3) the patents-in-suit are unenforceable due to the inequitable conduct of the inventor, Mr. Chen. (Dkt. 39)

During the litigation, the patents-in-suit were submitted to re-examination and were reissued by the United States Patent and Trademark Office ("USPTO"). A Re-examination Certificate was issued on the '253 Patent on June 7, 2011. (Dkt. 185-4) A Re-examination Certificate was issued on the '109 Patent on July 5, 2011. (Dkt. 175)

The jury trial began in this action on April 30, 2012. During the trial, all the asserted claims related to the '253 patent were dismissed. On May 10, 2012, the issues of whether OWW infringed the '109 Patent; whether OWW willfully infringed the '109 patent; and whether the '109 Patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration. On May 11, 2012, the jury found that OWW did infringe Claims 1-3, 5, 6, 11 and 12 of the '109 Patent, OWW willfully infringed the '109 Patent, and the '109 Patent was valid.

## II. LEGAL STANDARD AND DISCUSSION

### A. Enhanced Damages

35 U.S.C. § 284[1] "allows the award of enhanced damages at the conclusion of a patent case based on a finding of willful infringement." Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc., 701 F.3d 1351, 1353 (Fed. Cir. 2012). While a finding of willful infringement is a prerequisite to the award of enhanced damages, "a finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages." i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 858 (Fed. Cir. 2010), see Read Corp. v. Portec, Inc., 907 F.2d 816, 826 (Fed. Cir. 1992). "Rather, '[t]he

---

[1] "[T]he court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.

2

paramount determination [for enhanced damages] . . . is the egregiousness of the defendant's conduct based on all the facts and circumstances.' Thus, the district court retains discretion to enhance damages." Electro Scientific Indus., Inc. v. General Scanning, Inc., 247 F.3d 1341, 1353 (Fed. Cir. 2001)(quoting Read Corp., 970 F.2d at 826).

The Federal Circuit has established nine factors to assist the district court in determining whether to award enhanced damages: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. Read Corp., 907 F.2d at 827.

After consideration of the Read factors, the record and the parties' arguments, the Court finds that the factors support entry of an award of enhanced damages. The evidence supports the jury's finding that OWW willfully infringed the '109 Patent. There was no close call on the issue of infringement of the '109 Patent. Further, there is no indication or assertion by OWW that it has taken any remedial action to avoid infringement since the reissurance of the '109 Patent. To the contrary, OWW proceeded headstrong in its endeavors that infringed the reissued patent. Moreover, OWW does not dispute that in light of its financial condition, it is capable of paying the damages awarded to ALPS and any potential award of enhanced damages. While, the

3

evidence does not support a finding that OWW attempted to conceal its misconduct or that OWW's behavior during this litigation was unacceptable beyond the infringement itself, the Court finds the totality of the circumstances supports the award of enhanced of damages. Nevertheless, the Court finds that OWW's conduct is not so egregious as to justify the maximum enhancement. Therefore, the Court **GRANTS** ALPS' motion to enhance damages to the extent that the damages award shall be doubled.

### B. Attorneys' Fees

35 U.S.C. § 285[2] "allows the award of attorneys' fees at the conclusion of the case, against either a patentee or an accused infringer, if the court finds the case 'exceptional.'" Highmark, Inc., 701 F.3d at 1353. The decision to award attorneys' fees is "committed to the district court's discretion." Id.

ALPS argues that a willful finding justifies a determination that this case is exceptional and an award of attorneys' fees is appropriate. OWW contends that ALPS has not met its burden of establishing by clear and convincing evidence that this case is exceptional and the Court should, therefore, deny ALPS' motion to attorneys' fees. Nonetheless, OWW contends that "[a]t the very least, because the jury's finding of willfulness is only as to OWW's post-July 5, 2011 behavior, the Court should limit any award of attorneys' fees to Alps to the portion of this litigation following July 5, 2011." (Dkt. 348 at 14)

In light of the jury's finding that OWW willfully infringed the '109 Patent, the Court finds this case exceptional. See Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1329 (Fed. Cir. 1987)("The finding of willful infringement is legally sufficient

---

[2] "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

4

to meet the criterion of 'exceptional case,' and in such a case it is within the court's discretionary authority to award attorney fees."). Further, based on OWW's willful infringement, the Court finds that an award of attorney fees is appropriate. See S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc., 781 F.2d 198, 200 (Fed. Cir. 1986)("District courts have tended to award attorney fees when willful infringement has been proven, and [the Federal Circuit] has uniformly upheld such awards.").

Accordingly, the Court **GRANTS** ALPS' motion for entitlement to attorneys' fees. ALPS is directed to file its claim for attorneys' fees **on or before June 10, 2013**. To the extent that OWW objects to an award of fees incurred prior to July 5, 2011, OWW shall file its objections and state with particularity any pre-July 2011 fees that OWW believes were not necessary to the successful prosecution of this lawsuit. Any objection to attorneys' fees shall be filed within **twenty one (21) days** after the filing of ALPS' claim.

### C. Prejudgment and Post-Judgment Interest

ALPS argues that prejudgment interest is necessary for the complete compensation to it of the damages awarded by the jury. ALPS asserts that the Court should apply the State of Florida's interest rate, which was 4.75% as of July 2011. Based on the State of Florida's interest rate, ALPS asserts that the prejudgment interest based on the damages award from July 5, 2011 through the start of the trial on April 30, 2012 would be $155,867.79. In addition, ALPS argues it is entitled to the post-judgment interest running from the final judgment until OWW satisfies the judgment.

OWW contends that the appropriate prejudgment interest rate should be based on the 52-week treasury rate and not the State of Florida's interest rate because ALPS

5

has not presented any evidence to justify the State of Florida's interest rate. OWW asserts that the corresponding interest rate for the week preceding the date of final judgment in this case was .17%. Further, OWW contends that the 52-week treasury rate, compounded annually, is the rate set forth for awards of post-judgment interest.

35 U.S.C. §284 provides that the Court shall award damages adequate to compensate for the infringement, "together with interest and costs as fixed by the court." 35 U.S.C. § 284. "An award of prejudgment interest serves to make the patentee whole because the patentee also lost the use of its money due to infringement." Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1361 (Fed. Cir. 2001). Thus, "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." General Motors Corp. v. Devex Corp., 462 U.S. 648, 657 (1983).

"The interest rate used to calculate prejudgment interest and the frequency of compounding is left to the sound discretion of the district court." Powell v. Home Depot U.S.A., Inc., 715 F. Supp. 2d 1285, 1300 (S.D. Fla. 2010). However, "[i]t has been recognized that an award of compound rather than simple interest assures that the patent owner is fully compensated." Rite-Hite Corp. v. Kelly Co., Inc., 56 F.3d 1538, 1555 (Fed. Cir. 1995)(internal quotation omitted).

Further, a patentee is entitled to post-judgment interest at a rate set forth in 28 U.S.C. § 1961. The post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield" and "compounded annually." 28 U.S.C. §§ 1961(a), (b).

6

Here, OWW does not provide and the Court does not find any justification to withhold prejudgment interest from ALPS. Therefore, the Court shall award prejudgment interest to ALPS.

The Court, however, is not persuaded that the prejudgment interest should be set at the State of Florida's interest rate. ALPS provides no justification for applying the State of Florida's interest rate. Further, the Court finds OWW's proposed interest rate inadequate to provide complete compensation to ALPS for the infringement found by the jury Instead, the Court finds that applying the prime rate of 3.25%, which was applicable on the date the '109 Patent reissued (i.e. July 5, 2011), as the prejudgment interest will adequately compensate ALPS for the infringement. Accordingly, the Court **GRANTS** ALPS' motion for prejudgment interest to the extent that ALPS shall be awarded prejudgment interest from July 5, 2011 at a rate of 3.25% compounded annually. Further, the Court **GRANTS** ALPS' motion for post-judgment interest. ALPS shall be awarded post-judgment interest pursuant to 28 U.S.C. § 1961.

### D. Taxation of Costs

ALPS argues that it is entitled to its costs, as the prevailing party, in the amount of $94,972.65. OWW contends that OWW and ALPS are both prevailing parties because ALPS prevailed with respect to the '109 Patent and OWW prevailed with respect to the '253 Patent. Thus, OWW asserts that "[i]n light of the facts of this case, either both parties should be entitled to their costs or the Court should decline to tax costs altogether." (Dkt. 348 at 21) Further, OWW objects to each cost requested by ALPS because OWW contends ALPS fails to apportion the costs based on having lost a portion of the case.

7

Under Federal Circuit law, which defines 'prevailing party' for purposes of patent litigation, there can only be one prevailing party.  Shum v. Intel Corp., 629 F.3d 1360, 1366-67 (Fed. Cir. 2010).  The Court has already determined that ALPS is the prevailing party in this case.  (See Dkt. 416)  As the prevailing party, the Court finds that ALPS is entitled to its costs.

In the absence of other statutory authority or contractual authorization, the federal courts can only tax costs authorized in 28 U.S.C. § 1920. U.S. E.E.O.C. v. W & O, Inc., 213 F.3d 600, 620 (11th Cir. 2000) (citing Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987)).  Costs that may be awarded under 28 U.S.C. § 1920 are as follows:

(1)  Fees of the clerk and marshal;
(2)  Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
(3)  Fees and disbursements for printing and witnesses;
(4)   Fees for exemplification and copies of papers necessarily obtained for use in the case;
(5)  Docket fees under section 1923 of this title;
(6)  Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.

### i.      Fees of the Clerk and Marshal

ALPS seeks $350.00 for fees of the clerk and marshal.  The fees consist only of the filing fee for the complaint.  The Court finds that ALPS is entitled to its fees of the clerk and marshal in the amount of $350.00.

### ii.      Fees of the Court Reporter

ALPS seeks $47,165.15 for court reporter fees.  Specifically, the court reporter fees include the court reporters' attendance fees for depositions, transcripts ordered for

8

the depositions, and transcripts of hearings and trial. ALPS asserts that the deponents appeared at trial, were on OWW's witness list or the deponents' depositions were used as support for summary judgment motions. Further, ALPS asserts that the transcripts of the hearings and trial were necessary for preparing the motion for judgment of matter of law motion and post-trial briefings. This Court agrees.

The Court finds that the court reporters' attendance fees for depositions, transcripts ordered for the depositions, and transcripts of hearings and trial were all necessary for use in this action. Accordingly, the Court finds ALPS is entitled to its fees of the court reporter in the amount of $47,165.15.

### iii.    Videographer Fees

ALPS seeks $10,390.00 for videographer fees. Specifically, ALPS seeks $9,750.00 for the videographer's attendance at the depositions of Lynn Walker, James Colvin, David Pierson, Robert Arbogast, and Ryan Arbogast, and $640.00 for the video packages for James Colvin, Robert Arbogast, and Ryan Arbogast.

> [W]hen a party notices a deposition to be recorded by nonstenographic means, or by both stenographic and nonstenographic means, and no objection is raised at that time by the other party to the method of recordation pursuant to Federal Rule of Civil Procedure 26(c), it is appropriate under § 1920 to award the cost of conducting the deposition in the manner noticed.

Morrison v. Reichhold Chemicals, Inc., 97 F.3d 460, 465 (11th Cir. 1996).

While the Court does find that the depositions of the potential witnesses were necessary for use in this case, ALPS does not indicate whether the depositions Thus, the Court declines to tax the videographer fees at this time. The Court will allow ALPS to supplement its motion for taxation of costs to support its claim for videographer fees.

9

### iv.    Photocopying Costs

ALPS seeks $29,087.72 for photocopying costs.   Photocopies are recoverable under § 1920 if the copies were necessarily obtained for use in the case.   U.S. E.E.O.C., 213 F.3d at 622-23.   However, general copying costs and copies made for counsel's convenience are not taxable.   Duckworth v. Whisenant, 97 F.3d 1393, 1399 (11th Cir. 1996).   The moving party bears the burden of showing that the costs are recoverable.  Id.

In its Motion, ALPS asserts various purposes for the photocopies.   For example, ALPS asserts that "seven of the photocopying groupings are for document productions for both Alps and Mr. Chen to be provided to OWW," "[a]nother grouping of the photocopying costs are for briefs," "[a]nother category of photocopying includes copies of pleadings, documents and case law for hearings in the case," and "[t]he last group of copying costs involves amounts paid to vendor document companies for document production during discovery and exhibits made for trial."   (Dkt. 343-3 at 21-22) However, the Court is unable to discern from the exhibits produced by ALPS which copies apply to which grouping or the amount of the photocopies for each grouping. While many of the photocopies associated with certain photocopying groupings may be taxable to OWW, there may be others that are not taxable to OWW.   For example exhibit costs are not taxable.  See U.S. E.E.O.C., 213 F.3d at 623 ("exhibit costs are not taxable because there is no statutory authorization.   Therefore, the Court declines to tax the photocopying fees to OWW at this time.   The Court will allow ALPS to supplement its motion for taxation of costs to provide the Court with an itemized list of

10

the photocopies providing the purpose of the photocopies and the amount for those photocopies.

### v.     Long Distance Calls and Facsimile Costs

ALPS seeks $for long distance calls. Facsimile these costs are not enumerated in the statute and no case decided in this context has been offered as support for such an award.  Long distance telephone calls may be compensable under § 1920, if the costs are reasonable.  <u>Cullens v. Ga. Dep't of Transp.</u>, 29 F.3d 1489, 1494 (11th Cir. 1994)("Long distance telephone charges and travel expenses are appropriate expenses under  § 1920 to the extent they are reasonable")  The Court notes that some district courts have held that <u>Cullens</u> is limited to civil rights actions under 42 U.S.C. § 1988, and does not include requests for costs under 28 U.S.C. § 1920.  <u>See</u>, <u>e.g.</u>, Williams v. R.W. Cannon, Inc., 657 F. Supp. 2d 1302, 1318 (S.D. Fla. 2009)("courts have since pointed out the *Cullens* is limited to civil rights actions under 42 U.S.C. § 1988, and not requests for costs under 28 U.S.C. § 1920").  However, until the Eleventh Circuit limits the plan language of its holding, this Court is bound by it. <u>Fox v. Acadia State Bank</u>, 937 F.2d 1566, 1570 (11th Cir. 1991) ("A district court is not bound by another district court's decision, or even an opinion by another judge of the same district court, but a district court in this circuit is bound by this court's decisions.").   The Court finds that the long distance calls are reasonable and are taxable to OWW.  Therefore, the Court finds that ALPS is entitled to its fees for the long distance calls of $33.45 but no fees for facsimiles in the amount of 624.00.

11

### vi. Services of Process

ALPS seeks $185.00 for service of process costs. Specifically, ALPS seeks $125.00 for service of process on Benjamin Elliot, who was a former employee of OWW, and $60.00 for service of process on Rick Fee, an attorney for Thermo-Ply, Inc. The Court finds that ALPS is entitled to these services of process costs and they are reasonable. Accordingly, the Court finds that ALPS is entitled to its fees for the services of process in the amount of $185.00.

### vii. Witness Fees and Travel Expenses

ALPS seeks $91.00 for witness fees. Specifically, ALPS seeks (1) $40.00 for Benjamin Elliot and (2) $51.00 for Bruce Kania, which includes the witness' mileage expense. Further, ALPS seeks $7,210.80 for travel expenses for witnesses. ALPS seeks the following amounts for the witnesses' travel expenses:

| Dr. Jerry Atwood | Travel between Missouri and Ohio for deposition | $361.10 |
|---|---|---|
| Dr. Jerry Atwood | Travel between Missouri and Florida for the Markman hearing | $687.40 |
| Dr. Jerry Atwood | Travel to Florida for trial | 813.60 |
| Jason Foster, Esq. | Travel between Ohio and Florida for trial | 1,194.80 |
| Dr. John Chen | Travel between California and Florida for trial | $4,153.90 |
| **TOTAL TRAVEL EXPENSES** | | **$7,210.80** |

"A witness shall be paid an attendance fee of $40 per day for each day's attendance." 28 U.S.C. § 1821(b). "A witness who travels by common carrier shall be paid for the actual expenses of travel on the basis of the means of transportation

12

reasonably utilized and the distance necessarily traveled to and from such witness's residence by the shortest practical route in going to and returning from the place of attendance." 28 U.S.C. § 1821(c)(1). Additionally, a travel allowance may be paid to each witness who travels by a privately owned vehicle. 28 U.S.C. § 1821(c)(2).

The Court finds that ALPS is entitled to its fees for the witnesses in the amount of $7,301.80.

### E. Supplemental Damages

ALPS seeks an accounting for all OWW infringing sales from April 30, 2012 through the date an injunction is entered. ALPS proposes that the same royalty rate of 20% imposed by the jury continue to apply in calculating supplemental damages.

OWW contends that to the extent that ALPS's claim is for prospective royalties, "ALPS has not put forth that issue before this Court." (Dkt. 348 at 21) Further, OWW argues that to force OWW to continue to pay at a rate that is not reasonable would be unjustifiable.

"[A] patentee is not fully compensated if the damages award [does] not include future lost sales. Therefore, the district court should [award] compensation for any infringement prior to the injunction." Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1213 (Fed. Cir. 2010)(internal quotations and citations omitted). Therefore, the Court finds that ALPS is entitled to an accounting for all of OWW's infringing sales from April 30, 2012 through May 9, 2013. Further, the Court finds that ALPS is entitled to supplemental damages based on OWW's infringing sales and at the same royalty rate found to be appropriate by the jury. See, e.g., Aero Prods. Int'l, Inc v. Intex Recreation Corp., No. 02-C-2590, 2005 WL 1498667 (N.D. Ill. June 9, 2005)(applying the royalty

13

rate determined by the jury for the supplemental damages); <u>Stryker Corp. v. Davol, Inc.</u>, 75 F. Supp. 2d 746 (W.D. Mich. 1999), <u>aff'd</u> 234 F.3d 1252 (Fed. Cir. 2000) (same).

## III. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Alps South, LLC's Motion For Enhanced Damages (Dkt. 323) is **GRANTED** to the extent that the damages award shall be doubled.

2. Alps South, LLC's Motion for Attorneys' Fees (Dkt. 323) is **GRANTED.** Alps South, LLC is directed to file its claim for attorneys' fees **on or before June 10, 2013**. To the extent that OWW objects to the attorneys' fees, including such fees incurred prior to July 5, 2011, OWW shall file its objections to the attorneys' fees within **twenty one (21) days** after the filing of ALPS' claim.

3. Alps South, LLC's Motion for Prejudgment Interest (Dkt. 323) is **GRANTED in part**. Alps South, LLC is entitled to its prejudgment to the extent discussed in this Order.

4. Alps South, LLC's Motion for Post-judgment Interest (Dkt. 323) is **GRANTED**.

5. Alps South, LLC's Motion for Costs (Dkt. 323) is **GRANTED in part and DENIED in part**. Alps South, LLC shall file its supplemental motion for taxation of costs related to the videography fees and photocopying costs **on or before May 24, 2013**. OWW may file its opposition to the costs **within fourteen (14) days** of the filing of Alps South, LLC's supplemental motion.

14

JA000138

6. Alps South, LLC's Motion for Supplemental Damages (Dkt. 323) is **GRANTED**.
OWW shall submit an accounting of its infringing sales from April 30, 2013 until
May 9, 2013, to Alps South, LLC and the Court **on or before May 24, 2013**.

**DONE** and **ORDERED** in Tampa, Florida this 9th day of May 2013.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
    All Counsel of Record
    All *Pro Se* parties

15

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

## HONORABLE MARY S. SCRIVEN

| CASE NO. 8:08-cv-1893-T-35MAP | DATE: November 1, 2013 |
|---|---|
| CASE NO. 8:13-cv-01267-MSS-MAP | |

| TITLE: ALPS South, LLC v. The Ohio Willow Wood Company AND |
|---|
| The Ohio Willow Wood Company v. ALPS South, LLC et al |

| TIME: 09:03 11:42AM/12:09-1:50 PM | TOTAL: 4 hours and 20 minutes |
|---|---|

| Courtroom Deputy: Anaida Vizza | |
|---|---|
| Court Reporter: Claudia Spangler-Fry | |

| Counsel for Alps: Ronald Christaldi, David Wicklund, and Mindi Richter |
|---|
| Counsel for Applied: Michael Stanton |

| Counsel for OWW: Jeffrey Standley, F. Michael Speed, and Patrick Risch |
|---|

## *CLERK'S MINUTES: PROCEEDINGS OF HEARING ON MOTIONS*

Court called to order. Defendant, OWW's Motion for Relief of Judgment Pursuant to Rule 60(b) (Dkt. 426) is **DENIED.**

OWW's Motion for Reconsideration under Fed. R.Civ. P. 59(e) or in the alternative 60(b)(6) of the Order of May 9, 2013 Granting an Injunction (Dkt. 435) is **GRANTED.**

Alps' Emergency Motion to Hold OWW in Contempt of the May 9, 2013 Injunction Order (Dkt. 429) is **GRANTED.** OWW is enjoined from performing certain acts, as stated on the record starting today. The Court will appoint a receiver. The Parties are to confer and if an agreement is not reached, parties are to submit 2 names per side as to who should be the receiver and the Court will make the determination.

The Court **DENIES** OWW's Oral Motion to Stay the injunction pending their motion for emergency relief to the Federal Circuit.

The Court sets an evidentiary hearing on sanctions for **November 7, 2013 at 11:30 AM**.

Alps is directed to prepare a proposed order and to email it to chambers, after OWW has had an opportunity to review it, in Word format, by Monday, **November 4, 2013.**

Alps' Motion for Attorney's Fees (Dkt. 445) is **DEFERRED**. The Court would award attorney's fees for this hearing, ruling deferred as to the entire case; it can be asserted either way. OWW is requesting an un-redacted copy of Alps' attorney's fees invoices.

(Dkt. 459) Alps is to file **under seal an un-redacted version of its attorney's fees** and the Court will determine what should be un-redacted. Alps will have an opportunity to decide whether they want to waive the fee or agree to have it un-redacted.

Oww's Unopposed Motion to File Under Seal Pursuant to Protective Order Expert Declarations and Supporting Materials in Rebuttal to the Supplemental Declaration of Dr. Jerry Atwood (Dkt. 486) is **DENIED as moot**.

Alps' Motion for Order requiring OWW to Provide Additional Information Concerning Potential Post-Trial Infringement (Dkt. 448) is **GRANTED**. Information is to be provided forthwith.

Regarding Dkt. 431, the costs awarded will be ordinary.

Alps' Motion for Leave to File Reply Memorandum with Respect to Plaintiff's Claim for Attorney's Fees (Dkt. 463) is **DENIED.**

OWW's Motion for Extension of Time to Provide Objections to Alps' Claim for Attorney's Fees and Motion to Compel Un-redacted Invoices (Dkt. 459) is **DENIED without Prejudice** pending the Court's review of the invoices.

The companion case 8:13-cv-01267-MSS-MAP will remain stayed and the Court will determine the status of that case at the November 7, 2013 hearing.

Court is adjourned.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

## HONORABLE MARY S. SCRIVEN

| | |
|---|---|
| CASE NO.  8:08-cv-1893-T-35MAP<br>CASE NO.  8:13-cv-01267-MSS-MAP | DATE:  November 7, 2013 |
| TITLE:  ALPS South, LLC v. The Ohio Willow Wood Company  AND<br>The Ohio Willow Wood Company v. ALPS South, LLC et al | |
| TIME:  11:37 AM – 12:32PM/12:49-1:24PM/1:48-6:30 PM | TOTAL:  6 hours and 12 minutes |

| | |
|---|---|
| Courtroom Deputy: Anaida Vizza | |
| Court Reporter:  Claudia Spangler-Fry | |

| |
|---|
| Counsel for Alps:  Ronald  Christaldi, David Wicklund, and Mindi Richter<br>Counsel for Applied: Michael Stanton |
| Counsel for OWW:  Jeffrey Standley, Patrick Risch  and F. Michael Speed |

### _CLERK'S MINUTES: PROCEEDINGS OF_
### _HEARING ON MOTION for SANCTIONS_

Court called to order. This matter is set for hearing on the Plaintiff's Motion for sanctions which is incorporated in Plaintiff's Motion for Contempt. (Dkt. 429)

11:44 AM – Direct examination of **Ryan Arbogast** by Mr. Christaldi.
12:32 PM – Brief recess.
12:49 PM – Court back in session.
01:24 PM – Brief recess.
01:48 PM – Court back in session.
02:26 PM – Cross by Mr. Speed.
02:43 PM – Re-direct.
02:52 PM – Direct examination of **Robert Arbogast** by Mr. Christaldi.
03:42 PM – Cross by Mr. Standley.
03:49 PM – Direct examination of **James Colvin** by Mr. Christaldi.
04:32 PM – Cross by Mr. Standley.
04:56 PM – Re-direct.
05:03 PM – Direct examination of **Chris Kelley** by Mr. Christaldi.

05:25 PM – Oral argument by Mr. Risch
06:03 PM – Mr. Christaldi in rebuttal.

Court adds to its May 2013 Order as stated on the record. The Court appoints James Abrams as receiver with duties and responsibilities as stated on the record.  OWW is directed to deposit into the Court's Registry the equivalent of 20% of its royalty based on gross revenues by November 15, 2013. OWW is directed to pay attorney's fees and costs associated with the Motion for Contempt. The Court Denies OWW's Oral Motion to stay the injunction pending emergency appeal. The Court Denies Alps' Oral Motion to increase OWW's bond. Court is adjourned.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALPS SOUTH, LLC,
a Florida limited liability company,

       Plaintiff,

v.                             **Case No.: 8:08-CV-1893-T-35MAP**

THE OHIO WILLOW WOOD
COMPANY, an Ohio corporation,

       Defendant.

_____/

## REDACTED ORDER

**THIS CAUSE** comes before the Court for consideration of the following:

1.    The Ohio Willow Wood Company's ("OWW") Motion for Relief of Judgment Pursuant to Rule 60(b) (Dkt. 426), Plaintiff Alps South, LLC's ("ALPS") Memorandum in Opposition to The Ohio Willow Wood Company's Rule 60(b) Motion (Dkt. 444), and OWW's Reply in Support of Motion for Relief From Judgment Pursuant to Rule 60(b) (Dkt. 490).

2.    OWW's Motion for Reconsideration, Under Federal Rule of Civil Procedure 59(e) or in the Alternative Rule 60(b)(6), of the Order of May 9, 2013 Granting an Injunction (Dkt. 435), ALPS' Response to The Ohio Willow Wood Company's Motion for Reconsideration of the Court's May 9, 2013 Order Granting a

Permanent Injunction (Dkt. 451), and OWW's Supplement to Motion for Reconsideration of the Order of May 9, 2013 Granting an Injunction (Dkt. 458).

3. ALPS' Emergency Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt of May 9, 2013 Injunction Order (Dkts. 429, S-31), OWW's Response in Opposition (Dkt. 446, S-447), and ALPS' Supplemental Declaration of Dr. Jerry Atwood (Dkt. S-487).

4. OWW's Motion to File Under Seal Pursuant to Protective Order Expert Declarations and Supporting Materials in Rebuttal to the Supplemental Declaration of Dr. Jerry Atwood (Dkt. 486), OWW's Amended Certificate of Compliance with Local Rule 3.01(g) to its Motion to File Under Seal Expert Declarations and Supporting Materials in Rebuttal to the Supplemental Declaration of Dr. Jerry Atwood (Dkt. 488), and ALPS' Response in Opposition (Dkt. 489).

5. ALPS' Supplement to Alps South, LLC's Motion for Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 431) and OWW's Response in Opposition. (Dkt. 442)

6. OWW's Motion for Extension of Time to Provide Objections to Plaintiff, Alps South, LLC's Claim for Attorneys' Fees and Motion to Compel Unredacted Invoices (Dkt. 459) and ALPS' Response in Opposition (Dkt. 473).

7. ALPS' Motion for Leave to File Reply Memorandum with Respect to Plaintiff's Claim for Attorneys' Fees (Dkt. 463) and OWW's Response in Opposition (Dkt. 475).

JA00166

8. ALPS' Motion for Order Requiring Defendant, The Ohio Willow Wood Company to Provide Additional Information Concerning Potential Post-Trial Infringement (Dkt. 448).

The Court held a hearing on the Motions on November 1, 2013, at which it received evidence in the form of affidavits submitted by the parties, and it held an additional hearing on November 7, 2013, at which witnesses testified concerning matters related to the relief requested by ALPS in connection with its Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt. (Dkts. 429, S-31) Upon consideration of all relevant filings, case law, and being otherwise fully advised of the issues raised, and for the reasons explained below and those stated at the hearings on November 1 and 7, 2013, the Court hereby:

(1) **DENIES** OWW's Motion for Relief of Judgment Pursuant to Rule 60(b) (Dkt. 426);

(2) **GRANTS** OWW's Motion for Reconsideration, Under Federal Rule of Civil Procedure 59(e) or in the Alternative Rule 60(b)(6), of the Order of May 9, 2013 Granting an Injunction (Dkt. 435) but **GRANTS IN PART AND DENIES IN PART** the relief sought therein;

(3) **GRANTS** ALPS' Emergency Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt of the Court's May 9, 2013 Injunction Order (Dkts. 429, S-31);

(4) **DENIES as moot** OWW's Motion to File Under Seal Pursuant to Protective Order Expert Declarations and Supporting Materials in Rebuttal to the Supplemental Declaration of Dr. Jerry Atwood (Dkt. 486);

(5) **GRANTS in part and DENIES in part** ALPS' requests for the taxation of costs set forth in its Supplement to Alps South, LLC's Motion for Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 431);

(6) **DENIES without Prejudice** OWW's Motion for Extension of Time to Provide Objections to Plaintiff, Alps South, LLC's Claim for Attorneys' Fees and Motion to Compel Unredacted Invoices (Dkt. 459);

(7) **DENIES** ALPS' Motion for Leave to File Reply Memorandum with Respect to Plaintiff's Claim for Attorneys' Fees (Dkt. 463); and

(8) **GRANTS** ALPS' Motion for Order Requiring Defendant, The Ohio Willow Wood Company to Provide Additional Information Concerning Potential Post-Trial Infringement (Dkt. 448).

## I.  BACKGROUND

ALPS initiated this action alleging OWW infringed U.S. Patent Nos. 6,552,109 (the "'109 Patent") and 6,867,253 (the "'253 Patent"). (Dkt. 35) OWW counterclaimed seeking a declaratory judgment that OWW did not infringe ALPS' patents and that the patents were invalid and unenforceable. (Dkts. 35, 39)

The jury trial began in this action on April 30, 2012. During the trial, all the asserted claims related to the '253 patent were withdrawn or dismissed. On May 10, 2012, the issues of whether OWW infringed the '109 Patent; whether OWW willfully infringed the '109 Patent; and whether the '109 Patent was invalid due to anticipation or obviousness by prior art, nonenablement and lack of support in the written description were presented to the jury for consideration. On May 11, 2012, the jury found that OWW infringed claims 1-3, 5, 6, 11 and 12 of the '109 Patent; that OWW willfully

infringed the '109 Patent; and, that the '109 Patent was valid. The Court entered judgment on the jury's verdict and also entered judgment dismissing OWW's claim of inequitable conduct. (Dkt. 339)

Following the trial, the Court entered an order on May 9, 2013, granting ALPS' request for injunctive relief and permanently enjoining OWW and all others acting in concert or participation with OWW from making, using, selling, offering for sale, or importing any product infringing the '109 Patent. (Dkt. 418) The Court also awarded enhanced damages, doubling the damages award, and it granted ALPS' requests for supplemental damages and attorneys' fees, in an amount to be determined after presentment of further information. (Dkt. 422)

The Court's Order granting ALPS' Motion for Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 343) directed ALPS to supplement its request for the taxation of costs related to videography fees and photocopying costs and to file a claim for attorneys' fees and costs. ALPS filed both its cost supplement and its claim for attorneys' fees. (Dkts. 431, 445) ALPS' claim for attorneys' fees was accompanied by redacted fee invoices. OWW responded by moving to compel unredacted copies of ALPS' fee invoices and for an extension of time to respond to ALPS' claim for attorneys' fees. (Dkt. 459) OWW argued that the redactions did not allow it to sufficiently identify objectionable billing entries and that ALPS waived any applicable privilege or immunity with respect to the invoices. Additionally, OWW responded in opposition to ALPS' demand for costs for synch packages because OWW argued that synch packages were not properly taxed under 28 U.S.C. § 1920.

Two weeks after the Court entered its order granting ALPS' request for injunctive relief, ALPS filed an emergency motion to hold OWW in contempt for violating the permanent injunction. (Dkts. 429, S-31) The day before ALPS filed its motion to hold OWW in contempt, OWW filed a motion for relief from judgment pursuant to Fed. R. Civ. P. 60(b), challenging ALPS' standing to enforce the '109 Patent. (Dkt. 426) Specifically, OWW claimed that it had only recently learned facts suggesting that the inventor of the '109 Patent, John Chen, did not assign his rights in the '109 Patent to his company, Applied Elastomerics, Inc. ("AEI"), before AEI entered into a patent sale and license agreement with ALPS. As such, OWW contends that ALPS lacked constitutional standing in this matter.

OWW also filed a motion for reconsideration of the Court's May 9, 2013 injunction Order claiming that the Order does not provide a reasonably detailed description of the acts sought to be restrained because the order applies to products other than those found by the jury to be infringing. (Dkt. 435) OWW later filed a supplement to its motion asking the Court to modify the expiration date of the injunction.

On November 1, 2013, the Court held a hearing on the foregoing Motions. (Dkt. 478) The Court then held a further hearing on November 7, 2013, concerning the extent of appropriate sanctions for contempt liability. (Dkt. 492) The Court's rulings on all the cited motions and relevant issues presented are described more fully herein.

## II.  DISCUSSION

### A.  OWW'S Motion for Relief from Judgment – Lack of Standing[1]

---

[1] Although the Court fully appreciates that a "*well-founded* challenge" to constitutional standing cannot be waived, it bears noting that OWW's suggestion that it just learned in recent months of the defect it claims defeats constitutional standing is belied by the evidentiary record of this case, which undermines the claimed basis for this late assertion. At the November 1, 2013 hearing, ALPS presented the following

The Parties do not dispute that the '109 Patent is a continuation-in-part of several parent applications, including application No. 08/280,690, filed on August 11, 1994, which is now U.S. Patent No. 5,633,286 (the "'286 Patent"). These parent applications were assigned by the patentee to AEI by broadly worded assignments, and the assignments were recorded with the United States Patent and Trademark Office ("USPTO") in 1995 and 1996. In particular, the assignment of the '286 Patent application, dated July 14, 1995, provides in relevant part that

> ASSIGNOR hereby sells, assigns and transfers to ASSIGNEE the full and exclusive right, title and interest to *said invention* and *all* Letters Patent of the United States to be obtained therefor on said application or *any* continuation, division, renewal, substitute or reissue thereof for the full term or terms for which the same may be granted.

(Dkt. 444-3 at 2-3) All parties agree that any rights conveyed by this assignment were subsequently transferred to ALPS by way of the Patent Sale and License Agreement on

---

April 22, 2010 deposition testimony of John Chen, as the corporate representative for AEI, elicited by OWW's counsel:

Q. Are all of the patents that have issued for which you are a named inventor, are they all assigned to AEI?

A. To my knowledge, yes.

Q. We have checked the patent office records for assignments related to the two patents that we've been discussing, primarily the '109 and '253.

A. Yes.

Q. I don't believe there's an assignment recorded in the patent office as it relates between you and AEI as to those patents. Would you have knowledge of why that is?

A. The assignment is effective as of the earlier cases from which these evolve.

(Dkt. 444-1)

When inquired of by the Court concerning this discrepancy, counsel could offer no meaningful rejoinder. In fact, this issue has been known by OWW for some time and the more likely explanation for its belated assertion is that it was initially viewed as unfounded.

August 31, 2008 and the Amended Patent Sale and License Agreement on January 28, 2010. (Dkt. S-2)

In the face of this broad assignment, OWW contends that Mr. Chen did not assign his rights in the '109 Patent to AEI until September 27 and 28, 2011, when Mr. Chen expressly set forth an assignment for the '109 Patent, which was recorded on November 22, 2011. (Dkts. 426-1, 426-2) ALPS counters that the assignments of the parent applications, including the '286 Patent application, were sufficient to convey rights in the '109 Patent to AEI and that the invention claimed in the '109 Patent was also assigned to AEI via the assignment of child and grandchild applications that specifically incorporated by reference the subject matter of the '109 Patent's application. Alternatively, ALPS maintains that assuming *arguendo* Mr. Chen did not execute a written assignment of the '109 Patent conveying ownership to AEI, the facts show that he granted AEI a license, or at least an implied exclusive license, which transferred substantial rights to AEI sufficient to confer constitutional standing on ALPS.

"Since 1790, the patent law has operated on the premise that rights in an invention belong to the inventor." Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 131 S.Ct. 2188, 2192 (2011). "It is equally well established that an inventor can assign his rights in an invention to a third party." Id. at 2195 (citing United States v. Dubilier Condenser Corp., 289 U.S. 178, 187 ("A patent is property and title to it can pass only by assignment"); 8 Chisum on Patents §22.01, at 22–2 (2011) ("The inventor . . . [may] transfer ownership interests by written assignment to anyone")). Likewise, where the intent of the grantor of rights in a patent is unclear, courts are free to resort to extrinsic evidence of the intent of the parties regarding the rights intended to

be conveyed. See Regents of Univ. of N.M. v. Knight, 321 F.3d 1111 (Fed. Cir. 2003). Finally, while the USPTO will not accept an assignment of a continuation-in-part by reference to the assignment of the parent, that is not the law of assignments as applicable to legal challenges to assignments of rights in the patent. Id. at 1121 ("The MPEP [, Manual of Patent Examining Procedure,] sets forth [US]PTO procedures; it is not a statement of law.").[2] Consequently, that fact alone does not defeat constitutional standing in an action by an assignee against a stranger to and infringer of the patent. Id.

"A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The term "patentee" includes successors in title to the patentee, such as assignees. 35 U.S.C. § 100(d). In addition to assignees, constitutional standing to sue for infringement extends to patent licensees who have been granted substantial rights in a patent. See, e.g., Intellectual Prop. Dev., Inc. v. TCI Cablevision of Ca., 248 F.3d 1333, 1345-46 (Fed. Cir. 2001). It is also well-established that patent licenses may be granted orally or implied from the conduct of the parties. See, e.g., De Forest Radio Tel. & Tel. Co. v. United States, 273 U.S. 236, 240-41 (1927); Waymark Corp. v. Porta Sys. Corp., 334 F.3d 1358, 1364 (Fed. Cir. 2003).

After considering the relevant filings and the Parties' arguments, the Court finds that ALPS has constitutional standing to pursue its claims against OWW, and it had such standing at the time this case was filed. The legal authority makes clear that a continuation or continuation-in-part application can be assigned through the assignment of a parent application. See, e.g., Regents of Univ. of N.M., 321 F.3d at 1120 ("We find

---

[2] OWW's argument that Mr. Chen's assignment to AEI and recordation of the '109 Patent in 2011 demonstrate his concession that the assignment did not occur until then reflects a misunderstanding of the Patent Office requirement that continuations in part be assigned and recorded separately. No doubt, had Mr. Chen attempted to make that assignment to any party other than AEI that effort would have been ineffectual.

the broad language contained in the Patent Policy, the Co–Inventor Agreement, and the Joint Assignments more than sufficient to obligate Scallen and Knight to assign to UNM their . . . inventions and all related patents and applications, including the CIP applications.").

In this case, the 1995 assignment of the '286 Patent application to AEI and the subsequent Patent Sale and License Agreement and the Amended Patent Sale and License Agreement to ALPS were adequate to confer constitutional standing on ALPS. The assignment of the '286 Patent application for the '109 Patent assigned in writing all "exclusive" rights, title, and interest in the inventions disclosed in the application to AEI. By OWW's own admissions, the '286 Patent disclosed the relevant claims of the '109 Patent. In its Motion *in Limine* prior to the jury trial in this case, OWW argued that the Court should defer to the priority dates established by the USPTO for the '109 Patent because virtually all of the claims in the '109 patent being asserted in the litigation were disclosed in the '286 Patent.[3]  Additionally, the USPTO had determined that Claims 1-12, 15, and 16 of the '109 Patent have a priority date of August 11, 1994, which is the date the '286 Patent application was filed, with the clear implication that those claims are disclosed in the '286 Patent.  (Dkt. 227)  Thus, the reasonable interpretation of the language of the assignment of rights in the '286 Patent application is that it is broad enough to include the assignment of exclusive rights in the '109 Patent.  Specifically, the assignment of the '286 Patent application assigned "exclusive" right, title, and interest in "*any* continuation" of the '286 Patent application, and there is no indication that Mr. Chen sought to exclude the '109 Patent from his assignment of the '286 Patent

---

[3] The Motion *in Limine* was denied as an untimely motion for summary judgment, but OWW maintains to this day that the priority date of the asserted claims in the '109 Patent is certainly no later than the date of the filing of the '286 Patent application.

application. The absence of a reference to "continuations-in-part" should not be deemed fatal to this analysis. As in Regents of Univ. of N.M., an action that did not involve an express assignment of an identified patent, but a mere agreement to assign, the Court found that the absence of the words "continuation-in-part" did not preclude a broad interpretation to include a continuation in part of an invention derived from university resources.

Moreover, even if it could be argued that the written assignments were not sufficiently expressed or could somehow be argued to be ambiguous as it relates to AEI's rights as conveyed to ALPS to pursue this case as the real party in interest that has been damaged, the Court's task would be to look to extrinsic evidence of the intentions of the Parties whose relative rights are being challenged. Here, the uncontroverted evidence discloses the actions of Mr. Chen that clearly demonstrate his intent to confer substantial, exclusive rights in the '109 Patent to AEI, and thereby to ALPS, and to acknowledge that such rights were actually conveyed. For example, prior to the commencement of this litigation, in 2002, Mr. Chen indicated on the form he submitted with his payment for the issue fee of the '109 Patent that AEI was the assignee of the '109 Patent. (Dkt. 444-2) As such, AEI was listed as the assignee on the original '109 Patent. (Dkt. 426-4) Further, the Amended Patent Sale and License Agreement between AEI and ALPS that was executed by Mr. Chen, specifically stated that AEI owns and has the right to license the patent rights covered in the '109 Patent. This has been reiterated and stands un-rebutted through the testimony of Mr. Chen on this record. No party to these agreements challenges ALPS' rights to assert this claim or the effect of the assignments. At the very least the evidence establishes the transfer

of an exclusive license to AEI, and thus to ALPS. (See Dkt. 444) Either is sufficient to confer constitutional standing on ALPS.

Only the infringer, OWW, asserts such a claim. Upon consideration of the Parties' relative positions as early as 2010, OWW did not perceive such an issue to be viable. Even while it was challenging ALPS' prudential standing, it did not assert such a concern. OWW's belated motion in this regard to achieve relief from the judgment now imposed against it on grounds of lack of constitutional standing is **DENIED**.

### B. ALPS' Motion to Hold OWW in Contempt

ALPS contends that OWW is in contempt of this Court's permanent injunction order because OWW is presently making, offering for sale, and selling a revised gel formulation in its Advanced Gel Products that infringes some or all of the asserted claims of the '109 Patent. Further, ALPS contends that OWW has induced or attempted to induce distributors who have purchased infringing products from it to sell those infringing products.

ALPS seeks the following remedies for OWW's contempt: (1) to have OWW disgorge 100 percent of the revenue it has received from the sale of the Advance Gel Products; (2) to have OWW destroy any products that are within the purview of the contempt finding from its inventory; (3) to have OWW recall the product from its distribution system; (4) to have OWW submit to the Court for review and approval any future products that are prosthetic gel liners it intends to launch into the market; (5) impose suspended sentences for certain OWW's principals and officers to coerce them to comply with this Court's orders; (6) to extend the permanent injunction past August

11, 2014 for a time period equal to the time OWW failed to comply with the permanent injunction; and (7) attorneys' fees.

A party moving for contempt for violation of a permanent injunction in a patent infringement case must demonstrate by clear and convincing evidence that "the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." TiVo Inc. v. EchoStar Corp., 646 F.3d 869, 882 (Fed. Cir. 2011). A party accused of contempt should be informed of the alleged contemptuous conduct and be given a hearing at which the party may attempt to show cause why it should not be held in contempt. See Mercer v. Mitchell, 908 F.2d 763, 776-77 (11th Cir. 1990). However, "when there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt and sanctioning him." Id. at 769 n.11.

Upon a finding of contempt, district courts enjoy wide discretion to fashion equitable remedies that are appropriate under the circumstances. United States v. City of Miami, 195 F.3d 1292, 1298 (11th Cir. 1999) (quoting EEOC v. Guardian Pools Inc., 828 F.2d 1507, 1515 (11th Cir. 1987)). Sanctions for civil contempt may serve one of two broad purposes: (1) coercing the contemnor to comply with a court order; or (2) compensating a party for losses suffered as a result of the contemptuous conduct. Id.

Upon consideration of the Parties' arguments at the November 1, 2013 hearing and November 7, 2013 hearing, and the relevant filings, the Court finds that the Advanced Gel Products that OWW has now launched are not colorably different from the OWW products found by the jury to be infringing. Further, the Advanced Gel

Products infringe the '109 Patent. Just by way of example, Claim 1 of the '109 Patent

provides in relevant part:

> A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat and physically interlocked with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene) and from (ii) about 300 to about 1,600 parts by weight of a plasticizing oil . . . .

(Dkt. 426-4 at 17-18)  Thus, Claim 1 of the '109 Patent on its face requires 100 parts by

weight of hydrogenated SIBS "comprising" SEEPS.

Evidence at trial demonstrated that the ALPS line of prosthetic limb protector

sleeves and the OWW ALPHA line of products at issue were made of 100 parts SEEPS

and 300 to 1,600 parts mineral oil. The relevant difference between OWW's Advanced

Gel Products and the OWW products adjudicated to infringe is that the revised gel

formulation for the Advanced Gel Products substitutes one hydrogenated styrene

isoprene/butadiene block copolymer ("SIBS") for another (*i.e.* Septon 4055 for J-Series).

But, it retains the use of SIBS copolymer, Septon 4033. Though the Parties dispute

whether the J-Series is a SEEPS copolymer, there is no dispute that Septon 4033 is a

SIBS copolymer that is classified as SEEPS.

ALPS contends the copolymer, known as J-Series, in OWW's revised gel

formulation is a SEEPS polymer, and that in any event, all that the claims of the '109

Patent require is that the gel composition be formed from one or a mixture of two or

more SIBS copolymers "comprising" SEEPS.  OWW contends that J-Series is not the

linear copolymer SEEPS, but rather, is a branched copolymer without the dual end

blocks made of styrene that are characteristic of a SEEPS copolymer. It offered evidence from the manufacturer of J-Series, Kuraray Co., Ltd., that the J-Series is not a SEEPS copolymer. (Dkt. S-447, Ex. F) More importantly, OWW claims that it understood that the gel formulation disclosed by Claim 1 of the '109 patent was a mixture of 100 parts SIBS exclusively limited to SEEPS combined with 300 to 1,600 parts mineral oil. And, since its new formulation is part SIBS (J-Series), not made of SEEPS, and part SEEPS (Septon 4033) in a ratio less than 100 parts SEEPS to 300 parts mineral oil, it believes its Advanced Gel Products are more than colorably different from its prior infringing products and do not infringe the '109 patent. OWW is wrong on the law and the facts.

On the legal point, the definition of "comprising," OWW is mistaken. It is beyond dispute that the word "comprising' as used in the patent context is a term of art that means "including but not limited to." See Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1344-45 (Fed. Cir. 2003) ("Comprising is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Thus, it is not, as OWW claims it understood, a limitation of composition. As its own counsel conceded during the November 7, 2013 hearing, it means the thing said to comprise "is in there." That is to say, if a formula is described as a certain component comprising another, the second is said to be some part of the mixture of the first. It is not understood to be the whole of the first or 100 percent of the first as OWW claims it understood. Significantly in this regard, OWW conceded, through its president, Ryan Arbogast and employee who handles its intellectual property matters, Jim Colvin, that if the term means by law,

"including but not limited to," its Advanced Gel Products infringe Claim 1 of the '109 patent.

When asked what their basis was for this "misunderstanding" of the term, neither Ryan Arbogast nor Jim Colvin, offered an explanation. Though they initially claimed reliance on the advice of opinion counsel or reliance on the advice of litigation counsel, each expressly, on their personal behalf and on behalf of OWW, subsequently waived any such defense. Without the assertion of such a defense, the Court is left to conclude that despite the plain language of Claim 1 of the '109 Patent and the clearly established and available precedent as to the definition of its terms, OWW proceeded blindly in its development and sale of its new infringing line in direct violation of this Court's injunction.

As to the facts supporting infringement, OWW is also wrong. As noted, the products found by the jury to be infringing included SEEPS. The Advanced Gel Products include SEEPS. OWW essentially concedes that in its nearly 100 attempts to design around the '109 Patent once faced with the verdict of the jury, it could not make a prosthetic limb protector sleeve that adequately performed to meet the properties of the prior infringing ALPHA product line (or ALPS' product line) without the inclusion of SEEPS. Ryan Arbogast and Jim Colvin testified that a number of other gel formulations were considered and tested for OWW's new products. However, those gel formulations not "comprising" SEEPS did not provide the desired properties of the Advanced Gel Products, which contain SEEPS. Jim Colvin testified that the only non-SEEPS formulation that approached the desired properties of its prior infringing products was

called the A19.[4] When it was compared with the gel formulation in the Advanced Gel

Products, however, it failed in so-called "creep," the movement and repositioning of the

gel within the composition of the sleeve such that it became uneven and thinner at

points of pressure.  Moreover, the non-SEEPS formula did not exhibit the same tensile

strength and resulting tear resistance as the SEEPS based formulation.  Additionally,

Ryan Arbogast testified that OWW's test customers perceived that the Advanced Gel

Products lasted longer than the non-SEEPS based product, principally because of the

resulting uneven appearance of the A19 sleeve as a result of "creep."  Finally, OWW's

test customers complained of discomfort using the non-SEEPS based sleeves.

Tellingly, the descriptions of the failures of the A19 product dovetail almost

precisely with the improvements of the SEEPS based product that Mr. Chen described

in the demonstration to the USPTO on reexamination.  When asked by ALPS' counsel

during the trial, to explain why the '109 Patent was a novel invention, Mr. Chen

responded with the following:

> The reason this composite gel, the 109, is novel revolutionary is that this
> free gel can be stretched and pulled and broken, but this composite
> cannot be stretched. Therefore, one of the main things I found was that if
> you shear this composite very slightly, deform it very slightly, what I term
> cyclic dynamic deformation, not very much, just constantly doing this or
> this, just shearing it, eventually, this will be destroyed and would take
> many, many cycles. And it turns out that my old gel composite compared
> to this, this is three to 700 percent better. The difference is 300 to 700
> percent better, and this would not catastrophically fail in dynamic
> deformation.
>
> So, that means you can wear this next to your skin and deform it by
> walking, walking, walking and you can walk three to 700 percent further
> number of steps in deforming it. So, it's completely unexpected to have
> something that will last that much longer than the old composite that I
> invented back in the '80s. So, this is a revolutionary improvement over my

---

[4] Ryan Arbogast testified at the November 7, 2013 hearing that, A19 is a gel formulation developed by
OWW that included the J-Series, but did not include any SEEPS copolymers.

old composite. And that's why the patent office allowed the claims, the invention twice, once in the original patent; again, in the re-examination they allowed -- they found it patentable overall the reference, including Hammond.

(Dkt. 388 at 60) It is precisely why the SEEPS based sleeve as disclosed in the '109 was considered by the patentee to be a protectable invention. Thus, the Court need not reach the question of whether the J-Series is or is not a SEEPS copolymer, which is contested. Whether the J-Series contained in the Advance Gel Products is a SEEPS copolymer is a distinction without a colorable difference because these products contain Septon 4033, a SEEPS copolymer. This composition, 100 parts SIBS, comprising SEEPS, is essential to permit the Advanced Gel Products to replace effectively the ALPHA product line. In sum, the resulting products are not colorably different than the ALPHA products previously found to be infringing. Without a SIBS comprising some amount of SEEPS, as claimed in Claim 1 of the '109 patent, OWW's other resulting product developed to date was deemed to be a failure.

There is also sufficient evidence presented that OWW's conduct constituted willful calculated infringement. OWW's principals testified repeatedly that it chose to "take a chance" and assume the risk that its Advanced Gel Products would be found not to infringe the '109 Patent. Their asserted plan was simply to be prepared to offer up royalties as compensation upon a finding of infringement.

SEALED

SEALED

SEALED

SEALED

SEALED

SEALED

SEALED

SEALED

This "infringe now, pay later" approach ignores the duty not to infringe a patent, but when it occurs after an injunction has issued, it evinces a clear intent to turn a blind eye to the boundaries of the Court's order. OWW offered the testimony of its officers and agent who were experienced in and well familiar with patent law. It strains credulity to assert a lack of knowledge of the term "comprising" or even the intellectual curiosity to ascertain such meaning when it knew the infringement would rise or fall on that understanding. Even if the Court were to accept this ignorance defense, which it does not, in light of its waiver of the defense of reliance on the advice of counsel, the Court is left to understand that OWW, surrounded by a sea of lawyers, chose not to seek or rely on advice of counsel as to such a fundamental issue. As noted, there was no evidence that OWW conferred with or relied on advice of independent counsel[5] and as noted previously, OWW admitted that if the term "compromising" is by law defined as "including, but not limited to," then the Advanced Gel Products infringe the '109 Patent.

For these reasons, the Court finds that OWW is in contempt of the Court's permanent injunction. Accordingly, ALPS' motion for contempt is **GRANTED**.

ALPS has asserted demands for a number of remedies to redress the contempt of OWW. Two warrant discussion: the others are fairly routine and are appropriately resolved in summary form herein.

---

[5] During the November 7, 2013 hearing, OWW's principals, officers, and employees conferred outside the presence of the Court and waived their rights to assert this defense.

First, ALPS seeks an order directing the destruction of the offending New Advanced Gel Products. OWW asserted that it should be allowed to retain the products, first mistakenly contending that the Court's order of injunction did not enjoin the manufacture of infringing goods. Upon review, OWW conceded that it was in fact so constrained. Whereupon, it alternatively contended that because the exclusivity ALPS enjoys in the '109 Patent will soon expire, OWW should be allowed to retain the products it manufactured in violation of this Court's injunction and ALPS' right of exclusivity and sell the products once the '109 Patent expires.

Such a notion runs counter to the purpose and letter of U.S. patent law. The holder of the rights in the patent enjoys no exclusivity at all if an infringer can simply stock-pile infringing products and flood the market once the patent expires. This is especially inappropriate where the infringer acts willfully in disregard of a court's injunction barring the manufacture of infringing products. OWW attempts to distinguish its circumstances from those of a trademark infringing purveyor of counterfeit "knock-off" items, whose goods are routinely destroyed, on grounds that its product is a genuine product. This assertion, however, ignores the fact that OWW's products were unlawfully manufactured and, as the infringer, it should not be permitted to recoup any of the damages it has been ordered to pay by selling the very product that the Court found to be infringing and that warranted the imposition of damages and fees and costs in the first instance. It is in fact no different than a trademark infringer in this respect: it has acquired goods unlawfully, and it is unlawful for it to profit from that infringement. Therefore, the Court finds that the destruction or proper disposal[6] of the offending

---

[6] The Court would be willing to entertain a creative solution that avoids economic waste. In this regard, counsel for OWW and its principal Robert ("Bob") Arbogast spoke at length about the charitable culture of

Advanced Gel Products is warranted. The Court shall, however, stay this aspect of the Court's injunction pending resolution of the appeal of this Court's ruling on ALPS' motion for contempt. In the interim, OWW shall continue to store the sequestered products in accordance with the directions of the Court-appointed Receiver.

Additionally, ALPS seeks to have the Court extend the current permanent injunction date past August 11, 2014 to include the time that OWW did not abide by the Court's permanent injunction order. While the Court recognizes that it has broad discretion in fashioning equitable remedies, the Court finds that the remedies it has already imposed upon OWW are sufficient to coerce OWW's compliance with the Court's orders and injunction and to compensate ALPS. Further, the Court is mindful that 35 U.S.C. § 283 provides that injunctions may be granted "to prevent the violation of any right secured by patent." 35 U.S.C. § 283. Giving deference to the USPTO's determination that claims 1-12, 15, and 16 of the '109 Patent have a priority date of August 11, 1994, claims 1-12, 15 and 16 of the '109 Patent will expire on August 11, 2014.[7] Thus, after August 11, 2014, ALPS will no longer have any secured rights in a patent.

---

OWW and its extension of resources to impecunious and worthy patients. If the parties could identify and agree upon a procedure for the distribution of infringing items in stock to the disadvantaged or veteran community in a way that does not compromise the integrity of ALPS' production reputation and is not cost prohibitive, the Court would consider such a proposal.

[7] The Court is not persuaded by OWW's late assertion, which is contrary to its position in its Motion *in Limine* and the pronouncement of the USPTO, that the expiration date of the '109 Patent is April 19, 2014.

## III.  CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED and ADJUDGED** as follows:

1.  OWW's Motion for Relief of Judgment Pursuant to Rule 60(b) (Dkt. 426) is **DENIED.**

2.  OWW's Motion for Reconsideration, Under Federal Rule of Civil Procedure 59(e) or in the Alternative Rule 60(b)(6), of the Order of May 9, 2013 Granting an Injunction (Dkt. 435) is **GRANTED to the extent set forth herein.** The Court modifies its Order entered May 9, 2013 (Dkt. 418) related to the permanent injunction as follows:

    The Ohio Willow Wood Company and all of its agents, officers, servants, employees, successors, assigns, attorneys, and all other persons acting in concert or participation with the Ohio Willow Wood Company who receive actual notice of this Order by personal service or otherwise, shall be permanently enjoined and restrained from infringing, inducing infringement of, or contributorily infringing, under 35 U.S.C. § 271, claims 1-3, 5, 6, 11, and 12 of United States Patent No. 6,552,109 ("the '109 Patent") through the manufacture, use, sale, or offer for sale, within the United States, or importation into the United States, of the products adjudged to infringe and any products that are no more than colorably different from the products adjudged to infringe. The products adjudged to infringe the '109 Patent include the Ohio Willow Wood Company's products

identified as: (a) the Alpha Original Liners; (b) the Alpha Spirit Liners; (c) the Alpha Max Liners; (d) the Alpha AK Liners; (e) the Alpha P-POD Liners; (f) the Alpha Upper Extremity Liners; (g) the Alpha Design AK Liners; (h) the Alpha Design BK Liners; (i) the Alpha Original Suction Seal; (j) the Alpha Spirit Suction Seal; (k) the Alpha Flex Sleeve; (l) the Alpha AK Sleeve; and (m) the Alpha Socket Pads. This injunction is effective from the date of the original Injunction Order, May 9, 2013, through August 11, 2014.

Additionally, as of November 1, 2013, the Ohio Willow Wood Company and all of its agents, officers, servants, employees, successors, assigns, attorneys, and all other persons acting in concert or participation with the Ohio Willow Wood Company who receive actual notice of this Order by personal service or otherwise, shall be permanently enjoined and restrained from infringing, inducing infringement of, or contributorily infringing, under 35 U.S.C. § 271, claims 1-3, 5, 6, 11, and 12 of United States Patent No. 6,552,109 ("the '109 Patent") through the manufacture, use, sale, or offer for sale, within the United States, or importation into the United States, of the products adjudged to infringe and any products that are no more than colorably different from the products adjudged to infringe, amended to include the liners and sleeves containing the Advanced Formulas which replaced the Alpha line of

products identified in the Court's injunction of May 9, 2013, which apparently bear the same names as the above-referenced products.

3. OWW is directed to serve notice of this Order upon its distributors, both domestic and foreign, **on or before November 19, 2013**. OWW is directed to provide a list of the distributors it served to ALPS **on or before November 26, 2013**.

4. ALPS' Emergency Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt of May 9, 2013 Injunction Order (Dkts. 429, S-31) is **GRANTED**. The following products are found to be not more than colorably different from the previously adjudicated infringing products and are found to be infringing: the liners and sleeves containing the Advanced Formulas which replaced the Alpha line of products identified in the Court's injunction of May 9, 2013, which apparently bear the same names as the previous products. These products shall, by this ORDER, be incorporated in the Courts Order of injunction.

5. Pursuant to the Court's equitable jurisdiction to take broad remedial action to effectuate compliance with its orders, the Court appoints James Abrams of the law firm of Taft Stettinius & Hollister LLP, as a Receiver to oversee OWW. The Receiver's principal responsibility shall be: (1) to evaluate and determine the current financial relationship OWW has with all of its distributors, including the amount of OWW's accounts receivable; (2) to evaluate OWW's efforts over the past two years to dissipate the assets of

OWW to avoid payment of the judgment and avoid payment of a fair royalty to ALPS; (3) to assist in the determination of the comprehensiveness of the inventory sequester that OWW contends it has undertaken; and (4) to ensure that there is no further manufacture, use, sale or offer for sale of the Advanced Gel Products. The Receiver shall file reports regarding OWW's compliance or noncompliance with the Court every thirty (30) days until further order by the Court, or earlier if exigencies arise. OWW shall bear all costs associated with the Receiver. The Receiver shall prepare an invoice of the estimated fees and cost of services, including ancillary costs, such as experts and travel, etc. to be sent to ALPS and OWW and filed with the Court **no later than November 19, 2013**. Upon approval by the Court, OWW shall deposit the amount of the estimated cost into the trust account of the Receiver to be billed against monthly by the Receiver as compensation for his services. Once this payment is made for the benefit of ALPS to cover the cost of oversight of OWW's conduct, OWW shall have no legal or equitable right or interest in the funds in the trust account of the Receiver, nor shall OWW have any reversionary right or interest in the funds. Any amount remaining after the Receiver's affairs round down shall be paid to ALPS as additional compensation for its losses associated with OWW's infringing conduct.

6. All of the adjudged infringing products and Advance Gel Products are to be sequestered in a warehouse for inspection by the Receiver.

7. OWW is directed to submit any new prosthetic liner product proposals to counsel for ALPS for review and approval prior to making, using, selling, offering for sale, marketing within the United States, or importing into the United States any such prosthetic liner product. If the parties are unable to agree as to whether the proposed product complies with the Court's permanent injunction as set forth herein, then OWW shall submit the new product proposal to the Court for review and approval prior to making using, selling, offering for sale, marketing within the United States, or importing into the United States the proposed product.

8. **On or before November 15, 2013**, OWW shall deposit, into the Court's registry, the equivalent of twenty (20) percent the gross revenues from the sale of the Advanced Gel Products as fair compensation to ALPS as necessary to ameliorate the injury from the contemptuous infringement in the manufacture and sale of the Advanced Gel Products from the date beginning from November 27, 2012 through November 1, 2013.

9. OWW is directed to pay reasonable attorneys' fees and costs of ALPS associated with ALPS' bringing the Emergency Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt of May 9, 2013 Injunction Order. (Dkts. 429, S-31) ALPS is directed to file its claim for attorneys' fees and costs **on or before December 6, 2013**. To the extent that OWW objects to the attorneys' fees and costs, OWW shall file its objections within **ten (10) days** after the filing of ALPS' claim.

10. ALPS' Motion for Order Requiring OWW to Provide Additional Information Concerning Potential Post-Trial Infringement (Dkt. 448) is **GRANTED** as the information requested is essential to permit calculation of the damages awarded herein, and OWW did not oppose this motion during the hearing on November 1, 2013. OWW shall submit to ALPS and the Court **on or before November 15, 2013** an accounting of its infringing sales from November 27, 2012 through November 1, 2013, to permit a complete evaluation of the calculation it has offered.

11. Regarding ALPS' Supplement to Alps South, LLC's Motion for Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 431), the Court finds that ALPS' request for videographer costs should be reduced by $640 as the Court finds no authority to support ALPS' request for taxation of costs related to video synchronization packages for the depositions of James Colvin, Robert Arbogast, and Ryan Arbogast. (Dkt. 422) At the November 1, 2013, hearing, OWW had no objection to ALPS' amended request for photocopying costs, which was reduced to account for nontaxable exhibit costs. (Dkt. 431) Accordingly, ALPS is awarded videographer costs in the amount of $9,750 and photocopy costs in the amount of $22,207.31. The Clerk of Court is directed to tax these costs against OWW.

12. OWW's Motion for Extension of Time to Provide Objections to Plaintiff, Alps South, LLC's Claim for Attorneys' Fees and Motion to Compel Unredacted Invoices (Dkt. 459) is **DENIED without prejudice**. The Court will review the

unredacted attorneys' fee invoices provided by ALPS, and to the extent the Court believes OWW should be permitted to address any issues raised by the unredacted invoices, the Court will direct a further response from OWW.

13. ALPS' Motion for Leave to File Reply Memorandum with Respect to Plaintiff's Claim for Attorneys' Fees (Dkt. 463) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida this _12th_ day of November, 2013.

Mary S. Scriven
United States District Judge

Copies furnished to:
All Counsel of Record
All *Pro Se* parties

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ALPS SOUTH, LLC,**
**a Florida limited liability company,**

     **Plaintiff,**

**v.**                       **Case No.: 8:08-CV-1893-T-35MAP**

**THE OHIO WILLOW WOOD**
**COMPANY, an Ohio corporation,**

     **Defendant.**

_____/

## <u>ORDER</u>

**THIS CAUSE** comes before the Court for consideration of the Notice of Filing Receiver's Initial Estimate of Fees and Cost of Services and First Report filed under seal.  In the Notice, the Receiver provides an initial estimate of fees and costs of services in the amount of $117,375.00. The Court approves the amount of the initial estimate of fees and costs of services.   The Court directs The Ohio Willow Wood Company ("OWW") to deposit $117,375.00 into the Court's registry **on or before December 6, 2013**.

     The Receiver shall submit his bills for his services to the Undersigned's chambers e-mail, with a copy of the e-mail sent to the parties, every **thirty (30) days** until he is relinquished from his duties by the Court.  The Receiver's first bill shall be due **no later than December 6, 2013**.  The parties shall have **up to and including seven (7) days** from the day the Receiver submits his bill to object to the bill.  The parties shall file their objections under seal with the Court.

The Court has reviewed the Receiver's report and accepts the information and procedures set out by the Receiver to be followed by OWW, except to the extent set forth herein.

As an initial matter, the Court notes that the Receiver references J-Series as SEEPS. The Parties dispute whether J-Series is SEEPS, and the Court has made no determination whether J-Series is SEEPS.

Secondly, based on the report, it appears that OWW has sequestered the raw materials (*i.e.* SEEPS and J-Series) used to produce the infringing products. Further, the Receiver has instructed OWW to contact Kuraray to advise Kuraray that OWW cannot purchase SEEPS or J-Series until the Court's injunction expires. The Court is without knowledge, however, whether SEEPS was or would be utilized to produce other products that did not infringe the '109 Patent. Further, the Court is aware that OWW has advised that it has produced products for testing that contain J-Series (*i.e.* A-19), but that it claims do not infringe the '109 Patent. The Court's concern in this matter is to ensure that OWW complies with its injunction, which is that OWW cannot manufacture, use, sale, or offer for sale, within the United States, or importation into the United States, the products adjudged to infringe and any products that are no more than colorably different from the products adjudged to infringe. The Court is not empowered to prohibit OWW from possessing raw materials that are not subject to the ALPS patent in their raw form or using raw materials to manufacture products that have not been adjudged by this Court to be infringing. Therefore, the Court does not require OWW to sequester the SEEPS and J-Series it has already purchased and does not prohibit OWW from purchasing SEEPS or J-Series from Kuraray. The Court recognizes this

2

decision may impose an additional burden on the Receiver to monitor the SEEPS and J-Series to ensure that they are not being used to produce the infringing products.

Finally, the report states that OWW has expressed concerns about customer returns, including returns of previously sold infringing product. The Receiver asserts that the Parties are going to have to come to an agreement as to how these customer returns are handled so that innocent users of the infringing products are not injured. Any negotiation between the Parties regarding customer returns is a matter solely for the Parties to address. The Court will only direct OWW to comply with this Court's injunction that it not "manufacture, use, sale, or offer for sale, within the United States, or importation into the United States, the products adjudged to infringe and any products that are no more than colorably different from the products adjudged to infringe." To the extent that exchanging infringing products would be necessary to meet its warranty or exchange agreements with its customers, any such exchange would be at least "using" infringing products in violation of the injunction. Unless other agreements are made between ALPS and OWW concerning exchanges and those agreements are disclosed to the Receiver and to the Court, OWW will have to determine other means to meet its obligations to its customers.

Upon consideration of the forgoing, it is hereby ORDERED as follows:

1. OWW is directed to **DEPOSIT** in the Court's registry $117,375.00 **on or before December 6, 2013**. Upon deposit of these funds in the Court's registry, OWW shall have no legal or equitable right or interest in the funds in the trust account of the Receiver, nor shall OWW have any reversionary right or interest in the funds.

JA000195

2. OWW is directed to follow the procedures set forth in the Receiver's report, except to the extent set forth herein.

3. The Receiver shall submit his bills to the Undersigned's chambers e-mail, with a copy of the e-mail sent to the parties, every **thirty (30) days** until he is relinquished from his duties by the Court. The Receiver's first bill shall be due **no later than December 6, 2013**.

4. The Parties shall have **up to and including seven (7) days** from the day the Receiver submits his bill to object to the bill. The Clerk is directed to file the parties' objections under **SEAL**.

**DONE** and **ORDERED** in Tampa, Florida this 25th day of November 2013.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
All Counsel of Record
All *Pro Se* parties

4

JA000196

US006552109B1

(12) **United States Patent**   (10) **Patent No.:**     **US 6,552,109 B1**
Chen                              (45) **Date of Patent:**      **Apr. 22, 2003**

(54) **GELATINOUS ELASTOMER COMPOSITIONS AND ARTICLES**

(75) Inventor: **John Y. Chen**, Pacifica, CA (US)

(73) Assignee: **Applied Elastomerics, Inc.**, South San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/612,586**

(22) Filed: **Mar. 8, 1996**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. PCT/US94/04278, filed on Apr. 19, 1994, application No. PCT/US94/07314, filed on Jun. 27, 1994, application No. 08/288,690, filed on Aug. 11, 1994, now Pat. No. 5,633,286, application No. 08/581,188, filed on Dec. 29, 1995, now abandoned, application No. 08/581,191, filed on Dec. 29, 1995, now Pat. No. 5,760,117, and application No. 08/581,125, filed on Dec. 29, 1995, now Pat. No. 5,962,572.

(51) Int. Cl.$^7$ ............................ **C08J 5/02; C08J 51/00; C08K 5/01; B61C 15/00**

(52) **U.S. Cl.** ......................... **524/270;** 132/321; 442/59; 428/319.3; 428/319.7; 428/319.9; 428/378; 428/441; 428/462; 428/521; 428/537.1; 428/688; 174/137 A; 174/137 B; 524/474; 524/476; 524/490; 524/505

(58) **Field of Search** ........................... 132/321; 442/59; 428/319.3, 319.7, 319.9, 378, 441, 462, 521, 537.1, 688; 174/137 A, 137 B; 524/505, 474, 490, 476; 525/95, 98

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,485,787 A | 12/1969 | Haefele | 524/474 |
| 3,676,387 A | 7/1972 | Lindlof | 524/487 |
| 3,827,999 A | 8/1974 | Crossland | 524/500 |
| 3,860,013 A | 1/1975 | Czapor | 132/91 |
| 3,935,338 A | 1/1976 | Robertson | 427/207 |
| 4,001,167 A | 1/1977 | Tungseth | 524/476 |
| 4,136,699 A | 1/1979 | Collins | 604/387 |
| 4,151,057 A | 4/1979 | St. Clair | 522/110 |
| 4,176,240 A | 11/1979 | Sabia | 174/23 C |
| 4,259,540 A | 3/1981 | Sabia | 174/23 C |
| 4,369,284 A | * 1/1983 | Chen | 524/505 |
| 4,432,607 A | 2/1984 | Levy | 350/96.34 |
| 4,492,428 A | 1/1985 | Levy | 350/96.3 |
| 4,618,213 A | * 10/1986 | Chen | 524/505 |
| 4,643,924 A | 2/1987 | Uken | 428/35 |
| 4,690,831 A | 9/1987 | Uken | 427/44 |
| 4,692,371 A | 9/1987 | Morman | 428/244 |
| 4,709,982 A | 12/1987 | Crine | 524/476 |
| 4,718,678 A | 1/1988 | Vansant | 277/1 |
| 4,741,940 A | 5/1988 | Reed | 428/68 |
| 4,822,834 A | 4/1989 | Blevins | 524/427 |
| 4,842,931 A | 6/1989 | Zook | 428/354 |
| 4,865,905 A | 9/1989 | Uken | 428/220 |

| | | | |
|---|---|---|---|
| 4,880,878 A | 11/1989 | Himes | 525/89 |
| 4,883,196 A | 11/1989 | Sieverding | 524/480 |
| 4,900,877 A | 2/1990 | Dubrow | 174/35 |
| 4,942,270 A | 7/1990 | Gamarra | 174/93 |
| 5,066,259 A | 11/1991 | Acker | 446/385 |
| 5,088,734 A | 2/1992 | Glava | 273/73 |
| 5,098,421 A | 3/1992 | Zook | 604/367 |
| 5,149,736 A | 9/1992 | Gamarra | 524/490 |
| 5,153,254 A | * 10/1992 | Chen | 524/505 |
| 5,167,649 A | 12/1992 | Zook | 604/307 |
| 5,191,752 A | 3/1993 | Murphy | 54/44.5 |
| 5,262,468 A | * 11/1993 | Chen | 524/505 |
| 5,313,019 A | * 5/1994 | Brusselmans et al. | 174/93 |
| 5,330,452 A | 7/1994 | Zook | 604/307 |
| 5,334,646 A | * 8/1994 | Chen | 428/521 |
| 5,336,708 A | * 8/1994 | Chen | 132/321 |
| 5,479,952 A | 1/1996 | Zachariades | 132/321 |
| 5,508,334 A | * 4/1996 | Chen | 524/505 |
| 5,559,265 A | 9/1996 | Love | 558/177 |
| 5,618,882 A | 4/1997 | Hammond | 525/92 D |
| 5,633,286 A | * 5/1997 | Chen | 524/505 |

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| GB | 1268431 | of 0000 |
| WO | WO 9005166 | * 5/1990 |

**OTHER PUBLICATIONS**

"Properties of Oriented Block copolymers", A. Skoulios, Journal of Polymer Science: Polymer Symnposium 58, 369–379 (1977).

"Styrene–Diene Triblock Copolymers: Orientation Conditions and Mechanical Properties of The Oriented Materials" A. Weill and R. Pixa, Journal of Polymer Science Polymer Symposium 58, 381–394 (1977).

SC:1102–89 Shell Chemical Technical Bulletin "KRATON® Thermoplastic Rubber in oil gels" Apr. 1989.

Adhesion of Viscoelastic Materials to Rigid Substrates Proc. Roy. Soc. A. 310, 433–448 (1969) Printed in Great Britain. Allen et al, Comprehensive Polymer Science—vol. 7; 1994; p. 416–431.

Kirk–Othmer; Encyclopedia of Chemical Technology; 1994; 4th Edition; p. 17–37.

Garder, William; Gardner's Chemical Synonyms and Trade Names; 1994.

Holden et al; Thermoplastic Elastomers; 2nd Edition; 1996; Chapter 1—p. 1–26; Chapter 3—p. 27–70; Chapter 4—p. 71–100.

* cited by examiner

*Primary Examiner*—Herbert J. Lilling

(57) **ABSTRACT**

Novel gelatinous compositions and articles are formed from an intimate melt blend admixture of one or more of a high viscosity poly(styrene-ethylene-butylene-styrene), poly (styrene-ethylene-ethylene-propylene-styrene), poly (styrene-ethylene-butylene)$_n$, and poly(styrene-ethylene-propylene)$_n$ triblock and branched copolymers and high levels of a plasticizing oil.

**12 Claims, No Drawings**

**Exhibit 1**

1

## GELATINOUS ELASTOMER COMPOSITIONS AND ARTICLES

### ORIGINS OF INVENTION AND RELATED APPLICATIONS

This application is a continuation-in-part of the following applications: U.S. Ser. Nos. PCT/US94/04278 filed Apr. 19, 1994 (published May 26, 1995 No. WO95/13851); PCT/US94/07314 filed Jun. 27, 1994 (published Jan. 4, 1996 No. WO96/00118); USSN 08/288,690 filed Aug. 11, 1994, now U.S. Pat. No. 5,633,286; USSN 08/581,188 filed Dec. 29, 1995, now abandoned; USSN 08/581,191 filed Dec. 29, 1995, now U.S. Pat. No. 5,760,117; USSN 08/581,125 filed Dec. 29, 1995, now U.S. Pat. No. 5,962,572.

### FIELD OF THE INVENTION

The present invention relates to useful gelatinous elastomer compositions and articles.

### BACKGROUND OF THE INVENTION

This application is based upon subject matters described in earlier filed and copending related applications and patents (see Related Applications above) which are specifically incorporated herein by reference.

As taught in related U.S. Pat. No. 4,369,284, No. 4,618,213 and No. 5,153,254, oil extended thermoplastic block copolymers of the prior art suffer certain poor properties. Shell Technical Bulletin No. SC 65-75 teaches the use of low viscosity poly(styrene-ethylene-butylene-styrene) triblock copolymers (Kraton G 1650 and G 1652) with Brookfield Viscosities of 1,500 and 550 cps (viscosity being measured for a solution of 20 weight percent solids in toluene at 250° C.) plasticized with oil, the compositions obtained trend to rupture and crumble when submitted to moderate shearing stress conditions.

### SUMMARY OF THE INVENTION

The advantages and inherent properties of the gelatinous elastomer compositions (herein interchangeably refer to as "gelatinous compositions" or simply as "gel compositions" or more simply as "gels") and articles of the invention are many. The gel compositions exhibits high dimensional stability, crack, tear, craze, and creep resistance, excellent tensile strength and high elongation, long service life under stress and capable of repeated handling, excellent processing ability for cast molding, non-toxic, nearly tasteless and odorless, extremely soft and strong, highly flexible, possessing elastic memory, substantially with little or no plasticizer bleedout. The gel can also be made transparent. The desirable combination of physical properties are unexpected.

In a first embodiment, the composites of the invention comprises a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat and interlocked with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) and from

(ii) about 300 to about 1,600 parts by weight of a plasticizing oil; said gelatinous elastomer compositions characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said block copolymers have the general configuration A-B-A wherein A is a glassy polymer end block segment of polystyrene and B is an

2

elastomeric polymer center block segment of (ethylene-ethylene-propylene) and said gel being in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly (styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nG_nM_n$, $M_nG_nG_nM_nM_n$, $M_nG_nM_nG_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity of from about 20 to about 800 gram Bloom.

More generally, the invention comprises thermoplastic, heat formable and heat reversible gelatinous elastomer compositions and articles formed from (I) 100 parts by weight of one or more hydrogenated styrene block copolymers having 2-methyl-1,3-butadiene and 1,3-butadiene blocks of the formula poly(styrene-ethylene-ethylene-propylene-styrene) and optionally in combination with (II) a selected amount of one or more selected polymer or copolymer; (III) from about 300 to about 1,600 parts by weight of a plasticizing oil; said gelatinous elastomer compositions being characterized by a gel rigidity of from about 20 to about 800 gram Bloom.

Useful articles can be formed from the gelatinous elastomer compositions of the invention, including molded articles, composites (gel compositions "interlocked" with various substrates), articles having sticking and non-sticking properties, strong oriented gel compositions as view in polarized light etc.

The various aspects and advantages of the invention will become apparent to those skilled in the art upon consideration of the accompanying disclosure.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

Gel compositions useful in the present invention are described in my earlier patents Nos. 4,369,284; 4,618,213; 5,153,254; 5,239,723; 5,262,468; 5,324,222; 5,334,646; 5,336,708; 5,475,890; 5,508,334; 5,624,294; 5,633,286; and 5,655,947 which are incorporated herein by reference.

The polymers useful in forming the gel compositions of the invention comprises high viscosity triblock and branched copolymers. The triblock copolymers have the general configuration A-B-A wherein each A is a glassy polymer end block segment of polystyrene and B is a elastomeric polymer center block segment of poly(ethylene-butylene), poly (ethylene-propylene) or poly(ethylene-ethylene-propylene). The useful high viscosity branched copolymers have the general configuration (A-B)$_n$ wherein A is polystyrene and B is (ethylene-butylene), (ethylene-propylene) or (ethylene-

JA000202

3

ethylene-propylene) and the subscript n is an number. The B and A portions of the triblock and branched copolymers are incompatible and form a two-phase system consisting of sub-micron domains of glassy polystyrene interconnected by flexible B chains. These domains serve to crosslink and reinforce the structure. This physical elastomeric network structure is reversible, and heating the polymer above the softening point of polystyrene temporarily disrupt the structure, which can be restored by lowering the temperature.

The most preferred gels can be prepared by melt blending an admixture comprising: (I) 100 parts by weight of one or more of a high viscosity triblock or branched copolymers or a mixture of two or more of poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-propylene-styrene), (styrene-ethylene-propylene)$_n$, (styrene-ethylene-butylene)$_n$, and optionally in combination with (II) a selected amount of one or more polymer or copolymer selected from the group consisting of poly(styrene-butadiene-styrene), poly (styrene-butadiene), poly(styrene-isoprene-styrene), poly (styrene-isoprene), poly(styrene-ethylene-propylene), poly (styrene-ethylene-ethylene-propylene-styrene) poly (styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly (ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, branched or star-shaped, or multiarm copolymer; and (III) from about 300 to about 1,600 parts by weight of an plasticizing oil.

As used herein, the liner triblock copolymers poly (styrene-ethylene-ethylene-propylene-styrene) is denoted by "SEEPS", poly(styrene-ethylene-butylene-styrene) is denoted by "SEBS", poly(styrene-ethylene-propylene-styrene) is denoted by "SEPS"; and the branched copolymers poly(styrene-ethylene-propylene)$_n$ is denoted by "(SEP)$_n$", and poly(styrene-ethylene-butylene)$_n$ is denoted by "(SEB)$_n$". Branched copolymers are often times conventionally referred to as radial or star-shaped polymers.

Gel compositions of the invention are characterized by gel rigidities of from less than about 20 gram Bloom to about 700 gram Bloom and higher. As used herein, the term "gel rigidity" in gram Bloom is determined by the gram weight required to depress a gel a distance of 4 mm with a piston having a cross-sectional area of 1 square centimeter at 23° C.

It should be noted that when the A to B ratio falls substantially below 31:69, various properties such as elongation, tensile strength, tear resistance and the like can decrease while retaining other desired properties, such as gel rigidity, flexibility, elastic memory.

The high viscosity triblock, radial, star-shaped, and multiarm copolymers in (I) which are suitable for use in the present invention has a typical Brookfield Viscosity value of a 20 weight percent solids solution in toluene at 25° C. of at least about 1,800 cps, and preferably about 2,000 cps or higher. Typically, the Brookfield Viscosity values can range from at least about 1,800 to about 16,000 cps and higher. More typically, the Brookfield Viscosity values can range from at least about 1,800 cps to about 40,000 cps and higher. Still more typically, the Brookfield Viscosity values can range from at least about 1,800 cps to about 80,000 cps and higher. Due to structural variations between the triblock, radial, star-shaped, and multiarm copolymers, the high vis-

4

cosity branched copolymers useful in the invention, typically, may exhibit a lower Brookfield Viscosity value than its counterpart triblock copolymers. However, when the triblock copolymers are considered as branched, then at equal branch lengths, the solution viscosities of the triblock copolymers and branched copolymers are about the same or equivalent. In other words, the typical Brookfield Viscosity values for branched copolymers of a 20 weight percent solids solution in toluene at 25° C. can be less than their counterpart triblock copolymers.

In all cases, the molecular chain lengths (molecular weights) of the triblock and branch copolymers must be sufficient to meet the high solution Brookfield Viscosities requirements described herein that is necessary for making the extremely soft and strong gel compositions.

The high viscosity triblock and branched copolymers: SEEPS, SEBS, SEPS, (SEB)$_n$, and (SEP)$_n$ can be measured under varying conditions of weight percent solution concentrations in toluene. The most preferred and useful triblock and branched copolymers selected have Brookfield Viscosity values ranging from about 1,800 cps to about 80,000 cps and higher when measured at 20 weight percent solution in toluene at 25° C., about 4,000 cps to about 40,000 cps and higher when measured at 25 weight percent solids solution in toluene. Typical examples of Brookfield Viscosity values for branched copolymers (SEB)$_n$ and (SEP)$_n$ at 25 weight percent solids solution in toluene at 25° C. can range from about 3,500 cps to about 30,000 cps and higher; more typically, about 9,000 cps and higher. Other preferred and acceptable triblock and branched copolymers can exhibit viscosities (as measured with a Brookfield model RVT viscometer at 25° C.) at 10 weight percent solution in toluene of about 400 cps and higher and at 15 weight percent solution in toluene of about 5,600 cps and higher. Other acceptable triblock and branched copolymers can exhibit about 8,000 to about 20,000 cps at 20 weight percent solids solution in toluene at 25° C. Examples of most preferred high viscosity triblock and branched copolymers can have Brookfield viscosities at 5 weight percent solution in toluene at 30° C. of from about 40 to about 50 cps and higher. While less preferred polymers can have a solution viscosity at 10 weight percent solution in toluene at 30° C. of about 59 cps and higher.

The high viscosity triblock, radial, star-shaped, and multiarm copolymer of the invention can have a broad range of styrene end block to ethylene and butylene center block ratio of about 20:80 or less to about 40:60 or higher. Examples of high viscosity triblock copolymers that can be utilized to achieve one or more of the novel properties of the present invention are styrene-ethylene-butylene-styrene block copolymers (SEBS) available from Shell Chemical Company and Pecten Chemical Company (divisions of Shell Oil Company) under trade designations Kraton G 1651, Kraton G 1654X, Kraton G 4600, Kraton G 4609 and the like. Shell Technical Bulletin SC:1393-92 gives solution viscosity as measured with a Brookfield model RVT viscometer at 25° C. for Kraton G 1654X at 10% weight in toluene of approximately 400 cps and at 15% weight in toluene of approximately 5,600 cps. Shell publication SC:68-79 gives solution viscosity at 25° C. for Kraton G 1651 at 20 weight percent in toluene of approximately 2,000 cps. When measured at 5 weight percent solution in toluene at 30° C., the solution viscosity of Kraton G 1651 is about 40. Examples of high viscosity SEBS triblock copolymers includes Kuraray's SEBS 8006 which exhibits a solution viscosity at 5 weight percent at 30° C. of about 51 cps. Kuraray's 4055 SEEPS (styrene-ethylene/ethylene-propylene-styrene) block poly-

US 6,552,109 B1

mer made from hydrogenated styrene isoprene/butadiene block copolymer or more specifically made from hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene which exhibits a viscosity at 5 weight percent solution in toluene at 30° C. of about 90 mPa-S, at 10 weight percent about 5800 mPa-S. Kuraray's 2006 SEPS polymer exhibits a viscosity at 20 weight percent solution in toluene at 30° C. of about 78,000 cps, at 5 weight percent of about 27 mPa-S, at 10 weight percent of about 1220 mPa-S, and at 20 weight percent 78,000 cps. Kuraray SEPS 2005 polymer exhibits a viscosity at 5 weight percent solution in toluene at 30° C. of about 28 mPa-S, at 10 weight percent of about 1200 mPa-S, and at 20 weight percent 76,000 cps. Other grades of SEBS, SEPS, (SEB)$_n$, (SEP)$_n$ polymers can also be utilized in the present invention provided such polymers exhibits the required high viscosity. Such SEBS polymers include (high viscosity) Kraton G 1855X which has a Specific Gravity of 0.92, Brookfield Viscosity of a 25 weight percent solids solution in toluene at 25° C. of about 40,000 cps or about 8,000 to about 20,000 cps at a 20 weight percent solids solution in toluene at 25° C.

The styrene to ethylene and butylene (S:EB) weight ratios for the Shell designated polymers can have a low range of 20:80 or less. Although the typical ratio values for Kraton G 1651, 4600, and 4609 are approximately about 33:67 and for Kraton G 1855X approximately about 27:73, Kraton G 1654X (a lower molecular weight version of Kraton G 1651 with somewhat lower physical properties such as lower solution and melt viscosity) is approximately about 31:69, these ratios can vary broadly from the typical product specification values. In the case of Kuraray's SEBS polymer 8006 the S:EB weight ratio is about 35:65. In the case of Kuraray's 2005, 2006, and 4055 the and S:EP weight ratios are 20, 35 and 30 respectively. Much like S:EB ratios of SEBS and (SEB)$_n$, the S:EP ratios of very high viscosity SEPS, (SEP)$_n$ copolymers are expected to be about the same and can vary broadly.

The S:EB, S:EP weight ratios of high viscosity SEBS, SEPS, (SEB)$_n$, and (SEP)$_n$ useful in forming the gel compositions of the invention can range from lower than about 20:80 to above about 40:60 and higher. More specifically, the values can be 19:81, 20:80, 21:79, 22:78, 23:77, 24:76, 25:75, 26:74, 27:73, 28:72, 29:71, 30:70, 31:69, 32:68, 33:67, 34:66, 35:65, 36:64, 37:63, 38:62, 39:61, 40:60, 41:59, 42:58, 43:57, 44:65, 45:55, 46:54, 47:53, 48:52, 49:51, 50:50, 51:49 and etc. Other ratio values of less than 19:81 or higher than 51:49 are also possible. Broadly, the styrene block to elastomeric block ratio of the high viscosity triblock, radial, star-shaped, and multiarm copolymers of the invention is about 20:80 to about 40:60 or higher, less broadly about 31:69 to about 40:60, preferably about 32:68 to about 38:62, more preferably about 32:68 to about 36:64, particularly more preferably about 32:68 to about 34:66, especially more preferably about 33:67 to about 36:64, and most preferably about 33:67. In accordance with the present invention, triblock copolymers such as Kraton G 1654X having ratios of 31:69 or higher can be used and do exhibit about the same physical properties in many respects to Kraton G 1651 while Kraton G 1654X with ratios below 31:69 may also be use, but they are less preferred due to their decrease in the desirable properties of the final gel.

Other polymers and copolymers (in major or minor amounts) can be selectively melt blended with one or more of the high viscosity polymers as mentioned above without substantially decreasing the desired properties; these (III) polymers include (SBS) styrene-butadiene-styrene block copolymers, (SIS) styrene-isoprene-styrene block

copolymers, (low styrene content SEBS) styrene-ethylene-butylene-styrene block copolymers, (SEP) styrene-ethylene-propylene block copolymers, (SEPS) styrene-ethylene-propylene-styrene block copolymers, (SB)$_n$ styrene-butadiene and (SEB)$_n$, (SEBS)$_n$, (SEP)$_n$, (SI)$_n$, styrene-isoprene multi-arm, branched or star-shaped copolymers and the like. Still, other (III) polymers include homopolymers which can be utilized in minor amounts; these include: polystyrene, polybutylene, polyethylene, polypropylene and the like.

Representative plasticizer oil gels (polymer+oil) of the invention include: (a) Kraton G 1651, G 1654X gels; (b) Kraton G 4600 gels; (c) Kraton G 4609 gels; other suitable high viscosity polymer and oil gels include: (d) Tuftec H 1051 gels; (e) Tuftec H 1041 gels; (f) Tuftec H 1052 gels; (g) Kuraray SEEPS 4055 gel; (h) Kuraray SEBS 8006 gel; (i) Kuraray SEPS 2005 gel; (j) Kuraray SEPS 2006 gel, and (k) Gels made from blends (polyblends) of (a)-(h) with other polymers and copolymers include: (1) SEBS-SBS gels: (2) SEBS-SIS gels; (3) SEBS-(SEP) gels; (4) SEBS-(SEB)$_n$ gels; (5) SEBS-(SEB)$_n$ gels; (6) SEBS-(SEP)$_n$ gels; (7) SEBS-(SI)$_n$ gels; (8) SEBS-(SI) multiarm gels; (9) SEBS-(SEB)$_n$ gels; (10) (SEB)$_n$ star-shaped copolymer gels; (11) gels made from blends of (a)-(k) with other homopolymers include: (12) SEBS/polystyrene gels; (13) SEBS/polybutylene gels; (14) SEBS/polyethylene gels; (14) SEBS/polypropylene gels; (16) SEP/SEBS oil gels (17), SEP/SEPS oil gels (18), SEP/SEPS/SEB oil gels (19), SEPS/SEBS/SEP oil gels (20), SEB/SEBS (21), EB-EP/ SEBS (22), SEBS/EB (23), SEBS/EP (24), (25) (SEP)$_n$ gels, (26) (SEP)$_n$ gels and the like.

Representative examples of commercial elastomers that can be formed with plasticizing oils in combination with the high viscosity triblock and branched copolymers described above into suitable gels for use in making the gel compositions of the invention: Shell Kratons D1101, D1102, D1107, D1111, D1112, D1113X, D1114X, D1116, D1117, D1118X, D1122X, D1125X, D1133X, D1135X, D1184, D1188X, D1300X, D1320X, D4122, D4141, D4158, D4240, G1650, G1652, G1657, G1701X, G1702X, G1726X, G1750X, G1765X, FG1901X, FG1921X, D2103, D2109, D2122X, D3202, D3204, D3226, D5298, D5999X, D7340, G1654X, G2701, G2703, G2705, G1706, G2721X, G7155, G7430, G7450, G7523X, G7528X, G7680, G7705, G7702X, G7720, G7722X, G7820, G7821X, G7827, G7890X, G7940. Kuraray's SEEPS, SEP/SEPS or SEP/SEB/SEPS Nos. 1001, 1050, 2002, 2003, 3023, 2007, 2043, 2063, 2050, 2103, 2104, 2105, 4033 (SEEPS), 4045 (SEEPS), 8004 (SEBS), 8007, and the like.

Plasticizers particularly preferred for use in practicing the present invention are will known in the art, they include rubber processing oils such as paraffinic and naphthenic petroleum oils, highly refined aromatic-free paraffinic and naphthenic food and technical grade white petroleum mineral oils, and synthetic liquid oligomers of polybutene, polypropene, polyterpene, etc. The synthetic series process oils are high viscosity oligomers which are permanently fluid liquid nonolefins, isoparaffins or paraffins of moderate to high molecular weight.

Examples of representative commercially available plasticizing oils include Amoco® polybutenes, hydrogenated polybutenes, polybutenes with epoxide functionality at one end of the polybutene polymer, liquid poly(ethylene/butylene), liquid hetero-telechelic polymers of poly (ethylene/butylene/styrene) with epoxidized polyisoprene and poly(ethylene/butylene) with epoxidized polyisoprene: Example of such polybutenes include: L-14 (320 Mn), L-50

(420 Mn), L-100 (460 Mn), H-15 (560 Mn), H-25 (610 Mn), H-35 (660 Mn), H-50 (750 Mn), H-100 (920 Mn), H-300 (1290 Mn), L-14E (27-37 cst @ 100oF Viscosity), H-300E (635-690 cst @ 210oF Viscosity), Actipol E6 (365 Mn), E16 (973 Mn), E23 (1433 Mn), Kraton L-1203, EKP-206, EKP-207, HPVM-2203 and the like. Example of various commercially available oils include: ARCO Prime (55, 70, 90, 200, 350, 400 and the like), Duraprime and Tufflo oils (6006, 6016, 6016M, 6026, 6036, 6056, 6206, etc), other white mineral oils include: Bayol, Bernol, American, Blandol, Drakeol, Ervol, Gloria, Kaydol, Litetek, Lyondell (Duraprime 55, 70, 90, 200, 350, 400, etc), Marcol, Parol, Peneteck, Primol, Protol, Sontex, and the like.

The Kuraray SEPTON 4000 series block polymers: 4033, 4055, 4045, and the like useful in making the gels of the instant invention are made from hydrogenated styrene isoprene/butadiene styrene block copolymer or more specifically made from hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene. Such poly (styrene-isoprene/butadiene-styrene) polymers, depending on the butadiene structure, when hydrogenated will result in "(SEB/EPS)" or reading the other way "(SEP/EBS)". In cases where the butadiene structures are controlled, it is appropriate to denote (SEB/EPS) as (SE/EPS) where E/EP is ethylene-ethylene-propylene or more simply as (SEEPS) to indicate that the ethylene (E) of the ethylene-butylene (EB) segment of the midblock (EB/EP) of the (SEB/EPS) block polymer is substantially greater than butylene (B) and the amount of (E) can be sufficient so as to exhibit ethylene crystallinity.

Generally, plasticizing oils with average molecular weights less than about 200 and greater than about 700 may also be used (e.g. H-300 (1290 Mn)).

The gel compositions of the invention can also be made into composites. The gels may be made non-adhering, non-sticking, (non-tacky), by incorporating an advantage amount of stearic acid (octadecanoic acid) or metal stearates (e.g., calcium stearate, magnesium sterate, zinc stearate, etc.).

An advantage of making non-sticking, non-tacky gels is the use of waxes, stearic acid and waxes, metal sterate and waxes, metal sterate and stearic acid. The use of stearic acid alone do not reduce tack. The amount of stearic acid is also important. As an example, ratio of 200 grams stearic acid to 2,000 gram of SEBS (a ratio of 0.1) will result in spotted tack reduction on the surface of the gel. A ratio of 250 to 2,000 will result in spotted crystallized regions on the surface of the gel or spotted tack reduction. A ratio of 300 to 2,000 will result in complete tack reduction with large stearic acid crystallized regions on the surface of the gel. When microcrystalline waxes are incorporated together with stearic acid, the crystallization of stearic acid completely disappears from the surface of the gel. For example excellent result is achieved with 200 grams of stearic acid, 150 grams of microcrystalline wax and 2,000 grains of SEBS. The same excellent results is achieved when SEBS is adjusted to 3,000 grams, 4,000 grams, etc. The same result is achieved with SEPS, $(SEB)_n$, $(SEP)_n$ polymers.

The present invention also provides oriented gels with improved high strength alignment properties as evidenced by optical techniques such as viewing oriented gel in plane-polarized light. Oriented gels exhibit birefringence in the relaxed unextended state. Oriented gels with improved strength are suitable for use as dental floss since they do not break as easily as un-oriented gels of the same rigidity.

The oriented gels can also contain useful amounts of conventionally employed additives such as stabilizers,

antioxidants, antiblocking agents, colorants, fragrances, flame retardants, flavors, other polymers in minor amounts and the like to an extend not affecting or substantially decreasing the desired properties of the invention.

Oriented gels aligned by controlled stretching during the gel's transition from a heated, extremely viscous, non melting, non flowing state and the cooled solid gel state produces strong gels which are found to have greater tensile strength than gels of the same rigidity which have not been stretched to a selected degree during its heating and cooling histories. Gels which are selectively stretched during its (non melt flowing) heated state and rapidly cooled by flowing air, cold liquid bath or in contact with a cool surface exhibit optical birefringence when viewed under plane-polarized light. The degree of stretching during the gels cooling history from the heated state can vary. Stretching of at least about 50% to more than about 1000% are of advantage to produce birefringence and stronger gels. Birefringence is not observed in relaxed gels which do not undergo stretching during its heating and cooling histories. Slight to very strong birefringence are observed in relaxed gels which are stretched during their heating and cooling histories. It is evident that stressing the gel during its cooling history as it cools from the heated state produce unexpected stronger oriented gels. We therefore consider oriented gels to be a new and novel composition physically different from the less stronger gels formed without stressing during the gels cooling history and which do not show birefrigence in the relaxed state. Oriented gels may be formed in combination with various substrates such as described below. In past situations where in order to obtain stronger gel strength, gels with higher rigidities and lower plasticizer content must be used, it is now possible to make a oriented gel with the same plasticizer content having a higher useful gel strength.

The gel compositions and oriented gel compositions of the invention can be casted unto various substrates, such as open cell materials, metals, ceramics, glasses, and plastics, etc.; the molten gel composition is deformed as it is being cooled. Useful open-cell plastics include: polyamides, polyimides, polyesters, polyisocyanurates, polyisocyanates, polyurethanes, poly(vinyl alcohol), etc. Open-celled Plastic (sponges) suitable for use with the compositions of the invention are described in "Expanded Plastics and Related Products", Chemical Technology Review No. 221, Noyes Data Corp., 1983, and "Applied Polymer Science", Organic Coatings and Plastic Chemistry, 1975. These publications are incorporated herein by reference.

The gel compositions denoted as "G" of the invention can be physically interlocked with a selected material denoted as "M" to form composites as denoted for simplicity by their combinations $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nG_nM_n$, $G_nM_nM_nG_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, and the like or any of their permutations of one or more $G_n$ with $M_n$ and the like, wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials and the like; wherein when n is a subscript of G, n denotes the same or a different gel rigidity of from about 20 to about 800 gram Bloom). The gel compositions of the composites are formed from I, II, and III components described above.

Sandwiches of gel/material (i.e. gel-material-gel or material-gel-material, etc.) are ideal for use as shock absorbers, acoustical isolators, vibration dampers, vibration

JA000205

Case 1:12-cv-01652-AJT-JFA Document 185-1 Filed 02/28/2014 Page 172 of 234

9

isolators, and wrappers. For example the vibration isolators can be use under research microscopes, office equipment, tables, and the like to remove background vibrations.

The gelatinous elastomer compositions and oriented gel compositions are prepared by blending together the components including other additatives as desired at about 23° C. to about 100° C. forming a paste like mixture and further heating said mixture uniformly to about 150° C. to about 200° C. until a homogeneous molten blend is obtained. Lower and higher temperatures can also be utilized depending on the viscosity of the oils and amounts of SEBS, SEPS, $(SEB)_n$, $(SEP)_n$ or mixtures thereof used. These components blend easily in the melt and a heated vessel equipped with a stirrer is all that is required. Small batches can be easily blended in a test tube using a glass stirring rod for mixing. While conventional large vessels with pressure and/or vacuum means can be utilized in forming large batches of the instant compositions in amounts of about 40 lbs or less to 10,000 lbs or more. For example, in a large vessel, inert gases can be employed for removing the composition from a closed vessel at the end of mixing and a partial vacuum can be applied to remove any entrapped bubbles. Stirring rates utilized for large batches can range from about less than 10 rpm to about 40 rpm or higher.

The oriented gelatinous elastomer composition of the invention is excellent for forming the strong gelatinous elastomer articles of the invention. The gelatinous elastomer articles can be formed by blending, injection molding, extruding and other conventional methods. For example, Shapes having various crossection can be extruded; and as the hot exudate is emerging from the extrusion die, the extradate can be stretched, pulled, twisted or in various manner stressed as it is rapidly placed in contact with cooling air, cool water bath, or other cooling media.

The gel compositions can also be formed directly into articles or remelted in any suitable hot melt applicator and extruded or spun into threads, bands, or other shapes.

The instant compositions is excellent for cast molding and the molded products have various excellent characteristics which cannot be anticipated form the properties of the raw components. Other conventional methods of forming the composition can be utilized.

The basis of this invention resides in the fact that one or more of a high viscosity triblock or branched copolymers or a mixture of two or more of such copolymers having styrene end block to elastomeric block ratio preferably within the contemplated range of from about 20:80 to about 40:60 and higher, more preferably from between about 31:69 to about 40:60 and higher when blended in the melt with an appropriate amount of plasticizing oil makes possible the attainment of gelatinous elastomer compositions having a desirable combination of physical and mechanical properties, notably high elongation at break of at least 1,600%, ultimate tensile strength of about at least $8\times10^5$ dyne/cm², low elongation set at break of substantially not greater than about 2%, tear resistance of at least $5\times10^5$ dyne/cm², substantially about 100% snap back when extended to 1,200% elongation, and a gel rigidity of substantially from about 20 gram to about 700 gram Bloom and higher.

More specifically, the gelatinous composition of the present invention exhibit one or more of the following properties. These are: (1) tensile strength of about $8\times10^5$ dyne/cm² to about $10^7$ dyne/cm² and greater; (2) elongation of about 1,600% to about 3,000% and higher; (3) elasticity modulus of about $10^4$ dyne/cm² to about $10^6$ dyne/cm² and greater; (4) shear modulus of about $10^4$ dyne/cm² to about

10

$10^6$ dyne/cm² and greater as measured with a 1, 2, and 3 kilogram load at 23° C.; (5) gel rigidity of about less than about 20 gram Bloom to about 700 gram Bloom and higher as measured by the gram weight required to depress a gel a distance of 4 mm with a piston having a cross-sectional area of 1 square cm at 23° C.; (6) tear propagation resistance of at least about $5\times10^5$ dyne/cm²; (7) and substantially 100% snap back recovery when extended at a crosshead separation speed of 25 cm/minute to 1,200% at 23° C. Properties (1), (2), (3), and (6) above are measured at a crosshead separation speed of 25 cm/minute at 23° C.

The gelatinous elastomer articles molded from the instant compositions have various additional important advantages in that they do not crack, creep, tear, crack, or rupture in flexural, tension, compression, or other deforming conditions of normal use; but rather the molded articles made from the instant composition possess the intrinsic properties of elastic memory enabling the articles to recover and retain its original molded shape after many extreme deformation cycles as compared to prior art triblock copolymer oil-extended compositions. In applications where low rigidity, high elongation, good compression set and excellent tensile strength are important, the instant gel compositions would be preferred.

The gelatinous elastomer compositions of the present invention are useful in low frequency vibration applications, such as viscoelastic layers in constrained-layer damping of mechanical structures and goods, as viscoelastic layers used in laminates for isolation of acoustical and mechanical noise, as anti-vibration elastic support for transporting shock sensitive loads, as vibration isolators for an optical table, as viscoelastic layers used in wrappings, enclosures and linings to control sound, as compositions for use in shock and dielectric encapsulation of optical, electrical, and electronic components. The compositions are also useful as molded shape articles for use in medical and sport health care, such use include therapeutic hand exercising grips, dental floss, crutch cushions, cervical pillows, bed wedge pillows, leg rest, neck cushion, mattress, bed pads, elbow padding, dermal pads, wheelchair cushions, helmet liner, cold and hot packs, exercise weight belts, traction pads and belts, cushions for splints, slings, and braces (for the hand, wrist, finger, forearm, knee, leg, clavicle, shoulder, foot, ankle, neck, back, rib, etc.), and also soles for orthopedic shoes. Other uses may include as toys, optical uses (e.g. cladding for cushioning optical fibers from bending stresses) and various optical devices, as lint removers, dental floss, as tips for swabs, as fishing bate, as a high vacuum seal (against atmosphere pressure) which contains a useful amount of a mineral oil-based magnetic fluid particles, etc.

As an example of the versatility of use of the instant gel compositions, a hand exerciser can be made in any shape so long as it is suitable for use as a hand exerciser: a sphere shape, a cube shape, a rectangular shape, etc. Likewise, a wheelchair cushion can be made from the composition in any shape, so long as it meets the needs of the user of the cushion. For example, a cushion can be made by forming the composition into a selected shape matching the contours of the specific body part or body region. The composition can be formed into any desired shaped, size and thickness suitable as a cushion; the shaped composition can be additionally surrounded with film, fabric, foam, or any other desired material or combinations thereof. Moreover, the composition can be casted onto such materials, provided such materials substantially maintain their integrity (shape, appearance, texture, etc.) during the casting process. The same applies for brace cushions for the hand, wrist, finger, forearm, knee, leg, etc.

JA000206

11

Another versatile use of the composition is dental flossing. The dental floss can be almost any shape so long as it is suitable for dental flossing. A thick shaped piece of the composition can be stretched into a thin shape and used for flossing. A thinner shaped piece would require less stretching, etc.

The instant compositions can be formed in any shape; the original shape can be deformed into another shape (to contact a regular or irregular surface) by pressure and upon removal of the applied pressure, the composition in the deformed shape will recover back to its original shape.

While preferred components and formulation ranges have been disclosed herein persons of skill in the art can extend these ranges using appropriate material according to the principles discussed herein. All such variations and deviations which rely on the teachings through which the present invention has advanced the art are considered to be within the spirit and scope of the present invention. The invention is further illustrated by means of the following illustrative embodiments, which are given for purpose of illustration only and are not meant to limit the invention to the particular components and amounts disclosed.

## EXAMPLE I

A comparison was made between a low viscosity poly (styrene-ethylene-butylene-styrene) triblock copolymer having styrene end block to ethylene and butylene center block ratio below the range between 31:69 to 40:60 and a high viscosity poly(styrene-ethylene-butylene-styrene) triblock copolymer of the invention. Three different triblock copolymers were melt blended separately with a paraffinic white petroleum oil. Table I below shows the physical properties obtain with respect to each of the different viscosity and styrene to ethylene and butylene ratio triblock copolymer oil-blends tested.

The properties measured are as follows: Tear Propagation (ASTM D 19938 modified), Cracking (ASTM D 518 Method B modified), Tensile Strength (ASTM D 412 modified), Ultimate elongation (ASTM D 412 modified), Tensile Set (ASTM D 412 Modified), Compression Set (ASTM D 395 modified), Snap Back, and Hand Kneading (60 seconds). The methods of measurement are taught in United States patents Nos. 4,618,213 and 5,153,254; and, as well as, in copending applications Serial Nos. 705,711; 934,027 and 935,540.

### TABLE I

| Formulation | S/EB Ratio[1] | Weight Parts | | |
|---|---|---|---|---|
| | | A | B | C |
| SEBS[2] | 28:72 | 100 | | |
| SEBS[3] | 29:71 | | 100 | |
| SEBS[4] | 33:67 | | | 100 |
| Paraffinic oil[5] | | 400 | 400 | 400 |
| Stabilizer[6] | | 2.5 | 2.5 | 2.5 |
| Breaking strength[7], dyne/cm[2] | | $4 \times 10^5$ | $4 \times 10^5$ | $4 \times 10^6$ |
| Tear propagation[8], dyne/cm[2] | | $8 \times 10^4$ | $7 \times 10^4$ | $1 \times 10^6$ |

12

### TABLE I-continued

| Formulation | S/EB Ratio[1] | Weight Parts | | |
|---|---|---|---|---|
| | | A | B | C |
| Compression set[10] at 24 hours | | 81%[R] | 77%[R] | 0.0% |
| Rigidity, gram Bloom | | 1,536 | 1,520 | 360 |

[1]Styrene to ethylene and butylene ratio
[2]Shell Kraton G1650 having a Brookfield viscosity of 1,500 cps as measured for a 20% weight solids solution in toluene at 25° C.
[3]Shell Kraton G 1652 having a Brookfield viscosity of 550 cps as measured for a 20% weight solids solution in toluene at 25° C.
[4]Shell Kraton G 1651 having a Brookfield viscosity of 2,000 cps as measured for a 20% weight solids solution in toluene at 25° C.
[5]ARCO prime 200,
[6]Irganox 1010,
[7]ASTM D 412 modified,
[8]ASTM D 1938 modified,
[9]ASTM D 412 modified,
[10]ASTM D 2395 modified,
[R]ruptured completely

The results of Table I show drastically unacceptable poor properties of low viscosity triblock copolymers having styrene to ethylene and butylene ratios and low viscosity which are below the contemplated (preferred) range of the instant invention.

Comparisons of oil extended triblock copolymers have been described in Shell Chemical Company Technical Bulletin SC: 1102-89 (Apr. 1989) "KRATON®THERMOPLASTIC RUBBERS IN OIL GELS" which is incorporated herein by reference.

## EXAMPLE II

One hundred parts by weight of a high viscosity poly (styrene-ethylene-butylene-styrene) triblock copolymer (Shell Kraton G 1651) having a styrene end block to ethylene and butylene center block ratio of 33:67 with 0.1 parts by weight of a stabilizer (Irrganox 1010) was melt blended with various quantities of a naphthenic oil (ARCO Tufflo 6024). Samples having the dimensions of 5 cm×5 cm×3 cm were cut and measured for gel rigidity on a modified Bloom gelometer as determined by the gram weight required to depress the gel a distance of 4 mm with a piston having a cross-sectional area of 1 cm[2]. The average gel rigidity values with respect to various oil concessions are set forth in Table II below.

### TABLE II

| Oil per 100 parts of Triblock copolymer | Gel Rigidity, gram Bloom |
|---|---|
| 360 | 500 |
| 463 | 348 |
| 520 | 280 |
| 615 | 240 |
| 635 | 220 |
| 710 | 172 |
| 838 | 135 |
| 1,587 | 54 |

## EXAMPLE III

Example II was repeated except about 980 parts oil was used and the gel rigidity found to about 101 gram Bloom. Other properties measured were: tensile strength at break about $4.4 \times 10^6$ dyne/cm[2], elongation at break about 2,4470%, elasticity modulus about $3.5 \times 10^4$ dyne/cm[2], and

US 6,552,109 B1

13

shear modulus about $3.7 \times 10^4$ dyne/cm². The tensile strength, elongation, elasticity modules were measured with cross-head separation speed of 25 cm/minute at room temperature. The shear modulus was measured with a 1, 2, and 3 kilogram load at room temperature.

### EXAMPLE IV

Example II was repeated except about 520 parts of a polybutene (Amoco Indopol H-300) was used and the gel rigidity found to be about substantially unchanged with respect to use of naphthenic oil alone.

### EXAMPLE V

Example II was repeated except about 520 parts of a polypropene (Amoco C-60) was used and the gel rigidity found to be about substantially unchanged with respect to use of naphthenic oil alone.

### EXAMPLE VI

Example II was repeated except about 520 parts of a polyterpene (Hercules Piccolyte S10) was used and the gel rigidity found to be about substantially unchanged with respect to use of naphthenic oil alone.

### EXAMPLE VII

Example II was repeated except about 360 parts of a combined mixture of: 72 parts of a paraffinic oil (ARCO prime 200), 72 pars of a naphthenic oil (ARCO Tufflo 6014), 72 parts of a polybutene oligomer (Amoco Indopol H-200), 72 parts of a polypropene oligomer (Amoco Polypropene C-60), and 72 parts of a polyterpene oligomer (Hercules Piccolyte S10) was used and the gel rigidity found to be about substantially unchanged with respect to the use of naphthenic oil alone.

### EXAMPLE VIII

Example III was repeated except 933 parts oil with 147 parts by weight of a high viscosity poly(styrene-ethylene-butylene-styrene) triblock copolymer containing 47 parts of a naphthenic process oil (Shell Kraton G 4609) having a styrene to ethylene and butylene ratio of about 33:67 was used and the physical properties were found to be about substantially unchanged with respect to the components used in Example III.

### EXAMPLE IX

Example III was repeated except 933 parts oil with 147 parts by weight of a high viscosity poly(styrene-ethylene-butylene-styrene) triblock copolymer containing 47 parts of a paraffinic white petroleum oil (Shell Kraton G 4609) having a styrene to ethylene and butylene ratio of about 33:67 was used and the physical properties were found to be about substantially unchanged with respect to the components used in Example I.

### EXAMPLE X

Example I was repeated except about 400 parts of oil was used and the properties measured were: tear propagation about $1.4 \times 10^6$ dyne/cm², no crack growth in 180° bend under 50 gram load for 5,000 hours at room temperature, tensile strength about $4 \times 10^6$ dyne/cm², elongation at break about 1,700%, tensile set about 0% at 1,200% elongation, compression set about 0% when tested under 5,000 gram load for 24 hours, and 100% snap back recovery after extension to 1,200%.

14

Examples XI–XIV-t below illustrate other modes of practice contemplated.

### EXAMPLE XI

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer is used having a styrene end block to ethylene and butylene center block ratio of about 32:68 and the gel rigidity is found to be within the range of about 20 to about 700 gram Bloom.

### EXAMPLE XII

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 34:66 and the gel rigidity is found to be within the range of about 20 to about 700 gram Bloom.

### EXAMPLE XIII

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 36:64 and the gel rigidity is found to be within the range of about 20 to about 700 gram Bloom.

### EXAMPLE XIV

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 38:62 and the gel rigidity is found to be within the range of about 20 to about 700 gram Bloom.

### EXAMPE XIV-a

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 31:69 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-b

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 37:63 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-c

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 19:81 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-d

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to

JA000208

US 6,552,109 B1

15

ethylene and butylene center block ratio of about 20:80 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-e

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer is used having a styrene end block to ethylene and butylene center block ratio of about 38:62 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-f

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 29:71 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-g

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 26:74 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-h

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 22:78 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-i

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 25:75 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-j

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 26:74 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-k

Example II is repeated except a high viscosity poly (styrene-ethylene-propylene-styrene) polymer having a S:EP ratio of 35:65 and a Brookfield Viscosity at 20 weight percent at 30° C. of about 78,000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-l

Example II is repeated except a high viscosity poly (styrene-ethylene-propylene-styrene) polymer having a

16

S:EP ratio of 20:80 and a Brookfield Viscosity at 20 weight percent at 30° C. of about 76,000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-m

Compositions of Example II are continuously extruded into 1 meter length rod shape articles through a 0.05, a 0.1, a 0.2, a 0.4, a 0.8, a 1.0, a 1.5, a 1.8, a 2.0, a 4.0, a 8.0 cm (inside diameter) pipe and the extruded articles are allowed to cool to room temperature. Light from a Spectra Physics Model 155A laser with a wavelength of about 632.80 nm is introduced at one end of each article and the light transmitted therethrough.

## EXAMPLE XIV-n

Example II is repeated except a high viscosity star-shaped poly(styrene-ethylene-butylene) block copolymer having a S:EB ratio of 30:70 and a Brookfield Viscosity at 25 weight percent at 25° C. of about 9000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-o

Example II is repeated except a high viscosity star-shaped poly(styrene-ethylene-propylene) random copolymer having a S:EP ratio of 35:65 and a Brookfield Viscosity at 25 weight percent at 25° C. of about 20,000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-p

Example II is repeated except the molten composition is casted onto a polyether, a polyester, a surlyn ionomer open cell sponge thereby displacing the air space within the sponge and the gel rigidity is found to be greater than about the sum of the combined rigidity of the composition and sponge alone.

## EXAMPLE XIV-q

Example II is repeated except a high viscosity star-shaped mixed poly(styrene-ethylene-propylene) copolymer having a S:EP ratio of 35:65 and a Brookfield Viscosity at 25 weight percent at 25° C. of about 12,000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-r

Example II is repeated except a high viscosity star-shaped mixed poly(styrene-ethylene-butylene) block copolymer having a S:EB ratio of 35:65 and a Brookfield Viscosity at 25 weight percent at 25° C. of about 9,000 cps is used and the get rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-s

The composition of Example XXI is casted unto a SCOT-FOAM® 1/8" thick: 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 60, 70, 80, 90, 100, and 200 ppi foam sheet.

## EXAMPLE XIV-t

The procedure of Example II is repeated except Shell Kraton G 1855X, poly(styrene-ethylene-butylene-styrene)

17

triblock copolymer is used having a styrene end block to ethylene and butylene center block ratio of about 27:73 and the gel rigidity is found to be within the range of about 10 to about 800 gram Bloom.

## EXAMPLE XV

Examples I-XIV, XIV-I,n,o,q,r and t are repeated and the gels are extruded and rapidly stretched up to 800% elongation by hand in a cooled water bath. The resulting gels show birefrigence and greater strength than corresponding unstressed (unstretched) gels.

## EXAMPLE XVI

A gelatinous elastomer composition of 100 parts of Kraton G1651 and 400 parts by weight of Duraprime 200 white oil is made according to Example II and extruded and drawn into selected lengths of varying diameters from about 0.01 cm to about 0.25 cm for use as dental floss, the gel rigidity being within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XVII

Example XVI is repeated using Kurarary SEPS 2006 copolymer, Kurarary SEEPS 4055 copolymer, a high viscosity $(SEB)_n$ copolymer, and a high viscosity $(SEP)_n$ copolymer, the gel rigidities being within the range of about 20 to 800 gram Bloom.

While certain features of this invention have been described in detail with respect to various embodiments thereof, it will, of course, be apparent that other modifications can be made within the spirit and scope of this invention, and it is not intended to limit the invention to the exact details shown above except insofar as they are defined in the following claims.

What I claim is:

1. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) and from

(ii) about 300 to about 1,600 parts by weight of a plasticizing oil; and in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly (styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nM_n$, $G_nG_nM_nM_n$, $G_nG_nM_nM_nM_n$, $G_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_n$, $G_nG_nG_nM_n$, $G_nM_nM_nM_n$, $G_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected

18

from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

2. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil; in combination with or without

(iii) a selected amount of one or more polymer or copolymer of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene), poly(styrene-isoprene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, branched, star-shaped, or multiarm copolymer, and n is an integer greater than one; wherein said composite formed from the combination $G_nM_n$ of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

3. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene block copolymer(s) with 2-methyl-1,3-butadiene and 1,3-butadiene and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil: in combination with or without

(iii) a selected amount of one or more selected polymer or copolymer selected from the group consisting of poly (styrene-butadiene-styrene), poly(styrene-butadiene), poly(styrene-isoprene-styrene), poly(styrene-isoprene), poly(styrene-ethylene-propylene), poly (styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly (styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, branched, star-shaped, or multiarm copolymer; and n is an integer greater than one, wherein said gelatinous elastomer compositions characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said composite formed from the combination $G_nM_n$, $G_nM_nM_n$, $G_nG_nM_nM_n$, $G_nG_nM_nM_nM_n$, $G_nM_nG_nM_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_n$, $G_nG_nG_nM_n$, $G_nM_nM_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_n$,

$G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**4.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite article by heat with a selected substrate material M, said gelatinous elastomer composition form from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s), wherein at least one of said block copolymer is a high viscosity copolymer having a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 cps and higher which corresponds to a viscosity at 10 weight percent of about 5800 cps and higher which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25° C. of at about 80,000 cps and higher, and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without

(ii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene), poly(styrene-isoprene-styrene), poly(styrene-isoprene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, branched, radial, star-shaped, or multiarm copolymer; and n is an integer greater than one; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nG_n$, $G_nM_nG_nM_n$, $G_nM_nG_nM_n$, $G_nM_nG_nM_n$, $M_nG_nM_nG_nM_nG_n$, $M_nG_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$, wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**5.** A composite of claim **1, 2, 3,** or **4**, wherein said hydrogenated styrene block copolymer is one or more of a block copolymer of poly(styrene-ethylene-ethylene-propylene-styrene).

**6.** A composite article of claim **1** or **4**, wherein a source of said hydrogenated poly(styrene-isoprene/butadiene-styrene) block polymer being Septon 4055.

**7.** A composite of claim **1, 2, 3,** or **4**, wherein said one or more (i) block copolymer(s) is poly(styrene-ethylene-ethylene-propylene-styrene) and a source of said block copolymers being Septon® 4033, Septon® 4045 and Septon® 4055.

**8.** A composite of claim **2, 3,** or **6** wherein said thermoplastic, heat formable and heat reversible gelatinous elastomer composition is a dielectric encapsulant of an electrical, or an electronic component(s).

**9.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer

composition, G, which is formed into a composite article by heat with a selected substrate material M, said gelatinous elastomer composition form from

(i) 100 parts by weight of one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene) block copolymers and a source of said block copolymers being Septon® 4033, Septon® 4045 and Septon® 4055, and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nG_n$, $G_nM_nG_nM_n$, $M_nG_nM_nG_nM_nG_n$, $M_nG_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**10.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of a block copolymer of one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene block copolymers and a source of said block copolymers being Septon® 4033, Septon® 4045 and Septon® 4055, and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nG_n$, $G_nM_nG_nM_n$, $M_nG_nM_nG_nM_nG_n$, $M_nG_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**11.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene)

US 6,552,109 B1

block copolymers and a source of said block copolymers being Septon® 4033 and Septon® 4055, and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; wherein said gelatinous elastomer composition characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said composite formed from the combination $G_nM_n$,

$G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**12**. A composite according to claims **1**, **2**, **3**, or **4**, wherein said one or more (i) block copolymers is made from poly(styrene-ethylene-ethylene-propylene-styrene) and a source of said block copolymers being Septon® 4033 and Septon® 4055.

* * * * *



US006552109C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8385th)

# United States Patent

Chen

(10) **Number:** US 6,552,109 C1

(45) **Certificate Issued:** Jul. 5, 2011

(54) **GELATINOUS ELASTOMER COMPOSITIONS AND ARTICLES**

(75) Inventor: **John Y. Chen**, Pacifica, CA (US)

(73) Assignee: **Patent & License Office**, Pacifica, CA (US)

**Reexamination Request:**
No. 90/010,685, Sep. 16, 2009

**Reexamination Certificate for:**
Patent No.: **6,552,109**
Issued: **Apr. 22, 2003**
Appl. No.: **08/612,586**
Filed: **Mar. 8, 1996**

### Related U.S. Application Data

(63) Continuation-in-part of application No. PCT/US94/04278, filed on Apr. 19, 1994, and a continuation-in-part of application No. PCT/US94/07314, filed on Jun. 27, 1994, and a continuation-in-part of application No. 08/288,690, filed on Aug. 11, 1994, now Pat. No. 5,633,286, and a continuation-in-part of application No. 08/581,188, filed on Dec. 29, 1995, now abandoned, and a continuation-in-part of application No. 08/581,191, filed on Dec. 29, 1995, now Pat. No. 5,760,117, and a continuation-in-part of application No. 08/581,125, filed on Dec. 29, 1995, now Pat. No. 5,962,572.

(51) **Int. Cl.**
| | |
|---|---|
| *B61C 15/00* | (2006.01) |
| *C08J 5/02* | (2006.01) |
| *C08K 5/01* | (2006.01) |
| *C08K 5/00* | (2006.01) |

(52) **U.S. Cl.** ...................... 524/270; 428/537.1; 428/68; 428/319.3; 428/319.7; 428/319.9; 428/378; 428/441; 428/462; 428/521; 442/59; 524/474; 524/476; 524/490; 524/505; 132/321; 174/137 A; 174/137 B

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,265,765 | A | 8/1966 | Holden et al. |
| 3,676,387 | A | 7/1972 | Lindlof |
| 3,799,775 | A | * 3/1974 | Petruzzelle ............... 430/63 |
| 3,827,999 | A | 8/1974 | Crossland |
| 4,369,284 | A | 1/1983 | Chen |
| 4,389,587 | A | * 6/1983 | Levine et al. ............... 310/208 |
| 4,618,213 | A | 10/1986 | Chen |
| 4,716,183 | A | 12/1987 | Gamarra et al. |
| 4,798,853 | A | 1/1989 | Handlin |
| 4,842,931 | A | 6/1989 | Zook |
| 4,880,878 | A | 11/1989 | Hines |
| 4,987,194 | A | 1/1991 | Maeda et al. |
| 5,153,254 | A | * 10/1992 | Chen ............... 524/505 |
| 5,239,723 | A | 8/1993 | Chen |
| 5,262,468 | A | 11/1993 | Chen |
| 5,324,222 | A | 6/1994 | Chen |
| 5,336,708 | A | 8/1994 | Chen |
| 5,436,295 | A | 7/1995 | Nishikawa et al. |
| 5,442,004 | A | 8/1995 | Sutherland et al. |
| 5,475,890 | A | 12/1995 | Chen |
| 5,508,334 | A | 4/1996 | Chen |
| 5,603,122 | A | 2/1997 | Kania |
| 5,618,882 | A | 4/1997 | Hammond et al. |
| 5,624,294 | A | 4/1997 | Chen |
| 5,633,286 | A | 5/1997 | Chen |
| 5,655,947 | A | 8/1997 | Chen |
| 5,728,168 | A | 3/1998 | Laghi |
| 5,760,117 | A | 6/1998 | Chen |
| 5,830,237 | A | 11/1998 | Kania |
| 5,834,559 | A | 11/1998 | Keguchi et al. |
| 5,868,597 | A | 2/1999 | Chen |
| 5,962,572 | A | 10/1999 | Chen |
| 6,033,283 | A | 3/2000 | Chen |
| 5,633,286 | A | 10/2000 | Chen |
| 6,148,830 | A | 11/2000 | Chen |
| 6,406,499 | B1 | 6/2002 | Kania |
| 6,964,688 | B1 | 11/2005 | Kania |
| 7,291,182 | B1 | 11/2007 | Kania |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 108518 | A2 * | 5/1984 |
| EP | 88306357.0 | | 8/1989 |
| EP | 89118513.4 | | 4/1990 |
| EP | 89311603.1 | | 6/1990 |
| EP | 1618858 | B1 | 9/2008 |
| WO | WO 88/00603 | | 1/1988 |
| WO | WO 91/05014 | | 4/1991 |
| WO | WO 93/23472 | * | 11/1993 |
| WO | WO 94/18273 | | 8/1994 |
| WO | WO 96/29033 | | 9/1996 |

OTHER PUBLICATIONS

Septon Technical Information G–3–4 Dec. 3, 1992 Kuraray Co., Ltd., Property of Septon–4055, Septon 8008/oil Compound.

US Securities Exchange Commission Form 10–K Dec. 31, 2004 Langer, Inc. pp. 1,4, & 24.

Kania Declaration in Reexam 90/008,277 From Pair File Dec. 28, 2007 pp. 1–5.

Antec '99 Proceedings Deited by SPE Staff/pp. 1725. PW–90 Oil (1999).

Kraton Typical Property Guide SC 68–79 May 1979.

Technical Bulletin Shell Chemical Co SC:1102–89 Apr. 1989.

Kuraray SEP/SEPS Typical properties of SEP/SEPS Development products Chart: 4055 SEPS (17 sheets: some original page numbers missing) 1991.

High–Performance Thermoplastic Rubber Septon Kuraray Co, Ltd. Typical Properties Chart: 4055 SEPS, Aug. 1995 8.95(4,000).

Material Safety Data Sheet Kuraray Septon No. KIP–110US Feb. 7, 1997 Hydrogenated styrene isoprene/butadiene block copolymer CAS # 132778–07–5.

(Continued)

*Primary Examiner* Alan Diamond

(57) **ABSTRACT**

Novel gelatinous compositions and articles are formed from an intimate melt blend admixture of one or more of a high viscosity poly(styrene-ethylene-butylene-styrene), poly (styrene-ethylene-ethylene-propylene-styrene), poly (styrene-ethylene-butylene)$_n$ and poly(styrene-ethylene-propylene)$_n$ triblock and branched copolymers and high levels of a plasticizing oil.

## OTHER PUBLICATIONS

Material Safety Data Sheet Kuraray Septon–4033 No. KIP–107US Feb. 7, 1997 Hydrogenated styrene isoprene/ butadiene block copolymer CAS# 132778–07–5.

Material Safety Data Sheet Kuraray Septon–2005 No. KIP–93 Apr. 25, 1991 Hydrogenated styrene isoprene block copolymer.

Material Safety Data Sheet Kuraray Septon–2006 No. KIP–94 Apr. 25, 1991 Hydrogenated styrene isoprene block copolymer.

Material Safety Data Sheet Kuraray Septon–4055 No. KIP–95 Apr. 25, 1991 Hydrogenated styrene isoprene/buta- diene block copolymer.

Material Safety Data Sheet Kuraray Septon–8006 No. KIP–106 Jan. 12, 1993 Hydrogenated styrene butadiene block copolymer.

Prosthetics/Orthotics Silipos Advanced Polymer Technol- ogy of SEBS tri–block polymer gel product catalogue (4 bi–folds Knit–Rite distribution data of 1993).

Silipos Manual by Robert Mogel & Peter Bickel (26 pages). Requester (Mark R. Engle) prepared VI List Reference Appendix BB of Reexamination Request 90/010,837 (Bates No. KUR0116–117) of Affidavit of Harum ASA DOI of Oct. 11, 2006.

Septon Technical Information G–18, Sep. 17, 1992, Kuraray Co., Ltd.

Septon Technical Information G–3–4, Dec. 3, 1992, Kuraray Co., Ltd.

Holden, Geoffrey, et al., Thermoplastic Elastomers, 2nd Edi- tion, pp. 1–3 and 48–65, Hanser/Gardner Publications, Inc., Cincinnati, 1996.

CRC Handbook of Chemistry and Physics, 70th Edition, 1989–1990, pp. C–161–162 and C–329, Chemical Rubber Publishing Company, US.

Material Safety Data Sheet, Kuraray Co., Ltd., Kuraray Sep- ton 4055, Apr. 25, 1991, Tokyo, Japan.

High–Performance Thermoplastic Rubber, Septon™, Kuraray Co., Ltd., Aug. 1995, Tokyo, Japan.

Thermoplastic Elastomer Gels. I Effects of Composition and Processing on Morphology and Gel Behavior, Laurer, et al., J. of Poly. Sci.: Part B. Poly. Phys. V. 36 (1998).

Thermoplastic Elastomer Gels, I Effects of Composition and Temperature on Morphology and Gel Rheology, Laurer, et. al., J. of Poly. Sci.: Part B. Pol. Phys. V. 36 (1998).

Morphology and Rheology of SIS and SEPD Triblock Copolymers in the Presene of a Midblock Selective Solvent, Laurer, et al., Web Sep. 24, 1999.

Viscoelastic and Gelation Studies of SEBS Thermoplastic Elastomer in Different Hydrocarbgon Oils, J. F. Kim, et. al., Macromolecular Rech. V. 14, #3 (2006).

* cited by examiner

US 6,552,109 C1

| 1 | 2 |

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

ONLY THOSE PARAGRAPHS OF THE
SPECIFICATION AFFECTED BY AMENDMENT
ARE PRINTED HEREIN.

Column 10, after line 49:

*An example of the above mentioned toy is a Humdinger spinning toy of the related co-pending filed patent application U.S. Ser. No. 08/211,781 filed PCT on Apr. 19, 1994, now U.S. Pat. No. 6,033,283 and incorporated in U.S. Pat. No. 6,552,109 by reference, which describes the structure and operation of Humdinger spinning toy as follows:*

*When a gel body is set into rotation of at least 100 r.p.m. (revolutions per minute) to as high as 1,000 r.p.m. and higher, the forces can be significant. The following examples can best illustrate the forces involved.*

*The inward pulling forces generated by a pair of twisting stings as measured on a spring scale for a 2.00" (5.08 mm) dia. times, 0.50" (12.70 mm) thickness spinning circular gel body can range from an extreme of less than one pound to forty pounds and greater. The typical range for such a spinning gel body may range from between less than five pounds to twenty pounds and greater. As another example, the measured pulling forces for a (smaller) 1.75" (44.46 mm) diameter times 0.60" (15.24 mm) spinning circular gel body can range from an extreme of less than one pound to twenty five pounds and greater. The typical range for such a smaller body is between less than three pounds to about eight pounds and greater.*

*For the purpose of the invention, an indirect measure of the shearing forces generated during play is measured (in pounds) by the inward pulling forces of the twisting strings 5 on a spring balance during dynamic spinning. The typical values can range from less than one pound to fifty pounds and greater. String puling forces for various shapes (large and small) of spinning bodies having measured values of 0.5, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 . . . 40, 50, 60 ,70, 80 pounds and greater can be achieved and such values are typical. During spinning, the measured pulling force is read as a dynamic measurement which starts from a low value and rise as the string(s) are pulled apart forcing the body to reaching a maximum spin rate (i.e. maximum measured pulling force value).*

*The dynamic variables due to the centrifugal force of rotation of the bodies, such as elongation, stress and shear forces, under extreme high torque conditions, and the accelerations and de-accelerations involved are ever changing during play.*

*The bodies of the invention when rotated about an axis of rotation will experience increased deformation from their original shapes with increasing rates of rotation. Irrespective of the original shapes of the bodies, when subjected to rotational forces, the bodies will deform in a highly elastic, predetermined, non-uniform, and non-radial manner.*

*Because of the high deformations resulting from rotational forces, the bodies will distribute their mass outwardly by elongating perpendicularly with respect to its axis of rotation. The gel material at the extreme outer parts (equator) of the bodies will experience greater and greater centrifugal force as the bodies rotate and elongate more and more. The bodies if not properly designed will be pulled apart by the increasing centrifugal force of rotation. For example, the centrifugal force of a rotating body having a mass of about 50 grams and an elongated mass about the body's equator of about 10 centimeters may produce from less than about 50 to about 250 pound-force or higher.*

*If the hole separation distance is zero, then the torque will also be zero. Therefore, a suitable separation distance is needed to separate the holes from each other and the holes 6 from the selected axis of rotation. The holes should be separated approximately equal distance from the axis of rotation. A suitable distance, x, may be selected based on various factors, including the moment of inertia, axis of rotation, and the necessary torque need to rotate the bodies about its axis of rotation by the action of the twisting string. If the separation between the holes with respect to the axis of rotation is slightly off, then the torque applied to the bodies will be unbalanced. The unbalanced rotation would not be totally disastrous, but may produce a desirable off-balanced effect. While the humdinger may still adequately operate, it will be more difficult to keep the wobbling humdinger rotating in the unbalanced state.*

*As the bodies rotate, the moment of inertia will change and the point of the applied torque will also change. The moment of inertia of the bodies changes because the shape of the bodies changes with increased rate of rotation. Due to the highly elastic nature of the gel bodies, as their shape changes, so will the position of the holes with respect to each other and with respect to their distances from the axis of rotation. Any off-centering of the placement of the holes with respect to the axis of rotation will be greatly magnified by the centrifugal force acting on the body, since the original placement of the holes will also be changed due to elastic stretching. The torque acting on the bodies will greatly vary as the centrifugal force futher separates the holes from each other and from the axis of rotation.*

*Moreover, the overall original shape of a body will also affect the position of the holes, as the body is set into rotation. The change in separations between the holes and the change in distance between the holes and the axis of rotation due to the centrifugal force acting on the body is also affected by the shape of the original body as a whole. In other words, the configuration of the original shape of the elastic body directly affects the amount and direction of the elastic deformation about the holes caused by the centrifugal force. A stretching or elastic deformation of one part of a body will directly affect other parts of the body as well. Therefore, any deformation by an applied force on any part of the body will correspondingly cause deformation to other parts of the body. The holes and the shape of the bodies are always in a state of flux due to the forces generated during rotation. The holes freely move about as the shape of the body is changed by the force of rotation. This is the nature of bodies under dynamic motion as opposed to rigid bodies.*

*The string is passed through the two holes of the gel body and tied into a loop. For gel bodies having three or more holes, the individual strings may be passed through the holes and tied together at opposite ends. The gel body is set into continuous alternating rotating motion with an initial twirl of the body followed by alternately pulling and releasing the string while holding it in opposite directions which keeps it*

US 6,552,109 C1

3

*spinning. Between the second and fourth full reversal of rotation of the gel body, the string will have sufficient twist to shear off, and cut into or through the gel material separating the holes. Gel material of low strength cannot resist the tremendous shearing action of the twisting strings between the holes. The twisting action of the strings generated by the spinning gel body can exhibit a first order twist, a second order twist, or higher order twists. A first order twist refers to one or more twists of a pair of strings (i.e. a pair of strings when twisted together forms a small tight binding helix). A second order twist refers to one or more large binding helixes built up by a pair of strings that have been twisted beyond the maximum number of twists which normally produces small tight binding helixes of the first order kind. Similarly, a third order twist refers to a much larger tightly binding helix built up by the maximum number of second order twists produced by the pair of twisting strings. The third order twist may be manifested by the appearance of a branch of two or more twist of the first order twisting strings.*

*The shear force created by the static twisiting of the string, however, is substantially different than the shear force generated under dynamic twisting of the strings. This can be demonstrated by taking a sample of any of the soft gel bodies and subject it to static twisting between a pair of strings under a static spring load of 20, 30, and 40 lbs for twenty four hours and compare the condition of the sample to samples of the same gel body subject under dynamic twist spring load of less than 20 lbs. (e.g. 5, 8, 10, 12, 16, 18, etc.). The results show that the shear force produce by a dynamic twist spring load of less than 20 lbs will easily cut a soft gel body or any low strength material body while the same sample will remain substantially uncut under a higher static twist spring load. Therefore, it is important to take into consideration the drastic effects of the shear force produced by the dynamic twisting of a pair of strings.*

*Suitable interlocking materials (that helps resist the shear force of the twisting strings) for use in the humdingers of the invention include: open cell foams, other polymeric or elastomeric (Kraton) materials, porous materials, multi-layered coatings, and single layered, and composite layered materials. As an example, an opened cell foam when dipped into the instant composition will form an interpenetrating physical networks (interlocking of gel composition and foam composite). Such composite will exhibit greater rigidity and resistance to the shear force generated by a first, a second, a third, or a higher order dynamic twisting of a pair of strings. Furthermore, the interlocking materials surrounding the holes of the gel bodies may be made from flexible materials, such as fibers and fabrics of cotton, flax, and silk. Other flexible materials include: elastomers, fiber-reinforced composites, mohair, and wool. Useful synthetic fibers include: acetate, acrylic, aramid, glass, modacrylic polyethylene, nylon, olefin, polyester, rayon, spandex, carbon, sulfar, polybenzimidazole, and combinations of the above.*

*The following commercial elastomers can be formed with oil and in combination with other polymers into suitable gels for use in making the bodies of the invention, which includes Kuraray (SEP), (SEPS) or (SEB/EPS) Nos. 1001 (SEP), 2002 (SEPS), 2063 (SEPS), 2023 (SEPS), 2043 (SEPS), 2063 (SEPS), 2005 (SEPS), 2006 (SEPS), 2050 (SEPS), 2103 (SEPS), 2104 (SEPS), 2105 (SEPS), and 4055 (SEB/ EPS) (styrene-ethylene-butylene/ethylene-propylene-styrene) block polymer made from hydrogenated styrene isoprene/butadiene styrene block copolymer or more specifically made from hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene. Where the ethyl-*

4

*ene (E) of the ethylene-butylene (EB) segment of the mid-block (EB/EP) of the (SEB/EPS) block polymer is substantially greater than butylene (B) so as to exhibit ethylene crystallinity, (SEP/EPS) may be denoted as (SE/EPS) or denoted as (SEEPS) block polymer for the sake of simplicity.*

*In the operation of the humdingers of the invention, the string's twisting action imparts rotation to the gel body so as to elongate the gel body during rotation. The elongated gel body will reach a maximum elongation due to centrifugal force of 50% or more. Elongations of 100%, 200%, 300%, 400%, 500%, 600%, 700% and higher are possible depending on the amount of tension of the pull of the humdinger's strings. Gel bodies of the invention can be designed to withstand elongations higher than 1,000%, which can occur at extreme high rates of rotation of 500 r.p.m. and higher. Spinning rates can span from a low of 10 r.p.m. to a high of over 1,000 r.p.m. Spinning rates of 50, 100, 150, 200, 25, 300, 350, 400, 500, 600, 700, 800, 900, 1,000, 1,200, and 1,400 r.p.m. values are routinely achieved.*

*The operation of the humdingers of the invention can be ready observed under strobe light. The number of revolutions per minute may be counted in this way. The changes in radius can be measured. The change in gel body shape can be observed and measured. The centrifugal force acting on the rotating gel body can be likewise determined at any instant of time, at any instant rate of rotation, and at any instant change in gel body shape. The perpendicular-axis elongation effect of the gel body can be viewed under strobe light; its regions of deformation and re-distribution of mass can be viewed, measured and readily determined by ruled grid markings on the gel body.*

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1-11** are determined to be patentable as amended.

Claim **12**, dependent on an amended claim, is determined to be patentable.

New claims **13-16** are added and determined to be patentable.

1. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat *and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) *comprising poly(styrene-ethylene-ethylene-propylene-styrene)* and from (ii) about 300 to about 1,600 parts by weight of a plasticizing oil; and in combination with or without (iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly-(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multi-arm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_n$, $M_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$,

JA000216

## US 6,552,109 C1

**5**

$G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nM_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_nG_n$, $M_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein n is a subscript of G, n denotes the same or different gel rigidity.

**2.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat *and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) *comprising poly(styrene-ethylene-ethylene-propylene-styrene)* and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil; in combination with or without (iii) a selected amount of one or more polymer or copolymer of poly(styrene-butadiene-styrene), poly-(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene), poly-(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radical, branched, star-shaped, or multiarm copolymer, and n is an integer greater than one; wherein said composite formed from the combination $G_nM_n$ of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein n is a subscript of G, n denotes the same or a different gel rigidity.

**3.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat *and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene block copolymer(s) with 2-methyl-1,3-butadiene and 1,3-butadiene *comprising poly(styrene-ethylene-ethylene-propylene-styrene)* and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil; in combination with or without (iii) a selected amount of one or more selected polymer or copolymer selected from the group consisting of poly(styrene-butadiene-styrene), poly(styrene-butadiene), poly(styrene-isoprene-styrene), poly(styrene-isoprene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, branched, star-shaped, or multiarm copolymer, and n is an integer greater than one, wherein said gelatinous elastomer compositions characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said composite formed from the combination $G_nM_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nG_nM_n$,

**6**

$G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_n$, $G_nM_nM_nM_nM_n$, $M_nG_nM_nG_n$, $G_nG_nM_nM_nG_nG_n$, $M_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein n is a subscript of G, n denotes the same or a different gel rigidity.

**4.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite article by heat *and physically interlocked* with a selected substrate material M, said gelatinous elastomer composition from form (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) *comprising poly(styrene-ethylene-ethylene-propylene-styrene)*, wherein at least one of said block copolymer is a high viscosity copolymer having a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 cps and higher which corresponds to a viscosity at 10 weight percent of about 5800 cps and higher [which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25° C. of at about 80,000 cps and higher], and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, in combination with or without (ii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene), poly(styrene-isoprene-styrene), poly(styrene-isoprene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly-(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, branched, radial, star-shaped, or multiarm copolymer; and n is an integer greater than one; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nM_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$, wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**5.** A composite of claim **1**, **2**, **3**, or **4**, wherein said [hydrogenated styrene] block [copolymer] *copolymer(s)* is one or more of a block copolymer of poly(styrene-ethylene-ethylene-propylene-styrene).

**6.** A composite article of claim **1** or **4**, wherein a source of said [hydrogenated poly(styrene-isoprene/butadiene-styrene)] block [polymer] *copolymer(s)* being [Septon] *Septon®* 4055.

**7.** A composite of claim **1**, **2**, **3**, or **4**, wherein said *source of* one or more of (i) block copolymer(s) [is] *of* poly(styrene-ethylene-ethylene-propylene-styrene) [and a source of said block copolymers] *being of the group* Septon® 4033, Septon® 4045 and Septon® 4055.

**8.** A composite *article* of claim **2**, **3**, or [**6**] *4* wherein said thermoplastic, heat formable and heat reversible gelatinous elastomer composition is a dielectric encapsulant of an elec-

## US 6,552,109 C1

### 7

trical, or an electronic component(s); *wherein said electrical or said electronic component(s) are not a said substrate material $M_n$ being physically interlocked with said $G_n$ forming said composite article.*

**9.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite article by heat *and physically interlocked* with a selected substrate material M, said gelatinous elastomer composition form from (i) 100 parts by weight of one or a mixture of two or more poly(styrene-ehtylene-ethylene-propylene-styrene) block copolymers and a source of said block copolymers being *of the group* Septon® 4033, Septon® 4045 and Septon® 4055, and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without (iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly-(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**10.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by [heat] *heat and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from (i) 100 parts by weight of a block copolymer of one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene block copolymers and a source of said block copolymers being *of the group* Septon® 4033, Septon® 4045 and Septon® 4055, and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is subscript of M. n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**11.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat *and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition

### 8

formed from (i) 100 parts by weight of one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene) block copolymers and a source of said block copolymers being *of the group* Septon® 4033 and Septon® 4055, and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without (iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly-(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; wherein said gelatinous elastomer composition characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel ridigity.

**13.** *A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into said composite article by heat and physically interlocked with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from*

(i) *100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene), and from*

(ii) *about 300 to about 1,200 parts by weight of a plasticizing oil; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different fabric materials of the group cotton, acrylic, nylon, polyester, and spandex; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.*

**14.** *A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into said composite article by heat and interlocked with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from*

(i) *100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene), and from*

(ii) *about 300 to about 1,200 parts by weight of a plasticizing oil; wherein said composite formed from the combination $G_nM_n$, $M_nG_nM_n$, a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or one or more different fiber materials of the group acrylic, nylon, olefin, polyester, rayon, and spandex; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.*

US 6,552,109 C1

9 10

15. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into said composite article by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene), and from

(ii) about 300 to about 1,200 parts by weight of a plasticizing oil; wherein said composite formed from the combination $G_nM_n$, $M_nG_nM_n$, a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different fabric materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

16. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into said composite article by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene), and from

(ii) about 300 to about 1,200 parts by weight of a plasticizing oil; wherein said composite formed from the combination $G_nM_n$ or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different materials of the group fabric and synthetic fiber materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

\* \* \* \* \*

US006867253B1

## (12) United States Patent
### Chen

(10) Patent No.: **US 6,867,253 B1**

(45) Date of Patent: **Mar. 15, 2005**

(54) **TEAR RESISTANT, CRYSTALLINE MIDBLOCK COPOLYMER GELS AND ARTICLES**

(75) Inventor: **John Y. Chen**, Pacifica, CA (US)

(73) Assignee: **Applied Elastomerics, Inc.**, South San Francisco, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 269 days.

(21) Appl. No.: **09/721,213**

(22) Filed: **Nov. 21, 2000**

### Related U.S. Application Data

(63) Continuation-in-part of application No. 09/285,809, filed on Apr. 1, 1999, now abandoned, and a continuation-in-part of application No. 09/274,498, filed on Mar. 28, 1999, now Pat. No. 6,420,475, and a continuation-in-part of application No. 09/130,545, filed on Aug. 8, 1998, now Pat. No. 6,627,275, and a continuation-in-part of application No. 08/984,459, filed on Dec. 3, 1997, now Pat. No. 6,324,703, and a continuation-in-part of application No. PCT/US97/17534, filed on Sep. 30, 1997, and a continuation-in-part of application No. 08/909,487, filed on Jul. 12, 1997, now Pat. No. 6,050,871, and a continuation-in-part of application No. 08/863,794, filed on May 27, 1997, now Pat. No. 6,117,176, and a continuation-in-part of application No. 08/719,817, filed on Sep. 30, 1996, now Pat. No. 6,148,830, and a continuation-in-part of application No. 08/665,343, filed on Jun. 17, 1996, which is a continuation-in-part of application No. 08/612,586, filed on Mar. 8, 1996, now Pat. No. 6,552, 109, and a continuation-in-part of application No. 08/581, 191, filed on Dec. 29, 1995, now Pat. No. 5,760,117, and a continuation-in-part of application No. 08/581,188, filed on Dec. 29, 1995, now abandoned, and a continuation-in-part of application No. 08/581,125, filed on Dec. 29, 1995, now Pat. No. 5,962,572, and a continuation-in-part of application No. 08/288,690, filed on Aug. 11, 1994, now Pat. No. 5,633,286, and a continuation-in-part of application No. PCT/US94/07314, filed on Jun. 27, 1994, and a continuation-in-part of application No. PCT/US94/04278, filed on Apr. 19, 1994, said application No. 08/581,188, is a continuation-in-part of application No. 08/288,690, filed on Aug. 11, 1994, now Pat. No. 5,633,286, and a continuation-in-part of application No. PCT/US94/07314, filed on Jun. 27, 1994, and a continuation-in-part of application No. PCT/US94/04278, filed on Apr. 19, 1994, said application No. 08/288,690, and a continuation-in-part of application No. PCT/US94/07314, and a continuation-in-part of application No. PCT/US94/04278, said application No. 08/581,125, is a continuation-in-part of application No. 08/288,690, and a continuation-in-part of application No. PCT/US94/07314, filed on Jun. 27, 1994, and a continuation-in-part of application No. PCT/US94/04278.

(51) Int. Cl.$^7$ ............................ C08L 53/00; C08L 73/00

(52) U.S. Cl. ...................... **524/505**; 524/507; 524/508; 524/513; 524/515; 623/59; 623/61; 623/63

(58) Field of Search ................................. 524/505, 507, 524/508, 513, 515; 623/59, 61, 63; 525/98

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,459,193 A * 10/1995 Anderson et al. ........... 524/505

* cited by examiner

*Primary Examiner*—Robert D. Harlan

(57) **ABSTRACT**

Novel gels and articles are formed from one or more multiblock copolymers having at least one block segment of poly(ethylene) and selected amounts of one or more low viscosity plasticizers, said gels having an amount of crystallinity, glassy components, selected amounts of plasticizers, with or without other additives sufficient to achieve improvements in one or more physical properties including improved crack propagation resistance, improved tea resistance, improved resistance to fatigue and resistance to catastrophic failure not obtainable in amorphous gels and exceptionally lower and/or no tack.

**17 Claims, 10 Drawing Sheets**

# Exhibit 3

| M1 | Fabric or Cloth |
|----|----------------|
| G | Gel |
| GM | Gel-Sponge or Gel-Foam |
| M2 | Foam or Sponge |
| M3 | Synthetic Resin or Plastic |
| M4 | Fibre |
| M5 | Concrete |
| M6 | Metal or Metal Sponge |
| M7 | Wood |
| M8 | Wire or Screening |
| M9 | Refractory Material |
| M10 | Other Material |

# Figure 1



Figure 2a

Figure 2b

Figure 2c

Figure 2d

JA000222



Figure 3a    Figure 3b    Figure 3c

Figure 3d    Figure 3e    Figure 3f

Figure 3g    Figure 3h    Figure 3i

Figure 3j    Figure 3k

Figure 3l

Figure 3m    Figure 3n



Figure 4a

Figure 4b

Figure 4c

Figure 4d

Figure 4e

Figure 4f

Figure 4g

Figure 4h

Figure 4i

Figure 4j

Figure 4k

Figure 4l

Figure 4m

Figure 4n

Figure 4o

Figure 4p

Figure 4q

Figure 4r

Figure 4s

Figure 4t

Figure 4u

Figure 4v

Figure 4w

JA000224



S - E - EP - S

Figure 5

Case 3:03-cv-01536-MBK-TJB Document 135-17 Filed 02/03/2014 Page 2 of 10



**Figure 6**



S - E - EB$_{25}$ - S

Figure 7



S - E - EP - E - S

**Figure 8**

Case: 8:08-1452 CGM3-B4TH DAVNTS-0 CIN8S-0 Document 83-0 Page: 18748 7 / F R e b 0 7 / 2 8 7 0 2 0 1 4 4 0 2 0 2 / 2 7 / 2 0 1 4



**S - EP - E - EP - S**

**Figure 9**

JA000229

Case: 8:13-45-20389-SYS-8462-PCI-Document No. 156-3 Page-188/37 Filed 02/23/20 F44 Page 10/20 84



**Figure 10**

1

# TEAR RESISTANT, CRYSTALLINE MIDBLOCK COPOLYMER GELS AND ARTICLES

## ORIGINS OF INVENTION AND RELATED APPLICATIONS

This application is a continuation-in-part of the following applications: Ser. No. 09/285,809 filed Apr. 1, 1999 (now abandoned); Ser. No. 09/274,498, filed Mar. 28, 1999 (now U.S. Pat. No. 6,420,475); Ser. No. 09/130,545, filed Aug. 8, 1998 (now U.S. Pat. No. 6,627,275 B1); Ser. No. 08/984, 459, filed Dec. 3, 1997 (now U.S. Pat. No. 6,324,703 B1); Ser. No. 08/909,487, filed Jul. 12, 1997 (now U.S. Pat. No. 6,050,871); Ser. No. 08/863,794, filed May 27, 1997 (now U.S. Pat. No. 6,117,176); PCT/US97/17534, filed 30 Sep 1997; U.S. Ser. No: 08/719,817 filed Sep. 30, 1996 (now U.S. Pat. No. 6,148,830), U.S. Ser. No.: 08/665,343 filed Jun. 17, 1996 which is a Continuation-in-part of U.S. Ser. No.: 08/612,586 filed Mar. 8, 1996 (now U.S. Pat. No. 6,552,109); PCT/US94/04278 filed Apr. 19, 1994 (published May 26, 1995 No. WO95/13851) (now U.S. Pat. No. 6,033, 283); PCT/US94/07314 filed Jun. 27, 1994 (published Jan. 4, 1996 No. WO 96/00118) (now U.S. Pat. No. 5,868,597); Ser. No. 08/288,690 filed Aug. 11, 1994 (now U.S. Pat. No. 5,633,286); Ser. No. 08/581,188 filed Dec. 29, 1995; Ser. No. 08/581,191 filed Dec. 29, 1995 (now U.S. Pat. No 5,760,117); Ser. No. 08/581,125 filed Dec. 29, 1995 (now U.S. Pat. No. 5,962,527). In turn U.S. Ser. Nos. 08/581,188; 08/581,191; and 08/581,125 are continuation-in-parts of the following applications: Ser. Nos.: 08/288,690; PCT/US94/ 07314 which is a CIP of PCT/US 94/04278. The subject matter contained in the related applications and patents are specifically incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to gels and gel articles.

## BACKGROUND OF THE INVENTION

This application is based upon subject matters described in earlier filed and copending related applications and patents (see Related Applications above).

A general view of oriented block copolymers is described in a publication by A. Weill and R. Pixa, in Journal of Polymer Science Symposium, 58,381–394 (1977), tided: "Styrene-diene Triblock Copolymers: Orientation Conditions and Mechanical Properties of the Oriented Materials" describe techniques of orientation of neat SIS and SBS block copolymers and their properties.

Other subject matters of interest are:

Elastomeric Thermoplastic, Vol. 5, pages 416–430, Block Copolymers, Vol. 2, pages 324; Block and Graft Copolymers; Styrene-Diene Block Copolymers, Vol. 15, pages 508–530; and Microphase Structure, can be found in *ENCYCLOPEDIA OF POLYMER SCIENCE AND ENGINEERING*, 1987.

Legge, N. R, et al., Chemistry and Technology of Block Polymers, Ch. 29, pages 394–429, ACS, Organic Coatings and Plastics Chemistry,© 1975.

Legge, N. R., Thermoplastic Elastomers, Rubber Chemistry and Technology, Vol. 60, pages G79–117.

Lindsay, G. A., et al., Morphology of Low Density Polyethylene/EPDM Blends Having Tensile Strength Synergism, source: unknown.

Cowie, J. M. G., et al., Effect of Casting on the Stress-Hardening and Stress-Softening Characteristics of Kraton-G

2

1650 Copolymer Films, J. Macromol. Sci.-Phys., B16(4), 611–632 (1979).

Futamura, S., et al., Effects of Center Block Structure on the Physical and Rheological Properties of ABA Block Copolymers. Part II. Rheological Properties, Polymer Engineering and Science, August, 1977, Vol. 17, No.8, pages 563–569.

Kururay Co., LTD. MSDS, Kuraray Septon 4055, Hydrogenated Styrene Isoprene/Butadiene Block Copolymer, Apr. 25, 1991.

## SUMMARY OF THE INVENTION

The invention comprises gels and articles made from multiblock copolymers having two or more midblock polymer chains which gels exhibit advantages of improved tear propagation resistance. The gels also possess high tensile strength and rapid return from high extension and can exist in an altered state of delay elastomeric recovery as it regains its original shape following high extensions or dynamic deformations. Such combination of properties are not found in gels of substantially the same rigidity made from triblock copolymers. The gels of the present invention also exhibit low set, high dimensional stability, crack, tear, craze, and creep resistance, excellent tensile strength and high elongation, long service life under shear, stress and strain and capable of withstanding repeated dynamic shear, tear and stress forces, excellent processing ability for cast molding, extruding, fiber forming film forming and spinning, non-toxic, nearly tasteless and odorless, soft and strong, optically clear, highly flexible, possessing elastic memory, substantially with little or no plasticizer bleedout. The gels are especially suitable and have advantages where resistance to dynamic stretching, shearing and tearing forces are particularly critical such as those forces acting during dental flossing, while gels in the altered state with delay elastomeric recovery from deformation and extension are excellent for use where energy and vibration damping at high impact, low frequencies, such as in running shoe cushioning designs are essential.

Moreover, the gels can be made with selectively lower gel rigidities while achieving higher tensile strength or can be orientated to achieve high gel rigidities with lower gel tensile strengths.

Generally, the unique tear resistant gels comprises: (I) 100 parts by weight of one or more high viscosity linear multiblock copolymers or star-shaped (or radial) multiblock copolymers having two or more midblock segments or mixtures of two or more such copolymers; optionally in combination with a selected amount of one or more of a (II) polymer or copolymer, and selected amounts of one or more compatible plasticizing oils (III) sufficient to achieve gel rigidities of from less than about 2 gram Bloom to about 1,800 gram Bloom and higher.

The linear and star-shaped multiblock copolymers comprises one or more poly(ethylene) segment containing copolymer(s) which can exhibit crystallinity with glassy end block ($A''$) of a monoalkenyl arene compounds, more specifically, a monovinyl aromatic compounds, and midblocks (Z) comprising two or more segment polymer chains of poly(ethylene), poly(butylene), poly(propylene), poly (ethylene-butylene), and poly(ethylene-propylene).

The (I) linear copolymers are characterized as having a Brookfield Viscosity cP(mPa•S) value at 5 weight percent solids solution in toluene at 30° C. of from less than about 40 cps to about 150 cps and higher, advantageously from about 40 cps to about 60 cps and higher, more advanta-

US 6,867,253 B1

3

geously from about 50 cps to about 80 cps and higher, still more advantageously from about 70 cps to about 110 cps and higher, and even more advantageously from about 90 cps to about 180 cps and higher.

The (I) star-shaped copolymers are characterized as having a Brookfield Viscosity cP(mPa•S) value at 5 weight percent solids solution in toluene at 30° C. of from about 150 cps to about 380 cps and higher, advantageously from about 150 cps to about 260 cps and higher, more advantageously from about 200 cps to about 580 cps and higher, and still more advantageously from about 500 cps to about 1,000 cps and higher.

As used herein, the term "gel rigidity" in gram Bloom is determined by the gram weight required to depress a gel a distance of 4 mm with a piston having a cross-sectional area of 1 square centimeter at 23° C.

As described herein, the conventional term "major" means about 51 weight percent and higher (e.g. 55%, 60%, 65%, 70%, 75%, 80% and the like) and the term "minor" means 49 weight percent and lower (e.g. 2%, 5%, 10%, 15%, 20%, 25% and the like).

The various aspects and advantages will become apparent to those skilled in the art upon consideration of the accompanying disclosure.

## DESCRIPTION OF THE DRAWINGS

FIG. **1**. Representative components materials of composites forming useful articles of the invention.

FIG. **2**. Representative sectional view of composite articles of the invention (FIG. 2*a*.=MGM, FIG. 2*b*.=GMG, FIG. 2*c*.=MGMGMGM, FIG. 2*d*.=foam entirely interlocked with composition).

FIGS. 3*a*–3*n*. Representative sectional view of composite articles as shown generally by the relationship of $G_n$ and $M_n$ and more specific article examples of $M_1$, $M_2$, $M_3$, and $M_4$ with $G_n$ when the material $M_n$ is n=1 (fabric/cloth), n=2 (foam/sponge), n=3 (synthetic resin/plastic), and n=4 (fibre) as shown in FIGS. 3*d, 3e, 3h,* and 3*j* respectively.

FIGS. 4*a*–4*w*. Representative sectional view of composite articles as shown generally by the relationship of $G_n$ and $M_n$ and more specific article examples of $M_1$, $M_2$, $M_3$, and $M_4$ with $G_n$ when the material $M_n$ is n=1 (fabric/cloth), n=2 (foam/sponge), n=3 (synthetic resin/plastic), and n=4 (fibre) as shown in FIGS. 4*l, 4m, 4n,* and 4*q* respectively.

FIG. **5**. Representation of S-E-EP-S crystalline polystyrene domain/amorphous structure.

FIG. **6**. Representation of S-EB$_{45}$-EP-S polystyrene domain/amorphous structure.

FIG. **7**. Representation of S-E-EB$_{25}$-S crystalline/ polystyrene domain/amorphous structure.

FIG. **8**. Representation of S-E-EP-E-S crystalline/ polystyrene domain/amorphous structure.

FIG. **9**. Representation of S-EP-E-EP-S crystalline/ polystyrene domain/amorphous structure.

FIG. **10**. Effect of butylene concentration of the percent (%) crystallinity of $(CH_2)^{16}$ units in the elastomer (midblock) phase. Reference W. P. Gergen paper at Rubber Division ACS 1985 and Legge, Norman R., paper at ACS 1987.

## DESCRIPTION OF THE INVENTION

Thermoplastic elastomer gels are described in my patents and published applications: PCT/US97/17534; PCT/US94/ 04278; PCT/US94/07314; U.S. Pat. Nos. 5,884,639; 5,868,

4

597; 5,760,117; 5,655,947; 5,624,294; 5,508,334; 5,475, 890; 5,336,708; 5,324,222; 5,262,468; 5,239,723; 5,153, 254; 4,618,213; and 4,369,284. Various patents on thermoplastic elastomers and blends are described in U.S. Pat. Nos. 5,755,243; 3,595,942, Reissue 27,145-28,236; 3,772,234; 4,116,917; 4,687,815; and 4,880,878. Other non-patent publications related to S-EB-S polymers include: (1) W. P. Gergen, "Uniqueness of Hydrogenated Block Copolymers for Elastomeric Applications," presented at the German Rubber Meeting, Wiesbaden, 1983; Kautsch, Gummi, Kunstst. 37, 284 (1984). (2) W. P. Gergen, et al., "Hydrogenated Block Copolymers," Paper No. 57, presented at a meeting of the Rubber Division ACS, Los Angeles, Apr. 25, 1985. Encyclopedia of Polymer Science and Engineering, Vol. 2, pp 324–434, "Block Copolymers". (3) L. Zotteri and et al., "Effect of hydrogenation on the elastic properties of poly(styrene-b-diene-b-styrene) copolymers", Polymer, 1978, Vol. 19, April. (4) J. Kenneth Craver, et al., Applied Polymer Science, Ch. 29, "Chemistry and Technology of Block Polymers", pp. 394–429, 1975. (5) Y. Mahajer and et al., "The influence of Molecular Geometry on the Mechanical Properties of homopolymers and Block Polymers of Hydrogenated Butadiene and Isoprene" reported under U.S. ARO Grant No. DAAG29-78-G0201. (6) J. E. McGrath, et al., "Linear and Star Branched Butadiene-Isoprene Block Copolymers and Their Hydrogenated Derivatives", Chem. Dept, Virginia Polytechnic Institute and State University Blacksturg, Va., reported work supported by Army Research Office. (7) Legge, Norman R., "Thermoplastic Elastomers", Charles Goodyear Medal address given at the 131st Meeting of the Rubber Division, American Chemical Society, Montreal, Quebec, Canada, Vol. 60, G79–G115, May 26–29, 1987. (8) Falk, John Carl, and et al., "Synthesis and Properties of Ethylene-Butylene-1 Block Copolymers", Macromolecules, Vol. 4, No. 2, pp. 152–154, March–April 1971. (9) Morton, Maurice, and et al., "Elastomeric Polydiene ABA Triblock Copolymers within Crystalline End Blocks", University of Arkon, work supported by Grant No. DMR78-09024 from the National Science Foundation and Shell Development Co. (10) Yee, A. F., and et al., "Modification of PS by S-EB-S Block Copolymers: Effect of Block Length", General Electric Corporate Research & Development, Schenectady, N.Y. 12301. (11) Siegfried, D. L, and et al., "Thermoplastic Interpenetrating Polymer Networks of a Triblock Copolymer elastomer and an Ionomeric Plastic Mechanical Behavior", Polymer Engineering and Science, January 1981, Vol. 21, No.1, pp 39–46. (12) Clair, D. J., "S-EB-S Copolymers Exhibit Improved Wax Compatibility", Adhesives Age, November, 1988. (13) Shell Chemical Technical Bulletin SC:1102–89, "Kraton® Thermoplastic Rubbers in oil gels", April 1989. (14) Chung P. Park and George P. Clingerman, "Compatibilization of Polyethylene-Polystyrene Blends with Ethylene-Styrene Random Copolymers", the Dow Chemical Company, May 1996. (15) Steve Hoenig, Bob Turley and Bill Van Volkenburgh, "Material Properties and Applications of Ethylene-Styrene Interpolymers", the Dow Chemical Company, September 1996. (16) Y. Wilson Cheung and Martin J. Guest, "Structure, Thermal Transitions and Mechanical Properties of Ethylene/Styrene Copolymers", the Dow Chemical Company, May 1996. (17) Teresa Plumley Karjaia, Y. Wilson Cheung and Martin J. Guest, "Melt Rheology and Processability of Ethylene/Styrene Interpolymers", the Dow Chemical Company, May 1997. (18) D. C. Prevorsek, et al., "Origins of Damage Tolerance in Ultrastrong Polyethylene Fibers and Composites:, Journal of Polymer Science: Polymer Symposia No. 75, 81–104

5

(1993). (19) Chen, H., et al, "Classification of Ethylene-Styrene Interpolymers Based on Comonomer Content", J. Appl. Polym. Sci., 1998,70, 109. (20–24) U.S. Pat. Nos. 5,872,201; 5,460,818; 5,244,996; EP 415815A; JP07,278, 230 describes substantially random, more appropriately presudo-random copolymers (interpolymers), methods of making and their uses. (25) Alizadeh, et al., "Effect of Topological Constraints on The Crystallization Behavior of Ethylene/alp[ha-Olefin Copolymers", PMSE, Vol, 81, pp. 248–249, Aug. 22–26, 1999. (26) Guest, et al., "Structure/ Property Relationships of Semi-Crystalline Ethylene-Styrene Interpolymers (ESI)", PMSE, Vol, 81, pp. 371–372, Aug. 22–26, 1999. The above applications, patents and publications are specifically incorporated herein by reference.

Legge's paper teaches the development of (conventional substantially amorphous elastomer mid segment) SEBS triblock copolymers. In the polymerization of butadiene by alkyllithium initiators, 1,4-addition or 1,2-addition polymers, mixtures, can be obtained. In forming styrene butadiene triblock copolymers involving the addition of solvating agents such as ethers just before the final styrene charge is added, any excess of ethers can alter the polybutadiene structure from a 1,4-cis or trans structure to a 1,2- or 3,4-addition polymer. Using difunctional coupling agent would give linear block copolymers and multifuntional agents would give star-shaped or radial block copolymers. Hydrogenation of the 1,4-polybutadiene structure yields polyethylene, while that of the 1,2-polybutadiene yields polybutylene. The resulting polyethylene will be essentially identical with linear, high-density polyethylene with a melting point, Tm, of about 136° C. Hydrogenation of 1,2-polybutadiene would yield atactic poly(1-butene) (polybutylene). The Tg of polybutylene is around –18° C. Random mixtures of ethylene and butylene units in the chain would suppress crystallinity arising from polyethylene sequences. The objective for a good elastomer should be to obtain a saturated olefin elastomeric segment with the lowest possible Tg and the best elastomeric properties. Such an elastomer favored using styrene as the hard-block monomer and selecting the best monomer for hydrogenation of the elastomer mid segment Using a mixture of 1,4- and 1,2-polybutadiene as the base polymer for the mid segment would result in an ethylene/butylene mid segment in the final product. The elements of selection of the midsegment composition is elastomer crystallinity and the elastomer Tg of an ethylene/butylene copolymer. Very low levels of crystallinity can be achieved around 40–50% butylene concentration. The minimum in dynamic hysteresis around 35% butylene concentration in the elastomeric copolymer. A value of 40% butylene concentration in the ethylene/butylene midsegment was chosen for the S-EB-S block copolymers.

Clair's paper teaches that the EB midblock of conventional S-EB-S polymers is a random copolymer of ethylene and 1-butene exhibiting nearly no crystallinity in the midblock. In the preparation of ethylene-butylene (EB) copolymers, the relative proportions of ethylene and butylene in the EB copolymer chain can be controlled over a broad range from almost all ethylene to almost all butylene. When the EB copolymer is nearly all ethylene, the methylene sequences will crystallize exhibiting properties similar to low density polyethylene. In differential scanning calorimeter (DSC) curves, the melting endotherm is seen on heating and a sharp crystallization exotherm is seen on cooling. As the amount of butylene in the EB copolymer is increased, the methylene sequences are interrupted by the

6

ethyl side chains which shorten the methylene sequences length so as to reduce the amount of crystallinity in the EB copolymer. In conventional S-EB-S polymers, the amount of 1-butene is controlled at a high enough level to make the EB copolymer midblock almost totally amorphous so as to make the copolymer rubbery and soluble in hydrocarbon solvents. Clair suggests that an S-EB-S polymer retaining at least some crystallinity in the EB copolymer midblock may be desirable. Therefore, a new family of S-EB-S polymers are developed (U.S. Pat. No. 3,772,234) in which the midblock contains a higher percentage of ethylene. The molecular weights of the new crystalline midblock segment S-EB-S polymers can vary from low molecular weight, intermediate molecular, to high molecular weight; these are designated Shell GR-3, GR-1, and GR-2 respectively. Unexpectly, the highest molecular weight polymer, GR-2 exhibits an anomalously low softening point. A broad melting endotherm is seen in the DSC curves of these polymers. The maximum in this broad endotherm occurs at about 40° C.

Himes, et al., (U.S. Pat. No. 4,880,878) describes SEBS blends with improved resistance to oil absorption.

Papers (14)–(17) describes poly(ethylene-styrene) substantially random copolymers (Dow Interpolymers™): Dow S, M and E Series produced by metallocene catalysts, using single site, constrained geometry addition polymerization catalysts resulting in poly(ethylene-styrene) substantially random copolymers with weight average molecular weight (Mw) typically in the range of $1 \times 10^5$ to $4 \times 10^5$, and molecular weight distributions (Mw/Mn) in the range of 2 to 5.

Paper (18) Prevorsek, et al., using Raman spectroscopy, WAXS, SAXD, and EM analysis interprets damage tolerance of ultrastrong PE fibers attributed to the nano scale composite structure that consists of needle-like-nearly perfect crystals that are covalently bonded to a rubbery matrix with a structure remarkably similar to the structure of NACRE of abalone shells which explains the damage tolerance and impact resistance of PE fibers. PE because of its unique small repeating unit, chain flexibility, ability to undergo solid state transformation of the crystalline phase without breaking primary bonds, and its low glass transition temperature which are responsible for large strain rate effects plays a key role in the damage tolerance and fatigue resistance of structures made of PE fibers.

Chen (19) classifies 3 distinct categories of E (approximately 20–50 wt % styrene), M (approximately 50–70 wt % styrene), & S (greater than approximately 70 wt % styrene) substantially random or more appropriately pseudo-random ethylene-styrene copolymers or random copolymers of ethylene and ethylene-styrene dyads. The designated Ethylene-styrene copolymers are: E copolymers (ES16, ES24, ES27, ES28, ES28, ES30, and ES44 with styrene wt % of 15.7, 23.7, 27.3, 28.1, 39.6 & 43.9 respectively), M copolymers (ES53, ES58, ES62, ES63, and ES69 with styrene wt % of 52.5, 58.1, 62.7, 62.8, and 69.2 respectively and crystallinity, % DSC, based on copolymer of 37.5, 26.6, 17.4,22.9, 19.6 and 5.0 respectively), S copolymers (ES72, ES73, and ES74 with styrene wt % of 72.7, 72.8, and 74.3 respectively). The maximum comonomer content for crystallization of about 20% is similar in other ethylene copolymers, such as in ethylene-hexene and ethylene-vinyl acetate copolymers. If the comonomer can enter the crystal lattice, such as in ethylene-propylene, compositions in excess of 20 mol % comonomer can exhibit crystallinity. The molecular weight distribution of these copolymers is narrow, and the comonomer distribution is homogeneous. These copolymers exhibit high crystalline, lamellar morphologies to fringed micellar morphologies of

JA000233

7

low crystallinity. Crystallinity is determined by DSC measurements using a Rheometric DSC. Specimens weighing between 5 and 10 mg are heated from −80 to 180° C. at a rate of 10° C./min (first heating), held at 190° C. for 3 min, cooled to −80° C. at 10° C./min, held at −80° C. for 3 min, and reheated from −80° C. to 180° C. at 10° C./min (second heating). The crystallinity (wt %) is calculated from the second heating using a heat of fusion of 290 J/g for the polyethylene crystal. Contributing effects of the crystallinity include decrease volume fraction of the amorphous phase, restricted mobility of the amorphous chain segments by the crystalline domains, and higher styrene content of the amorphous phase due to segregation of styrene into the amorphous phase. Table I of this paper shows values of Total Styrene (wt %), aPS (wt %), Styrene (wt %), Styrene (mol %), $10^{-3}$ Mw, Mw/Mn, and total (wt %) for Ethylene-styrene copolymers ES16–ES74 while FIGS. **1–12** of this paper shows: (1) melting thermograms of ESI 1st and 2nd heating for ES16, ES27, ES44, ES53, ES63, & ES74; (2) crystallinity from DSC as a function of commonomer content; (3) Logarithmic plot of the DSC beat of melting vs. Mole % ethylene for ESIs; (4) measured density as a function of styrene content for semicrystalline and amorphous ESIs; (5) % crystallinity from density vs % crystallinity from DSC melting enthalpy; (6) Dynamic mechanical relaxation behavior; (7) Glass transition temperature as a function of wt % ethylene-styrene dyads for semicrystalline and amorphous ESIs; (8) Arrhenius plots of the loss tangent peak temperature for representative semicrystalline and amorphous ESIs; (9) Draw ratio vs engineering strain; (10) Engineering stress-strain curves at 3 strain rates for ES27, ES63 and ES74; (11) Engineering stress-strain curves of ESIs; (12) Classification scheme of ESIs based on composition.

(20) U.S. Pat. No. 5,872,201 describes interpolymers: terpolymers of ethylene/styrene/propylene, ethylene/styrene/4-methyl-1-pentene, ethylene/styrene/hexend-1, ethylene/styrene octene-1, and ethylene/styrene/norbornene with number average molecular weight (Mn) of from 1,000 to 500,000.

(21–24) U.S. Pat. Nos. 5,460,818; 5,244,996; EP 415815A; JP07,278,230 describes substantially random, more appropriately presudo-random copolymers (interpolymers), methods of making and their uses.

(25) Alizadeh, et al., find the styrene interpolymers impedes the crystallization of shorter ethylene crystallizable sequences and that two distinct morphological features (lamellae and fringe micellar or clain clusters) are observed in ethylene/styrene (3.4 mol %) as lamella crystals organized in stacks coexisting with interlamellar bridge-like structures.

(26) Guest, et al., describes ethylene-styrene copolymers having less than about 45 wt % copolymer styrene being semicrystalline, as evidenced by a melting endotherm in DSC testing (Dupont DSC-901,10° C./min) data from the second heating curve. Crystallization decreases with increasing styrene content. Based on steric hindrance, styrene unit is excluded from the crystalline region of the copolymers. Transition from semi-crystalline to amorphous solid-state occurs at about 45 to 50 wt % styrene. At low styrene contents (<40%), the copolymers exhibit a relatively well-defined melting process. FIGS. **1–5** of this paper shows (a) DSC data in the T range associated with the melting transition for a range of ESI differing primarily in copolymer styrene content, (b) variation in percent crystallinity (DSC) for ESI as a function of copolymer S content, (c) elastic modulus versus T for selected ESI differing in S content, (d) loss modulus versus T for selected ESI differing in S content,

8

(e) Tensile stress/strain behavior of ESI differing in S content, respectively. The above patents and publications are specifically incorporated herein by reference.

The gels of the invention comprises high levels of one or more compatible plasticizers and one or more high viscosity linear multiblock copolymers and star-shaped (or radial) multiblock copolymers having the general configurations A″-Z-A″ and (A″-Z)$_n$ wherein each A″ is a selected glassy polymer end block of a monoalkenyl arene compounds, more specifically, a monovinyl aromatic compounds such as polystyrene (where superscript n=1), monovinylnaphthalene as well as the alkylated derivatives thereof such as poly(alpha-methylstyrene) (n=2), poly(o-methylstyrene) (n=3), poly(m-methylstyrene) (n=4), poly(p-methylstyrene) (n=5) poly(tertiary-butylstyrene) (n=6), and the like, and midblocks (Z) comprising two or more polymer chains of poly(ethylene), poly(butylene) or poly(propylene) in combination with one or more polymer chains of poly(ethylene-butylene) or poly(ethylene-propylene). These are denoted by (E), (B), (P), (EB), and (EP) respectively.

In one embodiment of the invention, to obtain elastic crystal gels, it is necessary that the selective synthesis of butadiene produce sufficient amounts of 1,4 poly(butadiene) that on hydrogenation can exhibit "crystallinity" in the midblocks. In order for the block copolymers forming the crystal gels of the invention to exhibit crystallinity, the crystalline midblock segments must contain long runs of —CH$_2$— groups. There should be approximately at least 16 units of —(CH$_2$)— in sequence for crystallinity. Only the (—CH$_2$—)$^3$ units can crystallize, and then only if there are at least 4 units of (—CH$_2$—)$^3$ in sequence; alternatively, the polyethylene units are denoted by [—(CH$_2$—CH$_2$—CH$_2$—CH$_2$)—]$^4$, [(—CH$_2$—)$^4$ ]$^4$ or (—CH$_2$—)$^{16}$. The amount of (—CH$_2$—)$^{16}$ units forming the (E) midblocks of the block copolymers comprising the crystal gels of the invention can be at least about 20% which amount is capable of exhibiting a melting endotherm in differential scanning calorimeter (DSC) curves.

In a further embodiment of the invention, ethylene-styrene copolymers produced by metallocene catalysts, using single site, constrained geometry addition polymerization catalysts resulting in substantially random poly (ethylene-styrene) copolymers such as commercially available Dow Interpolymers™, Dow S, M and E Series (ES16, ES24, ES27, ES28, ES28, ES30, ES44, ES53, ES58, ES62, ES63, ES69, ES72, ES73, ES74 and the like) can be used in combination with major or minor amounts of block copolymers of SEEPS, SEBS, and SEPS in forming gels of the invention.

A still further embodiment of the invention is a composite comprising a gel G$_n$ with a selected material M$_n$, characterized by a gel gram Bloom rigidity of about 20 to about 1,800 gram bloom, said composite made from (i) 100 parts by weight of one or more block copolymer; (ii) from about 300 to about 1,600 parts by weight of one or more selected plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity of about 4 cSt at 40° C. and greater, with or without one or more of (iii) an additive; wherein said (i), (ii), and (iii) are combined t form said gelatinous elastomeric composition; wherein said block copolymer comprises A-B-A blocks, A being selected from monoalkenularene polymers including polystyrene; said B being a hydrogenated polymer comprising a plurality of covalently linked conjugated diene monomers including a hydrogenated polymer of isoprene/butadiene; where said (i) block copolymer is poly(styrene-ethylene-ethylene-propylene-styrene); (1) said composite having layers of

9

$G_nM_n$, $G_nM_nM_n$, or $M_nM_nG_nM_nM_n$, $M_nG_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nG_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nG_n$, $G_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nG_nM_nM_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nM_nG_n$, or permutation of one or more of said $G_n$ with $M_n$; wherein said additive is: (2) an additive selected from the group consisting of aggregation of gas bubbles formed by inert gases, and blowing agents including water, (3) an additive selected from the group consisting of internatal and external tack modifiers including, antiblocking agents, non-adhering, non-sticking modifiers including tetrakis[methylene 3,-(3'5'-di-tertbutyl-4'-hydroxyphenyl) propionatel methane, octadecyl 3-(3",5"-di-tert-butyl-4"-hydroxyphenyl) propionate, distearyl- pentaerythritol-dipropionate, thiodiethylene bis-(3,4-ter-butyl-4-hydroxy) hydrocinnamate, (1,3,5-trimethyl-2,4,6-tris[3,5-di-tert-butyl-4-hydroxybenzyl]benzene), 4,4"-methylenebis(2,6-di-tert-butylphenol), additives of stearic acid, oleic acid, stearamide, behenamide, oleamide, erucamide, N,N"-ethylenebisstearamide, N,N"-ethylenebisoleamide, sterryl drucamide, erucyl erucamide, oleyl palmitamide, stearyl stearamide, erucyl stearamide, waxes, mica, talc, zinc sterate, amorphous silica, silica, silicon dioxide, aluminum sterate, fine metallic powder, metal flakes, and silicone fluids, (4) an additive selected from the group consisting of polyisobutylene including polybutene, hydrocarbon resins including polymerized mixed olefins, polyterpene, glycerol ester of rosin, pentaerythritol ester of rosin, saturated alicyclic hydrocarbon, coumarone indene, hydrocarbon, mixed olefin, alkylated aromatic hydrocarbon, polyalphamethylstyrene/vinyl toluene copolymer, polystyrene, and elastomeric diblock copolymers of poly (styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$, poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), (5) an additive selected from the group consisting of flame retardants, (6) an additive selected from the group consisting of hydrocarbon resins, polyisobutylene including polybutene, additional block copolymers of poly (styrene-isoprene-styrene), poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly (styrene-ethylene-propylene)$_n$, poly(ethylene-styrene), poly (styrene-ethylene-butylene)$_n$, particulate fillers, microspheres, butadiene rubber, poly(ethylene/propylene), and poly(ethylene/butylene), (7) an additive selected from the group consisting of poly(styrene-butadiene-styrene), polystyrene, polybutylene, poly(ethylene-porpylene), poly (ethylene-butylene), polypropylene, polyethylene, diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly (styrene-ethylene-butylene)$_n$, stearic acid, oleic acid, stearamide, behenamide, oleamide, erucamide, N,N"-ethylenebisstearamide, N,N"-ethylenebisoleamide, sterryl erucamide, erucyl erucamide, oleyl palmitamide, stearyl stearamide, erucyl stearamide, waxes, and silicone fluids, and (8) an additive selected from the group consisting of hydrocarbon resins of polystyrene, polymerized mixed olefins, polyterpene, glycerol ester of rosin, pentaerythritol ester of rosin, saturated alicyclic hydeocarbon, coumarone indene, hydrocarbon, mixed olefin, alkylated aromatic hydrocarbon, particulate fillers, and microspheres; said gel having a hydrophobic or hydrophilic surface depending on additives selected.

10

Advantageously, the elastomer midblock segment may have a crystallinity of at least about 20% of $(\text{—CH}_2\text{—})^{16}$ units of the total mole % forming the midblocks of the block copolymer, more advantageously at least about 25%, still more advantageously at least about 30%, especially advantageously at least about 40% and especially more advantageously at least about 50% and higher. Broadly, the crystallinity of the midblocks can range from at least about 20% to about 60%, less broadly from at least about 18% to about 65%, and still less broadly from at least 22% to about 70%.

The melting endotherm in DSC curves of the crystalline block copolymers comprising at least 20% crystallinity are much higher than conventional amorphous block copolymers. The poly(ethylene) crystalline segments or midblocks of copolymers forming the crystal gels of the invention are characterized by sufficient crystallinity as to exhibit a melting endotherm of at least about 25° C., more advantageously of about 40° C. or higher as determined by DSC curve. The maximum in the endotherm curves of the crystalline block copolymers occurs at about 40° C., but can range from greater than about 25° C. to about 60° C. and higher. The crystalline block copolymers forming the crystal gels of the invention can exhibit melting endotherms (as shown by DSC) of about 25° C. to about 75° C. and higher. More specific melting endotherm values of the crystalline midblock block copolymers include: about 28° C., 29° C., 30° C., 31° C., 32° C., 33° C., 34° C., 35° C., 36° C., 37° C., 38° C., 39° C., 40° C., 41° C., 42° C., 43° C., 44° C., 45° C., 46° C., 47° C., 48° C., 49° C., 50° C., 51° C., 52° C., 53° C., 54° C., 55° C., 56° C., 57° C., 58° C., 59° C., 60° C., 61° C., 62° C., 63° C., 64° C., 65° C., 66° C., 67° C., 68° C., 69° C., 70° C., 71° C., 72° C., 73° C., 74° C., 75° C., 76° C., 77° C., 78° C., 79° C., 80° C., 90° C., 100° C., 110° C., 120° C., and higher, whereas, the melting endotherm (DSC) for conventional amorphous midblock segment block copolymers are about 10° C. and lower.

The melting endotherm is seen on heating and a sharp crystallization exotherm is seen on cooling. Such midblock crystallization endothermic and exothermic characteristics are missing from DSC curves of amorphous gels. The crystallization exotherm and fusion endotherm of the crystalline block copolymer gels of the invention are determined by ASTM D 3417 method.

Generally, the method of obtaining long runs of crystalline $\text{—(CH}_2\text{)—}$ is by sequential block copolymer synthesis followed by hydrogenation. The attainment of crystal gels of the instant invention is solely due to the selective polymerization of the butadiene monomer (forming the midblocks) resulting in one or more predetermined amount of 1,4 poly(butadiene) blocks followed by sequential polymerization of additional midblocks and hydrogenation to produce one or more crystalline midblocks of the final block copolymers.

The crystalline block copolymers are made by sequential block copolymer synthesis, the percentage of crystallinity or $(\text{—CH}_2\text{—})^{16}$ units can be at least about $(0.67)^4$ or about 20% and actual crystallinity of about 12%. For example, a selectively synthesized S-EBn-S copolymer having a ratio of 33:67 of 1,2 and 1,4 poly(butadiene) on hydrogenation will result in a midblock with a crystallinity of $(0.67)^4$ or 20%. For sake of simplicity, when n is a subscript of -EB-, n denotes the percentage of $(\text{—CH}_2\text{—})^4$ units, eg, n=33 or 20% crystallinity which is the percentage of $(0.67)^4$ or "$(\text{—CH}_2\text{—})^{16}$" units. Thus, when n=28 or 72% of $(\text{—CH}_2\text{—})^4$ units, the % crystallinity is $(0.72)^4$ or 26.87% crystallinity attributed to $(\text{—CH}_2\text{—})^{16}$ units, denoted by $\text{-EB}_{28}$-. As a matter of convention, and for purposes of this

US 6,867,253 B1

11

specification involving hydrogenated polybutadiene: the notation -E- denotes at least about 85% of (—CH₂—)⁴ units. The notation -B- denotes at least about 70% of [—CH₂—CH(C₂H₅)—] units. The notation -EB- denotes between about 15 and 70% [—CH₂—CH(C₂H₅)—] units. The notation -EBn- denotes n % [—CH₂—CH(C₂H₅)—] units. For hydrogenated polyisoprene: The notation -EP- denotes about at least 90% [—CH₂—CH(CH₃)—CH₂—CH₂—] units.

Generally, one or more (E) midblocks can be incorporated at various positions along the midblocks of the block copolymers. The lower flexibility of block copolymer crystal gels due to (E) midblocks can be balanced by the addition of sequentially (W) midblocks. For example, the sequentially synthesized block copolymer S-E-EB-S can maintain a high degree of flexibility due to the presence of amorphous -EB- block The sequential block copolymer S-E-EB-B-S can maintain a high degree of flexibility due to the presence of amorphous -EB- and -B- midblocks. The sequential block copolymer S-EP-EP-E-S can maintain a high degree of flexibility due to the presence of -EP- midblock. The sequential block copolymer S-E-EB-S can maintain a high degree of flexibility due to the presence of the -B- midblock. For S-E-S, where the midblock is substantially crystalline and flexibility low, physical blending with amorphous block copolymers such as S-EB-S, S-B-S, S-EP-S, S-EB-EP-S, (S-EP)ₙ, and the like can produce more softer, less rigid, and more flexible crystal gel.

Because of the (E) midblocks, the crystal gels of the invention exhibit different physical characteristics and improvements over substantially amorphous gels including damage tolerance, improved crack propagation resistance, improved tear resistance producing knotty tears as opposed to smooth tears, crystalline melting point of at least 28° C., improved resistance to fatigue, higher hysteresis, etc. Moreover, the crystal gels when stretched exhibit additional yielding as shown by necking caused by stress induced crystallinity. Additionally, the crystallization rates of the crystalline midblocks can be controlled and slowed depending on thermal history producing time delay recovery upon deformation.

Regarding resistance to fatigue, fatigue (as used herein) is the decay of mechanical properties after repeated application of stress and strain. Fatigue tests give information about the ability of a material to resist the development of cracks or crazes resulting from a large number of deformation cycles. Fatigue test can be conducted by subjecting samples of amorphous and crystal gels to deformation cycles to failure (appearance of cracks, crazes, rips or tears in the gels).

Tensile strength can be determined by extending a selected gel sample to break as measured at 180° U bend around a 5.0 mm mandrel attached to a spring scale. Likewise, tear strength of a notched sample can be determined by propagating a tear as measured at 180° U bend around a 5.0 mm diameter mandrel attached to a spring scale.

Various block copolymers can be obtained which are amorphous, highly rubbery, and exhibiting minimum dynamic hysteresis:

Block Copolymer S-EB-S

The monomer butadiene can be polymerized in a ether/hydrocarbon solvent to give a 50/50 ratio of 1,2 poly (butadiene)/1,4 poly(butadiene) and on hydrogenation no long runs of —CH₂— groups and negligible crystallinity, ie, about $(0.5)^4$ or 0.06 or 6% and actual crystallinity of about

12

3%. Due to the constraints of Tg and minimum hysteresis, conventional S-EB-S have ethylene-butylene ratios of about 60:40 with a crystallinity of about $(0.6)^4$ or 0.129 or 12% and actual crystallinity of about 7.7%.

Block Copolymer S-EP-S

The monomer isoprene when polymerized will produce 95% 1,4 poly(isoprene)/5% 3,4 poly(isoprene) and upon hydrogenation will form amorphous, rubbery poly(ethylene-propylene) midblock and no long runs of —CH₂— and no crystallinity.

Mixed Block Copolymer S-EB/EP-S

The polymerization of a 50/50 mixture of isoprene/butadiene monomers in suitable ether/hydrocarbon solvents to give equal amounts of 1,2 and 1,4 poly(butadiene) on hydrogenation will produce a maximum crystallinity of $(0.25)^4$ or 0.4%. The actual crystallinity would be approximately about 0.2%, which is negligible and results in a good rubbery midblock.

The polymerization of a 80/20 mixture of isoprene/butadiene monomers in suitable ether/hydrocarbon solvents to give equal amounts of 1,2 and 1,4 poly(butadiene) will upon hydrogenation produce a low crystallinity of $(0.10)^4$ or 0.01%. The actual crystallinity would be approximately about 0.006%, which is negligible and results in a good rubbery midblock.

The polymerization of a 20/80 mixture of isoprene/butadiene monomers in suitable ether/hydrocarbon solvents to give equal amounts of 1,2 and 1,4 poly(butadiene) will upon hydrogenation produce a low crystallinity of $(0.4)^4$ or 2.56%. The actual crystallinity would be approximately about 1.53%, which is negligible and results in a good rubbery midblock.

The polymerization of a 20/80 mixture of isoprene/butadiene monomers in suitable ether/hydrocarbon solvents to give a 40:60 ratio of 1,2 and 1,4 poly(butadiene) will upon hydrogenation produce a low crystallinity of $(0.48)4$ or 5.3%. The actual crystallinity would be approximately about 3.2%, which is negligible and results in a good rubbery midblock.

For purpose of convince and simplicity, the hydrogenated polybutadiene are denoted as follows: -E- denotes at least 85% R-1 units, -B- denotes at least 70% R-2 units, -EB- denotes between 15 and 70% R-2 units, -EBn- denotes n % R-2 units, and -EP- denotes 90% R-3 units.

Table I below gives the % of units on hydrogenation of polybutadiene/polyisoprene copolymer midblocks

$$—(CH_2)_4—(CH—CH_2)\xrightarrow{IH2}(CH_2—CH—CH_2—CH_2)—(CH_2—CH)—$$

|  | $C_2H_5$ | $CH_3$ | $CH$ |
|---|---|---|---|
|  |  |  | $CH_3$  $CH_3$ |

| n % from polybutadiene | | (1-n) % from polyisoprene | |
|---|---|---|---|
| 90%•n | 10%•n | 95%•(1-n) | 5%•(1-n) |

where n is the mole % polybutadiene in the polybutadiene-polyisoprene starting polymer

US 6,867,253 B1

13

| n = | R-1 | R-2 | R-3 | R-4 |
|---|---|---|---|---|
| 0% | 0% | 0% | 95% | 5% |
| 20% | 18% | 2% | 76% | 4% |
| 40% | 36% | 4% | 57% | 3% |
| 60% | 54% | 6% | 38% | 2% |
| 80% | 72% | 8% | 19% | 1% |
| 100% | 90% | 10% | 0% | 0% |

where

R-1 denotes $(-CH_2-)^4$,

R-2 denotes $-(CH-CH_2)-$, $C_2H_5$

R-3 denotes $-(CH_2-CH-CH_2-CH_2)-$, and $CH_3$

R-4 denotes

$$-(CH_2-CH)-$$
$$CH$$
$$CH_3 \quad CH_3$$

Therefore, the percentage that can crystallize is $[(-CH_2-)^4]^4$ since this is the chance of getting four $(-CH_2-)^4$ units in sequence. The percentage that will crystallize is about 60% of this.

| n = | $(-CH_2-)^4$ | $[(-CH_2-)^4]^4$ | $0.6X[(-CH_2-)^4]^4_n$ |
|---|---|---|---|
| 0% | 0% | 0% | 0% |
| 20% | 18% | 0.1% | 0.06% |
| 40% | 36% | 1.7% | 1.0% |
| 60% | 54% | 8.5% | 5.1% |
| 80% | 72% | 26.9% | 16.1% |
| 100% | 90% | 65.6% | 39.4% |

This applies to polymerization in a hydrocarbon solvent. In an ether (eg, diethylether), the percentage $(-CH_2-)^4$ units will be reduced so that crystallinity will be negligible.

| n = | $(-CH_2-)^4$ | $[(-CH_2-)^4]^4$ | $0.6X[(-CH_2-)^4]^4_n$ |
|---|---|---|---|
| 0% | 0% | 0% | 0% |
| 20% | 5% | 0.0006% | 0.0004% |
| 40% | 10% | 0.01% | 0.006% |
| 60% | 15% | 0.05% | 0.03% |
| 80% | 20% | 0.16% | 0.10% |
| 100% | 25% | 0.39% | 0.23% |

These values are all negligible. There will be no detectable crystallinity in any of these polymer midblocks. In a mixed ether/hydrocarbon solvent, values will be intermediate, depending on the ratio of ether to hydrocarbon.

The midblock components (Z) can comprise various combinations of midblocks between the selected end blocks (A); these include: -E-EB-, -E-EP-, -B-EP-, -B-EB-, -E-EP-E-, -E-EB-E, -B-EP-E-, -B-EB-E-, -B-EB-B-, -E-E-EP-, -E-E-EB-, -B-E-EP-, -B-E-EB-, -B-B-EP-, -B-B-EB-, -E-B-EB-, -E-B-EP-, -EB-EP-, -EB-EB-, -EP-EP-, -E-EB-EB-, -E-EP-EP-, -E-EB-EP-, -E-EP-EB-, -B-EB-EB-, -B-EP-EP-, -B-EB-EP-, -E-EP-E-EP-, -E-EB-E-EB-, -E-EP-E-EB-, -B-EP-B-EP-, -B-EB-B-EB-, -B-EB-B-EP-, -B-EB-E-EB-, -B-EP-E-EP-, -E-EB-E-EP-, -E-EB-EB-EB-, -P-EB-, -P-EP-, -P-EP-P-, -P-EB-P-, -B-EP-P-, -B-EB-P-, -P-E-EP-, -P-E-EB-, -B-P-EP-, -B-P-EB-, -P-B-EB-, -P-B-EP-, -PEB-EB-, -P-EP-EP-, -P-EB-EP-,

14

-P-EP-EB-, -P-EP-P-EP-, -P-EB-P-EB-, -P-EP-P-EB-, -B-EB-P-EB-, -B-EP-P-EP-, -P-EP-B-EP-, -P-EB-B-EP-, -E-EP-P-, -E-EB-P-, -E-P-EP-, -E-P-EB-, -E-EP-P-EP-, -E-EB-EB-, -E-EP-P-EB-, -E-EP-SE-E-E-, -B-EP-B-EP-B-, -P-EP-P-EP-P-, -E-EB-E-EB-E-, -P-EP-P-EP-P-, and the like.

The (Z) midblock of two or more polymer chains can be obtained by hydrogenation methods, for example: 1,4-polybutadiene ($B_{1,4}$) can be converted by hydrogenation to poly(ethylene), 1,4-polybutadiene ($B_{1,4}$) and 1,2-polybutadiene ($B_{1,2}$) can be converted by hydrogenation to poly(ethylene-butylene), 1,4-poly-isoprene ($I_{1,4}$) can be converted by hydrogenation to poly(ethylene-propylene), 1,2-polybutadiene ($B_{1,2}$) can be converted by hydrogenation to atactic poly(1-butene)(polybutylene), 1,4-polybutadiene ($B_{1,4}$) and polyisoprene (I) 1,4-poly-butadiene ($B_{1,4}$) can be converted by hydrogenation to poly(ethylene-ethylene-co-propylene-ethylene), 2-methyl-1,3-polybutadiene and 1,3-polybutadiene (I, $B_{1,3}$) can be converted by hydrogenation to poly(ethylene-ethylene-co-propylene), and the like. Polypropylene can be modified by tailblocking a poly(ethylene-propylene) copolymer segment on the propylene block to form poly(propylene-ethylene-co-propylene); likewise, poly(ethylene-propylene)$_n$ (EP), poly(propylene-ethylene-co-propylene-propylene) (P-EP-P), poly (propylene-ethylene-propylene) (P-E-P), poly(ethylene-ethylene-co-propylene) (E-EP) can be formed. It is noted herein that B (bold) denotes polybutadiene and B (plain) denotes polybutylene.

Further, the multiblock copolymers (A$^n$-Z-A$^n$) can be obtained by various synthesis methods including hydrogenation of selected block copolymers When the subscript n of A is=1, (polystyrene) (S), for example, suitable block copolymers can be converted to the useful multiblock copolymers forming the gels. These include: conversions of S-I-B$_{1,3}$-S to (S-E-EP-S), S-B$_{1,4}$-I-B$_{1,4}$-S to (S-E-EB-S), S-B$_{1,2}$-I-S to (S-B-EP-S), S-B$_{1,3}$-B$_{1,2}$-B$_{1,4}$-S to (S-E-EB-S), S-B$_{1,4}$-B$_{1,2}$-I-S tom (S-EB-EP-S), S-I-B$_{1,3}$-B$_{1,2}$-B$_{1,4}$-S to (S-E-EP-EB-S), etc. As denoted herein abbreviations are interchangeably used, for example, (S-E-EP-S) denotes poly (styrene-ethylene-ethylene-co-propylene-styrene). Other linear multiblock copolymers (denoted in abbreviations) can be formed, including: (S-B-EB-S), (S-E-EB-E-S), (S-B-EP-E-S), (S-B-EB-E-S), (S-B-EP-B-S), (S-B-EB-B-S), (S-E-E-EP-S), (S-E-E-EB-S), (S-B-E-EP-S), (S-B-E-EB-S), (S-B-B-EP-S), (S-B-B-EB-S), (S-E-B-EB-S), (S-E-B-EP-S), (S-EB-EB-S), (S-EP-EP-S), (S-E-EB-EB-S), (S-E-EP-EP-S), (S-E-EB-EP-S), (S-B-EB-EB-S), (S-B-EP-EP-S), (S-B-EB-EP-S), (S-E-EP-E-EP-S), (S-E-EB-E-EB-S), (S-E-EP-E-EB-S), (S-B-EP-B-EP-S), (S-B-EB-B-EB-S), (S-B-EB-B-EP-S), (S-B-EB-E-EB-S), (S-B-EP-E-EP-S), (S-E-EB-B-EP-S), (S-E-EP-B-EB-S), (S-P-EB-S), (S-P-EP-S), (S-P-EP-P-S), (S-P-EB-P-S), (S-B-EP-P-S), (S-B-EB-P-S), (S-P-E-EP-S), (S-P-E-EB-S), (S-P-EP-P-S), (S-P-B-EB-S), (S-P-B-EP-S), (S-P-EB-EB-S), (S-P-EP-EP-S), (S-P-EB-EP-S), (S-P-EP-EB-S), (S-B-EP-EP-S), (S-P-EB-P-EB-S), (S-P-EP-P-EB-S), (S-B-EB-P-EB-S), (S-B-EP-P-EP-S), (S-P-EP-B-EP-S), (S-P-EB-B-EP-S), (S-E-EP-P-S), (S-E-EB-P-S), (S-E-EP-EP-S), (S-E-EP-P-EB-S), (S-E-EP-E-ES), (S-B-EP-B-EP-B-S), (S-P-EP-P-EP-P-S), (S-E-EB-E-EB-E-S), (S-P-EP-P-EP-P-S), and the like.

The multiblock star-shaped (or radial) copolymers (A$^n$-Z)$_n$ can be obtained by various synthesis methods including hydrogenation of selected block copolymers. When the subscript n of A is=1, (polystyrene) (S), for example, suit-

able block copolymers can be converted to the useful multiblock copolymers forming the gels. These include: conversions of $(S-I-B_{1,3})_n$ to poly(styrene-ethylene-ethylene-co-propylene)$_n$ denoted by the abbreviation (S-E-EP)$_n$, $(S-B_{1,4}-I-B_{1,4})_n$ to (S-E-EP-E)$_n$, $(S-B_{1,2}-I)_n$ to (S-B-EP)$_n$, $(S-B_{1,3}-B_{1,2}-B_{1,4})_n$ to (S-E-EB)$_n$, $(S-B_{1,4}-B_{1,2}-I)_n$ to (S-EB-EP)$_n$, $(S-I-B_{1,3}-B_{1,4})_n$ to (S-E-EP-EB)$_n$, etc. Other multiblock copolymers can be formed, including: (S-B-EB)$_n$, (S-E-EB-E)$_n$, (S-B-EP-E)$_n$, (S-B-EP-B)$_n$, (S-B-EB-B)$_n$, (S-E-E-EP)$_n$, (S-E-EB)$_n$, (S-E-B-EP)$_n$, (S-B-B-EP)$_n$, (S-B-B-EP)$_n$, (S-E-B-EB)$_n$, (S-E-B-EP)$_n$, (S-EB-EB)$_n$, (S-EP-EP)$_n$, (S-E-EB-EB)$_n$, (S-E-EP-EP)$_n$, (S-E-EB-EP)$_n$, (S-B-EB-EB)$_n$, (S-B-EP-EP)$_n$, (S-B-EB-EP)$_n$, (S-E-EB-EP)$_n$, (S-E-EP-EP)$_n$, (S-E-EB-E-EB)$_n$, (S-E-EP-E-EB)$_n$, (S-B-EP-B-EP)$_n$, (S-B-EB-B-EB)$_n$, (S-B-EP-B-EP)$_n$, (S-B-EP-EP)$_n$, (S-E-EB-EB-EP)$_n$, (S-E-EP-B-EB)$_n$, (S-P-EB)$_n$, (S-P-EP)$_n$, (S-P-EP-P)$_n$, (S-B-EP-P)$_n$, (S-B-EB-P)$_n$, (S-P-E-EP)$_n$, (S-P-E-EB)$_n$, (S-B-P-EP)$_n$, (S-B-P-EB)$_n$, (S-P-B-EB)$_n$, (S-P-EB-EB)$_n$, (S-EP-EP-EP)$_n$, (S-P-EB-EP)$_n$, (S-P-EP-EB)$_n$, (S-P-EP-P-EP)$_n$, (S-P-EB-P-EP)$_n$, (S-P-EP-P-EB)$_n$, (S-B-EP-EP)$_n$, (S-P-EB-B-EP)$_n$, (S-B-EP-B-EB)$_n$, (S-E-E-EP)$_n$, (S-E-EB-P)$_n$, (S-E-EP)$_n$, (S-E-EP-EB)$_n$, (S-E-EP-P-EP)$_n$, (S-E-EB-P-EB)$_n$, (S-E-EP-E-EP)$_n$, (S-B-EP-B-EP-B)$_n$, (S-P-EP-EP-EP-P)$_n$, (S-E-EB-E-EB-E)$_n$, (S-P-EP-P-EP-P)$_n$, and the like.

The Z and A portions of the linear and star-shaped multiblock copolymers are incompatible and form a two or more-phase system consisting of sub-micron glassy domains (A) interconnected by flexible Z chains. These domains serve to crosslink and reinforce the structure. This physical elastomeric network structure is reversible, and heating the polymer above the softening point of the glassy domains temporarily disrupt the structure, which can be restored by lowering the temperature.

Theory notwithstanding, the multiblock copolymer gel properties can be attributed to the additional blocks affecting the separate polymer phases, the additional blocks affecting the heterophase structure, the additional blocks affecting the interfacial regions between phases of the multiblock polymers or the additional blocks forming a separate phase or inducing the formation of additional separate phases. Due to the additional number of midblocks of the copolymers (I), the differences in solubility parameters between (A) and (Z) becomes greater than the solubility parameters differences between (A) and (D) of triblock copolymers, where D denotes the lone midblock polymer chain. Moreover, the presence of additional midblocks of ethylene, propylene, butylene, ethylene-propylene, or ethylene-butylene can contribute to stress-induced crystallization. This may explain why as the viscosity of the multiblock copolymers is increased to a higher level, the appearance of the gels change from crystal clear to more translucent white.

The gels of the present invention resist tearing under tensile loads or dynamic deformation in that when cut or notched, the "crack" made on the gel deep surface does not readily propagate further under dynamic deformation or tensile loads. Unlike triblock copolymer gels, such as (SEBS) and (SEPS) gels which possess high tensile strength and will catastrophically snap apart into two reflective clean smooth surfaces when cut or notched under tensile or dynamic loads. Furthermore, when elongated, the instant gels can exhibit two or more draw plateaus and can possess high tensile strength and rapid return from high extension without noticeable set or deformation. As observed, the gels can be stretched by a first tensile load with uniform defor-

mation to a measured length, upon the application of higher tensile loads, the gel can be further extended without breaking. Upon release, the gel returns immediate to its original shape and any necking quickly disappears. Again, theory notwithstanding, the additional drawing plateaus of the gel can be attributed to yielding of crystallite formations ethylene or propylene components in the gel or yield of induced interfacial regions of concentrated ethylene or propylene between the domains which during extension absorbs the elastic energy. Likewise, the resistance to tear propagation of the instant gels when notched under tensile load can be attributed to yielding of the gel midblock components, yielding of additional phases, or yielding of interfacial regions before rupture or deformation of the (A) domains can take place.

Additionally, shearing, heating or cooling form the molten state can alter the gels' state. The instant gels can be made to exhibit long elastomeric recovery times. Such gels can be used effectively in suppressing low frequency vibrations and for absorbing energy. The unusual properties of the gels can be attributed to altering different phase or interfacial arrangements of the domains of the multiblock copolymers.

It should be noted that when the A to Z ratios falls substantially below about 30:70, various properties such as elongation, tensile strength, tear resistance and the like can decrease while retaining other desired properties, such as gel rigidity, flexibility, elastic memory.

In general, for these block copolymers, the various measured viscosities of 5, 10, 15, and 20, weight percent solution values in toluene at 30° C. can be extrapolated to a selected concentration. For example, a solution viscosity of a 5 weight percent copolymer solution in toluene can be determined by extrapolation of 10, 15, and 20 weight percent measurements to 5 weight percent concentration.

The Brookfield Viscosities can be measured at various neat polymer concentrations, for example, the selected high viscosity linear multiblock copolymers in (I) can have a typical Brookfield Viscosity value of a 20 weight percent solids solution in toluene at 25° C. of about 1,800 cps and higher, and advantageously about 2,000 cps and higher. Typically, the Brookfield Viscosity values can range from at least about 1,800 to about 16,000 cps and higher. More typically, the Brookfield Viscosity values can range from at least about IWD cps to about 40,000 cps and higher. Still more typically, the Brookfield Viscosity values can range from at least about 1,000 cps to about 80,000 cps and higher. Due to structural variations between the multiblock and star-shaped copolymers, the high viscosity star-shaped or radial copolymers, typically, may exhibit a lower Brookfield Viscosity value than its counterpart linear multiblock copolymers. However, when the multi block copolymers are considered as star-shaped or branched, than at equal branch lengths, the solution viscosities of the multiblock copolymers and branched copolymers are about the same or equivalent.

In all cases, the molecular chain lengths (molecular weights) of the multiblock and star-shaped (or radial) copolymers (I) must be sufficient to meet the high solution Brookfield Viscosities requirements described herein that is necessary for making the soft, strong and extreme tear resistant gels.

The copolymers (I) selected have Brookfield Viscosity values ranging from about 1,800 cps to about 80,000 cps and higher when measured at 20 weight percent solution in toluene at 25° C., about 4,000 cps to about 40,000 cps and higher when measured at 25 weight percent solids solution in toluene. Typical examples of Brookfield Viscosity values

17

for star-shaped copolymers at 25 weight percent solids solution in toluene at 25° C. can range from about 3,500 cps to about 30,000 cps and higher; more typically, about 9,000 cps and higher. Other advantageous multiblock and multiblock star-shaped copolymers can exhibit viscosities (as measured with a Brookfield model RVT viscometer at 25° C.) at 10 weight percent solution in toluene of about 400 cps and higher and at 15 weight percent solution in toluene of about 5,000 cps and higher. Other advantageous multiblock and star-shaped copolymers can exhibit about 8,000 to about 20,000 cps at 20 weight percent solids solution in toluene at 25° C. Examples of most advantageous high viscosity linear multiblock copolymers can have Brookfield viscosities at 5 weight percent solution in toluene at 30° C. of from about 40 to about 50, 60, 70, 80, 90, 100 . . . 120, 150, 200 cps and higher, while viscosities of star-shaped multiblock copolymers are 150 cps and higher.

Examples of high viscosity multiblock copolymers (I) having two or more midblocks are hydrogenated styrene isoprene/butadiene block copolymers, more specifically, hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene: Kuraray's 4055 (S-E-EP-S) multiblock copolymer and 4077 (hydrogenated styrene isoprene/butadiene block copolymers) and the like, more specifically, hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene) which exhibit viscosities at 5 weight percent solution in toluene at 30° C. of about 90 cps to about 120 cps and about 200 to about 380 cps respectively. At 10 weight percent SEEPS 4055 is about 5,900 cps and higher. Other linear and star multiblock copolymers (I) such as (S-E-EP-S), (S-E-EP-E-S), (S-B-EP-S), (S-E-EB-S), (S-EB-EP-S), (S-E-EP-EB-S), (S-B-EB-S), (S-B-EP-E-S), (S-B-E-S), (S-B-EP-S), (S-B-EB-B-S), (S-B-E-EP-S), (S-E-E-EB-S), (S-B-E-EP-S), (S-B-E-EB-S), (S-B-B-EB-S), (S-E-B-EB-S), (S-B-EP-EP-S), (S-E-EB-EB-S), (S-E-EP-EP-S), (S-E-EB-EP-S), (S-B-EB-EB-S), (S-B-EP-EB-S), (S-B-EB-B-EP-S), (S-B-EP-EP-S), (S-E-EB-EB-S), (S-E-EP-EB-S), (S-E-EP-E-EB-S), (S-B-EP-EB-EP-S), (S-B-EB-EB-S), (S-B-EB-B-EP-S), (S-E-EB-E-EB-S), (S-B-EP-E-EP-S), (S-E-EP-B-EB-S), (S-P-EB-S), (S-P-EP-S), (S-P-EP-P-S), (S-P-EB-P-S), (S-B-EB-P-S), (S-P-E-EP-S), (S-P-E-EB-S), (S-B-P-EP-S), (S-B-P-EB-S), (S-P-B-EB-S), (S-P-B-EP-S), (S-P-EB-EB-S), (S-P-EP-EP-S), (S-P-EB-EP-S), (S-P-EP-EB-S), (S-P-EP-P-EB-S), (S-P-EB-P-EB-S), (S-B-EB-P-EB-S), (S-P-EP-P-EB-S), (S-P-EB-B-EP-S), (S-P-EP-B-EB-S), (S-E-EP-P-S), (S-E-EB-P-S), (S-E-EP-P-S), (S-E-EB-P-S), (S-E-EP-EB-S), (S-E-EP-P-EP-S), (S-E-EB-P-EB-S), (S-E-EP-P-EP-P-S), (S-E-EB-E-EB-E-S), (S-P-EP-P-EP-P-S), (S-E-EP)$_n$, (S-E-EP-E)$_n$, (S-B-EP)$_n$, (S-E-EB-S), (S-E-EP-)$_n$, (S-E-EP-EB)$_n$, (S-B-EB)$_n$, (S-E-EB-E)$_n$, (S-B-E-EP)$_n$, (S-B-EP-E)$_n$, (S-B-EB-B)$_n$, (S-E-E-EP)$_n$, (S-E-EB)$_n$, (S-B-E-EP)$_n$, (S-B-E-EB)$_n$, (S-B-B-EP)$_n$, (S-B-B-EB)$_n$, (S-E-B-EB)$_n$, (S-E-EP-EP)$_n$, (S-E-EB)$_n$, (S-EP-EP)$_n$, (S-E-EB-EB)$_n$, (S-E-EP-EP)$_n$, (S-E-EB-EP)$_n$, (S-E-EP-EB)$_n$, (S-E-B-EP)$_n$, (S-B-EP-EB)$_n$, (S-E-EP-E-EP)$_n$, (S-E-EB-EB)$_n$, (S-E-EP-E-EB)$_n$, (S-B-EP-B-EP)$_n$, (S-B-EB-B-EP)$_n$, (S-B-EB-B-EB)$_n$, (S-B-EP-E-EP)$_n$, (S-E-EB-B-EP)$_n$, (S-E-EP-B-EB)$_n$, (S-P-EB)$_n$, (S-P-EP)$_n$, (S-P-EP-P)$_n$, (S-P-EB-P)$_n$, (S-B-EB-P)$_n$, (S-P-E-EP)$_n$, (S-P-E-EB)$_n$, (S-B-P-EP)$_n$, (S-B-P-EB)$_n$, (S-P-B-EB)$_n$, (S-P-B-EP)$_n$, (S-P-EB-EB)$_n$, (S-P-EP-EP)$_n$, (S-P-EB-EP)$_n$, (S-P-EP-EB)$_n$, (S-P-EP-P-EP)$_n$, (S-P-EB-P-EB)$_n$, (S-P-EP-P-EB)$_n$, (S-B-EB-P-EB)$_n$, (S-B-EP-P-

18

EP)$_n$, (S-P-EB-B-EP)$_n$, (S-P-EP-B-EB)$_n$, (S-E-EP-P)$_n$, (S-E-EB-P)$_n$, (S-E-EP)$_n$, (S-E-EB)$_n$, (S-E-EP-P-EP)$_n$, (S-E-EB-P-EB)$_n$, (S-E-EP-E-EP)$_n$, (S-B-EP-B-EP)$_n$, (S-P-EP-P-EP)$_n$, (S-E-EB-E-EB-E)$_n$, and (S-P-EP-P-EP-P)$_n$ can also exhibit viscosities at 5 weight percent solution in toluene at 30° C. of from less than about 100 to about 200, 300, 400, 500, 600, 700, 800, 900, 1,000, 1,200, 1,300, 1,600, 1,800, 2,000 cps and higher.

The copolymer (I) forming the gels can have a broad range of A end block to Z center block ratio of about 20.80 or less to about 40:60 or higher. The A:Z weight ratios can range from lower than about 20:80 to above about 40:60 and higher. More specifically, the values can be 19:81, 20:80, 21:79, 22:78, 23:77, 24:76, 25:75, 26:74, 27:73, 28:72, 29:71, 30:70, 31:69, 32:68, 33:67, 34:66, 35:65, 36:64, 37:63, 38:62, 39:61, 40:60, 41:59, 42:58, 43:57, 44:65, 45:55, 46:54, 47:53, 48:52, 49:51, 50:50, 51:49 and etc. Other ratio values of less than 19:81 or higher than 51:49 are also possible. Broadly, the styrene block to elastomeric block ratio A:Z of the high viscosity multiblock and star copolymers (I) is about 20:80 to about 40.60 or higher, less broadly about 31:69 to about 40:60, preferably about 32:68 to about 38:62, more preferably about 32:68 to about 36:64, particularly more preferably about 32:68 to about 34:66, especially more preferably about 33.67 to about 36:64, and most preferably about 30.70.

The multiblock copolymers (I) such as Kuraray's (S-E-EP-S) 4055 and 4077 while exhibiting a high viscosity also have a lower (30:70) S:E-EP ratio which makes it of advantage in processing the high molecular weight, high viscosity multiblock copolymers into a gel at suitable temperatures.

The gels can optionally comprise selected major or minor amounts of one or more polymers or copolymers (II) provided the amounts and combinations are selected without substantially decreasing the desired properties. The polymers and copolymers can be linear, star-shaped, branched, or multiarm; these including: (SBS) styrene-butadiene-styrene block copolymers, (SIS) styrene-isoprene-styrene block copolymers, (low styrene content SEBS) styrene-ethylene-butylene-styrene block copolymers, (SEP) styrene-ethylene-propylene block copolymers, (SEPS) styrene-ethylene-propylene-styrene block copolymers, (SB)$_n$ styrene-butadiene and (SEB)$_n$, (SEBS)$_n$, (SEP)$_n$, (SI)$_n$ styrene-isoprene multi-arm, branched or star-shaped copolymers, polyethyleneoxide (EO), poly(dimethylphenylene oxide) and the like. Still, other (II) polymers include homopolymers which can be utilized in minor amounts; these include: polystyrene, polybutylene, polyethylene, polypropylene and the like. The conventional term "major" means about 51 weight percent and higher and the term "minor" means 49 weight percent and lower.

Example of (II) polymers, copolymers, and blends include: (a) Kraton G 1651, G 1654X; (b) Kraton G 4600; (c) Kraton G 4609, other suitable high viscosity polymer and oil is include: (d) Tuftec H 1051; (e) Tuftec H 1041; (f) Tuftec H 1052; (g) Kuraray SEEPS 4033 (hydrogenated styrene isoprene/butadiene block copolymers, more specifically, hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene); (h) Kuraray SEBS 8006; (i) Kuraray SEPS 2005; (j) Kuraray SEPS 2006, and (k) blends (polyblends) of (a)–(h) with other polymers and copolymers include: (1) SEBS-SBS; (2) SEBS-SIS; (3) SEBS-(SEP); (4) SEBS-(SEB)$_n$; (5) SEBS-(SEB)$_n$; (6) SEBS-(SEP)$_n$; (7) SEBS-(SI)$_n$; (8) SEBS-(SI) multiarm; (9) SEBS-(SEB)$_n$; (10) (SEB)$_n$ star-shaped copolymer, (11) s made from blends of (a)–(k) with other homopolymers include: (12) SEBS/

19

polystyrene; (13) SEBS/polybutylene; (14) SEBS/polyethylene; (14) SEBS/polypropylene; (16) SEP/SEBS, (17) SEP/SEPS, (18) SEP/SEPS/SEB, (19), SEPS/SEBS/SEP, (20), SEB/SEBS (21), EB-EP/SEBS (22), SEBS/EB (23), SEBS/EP (24), (25) (SEB)$_n$, s, (26) (SEP)$_n$, (27) Kuraray 2007 (SEPS), (28) Kuraray 2002, (SEPS) and the like.

Representative examples of commercially available elastomers that can be combined include multiblock and star-shaped copolymers (I and II) described above including: Shell Kratons D1101, D1102, D1107, D1111, D1112, D1113X, D1114X, D1116, D1117, D1118X, D1122X, D1125X, D1133X, D1135X, D1184, D1188X, D1300X, D1320X, D4122, D4141, D4158, D4240, G1650, G1652, G1657, G1701X, G1702X, G1726X, G1750X, G1765X, FG1901X, FG1921X, D2103, D2109, D2122X, D3202, D3204, D3226, D5298, D5999X, 7340, G1654X, G2701, G2703, G2705, G1706, G2721X, G7155, G7430, G7450, G7523X, G7528X, G7680, G7705, G7702X, G7720, G7722X, G7820, G7821X, G7827, G7890X, G7940, FG1901X and FG1921X. Kuraray's SEPS, SEP/SEPS or SEP/SEB/SEPS Nos. SEP 1001, SEP 1050, 2027, 2003, SEPS 2006, SEPS 2023, SEPS 2043, SEPS 2063, SEPS 2050, SEPS 2103, SEPS 2104, SEPS 2105, SEEPS 4045 (hydrogenated styrene isoprene/butadiene block copolymers, more specifically, hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene), SEBS 8004, SEBS 8007, H-VS-3 (S-V-EP-S) and the like. Typical representative Dow Ethylene-styrene copolymers include ES16, ES24, ES27, ES28, ES28, ES30, ES44 with styrene wt % of 15.7, 23.7, 27.3, 28.1, 39.6 & 43.9 respectively, M copolymers (ES53, ES58, ES62, ES63, and ES69 with styrene wt % of 52.5, 58.1, 62.7, 62.8, and 69.2 respectively and crystallinity, %, DSC, based on copolymer of 37.5, 26.6, 17.4, 22.9, 19.6 and 5.0 respectively), S copolymers (ES72, ES73, and ES74 with styrene wt % of 72.7, 72.8, and 74.3 respectively). Other grade copolymers include ES60 (melt index 0.1, 0.5, 3, 10), ES20 (M=0.1. 0.5, 3, 11). The Brookfield Viscosity of a 5 weight percent solids solution in toluene at 30° C. of 2006 is about 27. Typical Brookfield Viscosities of a 10 weight percent solids solution in toluene at 30° C. of Kuraray SEP 1001, SEP 1050, SEPS 2007, SEPS 2063, SEPS 2043, SEEPS 4033, SEPS 2005, SEPS 2006, are about 70,70,17,29,32,50,1200, and 1220 respectively. Typical Brookfield Viscosity of a 25 weight percent solids solution in toluene at 25° C. of Kraton D1101, D1116, D1184, D1300X, G1701X, G1702X are about 4000, 9000, 20000, 6000, 50000 and 50000 cps respectively. Typical Brookfield Viscosity of a 10 weight percent solids solution in toluene at 25° C. of G1654X is about 370 cps. The Brookfield Viscosities of a 20 and 30 weight percent solids solution in toluene at 30° C. of H-VS-3 are about 133 cps and 350 cps respectively.

Suitable triblock copolymers (II) and their typical viscosities are further described: styrene-ethylene-butylene-styrene block copolymers (SEBS) available from Shell Chemical Company and Pecten Chemical Company (divisions of Shell Oil Company) under trade designations Kraton G 1651, Kraton G 1654X, Kraton G 4600, Kraton G 4609 and the like. Shell Technical Bulletin SC:1393-92 gives solution viscosity as measured with a Brookfield model RVT viscometer at 25° C. for Kraton G 1654X at 10% weight in toluene of approximately 400 cps and at 15% weight in toluene of approximately 5,600 cps. Shell publication SC:68–79 gives solution viscosity at 25° C. for Kraton G 1651 at 20 weight percent in toluene of approximately 2,000 cps. When measured at 5 weight percent

20

solution in toluene at 30° C., the solution viscosity of Kraton G 1651 is about 40. Examples of high viscosity SEBS triblock copolymers includes Kuraray's SEBS 8006 which exhibits a solution viscosity at 5 weight percent at 30° C. of about 51 cps. Kuraray's 2006 SEPS polymer exhibits a viscosity at 20 weight percent solution in toluene at 30° C. of about 78,000 cps, at 5 weight percent of about 27 cps, at 10 weight percent of about 1220 cps, and at 20 weight percent 78,000 cps. Kuraray SEPS 2005 polymer exhibits a viscosity at 5 weight percent solution in toluene at 30° C. of about 28 cps, at 10 weight percent of about 1200 cps, and at 20 weight percent 76,000 cps. Other grades of SEBS, SEPS, (SEB)$_n$, (SEP)$_n$ polymers can also be utilized in the present invention provided such polymers exhibits the required high viscosity. Such SEBS polymers include (high viscosity) Kraton G 1855X which has a Specific Gravity of 0.92, Brookfield Viscosity of a 25 weight percent solids solution in toluene at 25° C. of about 40,000 cps or about 8,000 to about 20,000 cps at a 20 weight percent solids solution in toluene at 25° C.

The styrene to ethylene and butylene (S:EB) weight ratios for the Shell designated polymers can have a low range of 20:80 or less. Although the typical ratio values for Kraton G 1651, 4600, and 4609 are approximately about 33:67 and for Kraton G 1855X approximately about 27:73, Kraton G 1654X (a lower molecular weight version of Kraton G 1651 with somewhat lower physical properties such as lower solution and melt viscosity) is approximately about 31:69, these ratios can vary broadly from the typical product specification values. In the case of Kuraray's SEBS polymer 8006 the S:EB weight ratio is about 35:65. In the case of Kuraray's 2005 (SEPS), and 2006 (SEPS), the S:EP weight ratios are 20:80 and 35:65 respectively. Much like S:EB ratios of SEBS and (SEB)$_n$, the SEP ratios of very high viscosity SEPS triblock copolymers are about the same and can typically vary as broadly.

The triblock copolymers (II) such as Kraton G 1654X having ratios of 31:69 or higher can be used and do exhibit about the same physical properties in many respects to Kraton G 1651 while Kraton G 1654X with ratios below 31:69 may also be use, but they are less advantageous due to their decrease in the desirable properties of the final gel.

Plasticizers particularly advantageous for use in practicing the present invention are will known in the art, they include rubber processing oils such as parffinic and naphthenic petroleum oils, highly refined aromatic-free paraffinic and naphthenic food and technical grade white petroleum mineral oils, and synthetic liquid oligomers of polybutene, polypropene, polyterpene, etc. The synthetic series process oils are high viscosity oligomers which are permanently fluid liquid nonolefins, isoparaffins or paraffins of moderate to high molecular weight.

Examples of representative commercially available plasticizing oils include Amoco® polybutenes, hydrogenated polybutenes, polybutenes with epoxide functionality at one end of the polybutene polymer, liquid poly(ethylene/butylene), liquid hetero-telechelic polymers of poly (ethylene/butylene/styrene) with epoxidized polyisoprene and poly(ethylene/butylene) with epoxidized polyisoprene: Example of such polybutenes include: L14 (320 Mn), L-50 (420 Mn), L-100(460 Mn), H-15 (560 Mn), H-25 (610 Mn), H-35 (660 Mn), H-50 (750 Mn), H-100 (920 Mn), H-300 (1290 Mn), L-14E (27–37 cst @ 100° F. Viscosity), H-300E (635–690 cst @ 210° F. Viscosity), Actipol E6 (365 Mn), E16 (973 Mn), E23 (1433 Mn), Kraton L-1203, EKP-206, EKP-207, HPVM-2203 and the like. Example of various commercially oils include: ARCO Prime (55, 70, 90, 200,

350, 400 and the like), Duroprime and Tuffio oils (6006, 6016, 6016M, 6026, 6036, 6056, 6206, etc), other white mineral oils include: Bayol, Bernol, American, Blandol, Drakeol, Ervol, Gloria, Kaydol, Utetek, Lyondell (Duroprime 55, 70, 90, 200, 350, 400, etc), Marcol, Parol, Peneteck, Primol, Protol, Sontex, and the like.

As described on page 23 of copending applications U.S. Ser. No. 09/285,809 and incorporated by reference above, minor amounts of one or more compatible plasticizers can be utilized in forming the invention gels. In providing non-tack gels, major amount of plasticizers used can be low viscosity platicizers having viscosities advantageously of not greater than typically about 30 cSt @ 40° C., for example 30, 29, 28, 27, 26, 25, 24, 23, 22, 21, 20, 19, 18, 17, 16, 15, 14, 13, 12, 11, 10, 9, 8, 7, 6, 5, 4, and the like. Such typical low viscosity plasticizers are commercially available as, for example, Witco, Rudol, Ervol, Benol, Blandol, Carnation, Klearol, Semtol100, Semtol 85, Semtol 70, Semtol 40; Lyondell Duroprime 55, 70, 90, Duroprime DS L & M, Duropac 70, 90, Crystex 22, Crystex AF L & M, Rufflo 6006, 6016 and the like.

Generally, various low to high viscosity commercially available plasticizing oils with average molecular weights ranging from less than about 200 to greater than about 700 may also be used (e.g. H-300 (1290 Mn)). It is well know that minor and sufficient amounts of Vitamin E is added to the described commercially available oils during bulk processing which is useful as a oil stabilizer, antioxidant, and preservative.

Of all the factors, the amount and varying viscosities of plasticizing oils can be controlled and adjusted advantageously to obtain various inherent properties, including substantially higher tear and tensile strength gels, and the like. The improvements in tensile strength of the gels are accompanied by responding increase in gel rigidity as the amount of plasticizing oils can be lowered until the rigidity of the gels becomes much higher than that of the rigidity of the gums (for example) which surround the teeth. Although higher tensile strengths can be obtained as the amount of plasticizing oils in the gel approaches zero, the tensile strength of the floss, however, must be maintained at an acceptable gel rigidity (at sufficient high plasticizing oil levels) in order to be as soft as the gums required for flossing. For example, the rigidities of a gel containing 100, 200, or 300 parts by weight of oil is much higher than a gel containing 300, 400, 500, 600, 800, or 900 parts of oil. Selected amounts of one or more low viscosity plasticizers can be use to advantage in forming the gels of the invention having little or no tack.

These gels can exhibit a larger unit lateral contraction at the same elongation per unit of length as their counterpart parent gels from which the new gels are derived or formed. This property would allow a same unit volume of gel when elongated as its parent to easily wedge between the teeth when flossing. It would seem that a gel having the 1.0 cm³ volume made from a ratio of 100 parts by weight of copolymer and 400 pats plasticizer would have a unique macro volume configurations that is at equilibrium with the plasticizer which is much like a 3-D fingerprint which is uniquely different from any other gel of a different copolymer to plasticizer ratio. Reducing the plasticizer content of a ratio 100:400 gel to a 100:300 ratio of copolymer to plasticizer will decrease the amount of plasticizer, but the original macro volume configurations will remain the same.

Speculative theories not withstanding, configurations may take the form of (1) swiss cheese, (2) sponge, (3) the insides of a loaf of bread, (4) structures liken to ocean brain corals,

(5) large structures and small structures forming the 3-D gel volume landscape, (6) the outer heated surface which cools faster than the inner volumes of the gel during its cooling histories may have a patterned crust (rich in A microphases) like that of a loaf of bread and the inner volume may have much like 1–5, and (7) the many different possible structures are unlimited and volume landscapes may be interconnected at the macro-level by threads or microstrands of Z microphases.

The amount of plasticizer extracted can advantageously range from less than about 10% by weight to about 90% and higher of the total weight of the plasticizer. More advantageously, the extracted amounts of plasticizer can range from less than about 20% by weight to about No by weight of the total plasticizer, and still more advantageously, from about 25% to about 75%. Plasticizing oils contained in the gels can be extracted by any conventional methods, such as solvent extraction, physical extraction, pressure, pressure-heat, heat-solvent, pressure-solvent-heat, vacuum extraction, vacuum-heat extraction, vacuum-pressure extraction, vacuum-heat-pressure extraction, vacuum-solvent extraction, vacuum-heat-solvent-pressure extraction, etc. The solvents selected, should be solvents which do not substantially disrupt the A and Z phases of the (I) copolymers forming the gels . Any solvent which will extract plasticizer from the gel and do not disrupt the A and Z phases can be utilized. Suitable solvents include alcohols, primary, secondary and tertiary alcohols, glycols, etc., examples include methanol, ethanol, tetradecanol, etc. Likewise, the pressures and heat applied to remove the desired amounts of oils should not be sufficient to disrupt the A and Z domains of the (1) copolymers. To form a lower rigidity gel, the simplest method is to subject the gel to heat in a partial vacuum or under higher vacuum for a selected period of time, depending on the amount of plasticizer to be extracted.

The gels can be made non-adhearing, non-sticking, (non-tacky) by using major or minor amounts of one or more low viscosity plasticizers, by incorporating an advantage amount of stearic acid (octadecanoic acid), metal stearates (e.g., calcium stearate, magnesium stearate, zinc stearate, etc.), polyethylene glycol distearate, polypropylene glycol ester or fatty acid, and polytetramethylene oxide glycol distearate, waxes, stearic acid and waxes, metal stearate and waxes, metal stearate and stearic acid. The use of stearic acid alone do not reduce tack. The amount of stearic acid is also important. As an example, ratio of 200 grams stearic acid to 2,000 gram of SEBS (a ratio of 0.1) will result in spotted tack reduction on the surface of the gel. A ratio of 250 to 2,000 will result in spotted crystallized regions on the surface of the gel or spotted tack reduction. A ratio of 300 to 2,000 will result in complete tack reduction with large stearic acid crystallized regions on the surface of the gel. When microcrystalline waxes are incorporated together with stearic acid, the crystallization of stearic acid completely disappears from the surface of the gel. For example excellent result is achieved with 200 grams of stearic acid, 150 grams of microcrystalline wax and 2,000 grams of SEBS. The same excellent results is achieved when SEBS is adjusted to 3,000 grams, 4,000 grams, etc. The same result is achieved with (I) copolymers as well as in combination with polymers (1I) such as SEPS, (SEB)ₙ, (SEP)ₙ polymers.

As described at pages 23–27 of copending applications U.S. application Ser. No. 09/285,809 and pages 20–23 of U.S. application Ser. No. 09/274,498 incorporated by reference above, polyphenolics with one or more sterically hindered phenolic hydroxy groups when incorporated into

US 6,867,253 B1

23

the invention gels will result in the appearance of large crystals in the interior as well as on the surface of the gels. The crystals have no effect on the high COF of the resulting gels. When selected amounts of internal nucleating agents are incorporated in the invention gels in combination with selected amounts or one or more of a low coefficient of friction (COF) agents, the large crystals no longer forms within the gels; and the surface of the gels exhibit lower and lower COF with time. Bringing the gels in contact with selected external nucleating agents decreases the time or totally eliminates the time needed for the gel's outer surface to exhibit a low COF.

The gels and soft elastomers incorporating low COF agents and internal and/or external nucleating agents exhibit a much lower coefficient of friction when measured in contact with a reference surface than gels and soft elastomers made without such components.

School book physics teaches COF can be determined experimentally, for two given surfaces that are dry and not lubricated, the ratio of the tangential force needed to overcome the friction to the normal force which holds the two surfaces in contact (e.g., the weight of a block of gel or elastomer material on a surface) is a constant, independent of the area or of the velocity with which the surfaces (surface of a side of the block in contact with another surface) move over wide limits. This ratio is $\mu$, the coefficient of friction. The coefficient of sliding friction for a block of material being

$$\mu=(f/F_n)$$

where f is the force of friction, and $F_n$ the normal force. For the case of the block on the horizontal table. If m is the mass of the block, then mg is the normal force and the above equation can be written as

$$\mu=f/mg.$$

In the case the block of a block rests on a board, originally horizontal, and that the board then is tilted until a limiting angle $\emptyset$ is reached, beyond which the block will begin to slide down the board. At this angle the component of the weight of the object along the board is just equal in amount to that necessary to overcome the force of friction. The force down the plane is mg sin $\emptyset$, while the normal force is mg cos $\emptyset$. Therefore we have

$$\mu=(mg \sin \emptyset)/(mg \cos \emptyset) \text{ or } \mu=\tan \emptyset.$$

The limiting value of $\emptyset$ for which $\mu=\tan \emptyset$ is true is call the angle of repose. Measurement of the tangent of this angle will give the coefficient of friction of the contacting surfaces of the block and the board that slide one upon the other. As an example of low COF agents advantageously useful in sofr thermoplastiv elastomers and gels, excellent results is achieved with 50 g rams of a polyphenolic with sterically hindered phenolic hydroxyl groups (Irganox 1010), about 100 of one or more nucleating agents (such as very fine particle size sodium benzoate, dibenzylidene sorbitol, its alkylated derivatives, talc, zinc sterate, amorphous silica, aluminum sterate, etc.) and 5,000 grams of S-EB-S and 25,000 gram of oil. The same excellent result is achieved when S-EB-S is adjusted to 3,000 grams, 4,000 grams, etc. The same result is achieved with copolymers as well as in combination with other polymers. Moreover, when about 50 grams of tetrakis[methylene 3,-(3'5'-di-tertbutyl-4"-

24

hydroxyphenyl) propionatel methane is use (per about 22.68 kilograms of 50 lbs of gel) as a low COF agent, tack is completely removed from the surface of the gel after two to three weeks of blooming.

When this is repeated with an external nucleating agent, such as with various fine particles for coating the outside surface of the elastomer or gel which fin particles can also be useful for removing tack, such as with talc, calcium stearate, zinc sterate, amorphous silica, aluminum sterate, fine flour, corn starch, fine soil, fine sand, fine metallic powder, vacuum dust, fine wood dusts and the like, lower COF of the gel surface by internal nucleating agents can be achieved within a few days to less than several hours. After coating the gel for the desired period of time, the fine polar and water soluble particles can be washed off with water and soap, while non-polar and non-water soluble fine powders including talc can be removed by wearing it off or by lifting it off with the use of adhesive tapes if so desired.

What is the surface properties of low CFO agents at the air/plasticizer-copolymer interface? Theory notwithstanding, the resulting gel surface will comprise of very fine molecular segments or even very fine crystal grains of low COF agents confined at the air/plasticizer and polymer interface. Depending on concentration, the non-polar segments of the low COF agents will have a tendency of being adsorpted by the predominate plasticizer and copolymer midblock phase at the gel surface. The slightly polar or more polar segments of the low COF agents are adsorbed to a lesser extent by the plasticizer-copolymer surface. This is supported by observing the water wetting characteristics at the gel surface with and with out low COF agents at the air gel surface interface. A drop of water will bead up and not readily wet the gel surface free of any low COF agents (hydrophobic). The presence of even slightly polar low COF agents exposed on the surface of the gel will make a drop of water flatten out and not bead up when place on the gel surface (hydrophilic).

Commercial high melting point, low oil solubility, and polar low COF agents such as polyphenolics which are advantageously useful in the present invention include: Ethanox 330 (Ethyl), Irganox 1010 (Ciba-Geigy), Santech-heim A/O 15-1 (Santech), Ultra 210 (GE), Hostanox 03 (Hoechst Celanese), Irganox 3114 (Ciba-Geigy), Mixxim AO-3 (Fairmont), and the like. Other high melting point, low oil solubility, polar low COF agents contemplated are common amino acids: Such As Alamine, Arginine, Asparagine, Aspartic Acid, Cysteine, Glutamine, Glutamic Acid, Glycine, Histidine, Isoleucine, Leucine, Lysine, Methionine, Phenylalanine, Pfoline, Serine, Threonine, Tryptophan, Tyrosine and Valine. The melting points of these amino acids range from about 178° C. to about 344° C. The amino acids having greater advantage serving as low COF agents are Asparagine, Aspartic acid. Glutamine, Glutamic acid, Tryptophan, and Tyrosine.

Copolymer for forming the low COF compositions include block copolymers, random copolymers, metallocene catalyzed ethylene-styrene copolymers, Low COF gels made from thermoplastic elastomer copolymers and block copolymers having one or mor substantially crystalline polyethylene segments or midblocks. The low COF gels advantageously exhibit high, higher, and higher, and ever higher tear resistance than realized before as well as improved high tensile strength. The low COF gels also exhibit improved damage tolerance, crack propagation resistance and especially improved resistance to high stress rupture which combination of properties makes the gels advantageously and surprisingly suitable for any desired use including toys, inflatable air cushions in automobiles, and the like.

JA000242

25

The invention gels are advantageously useful for making low COF gel sompositions. Moreover, various polymer gels made from linear triblock copolymers, multi-arm block copolymers, branched block copolymers, radial block copolymers, multiblock copolymers, random/non-random copolymers, thermosplastic crystalline polyurethane copolymers with hydrocarbon midblocks or mixtures of two or more of such copolymers can also be made with low COF.

The invention gels can also contain useful amounts of conventionally employed additives such as stabilizers, antioxidants, antiblocking agents, colorants, fragrances, flame retardants, flavors, other polymers in minor amounts and the like to an extend not affecting or substantially decreasing the desired properties. Additives useful in the gel of the present invention include: tetrakis[methylene 3,-(3'5'-di-tertbutyl-4"-hydroxyphenyl)propionate]methane, octade-cyl 3-(3",5"-di-tert-butyl-4-hydroxyphenyl)propionate, distearyl-pentaerythritol-diproprionate, thiodiethylene bis-(3,5-ter-butyl-4-hydroxy)hydrocinnamate, (1,3,5-trimethyl-2,4,6-tris[3,5-di-tert-butyl-4hydroxybenzyl]benzene), 4,4"-methylenebis(2,6di-tert-butylphenol), stearic acid, oleic acid, stearamide, behenamide, oleamide, erucamide, N,N"-ethylenebisstearamide, N,N"-ethylenebisoleamide, sterryl erucamide, erucyl erucamide, oleyl palmitamide, stearyl stearamide, erucyl stearamide, calcium sterate, other metal sterates, waxes (e.g. polyethylene, polypropylene, microcrystalline, carnauba, paraffin, montan, candelilla beeswax, ozokerite, ceresine, and the like). The gel can also contain metallic pigments (aluminum and brass flakes), $TiO_2$, mica, fluorescent dyes and pigments, phosphorescent pigments, aluminatrihydrate, antimony oxide, iron oxides ($Fe_2O_3$, etc.), iron cobalt oxides, chromium dioxide, iron, barium ferrite, strontium ferrite and other magnetic particle materials, molybdenum, silicone fluids, lake pigments, aluminates, ceramic pigments, ironblues, ultramarines, phthalocynines, azo pigments, carbon blacks, silicon dioxide, silica, clay, feldspar, glass, microspheres, barium ferrite, wollastonite and the like. The report of the committee on Magnetic Materials, Publication NMAB-426, National Academy Press (1985) is incorporated herein by reference.

The gels can also be made into composites. The gels can be casted unto various substrates, such as open cell materials, metals, ceramics, glasses, and plastics, elastomers, fluropolymers, expanded fluropolymers, Teflon (TFE, PTFE, PEA, FEP, etc), expanded Teflon, spongy expanded nylon, etc.; the molten gel composition is deformed as it is being cooled. Useful open-cell plastics include: polyamides, polyimides, polyesters, polyisocyanurates, polyisocyanates, polyurethanes, poly (vinyl alcohol), etc. Open-celled Plastic (sponges) suitable for use with the compositions are described in "Expanded Plastics and Related Products", Chemical Technology Review No. 221, Noyes Data Corp., 1983, and "Applied Polymer Science", Organic Coatings and Plastic Chemistry, 1975. These publications are incorporated herein by reference.

The gels denoted as "G" can be physically interlocked with a selected material denoted as "M" to form composites as denoted for simplicity by their combinations $G_nG_n$, $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_nM_n$, $G_nG_nG_nM_n$, $G_nG_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_n$, $G_nG_nM_nG_nM_n$, $M_nM_nG_nG_n$, $G_nG_nG_nG_nM_nG_n$, $G_nM_nM_nG_nM_n$, $G_nM_nM_nM_nG_n$, and the like or any of their permutations of one or more $G_n$ with $M_n$ and the like, wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric,

26

metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials and the like: wherein when n is a subscript of G, n denotes the same or a different gel rigidity of from about 2 gram to about 1,800 gram Bloom). The gels of the composites are formed from copolymers (I), polymers (II), and plasticizers (III) described above

This physical elastomeric network structure is reversible, and heating the polymer above the softening point of the glassy domains temporarily disrupt the structure, which can be restored by lowering the temperature. During mixing and heating in the presence of compatible plasticizers, the glassy domains (A) unlock due to both heating and solvation and the molecules are free to move when shear is applied. The disruption and ordering of the glassy domains can be viewed as a unlocking and locking of the elastomeric network structure. At equilibrium, the domain structure or morphology as a function of the (A) and (Z) phases (mesophases) can take the form of spheres, cylinders, lamellae, or bicontinous structures. The scale of separation of the phases are typically of the order of hundreds of angstroms, depending upon molecular weights (i.e. Radii of gyration) of the minority-component segments. The sub-micron glassy domains which provides the physical interlocking are too small to see with the human eye, too small to see using the highest power optical microscope and only adequately enough to see using the electron microscope. At such small domain scales, when the gel is in the molten state while heated and brought into contact to be formed with any substrate and allowed to cool, the glassy domains of the gel become interlocked with the surface of the substrate. At sufficiently high enough temperatures, with or without the aid of other glassy resins (such as polystyrene homopolymers and the like), the glassy domains of the copolymers forming the gels fusses and interlocks with even a visibly smooth substrate surface such as glass. The disruption of the sub-micron domains due to heating above the softening point forces the glassy domains to open up, unlocking the network structure and flow. Upon cooling below the softening point, the glassy polymers reforms together into sub-micron domains, locking into a network structure once again, resisting flow. It is this unlocking and locking of the network structure on the sub-micron scale with the surfaces of various materials which allows the gel to form interlocking composites with other materials.

A useful analogy is to consider the melting and freezing of a water saturated substrate, for example, foam, cloth, fabric, paper, fibers, plastic, concrete, and the like. When the water is frozen, the ice is to a great extent interlocked with the substrate and upon heating the water is able to flow. Furthermore, the interlocking of the ice with the various substrates on close examination involves interconnecting ice in, around, and about the substrates thereby interlocking the ice with the substrates. A further analogy, but still useful is a plant or weed well established in soil, the fine roots of the plant spreads out and interconnects and forms a physical interlocking of the soil with the plant roots which in many instances is not possible to pull out the plant or weed from the ground without removing the surrounding soil also.

Likewise, because the glassy domains are typically about 200 Angstroms in diameter, the physical interlocking involve domains small enough to fit into and lock with the smallest surface irregularities, as well as, flow into and flow through the smallest size openings of a porous substrate. Once the gel comes into contacts with the surface irregularities or penetrates the substrate and solidifies, it becomes difficult or impossible to separate it from the substrate because of the physical interlocking. When pulling the gel off a substrate, most often the physically interlocked gel

27

remains on the substrate. Even a surface which may appear perfectly smooth to the eye, it is often not the case. Examination by microscopy, especially electron microscopy, will show serious irregularities. Such irregularities can be the source of physical interlocking with the gel.

Such interlocking with many different materials produce gel composites having many uses. The high tear resistant soft crystal gels are advantageously suitable for a safer impact deployable air bag cushions, other uses include: toys; games; novelty, or souvenir items; elastomeric lenses, light conducing articles, optical fiber connectors; athletic and sports equipment and articles; medical equipment and articles including derma use and for the examination of or use in normal or natural body orifices, health care articles; artist materials and models, special effects; articles designed for individual personal care, including occupational therapy, psychiatric, orthopedic, podiatric, prosthetic, orthodontic and dental care; apparel or other items for wear by and on individuals including insulating gels of the cold weather wear such as boots, face mask, gloves, full body wear, and the like have as an essential, direct contact with the skin of the body capable of substantially preventing, controlling or selectively facilitating the production of moisture from selected parts of the skin of the body such as the forehead, neck, foot, underarm, etc; cushions, bedding, pillows, paddings and bandages for comfort or to prevent personal injury to persons or animals; housewares and luggage; articles useful in telecommunication, utility, industrial and food processing, and the like as further described herein.

The selected amount of crystallinity in the midblock should be sufficient to achieve improvements in one or more physical properties including improved damage tolerance, improved crack propagation resistance, improved tear resistance, improved resistance to fatigue of the bulk gel and resistance to catastrophic fatigue failure of crystal gel composites, such as between the surfaces of the crystal gel and substrate or at the interfaces of the interlocking material(s) and crystal gel, which improvements are not found in amorphous gels at corresponding gel rigidities.

As an example, when fabric interlocked or saturated with amorphous S-EB-S gels (gel composites) are used as gel liners for lower limb or above the knee prosthesis to reduce pain over pressure areas and give relief to the amputee, the commonly used amorphous gels forming the liners can tear or rip apart during marathon racewalk after 50–70 miles. In extended use, the amorphous gels can rip on the bottom of the liner in normal racewalk training of 40–60 miles over a six weeks period. In such demanding applications, the crystal gels are especially advantageous and is found to have greater tear resistance and resistance to fatigue resulting from a large number of deformation cycles than amorphous gels. The crystal gels are also useful for forming various orthotics and prosthetic articles such as for lower extremity prosthesis of the L5664 (lower extremity socket insert, above knee), L5665 (socket insert, multi-durometer, below knee), L5666 (below knee, cuff suspension interface), L5667 (below knee, above knee, socket insert, suction suspension with locking mechanism) type devices as described by the American Orthotic & Prosthetic Association (AOPA) codes. The crystal gels are useful for making AOPA code devices for upper extremity prosthetics. The devices can be cast molded or injection molded in combination with or without fiber or fabric backing or fiber or fabric reinforcement. When such liners are made without fabric backing, various gels can be used to form gel-gel and gel-gel-gel composites and the like with varying gel rigidities for the different gel layer(s).

28

Health care devices such as face masks for treatment of sleep disorder require non-tacky invention gels. The invention gel can be used by forming a gel overlap portion on the face cup at its edge conforming to the face and serve to provide comfort and maintain partial air or oxygen pressure when worn on the face during sleep. Although tacky gels can be made from the the invention gels, tacky gels because of its tactile feel are undesirable for such applications as face masks and other prolong skin contact uses.

The invention gels can be formed into gel strands, gel bands, gel tapes, gel sheets, and other articles of manufacture in combination with or without other substrates or materials such as natural or synthetic fibers, multifibers, fabrics, films and the like. Moreover, because of their improved tear resistance and resistance to fatigue, the crystal gels exhibit versatility as balloons for medical uses, such as balloon for valvuloplasty of the mitral valve, gastrointestinal balloon dilator, esophageal balloon dilator, dilating balloon catheter use in coronary angiogram and the like. Since the crystal gels are more tear resistant, they are especially useful for making condoms, toy balloons, and surgical and examination gloves. As toy balloons, the crystal gels are safer because it will not rupture or explode when punctured as would latex balloons which often times cause injures or death to children by choking from pieces of latex rubber. The crystal gels are advantageously useful for making gloves, thin gloves for surgery and examination and thicker gloves for vibration damping which prevents damage to blood capillaries in the fingers and hand caused by handling strong shock and vibrating equipment. Various other gel articles can be made from the advantageously tear resistant and gel composites of the inventions include gel suction sockets, suspension belts,

The crystal gels are also useful for forming orthotics and prosthetic articles such as for lower extremity prosthesis described below.

Advantageously, the invention gels are non-tacky requires no additive. Its non-tackiness are an inherent property of the glassy A components, and selected (one or more) low viscosity plasticizers forming the invention gels.

The glassy A component type homopolymers can be advantageously added to provide non-tackiness which are selected from one or more homopolymers of: polystyrene, poly(alpha-methylstyrene), poly(o-methylstyrene), poly(m-methylstyrene), poly(p-methylstyrene), and poly (dimethylphenylene oxide). The average molecular weight of the glassy homopolymers advantageously can range from about 2,500 to about 90,000, typical about 3,000; 4,000; 5,000; 6,000; 7,000; 8,000; 9,000; 10,000; 11,000; 12,000, 13,000; 14,000; 15,000; 16,000; 17,000; 18,000; 19,000; 20,000; 30,000; 40,000; 50,000; 60,000; 70,000; 80,000; 90,000 and the like. Example of various molecular weights of commercially available polystyrene: Aldrich Nos.: 32,771-9 (2,500 $M_w$), 32,772-7 (4,000 Mw), 37,951-4 (13,000 Mw), 32-774-3 (20,000 Mw), 32,775-1 (35,000 Mw), 33,034 5 (50,000 Mw), 32,777-8 (90,000 Mw); poly(alpha-methylstyrene) #41,794-7 (1,300 Mw), 19,184-1 (4,000 Mw); poly(4methylstyrene) #18,227-3 (72,000 Mw), Endex 155, 160, Kristalex 120, 140 from Hercules Chemical, GE: Blendex HPP820, HPP822, HPP823, and the like. Various glassy phase associating resins having softening points above about 120° C. can also serve to increase the glassy phase of the Crystal gels of the invention and met the non-tackiness criteria, these include: Hydrogenated aromatic resins (Regalrez 1126, 1128, 1139, 3102, 5095, and 6108), hydrogenated mixed aromatic resins (Regalite R125), and other aromatic resin (Picco 5130, 5140, 9140, Cumar LX509, Cumar 130, Lx-1035) and the like.

Case: 8:08-cv-01525-AG-RNB Document 85-3 Filed 02/07/2014 Page 204 of 214 Page ID #:...

US 6,867,253 B1

29

On the other hand, the molten gelatinous elastomer composition will adhere sufficiently to certain plastics (e.g. acrylic, ethylene copolymers, nylon, polybutylene, polycarbonate, polystyrene, polyester, polyethylene, polypropylene, styrene copolymers, and the like) provided the temperature of the molten gelatinous elastomer composition is sufficient high to fuse or nearly fuse with the plastic. In order to obtain sufficient adhesion to glass, ceramics, or certain metals, sufficient temperature is also required (e.g. above 250° F.). Commercial resins which can aid in adhesion to materials (plastics, glass, and metals) may be added in minor amounts to the gelatinous elastomer composition, these resins include: Super Sta-tac, Nevtac, Piccotac, Escorez, Wingtack, Hercotac, Betaprene, Zonarez, Nirez, Piccolyte, Sylvatac, Foral, Pentalyn, Arkon P, Regalrez, Cumar LX, Picco 6000, Nevchem, Piccotex, Kristalex, Piccolastic, LX-1035, and the like.

The commercial resins which can aid in adhesion to materials (plastics, glass, and metals) may be added in minor amounts to the gelatinous elastomer composition, these resins include: polymerized mixed olefins (Super Sta-tac, Betaprene Nevtac, Escorez, Hercotac, Wingtack, Piccotac), polyterpene (Zonarez, Nirez, Piccolyte, Sylvatac), glycerol ester of rosin (Foral), pentaerythritol ester of rosin (Pentalyn), saturated alicyclic hydrocarbon (Arkon P), coumarone indene (Cumar LX), hydrocarbon (Picco 6000, Regalrez), mixed olefin (Wingtack), alkylated aromatic hydrocarbon (Nevchem), Polyalphamethylstyrene/vinyl toluene copolymer (Piccotex), polystyrene (Kristalex, Piccolastic), special rosin (LX-1035), and the like. More earlier, I had also disclosed the use of liquid tackifiers in high viscosity SEBS gets.

The incorporation of such adhesion resins is to provide strong and dimensional stable adherent crystal gels, gel composites, and gel articles. Typically such adherent crystal gels can be characterized as adhesive gels, soft adhesives or adhesive sealants. Strong and tear resistant adherent crystal gels may be formed with various combinations of substrates or adhere (attach, cling, fasten, hold, stick) to substrates to form adherent crystal gel/substrate articles and composites.

Furthermore, the $M_n$ materials in contact with the gel of the invention may be made from flexible materials, such as fibers and fabrics of cotton, flax, and sill Other flexible materials include: elastomers, fiber-reinforced composites, mohair, and wool. Useful synthetic fibers include: acetate, acrylic, aremid, glass, modacrylic polyethylene, nylon, olefin, polyester, rayon, spandex, carbon, sufar, polybenzimidazole, and combinations of the above. Useful open-cell plastics include: polyamides, polyimides, polyesters, polyisocyanurates, polyisocyanates, polyurethanes, poly(vinyl alcohol), etc. Open-celled plastic (foams) suitable for use with the compositions of the invention are described in "Expanded Plastics and Related Products", Chemical Technology Review No. 221, Noyes Data Corp., 1983, and "Applied Polymer Science", Organic Coatings and Plastic Chemistry, 1975. These publications are incorporated herein by reference. These include: open and non-opened cell silicone, polyurethane, polyethylene, neoprene, polyvinyl chloride, polyimide, metal, ceramic, polyether, polyester, polystyrene, polypropylene. Example of such foams are: Thanol®, Arcol®, Ugipol®, Arcel®, Arpak®, Arpro®, Arsan®, Dylite®, Dytherm®, Styrofoam®, Trymer®, Dow Ethafoam®, Ensolite®, Scotfoam®, Pyrell®, Volana®, Trocellen®, Minicel®, and the like.

Sandwiches of gel-material (i.e. gel-material-gel or material-gel-material, etc.) are useful as dental floss, shock

30

absorbers, acoustical isolators, vibration dampers, vibration isolators, and wrappers. For example the vibration isolators can be use under research microscopes, office equipment, tables, and the like to remove background vibrations. The tear resistance nature of the instant gels are superior in performance to triblock copolymer gels which are much less resistance to crack propagation caused by long term continue dynamic loadings.

Adhesion to substrates is most desirable when it is necessary to apply the adherent crystal gels to substrates in the absence of heat or on to a low temperature melting point substrate for later peel off after use, such as for sound damping of a adherent crystal gel composite applied to a first surface and later removed for use on a the same or second surface. The low melting substrate materials which can not be exposed to the high heat of the molten adherent crystal gels, such as low melting metals, low melting plastics (polyethylene, PVC, PVE, PVA, and the like) can only be formed by applying the adherent crystal gels to the temperature sensitive substrates. Other low melting plastics include: polyolefins such as polyethylene, polyethylene copolymers, ethylene alpha-olefin resin, ultra low density ethylene-octene-1 copolymers, copolymers of ethylene and hexene, polypropylene, and etc. Other cold applied adherent crystal gels to teflon type polymers: TFE, PTFE, PEA, FEP, etc., polysiloxane as substrates are achieved using the adherent crystal gels of the invention.

Likewise, adherent crystal gel substrate composites can be both formed by casting hot onto a substrate and then after cooling adhering the opposite side of the adherent crystal gel to a substrate having a low melting point. The adherent crystal gel is most essential when it is not possible to introduce heat in an heat sensitive or explosive environment or in outer space. The use of solid or liquid resins promotes adherent crystal gel adhesion to various substrates both while the adherent crystal gel is applied hot or at room temperature or below or even under water. The adherent crystal gels can be applied without heating to paper, foam, plastic, fabric, metal, concrete, wood, wire screen, refractory material, glass, synthetic resin, synthetic fibers, and the like.

The adhesion properties of the gels are determined by measuring comparable rolling ball tack distance "D" in cm using a standard diameter "d" in mm stainless steel ball rolling off an inclined of height "H" in cm and determining the average force required to perform 180° C. peel of a heat formed $G_1M_1$ one inch width sample applied at room temperature to a substrate $M_2$ to form the composite $M_1G_1M_2$. The peel at a selected standard rate cross-head separation speed of 25 cm/minute at room temperature is initiated at the $G_1M_2$ interface of the $M_1G_1M_2$ composite, where the substrate $M_2$ can be any of the substrates mentioned and $M_1$ preferably a flexible fabric.

Advantageously, glassy phase associating homopolymers such as polystyrene and aromatic resins having low molecular weights of from about 2,500 to about 90,000 can be blended with the triblock copolymers of the invention in large amounts with or without the addition of plasticizer to provide a copolymer-resin alloy of high impact strengths. More advantageously, when blended with multiblock copolymers and substantially random copolymers the impact, strengths can be even higher. The impact strength of blends of from about 150 to about 1,500 parts by weight glass phase associating polymer and resins to 100 parts by weight of one or more multiblock copolymers can provide impact strength approaching those of soft metals. At the higher loadings, the impact strength approaches that of polycarbonates of about 12 ft-lb/in notch and higher.

JA000245

31                                     32

The improvements of the crystal gels of the invention is exceptional, the crystal gels are crystal to the touch and can be quantified using a simple test by taking a freshly cut Crystal gel probe of a selected gel rigidity made from the crystal gels of the invention. The crystal gel probe is a substantially uniform cylindrical shape of length "L" of at least about 3.0 cm formed components (1)–(3) of the crystal gels of the invention in a 16×150 mm test tube. The crystal gel probe so formed has a 16 mm diameter hemispherical tip which (not unlike the shape of a human finger tip) is brought into perpendicular contact about substantially the center of the top cover of a new, un-touched polystyrene reference surface (for example the top cover surface of a sterile polystyrene petri dish) having a diameter of 100 mm and a weight of 7.6 gram resting on its thin circular edge (which minimizes the vacuum or partial pressure effects of one flat surface in contact with another flat surface) on the flat surface of a scale which scale is tared to zero. The probe's hemi-spherical tip is place in contact with the center of the top of the petri dish cover surface and allowed to remain in contact by the weight of the gel probe while held in the upright position and then lifted up. Observation is made regarding the probe's tackiness with respect to the clean reference polystyrene surface. For purpose of the foregoing reference tack test, tackiness level 0 means the polystyrene dish cover is not lifted from the scale by the probe and the scale shows substantially an equal positive weight and negative weight swings before settling again back to zero with the swing indicated in (negative) grams being less than 1.0 gram. A tackiness level of one 1, means a negative swing of greater than 1.0 gram but less than 2.0 gram, tackiness level 2, means a negative swing of greater than 2 gram but less than 3 gram, tackiness level 3, means a negative swing of greater than 3 gram but less than 4 gram, before settling back to the zero tared position or reading. Likewise, when the negative weight swing of the scale is greater than the weight of the dish (i.e., for the example referred above, greater than 7.6 gram), then the scale should correctly read −7.6 gram which indicates the dish has completely been lifted off the surface of the scale. Such an event would demonstrate the tackiness of a gel probe having sufficient tack on the probe surface. The crystal gels of the invention fails to lift off the polystyrene reference from the surface of the scale when subject to the foregoing reference tack test. Advantageously, the crystal gels of the invention can register a tackiness level of less than 5, more advantageously, less than 3, still more advantageously, less than 2, and still more advantageously less than 1. The non-tackiness of the crystal gels of the invention can advantageously range from less than 6 to less than 0.5 grams, typical tack levels are less than 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1.0, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 2.0, 2.1, 2.2, 2.3, 2.5, 2.8, 3.0, 3.5, 4.0, 4.5, 5.0 grams and the like. Whereas probes of gels made from amorphous gels such as SEPS, SEBS, S-EP-EB-S, and the like with copolymer styrene to rubber ratio of less than 37:63 and plasticizer of higher than 30 cSt 40° C. are found to lift the polystyrene reference from the surface of the scale. For purposes of indicating tack, the method above can provide gel tack level readings of 1, 2, 3, 4, 5, 6, and 7 grams. More accurate and sensitive readings can be made using electronic scales of tack levels of less than 1 gram. By this simple method tack levels (of a gel probe on a polystyrene reference surface) can be measure in terms of gram weight displacement of a scale initially tared to zero. For purpose of the present invention the method of using a polystyrene reference surface having a weight of 7.6 grams in contact and being lifted by the tackiness of a cylindrical gel probe having

a 16 mm diameter hemi-spherical tip is used to determine the tackiness of the crystal gels of the invention. The level of tack being measured in gram Tack at 23° C.

The gels are prepared by blending together the components including the various additatives as desired at about 23° C. to about 100° C. forming a paste like mixture and further heating said mixture uniformly to about 150° C. to about 200° C. until a homogeneous molten blend is obtained. Lower and higher temperatures can also be utilized depending on the viscosity of the oils and amounts of multiblock copolymer (I) and polymer (II) used. These components blend easily in the melt and a heated vessel equipped with a stirrer is all that is required. Small batches can be easily blended in a test tube using a glass stirring rod for mixing. While conventional large vessels with pressure and/or vacuum means can be utilized in forming large batches of the instant compositions in amounts of about 40 lbs or less to 10,000 lbs or more. For example, in a large vessel, inert gases can be employed for removing the composition from a closed vessel at the end of mixing and a partial vacuum can be applied to remove any entrapped bubbles. Stirring rates utilized for large batches can range from about less than 10 rpm to about 40 rpm or higher.

The gels of the invention can also contain gases as an additive, i.e. the gel can be foamed. Foam is herein defined as tightly or loosely packing aggregation of gas bubbles, separated from each other by thin or thick layers of gel. Many types of foamed gels (from ultra high density to ultra low density) can be produced as desired by (i) adding gas to the molten gel during processing, and (ii) producing gas in the molten gel during processing. Gas can be added by whipping a gas into the molten gel before it cools or introduce a gas into the molten gel and then expand or reduce the size of the gas bubbles by reducing the pressure to reduce the bubbles size or applying high pressure to expand the bubbles size. In this regard, inert gases such as Carbon dioxide, Nitrogen, Helium, Neon, Argon, Krypton, Xenon and Radon are suitable. Air can also be used. Gas can be produced in the molten gel by adding one or more of a "blowing agent" to the. Useful blowing agents include dinitroso compounds, such as dinitroso pentamethylenetetramine, azodicarbonamide, 4,4'oxybis (benzenesulfonyl) hydrazine, 5-phenyltetrazole, p-toluenesulfonyl semicarbazide, sulfonyl hydrazide, such as benzene sulfonylhydrazide. Water can be used as a "blowing agent" to [1] produce varying density of foam gels; water used to advantage can be in the form of mist, droplets, steam, and hot or cold water. The density of the foam gels can vary from less than 1.00 kilograms per cubic meter to near the solid gel density. Although the materials forming soft solid gels may be more shear resistant, the same materials when made into a foam become much less shear resistant.

The gel articles can be formed by blending, injection molding, extruding, spinning, casting and other conventional methods. For example, Shapes having various cross-section can be extruded using a HP-2000 Mixing extruder from Dek-tron Scientific Instruments of Plainfield, N.J. 07060, USA.

The high glassy component copolymers suitable for use in forming the crystal gels of the invention include high styrene component BASF's Styroflex series copolymers including BX 6105 with a statistical SB sequence for the low elastomeric segments (styrene to butadiene ratio of 1:1) and an overall styrene content of almost 70%, high styrene content Shell Kraton G, Kraton D-1122X (SB)n, D-4122 SBS, D-4240 (SB)n, D-4230 (SB)n, DX-1150 SBS, D-4140 SBS, D-1115 SBS, D-4222 SBS, Kraton D-1401P, SEBS, Dexco's

33

Vector 6241-D, 4411-D, Fina's Finaclear high styrene content SBS series copolymers, Phillips Petroleum's XK40 K-Resin styrene/butadiene copolymers, Kuraray's S2104 SEPS. The copolymers include amorphous polymers with high styrene content: SBS, SIS, SEPS, SEB/EPS, and the like. The (i–viii) copolymers with glassy to elastomeric ratios can range from 37:63, 37.6:62.4, 38:62, 39:61, 40:60, 41:59, 42:58, 43:57, 44:65, 45:55, 46:54, 47:53, 48:52, 49:51, 50:50, 51:49 52:48, 53:47, 54:46, 55:45, 56:44, 57:43, 58:42, 59:41, 60:40, 6:39, 62:38, 63:37, 64:36, 65:35, 66:34, 67:33, 68:32, 69:31, 70:30, 7:29, 72:28, 73:27, 74:26, 75:25, 76:24, 77:23, 78:22, 79:21, to 80:20 and higher. High styrene content Dow ES30, and ES44 with styrene wt % of 15.7, 23.7, 273, 28.1, 39.6 & 43.9 respectively, M copolymers (ES53, ES58, ES62, ES63, and ES69 with styrene wt % of 52.5, 58.1, 62.7, 62.8, and 69.2 respectively and crystallinity, %, DSC, based on copolymer of 37.5, 26.6, 17.4, 22.9, 19.6 and 5.0 respectively, S copolymers ES72, ES73, and ES74 with styrene wt % of 72.7, 72.8, and 74.3 respectively may also be used. These hard to process polymers can be added (from 0.01 to 30% weigh basis of polymers) by dry blending in combination with 200–400 parts oil and multiblock copolymers such as SEEPS 4055, 4033, 4077, 4045 and the like and extruded at about between 75° C.–135° C. to form a preblend and then formulated with additional oil or/or oil and polymers to produce the final crystal gels of the invention.

Suitable polyolefins include polyethylene and polyethylene copolymers such as Dow Chemical Company's Dowlex 3010, 2021D, 2038, 2042A, 2049, 2049A, 2071,2077, 2244A, 2267A; Dow Affinity ethylene alpha-olefin resin PL-1840, SE-1400, SM-1300; more suitably: Dow Elite 5100, 5110, 5200, 5400, Primacor 141-XT, 1430, 1420, 1320, 3330, 3150, 2912, 3340, 3460; Dow Attane (ultra low density ethylene-octene-1 copolymers) 4803, 44801, 4602, Eastman Mxsten CV copolymers of ethylene and hexene (0.905–0.910 g/cm3).

The gels can also be formed directly into articles or remelted in any suitable hot melt applicator and extruded into shaped articles and films or spun into threads, strips, bands, yarns, or other shapes using a tubing header, multi-strand header, wire coating header, and the like. With respect to various shapes and yarn, its size are conventionally measured in denier (grams/9000 meter), tex (grams/1000 meter), and gage (1/2.54 cm). Gage, tex, denier can be converted as follows: tex=denier/9=specific gravity (2135/gage), for rectangular cross section, tex=specific gravity·(5806×103)(th)(w)/9, where th is the thickness and w the width of the strip, both in centimeters. General descriptions of (1) block copolymers, (2) elastomeric fibers and conventional (3) gels are found in volume 2, starting at pp. 324–415, volume 6, pp 733–755, and volume 7, pp. 515 of *ENCYCLOPEDIA OF POLYMER SCIENCE AND ENGINEERING*, 1987 which volumes are incorporated herein by reference.

The instant gels is excellent for cast molding and the molded products have various excellent characteristics which cannot be anticipated form the properties of the raw components. Other conventional methods of forming the composition can be utilized.

In general, the basis of this invention resides in the fact that one or more of a high viscosity linear multiblock and star-shaped multiblock copolymers (I) or a mixture of two or more of such copolymers having (A) end block to elastomeric block ratio preferably within the contemplated range of styrene to rubber ratios of from about 20:80 to about 40:60 and higher, more preferably from between about

34

31:69 to about 40:60 and higher when blended in the melt with an appropriate amount of plasticizing oil makes possible the attainment of gels having a desirable combination of physical and mechanical properties, notably high elongation at break of at least 1,600%, ultimate tensile strength of about $8\times10^5$ dyne/cm² and higher, low elongation set at break of substantially not greater than about 2%, tear resistance of $5\times10^5$ dyne/cm² and higher, substantially about 100% snap back when extended to 1,200% elongation, and a gel rigidity of substantially from about 2 gram to about 1,800 gram Bloom and higher.

More specifically, the gels of the present invention exhibit one or more of the following properties. These are: (1) tensile strength of about $8\times10^5$ dyne/cm² to about $10^7$ dyne/cm² and greater; (2) elongation of less than about 1,600% to about 3,000% and higher, (3) elasticity modulus of about $10^4$ dyne/cm² to about $10^6$ dyne/cm² and greater; (4) shear modulus of about $10^4$ dyne/cm² to about $10^6$ dyne/cm² and greater as measured with a 1, 2, and 3 kilogram load at 23° C.; (5) gel rigidity of about less than about 2 gram Bloom to about 1,800 gram Bloom and higher as measured by the gram weight required to depress a gel a distance of 4 mm with a piston having a cross-sectional area of 1 square cm at 23° C.; (6) tear propagation resistance of at least about $5\times10^5$ dyne/cm²; (7) and substantially 100% snap back recovery when extended at a crosshead separation speed of 25 cm/minute to 1,200% at 23° C. Properties (1), (2), (3), and (6) above are measured at a crosshead separation speed of 25 cm/minute at 23° C.

The gel articles molded from the instant compositions have various additional important advantages in that they do not crack, creep, tear, crack, or rupture in flexural, tension, compression, or other deforming conditions of normal use; but rather the molded articles made from the instant composition possess the intrinsic properties of elastic memory enabling the articles to recover and retain its original molded shape after many extreme deformation cycles. In applications where extreme tear resistance, low rigidity, high elongation, good compression set and excellent tensile strength are important, the instant gels would be advantageous.

The gels of the present invention are useful in low frequency vibration applications, such as viscoelastic layers in constrained-layer damping of mechanical structures and goods, as viscoelastic layers used in laminates for isolation of acoustical and mechanical noise, as ant-vibration elastic support for transporting shock sensitive loads, as vibration isolators for an optical table, as viscoelastic layers used in wrappings, enclosures and linings to control sound, as compositions for use in shock and dielectric encapsulation of optical, electrical, and electronic components. The compositions are also useful as molded shape articles for use in medical and sport health care, such use include therapeutic hand exercising grips, dental floss, crutch cushions, cervical pillows, bed wedge pillows, leg rest, neck cushion, mattress, bed pads, elbow padding, dermal pads, wheelchair cushions, helmet liner, cold and hot packs, exercise weight belts, traction pads and belts, cushions for splints, slings, and braces (for the hand, wrist, finger, forearm, knee, leg, clavicle, shoulder, foot, ankle, neck, back, rib, etc.), and also soles for orthopedic shoes. Other uses include various shaped articles as toys, optical uses (e.g. cladding for cushioning optical fibers from bending stresses) and various optical devices, as lint removers, dental floss, as tips for swabs, as fishing bait, as a high vacuum seal (against atmosphere pressure) which contains a useful amount of a mineral oil-based magnetic fluid particles, etc. Moreover,

the casted, extruded, or spun threads, strips, yarns, tapes can be weaved into cloths, fine or coarse fabrics.

The instant compositions can be formed in any shape; the original shape can be deformed into another shape (to contact a regular or irregular surface) by pressure and upon removal of the applied pressure, the composition in the deformed shape will recover back to its original shape.

As an example of the versatility of use of the instant gels, a hand exerciser can be made in any shape so long as it is suitable for use as a hand exerciser: a sphere shape, a cube shape, a rectangular shape, etc. Likewise, a wheelchair cushion can be made from the composition in any shape, so long as it meets the needs of the user of the cushion. For example, a cushion can be made by forming the composition into a selected shape matching the contours of the specific body part or body region. The composition can be formed into any desired shaped, size and thickness suitable as a cushion; the shaped composition can be additionally surrounded with film, fabric, foam, or any other desired material or combinations thereof. Moreover, the composition can be casted onto such materials, provided such materials substantially maintain their integrity (shape, appearance, texture, etc.) during the casting process. The same applies for brace cushions for the hand, wrist, finger, forearm, knee, leg, etc.

Other uses include self closing or self tightening enclosures for splicing electrical and telephone cables and wires. For example, the gels can be preformed into a small diameter tubing within an outer elastic tubing, both the internal gel tubing and external elastic tubing can be axially expanded and fixed in place by a removable continuous spiral retainer. Upon insertion of a spliced pair or bundle of cables or wires, the spiral retainer can be removed, as the retainer is removed, the gel and elastic tubing impinges onto the inserted cables or wires splices, thereby sealing the electrical splices against weather, water, dirt, corrosives and shielding the splice from external abuse. The enclosure is completed without the use of heat or flame as is conventionally performed. In the case of multiblock copolymer (I) 'treated' gels exhibiting delay recovery or long relaxation times and having extreme tear resistance, a tape of such a gel can be used to wrap the area of a spliced pair or bundle of cable or wire by extending the gel tape and wrapping it around the splice. The delayed recovery of the gel is important in that when the splice is fully wrapped and the gel tape end is let go, it will not quickly unravel itself. This allows time to fix in place an outer elastic shelve around the gel tape wrapped area. Thus, the gel tape will eventually fully recover around the spliced area gradually developing a strong radial recovery force about the spliced area so as to prevent the entry of water, dirt, and other contaminations. Triblock copolymer gels do not have adequate tear strength and have too rapid a recovery to allow time for placement of an outer elastic shelve.

As the treated gels and gels formed from multiblock copolymers (I) having more and more midblock polymer chains can be expected to exhibit greater delay recovery form extension or longer relaxation times with increasing number of midblocks and increasing midblock lengths, such gels having more than three midblocks forming the copolymers (I) can exhibit extreme tear resistance and excellent tensile strength while at the same time exhibit almost liquid like properties. For example, a fun toy can be made from (S-E-EB-ES), (S-B-EB-EB-S), (S-E-EP-E-EP-S), (S-P-EB-P-EB-S), (S-E-EB-E-EB-E-S), (S-E-EP-E-EP-E-EP-E-EP-S), (S-E-EP-EP)$_n$, (S-B-EP-E-EP)$_n$, (S-E-EP-FEP-E)$_n$, (S-E-EB-E-EB-E-EB-E-EB-S)$_n$ copolymer gels which are

molded into cube shapes when placed on the surface of a incline will collect it self together and flow down the incline as a moving body much like a volume of water moving on a high surface tension surface. This is due to the greater distance between the end block (A) domains. Such liquid like performing gels can be very strong and exhibit extreme tear resistance as exhibited by gels made from (S-E-EP-S) multiblock copolymer gels with shorter (A) distance between domains. Such liquid like gels when shaped into a cube will be deformed by the force of gravity on Earth, but will retain its memory and regain to its molded cube shape when released in outer space or reform into a cube if let loose in a container of liquid of equal density. As a comparison, such a toy formed in the shape of a large cube from a high viscosity triblock copolymer with a plasticizer content of 1:1,600 parts will be flattened by the force of gravity and run down an incline, but is very fragile and will start to tear if attempt is made to pick it up by hand. This is an excellent comparison of the difference of tear resistance difference between triblock copolymer gels and multiblock copolymer gels. A useful application is to use such an elastic liquid gel volume to fill a container or to encapsulate an electrical or electronic component in a container filling every available space, when needed, the shapeless gel volume can be removed by pouring it out of the container whole.

The most surprising, unexpected, versatile use of the composition is dental flossing. The dental floss can be almost any shape so long as it is suitable for dental flossing. A thick shaped piece of the composition can be stretched into a thin shape and used for flossing. A thinner shaped piece would require less stretching, etc. For purposes of dental flossing, while flossing between two closely adjacent teeth, especially between two adjacent teeth with substantial contact points and more especially between two adjacent teeth with substantial amalgam alloy metal contact points showing no gap between the teeth, it is critical that the gel resist tearing, shearing, and crazing while being stretched to a high degree in such situations. For example, dental gel floss can take the form of a disk where the segments of the circumference of the disk is stretched for flossing between the teeth. Other shaped articles suitable for flossing include threads, strips, yarns, tapes, etc., mentioned above.

In order for gels to be useful as a dental floss, it must overcome the difficult barriers of high shearing and high tearing under extreme elongation and tension loads. The difficulties that the gels must overcome during flossing can be viewed as follows: during the action of flossing, the gel is stretched from no less than about 200% to about 1,100% or higher, the gel floss is deformed as it is pulled down with tearing action between the contacting surfaces of the teeth, then, the wedge of gel floss is sheared between the inner contacting surfaces of the teeth, and finally, the elongated wedged of gel floss is pulled upwards and out between the surfaces of the teeth. The forces encountered in the act of flossing are: tension, shearing, tearing under extreme tension.

This invention advances the flossing art by providing strong, soft, and extreme tear resistant gels made from multiblock copolymers which gels are substantially as soft as the gums surrounding the teeth.

Gel floss formed from the gels has many advantages over conventional dental floss such as regular and extra fine waxed and unwaxed nylon floss, spongy nylon fiber floss, and waxed and unwaxed expanded and unexpended teflon floss. Such conventional floss are not recommended for use by children, since a slip or sudden snap in forcing the floss

37

between the teeth may cause injury to the gums which often times results in bleeding. For sensitive gums and inflamed gums which has become red and puffy, it is difficult to floss at, near, and below the gumline. The soft gel floss with softness substantially matching the softness of the gums are of great advantage for use by children and for flossing teeth surrounded by sensitive and tender gums.

The shear resistant characteristics of the gels can be indirectly determined by subjecting the gel to the shear forces of a pair of twisting strings and the resulting inward pulling forces of the twisting strings can be directly read off of a spring scale. As a pair of strings are gradually twisted, typical values will range from less than one pound to fifty pounds and greater. As the string is being twisted (simulating increased shearing forces), the measured pulling forces can range from a low value of 0.5, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 . . . to values of 40, 50, 60, 70, 80 pounds and greater.

Gel material of low strength can not resist the tremendous shearing action of the twisting strings. The twisting action of the strings can exhibit a first order twist, a second order twist, or higher order twists. A first order twist refers to one or more twists of a pair of strings (i.e. a pair of strings when twisted together forms a small tight binding helix). A second order twist refers to one or more large binding helixes build up by a pair of strings that have been twisted beyond the maximum-number of twist which normally produce small tight binding helixes of the first order kind. Similarly, a third order twist refers to a much larger tightly binding helix build up by the maximum number of second order twists produced by the pair of twisting strings. The third order twist may be manifested by the appearance of a branch of two or more twist of the first order twisting strings.

The order of twisting will increase (from a one, two, three, and higher order twist) until the rubber band breaks. Likewise, a looped string with one end attached to a spring scale and the other end attached to a fixed anchor can be twisted into a first, second, third, and higher ordered twist state. This method can be utilized to directly measure the force generated for each ordered twist states. The static force generated by twisting a string on a spring scale is a way of determining the shear force generated in the shearing action of forcing the gel floss between two closely contacting teeth when flossing.

In considering dental flossing criteria, one or more of the following conditions can be regarded as critical factors for dental flossing gels.

Shear Resistant Criteria

For the gels to be considered useful for flossing, the gels, critically, can withstand a twisting string shearing force of at least about 5 Kg, more advantageously at least about 8 Kg, and still more advantageously at least about 10 Kg of inward pulling force of a pair of twisting strings measured directly on a spring scale.

Flossing Cycle Criteria

For the gels to be considered useful for flossing, the gels, critically, can advantageously be able to perform at least 4 flossing cycles, more advantageously 8 cycles, and still more advantageously of about 20 cycles without breaking apart when a 3.0 mm diameter gel strand is tested on a set of simulated upper front teeth fully contacting under a uniform spring load of (0.9027 Kg) two pounds. The simulated upper front teeth comprises two small stainless steel rollers (⅜" dia.) facing lengthwise parallel and forced together so as to form a contact length of ½ inches under a spring load of two pounds as measured by a Entran® model ELO-200-4 load cell adjusted by a straight micrometer at room temperature.

38

Gel Strength Criteria

For the gels to be considered useful for flossing, the gels, critically, can advantageously exhibit a tensile strength of at least 5 Kg/cm² (when extended to break as measured at 180° U bend around a 5.0 mm mandrel attached to a spring scale) and more advantageously at least 8 Kg/cm², and still more advantageously of about 10 Kg/cm² and higher. The high and gels useful as dental floss can exhibit tensile strengths at break of at least 20 Kg/cm², more advantageously of at least 40 Kg/cm²· and exceptionally more advantageously at least 60 Kg/cm². Typically, the tensile strengths range from about 20 Kg/cm² to about 110 Kg/cm2 and higher, more typically from about 30 Kg/cm² to 80 Kg/cm² and higher, especially more typically from about 40 Kg/cm² to about 90 Kg/cm² and higher, and exceptionally typically from about 50 Kg/cm² to about 100 Kg/cm² and higher.

Propagating Tear Criteria

As a minimum, for the Gets to be considered useful for flossing, the gels, critically, can advantageously exhibit a propagating tear force (when propagating a tear as measured at 180° U bend around a 5.0 mm diameter mandrel attached to a spring scale) of at least about 1 Kg/cm, more advantageously at least 2 Kg/cm, and still more advantageously of about 3 Kg/cm and higher. The gels useful as dental floss can exhibit tear strengths of at least 4 Kg/cm and higher, more advantageously of at least 6 Kg/cm and higher, exceptionally more advantageously of at least 8 Kg/cm and higher. Typically, the tear propagation strength can range from about 5 Kg/cm to about 20 Kg/cm and higher, more typically from about less than 5 Kg/cm to about 25 Kg/cm and higher, especially more typically form about less than 6 Kg/cm to about 30 Kg/cm and higher, and exceptionally more typically from about less than 8 Kg/cm to about 35 Kg/cm and higher.

For the Gels to be considered useful for flossing, the gels, critically, can advantageously exhibit a propagating tension tear force (when a cylindrical sample is notched and a tear is initiated at the notched area and propagated past its maximum cylindrical diameter by length-wise stretching of the cylindrical sample) of at least about 1 Kg/cm, more advantageously at least 2 Kg/cm, and still more advantageously of about 4 Kg/cm and higher. The extreme tear resistant gels typically will exhibit even higher tension tear values.

Rigidity Criteria

The rigidities of the extreme tear resistant useful for flossing can advantageously range from about 350 gram to about 1,800 gram Bloom, more advantageously from about 400 gram to about 1,500 gram Bloom, especially more advantageously from about 450 gram to about 1,200 gram Bloom, still more advantageously from about 450 gram to about 1,000 gram Bloom, and less advantageously at values of greater than 1,800 gram Bloom.

In general, as a minimum, the flossing gels can exhibit several critical properties, including advantageously the ability to:

(1) withstand a shearing force of at least about 5 Kg under the string twisting test described above,

(2) perform at least 4 flossing cycles without breaking apart when tested on a set of simulated upper front teeth fully contacting under a uniform spring load of two pound,

(3) exhibit a tensile strength of at least 5 Kg/cm² and higher,

(4) exhibit a propagating tear force at 180° U bend test of at least about 1 Kg/cm, and

(5) exhibit a propagating tension tear force (on a notched cylindrical sample) of at least about 1 Kg/cm.

39         40

For use as a dental floss, the gel is made (by extruding, spinning, casting, etc) as a continuous gel strand, the gel strand can be in the shape of a fiber of a selected diameter (from less than about 0.15 to about 5.0 mm and greater) as a continuous tape having a selected width and thickness (tape less than 0.10 mm thin to about 5.0 mm and thicker) or in any desired shape suitable for flossing. The fiber, tape or a selected shape is then cut to a desired length, rolled up and placed into a dispenser suitable for containing and dispensing a measured use amount of gel floss. The continuous fiber and tape can be partly cut or notched for measured single or multiple use. When the floss is pulled from the dispenser to a point showing the notched or cut mark on the length of gel floss, the lid is pushed down on the gel floss nipping it and allowing the floss to be further pulled and separated at the notched or cut point. Additionally, a suitable floss dispenser containing a measured length of gel floss can be fitted with a cutting edge attached to its lid or on its body and the uncut and un-notched gel floss can be dispensed from the dispensing container and cut at the desired measured use length by pressing close the dispenser cutting edge down on the floss so as to nip and cut the gel or by simply closing the dispenser lid or running the gel along the cutting edge on the dispenser body separating a useful length of gel floss.

In practice, typically during flossing, a gel strand will under go various deformations, some of these deformations can be measured, including original shape, extended shape under tension, nipping force, and nipped deformation under a measured force and width. Typically, any shaped gel strand can be used for flossing, a square cross-section, a circular cross-section, a rectangular cross-section, round, oval, etc. For example, a 235 mm diameter strand when extended under a force of 2.5 kg can be nipped down to 0.14 mm thickness (along a 3 mm uniform width of its cross-section) by a force of 0.9072 Kg (2.0 pound force), a reduction of 16.78:1; a 1.89 mm diameter strand when extended under a force of 2.5 kg can be nipped down to 0.14 mm thickness by a force of 0.9072 Kg (2.0 pound force), a reduction of 135:1; a 2.75 mm diameter strand when extended under a force of 2.5 kg can be nipped down to 0.19 mm thickness by a force of 0.9072 Kg (2.0 pound force), a reduction of 14.4:1; and a 2.63 mm diameter strand when extended under a force of 25 kg can be nipped down to 0.19 mm thickness by a force of 0.9072 Kg (2.0 pound force), a reduction of 13.8:1. the cross-section of the gel floss can be reduced to any degree by stretching and nipping (from less than about 1% to about 1,600% and higher). Advantageously, a gel having the required strength, tear resistance, gel rigidity, and other characteristics described can be formed into a floss of any selected cross-section and thickness provided the floss is capable of being stretched when flossing under tension without breaking. Typically the stretching or pulling force is from about less than 0.1 Kg to about 3 Kg and higher. The cross-section of the strand of gel floss can be capable of being nipped by a 0.9027 Kg (2 pounds) force applied across a width of 3 mm from its original cross-sectional dimensions to a nipped thickness of about 3.0 mm to about 0.02 mm and lower, more advantageously from about 2.5 mm to about 0.04 mm and lower, still more advantageously from about 2.0 mm to about 0.08 mm and lower; especially advantageously from about 15 mm to about 0.15 mm and lower; especially more advantageously from about 1.2 mm to about 0.20 mm and lower; especially still more advantageously from about 1.0 mm to about 0.25 mm and lower.

The gels made from higher viscosity copolymers (I) are resistant to breaking when sheared than triblock copolymer gels. This can be demonstrated by forming a very soft gel,

for example 100 parts copolymer to 800 parts plasticizing oil. The soft gel is cut into a strip of 25 cm×25 cm cross-section, the gel strip is gripped lengthwise tightly in the left hand about its cross-section and an exposed part of the gel strip being gripped lengthwise around its cross-section tightly by the right hand as close to the left hand as possible without stretching. With the two hands gripping the gel strip's cross-section, the hands are moved in opposite directions to shear apart the gel strip at its cross-section. The shearing action by the gripping hands is done at the fastest speed possible as can be performed by human hands. The shearing action is performed at a fraction of a second, possible at about 0.5 seconds. Using this demonstration, the copolymer (I) gels will not easily break completely apart as would gels formed from triblock copolymers. In some cases, it will take two, three, or more attempts to shear a high viscosity copolymer (I) gel strip this way. Whereas, a lower viscosity triblock copolymer gel strip can be sheared apart on the first try. For gels made from copolymers with viscosities of 5 wt % solution in Toluene, their shear resistance will decrease with decreasing viscosity. For example, the shear strengths as tested by hand shearing described above of gels made from copolymers having viscosities of 150, 120, 110, 105, 95, 90, 89, 85, 70, 60, 58, 48, 42, 40, 35, 28, 27, 25, 21 cps, and the like can be expected to decrease with decreasing viscosity.

The tensile strengths of multiblock copolymer gels made from higher viscosity copolymers (1) can be slightly lower than or equal to the tensile strengths of gels made from lower solution viscosity triblock copolymers (II).

Strands of gels comprising higher viscosity multiblock copolymers will perform better than gel strands made from gels of lower viscosity triblock copolymers when used in flossing amalgam molars and more than three times better when used in flossing front teeth.

Gels, in general, will exhibit higher tensile and greater tear resistance than their parent gels containing higher concentrations of plasticizer.

As compared to spongy nylon, regular waxed nylon, and extra fine unwaxed nylon when flossing amalgam molars, the performance of multiblock copolymer gels are on the average substantially better.

While advantageous components and formulation ranges based on the desired properties of the multiblock copolymer gels have been disclosed herein. Persons of skill in the art can extend these ranges using appropriate material according to the principles discussed herein. All such variations and deviations which rely on the teachings through which the present invention has advanced the art are considered to be within the spirit and scope of the present invention.

The invention is further illustrated by means of the following illustrative embodiments, which are given for purpose of illustration only and are not meant to limit the invention to the particular components and amounts disclosed.

Comparisons of oil extended multiblock copolymers have been described in Shell Chemical Company Technical Bulletin SC:1102-89 (April 1989) "KRATON®THERMO-PLASTIC RUBBERS IN OIL GELS" which is incorporated herein by reference.

EXAMPLE I

Gels of 100 parts of Kraton G1651, Kuraray Septon 2006 (SEPS), Kuraray Septon 8006 (SEBS), a high viscosity (SEB)$_n$, and a high viscosity (SEP)$_n$ triblock copolymers and 1,600, 1,200, 1,000, 800, 600, 500, 450, and 300 parts by weight of Duroprime 200 white oil are melt blended and

41                                                                  42

samples extruded (from a 7.15 mm diameter orifice) into selected lengths of varying diameters for use as dental floss, the bulk gel rigidities is found to be within the range of 2 to 1,800 gram Bloom, the tensile strength is found to decrease with increase orientation, and the optimum tensile strength found for gel samples with the least amount of stress or orientation imparted during cool from the molten state to room temperature.

### EXAMPLE II

Example I is repeated using Kuraray (S-E-EP-S) 4055 and 4077 multiblock copolymers, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the tear resistance of the multiblock copolymers at corresponding rigidities are found to be substantially higher than the tear resistance of the triblock copolymer gels of EXAMPLE I. The tensile strength is found to decrease with increase orientation, and the optimum tensile strength found for gel samples with the least amount of stress or orientation imparted during cool from the molten state to room temperature.

### EXAMPLE III

Example I is repeated using (S-E-EP-S), (S-E-EP-E-S), (S-B-EP-S), (S-E-EB-S), (S-EB-EP-S), (S-E-EP-EB-S), (S-B-EB-S), (S-EB-EP-E-S), (S-B-EB-E-S), (S-B-EP-B-S), (S-B-EB-B-S), (S-E-E-EP-S) (S-E-E-EB-S), (S-B-E-EP-S), (S-B-E-EB-S), (S-B-B-EP-S), (S-B-B-EB-S), (S-E-B-EB-S), (S-E-B-EP-S), (S-EB-EB-S), (S-EP-EP-S), (S-E-EB-EB-S), (S-E-EP-EP-S), (S-E-EB-EP-S), (S-B-EB-EB-S), (S-B-EP-EP-S), (S-B-EB-EP-S), (S-B-EP-EB-S), (S-E-EP-E-EP-S), (S-E-EB-E-EB-S), (S-E-EP-E-EB-S), (S-B-EP-B-EP-S), (S-B-EB-B-EB-S), (S-B-EB-B-EP-S), (S-B-EB-E-EB-S), (S-B-EP-E-EP-S), (S-(EB-B-EP-S), (S-E-EP-EB-S), (S-E-EP-B-S), (S-P-EP-S), (S-P-EP-P-S), (S-P-EB-P-S), (S-B-EP-P-S), (S-B-EB-P-S), (S-P-E-EB-S), (S-P-E-EB-S), (S-B-P-EP-S), (S-B-P-EB-S), (S-P-B-EB-S), (S-P-EP-S), (S-P-EB-EB-S), (S-P-EP-EP-S), (S-P-EB-EP-S), (S-P-EP-EP-P-S), (S-P-EB-P-EB-S), (S-P-EP-P-EB-S), (S-B-EP-P-EB-S), (S-B-EB-P-EB-S), (S-B-EP-P-EP-S), (S-P-EP-B-EP-S), (S-P-EB-P-EB-S), (S-P-EP-B-EB-S), (S-B-EB-P-EB-S), (S-E-EP-P-S), (S-E-EB-P-S), (S-EP-EP-S), (S-E-EB-EB-S), (S-E-EP-EB-S), (S-E-EP-EP-S), (S-B-EP-P-EB-P-S), (S-P-EP-P-EP-P-S), (S-E-EB-E-EB-E-S), (S-P-EP-P-EP-P-S), (S-E-EP), (S-E-EP-E)$_n$, (S-B-EP)$_n$, (S-E-EB-S)$_n$, (S-E-EP-S)$_n$, (S-B-EB-EP)$_n$, (S-E-EB-E)$_n$, (S-B-E-EP-E)$_n$, (S-B-EB-E)$_n$, (S-B-EP-B)$_n$, (S-B-EB-B)$_n$, (S-E-E-EP)$_n$, (S-E-E-EB)$_n$, (S-B-E-EP)$_n$, (S-B-E-EB)$_n$, (S-B-B-EP)$_n$, (S-B-B-EB)$_n$, (S-E-B-EB)$_n$, (S-E-B-EP)$_n$, (S-EP-EP)$_n$, (S-E-EP-EP)$_n$, (S-E-EB-EP)$_n$, (S-B-EB-EB)$_n$, (S-B-EP-EP)$_n$, (S-B-EB-EP)$_n$, (S-B-EP-EB)$_n$, (S-E-EP-E-EP)$_n$, (S-E-EB-E-EB)$_n$, (S-E-EP-E-EB)$_n$, (S-B-EB-B-EP)$_n$, (S-B-EB-E-EB)$_n$, (S-B-EP-E-EP)$_n$, (S-E-EB-B-EP-B-EB)$_n$, (S-P-EP-P)$_n$, (S-P-EB-P)$_n$, (S-B-EP-P)$_n$, (S-B-EB-P)$_n$, (S-P-EP)$_n$, (S-P-EP-P)$_n$, (S-P-EB-P)$_n$, (S-B-EP-P)$_n$, (S-EB-P)$_n$, (S-P-B-EB)$_n$, (S-P-B-EP)$_n$, (S-P-EB-EB)$_n$, (S-P-EP)$_n$, (S-P-EB-EB)$_n$, (S-P-EP-P-EP)$_n$, (S-P-EB-P-EB)$_n$, (S-P-EP-P-EB)$_n$, (S-B-EP-P-EB)$_n$, (S-B-EB-P-EB)$_n$, (S-E,EP-P)$_n$, (S-E-EP-EP)$_n$, (S-EP-P)$_n$, (S-E-EB-P)$_n$, (S-E-P-EP)$_n$, (S-E-P-EB)$_n$, (S-E-EB-P)$_n$, (S-E-EP-P)$_n$, (S-E-EB-EP)$_n$, (S-E-EP-EP-E)$_n$, (S-B-EP-B-EB-B)$_n$, (S-P-EP-EP-P)$_n$, (S-E-EB-E-EB-E)$_n$, (S-P-EP-EP-P)$_n$, multiblock copolymers, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram

Bloom and the tear resistance of the multiblock copolymers at corresponding rigidities are found to be substantially higher than the tear resistance of the triblock copolymer gels of EXAMPLE I. The tensile strength is found to decrease with increase orientation, and the optimum tensile strength found for gel samples with the least amount of stress or orientation imparted during cool from the molten state to room temperature. cl EXAMPLE IV

Example II is repeated using plasticizers L-14, L-50, L-100, H-15, H-25, H-35, H-50, H-100, H-300, L-14E, H-300E, Actipol E6, E16, E23, Kraton L-1203, EKP-206, EKP-207, HPVM-2203, Amoco C-60, Piccolyte S10, Duroprime (55, 70, 90, 200, 350, 400), Tufflo (6006, 6016, 6016M, 6026, 6036, 6056, 6206,) Bayol, Bernol, American, Blandol, Drakeol, Ervol, Gloria, and Kaydol, the bulk gel rigidities are found to be within the range of 2 to 1,800 gram Bloom and the tear resistance of the multiblock copolymers at corresponding rigidities are found to be substantially higher than the tear resistance of the triblock copolymer gels of EXAMPLE I.

### EXAMPLE V

Example III is repeated using plasticizers L-14, L-50, L-100, H-15, H-25, H-35, H-50, H-100, H-300, L-14E, H-300E, Actipol E6, E16, E23, Kraton L-1203, EKP-206, EKP-207, HPVM-2203, Amoco C-60, Piccolyte S10, Duroprime (55, 70, 90, 200, 350, 400), Tufflo (6006, 6016, 6016M, 6026, 6036, 6056, 6206,) Bayol, Bernol, American, Blandol, Drakeol, Ervol, Gloria, and Kaydol, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the tear resistance of the multiblock copolymers at corresponding rigidities are found to be substantially higher than the tear resistance of the triblock copolymer gels of EXAMPLE I.

### EXAMPLE VI

A gel composition of 100 parts of Kuraray's S-E-EP-S 4055 copolymer and 400 parts by weight of Duroprime 200 white oil was made following Example I and extruded and drawn (from a 7.15 mm diameter orifice) into a strand of uniform diameter onto a take-up roll of continuous lengths. The strand diameter was varied by increasing and decreasing the speed of the take-up roll. The continuous strand of varying diameter gel strand was cut to suitable lengths for use and testing as dental floss. Additional gel was also casted in varying thickness and tested. The results of samples tested are shown in Table 3, #4–7; Table 4, #12–15 and 20, Table 5 #22, 23, 27–29; Table 6 #36–32; Table 7, #40–43, #76 and 77. Sample Nos. 76 and 77 were tested together. Sample 77 exhibited higher tensile strength after 27.75% of plasticizing oil was extracted (with 2.89 parts by weight of oil remaining), its rigidity remained substantially unchanged.

### EXAMPLE VII

A gel composition of 100 parts of Kraton G1651 and 400 parts of Duroprime 200 white oil was made following Example I and extruded and drawn (from a 7.15 mm diameter orifice) into a strand of uniform diameter onto a take-up roll of continuous lengths The strand diameter was varied by increasing and decreasing the speed of the take-up roll. The continuous strand of varying diameter gel strand was cut to suitable lengths for use and testing as dental floss. Additional gel was also casted in varying thickness and tested. The results of samples tested are shown in Table 3B, #8–11; Table 4, #16–19 and 21; Table 5, #24–26; Table 6, #33–35; and Table 7, #36–39.

**43**

**44**

### EXAMPLE VIII

Example II was repeated melt blending under inert gas 100 parts by weight of Kuraray (S-E-EP-S) 4077 multiblock copolymer and 400 parts by weight of Duroprime 70 white oil. A first part of the molten gel was allowed to cool to room temperature, the remainder gel was heated under inert gas for an additional three hours at 300–325° F. and a second part of the gel was extruded (from a 7.15 mm diameter orifice) into cold running water, and the third and final remaining gel was allowed to cool to room temperature. The bulk gel rigidities of the first, second and third parts were found to be within the range of 2 to 1,800 gram Bloom. The second and third final parts of the gel appeared to be altered and different from the first gel part. The first part exhibited rapid return when extended, but the second and third final parts exhibited delay elastomeric recovery when released after extension and deformation. All of the samples exhibited 100% recovery after repeated extensions and deformations.

#### TABLE 3A

Flossing Cycles to Break

| Sample No. | Floss Type | cross-section size (mm²) | ²Floss amalgam molars to break | ³Floss fronts to break |
|---|---|---|---|---|
| 1 | ⁴Unwaxed spongy nylon | 0.30 | 18 | 200+ |
| 2 | ⁵Regular waxed nylon | 0.11 | 11 | 200+ |
| 3 | ⁶Extra fine unwaxed nylon | 0.06 | 6 | 200+ |

#### TABLE 3B

Flossing Cycles to Break

| Sample No. | Floss Type | ¹Relaxed/extended dia. (mm) | ²Floss amalgam molars to break | ³Floss fronts to break |
|---|---|---|---|---|
| 4 | ⁷Gel | 2.42/0.16 | 37 | 76 |
| 5 | ⁷Gel | 2.63/0.17 | 29 | 83 |
| 6 | ⁷Gel | 2.75/0.17 | 36 | 183 |
| 7 | ⁷Gel | 2.83/0.20 | 20 | 74 |
| 8 | ⁸Gel | 3.22/0.22 | 8 | 30 |
| 9 | ⁸Gel | 2.48/0.31 | 4 | 20 |
| 10 | ⁸Gel | 3.16/0.33 | 6 | 44 |
| 11 | ⁸Gel | 2.86/0.24 | 5 | 29 |

¹floss dimension relaxed state and when extended during flossing cycles. ²Test conditions: number of flossing cycles (before breaking) between amalgam alloy metal (fully contacting) lower, left first and second human back molars. ³Test conditions: number of flossing cycles (before breaking) between upper human front teeth. ⁴Oral-B Ultra Floss™, interlocking network of spongy nylon floss. ⁵Johnson & Johnson regular waxed nylon floss. ⁶Johnson & Johnson extra fine unwaxed nylon floss. ⁷Gel made from 100 parts by weight of S-E-EP-S 4055 multiblock copolymer having a Brookfield viscosity of 90 as measured for a 5wt % solution in toluene at 30° C. and 400 parts by weight of Duroprime 200 plasticizing oil. ⁸Gel made from 100 parts by weight of SEBS Kraton G1651 copolymer having a Brookfield viscosity of 40 as measured for a 5wt % solution in toluene at 30° C. ²,³Any selected test methods may be utilized in testing the floss performance of the gels. For example, a set of simulated upper front teeth fully contacting under a uniform spring load of two pounds may be used in place of human teeth. Such simulated testing conditions may be more severe than conditions 2 and less severe than conditions 3 above.

#### TABLE 4

Tensile Strength of Gel Strands

| Sample No. | Number of Strands | Radius (mm) | Area (cm²) | Failure (Kg) | Tensile (Kg/cm²) |
|---|---|---|---|---|---|
| 12 | 3 | 1.325 | 0.165 | 9.00 | 54.54 |
| 13 | 4 | 1.250 | 0.196 | 9.50 | 48.39 |
| 14 | 4 | 1.421 | 0.253 | 9.50 | 37.44 |
| 15 | 5 | 1.359 | 0.290 | 12.5 | 43.08 |
| 16 | 2 | 2.14 | 0.287 | 14.0 | 48.78 |
| 17 | 2 | 1.55 | 0.151 | 11.5 | 75.95 |
| 18 | 2 | 1.17 | 0.086 | 8.50 | 98.84 |
| 19 | 2 | 1.322 | 0.109 | 9.0 | 81.96 |
| 20 | 6 | 1.375 | 0.356 | 14 | 39.32 |
| 21 | 2 | 1.445 | 0.131 | 10 | 76.33 |
| 76 | 1 | 1.22 | 0.0467 | 2.00 | 42.82 |
| 77† | 1 | 1.38 | 0.0598 | 4.00 | 66.88 |

†Plasticizing oil extracted

#### TABLE 5

Tensile Strength of Bulk Gels Samples

| Sample No. No. | Cross-section (cm²) | Failure (Kg) | Tensile (Kg/cm2) |
|---|---|---|---|
| 22 | 1.96 | 24.0 | 12.24 |
| 23 | 1.56 | 25.0 | 16.02 |
| 24 | 0.58 | 15.0 | 25.83 |
| 25 | 0.602 | 16.0 | 26.54 |
| 26 | 1.163 | 24.0 | 20.64 |
| 27 | 0.913 | 21.0 | 23.00 |
| 28 | 0.595 | 18.5 | 36.56 |
| 29 | 0.702 | 19.0 | 27.06 |

#### TABLE 6

180° U Bend Tear Propagation of Bulk Gels Samples

| Sample No. | Tear width (cm) | Failure (Kg) | Tear Force (Kg/cm) |
|---|---|---|---|
| 30 | 1.31 | 2.75 | 2.09 |
| 31 | 1.28 | 3.0 | 2.30 |
| 32 | 1.14 | 2.75 | 2.56 |
| 33 | 1.53 | 2.75 | 1.79 |
| 34 | 1.27 | 2.25 | 1.76 |
| 35 | 1.26 | 2.25 | 1.77 |

#### TABLE 7

Notched Gel Strand Tension Tear Propgation

| Sample No. | Strand Dia. (mm) | Failure (Kg) | Tear Force (Kg/cm) |
|---|---|---|---|
| 36 | 2.86 | 0.75 | 2.62 |
| 37 | 2.49 | 0.75 | 3.01 |
| 38 | 3.09 | 0.60 | 1.94 |
| 39 | 2.62 | 0.70 | 2.67 |
| 40 | 2.54 | 0.60 | 2.36 |
| 41 | 1.94 | 1.10 | 5.67 |
| 42 | 1.58 | 0.75 | 4.74 |
| 43 | 2.34 | 1.2 | 5.12 |

The tensile strengths of gels made from higher viscosity copolymers are lower than the tensile strengths of gels made from lower solution viscosity copolymers. This was later found to be due to orientation effects and not considered significant.

US 6,867,253 B1

45

The tear resistance of gels made from higher viscosity copolymers are higher than the tear resistance of gels made from lower solution viscosity copolymers.

Gel strands made from higher viscosity copolymers perform better than gel strands made of lower viscosity copolymers when used in flossing amalgam molars and more than three times better when used in flossing front teeth.

As compared to spongy nylon, regular waxed nylon, and extra fine unwaxed nylon when flossing amalgam molars, the performance of gels are on the average substantially better.

Examples below illustrate other modes of practice contemplated.

## EXAMPLE IX

At least 120 pcs of the gel strands of EXAMPLE II containing 600 parts oil is individually weighted and placed in a heated vacuum oven, a partial vacuum is applied and the temperature is regulated between about 80° F. to about 150° F. to extract plasticizer from the gel strands. At various oven and vacuum times, three gel strands are removed from the vacuum oven, allowed to cool to room temperature, weighted to determine the amount of weight loss and tested for tensile and tear strength As the amount of oil contained in the original gel is reduced from 600 parts by weight to less than 200 parts by weight, the "reduced plasticizer volume" gels are weighted and tested. The tear and tensile strengths of the reduced plasticizer volume gels are found to be improved over the properties of the original 600 parts by weight referenced gel strands.

The gels are especially advantageously useful when subjected to conditions of stretching, shearing, and tearing during flossing. The gels useful for flossing are characterized by low rigidities and high solution viscosity of the gels made from multiblock copolymers having two or more midblock polymer chains.

Tables 8–11 are illustrative in meeting one or more of the criteria detailed above.

### 8. Illustrative Modes of Practice Contemplated for multiblock copolymer Gels

| 100 Parts by wt | 5 Wt % Copolymer Viscosity (cps) | Styrene % | Parts by Wt of Oil | Number of floss cycles to break | Sample No. |
|---|---|---|---|---|---|
| S-E-EP-S | 90 | 30 | 300 | 30+ | 44 |
| S-E-EP-E-S | 60 | 30 | 300 | 30+ | 45 |
| (S-E-EP)n | 240 | 30 | 300 | 30+ | 46 |
| (S-E-EP-E)n | 240 | 35 | 300 | 30+ | 47 |
| S-B-EP-S | 90 | 30 | 300 | 30+ | 48 |
| S-E-EB-S | 90 | 35 | 300 | 30+ | 49 |
| S-B-EP-S | 90 | 30 | 300 | 30+ | 50 |
| S-E-EP-EP-S | 90 | 30 | 300 | 30+ | 51 |

### TABLE 9

Illustrative Modes of Practice Contemplated for multiblock copolymer Gels

| 100 Parts by wt | 5 Wt % Copolymer Viscosity (cps) | Styrene % | Parts by Wt of Oil | Number of Floss cycles to Break | Sample No. |
|---|---|---|---|---|---|
| S-E-EP-EB-S | 120 | 33 | 250 | 30+ | 52 |
| S-E-EP-EP-S | 120 | 33 | 250 | 30+ | 53 |

46

### TABLE 9-continued

Illustrative Modes of Practice Contemplated for multiblock copolymer Gels

| 100 Parts by wt | 5 Wt % Copolymer Viscosity (cps) | Styrene % | Parts by Wt of Oil | Number of Floss cycles to Break | Sample No. |
|---|---|---|---|---|---|
| (S-B-EP)n | 380 | 35 | 250 | 30+ | 54 |
| (S-E-EB)n | 380 | 35 | 250 | 30+ | 55 |
| S-E-EP-E-EP-S | 120 | 30 | 250 | 30+ | 56 |
| S-E-EP-P-S | 120 | 35 | 250 | 30+ | 57 |
| S-E-B-EP-S | 120 | 30 | 250 | 30+ | 58 |
| S-E-EP-EP-E-S | 120 | 30 | 250 | 30+ | 59 |

### TABLE 10

Illustrative Modes of Practice Contemplated for multiblock copolymer (0.5–2.0 cm diameters) Gel Strands

| 100 Parts by wt | 5 Wt % Copolymer Viscosity (cps) | Styrene % | Parts by Wt of Oil | # of Floss cycles to Break | Sample No. |
|---|---|---|---|---|---|
| S-E-EP-S | 40 | 30 | 350 | 30+ | 60 |
| S-E-EP-S | 60 | 30 | 350 | 30+ | 61 |
| (S-E-EP-EB)n | 340 | 30 | 350 | 30+ | 62 |
| (S-E-EP-EP-E)n | 340 | 30 | 350 | 30+ | 63 |
| S-E-EP-P-EP-E-S | 90 | 30 | 350 | 30+ | 64 |
| S-E-EB-EP-S | 90 | 35 | 350 | 30+ | 65 |
| S-B-EB-B-S | 90 | 30 | 350 | 30+ | 66 |
| S-E-EP-EP-E-S | 90 | 30 | 350 | 30+ | 67 |

### TABLE 11

Illustrative Modes of Practice Contemplated for multiblock copolymer (0.5–2.0 cm diameters) Gel Strands

| 100 Parts by wt | 5 Wt % Copolymer Viscosity (cps) | Styrene % | Parts by Wt of Oil | # of Floss cycles to Break | Sample No. |
|---|---|---|---|---|---|
| S-E-EB-S | 120 | 30 | 250 | 40+ | 68 |
| S-E-EP-S | 120 | 30 | 250 | 40+ | 69 |
| (S-E-EB)n | 280 | 35 | 250 | 40+ | 70 |
| (S-E-EP)n | 280 | 35 | 250 | 40+ | 71 |
| S-E-EP-E-S | 120 | 30 | 250 | 40+ | 72 |
| S-EP-E-EP-S | 120 | 30 | 250 | 40+ | 73 |
| S-EB-E-EB-S | 120 | 30 | 250 | 40+ | 74 |
| S-E-EB-EB-S | 120 | 30 | 250 | 40+ | 75 |

## EXAMPLE X

Gels of 100 parts of Kraton G1651, Kraton RP-6917 (amorphous S-EB-S), Septon 8006 (amorphous S-EB-S), Kraton RP-6919, Septon S2006 (amorphous S-EP-S) and a high viscosity radial amorphous midblock segment (SEB)n triblock copolymers and 1,600, 1,200, 1,000, 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 200 white oil (plasticizer having Vis. cSt @ 40° C. of 39.0) are melt blended, test, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 to 1,800 gram Bloom and the tensile strength, notched tear strength, and resistance to fatigue are found to decrease with increase amounts of plasticizers, while tackiness of the gels is found to be greater than 7.6 gram Tack

US 6,867,253 B1

47

48

## EXAMPLE XI

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 and 1,600, 1,200, 1,000, 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 200 white oil (plasticizer having Vis. cSt @ 40° C. of 39.0) are melt blended, test and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 to 1,800 gram Bloom and the gel tackiness are found to increase with increase amounts of plasticizers and the tack greater than 7.6 gram Tack.

## EXAMPLE XII

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow S series poly(ethylene/styrene) random copolymer (250,000 Mw) having a high styrene content sufficient to form gel blends with total styrene content of 37 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example I, while tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

## EXAMPLE XII

Gels of 100 parts of Septon 4045 (crystalline S-E/EP-S having a styrene content of 37.6) and 1,600, 1,200, 1,000, 800, 600, 500, 450, 300, 250 parts by weight of Duroprime Klearol white oil (plasticizer having Vis. CSt @ 40° C. of 7–10) are melt blended, test and probe samples molded, the bulk gel rigidities are found to be within the range of 2 to 2,000 gram Bloom and the tackiness is found to be less than about 1 gram Tack.

## EXAMPLE XIV

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of Septon 2104 (Amorphous SEPS having a high styrene content of 65) and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example X and XI.

## EXAMPLE XV

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination.with sufficient amounts of a Dow M series poly(ethylene/styrene) random copolymer (350,000 Mw) having a high styrene content sufficient to form gel blends with total styrene content of 37 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example I, while tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

## EXAMPLE XVI

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow E series poly(ethylene'styrene) random copolymer (240,000 Mw) having a high styrene content sufficient to form gel blends with total styrene content of 37 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example I, while tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

## EXAMPLE XVII

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with polystyrene homopolymers (having Mw of 3,000; 4,000; 5,000; 6,000; 7,000; 8,000; 9,000; 10,000; 11,000; 12,000, 13,000; 14,000; 15,000; 16,000; 17,000; 18,000, 19,000; 20,000; 30,000; 40,000; 50,000; 60,000; 70,000; 80,000; 90,000) in sufficient amounts to form gel blends with total styrene content of 37, 45, 48, 50, and 55 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 2,000 gram Bloom and tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than die gels of Example I and II.

## EXAMPLE XVIII

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow M series poly(ethylene/styrene) random copolymer (350,000 Mw) having a high styrene content sufficient to form gel blends with total styrene contents of 40, 45, 48, 50, and 55 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example I, while tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

## EXAMPLE XIX

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient

US 6,867,253 B1

49                                                          50

amounts of a Dow S series poly(ethylene/styrene) random copolymers (with Mw of 140,000; 250,000 and 340,000) having a high styrene content sufficient to form gel blends with total styrene content of 40, 45, 48, 50, and 55 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example I, while tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

### EXAMPLE XX

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow E series poly(ethylene/styrene) random copolymers (with Mw of 250,000; 340,000 and 400,000) having a high styrene content sufficient to form gel blends with total styrene content of 40, 45, 48, 50, and 55 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example I, while tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

### EXAMPLE XXI

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow M series poly(ethylene/styrene) random copolymer (with Mw of 250,000; 340,000 and 400,000) having a high styrene content sufficient to form gel blends with total styrene content of 40, 45, 48, 50, and 55 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example I, while tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

### EXAMPLE XXII

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4045, 4055, and 4077 in combination with sufficient amounts of a Dow E series crystalline poly (ethylene/styrene) random copolymer (with Mw of 250,000; 340,000 and 400,000) having a high styrene content sufficient to form gel blends with total styrene content of 37, 40, 45, 48, 50, 55, and 60 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55,

70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example I, while tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

### EXAMPLE XXIII

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with polystyrene (of 2,500 Mw, 4,000 Mw, 13,000 Mw, 20,000 Mw, 35,000 Mw, 50,000 Mw, and 90,000 Mw; poly(alpha-methylstyrene) (of 1,300 Mw, 4,000 Mw; poly(4-methylstyrene)(of 72,000 Mw), Endex 155, 160, Kristalex 120, and 140 ) in sufficient amounts to form gel blends with total styrene content of 37, 45, 48, 50, and 55 by weight of copolymers and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 2,000 gram Bloom and tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

### EXAMPLE XXIV

Examples XIV is repeated and gels of 100 parts of (S-EB$_{15}$-EP-S), (S-E-EB$_{25}$-S), (S-EP-E-EP-S), (S-E-EB-S), (S-E-EP-S), (S-E-EP-E-S), (S-E-EP-EB-S), (S-E-EP-E-EP-S), (S-E-EP-E-EB-S), (S-E-EP-E-EP-E-S), (S-E-EP-E-EB-S), (S-E-EP-E-EP-EB-S), and (S-E-EP-E-EP-E-S) block copolymers are each melt blended, tests and probe samples molded, the bulk gel rigidities are found to be within the range of 2 to 1,800 gram Bloom and tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

### EXAMPLE XXV

Example XIV is repeated and minor amounts of 2, 5, 10 and 15 parts of the following polymers are formulated with each of the triblock copolymers: styrene-butadiene-styrene block copolymers, styrene-isoprene-styrene block copolymers, low viscosity styrene-ethylene-butylene-styrene block copolymers, styrene-ethylene-propylene block copolymers, styrene-ethylene-propylene-styrene block copolymers, styrene-butadiene, styrene-isoprene, polyethyleneoxide, poly(dimethylphenylene oxide), polystyrene, polybutylene, polyethylene, polypropylene, high ethylene content EPDM, amorphous copolymers based on 2,2-bistrifluoromethyl-4,5-difuoro-1,3-dioxole/tetrafluoroethylene. The bulk gel rigidities of each of the formulations are found to be within the range of 2 gram to 2,000 gram Bloom and tack is found to decrease with decreasing plasticizer content and in all instances substantially lower than the gels of Example I and II.

### EXAMPLE XXVI

Molten gels of Examples III–XVI are formed into composites with paper, foam, plastic, elastomers, fabric, metal,

51

concrete, wood, glass, ceramics, synthetic resin, synthetic fibers, and refractory materials and the resistance to fatigue of the composite-crystal gels at corresponding rigidities are found to be greater than that of the composite-amorphous gels of Example X.

## EXAMPLE XXVII

Three cm thick sheets of each of the crystal gels of Example XIV and the amorphous gels of Example I are tested by repeatedly displacing the sheets to a depth of 1 cm using a 10 cm diameter smooth (water soaked) wood plunger for 1,000, 5,000, 10,000, 25,000, 50,000, and 100,000 cycles. The sheets of crystal gels are found capable of exhibiting greater fatigue resistance than the sheets of amorphous gels at corresponding rigidities.

## EXAMPLE XXVIII

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES16 having 37.5% crystallinity and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

## EXAMPLE XXIX

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymer, ES24 having 26.6% crystallinity and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

## EXAMPLE XXX

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES27 having 17.4% crystallinity and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

## EXAMPLE XXXI

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copoly-

52

mers ES28 having 22.9% crystallinity and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

## EXAMPLE XXII

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES30 having 9.6% crystallinity and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

## EXAMPLE XXXIII

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES44 having 5.0% crystallinity and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) arc melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

## EXAMPLE XXXIV

Gels of 10 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES72 and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

## EXAMPLE XXXV

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES73 and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the

53

notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

### EXAMPLE XXXVI

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES74 and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt i) 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

### EXAMPLE XXXVII

Gels of 100 puts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES69 and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

### EXAMPLE XXXVIII

Gels of 100 parts of Septon crystalline (SEEPS) copolymers 4033, 4055, and 4077 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES62 and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

### EXAMPLE XXXIX

Gels of 100 parts of Septon (SEPS) copolymers Kraton GRP6918 in combination with each of a Dow poly(ethylene/styrene) random copolymers ES16, ES24, ES27, ES28, ES30, and ES44 and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

### EXAMPLE XL

Gels of 100 pats of Septon (SEBS) copolymers S8006 and Kraton G1651, G1654 in combination with sufficient amounts of a Dow poly(ethylene/styrene) random copolymers ES16, ES24, ES27, ES28, ES30, and ES44 and 800,

54

600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

### EXAMPLE XLI

Gels of 100 parts of Septon (SEEPS) copolymers 4033, 4045, 4055, 4077 in combination each with 25 parts by weight of Super Sta-tac, Betaprene Nevtac, Escorez, Hercotac, Wingtack, Piccotac, polyterpene, Zonarez, Nirez, Piccolyte, Sylvatac, glycerol ester of rosin (Foral), pentaerythritol ester of rosin (Pentalyn), saturated alicyclic hydrocarbon (Arkon P), coumarone indene (Cumar LX), hydrocarbon (Picco 6000, Regalrez), mixed olefin (Wingtack), alkylated aromatic hydrocarbon (Nevchem), Polyalphamethylstyrene vinyl toluene copolymer (Piccotex), polystyrene (Kristalex, Piccolastic), special resin (LX-1035) and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

### EXAMPLE XLII

Gels of 200 parts of Septon (SEEPS) copolymers 4033, 4045, 4055, 4077 in combination each with 25 parts by weight of Super Sta-tac, Betaprene Nevtac, Escorez, Hercotac, Wingtack, Piccotac, polyterpene, Zonarez, Nirez, Piccolyte, Sylvatac, glycerol ester of rosin (Foral), pentaerythritol ester of rosin (Pentalyn), saturated alicyclic hydrocarbon (Arkon P), coumarone indene (Cumar LX), hydrocarbon (Picco 6000, Regalrez), mixed olefin (Wingtack), alkylated aromatic hydrocarbon (Nevchem), Polyalphamethylstyrene/vinyl toluene copolymer (Piccotex), polystyrene (Kristalex, Piccolastic), special resin (LX-1035) and 800, 600, 500, 450, 300, 250 parts by weight of Duroprime 55, 70, Klearol, Carnation, Blandol, Benol, Semtol 85, 70, and 40 (plasticizers having Vis. CSt @ 40° C. of less than 20) are melt blended, tests, and tack probe samples molded, the bulk gel rigidities are found to be within the range of 2 gram to 1,800 gram Bloom and the notched tear strength and resistance to fatigue of the gel at corresponding rigidities are found to be greater than that of amorphous gels of Example X.

While certain features of this invention have been described in detail with respect to various embodiments thereof, it will, of course, be apparent that other modifications can be made within the spirit and scope of this invention, and it is not intended to limit the invention to the exact details shown above except insofar as they are defined in the following claims.

What is claimed is:

1. A composite comprising: a gel denoted by G, being in adherent contact, adhesive contact, clinging contact, fastening contact, sticking contact, or physical contact with a selected material M forming the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nM_nG_n$,

55

$G_nM_nG_nM_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_nM_nM_n$, or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of paper, foam, plastic, fabric, metal, metal foil, metalic flakes, concrete, wood, glass, glass fibers, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity; said gel comprising: (i) 100 parts by weight of one or more block copolymers selected from poly(styrene-ethylene-ethylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly (styrene-ethylene-ethylene-butylene$_{2.5}$-styrene), poly (styrene-ethylene-propylene-ethylene-styrene), poly (styrene-ethylene-ethylene-butylene)$_n$, poly(styrene-ethylene-ethylene-propylene)$_n$, poly(styrene-ethylene-ethylene-butylene$_{2.5}$)$_n$, poly(styrene-ethylene-propylene-ethylene)$_n$, or mixtures thereof, wherein subscript n is two or more; (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity of about 4 cSt at 40° C. and greater; said gel characterized by a gel gram Bloom of about 2 gram to about 1,800 gram Bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers comprising poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(ethylene-styrene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene )$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; said gel having greater tear resistance than gels having corresponding rigidity made from a poly (styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers.

**2**. A composite comprising: a gel denoted by G, being in adherent contact, adhesive contact, clinging contact, fastening contact, sticking contact, or physical contact with a selected material M or in combination with one or more of the same gel or a different gel forming a composite of the combination $G_nG_n$, $G_nG_nG_n$, $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $M_nG_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_nG_n$, $G_nM_nG_nM_nM_n$, $M_nG_nG_nM_nG_n$, $G_nG_nM_nG_nM_n$, $G_nG_nM_nG_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_nG_nM_nG_n$, $G_nM_nM_nG_nM_n$, $G_nG_nM_nG_nM_nG_n$, $G_nM_nG_nM_nM_n$, $M_nM_nM_nG_n$, $M_nM_nG_nG_nM_nM_n$, or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of paper, foam, plastic, fabric, metal, metal foil, concrete, wood, glass, glass fibers, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity; said gel comprising: (i) 100 parts by weight of one or more block copolymers selected from poly(styrene-ethylene-ethylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-ethylene-butylene$_{2.5}$-styrene), poly(styrene-ethylene-propylene-ethylene-styrene), poly(styrene-ethylene-ethylene-butylene)$_n$, poly(styrene-ethylene-ethylene-propylene)$_n$, poly(styrene-ethylene-ethylene-butylene$_{2.5}$)$_n$, poly(styrene-ethylene-propylene-ethylene)$_n$, or mixtures thereof, wherein subscript n is two or more; (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of about 200 and greater; said gel characterized by a gel gram Bloom of about

56

2 gram to about 1,800 gram Bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers comprising poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly (styrene-ethylene-propylene), poly(ethylene-styrene), poly (styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; said gel having greater fatigue resistance than gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers.

**3**. A composite according to claim **1**, wherein. said composite being formed into a gel hand exercising grip, a gel shape floss suitable for use as a dental floss, a gel crutch cushion, a gel cervical pillow, a gel bed wedge pillow, a gel leg rest, a gel neck cushion, a gel mattress, a gel bed pad, a gel elbow pad, a gel dermal pad, a gel wheelchair cushion, a gel helmet liner, a gel cold and hot pack, a gel exercise weight belt, a gel traction pad or belt, a gel cushion for splints, a gel sling, a gel brace for the hand, wrist, finger, forearm, knee, leg, clavicle, shoulder, foot, ankle, neck, back, rib, a gel sole for orthopedic shoe, a gel shaped toy article, a gel optical cladding for cushioning optical fibers from bending stresses, a gel swab tip, a gel fishing bait, a gel seal against pressure, a gel thread, a gel strip, a gel yarn, a gel tape, a weaved gel cloth, a gel fabrics, a gel balloon for valvuloplasty of the mitral valve, a gel trointestinal balloon dilator, a gel esophageal balloon dilator, a gel dilating balloon catheter use in coronary angiogram, a gel condom, a gel toy balloon, a gel surgical and examination glove, a self sealing enclosures for splicing electrical and telephone cables and wires, a gel film, or a gel liner.

**4**. A composite of claim **2** shaped in the form of a gel liner for lower limb or above the knee amputee prosthesis formed by injection molding, extruding, spinning, casting, or dipping of said gel.

**5**. A composite of claim **1** shaped in the form of a gel liner for lower limb or above the knee amputee prosthesis formed by injection molding, extruding, spinning, casting, or dipping of said gel.

**6**. A composite comprising a gel $G_n$ with a selected material $M_n$; said gel formed from

(I) 100 parts by weight of one or more linear, branched, star-shaped (radial), or multiarm block copolymers or mixtures of two or more such block copolymers, said block copolymers having one or more midblock segments, said midblock segments comprising one or more polyethylene segments and with (i) one or more amorphous midblocks or (ii) without amorphous midblocks, and in combination with or without a selected amount of one or more (II) polymers or copolymers, and selected amounts of (III) one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of about 200 and greater; said plasticizing oil(s) being of sufficient amount to achieve gel rigidities of from less than about 2 gram Bloom to about 1,800 gram Bloom, with the proviso when said (I) block copolymers without any amorphous midblock segments are combined with at least one block copolymer having at least one amorphous midblock segments, that said midblock segment(s) of said (I) block copolymers forming said gel comprises a polyethylene midblock

57

segment; said (II) polymer or compolymer selected from poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(ethylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_n$, $G_nM_nG_nG_n$, $G_nG_nM_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nG_nG_n$, $G_nG_nM_n$, $G_nM_nG_nM_n$, $M_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with a material $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity; said $G_n$ and $M_n$ combination(s) being in one or more the same or different selected adherent contact, adhesive contact, clinging contact, fastening contact, sticking contact, or physical contact.

7. A composite comprising a gel $G_n$ with a selected material $M_n$, said gel formed from

(i) 100 parts by weight of one or more block copolymers of the formula poly(styrene-ethylene-ethylene-propylene-styrene), having greater tear resistance than a gel of corresponding rigidity made from a poly (styrene-ethylene-propylene-styrene) block copolymer, wherein said (i) block copolymer is a high viscosity copolymer having a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 mPa.S and higher which corresponds to a viscosity at 10 weight percent of about 5800 mPa.S and higher which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25° C. of at about 80,000 mPa.S and higher, and from

(ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity of about 4 cSt at 40° C. and greater; said gelatinous elastomer compositions characterized by a gel gram Bloom rigidity of about 20 to about 800 gram bloom; and in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly (styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly (styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly (styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-styrene), poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_n$, $G_nM_nG_nG_n$, $G_nG_nM_n$, $G_nG_nM_nM_n$, $M_nG_nM_nG_nG_n$, $G_nG_nM_n$, $G_nM_nG_nM_n$, $M_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with one or

58

more $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

8. A composite comprising a gel $G_n$ with a selected material $M_n$; said gel formed from

(i) 100 parts by weight of one or more block copolymers of poly(styrene-ethylene-ethylene-propylene-styrene), and from

(ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of less than about 200 and greater; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; and in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly (styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly (styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly (styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_mG_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_n$, $G_nM_nG_nG_n$, $G_nG_nM_n$, $G_nG_nM_nM_n$, $M_nG_nM_nG_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

9. A composite comprising a gel $G_n$ with a selected material $M_n$; said gel formed from

(i) 100 parts by weight of one or more block copolymers having a polyethylene midblock of the formula poly (styrene-ethylene-ethylene-propylene-styrene) exhibiting stress induced necking at high elongations not exhibited by gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly (styrene-ethylene-propylene-styrene) block copolymers wherein said block copolymer is a high viscosity copolymer having a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 cps and higher which corresponds to a viscosity at 10 weight percent of about 5800 cps and higher which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25° C. of at about 80,000 cps and higher, and from

(ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of less than about 200 to greater than about 700; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; and in combination with or without one or more of

(iii) a selected amount of one or more block copolymers of poly(styrene-butadiene-styrene), poly(styrene-

JA000259

59

butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene )$_n$, or poly(styrene-ethylene-butylene)$_n$; a selected amount of one or more diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly (styrene-ethylene-butylene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene); a selected amount of a hydrocarbon resins including polystyrene, polypropylene, or polyethylene; a selected amount of polybutylene; a selected amount of rubbers of poly (ethylene-propylene) or poly(ethylene-butylene); a selected amount of a flame retardant; a selected amount of one or more internal and external non-adhering, non-sticking modifiers selected from amorphous silica, talc, zinc sterate, aluminum sterate, mica, and silicon dioxide; a selected amount of microspheres or aggregation of gas bubbles; a selected amount of microspheres or aggregation of gas bubbles; wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_{Mn}G_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_n$, $G_nG_nM_nM_n$, $M_nG_nM_nG_{nMn}G_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**10.** A composite comprising a gel $G_n$ with a selected material $M_n$; said gel formed from

(i) 100 parts by weight of one or more block copolymers of poly(styrene-ethylene-ethylene-propylene-styrene), and from

(ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity of about 4 cSt at 40° C. and greaer; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; and in combination with or without one of more of

(iii) a selected amount of one or more block copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$; a selected amount of one or more diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly (styrene-ethylene-butylene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene); a selected amount of a hydrocarbon resins including polystyrene, polypropylene, or polyethylene; a selected amount of polybutylene; a selected amount of rubbers of poly (ethylene-propylene) or poly(ethylene-butylene); a selected amount of a flame retardant; a selected amount of one or more internal and external non-adhering, non-sticking modifiers selected from amorphous silica, talc, zinc sterate, aluminum sterate, mica, and silicon dioxide; a selected amount of microspheres or aggregation of gas bubbles; wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$,

60

$G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_{Mn}G_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_n$, $G_nG_nM_nM_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $M_nG_nM_n$, $M_nG_nM_{nMn}G_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**11.** A composite comprising a gel $G_n$ with a selected material $M_n$; said gel formed from

(i) 100 parts by weight of one or more block copolymers of poly(styrene-ethylene-ethylene-propylene-styrene), and from

(ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity of about 4 cSt at 40° C. and greaer; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; and in combination with or without one or more of

(iii) a selected amount of one or more block copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(ethylene-styrene), or poly (styrene-ethylene-butylene)n; a selected amount of one or more diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$, poly (styrene-ethylene-propylene), poly(styrene-ethylene-butylene); a selected amount of a hydrocarbon resins including polystyrene, polypropylene, or polyethylene; a selected amount of polybutylene; a selected amount of rubbers of poly(ethylene-propylene) or poly (ethylene-butylene); a selected amount of a flame retardant; a selected amount of non-adhering, non-sticking modifiers selected from amorphous silica, talc, zinc sterate, aluminum sterate, mica, and silicon dioxide; a selected amount of microspheres or aggregation of gas bubbles; wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_nM_n$, $M_nM_nM_nG_n$, $M_nG_nG_nM_n$, $G_{Mn}G_nG_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nM_n$, $G_nM_nM_nG_n$, $G_nG_nM_n$, $G_nM_nM_nG_n$, $M_nG_nM_nM_n$, $M_nG_nM_nG_nM_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**12.** A composite comprising a gel $G_n$ with a selected material $M_n$; said gel formed from

(i) 100 parts by weight of one or more block copolymers poly(styrene-ethylene-ethylene-propylene-styrene), and from

(ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity of about 4 cSt at 40° C. and greaer; said gelatinous elastomer

US 6,867,253 B1

61

compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; and in combination with or without one more of (iii–xii):

(iii) a selected amount of one or more block copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, poly(ethylene-styrene), or poly (styrene-ethylene-butylene)$_n$;

(iv) a selected amount of one or more diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene);

(v) a selected amount of a hydrocarbon resins including polystyrene, polypropylene, or polyethylene, or poly-butylene;

(vi) a selected amount of rubbers of poly(ethylene-propylene) or poly(ethylene-butylene);

(vii) a selected amount of a flame retardant;

(viii) a selected amount of non-adhering, non-sticking additives comprising antiblocking agents including tetrakis[methylene 3,-(3'5'-di-tertbutyl-4"-hydroxyphenyl)propionate]methane, octadecyl 3-(3", 5"-di-tert-butyl-4"-hydroxyphenyl)propionate, distearyl-pentaerythritol-diproprionate, thiodiethylene bis-(3,5-ter-butyl-4-hydroxy)hydrocinnamate, (1,3,5-trimethyl-2,4,6-tris[3,5-di-tert-butyl-4-hydroxybenzyl] benzene), 4,4"-methylenebis(2,6-di-tert-butylphenol), additives of stearic acid, oleic acid, stearamide, behenamide, oleamide, erucamide, N,N"-ethylenebisstearamide, N,N"-ethylenebisoleamide, sterryl erucamide, erucyl erucamide, oleyl palmitamide, stearyl stearamide, erucyl stearamide, waxes, and silicone fluids;

(ix) a selected amount of microspheres, aggregation of gas bubbles, or blowing agents;

(x) one or more additives selected from the group consisting of polyisobutylene including polybutene, hydrocarbon resins including polymerized mixed olefins, polyterpene, glycerol ester of rosin, pentaerythritol ester of rosin, saturated alicyclic hydrocarbon, coumarone indene, hydrocarbon, mixed olefin, alkylated aromatic hydrocarbon, polyalphamethylstyrene/vinyl toluene copolymer, polystyrene, and elastomeric diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly (styrene-ethylene-butylene)$_n$, poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, poly(styrene-ethylene-propylene), poly (styrene-ethylene-butylene);

(xi) one or more additives selected from the group consisting of hydrocarbon resins, butyl rubber, polyisobutylene, additional block copolymers of poly (styrene-isoprene-styrene), poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, poly (styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, polyethylene, diblock copolymers of poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), stearic acid, oleic acid, stearamide, behenamide, oleamide, erucamide, N,N"-ethylenebisstearamide, N,N"-ethylenebisoleamide, sterryl erucamide, erucyl erucamide, oleyl palmitamide, stearyl stearamide,

62

erucyl stearamide, waxes, and silicone fluids; magnetic particle materials, carbon blacks, silicon dioxide, silica, mica, talc, zinc sterate, amorphous silica, silica, silicon dioxide, aluminum sterate, fine metallic powder, metal flakes, clay, feldspar, glass microspheres, barium ferrite, wollastonite, hydrocarbon resins of polymerized mixed olefins, polyterpene, glycerol ester of rosin, pentaerythritol ester of rosin, saturated alicyclic hydrocarbon, coumarone indene, hydrocarbon, mixed olefin, alkylated aromatic hydrocarbon; wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination:

(xii) layers of $G_nM_n$, $M_nG_nM_n$, $M_nM_nG_n$, $M_nM_nG_nM_n$, $M_n$, $G_nM_nG_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nG_nM_n$, $G_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nM_nG_n$, $G_nM_nM_nM_n$, $G_nG_nG_nM_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_n$, $M_nG_nM_nG_nM_n$, $G_nM_nM_nG_nM_n$, and $G_nG_nM_nG_nM_n$, a sequential addition or a permutation of one or more of said Gn with Mn; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

13. A composite comprising a gel $G_n$ with a selected material $M_n$, characterized by a gel gram Bloom rigidity of about 20 to about 1,800 gram bloom, said composite made from

(i) 100 parts by weight of one or more block copolymers;

(ii) about 300 to about 1,600 parts by weight of one or more selected plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity of about 4 cSt at 40° C. and greaer, with or without one or more of

(iii) an additive;

wherein said (i), (ii), and (iii) are combined to form said gelatinous elastomeric composition; wherein said block copolymer comprises A—B—A blocks having a weight average molecular weight of at least about 300,000 or more corresponding to a measurable solution viscosity at 5 wt % solids in 95% toluene at 25° C. which solution remains a solid at 20 wt % solids in 80% toluene at 25° C. which corresponds to a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 cps and higher which corresponds to a viscosity at 10 weight percent of about 5800 cps and higher which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25° C. of about 80,000 cps and higher; said A being selected from monoalkenylarene polymers including polystyrene; said B being a hydrogenated polymer comprising a plurality of covalently linked conjugated diene monomers including a hydrogenated polymer of isoprene/butadiene; wherein said (i) block copolymer is of the formula poly(styrene-ethylene-ethylene-propylene-styrene);

(1) said composite having layers of $G_nM_n$, $G_nM_nM_n$, or $M_nM_nG_nM_nM_n$, $M_nG_nM_n$, $G_nM_nG_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nM_n$, $G_nM_nG_n$, $G_nM_nM_nG_n$, $M_nM_nG_nG_n$, $G_nG_nM_n$, $G_nM_nM_nM_n$, $G_nG_nG_nM_n$, $G_nM_nG_nM_n$, $G_nG_nM_nG_n$, $M_nG_nM_nG_nM_n$, $G_nG_nM_nG_nM_n$, or permutation of one or more of said $G_n$ with $M_n$; wherein said additive is:

(2) an additive selected from the group consisting of aggregation of gas bubbles formed by inert gases, and blowing agents including water,

63

(3) an additive selected from the group consisting of internatal and external tack modifiers including, anti-blocking agents, non-adhering, non-sticking modifiers including tetrakis[methylene 3,-(3'5'-di-tertbutyl-4"-hydroxyphenyl)propionate]methane, octadecyl 3-(3", 5"-di-tert-butyl-4"-hydroxyphenyl)propionate, distearyl-pentaerythritol-dipropionate, thiodiethylene bis-(3,5-ter-butyl-4-hydroxy)hydrocinnamate, (1,3,5-trimethyl-2,4,6-tris[3,5-di-tert-butyl-4-hydroxybenzyl] benzene), 4,4"-methylenebis(2,6-di-tert-butylphenol), additives of stearic acid, oleic acid, stearamide, behenamide, oleamide, erucamide, N,N"-ethylenebisstearamide, N,N"-ethylenebisoleamide, sterryl erucamide, erucyl erucamide, oleyl palmitamide, stearyl stearamide, erucyl stearamide, waxes, mica, talc, zinc sterate, amorphous silica, silica, silicon dioxide, aluminum sterate, fine metallic powder, metal flakes, and silicone fluids,

(4) an additive selected from the group consisting of polyisobutylene including polybutene, hydrocarbon resins including polymerized mixed olefins, polyterpene, glycerol ester of rosin, pentaerythritol ester of rosin, saturated alicyclic hydrocarbon, coumarone indene, hydrocarbon, mixed olefin, alkylated aromatic hydrocarbon, polyalphamethylstyrene/vinyl toluene copolymer, polystyrene, and elastomeric diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly (styrene-ethylene-butylene)$_n$, poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly (styrene-ethylene-propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$, poly(styrene-ethylene-propylene), poly (styrene-ethylene-butylene),

(5) an additive selected from the group consisting of flame retardants,

(6) an additive selected from the group consisting of hydrocarbon resins, polyisobutylene including polybutene, additional block copolymers of poly (styrene-isoprene-styrene), poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, poly (ethylene-styrene), poly(styrene-ethylene-butylene)$_n$, particulate fillers, microspheres, butadiene rubber, poly (ethylene/propylene), and poly(ethylene/butylene),

(7) an additive selected from the group consisting of poly(styrene-butadiene-styrene), polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, polyethylene, diblock copolymers of poly(styrene-butadiene)$_n$, poly (styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, stearic acid, oleic acid, stearamide, behenamide, oleamide, erucamide, N,N"-ethylenebisstearamide, N,N"-ethylenebisoleamide, sterryl erucamide, erucyl erucamide, oleyl palmitamide, stearyl stearamide, erucyl stearamide, waxes, and silicone fluids, and

(8) an additive selected from the group consisting of hydrocarbon resins of polystyrene, polymerized mixed olefins, polyterpene, glycerol ester of rosin, pentaerythritol ester of rosin, saturated alicyclic hydrocarbon, coumarone indene, hydrocarbon, mixed olefin, alkylated aromatic hydrocarbon, particulate fillers, and microspheres;

said gel having a hydrophobic or hydrophilic surface depending on said additive (3) selected.

64

14. A composite comprising a gel $G_n$ and selected material $M_n$, formed from

(i) 100 parts by weight of one or more block copolymers with a polyethylene midblock segment of the formula poly(styrene-ethylene-ethylene-propylene-styrene) exhibiting a measurable amount of polyethylene crystallinity characterized by stress induced crystallinity not exhibited by gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers wherein said block copolymer is a high viscosity copolymer having a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 cps and higher which corresponds to a viscosity at 10 weight percent of about 5800 cps and higher which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25° C. of at about 80,000 cps and higher, and from

(ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity of about 4 cSt at 40° C. and greater; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; and in combination with or without

(iii) a selected amount of one or more block copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$; a selected amount of one or more diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly (styrene-ethylene-butylene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene); a selected amount of a hydrocarbon resins including polystyrene, polypropylene, or polyethylene; a selected amount of polybutylene; a selected amount of rubbers of poly (ethylene-propylene) or poly(ethylene-butylene); a selected amount of a flame retardant; a selected amount of non-adhering, non-sticking modifiers; a selected amount of microspheres or aggregation of gas bubbles; wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_n$, $M_nG_nG_nG_n$, $G_nM_nG_nG_n$, $G_nG_nM_n$, $G_nG_nM_n$, $M_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

15. A composite of claim 7, shaped in the form of a gel liner for lower extremity, above or below the knee prosthesis devices as described by one or more codes L5664, L5665, or L5667 of the American Orthotic and Prosthetic Association, said gel liner formed by injection molding, extruding, spinning, casting, or dipping of said gel $G_n$ of selected rigidity with a selected said material $M_n$.

16. A composite of claim 8, shaped in the form of a gel liner for lower extremity, above or below the knee prosthesis devices as described by one or more codes L5664, L5665, or L5667 of the American Orthotic and Prosthetic Association,

JA000262

US 6,867,253 B1

65

said gel liner formed by injection molding, extruding, spinning, casting, or dipping of said gel $G_n$ of selected rigidity with a selected said material $M_n$.

**17**. A composite of claim **7**, wherein said composite being formed into a composite article into a gel hand exercising grip, a gel shape floss suitable for use as a dental floss, a gel crutch cushion, a gel cervical pillow, a gel bed wedge pillow, a gel leg rest, a gel neck cushion, a gel mattress, a gel bed pad, a gel elbow pad, a gel dermal pad, a gel wheelchair cushion, a gel helmet liner, a gel cold and hot pack, a gel exercise weight belt, a gel traction pad or belt, a gel cushion for splints, a gel sling, a gel brace for the hand, wrist, finger, forearm, knee, leg, clavicle, shoulder, foot, ankle, neck,

66

back, rib, a gel sole for orthopedic shoe, a gel shaped toy article, a gel optical cladding for cushioning optical fibers from bending stresses, a gel swab tip, a gel fishing bait, a gel seal against pressure, a gel thread, a gel strip, a gel yarn, a gel tape, a weaved gel cloth, a gel fabrics, a gel balloon for valvuloplasty of the mitral valve, a gel trointestinal balloon dilator, a gel esophageal balloon dilator, a gel dilating balloon catheter use in coronary angiogram, a gel condom, a gel toy balloon, a gel surgical and examination glove, a self sealing enclosures for splicing electrical and telephone cables and wires, a gel film, or a gel liner.

\* \* \* \* \*

JA000263

US006867253C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8314th)

# United States Patent
## Chen

(10) **Number:** US 6,867,253 C1
(45) **Certificate Issued:** Jun. 7, 2011

(54) **TEAR RESISTANT, CRYSTALLINE MIDBLOCK COPOLYMER GELS AND ARTICLES**

(76) Inventor: **John Y. Chen**, Pacifica, CA (US)

**Reexamination Request:**
No. 90/011,018, May 28, 2010

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,867,253** |
| Issued: | **Mar. 15, 2005** |
| Appl. No.: | **09/721,213** |
| Filed: | **Nov. 21, 2000** |

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/285,809, filed on Apr. 1, 1999, now abandoned, and a continuation-in-part of application No. 09/274,498, filed on Mar. 28, 1999, now Pat. No. 6,420,475, and a continuation-in-part of application No. 09/130,545, filed on Aug. 8, 1998, now Pat. No. 6,627,275, and a continuation-in-part of application No. 08/984,459, filed on Dec. 3, 1997, now Pat. No. 6,324,703, and a continuation-in-part of application No. 08/909,487, filed on Jul. 12, 1997, now Pat. No. 6,050,871, and a continuation-in-part of application No. 08/863,794, filed on May 27, 1997, now Pat. No. 6,117,176, and a continuation-in-part of application No. PCT/US97/17534, filed on Sep. 30, 1997, and a continuation-in-part of application No. 08/719,817, filed on Sep. 30, 1996, now Pat. No. 6,148,830, and a continuation-in-part of application No. 08/665,343, filed on Jun. 17, 1996, which is a continuation-in-part of application No. 08/612,586, filed on Mar. 8, 1996, now Pat. No. 6,552,109, and a continuation-in-part of application No. PCT/US94/04278, filed on Apr. 19, 1994, and a continuation-in-part of application No. PCT/US94/07314, filed on Jun. 27, 1994, and a continuation-in-part of application No. 08/288,690, filed on Aug. 11, 1994, now Pat. No. 5,633,286, and a continuation-in-part of application No. 08/581,188, filed on Dec. 29, 1995, and a continuation-in-part of application No. 08/581,191, filed on Dec. 29, 1995, now Pat. No. 5,760,117, and a continuation-in-part of application No. 08/288,690, and a continuation-in-part of application No. PCT/US94/07314, which is a continuation-in-part of application No. PCT/US94/04278, and a continuation-in-part of application No. 08/581,191, is a continuation-in-part of application No. 08/288,690, and a continuation-in-part of application No. PCT/US94/07314, which is a continuation-in-part of application No. PCT/US94/04278.

(51) **Int. Cl.**

| | |
|---|---|
| *A61C 15/00* | (2006.01) |
| *A61C 15/04* | (2006.01) |
| *C08L 51/00* | (2006.01) |
| *C08L 53/00* | (2006.01) |
| *C08L 53/02* | (2006.01) |

(52) **U.S. Cl.** .......................... **524/505**; 524/507; 524/508; 524/513; 524/515; 623/59; 623/61; 623/63

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,676,387 A | 7/1972 | Lindlof | |
| 3,827,999 A | 8/1974 | Crossland | |
| 4,369,284 A | 1/1983 | Chen | |
| 4,842,931 A | 6/1989 | Zook | |
| 4,942,270 A | * 7/1990 | Gamarra | 174/93 |
| 5,442,004 A | 8/1995 | Sutherland et al. | |
| 5,603,122 A | 2/1997 | Kania | |
| 5,633,286 A | 5/1997 | Chen | |
| 5,760,117 A | 6/1998 | Chen | |
| 5,830,237 A | 11/1998 | Kania | |
| 5,884,639 A | 3/1999 | Chen | |
| 5,962,572 A | 10/1999 | Chen | |
| 6,117,176 A | 9/2000 | Chen | |
| 6,148,830 A | 11/2000 | Chen | |
| 6,324,703 B1 | 12/2001 | Chen | |
| 6,420,475 B1 | 7/2002 | Chen | |
| 6,552,109 B1 | 4/2003 | Chen | |
| 6,627,275 B1 | 9/2003 | Chen | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 108518 A2 | * | 5/1984 |
| WO | 199323472 | | 11/1993 |
| WO | 199629033 | | 9/1996 |

OTHER PUBLICATIONS

US Securities Exchange Commission Form 10–K Dec. 31, 2004 Langer, Inc. pp. 1, 4, & 24.
Kania Declaration in Reexam 90/008,277 From Pair File Dec. 28, 2007 pp. 1–5.
ANTEC '99 Proceedings Deited by SPE Staff/pp. 1725. PW–90 Oil, (1999).
Septon Technical Information G–3–4 Dec. 3, 1992 Kuraray Co., Ltd., Property of Septon–4055, Septon 8008/oil Compound.
Septon 4055 Material Safety Data Sheet, dated Apr. 25, 1991.
Affidavit of Septon Company of America, *Edizone* v. *Cloud Nine,* Civil Case No. 1:04cv00117TS, Oct. 11, 2006.
EPA Premanufacture Notice for Septon 4055, dated Aug. 10, 1990.
Septon 4055 Material Safety Data Sheet, dated May 1, 1995.
Septon 4055 Material Safety Data Sheet, dated Apr. 30, 2001.
Prosthetics/Orthotics Silipos Advanced Polymer Technology of SEBS tri–block polymer gel product catalogue (4 bi–folds Knit–Rite distribution date of 1993).

* cited by examiner

*Primary Examiner*—Alan Diamond

(57) **ABSTRACT**

Novel gels and articles are formed from one or more multiblock copolymers having at least one block segment of poly (ethylene) and selected amounts of one or more low viscosity plasticizers, said gels having an amount of crystallinity, glassy components, selected amounts of plasticizers, with or without other additives sufficient to achieve improvements in one or more physical properties including improved crack propagation resistance, improved tea resistance, improved resistance to fatigue and resistance to catastrophic failure not obtainable in amorphous gels and exceptionally lower and/ or no tack.

US 6,867,253 C1

# 1

## EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

### THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

### ONLY THOSE PARAGRAPHS OF THE SPECIFICATION AFFECTED BY AMENDMENT ARE PRINTED HEREIN.

Column 37, after line 18:

*An example of the above mentioned toy is a Humdinger spinning toy of the related co-pending filed patent application Ser. No. 08/211,781 filed PCT on Apr. 19, 1994, now U.S. Patent 6,033,283 and incorporated in US 6,867,253 by reference, which describes the structure and operation of Humdinger spinning toy as follows:*

*When a gel body is set into rotation of at least 100 r.p.m. (revolutions per minute) to as high as 1,000 r.p.m. and higher, the forces can be significant. The following examples can best illustrate the forces involved.*

*The inward pulling forces generated by a pair of twisting stings as measured on a spring scale for a 2.00" (5.08 mm) dia. times.0.50" (12.70 mm) thickness spinning circular gel body can range from an extreme of less than one pound to forty pounds and greater. The typical range for such a spinning gel body may range from between less than five pounds to twenty pounds and greater. As another example, the measured pulling forces for a (smaller) 1.75" (44.46 mm) dia..times.0.60" (15.24 mm) spinning circular gel body can range from an extreme of less than one pound to twenty-five pounds and greater. The typical range for such as a smaller body is between less than three pounds to about eight pounds and greater.*

*For the purpose of the invention, an indirect measure of the shearing forces generated during play is measured (in pounds) by the inward pulling forces of the twisting strings 5 on a spring balance during dynamic spinning. The typical values can range from less than one pound to fifty pounds and greater. String puling forces for various shapes (large and small) of spinning bodies having measured values of 0.5, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 . . . 40, 50, 60, 70, 80 pounds and greater can be achieved and such values are typical. During spinning, the measured pulling force is read as a dynamic measurement which starts from a low value and rise as the string(s) are pulled apart forcing the body to reaching a maximum spin rate (i.e. maximum measured pulling force value).*

*The dynamic variables due to the centrifugal force of rotation of the bodies, such as elongation, stress and shear forces, under extreme high torque conditions, and the accelerations and de-accelerations involved are ever changing during play.*

*The bodies of the invention when rotated about an axis of rotation will experiece increased deformation from their original shapes with increase rates of rotation. Irrespective of the original shapes of the bodies, when subjected to rotation forces, the bodies will deform in a highly elastic,*

# 2

*predetermined, non-uniform, and non-radial manner. Because of the high deformations resulting from rotational forces, the bodies 2 will distribute their mass outwardly by elongating perpendicularly with respect to its axis of rotation. The gel material at the extreme outer parts (equator) of the bodies will experience greater and greater centrifugal force as the bodies rotate and elongate more and more. The bodies if not properly designed will be pulled apart by the increasing centrifugal force of rotation. For example, the centrifugal force of a rotating body having a mass of about 50 grams and an elongated mass about the body's equator of about 10 centimeter may produce from less than about 50 to at about 250 pound-force or higher.*

*If the hole separation distance is zero, then the torque will also be zero. Therefore, a suitable separation distance is needed to separate the holes from each other and the holes 6 from the selected axis of rotation. The holes should be separated approximately equal distance from the axis of rotation. A suitable distance, x, may be selected based on various factors, including the moment of inertia, axis of rotation, and the necessary torque need to rotate the bodies about its axis of rotation by the action of the twisting string. If the separations between the holes with respect to the axis of rotation is slightly off, then the torque applied to the bodies will be unbalanced. The unbalanced rotation would not be totally disastrous, but may produce a desirable off-balanced effect. While the humdinger may still adequately operate, it will be more difficult to keep the wobbling humdinger rotating in the unbalanced state.*

*As the bodies rotate, the moment of inertia will change and the point of the applied torque will also change. The moment of inertia of the bodies changes because the shape of the bodies changes with increased rate of rotation. Due to the highly elastic nature of the gel bodies, as their shape changes, so will the position of the holes with respect to each other and with respect to their distances from the axis of rotation. Any off-centering of the placement of the holes with respect to the axis of rotation will be greatly magnified by the centrifugal force acting on the body, since the original placement of the holes will aslo be changed due to elastic stretching. The torque acting on the bodies will greatly vary as the centrifugal force further separates the holes 6 from each other and from the axis of rotation.*

*Moreover, the over all original shape of a body will also affect the position of the holes as the body is set into rotation. The change in separations between the holes and the change in distance between the holes and the axis of rotation due to the centrifugal force acting on the body is also affected by the shape of the original body as a whole. In other words, the configuration of the original shape of the elastic body directly affects the amount and direction of the elastic deformation about the holes caused by the centrifugal force. A stretching or elastic deformation of one part of a body will directly affect other parts of the body as well. Therefore, any deformation by an applied force on any part of the body will correspondingly cause deformation to other parts of the body. The holes and the shape of the bodies are always in a state of flux due to the forces generated during rotation. The holes freely move about as the shape of the body is changed by the force of rotation. This is the nature of bodies under dynamic motion as opposed to rigid bodies.*

*The string is passed through the two holes of the gel body and tied into a loop. For gel bodies having three or more holes, the individual strings may be passed through the holes and tied together at opposite ends. The gel body is set into continuous alternating rotating motion with an initial twirl of the body followed by alternately pulling and releasing the*

3

*string while holding it in opposite directions which keeps it spinning. Between the second and fourth full reversal of rotation of the gel body, the string will have sufficient twist to shear off, and cut into or through the gel material separating the holes. Gel material of low strength cannot resist the tremendous shearing action of the twisting strings between the holes. The twisting action of the strings generated by the spinning gel body can exhibit a first order twist, a second order twist, or higher order twists. A first order twist refers to one or more twists of a pair of strings (i.e. a pair of strings when twisted together forms a small tight binding helix). A second order twist refers to one or more large binding helixes built up by a pair of strings that have been twisted beyond the maximum number of twists which normally produces small tight binding helixes of the first order kind. Similarly, a third order twist refers to a much larger tightly binding helix built up by the maximum number of second order twists produced by the pair of twisting strings. The third order twist may be manifested by the appearance of a branch of two or more twist of the first order twisting strings.*

*The shear force created by the static twisting of the string, however, is substantially different than the shear force generated under dynamic twisting of the strings. This can be demonstrated by taking a sample of any of the soft gel bodies and subject it to static twisting between a pair of strings under a static spring load of 20, 30, and 40 lbs for twenty four hours and compare the condition of the sample to samples of the same gel body subject under dynamic twist spring load of less than 20 lbs. (e.g. 5, 8, 10, 12, 16, 18, etc.). The results show that the shear force produce by a dynamic twist spring load of less than 20 lbs will easily cut a soft gel body or any low strength material body while the same sample will remain substantially uncut under a higher static twist spring load. Therefore, it is important to take into consideration the drastic effects of the shear force produced by the dynamic twisting of a pair of strings.*

*Suitable interlocking materials (that helps resist the shear force of the twisting strings) for use in the humdingers of the invention include: open cell foams, other polymeric or elastomeric (Kraton) materials, porous materials, multi-layered coatings, and single layered, and composite layered materials. As an example, opened cell foam when dipped into the instant composition will form an interpenetrating physical networks (interlocking of gel composition and foam composite). Such composite will exhibit greater rigidity and resistance to the shear force generated by a first, a second, a third, or a higher order dynamic twisting of a pair of strings. Furthermore, the interlocking materials surrounding the holes of the gel bodies may be made from flexible materials, such as fibers and fabrics of cotton, flax, and silk. Other flexible materials include: elastomers, fiber-reinforced composites, mohair, and wool. Useful synthetic fibers include: acetate, acrylic, aramid, glass, modacrylic polyethylene, nylon, olefin, polyester, rayon, spandex, carbon, sulfar, polybenzimidazole, and combinations of the above.*

*As taught in parent US 6,033,283, the following commercial elastomers can be formed with oil and in combination with other polymers into suitable gels for use in making the bodies of the invention, which includes Kuraray (SEP), (SEPS) or (SEB/EPS) Nos. 1001 (SEP), 2002 (SEPS), 2063 (SEPS), 2023 (SEPS), 2043 (SEPS), 2063 (SEPS), 2005 (SEPS), 2006 (SEPS), 2050 (SEPS), 2103 (SEPS), 2104 (SEPS), 2105 (SEPS), and 4055 (SEB/EPS) (styrene-ethylene-butylene/ethylene-propylene-styrene) block polymer made from hydrogenated styrene isoprene/butadiene styrene block copolymer or more specifically made from*

4

*hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene. Where the ethylene (E) of the ethylene-butylene (EB) segment of the midblock (EB/EP) of the (SEB/EPS) block polymer is substantially greater than butylene (B) so as to exhibit ethylene crystallinity, (SEB/EPS) may be denoted as (SE/EPS) or denoted as (SEEPS) block polymer for the sake of simplicity.*

*In the operation of the humdingers of the invention, the string's twisting action imparts rotation to the gel body so as to elongate the gel body during rotation. The elongated gel body will reach a maximum elongation due to centrifugal force of 50% or more. Elongations of 100%, 200%, 300%, 400%, 500%, 600%, 700% and higher are possible depending on the amount of tension of the pull of the humdinger's strings. Gel bodies of the invention can be designed to withstand elongations higher than 1,000%, which can occur at extreme high rates of rotation of 500 r.p.m. and higher. Spinning rates can span from a low of 10 r.p.m. to a high of over 1,000 r.p.m. Spinning rates of 50, 100, 150, 200, 25, 300, 350, 400, 500, 600, 700, 800, 900, 1,000, 1,200, and 1,400 r.p.m. values are routinely achieved.*

*The operation of the humdingers of the invention can be ready observed under strobe light. The number of revolutions per minute may be counted in this way. The changes in radius can be measured. The change in gel body shape can be observed and measured. The centrifugal force acting on the rotating gel body can be likewise determined at any instant of time, at any instant rate of rotation, and at any instant change in gel body shape. The perpendicular-axis elongation effect of the gel body can be viewed under strobe light; its regions of deformation and re-distribution of mass can be viewed, measured and readily determined by ruled grid markings on the gel body.*

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims 1, 2, 7, 8, 10-12 and 14 are determined to be patentable as amended.

Claims 3-5 and 15-17, dependent on amended claim, are determined to be patentable.

New claims 18-20 are added and determined to be patentable.

Claims 6, 9 and 13 were not reexamined.

1. A composite comprising: a gel denoted by G, being [in adherent contact, adhesive contact, clinging contact, fastening contact, sticking contact, or] *formed by heat into a composite in physical contact* with a selected material M forming the combination $G_n, M_n, G_n, M_nG_n, M_nG_n, M_n, M_nG_nG_n, M_n, G_n, M_n, M_n, G_n, G_n, M_n, G_n, M_n, G_n, M_n, M_n, G_n, M_n, M_n, M_n, G_nG_n, M_n, M_n, G_n, M_nG_n, M_nG_n, M_n, M_n, M_nG_n, M_nM_n$ or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of paper, foam, plastic, fabric, metal, metal foil, [metalic flakes,] concrete, wood, glass, [glass fibers,] ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity; said gel comprising: (i) 100 parts by weight of one or more block copolymers selected from poly(styrene-ethylene-butylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-ethylene-butylene$_{25}$-styrene), poly(styrene-ethylene-propylene-ethylene-styrene), poly(styrene-ethylene-ethylene-

| 5 | 6 |
|---|---|

butylene)$_n$; [poly(styrene-ethylene-ethylene-propylene)$_n$,] poly(styrene-ethylene-ethylene-butylene$_{25}$)$_n$, [poly(styrene-ethylene-propylene-ethylene)$_n$,] or mixtures thereof, wherein subscript n is two or more; (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity [of about] *greater than* 4 cSt at 40° C. [and greater]; said gel characterized by a gel gram Bloom of about 2 gram to about 1,800 gram Bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers comprising poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(ethylene-styrene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; said gel havig greater tear resistance than gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers.

2. A composite comprising: a gel denoted by G, being [in] adherent contact, adhesive contact, clinging contact, fastening contact, sticking contact, or] *formed by heat into a composite* in physical contact with a selected material M or in combination with one or more of the same gel or a different gel forming a composite of the combination G$_n$ G$_n$, G$_n$ G$_n$ G$_n$ G$_n$ M$_n$, G$_n$ M$_n$ G$_n$, M$_n$ G$_n$ M$_n$, M$_n$ G$_n$ M$_n$ M$_n$ G$_n$ M$_n$, M$_n$ G$_n$ M$_n$ G$_n$, M$_n$ G$_n$ M$_n$ M$_n$ G$_n$ M$_n$, M$_n$, M$_n$ G$_n$ G$_n$ M$_n$, G$_n$ M$_n$ G$_n$ G$_n$, G$_n$ G$_n$ M$_n$ M$_n$, G$_n$ M$_n$ M$_n$ G$_n$, G$_n$ G$_n$ M$_n$ M$_n$ G$_n$, G$_n$ G$_n$ M$_n$, M$_n$ G$_n$, G$_n$ M$_n$ M$_n$, M$_n$ G$_n$ M$_n$ M$_n$ G$_n$ M$_n$ G$_n$ M$_n$ G$_n$ M$_n$, G$_n$ M$_n$, G$_n$ G$_n$ M$_n$ M$_n$ G$_n$, G$_n$ G$_n$ M$_n$ G$_n$ M$_n$ G$_n$ M$_n$ G$_n$ M$_n$, G$_n$, G$_n$ M$_n$ G$_n$ M$_n$, M$_n$ M$_n$ G$_n$ M$_n$, M$_n$ M$_n$ M$_n$ G$_n$ M$_n$ M$_n$ or a permutation of one or more of said G$_n$ with M$_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of paper, foam, plastic, fabric, metal, metal foil, concrete, wood, glass, glass fibers, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity; said gel comprising: (i) 100 parts by weight of one or more block copolymers selected from poly(styrene-ethylene-ethylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly-(styrene-ethylene-ethylene-butylene$_{25}$-styrene), poly(styrene-ethylene-propylene-ethylene-styrene), poly(styrene-ethylene-ethylene-butylene)$_n$, [poly(styrene-ethylene-ethylene-propylene)$_n$,] poly(styrene-ethylene-ethylene-butylene$_{25}$)$_n$, [poly(styrene-ethylene-propylene-ethylene)$_n$,] or mixtures thereof, wherein subscript n is two or more; (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of about 200 and greater; said gel characterized by a gel gram Bloom of about 2 gram to about 1,800 gram Bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers comprising poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(ethylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; said gel havig greater tear resistance than

gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene), or poly(styrene-ethylene-propylene-styrene) block copolymers.

7. A composite comprising a gel G$_n$ *which is formed into a composite by heat and physically interlocked* with a selected material M$_n$; said gel formed from (i) 100 parts by weight of one or more block copolymers of the formula poly(styrene-ethylene-ehtylene-propylene-styrene) having greater tear resistance than a gel of corresponding rigidity made from a poly(styrene-ethylene-propylene-styrene), block copolymer, wherein said (i) block copolymer is a high viscosity copolymer havig a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 mPa.S and higher which corresponds to a viscosity at 10 weight percent of about 5800 mPa.S and higher which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25° C. of at about 80,000 mPa.S and higher, and from (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity [of about] *greater than* 4 cSt at 40° C. [and greaer]; said gelatinous elastomer compositions characterized by a gel gram Bloom rigidity of about 20 to about 800 gram bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly-(styrene-ethylene-butylene), poly(styrene-ethylene-styrene-)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(styrene-ethylene-propylene), poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination G$_n$ M$_n$, G$_n$ M$_n$ G$_n$, M$_n$ G$_n$ M$_n$, M$_n$ G$_n$ G$_n$, G$_n$ G$_n$ M$_n$, M$_n$ M$_n$ M$_n$ G$_n$, M$_n$ G$_n$ M$_n$, M$_n$ G$_n$ G$_n$, M$_n$ G$_n$ G$_n$, G$_n$ M$_n$ G$_n$, M$_n$ G$_n$ M$_n$, G$_n$ G$_n$ M$_n$ M$_n$ G$_n$, G$_n$ M$_n$ G$_n$, G$_n$ M$_n$, G$_n$ G$_n$ M$_n$ G$_n$, G$_n$ M$_n$, G$_n$ M$_n$ G$_n$ M$_n$, M$_n$ G$_n$ M$_n$ G$_n$ M$_n$ G$_n$, G$_n$ G$_n$ M$_n$, G$_n$ M$_n$, a sequential addition or a permutation of one or more of said G$_n$ with one or more M$_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

8. A composite comprising a gel G$_n$ *which is formed into a composite by heat and physically interlocked* with a selected material M$_n$; said gel formed from (i) 100 parts by weight of one or more block copolymers of poly(styrene-ethylene-propylene-styrene), and from (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of less than about 200 and greater; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination G$_n$ M$_n$, G$_n$ M$_n$ G$_n$, M$_n$ G$_n$ M$_n$,

7

$M_n G_n G_n, G_n G_n M_n, M_n M_n M_n G_n, M_n M_n M_n G_n M_n, M_n$
$G_n G_n M_n, G_n M_n G_n G_n, G_n M_n M_n G_n, G_n M_n M_n G_n, G_n$
$G_n M_n M_n, G_n G_n M_n G_n M_n, G_n M_n G_n G_n, G_n G_n M_n G_n$
$M_n G_n M_n M_n, M_n G_n M_n G_n M_n G_n, , G_n G_n M_n M_n G_n, G_n$
$G_n M_n G_n M_n G_n$, a sequential addition or a permutation of
one or more of said $G_n$ with $M_n$; wherein when n is a sub-
script of M, n is the same or different selected from the
group consisting of foam, plastic, fabric, glass, ceramics,
synthetic resin, or synthetic fibers; and wherein when n is a
subscript of G, n denotes the same or a different gel rigidity.

**10**. A composite comprising a gel $G_n$ *which is formed into
a composite by heat and physically interlocked* with a
selected material $M_n$; said gel formed from (i) 100 parts by
weight of one or more block copolymers of poly(styrene-
ethylene-ethylene-propylene-styrene), and from (ii) about
300 to about 1,600 parts by weight of one or more plasticiz-
ing oils with a selected amount of at least one said plasticiz-
ing oil(s) having a viscosity [of about] *greater than* 4 cSt at
40° C. [and greaer]; said gelatinous elastomer compositions
characterized by a gel gram Bloom of about 20 to about 800
gram bloom; and in combination with or without one or
more of (iii) a selected amount of one or more block copoly-
mers of poly(styrene-butadiene-styrene), poly(styrene-buta-
diene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-pro-
pylene)$_n$, or poly(styrene-ethylene-butylene)$_n$; a selected
amount of one or more diblock copolymers of poly(styrene-
butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-
propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$, poly(sty-
rene-ethylene-propylene), poly(styrene-ethylene-butylene); a
selected amount of a hydrocarbon resins including polysty-
rene, polypropylene, or polyethylene; a selected amount of
polybutylene; a selected amount of rubbers of poly(ethyl-
ene-propylene) or poly(ethylene-butylene); a selected
amount of a flame retardant; a selected amount of one or
more internal and external non-adhering, non-sticking modi-
fiers selected from amorphous silica, talc, zinc sterate, alu-
minum sterate, mica, and silicon dioxide; a selected amount
of microspheres or aggregation of gas bubbles; wherein said
selected copolymer is a linear, radial, star-shaped, branched
or multiarm copolymer, wherein n is greater than one; and
wherein said composite formed from the combination $G_n$
$M_n, G_n M_n G_n, M_n G_n M_n, M_n G_n G_n, G_n G_n M_n, M_n M_n M_n$
$G_n, M_n M_n M_n G_n M_n, M_n G_n G_n M_n, G_n M_n G_n G_n, G_n M_n$
$M_n G_n, G_n M_n M_n M_n, M_n G_n M_n M_n, G_n G_n M_n M_n, G_n M_n$
$M_n G_n, G_n G_n M_n, G_n M_n G_n M_n, G_n G_n M_n M_n G_n, G_n$
$G_n, G_n G_n M_n M_n G_n, G_n G_n M_n G_n M_n G_n$, a sequential
addition or a permutation of one or more of said $G_n$ with $M_n$;
wherein when n is a subscript of M, n is the same or different
selected from the group consisting of foam, plastic, fabric,
glass, ceramics, synthetic resin, or synthetic fibers; and
wherein when n is a subscript of G, n denotes the same or a
different gel rigidity.

**11**. A composite comprising a gel $G_n$ *which is formed into
a composite by heat and physically interlocked* with a
selected material $M_n$; said gel formed from (i) 100 parts by
weight of one or more block copolymers of poly(styrene-
ethylene-ethylene-propylene-styrene), and from (ii) about
300 to about 1,600 parts by weight of one or more plasticiz-
ing oils with a selected amount of at least one said plasticiz-
ing oil(s) having a viscosity [of about] *greater than* 4 cSt at
40° C. [and greaer]; said gelatinous elastomer compositions
characterized by a gel gram Bloom of about 20 to about 800
gram bloom; and in combination with or without one or
more of (iii) a selected amount of one or more block copoly-
mers of poly(styrene-butadiene-styrene), poly(styrene-buta-

8

diene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-pro-
pylene)$_n$, poly(ethylene-styrene); or poly(styrene-ethylene-
butylene)$_n$; a selected amount of one or more diblock
copolymers of poly(styrene-butadiene)$_n$, poly(styrene-iso-
prene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(styrene-
ethylene-butylene)$_n$,       poly(styrene-ethylene-propylene),
poly(styrene-ethylene-butylene); a selected amount of a
hydrocarbon resins including polystyrene, polypropylene, or
polyethylene; a selected amount of polybutylene; a selected
amount of rubbers of poly(ethylene-propylene) or poly(eth-
ylene-butylene); a selected amount of a flame retardant; a
selected amount of non-adhering, non-sticking modifiers
selected from amorphous silica, talc, zinc sterate, aluminum
sterate, mica, and silicon dioxide; a selected amount of
microspheres or aggregation of gas bubbles; wherein said
selected copolymer is a linear, radial, star-shaped, branched
or multiarm copolymer, wherein n is greater than one; and
wherein said composite formed from the combination $G_n$
$M_n, G_n M_n G_n, M_n G_n M_n, M_n G_n G_n, G_n G_n M_n, M_n M_n M_n$
$G_n, M_n M_n M_n G_n M_n, M_n G_n G_n M_n, G_n M_n G_n G_n, G_n M_n$
$M_n G_n, G_n M_n M_n M_n, G_n G_n M_n M_n, G_n M_n M_n G_n, G_n M_n$
$M_n G_n G_n, G_n G_n M_n, G_n M_n G_n M_n, M_n G_n M_n G_n M_n$
$M_n G_n G_n, G_n G_n M_n, G_n G_n M_n M_n M_n, M_n G_n M_n G_n M_n$
$G_n, , G_n G_n M_n M_n G_n, G_n G_n M_n G_n M_n G_n$, a sequential
addition or a permutation of one or more of said $G_n$ with $M_n$;
wherein when n is a subscript of M, n is the same or different
selected from the group consisting of foam, plastic, fabric,
glass, ceramics, synthetic resin, or synthetic fibers; and
wherein when n is a subscript of G, n denotes the same or a
different gel rigidity.

**12**. A composite comprising a gel $G_n$ *which is formed into
a composite by heat and physically interlocked* with a
selected material $M_n$; said gel formed from (i) 100 parts by
weight of one or more block copolymers poly(styrene-ethyl-
ene-ethylene-propylene-styrene), and from (ii) about 300 to
about 1,600 parts by weight of one or more plasticizing oils
with a selected amount of at least one said plasticizing oil(s)
having a viscosity [of about] *greater than* 4 cSt at 40° C.
[and greater]; said gelatinous elastomer compositions char-
acterized by a gel gram Bloom of about 20 to about 800
gram bloom; and in combination with or without one or
more of (iii-xii): (iii) a selected amount of one or more block
copolymers of poly(styrene-butadiene-styrene), poly(sty-
rene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-eth-
ylene-propylene)$_n$, poly(ethylene-styrene); or poly(styrene-
ethylene-butylene)$_n$; (iv) a selected amount of one or more
diblock copolymers of poly(styrene-butadiene)$_n$, poly(sty-
rene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly-
(styrene-ethylene-butylene)$_n$,  poly(styrene-ethylene-propy-
lene), poly(styrene-ethylene-butylene); (v) a selected
amount of a hydrocarbon resins including polystyrene,
polypropylene, or polyethylene, or polybutylene; (vi)a
selected amount of rubbers of polybutylene; (vi) a selected
amount of rubbers of poly(ethylene-propylene) or poly(eth-
ylene-butylene); (viii) a selected amount of a flame retar-
dant; (viii) a selected amount of non-adhering, non-sticking
additives comprising antiblocking agents including tetrakis
[methylene 3, -(3'5'-di-tertbutyl-4"-hydroxyphenyl)propi-
onate]methane, octadecyl 3, -(3"5"-di-tert-butyl-4"-hydrox-
yphenyl)propionate, distearyl-pentaerythritol-diproprionate,
thiodiethylene       bis-(3,5-ter-butyl-4-hydroxy)hydrocin-
namate,    (1,3,5-trimethyl-2,4,6-tris[3,5-di-tert-butyl-4-hy-
droxybenzyl]benzene),    4,4"-methylenebis(2,6-di-tert-bu-
tylphenol), additives of stearic acid, oleic acid, stearamide,
behenamide, oleamide, erucamide, N,N"-ethylenebissteara-
mide, N,N"-ethylenebisoleamide, sterryl erucamide, erucyl
erucamide, oleyl palmitamide, stearyl stearamide, erucyl

| 9 | 10 |

stearamide, waxes, and silicone fluids; (ix) a selected amount of microspheres, aggregation of gas bubbles, or blowing agents; (x) one or more additives selected from the group consisting of polyisobutylene including polybutene, hydrocarbon resins including polymerized mixed olefins, polyterpene, glycerol ester of rosin, pentaerythritol ester of rosin, saturated alicyclic hydrocarbon, coumarone indene, hydrocarbon, mixed olefin, alkylated aromatic hydrocarbon, polycarbon, polyalphamethylstyrene/vinyl toluene copolymer, polystyrene, and elastomeric diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(-ethylene-butylene)$_n$, poly(styrene-butadiene)$_n$, poly(styrene-styrene)$_n$, poly(styrene-ethylene-propylene)$_n$, poly(ethylene-propylene), poly(styrene-ethylene-butylene); (xi) one or more additives selected from the group consisting of hydrocarbon resins, butyl rubber, polyisobutylene, additional block copolymers of poly(styrene-isoprene-styrene), poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, polyethylene, diblock copolymers of poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), stearic acid, oleic acid, stearamide, behenamide, oleamide, erucamide, N,N''-ethylenebisstearamide, N,N''-ethylenebisoleamide, sterryl erucamide, erucyl erucamide, oleyl palmitamide, stearyl stearamide, erucyl stearamide, waxes, and silicone fluids, magnetic particle materials, carbon blacks, silicon dioxide, silica, mica, talc, zinc sterate, amorphous silica, silica, silicon dioxide, aluminum sterate, fine metallic powder, metal flakes, clay, feldspar, glass microspheres, barium ferrite, wollastonite, hydrocarbon resins of polymerized mixed olefins, polyterpene, glycerol ester of rosin, pentaerythritol ester of rosin, saturated alicyclic hydrocarbon, coumarone indene, hydrocarbon, mixed olefin, alkylated aromatic hydrocarbon; wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination: (xii) layers of $G_n M_{n'}$, $G_n M_n G_{n'}$, $M_n G_n M_{n'}$, $M_n G_n G_{n'}$, $G_n G_n M_{n'}$, $M_n M_n M_{n'}$, $M_n G_n$, $M_n M_n G_n M_{n'}$, $M_n G_n G_n M_{n'}$, $M_n G_n G_n G_{n'}$, $G_n M_n M_n G_{n'}$, $G_n M_n M_n G_{n'}$, $G_n G_n M_n M_{n'}$, $G_n G_n M_{n'}$, $G_n M_n G_n G_{n'}$, $G_n G_n M_n G_{n'}$, $G_n G_n M_n M_{n'}$, $M_n G_n$, $G_n G_n M_n M_n G_{n'}$, and $G_n G_n M_n G_n M_n G_{n'}$, a sequential addition or a permutation of one or more of said $G_n$ with $M_{n'}$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, or synthetic fibers; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**14.** A composite comprising a gel $G_n$ [and] *which is formed into a composite by heat and physically interlocked* with a selected material $M_{n'}$, formed from (i) 100 parts by weight of one or more block copolymers with a polyethylene midblock segment of the formula poly(styrene-ethylene-ethylene-propylene-styrene) exhibiting a measurable amount of polyethylene crystallinity characterized by stress induced crystallinity not exhibited by gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers wherein said block copolymer is a high viscosity copolymer having a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 cps and higher which corresponds to a viscosity at 10 weight percent of about 5800 cps and higher which corresponds to a viscosity

at 20 weight percent solids solution in toluene at 25° C. of at about 80,000 cps and higher, and from (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity [of about] *greater than* 4 cSt at 40° C. [and greater]; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; and in combination with or without (iii) a selected amount of one or more block copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$; a selected amount of one or more diblock copolymers of poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene)$_n$, or poly(styrene-ethylene-butylene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene); a selected amount of a hydrocarbon resins including polystyrene, polypropylene, or polyethylene; a selected amount of polybutylene; a selected amount of rubbers of poly(ethylene-propylene) or poly(ethylene-butylene); a selected amount of a flame retardant; a selected amount of non-adhering, nonsticking modifiers; a selected amount of microspheres or aggregation of gas bubbles; wherein said selected copolymer is a linear, radial, star-shaped or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_n M_{n'}$, $G_n M_n G_{n'}$, $M_n G_n M_{n'}$, $M_n G_n G_{n'}$, $G_n G_n M_{n'}$, $M_n M_n M_{n'}$, $M_n G_n$, $M_n M_n G_n M_{n'}$, $M_n G_n G_n M_{n'}$, $M_n G_n G_n G_{n'}$, $G_n M_n M_n G_{n'}$, $G_n M_n M_n G_{n'}$, $G_n G_n M_n M_{n'}$, $G_n G_n M_{n'}$, $G_n M_n G_n G_{n'}$, $G_n G_n M_n G_{n'}$, $G_n G_n M_n M_{n'}$, $M_n G_n$, $G_n G_n M_n M_n G_{n'}$, a sequential addition or a permutation of one or more of said $G_n$ with $M_{n'}$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, glass, ceramics, synthetic resin, and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

*18.* A composite gel liner comprising a gel $G_n$ which is formed into a composite by heat and physically interlocked with a selected material $M_{n'}$; said gel formed from (i) 100 parts by weight of one or more block copolymers of poly(styrene-ethylene-ethylene-propylene-propylene-styrene), and from (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of less than about 200 and greater; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_n M_{n'}$, $G_n M_n G_{n'}$, $M_n G_n M_{n'}$, $M_n M_n M_{n'}$, $M_n G_n G_{n'}$, $G_n G_n M_{n'}$, $G_n M_n G_{n'}$, $M_n M_n M_n M_{n'}$, $M_n M_n M_n G_{n'}$, $G_n G_n M_{n'}$, $G_n M_n G_n G_{n'}$, $G_n M_n M_n G_{n'}$, $G_n M_n M_n G_{n'}$, $G_n G_n$, $M_n M_n G_n M_{n'}$, $M_n G_n M_n G_{n'}$, $G_n G_n M_n M_{n'}$, $M_n M_{n'}$, $M_n G_n M_n G_n M_{n'}$, $G_n G_n M_n M_n G_{n'}$, $G_n G_n M_n G_n$, $M_n G_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_{n'}$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, ceramics, synthetic resin, or syn-

US 6,867,253 C1

**11**

thetic fibers; and wherein when $n$ is a subscript of $G$, $n$ denotes the same or a different gel rigidity.

19. A composite gel liner comprising a gel $G_n$ which is formed into a composite by heat and physically interlocked with a selected material $M_n$; said gel formed from (i) 100 parts by weight of one or more block copolymers of poly(styrene-ethylene-ethylene-propylene-styrene), and from (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of less than about 200 and greater; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom: wherein $n$ is greater than one: and wherein said composite formed from the combination $G_n M_n$, $G_n M_n G_n$, $M_n G_n M_n$, $M_n M_n M_n G_n$, $M_n M_n M_n G_n M_n$, $M_n$ $G_n G_n M_n$, $G_n M_n G_n G_n$, $G_n M_n M_n G_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when $n$ is a subscript of $M$, $n$ is the same or different selected from the group consisting of foam, plastic, fabric, synthetic resin, or synthetic fibers; and wherein when $n$ is a subscript of $G$, $n$ denotes the same or a different gel rigidity.

**12**

20. A composite gel liner comprising a gel $G_n$ which is formed into a composite by heat and physically interlocked with a selected material $M_n$; said gel formed from (i) 100 parts by weight of one or more block copolymers of poly(styrene-ethylene-ethylene-propylene-styrene), and from (ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil having an average molecular weight of less than about 200 and greater; said gelatinous elastomer compositions characterized by a gel gram Bloom of about 20 to about 800 gram bloom; wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein $n$ is greater than one; and wherein said composite formed from the combination $G_n M_n$, $G_n M_n G_n$, $M_n G_n M_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when $n$ is a subscript of $M$, $n$ is the same or different selected from the group consisting of foam, plastic or fabric; and wherein when $n$ is a subscript of $G$, $n$ denotes the same or a different gel rigidity.

\*    \*    \*    \*    \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.         : 6,867,253 C1                                    Page 1 of 4
APPLICATION NO.  : 90/011018
DATED              : March 15, 2005
INVENTOR(S)       : John Y. Chen

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 54-55, delete claim 1:

"1. A composite comprising: a gel denoted by G, being [in adherent contact, adhesive contact, clinging contact, fastening contact, sticking contact, or]*formed by heat into a composite* in physical contact with a selected material M forming the combination $G_n M_n$, $G_n M_n G_n$, $M_n G_n M_n$, $M_n G_n G_n M_n$, $G_n M_n M_n G_n$, $G_n M_n G_n M_n G_n M_n$ $M_n M_n G_n M_n M_n M_n G_n M_n M_n M_n$ or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of paper, foam, plastic, fabric, metal, metal foil, [metalic flakes,]concrete, wood, glass, [glass fibers]ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity; said gel comprising:
(i) **100** parts by weight of one or more block copolymers selected from poly(styrene-ethylene-ethylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-ethylene-butylene$_{25}$-styrene), poly(styrene-ethylene-propylene-ethylene-styrene), poly(styrene-ethylene-ethylene-butylene)$_n$; [poly(styrene-ethylene-ethylene-propylene)$_n$,] poly(styrene-ethylene-ethylene-butylene$_{25}$)$_n$, [poly(styrene-ethylene-propylene-ethylene)$_n$,]or mixtures thereof, wherein subscript n is two or more; (ii) about **300** to about **1,600** parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity [of about]*greater than* **4** cSt at **40°** C. [and greater]; said gel characterized by a gel gram Bloom of about **2** gram to about **1,800** gram Bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers comprising poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(ethylene-styrene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; said gel having greater tear resistance than gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers."

Signed and Sealed this
Twenty-sixth Day of July, 2011

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF CORRECTION (continued)**
**U.S. Pat. No. 6,867,253 C1**

Col. 54-55, claim 1 should read as follows:

-- 1. A composite comprising: a gel denoted by G, being *formed by heat into a composite* [in adherent contact, adhesive contact, clinging contact, fastening contact, sticking contact, or] in physical contact *and physically interlocked* with a selected material M forming the combination $G_n M_n$, $G_n M_n G_n$, $M_n G_n M_n$, $M_n G_n G_n M_n$, $G_n M_n G_n M_n$, $M_n M_n M_n G_n$, $M_n M_n M_n G_n G_n M_n$ or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of paper, foam, plastic, fabric, metal, metal foil, [metalic flakes,] concrete, wood, glass, [glass fibers,] ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity; said gel comprising: (i) **100** parts by weight of one or more block copolymers selected from poly(styrene-ethylene-ethylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-ethylene-butylene$_{25}$-styrene), poly(styrene-ethylene-propylene-ethylene-styrene), poly(styrene-ethylene-ethylene-butylene)$_n$, [poly(styrene-ethylene-ethylene-propylene)$_n$,] poly(styrene-ethylene-ethylene-butylene$_{25}$)$_n$, [poly(styrene-ethylene-propylene-ethylene)$_n$,]or mixtures thereof, wherein subscript n is two or more; (ii) about **300** to about **1,600** parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having a viscosity *greater than* [of about] **4** cSt at **40°** C. [and greater]; said gel characterized by a gel gram Bloom of about **2** gram to about **1,800** gram Bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers comprising poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(ethylene-styrene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; said gel having greater tear resistance than gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers. --

Col. 55, delete claim 2:

"**2**. A composite comprising: a gel denoted by G, being *formed by heat into a composite* [in adherent contact, adhesive contact, clinging contact, fastening contact, sticking contact, or] in physical contact with a selected material M or in combination with one or more of the same gel or a different gel forming a composite of the combination $G_n G_n$, $G_n G_n G_n$, $G_n M_n$, $G_n M_n G_n$, $M_n G_n M_n$, $M_n G_n G_n$, $M_n M_n M_n G_n M_n$, $M_n G_n G_n M_n$, $G_n M_n G_n G_n$, $G_n G_n M_n M_n$, $G_n M_n M_n G_n$, $G_n G_n M_n G_n M_n G_n G_n$, $G_n M_n G_n M_n$, $M_n G_n M_n G_n M_n G_n$, $G_n G_n M_n G_n M_n G_n$, $G_n M_n$ $M_n G_n$, $M_n M_n M_n G_n$, $M_n M_n G_n$, $M_n M_n M_n$ or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of paper, foam, plastic, fabric, metal, metal foil, concrete, wood, glass, glass fibers, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity; said gel comprising: (i) **100** parts by weight of one or more block

copolymers selected from poly(styrene-ethylene-ethylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-ethylene-butylene$_{25}$-styrene), poly(styrene-ethylene-propylene-ethylene-styrene), poly(styrene-ethylene-ethylene-butylene)$_n$, [poly(styrene-ethylene-ethylene-propylene)$_n$,] poly(styrene-ethylene-ethylene-butylene$_{25}$)$_n$, [poly(styrene-ethylene-propylene-ethylene)$_n$,] or mixtures thereof, wherein subscript n is two or more; (ii) about **300** to about **1,600** parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of about **200** and greater; said gel characterized by a gel gram Bloom of about **2** gram to about **1,800** gram Bloom; and in combination with or without (iii) a selected amount of one or more polymers or copolymers comprising poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(ethylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; said gel having greater fatigue resistance than gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers."

Col. 55, claim 2 should read as follows:

-- **2.** A composite comprising: a gel denoted by G, being *formed by heat into a composite* [in adherent contact, adhesive contact, clinging contact, fastening contact, sticking contact, or] in physical contact *and physically interlocked* with a selected material M or in combination with one or more of the same gel or a different gel forming a composite of the combination $G_n G_n$, $G_n G_n G_n$, $G_n M_n$, $G_n M_n$ $G_n$, $M_n G_n M_n$, $M_n G_n G_n$, $M_n M_n M_n G_n M_n$, $M_n G_n G_n M_n$, $G_n M_n G_n G_n$, $G_n G_n M_n M_n$, $G_n M_n M_n G_n$, $G_n G_n M_n G_n M_n G_n G_n$, $G_n M_n G_n G_n$, $G_n M_n G_n M_n G_n M_n$, $G_n G_n M_n G_n M_n$, $G_n M_n G_n$ $M_n G_n$, $G_n M_n G_n M_n G_n$, $M_n M_n M_n G_n$, $M_n M_n M_n G_n M_n M_n$ or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of paper, foam, plastic, fabric, metal, metal foil, concrete, wood, glass, glass fibers, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity; said gel comprising: (i) **100** parts by weight of one or more block copolymers selected from poly(styrene-ethylene-ethylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-ethylene-butylene$_{25}$-styrene), poly(styrene-ethylene-propylene-ethylene-styrene), poly(styrene-ethylene-ethylene-butylene)$_n$, [poly(styrene-ethylene-ethylene-propylene)$_n$,] poly(styrene-ethylene-ethylene-butylene$_{25}$)$_n$, [poly(styrene-ethylene-propylene-ethylene)$_n$,] or mixtures thereof, wherein subscript n is two or more; (ii) about **300** to about **1,600** parts by weight of one or more plasticizing oils with a selected amount of at least one said plasticizing oil(s) having an average molecular weight of about **200** and greater; said gel characterized by a gel gram Bloom of about **2** gram to about **1,800** gram Bloom; and in combination with or without (iii) a selected amount of one or more polymers or

**CERTIFICATE OF CORRECTION (continued)**
**U.S. Pat. No. 6,867,253 C1**

copolymers comprising poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(ethylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; said gel having greater fatigue resistance than gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers. --

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2014, a true and accurate copy of this

Corrected Non-Confidential Brief was filed electronically with the Clerk of the

Court using CM/ECF, which will automatically serve all counsel registered for

CM/ECF.

Ronald A. Christaldi
SHUMAKER, LOOP & KENDRICK, LLP
101 East Kennedy Blvd., Suite 2800
Tampa, FL 33602
Tele: 813.221.7152
rchristaldi@slk-law.com

David W. Wicklund
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson St.
Toledo, OH 43604
Tele: (419) 321-1213
dwicklund@slk-law.com

/s/ John D. Luken
John D. Luken
*Attorney for Defendant-Appellant,
The Ohio Willow Wood Company*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)(7)

I hereby certify that I am counsel for Defendant-Appellant The Ohio Willow Wood Company and that the foregoing Corrected Brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure 32(a)(7)(B).

The brief contains 13,858 words, excluding the parts of the brief that are exempted under Fed. R. App. P. 32(a)(7)(B)(iii).


Dated: February 27, 2014           */s/ John D. Luken*_____
                                    John D. Luken
                                    Counsel for Defendant-Appellant