2013-1452, -1488, 2014-1147, -1426

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ALPS SOUTH, LLC,

*Plaintiff-Cross Appellant*,

v.

THE OHIO WILLOW WOOD COMPANY,

*Defendant-Appellant*.

_____

Appeals from the United States District Court for the
Middle District of Florida in Case No. 08-CV-1893, Judge Mary S. Scriven

_____

## NON-CONFIDENTIAL BRIEF OF DEFENDANT-APPELLANT

John D. Luken
Joshua A. Lorentz
Brian S. Sullivan
DINSMORE & SHOHL LLP
255 E. Fifth St., Suite 1900
Cincinnati, Ohio 45202
Tele: 513.977.8564
John.Luken@Dinsmore.com
Joshua.Lorentz@Dinsmore.com
Brian.Sullivan@Dinsmore.com

*Attorneys for Defendant-Appellant
The Ohio Willow Wood Company*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ALPS SOUTH, LLC v. THE OHIO WILLOW WOOD COMPANY

Nos. 2013-1452, -1488, 2014-1147, -1426

## CERTIFICATE OF INTEREST

Counsel for Appellant The Ohio Willow Wood Company certifies the following:

1. The full name of every party or amicus represented by me is: The Ohio Willow Wood Company

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: N/A

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| **DINSMORE & SHOHL LLP** | **STANDLEY LAW GROUP LLP** |
|---|---|
| John D. Luken | Jeffrey S. Standley |
| Brian S. Sullivan | F. Michael Speed, Jr. |
| Joshua A. Lorentz | James Kwak |
| Nita L. Hanson | Michael Stonebrook |
| | Matthew W. Upton |

**HILL WARD & HENDERSON P.A.**
Benjamin H. Hill, III
Patrick J. Risch

Date: June 12, 2014                    Respectfully submitted,

                              */s/ John D. Luken*
                              John D. Luken

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................v

TABLE OF ABBREVIATIONS ............................................................ix

STATEMENT OF RELATED CASES .....................................................x

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................... xii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES ON APPEAL ......................................3

STATEMENT OF THE CASE.................................................................4

      A.    The Accused Products ..............................................................4

      B.    The '109 Patent........................................................................6

      C.    Alp's Lawsuit ...........................................................................6

      D.    Prudential Standing..................................................................8

      E.    Rexamination ...........................................................................9

      F.    The Trial.................................................................................14

      G.    Post-Trial Motions .................................................................17

      H.    OWW's Redesign ..................................................................18

SUMMARY OF ARGUMENT .............................................................22

STANDARD OF REVIEW ..................................................................24

ARGUMENT ........................................................................................25

    I.     ALPS LACKS PRUDENTIAL STANDING. ...................................25

    II.   THERE WAS NO LEGALLY SUFFICIENT BASIS FOR FINDING THAT HAMMOND DID NOT ANTICIPATE...............30

      A.    Hammond and Debbaut Must Be Considered as a Single Reference. ................................................................................32

      B.    Hammond Thus Discloses Every Element of the Asserted Claims. ...................................................................................33

III.   EVEN IF HAMMOND, INCORPORATING DEBBAUT, DID NOT ANTICIPATE, THEIR COMBINATION MAKES ALL ASSERTED CLAIMS OBVIOUS.................................................37

    A.   A Skilled Artisan Would Have Been Motivated to Combine Hammond and Debbaut. ..........................................38

    B.   Chen's Purported Unexpected Results Do Not Support Non-Obviousness...................................................................39

IV.   THE DISTRICT COURT ERRED IN FINDING THAT OWW WILLFULLY INFRINGED. ...............................................43

    A.   The District Court Erred in Ignoring the Objective Prong of *Seagate*....................................................................43

    B.   Remand on Willfulness Is Unnecessary Because The Record Is Clear That There Was No Objectively High Likelihood of Infringement..........................................45

    C.   Since the Willfulness Finding Was Error, the Enhancement of Damages, Finding of an Exceptional Case, and Award of Attorneys' Fees Must Be Reversed. ........47

V.   THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A PERMANENT INJUNCTION.....................................47

    A.   Alps Had to Show That the Patented Feature Is an Important Driver of Consumer Demand.................................48

    B.   Alps Did Not Demonstrate a Causal Nexus. ...........................50

VII.   THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING OWW IN CONTEMPT OF THE PERMANENT INJUNCTION. ...................................................................52

    A.   Analysis of Colorable Differences Focuses on "How the Patentee in Fact Proved Infringement" at Trial.......................53

    B.   Since OWW Redesigned Its Products in View of What Alps and Inventor Chen Had Consistently Represented to Be the Scope of Claims 1–3, the District Court Erred in Permitting Alps to Advance a New Infingement Theory in the Contempt Proceeding........................................................54

C. Irrespective of Alps's Previous Positions Regarding the Scope of Claims 1–3, the Advanced Gel Products Are More Than Colorably Different From the Original Gel Products........................................................................................57

D. The District Court Incorrectly Construed the Dispositive Claim Language.....................................................................59

CONCLUSION AND STATEMENT OF RELIEF SOUGHT...............................61

The material omitted on page 5 contains confidential financial information; the material omitted on pages 5–6, 7–8, and 27–28 contains confidential licensing information; the material omitted on pages 18–19, 20, 52, 55, 56, and 58 contains proprietary technical information.

# TABLE OF AUTHORITIES

## Cases

A123 Sys. v. Hydro-Quebec, 626 F.3d 1213 (Fed. Cir. 2010)..........................27, 28

Abbott Laboratories v. Diamedix Corp., 47 F.3d 1128 (Fed. Cir. 1995)....27, 28, 30

Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272
(Fed. Cir. 2000) .................................................................................................32

Am. Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350
(Fed. Cir. 1984) .................................................................................................31

Apple Inc. v. Samsung Elecs. Co., 695 F.3d 1370 (Fed. Cir. 2012) ...........18, 48, 51

Apple Inc. v. Samsung Elecs. Co., 735 F.3d 1352 (Fed. Cir. 2013) ..... 18, 48, 50-51

Bard Peripheral Vascular, Inc., v. W.L. Gore & Assoc., Inc.,
682 F.3d 1003 (Fed. Cir. 2012)................................................................25, 44, 46

Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.,
713 F.3d 1369 (Fed Cir. 2013) .........................................................................39

Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.,
229 F.3d 1120 (Fed. Cir. 2000).........................................................................38

Cont'l Can Co. USA v. Monsanto Co., 948 F.2d 1264 (Fed. Cir. 1991)................35

Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090 (Fed. Cir. 1998) ..............28

GAF Bldg. Materials Corp. v. Elk Corp. of Dallas, 90 F.3d 479
(Fed. Cir. 1996) .................................................................................................29

Grupo Dataflux v. Atlas Global Grp., L.P., 541 U.S. 567 (2004)....................29, 30

Harari v. Lee, 656 F.3d 1331 (Fed. Cir. 2011) ..................................................24, 32

i4i Ltd. v. Microsoft Corp., 598 F.3d 831 (Fed. Cir. 2010)....................................47

In Re Baxter Travenol Labs, 952 F.2d 388 (Fed. Cir. 1991) .................................42

In Re Malagari, 499 F.2d 1297 (CCPA 1974).......................................................31

In Re Seagate Technology, LLC, 497 F.3d 1360 (Fed. Cir. 2007)
    (en banc) ............................................................................. 17, 23, 43-45, 47

Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363 (Fed. Cir. 2008) ................... 25

Int'l Gamco, Inc., et al. v. Multimedia Games, Inc., 504 F.3d 1273
    (Fed. Cir. 2007) ............................................................................. 27

KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398 (2007) ............................................ 42

Keene Corp. v. United States, 508 U.S. 200 (1993) ............................................. 29

Kinetic Concepts, Inc. v. Smith & Nephew, Inc., 688 F.3d 1342
    (Fed. Cir. 2012) ......................................................................... 25, 37

Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362 (Fed. Cir. 2000) ............... 61

Krippelz v. Ford Motor Co., 667 F.3d 1261 (Fed. Cir. 2012) ........................ 31, 39

Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.,
    744 F.3d 1272 (Fed. Cir. 2014) (en banc) .............................................. 25

Matthews Int'l Corp. v. Biosafe Eng'g, LLC, 695 F.3d 1322
    (Fed. Cir. 2012) ......................................................................... 30

Mentor H/S, Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016
    (Fed. Cir. 2001) ..................................................................... 26, 30

Merck & Co. v. Biocraft Laboratories, Inc., 874 F.2d 804
(Fed. Cir. 1989) ............................................................................. 41

Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238 (2011) ................................. 36

Mollan v. Torrance, 22 U.S. 537 (1824) ............................................................. 29

Morrow v. Microsoft Corp., 499 F.3d 1332 (Fed. Cir. 2007) .............................. 26

nCube Corp. v. Seachange Int'l Inc., 732 F.3d 1346
    (Fed. Cir. 2013) ......................................................... 25, 53, 57-58, 61

Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826 (1989). ..................... 29, 30

Orenshteyn v. Citrix Systems, Inc., 691 F.3d 1356 (Fed. Cir. 2012) ...................... 1

Orion IP, LLC v. Hyundai Motor Am., 605 F.3d 967 (Fed. Cir. 2010)..................24

Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, (Fed. Cir. 2007)..................................40

Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329 (Fed. Cir. 2008) ...............24

Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,
    508 U.S. 49 (1993) ............................................................................................46

Propat Intern. Corp. v. Rpost, Inc., 473 F.3d 1187 (Fed. Cir. 2007)......................28

Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538 (Fed. Cir. 1995) (en banc)...............51

Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.,
    620 F.3d 1305 (Fed. Cir. 2010)........................................................................46

TiVo Inc. v. EchoStar Corp., 646 F.3d 869 (Fed. Cir. 2011)
    (en banc) .................................................................................3, 4, 53, 56, 59, 61

Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10
    (Fed. Cir. 2012) ...........................................................................................36, 39

## **Statutes**

28 U.S.C. §1295……………………………………………………………1

28 U.S.C. §1338……………………………………………………………1

35 U.S.C. §102……………………………………………………………51

35 U.S.C. §281……………………………………………………………26

# TABLE OF ABBREVIATIONS

| ABBREVIATION | TERM |
|---|---|
| '109 Patent | United States Patent No. 6,552,109 |
| '254 Patent | United States Patent No. 5,153,254 |
| Advanced Gel | OWW's redesigned gel products |
| Alps | Alps South, LLC |
| Debbaut | European Patent Application Publication No. 0108518 |
| Hammond | International Publication No. WO 93/23472 |
| Original Gel | OWW's original Alpha Liner products accused at trial |
| OWW | The Ohio Willow Wood Company |
| PTO | United States Patent and Trademark Office |
| SEBS | poly(styrene-ethylene-butylene-styrene) block copolymers |
| SEEPS | poly(styrene-ethylene-ethylene-propylene-styrene) block copolymers |
| SIB | styrene isoprene/butadiene block copolymers |

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Fed. Cir. R. 47.5(a), the Court should note that this same civil action was previously before this Court, *Alps South, LLC v. The Ohio Willow Wood Company*, Case No. 2013-1122. On April 11, 2013, the Court granted the motion of Alps South, LLC ("Alps") to dismiss the appeal as premature because, among other things, a motion for a permanent injunction was pending.

After the issuance of the permanent injunction, the Ohio Willow Wood Company ("OWW") filed a timely notice of appeal. This appeal was docketed as Case. No. 13-1452. Alps's cross-appeal was docketed as Case. No. 13-1488 and then consolidated with OWW's appeal. Since a motion of the type enumerated in Fed. R. App. P. 4(a)(4) had been filed in the trial court, this Court deactivated the appeals on July 8, 2013. (Dkt. 21.) Following the trial court's November 12, 2013 order (1) disposing of the Rule 4(a)(4) motion and (2) finding OWW in contempt of the permanent injunction, OWW again appealed. This appeal was docketed as Case No. 14-1147 and consolidated with now reactivated Case. No. 13-1452, -1488. (Dkt. 32.) On March 6, 2014, the district court issued two more judgments in Alps's favor. OWW's appeal from these judgments was docketed as Case No. 14-1426 and consolidated with Case. No. 13-1452, -1488, 14-1147 for purposes of briefing and oral argument. (Dkt. 56.)

Pursuant to Fed. Cir. R. 47.5(b), the Court should note that a case styled *The Ohio Willow Wood Company v. Alps South, LLC* is pending in the Middle District of Florida, Case No. 8:13-cv-01267, which may be directly affected by this Court's decision in the pending appeal.

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

In light of the significance of the issues to be decided, OWW respectfully requests oral argument of this appeal.

## JURISDICTIONAL STATEMENT

The district court assumed jurisdiction over this action under 28 U.S.C. §1338(a). The district court's jurisdiction is challenged on appeal on standing grounds, *see infra* at 25–30. This Court has jurisdiction over the appeals from the final judgments of the district court pursuant to 28 U.S.C. §1295(a)(1). Although the district court has not quantified its award of attorneys' fees, this Court has pendent jurisdiction to review the decision to award fees, as it was based solely on (and is thus "inextricably intertwined" with) the determination of willful infringement, which is final. *See Orenshteyn v. Citrix Systems, Inc.*, 691 F.3d 1356, 1358 (Fed. Cir. 2012).

## INTRODUCTION

In this patent infringement suit brought by Alps South, LLC ("Alps") against the Ohio Willow Wood Company ("OWW"), the district court committed several serious errors that warrant reversal. First, the trial court permitted Alps, an exclusive licensee, to cure what the court correctly recognized to be a lack of prudential standing as of the filing of the complaint by retroactively amending its license agreement with the patent owner, even though this Court has never allowed an exclusive licensee to cure such a deficiency through anything other than the joinder of the patent owner.

Second, the jury's verdict of no invalidity was not supported by legally sufficient evidence. The asserted claims are clearly anticipated. OWW's expert explained how each element of the asserted claims was disclosed in a single prior art reference, and the only limitation that Alps's expert asserted was missing from that reference is clearly present there via another reference, which both Alps's expert and the trial court recognized was exressly incorporated in the first reference. Even if the claims were not anticipated, they are clearly obvious. As OWW's expert explained, a skilled artisan would have motivated to combine these two references to achieve the claimed invention, because the first reference explicitly directs one to do just that. Alps's expert's brief, purely conclusory statement that the motivation to combine was lacking was insufficient to support the jury's verdict. The trial court's denial of OWW's renewed motion for JMOL of invalidity was error.

Similarly, in denying OWW's renewed motion for JMOL of no willful infringement, the court ignored its responsibility under *Seagate* to ascertain, as a matter of law, whether OWW's actions were objectively reckless. Since OWW asserted multiple reasonable defenses, the finding of willfulness was error, as were the awards of enhanced damages and attorneys' fees that flowed from that finding.

The trial court also disregarded this Court's recent *Apple* decisions when it issued a permanent injunction without as much as addressing the requirement for a

causal nexus between Alps's lost sales (its purported irreparable harm) and the infringement. The grant of the injunction was error, as the court had already found this causal link to be missing when it granted OWW's JMOL motion as to Alps's lost profits claim.

Finally, contrary to *TiVo*, when Alps moved to hold OWW in contempt of the injunction for selling a redesigned product, the court improperly permitted Alps to advance an infringement theory different from that raised at trial. It then adopted Alps's novel and incorrect construction of claim language that had not been previously construed, even though this construction contradicted the prior positions of Alps, its expert, and the inventor.

## STATEMENT OF THE ISSUES ON APPEAL

1.    Whether the district court erred in concluding that a post-complaint retroactive amendment to the license between Alps and the patent owner was sufficient to cure Alps's lack of prudential standing as of commencement of the suit.

2.    Whether the court erred in denying OWW's renewed motion for JMOL of anticipation, where the only limitation that Alps's validity expert identified as missing in a prior art reference is indisputably present there via express incorporation of another reference.

3.    Whether the court erred in its conclusion of non-obviousness where Alps's expert offered vague conclusions but did not challenge OWW's expert's specific testimony that the express incorporation of one reference by another provided the motivation to combine them, and that the results claimed were not unexpected.

4.    Whether the court erred in denying OWW's renewed motion for JMOL of no willful infringement without addressing the "objective" prong of *Seagate*, where OWW raised reasonable defenses; and whether the court therefore erred in doubling a portion of the damages, declaring this case exceptional, and awarding attorneys' fees on the basis of willfulness.

5.    Whether the court abused its discretion in granting a permanent injunction without addressing the existence of a nexus (indeed, despite the absence of it) between Alps's purported irreparable harm and OWW's infringement.

6.    Whether the court abused its discretion under *TiVo* in finding OWW in contempt of the permanent injunction by entertaining an infringement theory that was not litigated at trial and by then finding infringement based on an incorrect claim construction.

## STATEMENT OF THE CASE

### A.    The Accused Products

Defendant-Appellant The Ohio Willow Wood Company ("OWW") and Plaintiff-Appellee Alps South, LLC ("Alps") make and sell prosthetic "liners."  A

liner resembles a tube sock that is worn over the residuum of an amputated limb and acts as a cushioning layer between the residual limb and the prosthetic leg or arm, which is usually made from a hard material such as metal or plastic. Liners can be made from a variety of materials like silicone or urethane gel. The accused products are "thermoplastic gel" liners, comprising a fabric coated on the inside with thermoplastic gel, which reduces shock to the residual limb from the amputee's movement and thus improves comfort and safety.

OWW launched the liners accused at trial under the trademark "Alpha" in 1996. JA012834. The thermoplastic gel in these "Original Gel" liners ("Original Gel" is used here to distinguish the products at issue during the trial from the redesigned "Advanced Gel" products, discussed below, that would become the subject of the contempt proceeding) was a mixture of mineral oil and "SEEPS," a block copolymer.

Alpha Liners proved immensely successful—by 2012, OWW was selling about ███ units annually. JA012852. They were so popular with prosthetists and amputees that Alps and others soon copied them. Throughout the 1990s, Alps had made and sold silicone liners. JA012145. In 1997, Aldo Laghi, Alps's CEO, contacted John Chen (the named inventor of the patent-in-suit) and expressed interest in licensing Chen's patented gel made with "SEBS," another block copolymer. Dr. Laghi sent Chen ████████████████████

JA026055.

Alps secured a license for Chen's SEBS gel but soon abandoned SEBS and instead proceeded, like OWW, with SEEPS gel as the gel component of the liner. JA012205. Alps brought its first gel liner to the market in 1999. JA012204. Alps's sales of gel liners eventually eclipsed its sales of silicone liners; today, Alps sells as many gel liners as OWW. JA012146, JA012237.

### B.    The '109 Patent

In 1996, the same year that OWW introduced the Alpha Liner, Inventor Chen filed the application that eventually issued in April 2003 as U.S. Patent No. 6,552,109 (the "'109 Patent"). JA012461–62, JA000208. The invention disclosed in the '109 Patent is directed not to prosthetic liners, but rather to composite articles of a gel and a substrate material such as fabric. At trial, Chen asserted that his invention was limited to the combination of SEEPS gel and a substrate of fabric or another material. JA011991–92. However, Chen admitted that he did not invent SEEPS gel, which was known in the prior art. JA012011. Indeed, the district court, Alps, and Alps's expert all agreed that Chen did not invent the SEEPS polymer, the SEEPS gel, or the substrate materials of the invention. JA012540, JA012294.

## C.    Alps's Lawsuit

Shortly after the '109 Patent issued in 2003, Chen offered to license it to OWW.  JA035256.  Believing the patent as issued to be invalid (a belief later validated during reexamination when the PTO rejected all originally issued claims), OWW declined.  JA035271.  Meanwhile, by Dr. Laghi's own admission, Alps sold gel liners covered by the claims of the '109 Patent with no license for over five years before finally accepting one on August 31, 2008. JA012221–22.

The August 31, 2008 "Patent Sale and License Agreement" (the "Original License") between Alps and Chen's patent holding company, Applied Elastomerics, Inc. ("AEI"), granted Alps a license to the '109 Patent (and others), but ████████████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■

Dr. Laghi testified that Alps took the license because it had become involved in litigation against OWW "and [it] didn't want to get involved in anymore [sic] patent litigation." JA012222–23.[1] Despite this stated purpose of avoiding litigation, only 24 days later, Alps filed this suit against OWW.[2] JA000390. The complaint did not name AEI, the patent owner, as a co-plaintiff. *Id.*

### D. Prudential Standing

On October 28, 2009, OWW moved to dismiss the suit for failure to join AEI as a party. JA000609–15. On January 28, 2010, five days before the hearing on this motion, Alps and AEI signed an "Amended Patent Sale and License Agreement" (the "Amended License") that gave Alps more rights and claimed to be retroactively effective as of the date of the Original License. JA018396–422. Judge Covington, then presiding, denied OWW's motion, concluding that Alps had prudential standing under either agreement. JA000023–24. Before the trial, the case was transferred to Judge Scriven, who *sua sponte* revisited standing. She

---

[1] In 2004 and 2005, OWW sued Alps for infringing two patents directed to fabric covered gel liners.

[2] The original complaint asserted infringement of the '109 Patent. JA000390. Alps subsequently amended the complaint to add two other patents, but only claims 1–3, 5, 6, 11, and 12 of the '109 Patent were presented to the jury. JA000282.

concluded that the Original License did not give Alps prudential standing. JA014135. She recognized that this Court had never permitted a licensee to cure any standing deficiency other than by joining the patent owner, but she nonetheless held that the Amended License retroactively cured Alps's lack of standing. *Id.* She expressly invited Alps to join AEI as a party to clear up any uncertainty over standing, *id.*, but Alps has never done so.

### E.   Reexamination

OWW requested an *ex parte* reexamination of the '109 Patent. JA000533. The case was not stayed. JA002982. Within five weeks, the PTO granted the request; within another eight weeks, it rejected as invalid all claims. JA002606–19, JA000774.

As discussed above, the '109 Patent is directed to composite articles of thermoplastic gel and a substrate material such as fabric. The gel is made by mixing one or more polymers with mineral (or "plasticizing") oil in a ratio of 100 parts by weight (pbw) polymer to 300–1,600 pbw oil (below, the "polymer-to-oil-ratio" limitation). JA000209 (2:32–37). Originally issued claims 1–3 required hydrogenated **S**tyrene **I**soprene/**B**utadiene block copolymer(s) (a "hydrogenated SIB" or "hydrogenated SIBs") to be used in this gel. For example, claim 1 recited in relevant part a "composition" made from:

   (i)     100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) and from

   (ii)    about 300 to about 1,600 parts by weight of a plasticizing oil ….

JA000217 (17:42–46). [3]  In contrast, originally issued claims 5, 6, and 12 (dependent on claims 1–3) and independent claim 11 recited poly(**S**tyrene-**E**thylene-**E**thylene-**P**ropylene-**S**tyrene), or "SEEPS," as the polymer(s) in this gel. JA000218 (19:50–56, 20:66–21:64), JA000219 (22:14–18).  SEEPS is a species of hydrogenated SIB; every SEEPS is a hydrogenated SIB, but not every hydrogenated SIB is SEEPS.  JA002729.  Moreover, a hydrogenated SIB is either SEEPS or another polymer; a hydrogenated SIB cannot be a mixture of SEEPS and something else.  JA002729.  Like claims 1–3, then, claims 5, 6, 11, and 12 also required the polymer(s) in the gel to be hydrogenated SIB(s), but, unlike original claims 1–3, these claims were limited to a particular species of hydrogenated SIB.

    To overcome the rejection and distinguish the claimed invention from the prior art, Chen amended all claims to require the gel to be "physically interlocked" with the substrate material.  JA003716–22.  He also amended claims 1–3 to add— immediately following the phrase "hydrogenated [SIB](s)"—the phrase

---

[3] Part (i) of claim 3 recites "hydrogenated styrene block copolymer(s) with 2 methyl-1,3-butadiene and 1,3-butadiene." This is another way of saying "hydrogenated SIB(s)" (**I**soprene is also known as methyl-1,3-butadiene and **B**utadiene as 1,3-butadiene). JA002157–58.

"comprising    poly(styrene-ethylene-ethylene-propylene-styrene)"    ("comprising

SEEPS").  JA003716–17.  For example, amended claim 1 recited in relevant part:

> (i)    100 parts by weight of one or a mixture of two or more of a
> hydrogenated styrene isoprene/butadiene block copolymer(s)
> *comprising    poly(styrene-ethylene-ethylene-propylene-styrene)*
> and from
>
> (ii)    about 300 to about 1,600 parts by weight of a plasticizing oil ….

(Emphasis in original.)  Chen insisted that this change was not narrowing,

presumably because his intent had been to limit the "hydrogenated [SIB](s)" in

original claims 1–3 to SEEPS all along.  JA003726.

The PTO again rejected all of the amended claims.  JA006897.  Claims 1–3,

5, 6, 11, and 12 (those asserted below) were rejected, with others, as obvious over

the combination of PCT Publication No. WO 93/23472 ("Hammond") and Chen's

U.S. Patent No. 5,153,254 ("'254 Patent").  JA006902.  Hammond discloses a gel

made with Septon 4055, a SEEPS polymer, and plasticizing oil.  JA006902–03.

The '254 Patent discloses SEBS gel and the forming of composite articles of the

gel and a substrate material.  JA006903–04.  Since Hammond expressly states that

SEEPS gel improves upon SEBS gel, the PTO concluded that it would have been

obvious to replace the SEBS gel in the composites taught in the '254 Patent with

Hammond's SEEPS gel.  JA006904.

Hammond itself expressly incorporates by reference a publication that

describes composite articles of gel and various substrates. Hammond discusses the

suitability of SEEPS gels as sealing materials due to their elasticity, softness, and resulting capacity to conform to a surface upon contact. JA026505–06. It directs the reader to European Patent Application Publication No. 0108518A2 ("Debbaut"), explaining that SEEPS gels "in particular may be used as sealing materials for electrical connection enclosures, for example as illustrated in [Debbaut and another European patent application]." JA026500. Hammond then expressly states "the disclosures of [Debbaut] are both incorporated herein by reference." *Id.* Debbaut's sealants are composite articles of a gel (an "encapsulate") and a substrate like fabric or open-cell foam. JA006906–07.

The PTO rejected several claims as obvious over the combination of Hammond, Debbaut, and the '254 patent. JA006905. Although Hammond expressly incorporates the disclosures of Debbaut by reference, the examiner did not consider Hammond and Debbaut together as a single anticipatory reference. At trial, however, after both validity experts agreed that Hammond incorporates Debbaut in its entirety, the court held that they constitute a single reference for purposes of anticipation. JA013299–300.

Following this rejection, Chen requested an interview. JA013978. He offered a demonstration and claimed that it showed that his composites of SEEPS gel and fabric were unexpectedly much more resistant to shear stress than prior art composites. JA012031. He compared a composite of SEEPS gel and cotton fabric

and a composite of SEBS gel and the same cotton fabric. JA013979. Chen first asked the examiners to try to rupture each sample by hand. *Id.* They agreed that the SEEPS gel-fabric composite was stronger. JA013990. He then tested each sample using a "Humdinger," a spinning toy operated by repeated hand-pulling of a pair of twisting strings. JA013978–79. On average, rupturing the SEEPS gel-fabric composite required at least 704 percent more string-pulls. JA013995.

Chen subsequently submitted a written declaration detailing this evidence. Table IV, on page 22 of his 23-page declaration, showed the results of shear testing performed on samples of "non-composite" gel (i.e., gel free from any substrate). JA013977–99. It showed that Hammond's non-composited SEEPS gel did not rupture until after at least 630 percent more string-pulls than non-composited SEBS gel. JA013998. Chen did not mention this data during the demonstration or in the body of the declaration, so the examiners did not ask why, given that non-composited SEEPS gel was already 630 percent more resistant to shear than non-composited SEBS gel, it would have been unexpected that Chen's composite of SEEPS gel and fabric was 704 percent more shear resistant than a composite of SEBS gel and that same fabric.

A reexamination certificate issued on July 5, 2011. JA000220. The PTO cited the "unexpected resistance to sheer [sic]" of SEEPS gel-fabric composites as the reason for allowance. JA007945. On April 29, 2012, having found that the

13

amendments substantively changed the claims, the court granted OWW summary judgment of absolute intervening rights.  JA000084.

## F.    The Trial

The trial began on April 30, 2012.  Alps's expert, Dr. Jerry Atwood, testified that the "Original Gel" liners accused at trial satisfied the polymer-to-oil-ratio limitation of the asserted claims because they incorporated a gel made from 100 pbw SEEPS to 400 pbw oil.  JA012308, JA012310.  OWW admitted that these liners utilized Septon 4055 and Septon 4033 SEEPS polymers, which together totaled 100 pbw SEEPS to 400 pbw oil.

Thus, while it would later become critical in the contempt hearing (*see infra* at 19–22) at trial it did not matter whether the "comprising [SEEPS]" amendment narrowed claims 1–3 to require every "hydrogenated [SIB]" to comprise SEEPS (*i.e.*, to *be* SEEPS), such that claims 1–3 would require 100 pbw SEEPS to 300–1,600 pbw oil, or to require only that the mixture of hydrogenated SIBs include some amount of SEEPS (100 pbw hydrogenated SIBs, some part of which must be SEEPS, to 300–1,600 pbw oil).  The gel in the products at issue at trial was made with 100 pbw SEEPS to 400 pbw oil, so they met the ratio required in claims 1–3 under either of the constructions advanced later in the contempt hearing.

OWW's validity expert, Dr. Lynn Walker, testified that the asserted claims were anticipated by Hammond.  JA013082.  She explained that Hammond

incorporated the disclosures of Debbaut and then explained how each element of every asserted claim was disclosed in Hammond. JA013046, JA013931–40. She testified that Hammond discloses a gel made from Septon 4055 SEEPS and mineral oil in a ratio that anticipates the ratio claimed in the '109 Patent and that Hammond directs the reader to use the gel in Debbaut's composite articles of gel and a support material such as fabric or open-cell foam. JA013041–43, JA013049.

Dr. Atwood agreed that Hammond incorporates the entire Debbaut reference, stating that he "understood [Hammond] to mean that he wanted to incorporate the entirety of these patent applications [Debbaut and another application]." JA013270–71. The only element that he suggested was missing in Hammond was the application of the gel to a substrate. JA013269. However, he did not dispute that Debbaut teaches gel-fabric composites, nor did he explain why, given that Debbaut is incorporated in Hammond, that element was missing from Hammond. (The district court, having considered the testimony of both experts, held that Debbaut was fully incorporated in Hammond. JA013299–300. In view of this holding, OWW moved for JMOL of anticipation, but the court denied the motion without stating reasons. JA013322.)

Dr. Walker also testified that the asserted claims are obvious. She testified that, even if Hammond and Debbaut were viewed as separate references, one would be motivated to combine them since Hammond expressly directs the reader

to use the SEEPS gel in one of Debbaut's composites.  JA013120.  Dr. Atwood did not specifically address this testimony, instead asserting conclusorily that it would not have been obvious to combine Hammond with "any other reference." JA013274.  Asked what factors he had considered in reaching this conclusion, Dr. Atwood said his "general knowledge of the field[,] the testimony of Mr. Chen  and especially the fact that Mr. Chen testified … that he specifically revealed the Hammond patents to the PTO" during reexamination, though he did not explain how any of these supported his conclusion.  *Id.*

Finally, Dr. Walker testified that the superior shear resistance of Chen's composites was not unexpected, because Chen's own data showed that composited SEEPS gel (SEEPS gel physically interlocked with fabric) outperformed composited SEBS gel only marginally better than Hammond's *non*-composited SEEPS gel outperformed non-composited SEBS gel.  JA013142, JA013151–52. Dr. Atwood did not challenge this testimony.

The jury found that the asserted claims were not invalid, that the Original Gel products infringed, and that OWW's infringement was willful.  The jury awarded Alps $3,983,512.00 in reasonable royalty damages.  JA000314. The court subsequently entered a Second Amended Judgment on the jury's verdict. JA000103–04.

### G.    Post-Trial Motions

After the trial, OWW renewed its motion for JMOL of invalidity and no willful infringement.  JA013894–929.  OWW cited Dr. Walker's testimony that Hammond and Debbaut, considered together as a single anticipatory reference, disclose every element of the asserted claims, pointing out that Dr. Atwood had not explained the basis for his conclusory statement that Hammond (incorporating Debbaut) did not anticipate. JA013902–10, JA013931–40. OWW also cited Dr. Walker's testimony that one would have been motivated to combine Hammond and Debbaut (because Hammond instructs one to do so) and stressed that Dr. Atwood did not specifically address this testimony.    JA013915–17. As to willful infringement, citing *In Re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc), OWW argued that there had been no objectively high risk of infringement of a valid patent.  JA013896.

The district court denied OWW's motion on November 13, 2012. JA000106.  The court stated there was "record evidence" from which a reasonable jury could conclude that the asserted claims were not invalid but did not specifically identify it.    JA000110.    The court also denied the motion as to willfulness, although it failed to address *Seagate*'s "objective" component. JA000110–11.  Based on OWW's purported willful infringement, the court later enhanced the jury's damages award (doubling it), found this case to be exceptional,

17

and granted Alps's motion for attorneys' fees. JA000126–29. The court also awarded, but did not at the time quantify, supplemental damages for OWW's post-verdict sales of Original Gel products. JA000137–38.

On May 9, 2013, 12 months after the trial, the court issued a permanent injunction, without acknowledging the recent *Apple* decisions requiring a causal relationship between the defendant's infringement and the plaintiff's purported irreparable harm. JA000117–24. The court did not address whether there was a causal nexus between sales Alps lost to competition from OWW and OWW's alleged infringement, JA000119–20, even though during the trial the court found the purported causal link between Alps's sales and any infringement to be "speculation" and granted OWW's motion for JMOL as to Alps's lost profits claim. JA012805.

## H. OWW's Redesign

As discussed in OWW's motion for a partial stay pending appeal (Dkt. 33-1), which this Court granted (Dkt. 51), OWW introduced the redesigned "Advanced Gel" Alpha Liner products following the trial. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ JA016938–39. OWW also filed an action seeking a declaratory judgment that the redesigned products do not infringe. JA016389.

OWW implemented this redesign in view of Alps's consistent representations that all of the asserted claims, including claims 1–3 as amended, required 100 pbw SEEPS to 300–1,600 pbw mineral oil. Even before the "comprising SEEPS" language was added to claims 1–3 during reexamination (that is, before claims 1–3 mentioned SEEPS), Alps argued during the *Markman* proceeding that the term "hydrogenated [SIB]" should be construed as "SEEPS," such that claims 1–3 would require 100 pbw SEEPS to 300–1,600 pbw oil. JA002710. And at trial, Dr. Atwood, asked to explain the phrase "100 parts by weight of one or a mixture of two or more of a hydrogenated [SIB](s) *comprising [SEEPS]*" in claim 1, testified that the mixture "could be 100 parts [by] weight of one, namely the SEEPS polymer, or it could be a mixture of two or more similar polymers." JA012290–91. "100 parts by weight," he continued, "refers to, in its essential feature, the SEEPS polymer."

On May 23, 2013, Alps moved to hold OWW in contempt of the recently issued injunction for selling the redesigned products continued to infringe. JA014472–86. Alps primarily argued that ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

19

██████████████████████████████████████████████████████

████████████████████████████████████████████████ and the

district court's contempt order declined to address this factual issue. JA000182.

Alps's fallback argument, to which it devoted roughly one page, JA014482–

83, was that the redesigned products infringed claims 1–3 ██████████████

█████ JA0144822–83. For the first time, Alps asserted that claims 1–3 require

only a minimal amount of SEEPS,  provided it is in a mixture of 100 pbw

hydrogenated SIBs to 300–1,600 pbw oil. *Id.* The court had never addressed this

claim construction issue.

In response, OWW pointed to Dr. Atwood's unequivocal testimony that all

of the asserted claims, including 1–3, require 100 pbw SEEPS to 300–1,600 pbw

oil. JA016391. OWW also argued that the phrase "comprising [SEEPS]" modifies

the immediately preceding phrase "hydrogenated [SIB](s)," such that every

hydrogenated SIB in a mixture has to comprise SEEPS. JA016403. Under this

view, because a hydrogenated SIB is either is SEEPS or is not SEEPS (that is,

because it cannot include both SEEPS and another polymer), "a hydrogenated

[SIB](s) comprising [SEEPS]" means "a hydrogenated SIB which is SEEPS or

hydrogenated SIBs which are SEEPS."

The court did not acknowledge that Alps had offered a new infringement

theory (new because at trial Alps contended that the Original Gel products met the

20

"polymer-to-oil-ratio" limitation of the asserted claims because the gel was made from 100 pbw SEEPS to 300–1,600 pbw oil), or that Alps's claim construction was contrary to its previous position that all of the asserted claims required 100 pbw SEEPS to 300–1,600 pbw oil. The court did not even address OWW's argument that the phrase "comprising [SEEPS]" in claims 1–3 modifies the immediately preceding phrase "hydrogenated [SIB](s)."

On November 1, 2013, after a half-day hearing, the court held OWW in contempt. JA000161. In the subsequently issued order, the court stated that, as long as the redesigned products contained some SEEPS, no matter how little, and the ratio of all hydrogenated SIBs collectively fell within the claimed range, the Advanced Gel products not only infringed but were also no more than colorably different from the Original Gel products. JA000182.

On November 7, the court held a hearing on sanctions. JA000163. It required OWW to pay into court 20 percent (the same royalty rate set by the jury) of its Advanced Gel sales revenues, appointed a receiver to oversee OWW, ordered OWW to sequester all Advanced Gel products, and required OWW to seek permission from Alps (or failing that, the court) before making any new redesigned products. On November 12, the court issued an order restating these sanctions and extending the injunction to the Advanced Gel products (however, the court

declined to enhance the contempt damages). JA000188–90. This Court stayed the contempt order pending appeal on April 10, 2014. (Dkt. 51.)

On March 6, 2014, the district court entered the Third Amended Judgment, JA000201, which memorialized its earlier doubling of the jury's damages award and awarded $2,932,239.30, or 20 percent of revenues, in supplemental damages for post-verdict sales of Original Gel products. *See infra* at 18. The Third Amended Judgment also awarded pre- and post-judgment interest, costs, and attorneys' fees; however, the court deferred the determination of the precise amount of attorneys' fees until the conclusion of any appeals. The district court also entered a separate judgment, JA000204, awarding Alps damages for OWW's sales of Advanced Gel products in the amount of $4,560,617.00, or 20 percent of revenues (OWW had already paid this sum into court pursuant to the November 12, 2013 order).

## SUMMARY OF ARGUMENT

I.      The district court did not have jurisdiction to hear this case. When Alps filed the complaint, it lacked standing to sue alone, without AEI, the patent owner, as a co-plaintiff, because the Original License included a field of use restriction and left other substantial rights with AEI. This deficiency could be cured only by joining AEI; the subsequent retroactive Amended License could not confer the requisite standing.

II.     The Court should reverse the denial of OWW's renewed motion for JMOL of anticipation. The only element that Alps's expert suggested is missing in Hammond is the application of gel to a substrate to form a composite article. However, he did not dispute that Debbaut describes composites of gel and various substrates, and he agreed that the entire Debbaut disclosure is incorporated in Hammond by reference (and the court so held). Debbaut thus supplies the only element that Alps's expert asserted is not present in Hammond.

III.    Alternatively, the Court should reverse the district court's conclusion of non-obviousness, as it lacks any factual support. Even if Hammond did not anticipate, one would have been motivated to combine Hammond and Debbaut, given that Hammond expressly invites one to do just that. The purported evidence of unexpected results cannot overcome the overwhelming prima facie case of obviousness. In any event, the superior shear resistance of his composites of Hammond's SEEPS gel and fabric over prior art composites of SEBS gel and fabric was completely expected in view of the superior shear strength of Hammond's gel over SEBS gel.

IV.     The Court should reverse the finding of willful infringement. The district court's failure to even address *Seagate*'s objective prong, a legal question that must be decided by the court, is a reversible error. But remand is unnecessary, because the record cannot support a conclusion other than that OWW's invalidity defenses

were reasonable, which is dispositive as to objective recklessness. The district court's award of enhanced damages, finding of an exceptional case, and award of attorneys' fees, all predicated on OWW's purported willfulness, should be reversed as well.

V.    The district court abused its discretion in issuing a permanent injunction without addressing, much less finding, a causal nexus between Alps's alleged lost sales—the sole basis for its finding of irreparable harm—and OWW's infringement. Moreover, the court's granting of OWW's motion for JMOL as to lost profits precluded any finding of irreprable harm due to lost sales.

VI.    The Court should find that the district court abused its discretion by finding OWW in contempt based on a new infringement theory and an erroneous claim construction.

## **STANDARD OF REVIEW**

Jurisdictional issues are reviewed *de novo*. *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1335 (Fed. Cir. 2008).

Anticipation is a question of fact reviewed for substantial evidence when tried to a jury. *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir. 2010). However, incorporation by reference is a question of law. *Harari v. Lee*, 656 F.3d 1331, 1334 (Fed. Cir. 2011). The jury's conclusion on obviousness, a question of law, is reviewed without deference, and the underlying factual findings

24

are reviewed for substantial evidence. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356–57 (Fed. Cir. 2012).

The objective recklessness prong of *Seagate* is a question of law reviewed *de novo*. *Bard Peripheral Vascular, Inc., v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1007–08 (Fed. Cir. 2012).

The grant of injunctive relief is reviewable for abuse of discretion. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008). A district court abuses its discretion when it exercises that discretion based upon an error of law. *Id.*

Whether there are colorable differences between two products and whether a product infringes are questions of fact reviewable for clear error. *nCube Corp. v. Seachange Int'l Inc.*, 732 F.3d 1346, 1349 (Fed. Cir. 2013). Claim construction is a question of law reviewed *de novo*. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1286 (Fed. Cir. 2014) (en banc).

## ARGUMENT

## I. ALPS LACKS PRUDENTIAL STANDING.

Having recognized that Alps lacked standing to sue without AEI when it filed the complaint, and that this Court has allowed such a failure to be corrected only by the joinder of the patent owner, the district court erred by holding that the

post-complaint Amended License retroactively gave Alps prudential standing. JA014135.

35 U.S.C. §281 provides that a "patentee" may bring a "civil action for infringement of his patent." Where the patentee transfers "all substantial rights" to the patent, the transferee is deemed the effective "patentee" under the statute and has standing to sue for infringement in its own name. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339–40 (Fed. Cir. 2007). In contrast, a party with some exclusionary rights to the patent (such as an exclusive licensee) but who lacks all substantial rights may sue only if the patent owner is joined as a party (the joinder of the patent owner is said to confer "prudential" standing, which is rooted in concerns with avoiding multiple lawsuit against the accused infringer). *Id.* "[W]hether an exclusive licensee has sufficient rights in a patent to bring suit in its own name is jurisdictional[.]" *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1019 (Fed. Cir. 2001).

OWW moved to dismiss for lack of prudential standing because the pre-complaint Original License did not vest Alps with all substantial rights. JA000609–18. Shortly before the hearing on the motion, Alps and AEI entered into the Amended License, which gave Alps additional rights retroactively back to the date of the Original License. JA018396–422. Judge Covington held that Alps had prudential standing under either agreements. JA000023–24. Shortly before

the trial, Judge Scriven revisited standing, correctly finding "there was not prudential standing … at the time the action was instituted." JA014135. Recognizing "that prudential standing can be cured by adding a party," she encouraged Alps to join AEI, but she then incorrectly held that Alps's lack of prudential standing could also be cured retroactively by the Amended License. *Id.*

Because the Original License ███████████████████████████ ███████████████████████████ Alps lacked all substantial rights to the '109 Patent. JA018364. This Court has clearly held that "an exclusive field of use licensee does not have standing to sue in its own name without joining the patent owner…." *Int'l Gamco, Inc., et al. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1279 (Fed. Cir. 2007). *Gamco* "unequivocally determined the rights of an exclusive field of use licensee with respect to standing" and reversed the denial of a motion to dismiss, finding that the "prudential standing requirement compels an exclusive licensee with less than all substantial rights, such as a field of use license, to join the patentee before initiating suit." *Id.* at 1276, 1278. *See also A123 Sys. v. Hydro-Quebec*, 626 F.3d 1213, 1217–18 (Fed. Cir. 2010).

Even if the Original License were not limited to a particular field of use, AEI still would have lacked prudential standing. In *Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128 (Fed. Cir. 1995), prudential standing was lacking where the licensor, like AEI, retained substantial rights ████████████████

27

███████████████████████████████████

███████ 47 F.3d at 1132. ██████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████ JA018371, JA018373. *See also Propat Int'l. Corp. v. Rpost, Inc.,* 473 F.3d 1187, 1191–92 (Fed. Cir. 2007) (emphasizing responsibility to maintain patents as an indication of ownership rights).

The Amended License could not cure Alps's lack of prudential standing. The way to cure lack of prudential standing is through joinder of the patentee. *See A123*, 626 F.3d at 1217, 1219. The district court recognized that this Court has never permitted a licensee to cure a lack of prudential standing by entering into a post-complaint amended agreement "and relat[ing] it back to the original complaint," but it viewed this as an issue of first impression: "I don't believe [it] has been decided by any binding authority." JA014135. That is not the case.

In *Enzo APA & Son, Inc. v. Geapag A.G.,* the licensee attempted to cure its lack of standing as of time of the complaint by signing a retroactive agreement. 134 F.3d 1090, 1092 (Fed. Cir. 1998). This Court addressed "whether an oral exclusive license or a nunc pro tunc license executed after suit is brought, or some

combination of the two, can confer standing," and concluded that they could not, holding "that under any of these circumstances the holder of title [of the patent] must be joined in order to confer standing." *Id.* at 1093.

Even if this were a question of first impression, this Court should follow the "time-of-filing" rule applicable to other jurisdictional defects, under which post-complaint facts cannot retroactively create jurisdiction. Thus, diversity jurisdiction "depends upon the state of things at the time of the action brought." *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570–71 (2004) (quoting *Mollan v. Torrance*, 22 U.S. 537 (1824)). "[T]he policy goal of minimizing litigation over jurisdiction is thwarted whenever a new exception to the time-of-filing rule is announced, arousing hopes of further new exceptions in the future." *Id.* at 580–81. *See also Keene Corp. v. United States*, 508 U.S. 200, 207 (1993); *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 831 (1989) (finding 28 U.S.C. §1653 provides mechanism to "cure defective allegations of jurisdiction," not to "empower courts to amend a complaint so as to produce jurisdiction where none actually existed").

This Court has followed the time-of-filing rule where the patent did not issue until after the filing of the original complaint, holding that "[l]ater events may not create jurisdiction where none existed at the time of filing." *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 483 (Fed. Cir. 1996); *see also*

*Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1331 (Fed. Cir. 2012) (quoting *Grupo Dataflux,* 541 U.S. at 570–71 ("jurisdiction of the court depends upon the state of things at the time of the action brought")). This Court has repeatedly identified joinder as the alternative to dismissal for lack of prudential standing. *See, e.g., A123,* 626 F.3d at 1219–20; *Mentor H/S,* 240 F.3d at 1019; *Abbott Labs.,* 47 F.3d at 1133. Alps chose not to use the liberal joinder rules, which provide the means to cure jurisdictional deficiencies under the time-of-filing rule. *See, e.g., Grupo Dataflux,* 541 U.S. at 572; *Newman-Green,* 490 U.S. at 832. Allowing an amended agreement to retroactively confer prudential standing would improperly alter "the state of things" at the time of the complaint. An exclusive licensee without substantial rights must join the patentee or face dismissal. Alps was encouraged by the district court to join AEI, but did not do so. Its post-complaint agreement could not cure its lack of prudential standing. The judgments below should be vacated and the case below dismissed.

## II. THERE WAS NO LEGALLY SUFFICIENT BASIS FOR FINDING THAT HAMMOND DID NOT ANTICIPATE.

Alps's expert, Dr. Atwood, did not dispute that Hammond's SEEPS gel is identical to the gel claimed in the '109 Patent, but he nonetheless asserted that Hammond does not anticipate because it does not disclose composite articles of the gel and a substrate. Dr. Atwood did not assert that any other limitation was missing from Hammond. Crucially, he agreed with OWW's expert, Dr. Walker, that

Hammond incorporates the entire Debbaut reference, JA013046, JA013271, leading the district court to correctly hold that Debbaut is part of Hammond for purposes of anticipation. JA013299–300. Dr. Atwood did not dispute that Debbaut discloses composites of gel physically interlocked with various substrates.

In denying OWW's renewed JMOL motion, the district court pointed to no evidence that supported the jury's verdict of no anticipation, instead simply noting that overcoming the presumption of validity presents a "high burden." JA000110. The PTO did not consider Hammond and Debbaut as a single anticipatory reference. While deference is due to the PTO, "no such deference is due with respect to evidence it did not consider." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984). Purported unexpected results (here, the sole basis for the PTO's allowance of the claims) is irrelevant to anticipation. *See In re Malagari*, 499 F.2d 1297, 1302 (CCPA 1974). The court's uncritical deference to the PTO was misplaced. Given the absence of any evidence supporting the jury's verdict of no anticipation, the court should have entered judgment for OWW as a matter of law. *See Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1269 (Fed. Cir. 2012) (holding that "conclusory testimony of an expert witness … cannot create an issue of fact if none otherwise exists" and reversing denial of JMOL of no anticipation).

31

## A. Hammond and Debbaut Must Be Considered as a Single Reference.

A claim is anticipated if, within the four corners of a single, prior art reference every element of the claimed invention is described, "either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). "Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document." *Id.* "Whether material is incorporated by reference is a question of law." *Id.* at 1283. "[T]he standard is whether one reasonably skilled in the art would understand [the host document] as describing with sufficient particularity the material to be incorporated." *Harari*, 656 F.3d at 1334.

Both experts agreed that Hammond incorporated the entire Debbaut reference. Asked about Hammond's statement that "the compositions of this invention have numerous uses … for example as illustrated in [Debbaut and another European patent application] (the disclosures of which are both incorporated herein by reference)," Alps's expert replied that Hammond "wanted to incorporate the entirety of these patent applications." JA013270–71. The court properly held that "the entire thing [Debbaut] is incorporated by reference,"

because "that's what Dr. Walker said, that's what Dr. Atwood said. Both are the only people in the room ordinarily skilled in the art." JA013299–300.

## B. Hammond Thus Discloses Every Element of the Asserted Claims.

Dr. Walker, OWW's expert, testified how each element of each asserted claim was disclosed in Hammond. JA013931–40. She showed that Hammond teaches a thermoplastic gel made from Septon 4055 SEEPS and plasticizing oil, in a ratio (100 pbw SEEPS to 300–5,000 pbw oil) that anticipates that claimed in the '109 Patent (100 pbw SEEPS to 300–1,600 pbw oil). JA013041–45.[4] This went unchallenged by Dr. Atwood.

Dr. Walker also showed that Hammond discloses composites of SEEPS gel physically interlocked with a substrate material, because Hammond says that the gel can be used in Debbaut's composite articles and incorporates Debbaut by reference. JA013045–46. Debbaut is directed to "protective covers for substrates, for example, electrically conductive substrates." JA026515. The cover is a composite article of gel and a support material, resembling an Ace bandage, that can be wrapped around an electrical connection enclosure to protect it from the elements and be easily removed if needed. JA026517, JA013051. The gel (the "encapsulant") of the composite article is made by combining a polymer with

---

[4] Hammond specifically discusses gel compositions with 6, 12, and 18 percent Septon 4055, which corresponds to 100 pbw SEEPS to 1567 pbw oil, 100 pbw SEEPS to 733 pbw oil, and 100 pbw SEEPS to 456 pbw oil. JA026504.

plasticizing oil. JA026519. Debbaut discloses several suitable substrates, including a woven or non-woven fabric made from natural or synthetic fibers. Figure 5 illustrates a cross-section of a composite comprising the fabric 54 and the gel 52:



Fig. 5.

JA026534. Dr. Walker testified that one of ordinary skill would understand that, to make the sealant illustrated in Figure 5, one would "take a piece of fabric and pour [Hammond's] molten gel onto it or pour the melt at high temperature and allow it to solidify into a gel." JA013050. The gel and the fabric would physically interlock, yielding a gel-fabric composite. *Id.*

Debbaut's Figure 4 shows a cross-section of another composite article, comprising the gel 46 and a sheet of foam 44:



Fig. 4.

JA026534. Dr. Walker testified that one would understand to "take a piece of foam and … pour molten gel over it and allow it form a gel foam composite." JA013049. She testified that "[t]he gel would be able to flow into the interstices of the foam when it was a melt, so it would be mechanically interlocked and physically interlocked." *Id.*[5]

Dr. Atwood did not challenge this testimony; he offered no testimony whatsoever regarding what Debbaut discloses. He stated that Debbaut was considered by the PTO during reexamination but did not address the PTO's failure

---

[5] The "formed by heat" limitation of Chen's claims in inherently present in Debbaut, because, as established by Dr. Walker's unrebutted testimony, a skilled artisan would easily understand that, in order to use Hammond's thermoplastic SEEPS gel in the composite articles shown in Figures 4 and 5 of Debbaut, one would first have to melt the gel—"[t]hat is why you use thermoplastics, you heat them up"—then pour it over Debbaut's fabric or porous foam sheet and let it cool. JA013135–36. Therefore, insofar as Hammond does not expressly state that SEEPS gel would have to be melted before being applied to a substrate, the very nature of thermoplastics "make[s] clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *See Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

to consider Debbaut with Hammond as a single anticipatory reference. JA013271–72. His conclusory suggestion that Hammond does not describe composite articles is not a reasonable basis for the jury's verdict. *See Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 23–24 (Fed. Cir. 2012) (reversing denial of motion for JMOL of anticipation where accused infringer's expert explained how every element of claimed invention was disclosed in prior art reference and sole rebutting testimony was "conclusory" expert testimony that elements "aren't taught" in that reference).

In denying OWW's renewed motion for JMOL as to anticipation, the district court identified no evidence that supported the jury's verdict, asserting only that OWW failed to meet its burden and that the PTO had considered this prior art. JA000110. The court ignored that the PTO had failed to consider Hammond and Debbaut as a single reference, or that evidence of purportedly unexpected results—the PTO's *sole* basis for allowing the claims—is irrelevant under §102. It is a "commonsense principle that if the PTO did not have all material facts before it, its considered judgment may lose significant force." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2240 (2011). Debbaut is incorporated in Hammond and provides the only element of the asserted claims that Alps's expert asserted was missing in Hammond. The district court should have granted OWW's motion on anticipation.

## III. EVEN IF HAMMOND, INCORPORATING DEBBAUT, DID NOT ANTICIPATE, THEIR COMBINATION MAKES ALL ASSERTED CLAIMS OBVIOUS.

Even if Hammond did not anticipate the asserted claims, they would still be obviousness. Every element of Chen's purported invention—"the gel composite with a fabric," as he described it—is disclosed in Hammond and Debbaut . JA011911. Hammond discloses a thermoplastic gel made by mixing SEEPS with mineral oil, and Debbaut describes composite articles of gel physically interlocked with a substrate material. A skilled artisan would have been motivated to use Hammond's SEEPS gel in one of Debbaut's composites, as Hammond unambiguosuly directs one to do just that. JA013120. Dr. Walker's unrebutted testimony highlighting Hammond's invitation to combine established that it would have been obvious to combine the prior art teachings in the very fashion claimed by the '109 Patent. Dr. Atwood's purely conclusory assertion that the motivation to combine was lacking provided no basis for the jury's verdict of non-obviousness.

The district court was required to assess the jury's conclusion on obviousness, a question of law, without deference, and to ensure that the jury's underlying factual findings were supported by substantial evidence. *Kinetic Concepts*, 688 F.3d at 1356–57. The court did neither. It pointed to no facts supporting the jury's conclusion of non-obviousness and instead simply recited the

presumption of validity and OWW's "high burden." JA000110. The district court's conclusion of non-obviousness should be reversed.

### A. A Skilled Artisan Would Have Been Motivated to Combine Hammond and Debbaut.

Even if Debbaut were not incorporated by Hammond, it would have been obvious to combine these references. A motivation to combine references "may flow from the prior art references themselves…." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000). Here, such motivation unmistakably flows from Hammond. As explained by Dr. Walker, JA013053, JA013056–57, Hammond specifically discusses the suitability of SEEPS gels for use as sealants, which is due to their improved elasticity, softness, and resulting capacity to conform to a surface upon contact. JA026505. Debbaut describes sealants and Hammond expressly directs the reader to Debbaut, explaining that SEEPS gel compositions "in particular may be used as sealing materials for electrical connection enclosures, for example as illustrated in [Debbaut and another European patent application]." JA026500.

As Dr. Walker testified, a skilled artisan would be motivated to combine Hammond and Debbaut because "Hammond told you to." JA013120. Given Hammond's discussion of the suitability of SEEPS gel as sealing material and its express direction to use this gel in Debbaut's gel-substrate composites, the motivation to combine is overwhelming. *See also Bayer Healthcare Pharms., Inc.*

*v. Watson Pharms., Inc.*, 713 F.3d 1369, 1375 (Fed. Cir. 2013) (finding motivation to combine when first prior art reference expressly cites another reference and states that preparations disclosed in first reference can be used "analogously" to how they are used in second reference).

Rather than address this, Dr. Atwood vaguely asserted that one of ordinary skill would not be motivated to combine Hammond with "any other reference." JA013274. Asked what factors he had considered, he offered his "general knowledge of the field[,] the testimony of Mr. Chen and especially the fact that Mr. Chen testified … that he specifically revealed the Hammond patents to the PTO" during reexamination. *Id.* Dr. Atwood did not explain how any of this negated a motivation to combine, especially in light of Hammond's specific reference to Debbaut. His conclusory testimony was inadequate to support a conclusion of non-obviousness. *See Whitserve*, 694 F.3d at 23–24; *Krippelz*, 667 F.3d at 1269 (finding expert's "generic" testimony that limitation was not in prior art "too conclusory" to sustain verdict of no invalidity).

### B. Chen's Purported Unexpected Results Do Not Support Non-Obviousness.

At trial, Chen and Dr. Atwood suggested that Chen's SEEPS gel-fabric composites were novel—indeed, "revolutionary," according to Chen—due to their allegedly unexpected durability. JA011992, JA012359. Where, as here, the prima facie case of obviousness is overwhelming, evidence of unexpected results is not

39

availing.  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007) ("[T]he record establishes such a strong case of obviousness that [the] alleged unexpectedly superior results are ultimately insufficient.").

In any event, there were no unexpected results here. While Chen's demonstration to the PTO demonstrated the improved shear resistance of SEEPS gel-fabric composites over SEBS gel-fabric composites, this was far from unexpected.  As Chen knew but neglected to explain to the PTO, Hammond's SEEPS gel is itself far more shear resistant than SEBS gel.  Consequently, one would have expected a composite of SEEPS gel and fabric to be more shear resistant than a composite of SEBS gel and that same fabric. Chen's demonstration did no more than validate this natural expectation.

For the demonstration, Chen coated one piece of cotton fabric with Hammond's SEEPS gel and another with SEBS gel and showed that the fabric coated with Hammond's Septon 4055 SEEPS gel was 704 percent more shear resistant.  JA013995.  However, Dr. Walker testified that "[y]ou can't compare the composites without knowing what the gels would do.  You have to know what both things [would] do to know if [the composite] acted better than the parts." JA013142.  Neither Dr. Atwood, nor Chen, nor any other witness challenged this testimony. Yet Chen's own data (which he did not mention to the examiners during the demonstration but instead buried in a table on page 22 of his subsequent 23-

40

page declaration) showed that Hammond's SEEPS gel was itself 630 percent more shear resistant than SEBS gel. JA013998. The improvement of the SEEPS gel-fabric composite over the SEBS gel-fabric composite, which Chen touted in the declaration as the basis for patentability, JA013978–79, was not materially better than the improvement of non-composited SEEPS gel over non-composited SEBS gel.

As Dr. Walker testified, "if you're going to make a composite and you composite it with similar fabric, then that composite will have to be at least 630 percent better with the SEEPS gel [than with SEBS gel], and for it to be unexpectedly better, it's going to have to be more better [sic] than that." JA013151–52. When an inventor "tries to distinguish his claims from the prior art by introducing evidence of unexpected 'synergistic' properties," he must demonstrate "an effect greater than the sum of the several effects taken separately." *See Merck & Co. v. Biocraft Laboratories, Inc.*, 874 F.2d 804, 808 (Fed. Cir. 1989) (internal citations omitted). Chen's demonstration did no such thing.

At most, Chen discovered a previosuly undetected quality of SEEPS gel (its superior shear restistance), but that is not patentable. It is well-settled that "mere recognition of latent properties in the prior art does not render non-obvious an otherwise known invention." *In re Baxter Travenol Labs*, 952 F.2d 388, 392 (Fed. Cir. 1991).

For example, in *in re Kubin*, the inventors claimed DNA molecules encoding a protein known as NAIL. 561 F.3d 1351, 1352 (Fed. Cir. 2009). The BPAI rejected their claims as obvious. Having sustained the BPAI's finding that NAIL was known in the prior art, this Court then turned to the inventors' argument that their claims were patentable because they had discovered and claimed a binding relationship between NAIL and another protein. *Id.* at 1357. Even though no prior art discussed this relationship, this Court pointed out that it was a "property necessarily present in NAIL." *Id.* Emphasizing that "[i]t is not invention to perceive that the product which others had discovered had qualities they failed to detect," this Court affirmed BPAI's decision. *Id.* Likewise, the superior shear resistance of SEEPS gel is an inherent property of the gel. Chen's alleged discovery of this quality does not entitle him to a patent.

"[A] combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). Chen's combination of two "familiar elements"—Hammond's SEEPS gel and cotton fabric—according to a known method yielded perfectly predictable results. The district court's conclusion of non-obviousness is without support and should be reversed.

## IV. THE DISTRICT COURT ERRED IN FINDING THAT OWW WILLFULLY INFRINGED.

The district court's denial of OWW's renewed JMOL motion on willfulness infringement was fatally flawed. The court entirely ignored objective recklessness, a question of law under *Seagate*'s two-part test for willful infringement. 497 F.3d at 1371. The jury could at most address the second, subjective prong of *Seagate*. The district court's order on willfulness did not even mention *Seagate,* much less conduct the required objective recklessness inquiry. JA000106–112. But the issue need not be remanded, as the record is clear that OWW's defenses to liability were at least reasonable, foreclosing a determination of objective reckelessness. If this Court does not reverse on standing or invalidity, the judgment of willfulness must be reversed, and with it the resulting enhancement of damages and award of attorneys' fees.

### A. The District Court Erred in Ignoring the Objective Prong of *Seagate*.

To establish willful infringement, a patentee must show "that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Seagate*, 497 F.3d at 1371. "If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk … was either known or so obvious that it should have

been known to the accused infringer." *Id.* Both prongs must be met; the question is not posed in the alternative. *Id.*

*Seagate*'s objective first inquiry is a question of law, separate from the jury's determination of subjective willfulness under the second prong. *Bard*, 682 F.3d at 1006–08. "[T]he ultimate legal question of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent should always be decided as a matter of law by the judge," and it is then "subject to *de novo* review." *Id.* at 1007–08.

The district court failed to address *Seagate*'s objective prong. In its renewed JMOL motion, OWW pointed out the *Seagate* willfulness test and the requirement that the court assess whether a reasonable defense had been offered. JA013917–24, JA013896. The district court's order denying that motion neither acknowledged the two-step analysis of *Seagate* nor attempted to fulfill the court's obligation under *Bard* to determine whether the objective prong was satisfied. JA000110–11.

Instead, the court dedicated five sentences to willfulness, two suggesting that willfulness flows from infringement itself and three addressing the subjective element:

> OWW's final contention is that the jury's willfulness findings essentially build upon its infringement findings that were unsupported. However, if the jury's finding of infringement is upheld, as it is here, the willfulness

findings follow *a fortiori* on this record. The evidence at trial, as catalogued in ALPS'S Response in Opposition (Dkt. 364 at 14–18), was more than adequate to demonstrate willful infringement. Evidence of OWW's pattern of behavior and intent to infringe and of its admission that it continued to infringe even after reissuance of the '109 Patent and that its principal did nothing in response to demands to either purchase a license or stop infringing was more than sufficient to support a finding of willfulness. Certainly, the Court cannot find that no reasonable jury could have so concluded.

JA000110–11. This focus on a "pattern of behavior" and "intent" clearly addresses only the *subjective* prong of Seagate. The court's failure to even address objective recklessness alone requires reversal.

**B.    Remand on Willfulness Is Unnecessary Because The Record Is Clear That There Was No Objectively High Likelihood of Infringement.**

OWW asserted reasonable defenses to liability, including significant (indeed, meritorious) questions about the validity of the '109 Patent. In addition, Alps never sought a preliminary injunction, either when it filed the suit or after the reexamination certificate was issued.[6] The first prong of *Seagate* was not met here.

*Seagate*'s "objective" prong cannot be met when "a reasonable litigant could realistically expect success on the merits." *See Bard*, 682 F.3d at 1007 (quoting

---

[6] This Court has recognized that "a patentee who does not attempt to stop an accused infringer's activities" by means of a preliminary injunction may be precluded from recovering enhanced damages for willful infringement based on conduct that occurred after the complaint. *Seagate*, 497 F.3d at 1374.

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) ("*PRE*")). "'If an objective litigant could reasonably conclude that the suit is reasonably calculated to elicit a favorable outcome,' it is not objectively baseless." *Id.* (quoting *PRE*, 508 U.S. at 51). "Thus, the question on appeal often posed is whether a defense or noninfringement theory was 'reasonable.'" *Bard*, 682 F.3d at 1006.

OWW's anticipation and obviousness defenses are certainly more than "reasonable."[7] OWW did not have to prevail on these issues. A reasonable defense to infringement or validity is sufficient to preclude a determination of objective recklessness. *See Bard*, 682 F.3d at 1005–06; *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.,* 620 F.3d 1305, 1319 (Fed. Cir. 2010). *Spine Solutions* is particularly instructive. Medtronic had "raised a substantial question" as to obviousness because the combination of prior art offered by Medtronic's expert "plainly disclose[d] all of the claimed limitations." 620 F.3d at 1319. Even though the Court found support in the record to uphold the jury's implicit finding that one skilled in the art would not have found the combination obvious, "Medtronic was not objectively reckless in relying on the defense." *Id*.

---

[7] Indeed, Alps moved for summary judgment twice as to anticipation, JA004621–26, JA008994–98; and obviousness, JA004626–4629, JA008999–9003. Each time the district court concluded that reasonable jurors could find for OWW. *See* JA000048, JA000051, JA000072, JA000078, JA000088. That the jury later found for Alps on these issues does not make OWW's arguments, which precluded summary judgment for Alps, unreasonable.

46

In view of OWW's anticipation and obviousness defenses, there is no basis in the record for a determination of objective recklessness under *Seagate*, and the district court's denial of OWW's renewed motion for JMOL of no willful infringement should be reversed.

### C. Since the Willfulness Finding Was Error, the Enhancement of Damages, Finding of an Exceptional Case, and Award of Attorneys' Fees Must Be Reversed.

Based on the finding of willful infringement, the Court awarded Alps enhanced damages. JA000126–27. As the finding of willful infringement must be overturned, the Court's award of enhanced damages must also be reversed. *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir. 2010) ("A finding of willful infringement is a prerequisite to the award of enhanced damages"). The district court's award of attorneys' fees was also based solely upon the determination of willful infringement, JA000128–29, and Alps did not advance any other argument for awarding attorneys' fees. JA013652–53. This award should be reversed as well.

## V. THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A PERMANENT INJUNCTION.

Ignoring this Court's instruction that proof of irreparable harm requires proof of a causal nexus between the alleged harm and the infringement, the district court issued an injunction without even addressing the existence of a nexus between Alps's alleged lost sales (the sole basis for the court's finding of irreparable harm) and the infringement. This alone is an error of law that warrants

vacating the injunction.  But remand for further consideration is again unnecessary.  The district court has already found the requisite causal link between Alps's sales and OWW's infringement *to be missing* when it granted OWW JMOL as to Alps's lost profits claim, describing Alps's evidence of causation as pure "speculation." JA012805.  The grant of the injunction should be reversed.  *See Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) (*"Apple II"*).

## A. Alps Had to Show That the Patented Feature Is an Important Driver of Consumer Demand.

To prove irreparable harm, a patentee must establish that "a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple II*, 695 F.3d at 1374.  This requires proof that "the infringing feature drives consumer demand for the accused product." *Id.* at 1375.  The patentee must show a "connection between the patented feature and demand for [the accused] products"; specifically, that the "specific patented [feature] is an important driver of consumer demand." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1364–65 (Fed. Cir. 2013) (*"Apple III"*).  This prevents the "leverag[ing of the] patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Apple II*, 695 F.3d at 1375.

The '109 Patent's "inventive contribution," if any, is very limited.  The sole reason given by the PTO for patentability was the purportedly "unexpected" shear resistance or durability of the SEEPS gel-fabric composites relative to the prior art.

JA007945. Alps did not show this durability to be an "important driver" of consumer demand for OWW's products. *See Apple III*, 735 F.3d at 1365.

Consumer demand for prosthetic liners is driven by many factors. Silicone liners are the most durable but cause skin problems. JA012109. Urethane gel liners are softer and more comfortable but less durable and also cause skin problems without proper lubrication. JA012111–12. Thermoplastic gel liners are more comfortable than both silicone and urethane gel liners, but less durable. JA012109. Quality of the fabric, thickness of the gel, the method of suspending the prosthetic leg or arm, and price also influence consumer choice. For patients with irregularly shaped residual limbs, fit may be most important. Unlike most amputees, these patients cannot wear off-the-shelf liners and have to order custom-made ones (which OWW makes and Alps does not). JA012117. While Alps need not exclude all of these factors as reasons for consumer demand for OWW's products, the complexity of consumer choices illustrates the difficulty of Alps's burden.

### B. Alps Did Not Demonstrate a Causal Nexus.

While Mr. Chen, Dr. Atwood, and Dr. Laghi touted the "revolutionary" impact of Chen's invention, the record is devoid of evidence linking consumer demand for OWW's products to the patented feature. Neither of Alps's damages experts did any independent analysis of consumer demand. Its royalty expert

simply assumed that consumer demand is driven by "what Dr. Atwood said or what has been testified to." JA012646. Its lost profits expert testified that he did not even consider whether consumer demand was driven by the patented invention—he "[did not] think that's important." JA012589.

There was testimony from James McElhiney, a prosthetist and amputee, that OWW's SEEPS gel liners are more comfortable than silicone liners. JA012125–26. However, isolated quotations from consumers praising covered features "do not begin to prove that those particular features drive consumer demand in any more than an anecdotal way." *See Apple III*, 735 F. 3d at 1366 (quoting district court opinion with approval). Moreover, McElhiney praised OWW's liners for improved comfort (which he attributed to the softness of SEEPS gel) rather than superior durability—here, the supposed basis for patentability. This testimony therefore does not even begin to demonstrate that the patented feature is an "important driver" of consumer demand.

Furthermore, the district court's own findings affirmatively show there is no such nexus. At trial, the court granted OWW's JMOL motion as to lost profits. JA012805. "To recover lost profits damages the patentee must show a reasonable probability that 'but for' the infringement, it would have made the sales that were made by the infringer." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc). The patentee must establish at least a "reasonable

probability" of causation. *Id.* To show the nexus needed to secure an injunction, the patentee likewise has to demonstrate a causal "connection between the patented feature and demand for [the accused] products." *Apple III*, 735 F. 3d at 1364. Since the two standards present essentially the same causation threshold, Alps's failure to meet one precludes it from meeting the other.

The district court characterized the connection between Alps's evidence of lost sales and OWW's alleged infringement as pure "speculation." JA012805. It found that "there is no way that anyone could conclude how much of the market would go to a silicone-produced product or stay with a gel-produced product," JA012805, which reflects Alps's failure to present evidence that the specific patented features are important to consumers. The court pointed out that Alps did not even attempt to do a market study. JA012806.

Because "the causal nexus inquiry is … part of the irreparable harm calculus," *Apple II*, 695 F.3d at 1375, the court abused its discretion in finding irreparable harm without even addressing OWW's argument that a causal nexus was lacking. Indeed, Alps's failure to establish lost profits precluded, as a matter of law, a finding of irreparable harm on the basis of lost sales. The grant of the permanent injunction should be reversed.

## VII. THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING OWW IN CONTEMPT OF THE PERMANENT INJUNCTION.

Even if the district court had not erred in issuing the injunction, it erred in finding OWW in violation of that injunction for selling the redesigned Advanced Gel products. Given Alps's consistent position throughout this litigation that the asserted claims require 100 pbw SEEPS to 1,600 pbw mineral oil, OWW redesigned its products ███████████████████████████████ ███████████. But, during the contempt proceeding, Alps advanced a new infringement theory, arguing that the claims in fact require a mixture of 100 pbw hydrogenated SIBs, only some of which (perhaps a single molecule) must be SEEPS, to 1,600 pbw oil. Adjudicating the merits of this infringement theory in a contempt proceeding was improper, because a redesigned product must be deemed more than colorably different from the adjudged infringing product (and as such must be addressed in a separate lawsuit) unless the patent owner can prove it infringes under the *same* theory offered at trial. But, even if the court did not err in addressing whether the Advanced Gel products infringe, its ultimate conclusion of infringement was an error, as it misconstrued the dispositive claim language.

### A. Analysis of Colorable Differences Focuses on "How the Patentee in Fact Proved Infringement" at Trial.

A party bringing a contempt motion must prove by clear and convincing evidence "both that the newly accused product is not more than colorably different

from the product found to infringe and that the newly accused product actually infringes." *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (en banc). "[T]he colorable-differences standard focuses on how the patentee in fact proved infringement [at trial], not [on] what the claims require" (that is, *not* on whether the patentee can prove infringement under some new theory). *See nCube*, 732 F.3d at 1351. This separation of the two prongs of *TiVo* protects the values of notice and procedural fairness by "keeping contempt suitably limited." *Id.* Colorable-differences analysis begins with identifying "those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims." *TiVo*, 646 F.3d at 882. Where one or more of those elements has been modified or removed, the court must determine whether that modification is significant. *Id.* When the differences are "significant," the newly accused product must be deemed more than colorably different. *Id.*

B. **Since OWW Redesigned Its Products in View of What Alps and Inventor Chen Had Consistently Represented to Be the Scope of Claims 1–3, the District Court Erred in Permitting Alps to Advance a New Infingement Theory in the Contempt Proceeding.**

The district court paid no attention to how Alps "in fact proved infringement" at trial, instead permitting Alps to advance an infringement theory that was both new and plainly contrary to Alps's position throughout this litigation (as well as the inventor's statements throughout prosecution) on the scope,

meaning, and purported grounds for patentability of the asserted claims. For the court to accept Alps's novel theory in a contempt hearing, rather than to adjudicate its merits in the separate declaratory judgment action that OWW had filed, was error.

Before the contempt proceedings, Alps had always urged that the asserted claims of the '109 Patent, including claims 1–3, require 100 pbw *SEEPS* to 300–1,600 pbw oil. At trial, Dr. Atwood testified that "100 parts by weight" of claim 1 "refers to, in its essential feature, the *SEEPS* polymer." JA012291 (emphasis added). He testified that the "only major difference" difference between claims 1 and 11 is "the source of the SEEPS polymer": claim 11 is limited to the Septon 4055 and Septon 4033 SEEPS polymers manufactured by Kuraray, while "[c]laim 1 just wants the SEEPS polymer regardless" of the manufacturer. JA012337–38. This cannot be reconciled with Alps's position in the contempt proceeding that claim 1 may be infringed with less than 100 pbw SEEPS to 300–1,600 pbw oil.

Dr. Atwood's trial testimony was consistent with Alps's earlier position and Chen's statements during prosecution. When construed before trial, the claims did not yet have the amendments added during reexamination. Thus, claims 1–3 did not have the "comprising [SEEPS]" language, but recited only hydrogenated SIBs. Alps, however, argued that "hydrogenated [SIB](s)" should be construed

54

essentially as "SEEPS," such that claims 1–3 would require 100 pbw SEEPS to 300–1,600 pbw oil. JA002710. Indeed, when Chen amended the claims during reexamination, he insisted that the "comprising [SEEPS]" language did not narrow the claims. JA003726.

OWW's Advanced Gel products do not have the required 100 pbw SEEPS to 300–1,600 pbw oil. OWW eliminated Septon 4055 altogether and reduced the amount of Septon 4033, replacing them with non-SEEPS hydrogenated SIBs (*i.e.*, J-Series). JA016938–39. ██████████████████████████

███████████████████████████████████████

████████████████████████████████ *Id.*

During the contempt hearing, Alps argued that J-Series is actually SEEPS and that consequently the ratio of SEEPS to oil in the Advanced Gel products was the same as in the Original Gel products. As a fallback argument, Alps opportunistically advanced a new claim construction, arguing for the first time that claims 1–3 require only *some* amount of SEEPS, provided it is part of a mixture of 100 pbw hydrogenated SIBs to 300–1,600 pbw oil. JA014482–83. Without acknowledging that this fallback argument presented a new issue of claim constriction and contradicted Alps's earlier position, the district court accepted it, holding that "[w]hether the J-Series contained in the Advance Gel Products is a

SEEPS copolymer is a distinction without a colorable difference because these products contain Septon 4033, a SEEPS copolymer." JA000182.

This was an abuse of discretion. Contempt is inappropriate where there is "a fair ground of doubt as to the wrongfulness of the defendant's conduct." *TiVo*, 646 F.3d at 881–882. OWW's ███████████████████████████ █████████████████████████████████████████████████ raised at least "a fair ground of doubt" as to whether the products infringe. The district court's addressing this question in a contempt proceeding denied OWW the appropriate notice before it could be held in contempt and undermined "the policy that legitimate design-around efforts should always be encouraged as a path to spur further innovation." *Id.* at 883.

### C. Irrespective of Alps's Previous Positions Regarding the Scope of Claims 1–3, the Advanced Gel Products Are More Than Colorably Different From the Original Gel Products.

Even if Alps's claim construction was merely novel (as opposed to also contradicting how Alps and the inventor had consistently characterized the claims before the contempt motion), the court's contempt finding was still an abuse of discretion. As *nCube* made clear, the patent owner cannot advance a new infringement theory in a contempt motion, as the focus is on "how the patentee in fact proved infringement" at trial, not "what the claims require." 732 F.3d at 1351.

In *nCube*, Claim 4 of a patent on a "video-on-demand" technology recited a method for retrieving and transporting data between a client and a server, requiring, inter alia, an "upstream physical address" to be updated in a "connection service table." *Id.* at 1348. SeaChange's accused ITV system utilized a series of identifiers, or data fields containing certain addressing information. *Id.* At trial, ARRIS singled out the ClientID, an identifier situated in the system's Connection Table and proved that it met the "upstream physical address" limitation. *Id.* Following a verdict of infringement, SeaChange redesigned the ITV system by moving the ClientID from the Connection Table to elsewhere. *Id.* at 1349. ARRIS moved to hold SeaChange in contempt. *Id.* at 1348. The ClientID no longer met the "upstream physical address" limitation (it was now updated *outside* the Connection Table), but ARRIS argued that the redesigned system infringed and was no more than colorably different because the SessionID, another identifier in the Connection Table, also met the "upstream physical address" limitation (since it too contained the "MAC address"). *Id.* at 1350–51.

ARRIS argued that changing the infringing system Connection Table "with the two MAC addresses" to a system "with only one" was insignificant. *Id.* at 1351. This Court, however, noted that, "for this argument to hold sway, the MAC address must be the portion of the ClientID that meets the upstream physical address limitation." But at trial ARRIS "never called out the MAC address as the

infringing aspect" of the ClientID and instead relied on the ClientID as a whole to prove infringement. *Id.* While ARRIS was "under no obligation to prove every possible avenue of infringement at trial," it could not raise a new infringement theory in a contempt proceeding. *Id.*

*nCube* is on point. Just as ARRIS's trial proof focused on the ClientID, Alps's trial proof that together Septon 4055 and Septon 4033 in the Original Gel products met the "polymer-to-oil-ratio" limitation was that each is SEEPS (the polymer Alps's expert described as the "essential feature" and the "essential polymer component" of the invention). JA012291. Just as the ClientID no longer met the "upstream physical address" limitation, ████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████ Just as ARRIS asserted for the first time in its contempt motion that something other than the ClientID satisfied the relevant limitation, Alps's contempt motion asserted for the first time that something other than SEEPS (a non-SEEPS hydrogenated SIB) counts toward "100 parts by weight" of claims 1–3. The district court improperly ignored *TiVo*'s separation of the colorable-differences and infringement prongs, focusing on "what the claims require" instead of how Alps "in fact proved infringement" at trial. Its finding that the redesigned Advanced Gel products are no more than colorably different from the Original Gel products was clearly erroneous.

58

### D.   The District Court Incorrectly Construed the Dispositive Claim Language.

Even if the district court did not err in addressing whether the redesigned Advanced Gel products infringe, its ultimate finding of infringement (and thus of contempt) was still in error.   The court's construction of claims 1–3, with "comprising [SEEPS]" modifying "one or a mixture" instead of "hydrogenated [SIB](s)," is not only grammatically incorrect but would improperly broaden the claims to cover mixtures of hydrogenated SIBs having a *single molecule* of SEEPS.

The written description states that the "the invention comprises" gels made from "100 parts by weight of one or more hydrogenated [SIBs] *of the formula* [SEEPS]" to 300–1,600 pbw oil. JA000209 (2:32–37) (emphasis added).   Nowhere does it describe a gel composition made from 100 pbw hydrogenated SIBs to 300–1,600 pbw oil in which any of these hydrogenated SIBs are anything other than SEEPS.

The prosecution history also supports OWW's construction.   During reexamination, the PTO rejected all original claims.   JA000778.   In response, Chen amended claims 1–3 to include the "comprising [SEEPS]" language, insisting that this language did not narrow the scope of the claims, JA003726, as he believed that claims 1–3 had required SEEPS all along.   For Chen, then, claims 1–3, both before *and after* the amendment, required 100 pbw SEEPS to 300–1,600 pbw oil.   The

PTO still rejected the amended claims as obvious. JA006897. It noted "no evidence, commensurate in scope with the composite article of the claims, demonstrating unexpected results." JA006942. In response, Chen conducted his demonstration. Critically, *all* of the polymers in Chen's "representative" gel-fabric composite were SEEPS. JA008529–30. The SEEPS-only sample is what Chen considered to be "commensurate in scope" with the claims. This demonstration of purportedly unexpected results was the PTO's sole reason for allowing the claims. JA007945. By broadening the scope of the amended claims to cover gel-fabric composites having any measurable amount of SEEPS, the district court's construction gutted the PTO's reason for allowing the claims.

During the contempt hearing, Alps defended its construction on the basis of claim differentiation. JA017812. Alps pointed the district court to claim 11, which expressly requires 100 pbw SEEPS (specifically, Septon 4055 or Septon 4033) to 300–1,600 pbw oil, and asserted that OWW's construction of claim 1 would render claim 11 redundant. *Id.* In fact, Dr. Atwood explained the difference between claims 1 and 11. Claim 11 is limited to the Septon 4055 and Septon 4033 SEEPS polymers manufactured by Kuraray, while "[c]laim 1 just wants the SEEPS polymer regardless" of the manufacturer. JA012337–38. This confirms OWW's construction of the SEEPS language in claims 1–3. In any event, the written description and prosecution history can overcome any presumption arising from

60

the doctrine of claim differentiation.  *See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000).  Here, the written description and Chen's comments during reexamination establish that claims 1–3 require 100 pbw SEEPS to 300–1,600 pbw oil.

The district court's contempt finding should be reversed, as it was an abuse of discretion under *TiVo* and *nCube* and it was based on an incorrect claim construction.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For all of the above reasons, OWW respectfully requests that this Court vacate the judgments for lack of jurisdiction, or, in the alternative, reverse on invalidity and hold the asserted claims to be invalid. Should this Court affirm on jurisdiction and invalidity, it should reverse the judgment of wilful infringement and the awards of enhanced damages and attorneys' fees; reverse the grant of the permanent injunction; and reverse the finding that OWW was in contempt of the injunction and vacate the associated sanctions and damages award.

Dated:  June 12, 2014                                       Respectfully submitted,

                                                            */s/ John D. Luken*
                                                            John D. Luken
                                                            Joshua A. Lorentz
                                                            Brian S. Sullivan
                                                            DINSMORE & SHOHL LLP

255 E. Fifth St., Suite 1900
Cincinnati, Ohio 45202
Tele: 513.977.8564
John.Luken@Dinsmore.com
Joshua.Lorentz@Dinsmore.com
Brian.Sullivan@Dinsmore.com

*Attorneys for Defendant-Appellant,*
*The Ohio Willow Wood Company*

2013-1452, -1488, 2014-1147, -1426

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ALPS SOUTH, LLC,

*Plaintiff-Cross Appellant*,

v.

THE OHIO WILLOW WOOD COMPANY,

*Defendant-Appellant*.

_____

Appeals from the United States District Court for the
Middle District of Florida in Case No. 08-CV-1893, Judge Mary S. Scriven
_____

## PUBLIC ADDENDUM TO BRIEF OF DEFENDANT-APPELLANT

John D. Luken
Joshua A. Lorentz
Brian S. Sullivan
DINSMORE & SHOHL LLP
255 E. Fifth St., Suite 1900
Cincinnati, Ohio  45202
Tele:  513.977.8564
John.Luken@Dinsmore.com
Joshua.Lorentz@Dinsmore.com
Brian.Sullivan@Dinsmore.com

*Attorneys for Defendant-Appellant
The Ohio Willow Wood Company*

Material has been deleted from the JA00182–83. This material was redacted by the
court below at the time of issuance of the opinion.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALPS SOUTH, LLC,
a Florida limited liability company,

              Plaintiff,

v.                                        Case No. 8:08-cv-1893-T-33MAP

THE OHIO WILLOW WOOD
COMPANY, an Ohio corporation,

              Defendant.
_____/

## ORDER

THIS cause is before the Court on Defendant, The Ohio Willow Wood Company's ("OWW"), Motion to Dismiss for Lack of Standing (Dkt. 31). The Court reviewed both the Motion to Dismiss, as well as Alps South, LLC's ("Alps") Response (Dkt. 34), and heard oral argument regarding the same on February 3, 2010. Based thereon, the Court finds the following:

The Patent Act provides that a patentee shall have remedy by a civil action for infringement of its patent, and the Patent Act defines the term "patentee" to include not only the patentee to whom the patent was issued, but also the successors in title to the patentee. The title to a patent may be transferred, as provided by law, which states that a patentee may grant and convey an exclusive right under his application for patent, or patents, to the whole or any specific part of the United States. When a patentee transfers all substantial rights under a patent, the transferee may effectively be deemed the patentee under the statute with standing to bring an infringement action in its own name. Restorative Products, Inc. v. MMAR Med. Group, Inc., 1996 WL 221786, *3 (April 29, 1996 M.D. Fla.); Applied Interact, LLC v. Vermont Teddy Bear Company, Inc., 2005 WL 1785115, *3 (July 28, 2005 S.D. N.Y.).

The substantial rights to a patent include the right to exclude others from making, using, or selling the invention in the United States, the right to transfer, and the right to sue. An exclusive licensee that has not been assigned all substantial rights in a patent can only bring suit as a co-plaintiff with the patentee in order to have standing.

Alps and Applied Elastomerics, Inc. entered into a Patent Sale and License Agreement ("Agreement") on August 31, 2008, under which Alps is named the exclusive licensee of the patents at issue in this case. The Agreement provides Alps with the substantial rights of excluding others and the rights to transfer and sue while Applied Elastomerics, Inc. retained or reserved some rights. The rights retained or reserved are not substantial enough under the language of the agreement or case law construing similar agreements to require that Applied Elastomerics, Inc. be joined as a co-plaintiff.

Alps and Applied Elastomerics, Inc. also entered into an Amended Agreement on January 28, 2010, with an effective date of August 31, 2008. Under the Amended Agreement, Alps clearly possesses the substantial rights to proceed without Applied Elastomerics in this case.

It is hereby

**ORDERED, ADJUDGED and DECREED** that:

1.    Defendant The Ohio Willow Wood Company's Motion to Dismiss for Lack of Standing (Dkt. 31) is **DENIED**.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, on the <u>11th</u> day of February 2010.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

2

Copies to:

Counsel of Record

3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**HONORABLE MARY S. SCRIVEN**

| | |
|---|---|
| CASE NO.  8:08-cv-01893-MSS-MAP | DATE: April 24, 2012 |
| TITLE:  ALPS South, LLC v. The Ohio Willow Wood Company | |
| TIME: 10:05AM-12:05PM/1:20-2:35PM | TOTAL:  3 hours and 15 minutes |
| Courtroom Deputy: Anaida Vizza | |
| Court Reporter: Janie Gibbs | |

| |
|---|
| Counsel for Plaintiff(s):  Ronald Christaldi, Mindi Richter , and Jason Stearns |
| Counsel for Defendant(s):  F. Michael Speed, Jeffrey Standley  and Patrick Risch |

### *CLERK'S MINUTES: PROCEEDINGS OF*
### *HEARING ON STANDING*

10:05AM Court called to order. Proffer by Mr. Christaldi. Proffer by Mr. Speed.

12:05 PM Lunch recess.

1:20 PM   Court back in session. Mr. Christaldi believes that standing is a technical issue, and requests that this matter proceed to trial on Monday or soon thereafter. Mr. Speed requests that the Court find that the Plaintiffs have no standing and that adding a party cannot cure or provide a remedy. The Court finds that the amended agreement cured the prudential standing issue. The Plaintiff, at their discretion, may move for leave to file an amended complaint. In the event that leave is granted to file an amended complaint, trial in this matter would be continued. Parties inform the Court that they are ready to proceed to trial on Monday April, 30, 2012. The Court will set aside 7 days for this trial (3.5 days per side); the trial will be in recess on Tuesday, May 8, 2012. Parties are to exchange their witness and exhibit list 24-48 hours prior to trial commencing.

2:35 PM Court is adjourned.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ALPS SOUTH, LLC,**

**Plaintiff,**

-vs-                                                   Case No.  8:08-cv-1893-T-35MAP

**THE OHIO WILLOW WOOD COMPANY,**

**Defendant.**

_____/

## JUDGMENT IN A CIVIL CASE

    **IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of Plaintiff ALPS and against Defendant OWW on the issue of inequitable conduct.

Date:   July 16, 2012

          SHERYL L. LOESCH, CLERK

          By:    B. Sohn, Deputy Clerk

Copies furnished to:

Counsel of Record

### CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)  **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

    (b)  **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)  **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)  **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5**: The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)  **Appeals pursuant to judicially created exceptions to the finality rule**: Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157,85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

    (a)  **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

    (b)  **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c)  **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d)  **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e)  **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant

4. **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Rev.: 4/04

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ALPS SOUTH, LLC,

                    Plaintiff,

-vs-                                                    Case No.  8:08-cv-1893-T-35MAP

THE OHIO WILLOW WOOD COMPANY,

                    Defendant.

_____/

## AMENDED JUDGMENT IN A CIVIL CASE

On May 10, 2012, the issues of whether OWW infringed the '109 patent; whether OWW willfully infringed the '109 patent; and whether the '109 patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration. On May 11, 2012, the jury found that OWW did infringe the '109 patent, OWW willfully infringed the '109 patent, and the '109 patent was valid. The Court, upon the close of the evidence, took the defense of inequitable conduct under consideration. On July 13, 2012, the Court ruled that OWW has not demonstrated by clear and convincing evidence that Mr. Chen engaged in inequitable conduct during the original prosecution of the '109 patent or the reexamination of the '109 patent.

Upon consideration of the foregoing, **IT IS ORDERED** that Judgment is entered for the Plaintiff, **ALPS SOUTH, LLC** and against the Defendant, **THE OHIO WILLOW WOOD COMPANY** with respect to the '109 Patent as to the issues of infringement; willful infringement; and validity due to anticipation or obviousness by prior art. Judgment is entered in the amount of $3,983,512.00.

**IT IS FURTHER ORDERED** that Judgment is entered for the Plaintiff, **ALPS SOUTH, LLC** and against the Defendant, **THE OHIO WILLOW WOOD COMPANY** with respect to the '109 Patent as to the issue of inequitable conduct.

Date:  July 19, 2012

SHERYL L. LOESCH, CLERK

By: /s/A. Vizza, Deputy Clerk

Copies furnished to:

Counsel of Record
Unrepresented Parties

## CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

   (b) **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d) **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5**: The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule**: Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

   (a) **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b) **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c) **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d) **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e) **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant

4. **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Rev.: 4/04

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ALPS SOUTH, LLC,

Plaintiff,

-vs-                                                  Case No.  8:08-cv-1893-T-35MAP

THE OHIO WILLOW WOOD COMPANY,

Defendant.

_____/

## SECOND AMENDED
## JUDGMENT IN A CIVIL CASE

On May 10, 2012, the issues of whether OWW infringed the '109 patent; whether OWW willfully infringed the '109 patent; and whether the '109 patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration. On May 11, 2012, the jury found that OWW did infringe the '109 patent, OWW willfully infringed the '109 patent, and the '109 patent was valid. The Court, upon the close of the evidence, took the defense of inequitable conduct under consideration. On July 13, 2012, the Court ruled that OWW has not demonstrated by clear and convincing evidence that Mr. Chen engaged in inequitable conduct during the original prosecution of the '109 patent or the reexamination of the '109 patent.

Upon consideration of the foregoing, **IT IS ORDERED** that Judgment is entered for the Plaintiff, **ALPS SOUTH, LLC** and against the Defendant, **THE OHIO WILLOW WOOD COMPANY** with respect to the '109 Patent as to the issues of infringement; willful infringement; and validity due to anticipation or obviousness by prior art, non-

enablement and written description. Judgment is entered in the amount of $3,983,512.00.

**IT IS FURTHER ORDERED** that Judgment is entered for the Plaintiff, **ALPS SOUTH, LLC** and against the Defendant, **THE OHIO WILLOW WOOD COMPANY** with respect to the '109 Patent as to the issue of inequitable conduct.

Date:  July 31, 2012

SHERYL L. LOESCH, CLERK

By: _____
/s/A. Vizza, Deputy Clerk

Copies furnished to:

Counsel of Record
Unrepresented Parties

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  __Appealable Orders__: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a) __Appeals from final orders pursuant to 28 U.S.C. Section 1291__: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

    (b) __In cases involving multiple parties or multiple claims__, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c) __Appeals pursuant to 28 U.S.C. Section 1292(a)__: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d) __Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5__: The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e) __Appeals pursuant to judicially created exceptions to the finality rule__: Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.  __Time for Filing:__ The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

    (a) __Fed.R.App.P. 4(a)(1)__: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing. Special filing provisions for inmates are discussed below.

    (b) __Fed.R.App.P. 4(a)(3)__: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c) __Fed.R.App.P.4(a)(4)__: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d) __Fed.R.App.P.4(a)(5) and 4(a)(6)__: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e) __Fed.R.App.P.4(c)__: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.  __Format of the notice of appeal__: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant

4.  __Effect of a notice of appeal__: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Rev.: 4/04

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ALPS SOUTH, LLC, a Florida
Corporation,**

       **Plaintiff,**

v.

                                **Case No. 8:08-cv-1893-T-35-MAP**

**THE OHIO WILLOW WOOD
COMPANY, an Ohio Corporation,**

       **Defendant.**

_____/

<u>**ORDER**</u>

    **THIS CAUSE** comes before the Court for consideration of The Ohio Willow

Wood Company's ("OWW") Renewed Motion for Judgment as a Matter of Law, or in the

Alternative, Motion for a New Trial, or for Remittur (Dkt. 356) and Alps South, LLC's

("ALPS") Response in Opposition. (Dkt. 364)  For the reasons that follow, the Court

finds that the jury's verdict in relation to infringement, willful infringement, damages and

validity is supported by the evidence presented at trial and there is no basis to conclude,

as OWW urges, that no reasonable jury could have reached the verdict rendered in this

case.  Accordingly, OWW's Renewed Motion for Judgment as a Matter of Law, or in the

Alternative, Motion for a New Trial, or for Remittur (Dkt. 356) should be and hereby is

**DENIED.**

   **I.  BACKGROUND**

    ALPS initiated this action alleging OWW infringed U.S. Patent Nos. 6,552,109

(the "'109 Patent") and 6,867,253 (the "'253 Patent") (collectively "patents-in-suit").

(Dkt. 35)  OWW filed a two-count counterclaim seeking a declaratory judgment that (1) OWW did not infringe on the patents-in-suit; (2) the patents-in-suit are invalid and unenforceable; and (3) the patents-in-suit are unenforceable due to the inequitable conduct of the inventor, Mr. Chen. (Dkt. 39)

During the litigation, the patents-in-suit were submitted for re-examination and the patents-in-suit were reissued by the United States Patent and Trademark Office ("PTO").  A Re-examination Certificate was issued on the '253 Patent on June 7, 2011. (Dkt. 185-4)  A Re-examination Certificate was issued on the '109 Patent on July 5, 2011. (Dkt. 175)

The jury trial began in this action on April 30, 2012.  During the trial, all the asserted claims related to the '253 patent were dismissed.  On May 10, 2012, the issues of whether OWW infringed the '109 Patent; whether OWW willfully infringed the '109 patent; and whether the '109 Patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration.  On May 11, 2012, the jury found that OWW did infringe Claims 1-3, 5, 6, 11 and 12 of the '109 Patent, OWW willfully infringed the '109 Patent, and the '109 Patent was valid.

## II.    LEGAL STANDARD

Rule 50 of the Federal Rules of Civil Procedure ("Rule 50") allows the Court to grant a motion for judgment as a matter of law ("JMOL Motion") if a party has been fully heard on an issue during a jury trial, and the Court finds that no reasonable jury would have had a legally sufficient evidentiary basis to find for the non-moving party on that issue. Fed. R. Civ. P. 50(a)(1).  In considering a JMOL Motion, the court must "consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the

2

nonmoving party . . . [and] in this light, [determine whether] there was any legally sufficient basis for a jury to find in favor of the nonmoving party." Powell v. Home Depot, U.S.A., Inc., 663 F.3d 1221, 1228 (Fed. Cir. 2011)(quoting Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc., 615 F.3d 1352, 1360 (11th Cir. 2010)).  The Court does not "make credibility determinations or weigh the evidence."  Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 724 (11th Cir. 2012).  However, "credence [is given] to evidence supporting the nonmoving party's case, as well as 'uncontradicted and unimpeached' evidence supporting the moving party, 'at least to the extent that that evidence comes from disinterested witnesses." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 503 U.S. 133, 150-51 (2000)).

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  The Court has discretion to grant a new trial if the verdict appears to be against the weight of the evidence, the damages are excessive, there are substantial errors in admission or rejection of evidence or instructions to the jury, or that, for other reasons, the trial was not fair to the movant. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940).  Although a court may exercise its discretion in determining whether to grant a new trial, it cannot displace a jury's verdict merely because it disagrees with it or because a contrary verdict may have been equally supportable. Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1310 (Fed. Cir. 2011).

3

### III. DISCUSSION

#### A. Judgment as a Matter of Law

Against Rule 50's high standard, OWW asserts four grounds to overturn this verdict. First, it claims that the '109 Patent was not infringed because the '109 patent required a level of crystallinity (20%) of the challenged polymer component, which it claims was not proven by ALPS to have been met by OWW's infringing products. Second, it claims that no reasonable jury would have had a legally sufficient evidentiary basis to find for ALPS on the issue of whether the claims of the '109 patent were anticipated by the Hammond Reference (i.e. International Publication No. WO 93/23472), which incorporated by reference European Patent Application 0108518 to Debbaut or prior art of the inventor, Mr. Chen. Third, OWW argues that no reasonable jury would have had a legally sufficient evidentiary basis to find the '109 patent nonobvious. Fourth, OWW argues that it is entitled to a directed verdict on willfulness.

The Court, having considered each of these contentions at trial and on this renewed motion, again finds that OWW's motion should be **DENIED**. First, with regards to OWW's first contention, nowhere in the claims of the '109 patent is there a requirement for 20% crystallinity in the gel polymer used in the composite. Even though there was evidence regarding a crystallinity requirement of the gel polymer the jury was apparently not persuaded by the evidence or the arguments made by Defendant to determine that Defendant did not infringe the '109 Patent. Thus, any challenge grounded in the failure of ALPS to prove up the crystallinity of the OWW's offending product or the jury's failure to conclude that the '109 patent was not infringed in the absence of proof of 20% crystalinity in the infringing product must fail.

4

JA000109

Second, there was record evidence from which the jury, like the PTO, could have concluded that the '109 patent was not anticipated by or rendered obvious by the Hammond Reference and any patent incorporated therein. Certainly, OWW has not shown on this motion that no reasonable jury could have found that OWW failed to meet its high burden of showing by clear and convincing evidence that the '109 Patent was either anticipated by or rendered obvious by the Hammond Reference or other prior art of Mr. Chen's inventions, specifically U.S. Patent No. 5,336,708. Particularly, as ALPS asserts: "Every piece of alleged prior art that OWW pointed to during trial for its obviousness defense was already considered by the PTO during prosecution and/or the reexamination. When the prior art has been considered by, and rejected, by the USPTO, it is even more difficult to overcome the presumption of nonobviousness." (Dkt. 364 at 10)(citing Hewlitt-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1467 (Fed. Cir. 1990)). Where, as here, the patent has also been upheld through a reexamination, OWW's burden of proving invalidity was more difficult to sustain. See PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1304 (11th Cir. 2008)("When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job.").

OWW's final contention is that the jury's willfulness findings essentially build upon its infringement findings that were unsupported. However, if the jury's finding of infringement is upheld, as it is here, the willfulness findings follow a fortiori on this record. The evidence at trial, as catalogued in ALPS' Response in Opposition (Dkt. 364 at 14-18), was more than adequate to demonstrate willful infringement. Evidence of

5

OWW's pattern of behavior and intent to infringe and of its admission that it continued to infringe even after reissuance of the '109 Patent and that its principal did nothing in response to demands to either purchase a license or stop infringing was more than sufficient to support a finding of willfulness. Certainly, the Court cannot find that no reasonable jury could have so concluded.

## B. New Trial

In the alternative to its request for judgment as a matter of law OWW seeks a new trial. OWW's request for a new trial essentially reasserts its claims for judgment as a matter of law in that it is based largely on the contention that the '109 Patent is obvious and any contrary judgment would work a manifest injustice. Because the Court has already concluded that the evidence could reasonably support the jury's verdict on this issue and the other issues raised, this claim fails.

Likewise, OWW's assertion that the damages verdict is excessive and warrants a new trial on damages fails. ALPS offered factual evidence and expert testimony on this issue. Its expert witness, Mr. Oscher, whose credentials were largely unassailed, testified that in his opinion a reasonable royalty in this case should be in the range of 15% to 20%. (Dkt. 372 at 63) In determining what a reasonable royalty should be in this case, Mr. Oscher applied the 15 well established factors first set forth in Georgia–Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), for determining a reasonable royalty in a hypothetical negotiation between a patent holder and infringer of his patent. In his testimony, Mr. Oscher addressed each of the factors and explained his opinion regarding its impact on the hypothetical negotiation between ALPS and OWW. Although Defendant OWW offered a different hypothesis through a different

6

expert, the jury apparently accepted Mr. Oscher as more credible. As noted, the Court's role here is not to reweigh the evidence or substitute its judgment for that of the jury's; but rather, the "court must draw all reasonable inferences in favor of the nonmoving party." Reeves, 530 U.S. at 150. If the Court, constrained to that level of review, determines the verdict to be supportable by the evidence, it must leave the verdict intact. Accordingly, the Court finds that no new damages determination or remittitur is appropriate against this verdict.

## IV.     Conclusion

Upon consideration of the foregoing, it is hereby **ORDERED** that The Ohio Willow Wood Company's Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for a New Trial, or for Remittur (Dkt. 356) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida this 13th day of November 2012.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
    All Counsel of Record
    All *Pro Se* parties

7

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ALPS SOUTH, LLC, a Florida Corporation,**

     **Plaintiff,**

v.

                                      **Case No. 8:08-cv-1893-T-35-MAP**

**THE OHIO WILLOW WOOD COMPANY, an Ohio Corporation,**

     **Defendant.**

_____/

<u>ORDER</u>

**THIS CAUSE** comes before the Court for consideration of The Ohio Willow Wood Company's ("OWW") Motion for Equitable Intervening Rights (Dkt. 355) and Alps South, LLC's ("ALPS") Response in Opposition. (Dkt. 363) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court hereby **DENIES** OWW's Motion for Equitable Intervening Rights (Dkt. 355), as described herein.

OWW contends that it is entitled to equitable intervening rights. Plaintiff objects citing OWW's adverse jury verdict, which found OWW liable for willful infringement, and citing the absence of proof of actual losses that would be sustained upon a failure to obtain equitable intervening rights.

35 U.S.C. § 252 provides, in pertinent part, that:

A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased,

offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

35 U.S.C. § 252.  This second paragraph of section 252 establishes two separate and distinct defenses under the doctrine of intervening rights: absolute intervening rights and equitable intervening rights. BIC Leisure Prods., Inc. v. Windsurfing Intern, Inc., 1 F.3d 1214, 1220 (Fed. Cir. 1993).  The Court has the discretion to grant the accused infringer "equitable intervening rights" to the "continued manufacture, use, or sale of additional products covered by the reissue patent when the [accused infringer] made, purchased, or used identical products, or made substantial preparations to make, use, or sell identical products, before the reissue date." Id. at 1221.

Factors district courts may consider to ascertain whether application of equitable intervening rights is warranted are

> (1) whether substantial preparation was made by the infringer before the reissue; (2) whether the infringer continued manufacturing before reissue on advice of its patent counsel; (3) whether there were existing orders or contracts; (4) whether non-infringing goods can be manufactured from the inventory used to manufacture the infringing product and the cost of conversion; (5) whether there is a long period of sales and operations before the patent reissued from which no damages can be assessed; and (6) whether the infringer made profits sufficient to recoup its investment.

2

Visto Corp. v. Sproqit Technologies, Inc., 413 F. Supp. 2d 1073, 1090 (N.D. Cal. 2006) (citing Seattle Box Co. v. Indus. Crating & Packing, Inc., 756 F.2d 1574, 1579 (Fed. Cir. 1985)).

Against this framework, OWW asserts that it had invested approximately two years of product testing and development into the accused products before manufacturing and selling the accused products in 1996. OWW asserts it invested in the development of intellectual property by filing numerous patent applications directed towards its prosthetic liner technology. Further, OWW asserts that the equipment used to make the accused products was specially designed and it has invested in an addition to its factory to support the manufacturing of the accused products. Moreover, OWW asserts that it pays the individual it contends is the inventor of the accused products a substantial amount in royalties annually.

OWW's contention that it is entitled to equitable intervening rights fails. First, as a willful infringer, as found by the jury in this case, it has unclean hands. Specifically, the jury determined that OWW willfully infringed the '109 patent. The evidence supporting this finding was substantial. It is axiomatic that equity demands that "[one] who seeks equity must do equity," OWW is not entitled to equitable relief, such as equitable intervening rights. As the Federal Circuit explained in Shockley v. Arcan, Inc., 248 F.3d 1349 (Fed. Cir. 2001), because the infringer "did not have clean hands, the district court did not abuse its discretion in declining to exercise its equitable powers on [the infringer's] behalf. Equity's 'unclean hands' doctrine demands that '[one] who seeks equity must do equity.'... The record, with its finding of willful infringement, amply supports the district court's discretion to deny [the infringer] access to equity." Shockley,

3

248 F.3d at 1361 (quoting <u>Mfrs.' Fin. Co. v. McKey</u>, 294 U.S. 442, 449 (1935)); <u>see also</u> <u>Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.</u>, 563 F.3d 1358, 1373 (Fed. Cir. 2009).

Second, the totality of the factors as applied to this record militates against OWW's entitlement to equitable intervening rights.  OWW has produced evidence that it has made substantial preparation of the accused products prior to the '109 Patent reissuance.  This evidence, however, is heavily outweighed by the fact that OWW's president testified that OWW's profits in the year prior to trial were sufficient to recoup its investment costs for the manufacture and production of the gel and fabric composite liners it sold. (Dkt. 392 at 52-53)("Q. Okay. Did Ohio Willow Wood realize a profit last year from its sale of gel and fabric composite liners? A. Yes. Q. Was that profit sufficient enough to recoup its investment in manufacturing and production of those liners? A. Yes.")  OWW's recoupment weighs against its entitlement to equitable intervening rights.  Further, OWW presented no evidence of existing orders or contracts that would be impacted if OWW were denied equitable intervening rights.

Upon consideration of the foregoing, it is hereby **ORDERED** that The Ohio Willow Wood Company's Motion for Equitable Intervening Rights (Dkt. 355) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida this 19th day of March 2013.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
   All Counsel of Record
   All *Pro Se* parties

4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALPS SOUTH, LLC, a Florida
Corporation,

      Plaintiff,

v.

                                Case No. 8:08-cv-1893-T-35-MAP

THE OHIO WILLOW WOOD
COMPANY, an Ohio Corporation,

      Defendant.

_____/

## ORDER

**THIS CAUSE** comes before the Court for consideration of Alps South, LLC's ("ALPS") Motion for a Permanent Injunction (Dkt. 323) and The Ohio Willow Wood Company's ("OWW") Response in Opposition. (Dkt. 331)  Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court hereby **GRANTS in part and DENIES in part** ALPS's Motion for a Permanent Injunction (Dkt. 323), as described herein.

## I. BACKGROUND

ALPS initiated this action alleging OWW infringed U.S. Patent Nos. 6,552,109 (the "'109 Patent") and 6,867,253 (the "'253 Patent") (collectively "patents-in-suit"). (Dkt. 35)  OWW filed a two-count counterclaim seeking a declaratory judgment that (1) OWW did not infringe on the patents-in-suit; (2) the patents-in-suit were invalid and unenforceable; and (3) the patents-in-suit were unenforceable due to the inequitable conduct of the inventor, Mr. Chen. (Dkt. 39)

During the litigation, the patents-in-suit were submitted for re-examination and were reissued by the United States Patent and Trademark Office ("USPTO"). A Re-examination Certificate was issued on the '253 Patent on June 7, 2011. (Dkt. 185-4) A Re-examination Certificate was issued on the '109 Patent on July 5, 2011. (Dkt. 175)

The jury trial began in this action on April 30, 2012. During the trial, all the asserted claims related to the '253 patent were dismissed. On May 10, 2012, the issues of whether OWW infringed the '109 Patent; whether OWW willfully infringed the '109 patent; and whether the '109 Patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration. On May 11, 2012, the jury found that OWW did infringe claims 1-3, 5, 6, 11 and 12 of the '109 Patent; that OWW willfully infringed the '109 Patent; and, that the '109 Patent was valid.

Now, ALPS seeks an order permanently enjoining OWW from making, using, selling, offering for sale, or importing into the United States any product infringing on the claims 1-3, 5, 6, 11, and 12 of the '109 Patent from the date of the Order granting a permanent injunction through the date that the '109 Patent expires on August 11, 2014. Further, Plaintiff seeks to enjoin any party who obtains any such product from OWW from using, selling or offering to sell, or importing into the United States any infringing OWW product.

## II. LEGAL STANDARD

Under the Patent Act, a district court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. A party seeking a permanent injunction in a patent infringement case must demonstrate:

2

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  The decision to grant or

deny a permanent injunction "is an act of equitable discretion by the district court." Id.

## III. DISCUSSION

### A. Permanent Injunction

#### i. Irreparable Injury and Adequacy of Remedies Available at Law

ALPS argues that it is sustaining irreparable injury as a result of OWW's infringement.  As evidence of this irreparable injury, ALPS asserts that (1) OWW's infringement of the '109 Patent "is a clear abridgement" of a property right; (2) it has lost and is losing market share as a result of OWW's infringement; (3) it and OWW are direct competitors and distribute their products through the same channels of distribution; and (4) OWW's "low quality products" continue to damage ALPS's reputation.

On the other hand, OWW contends the following factors show that ALPS is not being irreparably injured by OWW: (1) the pre-existing license of the '109 Patent to Silipos, Inc., a direct competitor of ALPS; (2) the existence of other competitors in the market selling gel-fabric liners; (3) the lack of evidence to substantiate its claim that it is losing sales due to OWW's infringement; (4) the success of OWW's products is not correlated to the features claimed by the '109 Patent; and (5) ALPS's delay in licensing the '109 Patent and bringing suit against OWW.

3

The evidence demonstrates that ALPS and OWW are direct competitors competing in the same market. (Dkt. 302 at 7-8, Dkt. 390 at 48)  This direct competition strongly weighs in favor of the assertion of ALPS that it will suffer irreparable injury without an injunction.  See Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.").  The Court finds that the evidence of Silipos, Inc.'s role as a competitor and other purported competitors is insufficient to overcome ALPS's showing of irreparable injury.  See Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1328 (Fed. Cir. 2008) ("A plaintiff's past willingness to license its patent is not sufficient per se to establish lack of irreparable harm if a new infringer were licensed.").  Accordingly, the Court concludes there is sufficient evidence to demonstrate that ALPS has suffered and will continue to suffer irreparable injury without injunctive relief.

Further, the Court finds that monetary damages will not fully compensate ALPS's injury.  ALPS has presented evidence that OWW provides a lower quality product to the market which has created a perception in the market that silicone liners are better than thermoplastic gel liners. (See Dkt. 301 at 64-65; Dkt. 302 at 31-32)  This perception impacts ALPS's ability to market and sell its product.  The difficulty in determining ALPS's loss of business opportunity or loss of goodwill based on this perception is a sufficient basis to conclude that the remedies at law would be inadequate to compensate ALPS for OWW's infringement.

4

### ii. Balance of Hardships

ALPS argues that the balance of hardships weighs in its favor of a permanent injunction. ALPS asserts that as a result of OWW's infringement ALPS is (1) losing sales; (2) being deprived of market share; (3) being deprived of funds necessary for further research and development; and (4) suffering reputational loss in relation to its products. OWW, however, contends that the balance of hardships weighs in its favor because it has invested substantially in the research and development of the infringing products and an injunction could put OWW out of business entirely.

"A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one." Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1156 (Fed. Cir. 2011). Moreover, "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986). The Court finds that OWW's hardship from investing in the infringing products does not outweigh the hardship to ALPS if OWW is permitted to continue competing against OWW. Thus, the Court concludes that the balance of hardship weighs in favor of granting a permanent injunction.

### iii. Public Interest

OWW contends a permanent injunction would disserve the public interest because it would create "consequential medical, practical, and economic issues for a large number of amputees who utilize OWW's Alpha Liner Products." (Dkt. 331 at 17) OWW asserts that "[b]ecause fit of the prosthetic solution is so critical, amputees

5

currently using the Alpha Liner products would be forced to return [ ] their prosthetics to be refitted for a different prosthetic solution were the [OWW] Alpha Liner to become unavailable." (Dkt. 331 at 18-19)

"As a general matter, the public maintains an interest in protecting the rights of patent holders, and the '[s]uccessful exploitation' of the patent by the infringer does not allow the infringer to avoid a permanent injunction." Enpat, Inc. v. Budnic, 6:11-cv-86-PCF-KRS, 2011 WL 1196420, at *5 (M.D. Fla. March 29, 2011) (quoting Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 704 (Fed. Cir. 2008)). While an amputee may have to return prosthetic devices to be refitted with another liner from a different manufacturer, there is no evidence that the amputee would experience any substantial inconvenience, additional costs or adverse consequences. Thus, the Court finds that the public interest would not be disserved by an injunction.

Accordingly, after considering the equitable factors, the Court concludes that the balance of equities warrants a permanent injunction.

### B. Scope of the Permanent Injunction

The Court now will determine the scope of the permanent injunction. ALPS seeks a permanent injunction enjoining OWW from making, using, selling, offering for sale, or importing into the United States any product infringing on the claims 1-3, 5, 6, 11 and 12 of the '109 Patent **and** any party who obtains any such product from OWW from using, selling or offering to sell, or importing into the United States any infringing OWW product.

"As a general matter, a court may not enjoin a non-party that has not appeared before it to have its rights legally adjudicated." Additive Controls & Measurement Sys.,

6

JA000122

Inc., 154 F.3d 1345, 1351 (Fed. Cir. 1998). "[T]he extent to which a federal injunction applies to non-parties is governed by Federal Rule of Civil Procedure 65(d)." Id. at 1355. Thus, an injunction may only bind the parties, "the parties' officers, agents, servants, employees, and attorneys;" and "other persons who are in active concert or participation with [them]" as long as they "receive actual notice of it by personal service or otherwise." Fed. R. Civ. P. 65(d)(2).

ALPS seeks to enjoin any party who obtains any product infringing on the claims 1-3, 5, 6, 11 and 12 of the '109 Patent from OWW from using, selling or offering to sell, or importing into the United States any infringing OWW product. To the extent that the party being sought to be enjoined is not OWW's officers, agents, servants, employees, or attorneys or a party in active concert or participation with OWW, the Court is not authorized to enjoin that party because that party has not appeared before this Court to have its rights legally adjudicated. Accordingly, the Court will only enjoin those non-parties that are described in Rule 65 of the Federal Rules of Civil Procedure 65.

## IV. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Alps South, LLC's Motion for a Permanent Injunction (Dkt. 323) is **GRANTED in part and DENIED in part**.

2. Ohio Willow Wood Company and all of its agents, officers, servants, employees, successors, assigns, attorneys, and all other persons acting in concert or participation with Ohio Willow Wood Company, are **PERMANENTLY ENJOINED and RESTRAINED** from making, using, selling, offering for sale, or importing into the United States any product infringing on

7

the claims 1-3, 5, 6, 11, and 12 of U.S. Patent No. 6,552,109. This injunction is effective from the date of this Order through August 11, 2014.

3. To the extent that Plaintiff seeks to enjoin any party who obtains any infringing OWW product from using, selling or offering to sell, or importing into the United States any infringing OWW product, Plaintiff's request is **DENIED**.

4. Alps South, LLC's Motion to Strike Exhibits Submitted with OWW's Response in Opposition to Motion for Permanent Injunction (Dkt. 341) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida this 9th day of May 2013.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
   All Counsel of Record
   All *Pro Se* parties

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ALPS SOUTH, LLC, a Florida
Corporation,**

      **Plaintiff,**

**v.**

                               **Case No. 8:08-cv-1893-T-35-MAP**

**THE OHIO WILLOW WOOD
COMPANY, an Ohio Corporation,**

      **Defendant.**

_____/

## ORDER

    **THIS CAUSE** comes before the Court for consideration of Alps South, LLC's ("ALPS") Motion For Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 343-3) and The Ohio Willow Wood Company's ("OWW") Response in Opposition. (Dkt. 348) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court hereby **GRANTS in part and DENIES in part** ALPS' Motion For Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 343-3), as described herein.

## I.  BACKGROUND

    ALPS initiated this action alleging OWW infringed U.S. Patent Nos. 6,552,109 (the "'109 Patent") and 6,867,253 (the "'253 Patent") (collectively "patents-in-suit"). (Dkt. 35) OWW filed a two-count counterclaim seeking a declaratory judgment that (1) OWW did not infringe on the patents-in-suit; (2) the patents-in-suit are invalid and

unenforceable; and (3) the patents-in-suit are unenforceable due to the inequitable conduct of the inventor, Mr. Chen. (Dkt. 39)

During the litigation, the patents-in-suit were submitted to re-examination and were reissued by the United States Patent and Trademark Office ("USPTO"). A Re-examination Certificate was issued on the '253 Patent on June 7, 2011. (Dkt. 185-4)  A Re-examination Certificate was issued on the '109 Patent on July 5, 2011.  (Dkt. 175)

The jury trial began in this action on April 30, 2012.  During the trial, all the asserted claims related to the '253 patent were dismissed.  On May 10, 2012, the issues of whether OWW infringed the '109 Patent; whether OWW willfully infringed the '109 patent; and whether the '109 Patent was invalid due to anticipation or obviousness by prior art were presented to the jury for consideration.  On May 11, 2012, the jury found that OWW did infringe Claims 1-3, 5, 6, 11 and 12 of the '109 Patent, OWW willfully infringed the '109 Patent, and the '109 Patent was valid.

## II. LEGAL STANDARD AND DISCUSSION

### A. Enhanced Damages

35 U.S.C. § 284[1] "allows the award of enhanced damages at the conclusion of a patent case based on a finding of willful infringement."  Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc., 701 F.3d 1351, 1353 (Fed. Cir. 2012).  While a finding of willful infringement is a prerequisite to the award of enhanced damages, "a finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages."  i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 858 (Fed. Cir. 2010), see Read Corp. v. Portec, Inc., 907 F.2d 816, 826 (Fed. Cir. 1992).  "Rather, '[t]he

---

[1] "[T]he court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.

JA000126

paramount determination [for enhanced damages] . . . is the egregiousness of the defendant's conduct based on all the facts and circumstances.' Thus, the district court retains discretion to enhance damages." Electro Scientific Indus., Inc. v. General Scanning, Inc., 247 F.3d 1341, 1353 (Fed. Cir. 2001)(quoting Read Corp., 970 F.2d at 826).

The Federal Circuit has established nine factors to assist the district court in determining whether to award enhanced damages: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. Read Corp., 907 F.2d at 827.

After consideration of the Read factors, the record and the parties' arguments, the Court finds that the factors support entry of an award of enhanced damages. The evidence supports the jury's finding that OWW willfully infringed the '109 Patent. There was no close call on the issue of infringement of the '109 Patent. Further, there is no indication or assertion by OWW that it has taken any remedial action to avoid infringement since the reissurance of the '109 Patent.  To the contrary, OWW proceeded headstrong in its endeavors that infringed the reissued patent. Moreover, OWW does not dispute that in light of its financial condition, it is capable of paying the damages awarded to ALPS and any potential award of enhanced damages. While, the

3

evidence does not support a finding that OWW attempted to conceal its misconduct or that OWW's behavior during this litigation was unacceptable beyond the infringement itself, the Court finds the totality of the circumstances supports the award of enhanced of damages. Nevertheless, the Court finds that OWW's conduct is not so egregious as to justify the maximum enhancement. Therefore, the Court **GRANTS** ALPS' motion to enhance damages to the extent that the damages award shall be doubled.

### B. Attorneys' Fees

35 U.S.C. § 285[2] "allows the award of attorneys' fees at the conclusion of the case, against either a patentee or an accused infringer, if the court finds the case 'exceptional.'" Highmark, Inc., 701 F.3d at 1353. The decision to award attorneys' fees is "committed to the district court's discretion." Id.

ALPS argues that a willful finding justifies a determination that this case is exceptional and an award of attorneys' fees is appropriate. OWW contends that ALPS has not met its burden of establishing by clear and convincing evidence that this case is exceptional and the Court should, therefore, deny ALPS' motion to attorneys' fees. Nonetheless, OWW contends that "[a]t the very least, because the jury's finding of willfulness is only as to OWW's post-July 5, 2011 behavior, the Court should limit any award of attorneys' fees to Alps to the portion of this litigation following July 5, 2011." (Dkt. 348 at 14)

In light of the jury's finding that OWW willfully infringed the '109 Patent, the Court finds this case exceptional. See Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1329 (Fed. Cir. 1987)("The finding of willful infringement is legally sufficient

---

[2] "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

4

to meet the criterion of 'exceptional case,' and in such a case it is within the court's discretionary authority to award attorney fees."). Further, based on OWW's willful infringement, the Court finds that an award of attorney fees is appropriate. See S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc., 781 F.2d 198, 200 (Fed. Cir. 1986)("District courts have tended to award attorney fees when willful infringement has been proven, and [the Federal Circuit] has uniformly upheld such awards.").

Accordingly, the Court **GRANTS** ALPS' motion for entitlement to attorneys' fees. ALPS is directed to file its claim for attorneys' fees **on or before June 10, 2013**. To the extent that OWW objects to an award of fees incurred prior to July 5, 2011, OWW shall file its objections and state with particularity any pre-July 2011 fees that OWW believes were not necessary to the successful prosecution of this lawsuit. Any objection to attorneys' fees shall be filed within **twenty one (21) days** after the filing of ALPS' claim.

### C. Prejudgment and Post-Judgment Interest

ALPS argues that prejudgment interest is necessary for the complete compensation to it of the damages awarded by the jury. ALPS asserts that the Court should apply the State of Florida's interest rate, which was 4.75% as of July 2011. Based on the State of Florida's interest rate, ALPS asserts that the prejudgment interest based on the damages award from July 5, 2011 through the start of the trial on April 30, 2012 would be $155,867.79. In addition, ALPS argues it is entitled to the post-judgment interest running from the final judgment until OWW satisfies the judgment.

OWW contends that the appropriate prejudgment interest rate should be based on the 52-week treasury rate and not the State of Florida's interest rate because ALPS

5

has not presented any evidence to justify the State of Florida's interest rate. OWW asserts that the corresponding interest rate for the week preceding the date of final judgment in this case was .17%. Further, OWW contends that the 52-week treasury rate, compounded annually, is the rate set forth for awards of post-judgment interest.

35 U.S.C. §284 provides that the Court shall award damages adequate to compensate for the infringement, "together with interest and costs as fixed by the court." 35 U.S.C. § 284. "An award of prejudgment interest serves to make the patentee whole because the patentee also lost the use of its money due to infringement." Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1361 (Fed. Cir. 2001). Thus, "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." General Motors Corp. v. Devex Corp., 462 U.S. 648, 657 (1983).

"The interest rate used to calculate prejudgment interest and the frequency of compounding is left to the sound discretion of the district court." Powell v. Home Depot U.S.A., Inc., 715 F. Supp. 2d 1285, 1300 (S.D. Fla. 2010). However, "[i]t has been recognized that an award of compound rather than simple interest assures that the patent owner is fully compensated." Rite-Hite Corp. v. Kelly Co., Inc., 56 F.3d 1538, 1555 (Fed. Cir. 1995)(internal quotation omitted).

Further, a patentee is entitled to post-judgment interest at a rate set forth in 28 U.S.C. § 1961. The post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield" and "compounded annually." 28 U.S.C. §§ 1961(a), (b).

6

Here, OWW does not provide and the Court does not find any justification to withhold prejudgment interest from ALPS.   Therefore, the Court shall award prejudgment interest to ALPS.

The Court, however, is not persuaded that the prejudgment interest should be set at the State of Florida's interest rate. ALPS provides no justification for applying the State of Florida's interest rate.   Further, the Court finds OWW's proposed interest rate inadequate to provide complete compensation to ALPS for the infringement found by the jury  Instead, the Court finds that applying the prime rate of 3.25%, which was applicable on the date the '109 Patent reissued (i.e. July 5, 2011), as the prejudgment interest will adequately compensate ALPS for the infringement.  Accordingly, the Court **GRANTS** ALPS' motion for prejudgment interest to the extent that ALPS shall be awarded prejudgment interest from July 5, 2011 at a rate of 3.25% compounded annually.  Further, the Court **GRANTS** ALPS' motion for post-judgment interest.  ALPS shall be awarded post-judgment interest pursuant to 28 U.S.C. § 1961.

### D.  Taxation of Costs

ALPS argues that it is entitled to its costs, as the prevailing party, in the amount of $94,972.65.   OWW contends that OWW and ALPS are both prevailing parties because ALPS prevailed with respect to the '109 Patent and OWW prevailed with respect to the '253 Patent.  Thus, OWW asserts that "[i]n light of the facts of this case, either both parties should be entitled to their costs or the Court should decline to tax costs altogether."  (Dkt. 348 at 21)  Further, OWW objects to each cost requested by ALPS because OWW contends ALPS fails to apportion the costs based on having lost a portion of the case.

7

Under Federal Circuit law, which defines 'prevailing party' for purposes of patent litigation, there can only be one prevailing party. Shum v. Intel Corp., 629 F.3d 1360, 1366-67 (Fed. Cir. 2010). The Court has already determined that ALPS is the prevailing party in this case. (See Dkt. 416) As the prevailing party, the Court finds that ALPS is entitled to its costs.

In the absence of other statutory authority or contractual authorization, the federal courts can only tax costs authorized in 28 U.S.C. § 1920. U.S. E.E.O.C. v. W & O, Inc., 213 F.3d 600, 620 (11th Cir. 2000) (citing Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987)). Costs that may be awarded under 28 U.S.C. § 1920 are as follows:

(1)  Fees of the clerk and marshal;
(2)  Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
(3)  Fees and disbursements for printing and witnesses;
(4)  Fees for exemplification and copies of papers necessarily obtained for use in the case;
(5)  Docket fees under section 1923 of this title;
(6)  Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.

### i.     Fees of the Clerk and Marshal

ALPS seeks $350.00 for fees of the clerk and marshal. The fees consist only of the filing fee for the complaint. The Court finds that ALPS is entitled to its fees of the clerk and marshal in the amount of $350.00.

### ii.     Fees of the Court Reporter

ALPS seeks $47,165.15 for court reporter fees. Specifically, the court reporter fees include the court reporters' attendance fees for depositions, transcripts ordered for

8

the depositions, and transcripts of hearings and trial.  ALPS asserts that the deponents appeared at trial, were on OWW's witness list or the deponents' depositions were used as support for summary judgment motions.  Further, ALPS asserts that the transcripts of the hearings and trial were necessary for preparing the motion for judgment of matter of law motion and post-trial briefings.  This Court agrees.

The Court finds that the court reporters' attendance fees for depositions, transcripts ordered for the depositions, and transcripts of hearings and trial were all necessary for use in this action.  Accordingly, the Court finds ALPS is entitled to its fees of the court reporter in the amount of $47,165.15.

### iii.    Videographer Fees

ALPS seeks $10,390.00 for videographer fees.  Specifically, ALPS seeks $9,750.00 for the videographer's attendance at the depositions of Lynn Walker, James Colvin, David Pierson, Robert Arbogast, and Ryan Arbogast, and $640.00 for the video packages for James Colvin, Robert Arbogast, and Ryan Arbogast.

> [W]hen a party notices a deposition to be recorded by nonstenographic means, or by both stenographic and nonstenographic means, and no objection is raised at that time by the other party to the method of recordation pursuant to Federal Rule of Civil Procedure 26(c), it is appropriate under § 1920 to award the cost of conducting the deposition in the manner noticed.

Morrison v. Reichhold Chemicals, Inc., 97 F.3d 460, 465 (11th Cir. 1996).

While the Court does find that the depositions of the potential witnesses were necessary for use in this case, ALPS does not indicate whether the depositions Thus, the Court declines to tax the videographer fees at this time.  The Court will allow ALPS to supplement its motion for taxation of costs to support its claim for videographer fees.

9

### iv.  Photocopying Costs

ALPS seeks $29,087.72 for photocopying costs.  Photocopies are recoverable under § 1920 if the copies were necessarily obtained for use in the case.  <u>U.S. E.E.O.C.</u>, 213 F.3d at 622-23.  However, general copying costs and copies made for counsel's convenience are not taxable.  <u>Duckworth v. Whisenant</u>, 97 F.3d 1393, 1399 (11th Cir. 1996).  The moving party bears the burden of showing that the costs are recoverable.  <u>Id.</u>

In its Motion, ALPS asserts various purposes for the photocopies.  For example, ALPS asserts that "seven of the photocopying groupings are for document productions for both Alps and Mr. Chen to be provided to OWW," "[a]nother grouping of the photocopying costs are for briefs," "[a]nother category of photocopying includes copies of pleadings, documents and case law for hearings in the case," and "[t]he last group of copying costs involves amounts paid to vendor document companies for document production during discovery and exhibits made for trial."  (Dkt. 343-3 at 21-22)  However, the Court is unable to discern from the exhibits produced by ALPS which copies apply to which grouping or the amount of the photocopies for each grouping.  While many of the photocopies associated with certain photocopying groupings may be taxable to OWW, there may be others that are not taxable to OWW.  For example exhibit costs are not taxable.  <u>See</u> <u>U.S. E.E.O.C.</u>, 213 F.3d at 623 ("exhibit costs are not taxable because there is no statutory authorization.  Therefore, the Court declines to tax the photocopying fees to OWW at this time.  The Court will allow ALPS to supplement its motion for taxation of costs to provide the Court with an itemized list of

the photocopies providing the purpose of the photocopies and the amount for those photocopies.

### v.   Long Distance Calls and Facsimile Costs

ALPS seeks $for long distance calls. Facsimile these costs are not enumerated in the statute and no case decided in this context has been offered as support for such an award.   Long distance telephone calls may be compensable under § 1920, if the costs are reasonable.   Cullens v. Ga. Dep't of Transp., 29 F.3d 1489, 1494 (11th Cir. 1994)("Long distance telephone charges and travel expenses are appropriate expenses under  § 1920 to the extent they are reasonable")  The Court notes that some district courts have held that Cullens is limited to civil rights actions under 42 U.S.C. § 1988, and does not include requests for costs under 28 U.S.C. § 1920.   See, e.g., Williams v. R.W. Cannon, Inc., 657 F. Supp. 2d 1302, 1318 (S.D. Fla. 2009)("courts have since pointed out the Cullens is limited to civil rights actions under 42 U.S.C. § 1988, and not requests for costs under 28 U.S.C. § 1920").   However, until the Eleventh Circuit limits the plan language of its holding, this Court is bound by it. Fox v. Acadia State Bank, 937 F.2d 1566, 1570 (11th Cir. 1991) ("A district court is not bound by another district court's decision, or even an opinion by another judge of the same district court, but a district court in this circuit is bound by this court's decisions.").   The Court finds that the long distance calls are reasonable and are taxable to OWW.   Therefore, the Court finds that ALPS is entitled to its fees for the long distance calls of $33.45 but no fees for facsimiles in the amount of 624.00.

### vi. Services of Process

ALPS seeks $185.00 for service of process costs.   Specifically, ALPS seeks $125.00 for service of process on Benjamin Elliot, who was a former employee of OWW, and $60.00 for service of process on Rick Fee, an attorney for Thermo-Ply, Inc. The Court finds that ALPS is entitled to these services of process costs and they are reasonable.   Accordingly, the Court finds that ALPS is entitled to its fees for the services of process in the amount of $185.00.

### vii. Witness Fees and Travel Expenses

ALPS seeks $91.00 for witness fees. Specifically, ALPS seeks (1) $40.00 for Benjamin Elliot and (2) $51.00 for Bruce Kania, which includes the witness' mileage expense.   Further, ALPS seeks $7,210.80 for travel expenses for witnesses.   ALPS seeks the following amounts for the witnesses' travel expenses:

| Dr. Jerry Atwood | Travel between Missouri and Ohio for deposition | $361.10 |
| Dr. Jerry Atwood | Travel between Missouri and Florida for the Markman hearing | $687.40 |
| Dr. Jerry Atwood | Travel to Florida for trial | 813.60 |
| Jason Foster, Esq. | Travel between Ohio and Florida for trial | 1,194.80 |
| Dr. John Chen | Travel between California and Florida for trial | $4,153.90 |
| **TOTAL TRAVEL EXPENSES** | | **$7,210.80** |

"A witness shall be paid an attendance fee of $40 per day for each day's attendance." 28 U.S.C. § 1821(b). "A witness who travels by common carrier shall be paid for the actual expenses of travel on the basis of the means of transportation

12

reasonably utilized and the distance necessarily traveled to and from such witness's residence by the shortest practical route in going to and returning from the place of attendance." 28 U.S.C. § 1821(c)(1). Additionally, a travel allowance may be paid to each witness who travels by a privately owned vehicle. 28 U.S.C. § 1821(c)(2).

The Court finds that ALPS is entitled to its fees for the witnesses in the amount of $7,301.80.

### E. Supplemental Damages

ALPS seeks an accounting for all OWW infringing sales from April 30, 2012 through the date an injunction is entered.  ALPS proposes that the same royalty rate of 20% imposed by the jury continue to apply in calculating supplemental damages.

OWW contends that to the extent that ALPS's claim is for prospective royalties, "ALPS has not put forth that issue before this Court."  (Dkt. 348 at 21)  Further, OWW argues that to force OWW to continue to pay at a rate that is not reasonable would be unjustifiable.

"[A] patentee is not fully compensated if the damages award [does] not include future lost sales. Therefore, the district court should [award] compensation for any infringement prior to the injunction." Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1213 (Fed. Cir. 2010)(internal quotations and citations omitted).  Therefore, the Court finds that ALPS is entitled to an accounting for all of OWW's infringing sales from April 30, 2012 through May 9, 2013.  Further, the Court finds that ALPS is entitled to supplemental damages based on OWW's infringing sales and at the same royalty rate found to be appropriate by the jury. See, e.g., Aero Prods. Int'l, Inc v. Intex Recreation Corp., No. 02-C-2590, 2005 WL 1498667 (N.D. Ill. June 9, 2005)(applying the royalty

13

rate determined by the jury for the supplemental damages);   Stryker Corp. v. Davol, Inc., 75 F. Supp. 2d 746 (W.D. Mich. 1999), aff'd 234 F.3d 1252 (Fed. Cir. 2000) (same).

## III. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Alps South, LLC's Motion For Enhanced Damages (Dkt. 323) is **GRANTED** to the extent that the damages award shall be doubled.

2. Alps South, LLC's Motion for Attorneys' Fees (Dkt. 323) is **GRANTED.**  Alps South, LLC is directed to file its claim for attorneys' fees **on or before June 10, 2013**.  To the extent that OWW objects to the attorneys' fees, including such fees incurred prior to July 5, 2011, OWW shall file its objections to the attorneys' fees within **twenty one (21) days** after the filing of ALPS' claim.

3. Alps South, LLC's Motion for Prejudgment Interest (Dkt. 323) is **GRANTED in part**.  Alps South, LLC is entitled to its prejudgment to the extent discussed in this Order.

4. Alps South, LLC's Motion for Post-judgment Interest (Dkt. 323) is **GRANTED**.

5. Alps South, LLC's Motion for Costs (Dkt. 323) is **GRANTED in part and DENIED in part**.  Alps South, LLC shall file its supplemental motion for taxation of costs related to the videography fees and photocopying costs **on or before May 24, 2013**.  OWW may file its opposition to the costs **within fourteen (14) days** of the filing of Alps South, LLC's supplemental motion.

14

6. Alps South, LLC's Motion for Supplemental Damages (Dkt. 323) is **GRANTED**.
OWW shall submit an accounting of its infringing sales from April 30, 2013 until
May 9, 2013, to Alps South, LLC and the Court **on or before May 24, 2013**.

**DONE** and **ORDERED** in Tampa, Florida this 9th day of May 2013.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
    All Counsel of Record
    All *Pro Se* parties

15

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**HONORABLE MARY S. SCRIVEN**

| | |
|---|---|
| CASE NO.  8:08-cv-1893-T-35MAP        DATE:  November 1, 2013 CASE NO.  8:13-cv-01267-MSS-MAP | |
| TITLE:  ALPS South, LLC v. The Ohio Willow Wood Company  AND The Ohio Willow Wood Company v. ALPS South, LLC et al | |
| TIME:  09:03 11:42AM/12:09-1:50 PM        TOTAL:  4 hours and 20 minutes | |
| Courtroom Deputy: Anaida Vizza | |
| Court Reporter:  Claudia Spangler-Fry | |
| Counsel for Alps:  Ronald Christaldi, David Wicklund, and Mindi Richter Counsel for Applied: Michael Stanton | |
| Counsel for OWW:  Jeffrey Standley, F. Michael Speed, and Patrick Risch | |

### _CLERK'S MINUTES: PROCEEDINGS OF HEARING ON MOTIONS_

Court called to order. Defendant, OWW's Motion for Relief of Judgment Pursuant to Rule 60(b) (Dkt. 426) is **DENIED.**

OWW's Motion for Reconsideration under Fed. R.Civ. P. 59(e) or in the alternative 60(b)(6) of the Order of May 9, 2013 Granting an Injunction (Dkt. 435) is **GRANTED.**

Alps' Emergency Motion to Hold OWW in Contempt of the May 9, 2013 Injunction Order (Dkt. 429) is **GRANTED.** OWW is enjoined from performing certain acts, as stated on the record starting today. The Court will appoint a receiver. The Parties are to confer and if an agreement is not reached, parties are to submit 2 names per side as to who should be the receiver and the Court will make the determination.

The Court **DENIES** OWW's Oral Motion to Stay the injunction pending their motion for emergency relief to the Federal Circuit.

The Court sets an evidentiary hearing on sanctions for **November 7, 2013 at 11:30 AM.**

Alps is directed to prepare a proposed order and to email it to chambers, after OWW has had an opportunity to review it, in Word format, by Monday, **November 4, 2013.**

Alps' Motion for Attorney's Fees (Dkt. 445) is **DEFERRED.** The Court would award attorney's fees for this hearing, ruling deferred as to the entire case; it can be asserted either way. OWW is requesting an un-redacted copy of Alps' attorney's fees invoices.

(Dkt. 459) Alps is to file **under seal an un-redacted version of its attorney's fees** and the Court will determine what should be un-redacted. Alps will have an opportunity to decide whether they want to waive the fee or agree to have it un-redacted.

Oww's Unopposed Motion to File Under Seal Pursuant to Protective Order Expert Declarations and Supporting Materials in Rebuttal to the Supplemental Declaration of Dr. Jerry Atwood (Dkt. 486) is **DENIED as moot**.

Alps' Motion for Order requiring OWW to Provide Additional Information Concerning Potential Post-Trial Infringement (Dkt. 448) is **GRANTED**. Information is to be provided forthwith.

Regarding Dkt. 431, the costs awarded will be ordinary.

Alps' Motion for Leave to File Reply Memorandum with Respect to Plaintiff's Claim for Attorney's Fees (Dkt. 463) is **DENIED.**

OWW's Motion for Extension of Time to Provide Objections to Alps' Claim for Attorney's Fees and Motion to Compel Un-redacted Invoices (Dkt. 459) is **DENIED without Prejudice** pending the Court's review of the invoices.

The companion case 8:13-cv-01267-MSS-MAP will remain stayed and the Court will determine the status of that case at the November 7, 2013 hearing.

Court is adjourned.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**HONORABLE MARY S. SCRIVEN**

| | |
|---|---|
| CASE NO.  8:08-cv-1893-T-35MAP | DATE:  November 7, 2013 |
| CASE NO.  8:13-cv-01267-MSS-MAP | |
| TITLE:  ALPS South, LLC v. The Ohio Willow Wood Company  AND The Ohio Willow Wood Company v. ALPS South, LLC et al | |
| TIME:  11:37 AM – 12:32PM/12:49-1:24PM/1:48-6:30 PM | TOTAL:  6 hours and 12 minutes |
| Courtroom Deputy: Anaida Vizza | |
| Court Reporter:  Claudia Spangler-Fry | |
| Counsel for Alps:  Ronald  Christaldi, David Wicklund, and Mindi Richter Counsel for Applied: Michael Stanton | |
| Counsel for OWW:  Jeffrey Standley, Patrick Risch  and F. Michael Speed | |

<u>*CLERK'S MINUTES: PROCEEDINGS OF*</u>
<u>*HEARING ON MOTION for SANCTIONS*</u>

Court called to order. This matter is set for hearing on the Plaintiff's Motion for sanctions which is incorporated in Plaintiff's Motion for Contempt. (Dkt. 429)

11:44 AM – Direct examination of **Ryan Arbogast** by Mr. Christaldi.
12:32 PM – Brief recess.
12:49 PM – Court back in session.
01:24 PM – Brief recess.
01:48 PM – Court back in session.
02:26 PM – Cross by Mr. Speed.
02:43 PM – Re-direct.
02:52 PM – Direct examination of **Robert Arbogast** by Mr. Christaldi.
03:42 PM – Cross by Mr. Standley.
03:49 PM – Direct examination of **James Colvin** by Mr. Christaldi.
04:32 PM – Cross by Mr. Standley.
04:56 PM – Re-direct.
05:03 PM – Direct examination of **Chris Kelley** by Mr. Christaldi.

05:25 PM – Oral argument by Mr. Risch
06:03 PM – Mr. Christaldi in rebuttal.

Court adds to its May 2013 Order as stated on the record. The Court appoints James Abrams as receiver with duties and responsibilities as stated on the record. OWW is directed to deposit into the Court's Registry the equivalent of 20% of its royalty based on gross revenues by November 15, 2013. OWW is directed to pay attorney's fees and costs associated with the Motion for Contempt. The Court Denies OWW's Oral Motion to stay the injunction pending emergency appeal. The Court Denies Alps' Oral Motion to increase OWW's bond. Court is adjourned.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALPS SOUTH, LLC,
a Florida limited liability company,

      Plaintiff,

v.                                Case No.: 8:08-CV-1893-T-35MAP

THE OHIO WILLOW WOOD
COMPANY, an Ohio corporation,

      Defendant.
_____/

**REDACTED ORDER**

    **THIS CAUSE** comes before the Court for consideration of the following:

    1.    The Ohio Willow Wood Company's ("OWW") Motion for Relief of Judgment Pursuant to Rule 60(b) (Dkt. 426), Plaintiff Alps South, LLC's ("ALPS") Memorandum in Opposition to The Ohio Willow Wood Company's Rule 60(b) Motion (Dkt. 444), and OWW's Reply in Support of Motion for Relief From Judgment Pursuant to Rule 60(b) (Dkt. 490).

    2.    OWW's Motion for Reconsideration, Under Federal Rule of Civil Procedure 59(e) or in the Alternative Rule 60(b)(6), of the Order of May 9, 2013 Granting an Injunction (Dkt. 435), ALPS' Response to The Ohio Willow Wood Company's Motion for Reconsideration of the Court's May 9, 2013 Order Granting a

Permanent Injunction (Dkt. 451), and OWW's Supplement to Motion for Reconsideration of the Order of May 9, 2013 Granting an Injunction (Dkt. 458).

3.      ALPS' Emergency Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt of May 9, 2013 Injunction Order (Dkts. 429, S-31), OWW's Response in Opposition (Dkt. 446, S-447), and ALPS' Supplemental Declaration of Dr. Jerry Atwood (Dkt. S-487).

4.      OWW's Motion to File Under Seal Pursuant to Protective Order Expert Declarations and Supporting Materials in Rebuttal to the Supplemental Declaration of Dr. Jerry Atwood (Dkt. 486), OWW's Amended Certificate of Compliance with Local Rule 3.01(g) to its Motion to File Under Seal Expert Declarations and Supporting Materials in Rebuttal to the Supplemental Declaration of Dr. Jerry Atwood (Dkt. 488), and ALPS' Response in Opposition (Dkt. 489).

5.      ALPS' Supplement to Alps South, LLC's Motion for Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 431) and OWW's Response in Opposition.  (Dkt. 442)

6.      OWW's Motion for Extension of Time to Provide Objections to Plaintiff, Alps South, LLC's Claim for Attorneys' Fees and Motion to Compel Unredacted Invoices (Dkt. 459) and ALPS' Response in Opposition (Dkt. 473).

7.      ALPS' Motion for Leave to File Reply Memorandum with Respect to Plaintiff's Claim for Attorneys' Fees (Dkt. 463) and OWW's Response in Opposition (Dkt. 475).

8.      ALPS' Motion for Order Requiring Defendant, The Ohio Willow Wood Company to Provide Additional Information Concerning Potential Post-Trial Infringement (Dkt. 448).

The Court held a hearing on the Motions on November 1, 2013, at which it received evidence in the form of affidavits submitted by the parties, and it held an additional hearing on November 7, 2013, at which witnesses testified concerning matters related to the relief requested by ALPS in connection with its Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt.  (Dkts. 429, S-31)  Upon consideration of all relevant filings, case law, and being otherwise fully advised of the issues raised, and for the reasons explained below and those stated at the hearings on November 1 and 7, 2013, the Court hereby:

(1) **DENIES** OWW's Motion for Relief of Judgment Pursuant to Rule 60(b) (Dkt. 426);

(2) **GRANTS** OWW's Motion for Reconsideration, Under Federal Rule of Civil Procedure 59(e) or in the Alternative Rule 60(b)(6), of the Order of May 9, 2013 Granting an Injunction (Dkt. 435) but **GRANTS IN PART AND DENIES IN PART** the relief sought therein;

(3) **GRANTS** ALPS' Emergency Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt of the Court's May 9, 2013 Injunction Order (Dkts. 429, S-31);

(4) **DENIES as moot** OWW's Motion to File Under Seal Pursuant to Protective Order Expert Declarations and Supporting Materials in Rebuttal to the Supplemental Declaration of Dr. Jerry Atwood (Dkt. 486);

(5) **GRANTS in part and DENIES in part** ALPS' requests for the taxation of costs set forth in its Supplement to Alps South, LLC's Motion for Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 431);

(6) **DENIES without Prejudice** OWW's Motion for Extension of Time to Provide Objections to Plaintiff, Alps South, LLC's Claim for Attorneys' Fees and Motion to Compel Unredacted Invoices (Dkt. 459);

(7) **DENIES** ALPS' Motion for Leave to File Reply Memorandum with Respect to Plaintiff's Claim for Attorneys' Fees (Dkt. 463); and

(8) **GRANTS** ALPS' Motion for Order Requiring Defendant, The Ohio Willow Wood Company to Provide Additional Information Concerning Potential Post-Trial Infringement (Dkt. 448).

I.   **BACKGROUND**

ALPS initiated this action alleging OWW infringed U.S. Patent Nos. 6,552,109 (the "'109 Patent") and 6,867,253 (the "'253 Patent"). (Dkt. 35) OWW counterclaimed seeking a declaratory judgment that OWW did not infringe ALPS' patents and that the patents were invalid and unenforceable. (Dkts. 35, 39)

The jury trial began in this action on April 30, 2012. During the trial, all the asserted claims related to the '253 patent were withdrawn or dismissed. On May 10, 2012, the issues of whether OWW infringed the '109 Patent; whether OWW willfully infringed the '109 Patent; and whether the '109 Patent was invalid due to anticipation or obviousness by prior art, nonenablement and lack of support in the written description were presented to the jury for consideration. On May 11, 2012, the jury found that OWW infringed claims 1-3, 5, 6, 11 and 12 of the '109 Patent; that OWW willfully

infringed the '109 Patent; and, that the '109 Patent was valid.   The Court entered judgment on the jury's verdict and also entered judgment dismissing OWW's claim of inequitable conduct. (Dkt. 339)

Following the trial, the Court entered an order on May 9, 2013, granting ALPS' request for injunctive relief and permanently enjoining OWW and all others acting in concert or participation with OWW from making, using, selling, offering for sale, or importing any product infringing the '109 Patent. (Dkt. 418)  The Court also awarded enhanced damages, doubling the damages award, and it granted ALPS' requests for supplemental damages and attorneys' fees, in an amount to be determined after presentment of further information. (Dkt. 422)

The Court's Order granting ALPS' Motion for Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 343) directed ALPS to supplement its request for the taxation of costs related to videography fees and photocopying costs and to file a claim for attorneys' fees and costs.  ALPS filed both its cost supplement and its claim for attorneys' fees.  (Dkts. 431, 445)  ALPS' claim for attorneys' fees was accompanied by redacted fee invoices.   OWW responded by moving to compel unredacted copies of ALPS' fee invoices and for an extension of time to respond to ALPS' claim for attorneys' fees.  (Dkt. 459)  OWW argued that the redactions did not allow it to sufficiently identify objectionable billing entries and that ALPS waived any applicable privilege or immunity with respect to the invoices. Additionally, OWW responded in opposition to ALPS' demand for costs for synch packages because OWW argued that synch packages were not properly taxed under 28 U.S.C. § 1920.

Two weeks after the Court entered its order granting ALPS' request for injunctive relief, ALPS filed an emergency motion to hold OWW in contempt for violating the permanent injunction. (Dkts. 429, S-31)  The day before ALPS filed its motion to hold OWW in contempt, OWW filed a motion for relief from judgment pursuant to Fed. R. Civ. P. 60(b), challenging ALPS' standing to enforce the '109 Patent.  (Dkt. 426) Specifically, OWW claimed that it had only recently learned facts suggesting that the inventor of the '109 Patent, John Chen, did not assign his rights in the '109 Patent to his company, Applied Elastomerics, Inc. ("AEI"), before AEI entered into a patent sale and license agreement with ALPS. As such, OWW contends that ALPS lacked constitutional standing in this matter.

OWW also filed a motion for reconsideration of the Court's May 9, 2013 injunction Order claiming that the Order does not provide a reasonably detailed description of the acts sought to be restrained because the order applies to products other than those found by the jury to be infringing.  (Dkt. 435)  OWW later filed a supplement to its motion asking the Court to modify the expiration date of the injunction.

On November 1, 2013, the Court held a hearing on the foregoing Motions.  (Dkt. 478)  The Court then held a further hearing on November 7, 2013, concerning the extent of appropriate sanctions for contempt liability.  (Dkt. 492)  The Court's rulings on all the cited motions and relevant issues presented are described more fully herein.

## II.  DISCUSSION

### A.    OWW'S Motion for Relief from Judgment – Lack of Standing[1]

---

[1] Although the Court fully appreciates that a "*well-founded* challenge" to constitutional standing cannot be waived, it bears noting that OWW's suggestion that it just learned in recent months of the defect it claims defeats constitutional standing is belied by the evidentiary record of this case, which undermines the claimed basis for this late assertion.  At the November 1, 2013 hearing, ALPS presented the following

The Parties do not dispute that the '109 Patent is a continuation-in-part of several parent applications, including application No. 08/280,690, filed on August 11, 1994, which is now U.S. Patent No. 5,633,286 (the "'286 Patent"). These parent applications were assigned by the patentee to AEI by broadly worded assignments, and the assignments were recorded with the United States Patent and Trademark Office ("USPTO") in 1995 and 1996. In particular, the assignment of the '286 Patent application, dated July 14, 1995, provides in relevant part that

> ASSIGNOR hereby sells, assigns and transfers to ASSIGNEE the full and exclusive right, title and interest to *said invention* and *all* Letters Patent of the United States to be obtained therefor on said application or *any* continuation, division, renewal, substitute or reissue thereof for the full term or terms for which the same may be granted.

(Dkt. 444-3 at 2-3) All parties agree that any rights conveyed by this assignment were subsequently transferred to ALPS by way of the Patent Sale and License Agreement on

---

April 22, 2010 deposition testimony of John Chen, as the corporate representative for AEI, elicited by OWW's counsel:

Q. Are all of the patents that have issued for which you are a named inventor, are they all assigned to AEI?

A. To my knowledge, yes.

Q. We have checked the patent office records for assignments related to the two patents that we've been discussing, primarily the '109 and '253.

A. Yes.

Q. I don't believe there's an assignment recorded in the patent office as it relates between you and AEI as to those patents. Would you have knowledge of why that is?

A. The assignment is effective as of the earlier cases from which these evolve.

(Dkt. 444-1)

When inquired of by the Court concerning this discrepancy, counsel could offer no meaningful rejoinder. In fact, this issue has been known by OWW for some time and the more likely explanation for its belated assertion is that it was initially viewed as unfounded.

August 31, 2008 and the Amended Patent Sale and License Agreement on January 28, 2010. (Dkt. S-2)

In the face of this broad assignment, OWW contends that Mr. Chen did not assign his rights in the '109 Patent to AEI until September 27 and 28, 2011, when Mr. Chen expressly set forth an assignment for the '109 Patent, which was recorded on November 22, 2011. (Dkts. 426-1, 426-2) ALPS counters that the assignments of the parent applications, including the '286 Patent application, were sufficient to convey rights in the '109 Patent to AEI and that the invention claimed in the '109 Patent was also assigned to AEI via the assignment of child and grandchild applications that specifically incorporated by reference the subject matter of the '109 Patent's application. Alternatively, ALPS maintains that assuming *arguendo* Mr. Chen did not execute a written assignment of the '109 Patent conveying ownership to AEI, the facts show that he granted AEI a license, or at least an implied exclusive license, which transferred substantial rights to AEI sufficient to confer constitutional standing on ALPS.

"Since 1790, the patent law has operated on the premise that rights in an invention belong to the inventor." Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 131 S.Ct. 2188, 2192 (2011). "It is equally well established that an inventor can assign his rights in an invention to a third party." Id. at 2195 (citing United States v. Dubilier Condenser Corp., 289 U.S. 178, 187 ("A patent is property and title to it can pass only by assignment"); 8 Chisum on Patents §22.01, at 22–2 (2011) ("The inventor . . . [may] transfer ownership interests by written assignment to anyone")). Likewise, where the intent of the grantor of rights in a patent is unclear, courts are free to resort to extrinsic evidence of the intent of the parties regarding the rights intended to

be conveyed.  See Regents of Univ. of N.M. v. Knight, 321 F.3d 1111 (Fed. Cir. 2003).

Finally, while the USPTO will not accept an assignment of a continuation-in-part by

reference to the assignment of the parent, that is not the law of assignments as

applicable to legal challenges to assignments of rights in the patent. Id. at 1121 ("The

MPEP [, Manual of Patent Examining Procedure,] sets forth [US]PTO procedures; it is

not a statement of law.").[2]  Consequently, that fact alone does not defeat constitutional

standing in an action by an assignee against a stranger to and infringer of the patent. Id.

"A patentee shall have remedy by civil action for infringement of his patent." 35

U.S.C. § 281. The term "patentee" includes successors in title to the patentee, such as

assignees. 35 U.S.C. § 100(d). In addition to assignees, constitutional standing to sue

for infringement extends to patent licensees who have been granted substantial rights in

a patent. See, e.g., Intellectual Prop. Dev., Inc. v. TCI Cablevision of Ca., 248 F.3d

1333, 1345-46 (Fed. Cir. 2001). It is also well-established that patent licenses may be

granted orally or implied from the conduct of the parties.  See, e.g., De Forest Radio

Tel. & Tel. Co. v. United States, 273 U.S. 236, 240-41 (1927); Waymark Corp. v. Porta

Sys. Corp., 334 F.3d 1358, 1364 (Fed. Cir. 2003).

After considering the relevant filings and the Parties' arguments, the Court finds

that ALPS has constitutional standing to pursue its claims against OWW, and it had

such standing at the time this case was filed.  The legal authority makes clear that a

continuation or continuation-in-part application can be assigned through the assignment

of a parent application.  See, e.g., Regents of Univ. of N.M., 321 F.3d at 1120 ("We find

---

[2] OWW's argument that Mr. Chen's assignment to AEI and recordation of the '109 Patent in 2011 demonstrate his concession that the assignment did not occur until then reflects a misunderstanding of the Patent Office requirement that continuations in part be assigned and recorded separately. No doubt, had Mr. Chen attempted to make that assignment to any party other than AEI that effort would have been ineffectual.

the broad language contained in the Patent Policy, the Co–Inventor Agreement, and the Joint Assignments more than sufficient to obligate Scallen and Knight to assign to UNM their . . . inventions and all related patents and applications, including the CIP applications.").

In this case, the 1995 assignment of the '286 Patent application to AEI and the subsequent Patent Sale and License Agreement and the Amended Patent Sale and License Agreement to ALPS were adequate to confer constitutional standing on ALPS. The assignment of the '286 Patent application for the '109 Patent assigned in writing all "exclusive" rights, title, and interest in the inventions disclosed in the application to AEI. By OWW's own admissions, the '286 Patent disclosed the relevant claims of the '109 Patent. In its Motion *in Limine* prior to the jury trial in this case, OWW argued that the Court should defer to the priority dates established by the USPTO for the '109 Patent because virtually all of the claims in the '109 patent being asserted in the litigation were disclosed in the '286 Patent.[3] Additionally, the USPTO had determined that Claims 1-12, 15, and 16 of the '109 Patent have a priority date of August 11, 1994, which is the date the '286 Patent application was filed, with the clear implication that those claims are disclosed in the '286 Patent. (Dkt. 227) Thus, the reasonable interpretation of the language of the assignment of rights in the '286 Patent application is that it is broad enough to include the assignment of exclusive rights in the '109 Patent. Specifically, the assignment of the '286 Patent application assigned "exclusive" right, title, and interest in "*any* continuation" of the '286 Patent application, and there is no indication that Mr. Chen sought to exclude the '109 Patent from his assignment of the '286 Patent

---

[3] The Motion *in Limine* was denied as an untimely motion for summary judgment, but OWW maintains to this day that the priority date of the asserted claims in the '109 Patent is certainly no later than the date of the filing of the '286 Patent application.

application.   The absence of a reference to "continuations-in-part" should not be deemed fatal to this analysis.   As in Regents of Univ. of N.M., an action that did not involve an express assignment of an identified patent, but a mere agreement to assign, the Court found that the absence of the words "continuation-in-part" did not preclude a broad interpretation to include a continuation in part of an invention derived from university resources.

Moreover, even if it could be argued that the written assignments were not sufficiently expressed or could somehow be argued to be ambiguous as it relates to AEI's rights as conveyed to ALPS to pursue this case as the real party in interest that has been damaged, the Court's task would be to look to extrinsic evidence of the intentions of the Parties whose relative rights are being challenged.   Here, the uncontroverted evidence discloses the actions of Mr. Chen that clearly demonstrate his intent to confer substantial, exclusive rights in the '109 Patent to AEI, and thereby to ALPS, and to acknowledge that such rights were actually conveyed.   For example, prior to the commencement of this litigation, in 2002, Mr. Chen indicated on the form he submitted with his payment for the issue fee of the '109 Patent that AEI was the assignee of the '109 Patent.   (Dkt. 444-2)   As such, AEI was listed as the assignee on the original '109 Patent.   (Dkt. 426-4)   Further, the Amended Patent Sale and License Agreement between AEI and ALPS that was executed by Mr. Chen, specifically stated that AEI owns and has the right to license the patent rights covered in the '109 Patent. This has been reiterated and stands un-rebutted through the testimony of Mr. Chen on this record.   No party to these agreements challenges ALPS' rights to assert this claim or the effect of the assignments.   At the very least the evidence establishes the transfer

of an exclusive license to AEI, and thus to ALPS. (See Dkt. 444)   Either is sufficient to confer constitutional standing on ALPS.

Only the infringer, OWW, asserts such a claim. Upon consideration of the Parties' relative positions as early as 2010, OWW did not perceive such an issue to be viable. Even while it was challenging ALPS' prudential standing, it did not assert such a concern. OWW's belated motion in this regard to achieve relief from the judgment now imposed against it on grounds of lack of constitutional standing is **DENIED**.

### B.    ALPS' Motion to Hold OWW in Contempt

ALPS contends that OWW is in contempt of this Court's permanent injunction order because OWW is presently making, offering for sale, and selling a revised gel formulation in its Advanced Gel Products that infringes some or all of the asserted claims of the '109 Patent. Further, ALPS contends that OWW has induced or attempted to induce distributors who have purchased infringing products from it to sell those infringing products.

ALPS seeks the following remedies for OWW's contempt: (1) to have OWW disgorge 100 percent of the revenue it has received from the sale of the Advance Gel Products; (2) to have OWW destroy any products that are within the purview of the contempt finding from its inventory; (3) to have OWW recall the product from its distribution system; (4) to have OWW submit to the Court for review and approval any future products that are prosthetic gel liners it intends to launch into the market; (5) impose suspended sentences for certain OWW's principals and officers to coerce them to comply with this Court's orders; (6) to extend the permanent injunction past August

11, 2014 for a time period equal to the time OWW failed to comply with the permanent injunction; and (7) attorneys' fees.

A party moving for contempt for violation of a permanent injunction in a patent infringement case must demonstrate by clear and convincing evidence that "the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." TiVo Inc. v. EchoStar Corp., 646 F.3d 869, 882 (Fed. Cir. 2011). A party accused of contempt should be informed of the alleged contemptuous conduct and be given a hearing at which the party may attempt to show cause why it should not be held in contempt. See Mercer v. Mitchell, 908 F.2d 763, 776-77 (11th Cir. 1990). However, "when there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt and sanctioning him." Id. at 769 n.11.

Upon a finding of contempt, district courts enjoy wide discretion to fashion equitable remedies that are appropriate under the circumstances. United States v. City of Miami, 195 F.3d 1292, 1298 (11th Cir. 1999) (quoting EEOC v. Guardian Pools Inc., 828 F.2d 1507, 1515 (11th Cir. 1987)). Sanctions for civil contempt may serve one of two broad purposes: (1) coercing the contemnor to comply with a court order; or (2) compensating a party for losses suffered as a result of the contemptuous conduct. Id.

Upon consideration of the Parties' arguments at the November 1, 2013 hearing and November 7, 2013 hearing, and the relevant filings, the Court finds that the Advanced Gel Products that OWW has now launched are not colorably different from the OWW products found by the jury to be infringing. Further, the Advanced Gel

Products infringe the '109 Patent.  Just by way of example, Claim 1 of the '109 Patent

provides in relevant part:

> A composite article comprising a thermoplastic, heat formable and heat
> reversible gelatinous elastomer composition, G, which is formed into a
> composite by heat and physically interlocked with one or more of a
> selected substrate material, M, said gelatinous elastomer composition
> formed from (i) 100 parts by weight of one or a mixture of two or more of a
> hydrogenated styrene isoprene/butadiene block copolymers(s) comprising
> poly(styrene-ethylene-ethylene-propylene-styrene) and from (ii) about 300
> to about 1,600 parts by weight of a plasticizing oil . . . .

(Dkt. 426-4 at 17-18)  Thus, Claim 1 of the '109 Patent on its face requires 100 parts by

weight of hydrogenated SIBS "comprising" SEEPS.

Evidence at trial demonstrated that the ALPS line of prosthetic limb protector

sleeves and the OWW ALPHA line of products at issue were made of 100 parts SEEPS

and 300 to 1,600 parts mineral oil. The relevant difference between OWW's Advanced

Gel Products and the OWW products adjudicated to infringe is that the revised gel

formulation for the Advanced Gel Products substitutes one hydrogenated styrene

isoprene/butadiene block copolymer ("SIBS") for another (*i.e.* Septon 4055 for J-Series).

But, it retains the use of SIBS copolymer, Septon 4033. Though the Parties dispute

whether the J-Series is a SEEPS copolymer, there is no dispute that Septon 4033 is a

SIBS copolymer that is classified as SEEPS.

ALPS contends the copolymer, known as J-Series, in OWW's revised gel

formulation is a SEEPS polymer, and that in any event, all that the claims of the '109

Patent require is that the gel composition be formed from one or a mixture of two or

more SIBS copolymers "comprising" SEEPS.  OWW contends that J-Series is not the

linear copolymer SEEPS, but rather, is a branched copolymer without the dual end

blocks made of styrene that are characteristic of a SEEPS copolymer. It offered evidence from the manufacturer of J-Series, Kuraray Co., Ltd., that the J-Series is not a SEEPS copolymer. (Dkt. S-447, Ex. F)   More importantly, OWW claims that it understood that the gel formulation disclosed by Claim 1 of the '109 patent was a mixture of 100 parts SIBS exclusively limited to SEEPS combined with 300 to 1,600 parts mineral oil. And, since its new formulation is part SIBS (J-Series), not made of SEEPS, and part SEEPS (Septon 4033) in a ratio less than 100 parts SEEPS to 300 parts mineral oil, it believes its Advanced Gel Products are more than colorably different from its prior infringing products and do not infringe the '109 patent. OWW is wrong on the law and the facts.

On the legal point, the definition of "comprising," OWW is mistaken. It is beyond dispute that the word "comprising' as used in the patent context is a term of art that means "including but not limited to." See Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1344-45 (Fed. Cir. 2003) ("Comprising is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Thus, it is not, as OWW claims it understood, a limitation of composition. As its own counsel conceded during the November 7, 2013 hearing, it means the thing said to comprise "is in there." That is to say, if a formula is described as a certain component comprising another, the second is said to be some part of the mixture of the first. It is not understood to be the whole of the first or 100 percent of the first as OWW claims it understood. Significantly in this regard, OWW conceded, through its president, Ryan Arbogast and employee who handles its intellectual property matters, Jim Colvin, that if the term means by law,

"including but not limited to," its Advanced Gel Products infringe Claim 1 of the '109 patent.

When asked what their basis was for this "misunderstanding" of the term, neither Ryan Arbogast nor Jim Colvin, offered an explanation.  Though they initially claimed reliance on the advice of opinion counsel or reliance on the advice of litigation counsel, each expressly, on their personal behalf and on behalf of OWW, subsequently waived any such defense.  Without the assertion of such a defense, the Court is left to conclude that despite the plain language of Claim 1 of the '109 Patent and the clearly established and available precedent as to the definition of its terms, OWW proceeded blindly in its development and sale of its new infringing line in direct violation of this Court's injunction.

As to the facts supporting infringement, OWW is also wrong. As noted, the products found by the jury to be infringing included SEEPS.  The Advanced Gel Products include SEEPS.  OWW essentially concedes that in its nearly 100 attempts to design around the '109 Patent once faced with the verdict of the jury, it could not make a prosthetic limb protector sleeve that adequately performed to meet the properties of the prior infringing ALPHA product line (or ALPS' product line) without the inclusion of SEEPS. Ryan Arbogast and Jim Colvin testified that a number of other gel formulations were considered and tested for OWW's new products.  However, those gel formulations not "comprising" SEEPS did not provide the desired properties of the Advanced Gel Products, which contain SEEPS.   Jim Colvin testified that the only non-SEEPS formulation that approached the desired properties of its prior infringing products was

called the A19.[4] When it was compared with the gel formulation in the Advanced Gel Products, however, it failed in so-called "creep," the movement and repositioning of the gel within the composition of the sleeve such that it became uneven and thinner at points of pressure. Moreover, the non-SEEPS formula did not exhibit the same tensile strength and resulting tear resistance as the SEEPS based formulation. Additionally, Ryan Arbogast testified that OWW's test customers perceived that the Advanced Gel Products lasted longer than the non-SEEPS based product, principally because of the resulting uneven appearance of the A19 sleeve as a result of "creep." Finally, OWW's test customers complained of discomfort using the non-SEEPS based sleeves.

Tellingly, the descriptions of the failures of the A19 product dovetail almost precisely with the improvements of the SEEPS based product that Mr. Chen described in the demonstration to the USPTO on reexamination. When asked by ALPS' counsel during the trial, to explain why the '109 Patent was a novel invention, Mr. Chen responded with the following:

> The reason this composite gel, the 109, is novel revolutionary is that this free gel can be stretched and pulled and broken, but this composite cannot be stretched. Therefore, one of the main things I found was that if you shear this composite very slightly, deform it very slightly, what I term cyclic dynamic deformation, not very much, just constantly doing this or this, just shearing it, eventually, this will be destroyed and would take many, many cycles. And it turns out that my old gel composite compared to this, this is three to 700 percent better. The difference is 300 to 700 percent better, and this would not catastrophically fail in dynamic deformation.
>
> So, that means you can wear this next to your skin and deform it by walking, walking, walking and you can walk three to 700 percent further number of steps in deforming it. So, it's completely unexpected to have something that will last that much longer than the old composite that I invented back in the '80s. So, this is a revolutionary improvement over my

---

[4] Ryan Arbogast testified at the November 7, 2013 hearing that, A19 is a gel formulation developed by OWW that included the J-Series, but did not include any SEEPS copolymers.

old composite. And that's why the patent office allowed the claims, the invention twice, once in the original patent; again, in the re-examination they allowed -- they found it patentable overall the reference, including Hammond.

(Dkt. 388 at 60) It is precisely why the SEEPS based sleeve as disclosed in the '109 was considered by the patentee to be a protectable invention. Thus, the Court need not reach the question of whether the J-Series is or is not a SEEPS copolymer, which is contested. Whether the J-Series contained in the Advance Gel Products is a SEEPS copolymer is a distinction without a colorable difference because these products contain Septon 4033, a SEEPS copolymer. This composition, 100 parts SIBS, comprising SEEPS, is essential to permit the Advanced Gel Products to replace effectively the ALPHA product line. In sum, the resulting products are not colorably different than the ALPHA products previously found to be infringing. Without a SIBS comprising some amount of SEEPS, as claimed in Claim 1 of the '109 patent, OWW's other resulting product developed to date was deemed to be a failure.

There is also sufficient evidence presented that OWW's conduct constituted willful calculated infringement. OWW's principals testified repeatedly that it chose to "take a chance" and assume the risk that its Advanced Gel Products would be found not to infringe the '109 Patent. Their asserted plan was simply to be prepared to offer up royalties as compensation upon a finding of infringement.

SEALED

SEALED

SEALED

SEALED

SEALED

SEALED

SEALED

SEALED

This "infringe now, pay later" approach ignores the duty not to infringe a patent, but when it occurs after an injunction has issued, it evinces a clear intent to turn a blind eye to the boundaries of the Court's order. OWW offered the testimony of its officers and agent who were experienced in and well familiar with patent law. It strains credulity to assert a lack of knowledge of the term "comprising" or even the intellectual curiosity to ascertain such meaning when it knew the infringement would rise or fall on that understanding. Even if the Court were to accept this ignorance defense, which it does not, in light of its waiver of the defense of reliance on the advice of counsel, the Court is left to understand that OWW, surrounded by a sea of lawyers, chose not to seek or rely on advice of counsel as to such a fundamental issue. As noted, there was no evidence that OWW conferred with or relied on advice of independent counsel[5] and as noted previously, OWW admitted that if the term "compromising" is by law defined as "including, but not limited to," then the Advanced Gel Products infringe the '109 Patent.

For these reasons, the Court finds that OWW is in contempt of the Court's permanent injunction. Accordingly, ALPS' motion for contempt is **GRANTED**.

ALPS has asserted demands for a number of remedies to redress the contempt of OWW. Two warrant discussion: the others are fairly routine and are appropriately resolved in summary form herein.

---

[5] During the November 7, 2013 hearing, OWW's principals, officers, and employees conferred outside the presence of the Court and waived their rights to assert this defense.

First, ALPS seeks an order directing the destruction of the offending New Advanced Gel Products. OWW asserted that it should be allowed to retain the products, first mistakenly contending that the Court's order of injunction did not enjoin the manufacture of infringing goods. Upon review, OWW conceded that it was in fact so constrained. Whereupon, it alternatively contended that because the exclusivity ALPS enjoys in the '109 Patent will soon expire, OWW should be allowed to retain the products it manufactured in violation of this Court's injunction and ALPS' right of exclusivity and sell the products once the '109 Patent expires.

Such a notion runs counter to the purpose and letter of U.S. patent law. The holder of the rights in the patent enjoys no exclusivity at all if an infringer can simply stock-pile infringing products and flood the market once the patent expires. This is especially inappropriate where the infringer acts willfully in disregard of a court's injunction barring the manufacture of infringing products. OWW attempts to distinguish its circumstances from those of a trademark infringing purveyor of counterfeit "knock-off" items, whose goods are routinely destroyed, on grounds that its product is a genuine product. This assertion, however, ignores the fact that OWW's products were unlawfully manufactured and, as the infringer, it should not be permitted to recoup any of the damages it has been ordered to pay by selling the very product that the Court found to be infringing and that warranted the imposition of damages and fees and costs in the first instance. It is in fact no different than a trademark infringer in this respect: it has acquired goods unlawfully, and it is unlawful for it to profit from that infringement. Therefore, the Court finds that the destruction or proper disposal[6] of the offending

---

[6] The Court would be willing to entertain a creative solution that avoids economic waste. In this regard, counsel for OWW and its principal Robert ("Bob") Arbogast spoke at length about the charitable culture of

Advanced Gel Products is warranted.   The Court shall, however, stay this aspect of the Court's injunction pending resolution of the appeal of this Court's ruling on ALPS' motion for contempt.   In the interim, OWW shall continue to store the sequestered products in accordance with the directions of the Court-appointed Receiver.

Additionally, ALPS seeks to have the Court extend the current permanent injunction date past August 11, 2014 to include the time that OWW did not abide by the Court's permanent injunction order.   While the Court recognizes that it has broad discretion in fashioning equitable remedies, the Court finds that the remedies it has already imposed upon OWW are sufficient to coerce OWW's compliance with the Court's orders and injunction and to compensate ALPS. Further, the Court is mindful that 35 U.S.C. § 283 provides that injunctions may be granted "to prevent the violation of any right secured by patent." 35 U.S.C. § 283.  Giving deference to the USPTO's determination that claims 1-12, 15, and 16 of the '109 Patent have a priority date of August 11, 1994, claims 1-12, 15 and 16 of the '109 Patent will expire on August 11, 2014.[7]  Thus, after August 11, 2014, ALPS will no longer have any secured rights in a patent.

_____

OWW and its extension of resources to impecunious and worthy patients.  If the parties could identify and agree upon a procedure for the distribution of infringing items in stock to the disadvantaged or veteran community in a way that does not compromise the integrity of ALPS' production reputation and is not cost prohibitive, the Court would consider such a proposal.

[7] The Court is not persuaded by OWW's late assertion, which is contrary to its position in its Motion *in Limine* and the pronouncement of the USPTO, that the expiration date of the '109 Patent is April 19, 2014.

### III. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED and ADJUDGED** as follows:

1. OWW's Motion for Relief of Judgment Pursuant to Rule 60(b) (Dkt. 426) is **DENIED.**

2. OWW's Motion for Reconsideration, Under Federal Rule of Civil Procedure 59(e) or in the Alternative Rule 60(b)(6), of the Order of May 9, 2013 Granting an Injunction (Dkt. 435) is **GRANTED to the extent set forth herein.** The Court modifies its Order entered May 9, 2013 (Dkt. 418) related to the permanent injunction as follows:

> The Ohio Willow Wood Company and all of its agents, officers, servants, employees, successors, assigns, attorneys, and all other persons acting in concert or participation with the Ohio Willow Wood Company who receive actual notice of this Order by personal service or otherwise, shall be permanently enjoined and restrained from infringing, inducing infringement of, or contributorily infringing, under 35 U.S.C. § 271, claims 1-3, 5, 6, 11, and 12 of United States Patent No. 6,552,109 ("the '109 Patent") through the manufacture, use, sale, or offer for sale, within the United States, or importation into the United States, of the products adjudged to infringe and any products that are no more than colorably different from the products adjudged to infringe. The products adjudged to infringe the '109 Patent include the Ohio Willow Wood Company's products

identified as: (a) the Alpha Original Liners; (b) the Alpha Spirit Liners; (c) the Alpha Max Liners; (d) the Alpha AK Liners; (e) the Alpha P-POD Liners; (f) the Alpha Upper Extremity Liners; (g) the Alpha Design AK Liners; (h) the Alpha Design BK Liners; (i) the Alpha Original Suction Seal; (j) the Alpha Spirit Suction Seal; (k) the Alpha Flex Sleeve; (l) the Alpha AK Sleeve; and (m) the Alpha Socket Pads. This injunction is effective from the date of the original Injunction Order, May 9, 2013, through August 11, 2014.

Additionally, as of November 1, 2013, the Ohio Willow Wood Company and all of its agents, officers, servants, employees, successors, assigns, attorneys, and all other persons acting in concert or participation with the Ohio Willow Wood Company who receive actual notice of this Order by personal service or otherwise, shall be permanently enjoined and restrained from infringing, inducing infringement of, or contributorily infringing, under 35 U.S.C. § 271, claims 1-3, 5, 6, 11, and 12 of United States Patent No. 6,552,109 ("the '109 Patent") through the manufacture, use, sale, or offer for sale, within the United States, or importation into the United States, of the products adjudged to infringe and any products that are no more than colorably different from the products adjudged to infringe, amended to include the liners and sleeves containing the Advanced Formulas which replaced the Alpha line of

products identified in the Court's injunction of May 9, 2013, which apparently bear the same names as the above-referenced products.

3.    OWW is directed to serve notice of this Order upon its distributors, both domestic and foreign, **on or before November 19, 2013**. OWW is directed to provide a list of the distributors it served to ALPS **on or before November 26, 2013**.

4.    ALPS' Emergency Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt of May 9, 2013 Injunction Order (Dkts. 429, S-31) is **GRANTED**. The following products are found to be not more than colorably different from the previously adjudicated infringing products and are found to be infringing:  the liners and sleeves containing the Advanced Formulas which replaced the Alpha line of products identified in the Court's injunction of May 9, 2013, which apparently bear the same names as the previous products.  These products shall, by this ORDER, be incorporated in the Courts Order of injunction.

5.    Pursuant to the Court's equitable jurisdiction to take broad remedial action to effectuate compliance with its orders, the Court appoints James Abrams of the law firm of Taft Stettinius & Hollister LLP, as a Receiver to oversee OWW.  The Receiver's principal responsibility shall be: (1) to evaluate and determine the current financial relationship OWW has with all of its distributors, including the amount of OWW's accounts receivable; (2) to evaluate OWW's efforts over the past two years to dissipate the assets of

OWW to avoid payment of the judgment and avoid payment of a fair royalty to ALPS; (3) to assist in the determination of the comprehensiveness of the inventory sequester that OWW contends it has undertaken; and (4) to ensure that there is no further manufacture, use, sale or offer for sale of the Advanced Gel Products.  The Receiver shall file reports regarding OWW's compliance or noncompliance with the Court every thirty (30) days until further order by the Court, or earlier if exigencies arise.  OWW shall bear all costs associated with the Receiver. The Receiver shall prepare an invoice of the estimated fees and cost of services, including ancillary costs, such as experts and travel, etc. to be sent to ALPS and OWW and filed with the Court **no later than November 19, 2013**.  Upon approval by the Court, OWW shall deposit the amount of the estimated cost into the trust account of the Receiver to be billed against monthly by the Receiver as compensation for his services. Once this payment is made for the benefit of ALPS to cover the cost of oversight of OWW's conduct, OWW shall have no legal or equitable right or interest in the funds in the trust account of the Receiver, nor shall OWW have any reversionary right or interest in the funds.  Any amount remaining after the Receiver's affairs round down shall be paid to ALPS as additional compensation for its losses associated with OWW's infringing conduct.

6.   All of the adjudged infringing products and Advance Gel Products are to be sequestered in a warehouse for inspection by the Receiver.

7.  OWW is directed to submit any new prosthetic liner product proposals to counsel for ALPS for review and approval prior to making, using, selling, offering for sale, marketing within the United States, or importing into the United States any such prosthetic liner product.  If the parties are unable to agree as to whether the proposed product complies with the Court's permanent injunction as set forth herein, then OWW shall submit the new product proposal to the Court for review and approval prior to making using, selling, offering for sale, marketing within the United States, or importing into the United States the proposed product.

8.  **On or before November 15, 2013**, OWW shall deposit, into the Court's registry, the equivalent of twenty (20) percent the gross revenues from the sale of the Advanced Gel Products as fair compensation to ALPS as necessary to ameliorate the injury from the contemptuous infringement in the manufacture and sale of the Advanced Gel Products from the date beginning from November 27, 2012 through November 1, 2013.

9.  OWW is directed to pay reasonable attorneys' fees and costs of ALPS associated with ALPS' bringing the Emergency Motion to Hold Defendant, The Ohio Willow Wood Company, in Contempt of May 9, 2013 Injunction Order. (Dkts. 429, S-31)  ALPS is directed to file its claim for attorneys' fees and costs **on or before December 6, 2013**.  To the extent that OWW objects to the attorneys' fees and costs, OWW shall file its objections within **ten (10) days** after the filing of ALPS' claim.

10. ALPS' Motion for Order Requiring OWW to Provide Additional Information Concerning Potential Post-Trial Infringement (Dkt. 448) is **GRANTED** as the information requested is essential to permit calculation of the damages awarded herein, and OWW did not oppose this motion during the hearing on November 1, 2013.  OWW shall submit to ALPS and the Court **on or before November 15, 2013** an accounting of its infringing sales from November 27, 2012 through November 1, 2013, to permit a complete evaluation of the calculation it has offered.

11. Regarding ALPS' Supplement to Alps South, LLC's Motion for Enhanced Damages, Attorneys' Fees, Supplemental Damages, Costs and Interest (Dkt. 431), the Court finds that ALPS' request for videographer costs should be reduced by $640 as the Court finds no authority to support ALPS' request for taxation of costs related to video synchronization packages for the depositions of James Colvin, Robert Arbogast, and Ryan Arbogast.  (Dkt. 422)  At the November 1, 2013, hearing, OWW had no objection to ALPS' amended request for photocopying costs, which was reduced to account for nontaxable exhibit costs.   (Dkt. 431)   Accordingly, ALPS is awarded videographer costs in the amount of $9,750 and photocopy costs in the amount of $22,207.31.  The Clerk of Court is directed to tax these costs against OWW.

12. OWW's Motion for Extension of Time to Provide Objections to Plaintiff, Alps South, LLC's Claim for Attorneys' Fees and Motion to Compel Unredacted Invoices (Dkt. 459) is **DENIED without prejudice**.  The Court will review the

unredacted attorneys' fee invoices provided by ALPS, and to the extent the Court believes OWW should be permitted to address any issues raised by the unredacted invoices, the Court will direct a further response from OWW.

13. ALPS' Motion for Leave to File Reply Memorandum with Respect to Plaintiff's Claim for Attorneys' Fees (Dkt. 463) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida this _12th_ day of November, 2013.

Mary S. Scriven
United States District Judge

Copies furnished to:
All Counsel of Record
All *Pro Se* parties

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALPS SOUTH, LLC,
a Florida limited liability company,

      Plaintiff,

v.                             Case No.: 8:08-CV-1893-T-35MAP

THE OHIO WILLOW WOOD
COMPANY, an Ohio corporation,

      Defendant.

_____/

### ORDER

**THIS CAUSE** comes before the Court for consideration of the Notice of Filing Receiver's Initial Estimate of Fees and Cost of Services and First Report filed under seal. In the Notice, the Receiver provides an initial estimate of fees and costs of services in the amount of $117,375.00. The Court approves the amount of the initial estimate of fees and costs of services. The Court directs The Ohio Willow Wood Company ("OWW") to deposit $117,375.00 into the Court's registry **on or before December 6, 2013**.

    The Receiver shall submit his bills for his services to the Undersigned's chambers e-mail, with a copy of the e-mail sent to the parties, every **thirty (30) days** until he is relinquished from his duties by the Court. The Receiver's first bill shall be due **no later than December 6, 2013**. The parties shall have **up to and including seven (7) days** from the day the Receiver submits his bill to object to the bill. The parties shall file their objections under seal with the Court.

The Court has reviewed the Receiver's report and accepts the information and procedures set out by the Receiver to be followed by OWW, except to the extent set forth herein.

As an initial matter, the Court notes that the Receiver references J-Series as SEEPS. The Parties dispute whether J-Series is SEEPS, and the Court has made no determination whether J-Series is SEEPS.

Secondly, based on the report, it appears that OWW has sequestered the raw materials (*i.e.* SEEPS and J-Series) used to produce the infringing products. Further, the Receiver has instructed OWW to contact Kuraray to advise Kuraray that OWW cannot purchase SEEPS or J-Series until the Court's injunction expires. The Court is without knowledge, however, whether SEEPS was or would be utilized to produce other products that did not infringe the '109 Patent. Further, the Court is aware that OWW has advised that it has produced products for testing that contain J-Series (*i.e.* A-19), but that it claims do not infringe the '109 Patent. The Court's concern in this matter is to ensure that OWW complies with its injunction, which is that OWW cannot manufacture, use, sale, or offer for sale, within the United States, or importation into the United States, the products adjudged to infringe and any products that are no more than colorably different from the products adjudged to infringe. The Court is not empowered to prohibit OWW from possessing raw materials that are not subject to the ALPS patent in their raw form or using raw materials to manufacture products that have not been adjudged by this Court to be infringing. Therefore, the Court does not require OWW to sequester the SEEPS and J-Series it has already purchased and does not prohibit OWW from purchasing SEEPS or J-Series from Kuraray. The Court recognizes this

2

decision may impose an additional burden on the Receiver to monitor the SEEPS and J-Series to ensure that they are not being used to produce the infringing products.

Finally, the report states that OWW has expressed concerns about customer returns, including returns of previously sold infringing product. The Receiver asserts that the Parties are going to have to come to an agreement as to how these customer returns are handled so that innocent users of the infringing products are not injured. Any negotiation between the Parties regarding customer returns is a matter solely for the Parties to address. The Court will only direct OWW to comply with this Court's injunction that it not "manufacture, use, sale, or offer for sale, within the United States, or importation into the United States, the products adjudged to infringe and any products that are no more than colorably different from the products adjudged to infringe." To the extent that exchanging infringing products would be necessary to meet its warranty or exchange agreements with its customers, any such exchange would be at least "using" infringing products in violation of the injunction. Unless other agreements are made between ALPS and OWW concerning exchanges and those agreements are disclosed to the Receiver and to the Court, OWW will have to determine other means to meet its obligations to its customers.

Upon consideration of the forgoing, it is hereby ORDERED as follows:

1. OWW is directed to **DEPOSIT** in the Court's registry $117,375.00 **on or before December 6, 2013**. Upon deposit of these funds in the Court's registry, OWW shall have no legal or equitable right or interest in the funds in the trust account of the Receiver, nor shall OWW have any reversionary right or interest in the funds.

3

2. OWW is directed to follow the procedures set forth in the Receiver's report, except to the extent set forth herein.

3. The Receiver shall submit his bills to the Undersigned's chambers e-mail, with a copy of the e-mail sent to the parties, every **thirty (30) days** until he is relinquished from his duties by the Court.  The Receiver's first bill shall be due **no later than December 6, 2013**.

4. The Parties shall have **up to and including seven (7) days** from the day the Receiver submits his bill to object to the bill.  The Clerk is directed to file the parties' objections under **SEAL**.

**DONE** and **ORDERED** in Tampa, Florida this 25th day of November 2013.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
All Counsel of Record
All *Pro Se* parties

4

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ALPS SOUTH, LLC,**
a Florida Corporation,

      **Plaintiff,**

**v.**                            **Case No: 8:08-cv-1893-T-35MAP**

**THE OHIO WILLOW WOOD
COMPANY, an Ohio Corporation,**

      **Defendant.**

_____

## THIRD AMENDED JUDGMENT IN A CIVIL CASE

**IT IS ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, ALPS SOUTH, LLC and against Defendant, THE OHIO WILLOW WOOD COMPANY with respect to the '109 Patent as to the issues of infringement; willful infringement; and validity due to anticipation of obviousness by prior art, non-enablement, and written description. The jury awarded damages in the amount of $3,983,512.00. The Court has awarded enhanced damages and directed that those damages be doubled. Therefore, the Judgment is entered in the amount of $7,967,024.00, plus prejudgment interest at a rate of 3.25% compounded annually from July 5, 2011 through July 18, 2012 and post-judgment interest pursuant to 28 U.S.C. § 1961 from July 19, 2012 to the date of payment.

**IT IS FURTHER ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, ALPS SOUTH, LLC and against Defendant, THE OHIO WILLOW WOOD COMPANY with respect to the '109 Patent as to the issue of inequitable conduct.

**IT IS FURTHER ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, ALPS SOUTH, LLC and against Defendant, THE OHIO WILLOW WOOD COMPANY with respect to supplemental damages from April 30, 2012 through May 9, 2013. Judgment for the supplemental damages is entered in the amount of $2,932,239.30.

**IT IS FURTHER ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, ALPS SOUTH, LLC and against Defendant, THE OHIO WILLOW WOOD COMPANY, concluding that Plaintiff, ALPS SOUTH, LLC's is entitled to reasonable attorney's fees. The amount of the attorney's fees is to be determined, if necessary, upon the resolution of the appeal of this action.

**IT IS FURTHER ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, ALPS SOUTH, LLC and against Defendant, THE OHIO WILLOW WOOD COMPANY with respect to Plaintiff's costs. Judgment for costs is entered in the amount of $86,992.71.

SHERYL L. LOESCH, CLERK

s/B. Sohn, Deputy Clerk

2

JA000202

# CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

   (b) **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d) **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5**: The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule**: Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

   (a) **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b) **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c) **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d) **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e) **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4. **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

- 3 -

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ALPS SOUTH, LLC,**
a Florida Corporation,

       **Plaintiff,**

**v.**
                                  **Case No: 8:08-cv-1893-T-35MAP**

**THE OHIO WILLOW WOOD**
**COMPANY, an Ohio Corporation,**

       **Defendant.**

---

## JUDGMENT IN A CIVIL CASE

    **IT IS ORDERED AND ADJUDGED** that as for ALPS SOUTH, LLC's claim for contempt with respect to THE OHIO WILLOW WOOD COMPANY's Advanced Gel Products, judgment is entered in favor of Plaintiff, ALPS SOUTH, LLC and against Defendant, THE OHIO WILLOW WOOD COMPANY for liability and damages in the amount of $4,560,617.00.

                                SHERYL L. LOESCH, CLERK

                                s/B. Sohn, Deputy Clerk

# CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

   (b) **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorney's fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d) **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5**: The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule**: Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

   (a) **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b) **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c) **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d) **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e) **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4. **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

JA000205

(12) **United States Patent**
Chen

(10) Patent No.: **US 6,552,109 B1**
(45) Date of Patent: **Apr. 22, 2003**

(54) **GELATINOUS ELASTOMER COMPOSITIONS AND ARTICLES**

(75) Inventor: **John Y. Chen**, Pacifica, CA (US)

(73) Assignee: **Applied Elastomerics, Inc.**, South San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/612,586**

(22) Filed: **Mar. 8, 1996**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. PCT/US94/04278, filed on Apr. 19, 1994, application No. PCT/US94/07314, filed on Jun. 27, 1994, application No. 08/288,690, filed on Aug. 11, 1994, now Pat. No. 5,633,286, application No. 08/581,188, filed on Dec. 29, 1995, now abandoned, application No. 08/581,191, filed on Dec. 29, 1995, now Pat. No. 5,760,117, and application No. 08/581,125, filed on Dec. 29, 1995, now Pat. No. 5,962,572.

(51) Int. Cl.[7] .............................. C08J 5/02; C08J 51/00; C08K 5/01; B61C 15/00

(52) U.S. Cl. ...................... **524/270**; 132/321; 442/59; 428/319.3; 428/319.7; 428/319.9; 428/378; 428/441; 428/462; 428/521; 428/537.1; 428/688; 174/137 A; 174/137 B; 524/474; 524/476; 524/490; 524/505

(58) Field of Search ...................... 132/321; 442/59; 428/319.3, 319.7, 319.9, 378, 441, 462, 521, 537.1, 688; 174/137 A, 137 B; 524/505, 474, 490, 476; 525/95, 98

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,485,787 A | 12/1969 | Haefele | 524/474 |
| 3,676,387 A | 7/1972 | Lindlof | 524/487 |
| 3,827,999 A | 8/1974 | Crossland | 524/500 |
| 3,860,013 A | 1/1975 | Czapor | 132/91 |
| 3,935,338 A | 1/1976 | Robertson | 427/207 |
| 4,001,167 A | 1/1977 | Tungseth | 524/476 |
| 4,136,699 A | 1/1979 | Collins | 604/387 |
| 4,151,057 A | 4/1979 | St. Clair | 522/110 |
| 4,176,240 A | 11/1979 | Sabia | 174/23 C |
| 4,259,540 A | 3/1981 | Sabia | 174/23 C |
| 4,369,284 A | * 1/1983 | Chen | 524/505 |
| 4,432,607 A | 2/1984 | Levy | 350/96.34 |
| 4,492,428 A | 1/1985 | Levy | 350/96.3 |
| 4,618,213 A | * 10/1986 | Chen | 524/505 |
| 4,643,924 A | 2/1987 | Uken | 428/244 |
| 4,690,831 A | 9/1987 | Uken | 427/44 |
| 4,692,371 A | 9/1987 | Morman | 428/244 |
| 4,709,982 A | 12/1987 | Corne | 524/505 |
| 4,718,678 A | 1/1988 | Vansant | 277/1 |
| 4,741,940 A | 5/1988 | Reed | 428/68 |
| 4,822,834 A | 4/1989 | Blevins | 524/427 |
| 4,842,931 A | 6/1989 | Zook | 428/354 |
| 4,865,905 A | 9/1989 | Uken | 428/220 |

| | | | |
|---|---|---|---|
| 4,880,878 A | 11/1989 | Himes | 525/89 |
| 4,883,196 A | 11/1989 | Sieverding | 524/480 |
| 4,900,877 A | 2/1990 | Dubrow | 174/35 |
| 4,942,270 A | 7/1990 | Gamarra | 174/93 |
| 5,066,209 A | 11/1991 | Acker | 446/385 |
| 5,088,734 A | 2/1992 | Glava | 273/735 |
| 5,098,421 A | 3/1992 | Zook | 604/367 |
| 5,149,736 A | 9/1992 | Gamarra | 524/490 |
| 5,153,254 A | * 10/1992 | Chen | 524/505 |
| 5,167,649 A | 12/1992 | Zook | 604/307 |
| 5,191,752 A | 3/1993 | Murphy | 54/44.5 |
| 5,262,468 A | * 11/1993 | Chen | 524/505 |
| 5,313,019 A | * 5/1994 | Brusselmans et al. | 174/83 |
| 5,330,452 A | 7/1994 | Zook | 604/307 |
| 5,334,646 A | * 8/1994 | Chen | 428/521 |
| 5,336,708 A | * 8/1994 | Chen | 132/321 |
| 5,479,952 A | 1/1996 | Zachariades | 132/321 |
| 5,508,334 A | * 4/1996 | Chen | 524/505 |
| 5,559,265 A | 9/1996 | Love | 558/177 |
| 5,618,882 A | 4/1997 | Hammond | 525/92 D |
| 5,633,286 A | * 5/1997 | Chen | 524/505 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| GB | 1268431 | | of 0000 |
| WO | WO 9005166 | * | 5/1990 |

OTHER PUBLICATIONS

"Properties of Oriented Block copolymers", A. Skoulios, Journal of Polymer Science: Polymer Symnposium 58, 369–379 (1977).

"Styrene–Diene Triblock Copolymers: Orientation Conditions and Mechanical Properties of The Oriented Materials" A. Weill and R. Pixa, Journal of Polymer Science Polymer Symposium 58, 381–394 (1977).

SC:1102–89 Shell Chemical Technical Bulletin "KRA-TON® Thermoplastic Rubber in oil gels" Apr. 1989.

Adhesion of Viscoelastic Materials to Rigid Substrates Proc. Roy. Soc. A. 310, 433–448 (1969) Printed in Great Britain.

Allen et al, Comprehensive Polymer Science—vol. 7; 1994; p. 416–431.

Kirk–Othmer; Encyclopedia of Chemical Technology; 1994; 4th Edition; p. 17–37.

Garder, William; Gardner's Chemical Synonyms and Trade Names; 1994.

Holden et al; Thermoplastic Elastomers; 2nd Edition; 1996; Chapter 1—p. 1–26; Chapter 3—p. 27–70; Chapter 4—p. 71–100.

* cited by examiner

*Primary Examiner*—Herbert J. Lilling

(57) **ABSTRACT**

Novel gelatinous compositions and articles are formed from an intimate melt blend admixture of one or more of a high viscosity poly(styrene-ethylene-butylene-styrene), poly (styrene-ethylene-ethylene-propylene-styrene), poly (styrene-ethylene-butylene)$_n$, and poly(styrene-ethylene-propylene)$_n$ triblock and branched copolymers and high levels of a plasticizing oil.

**12 Claims, No Drawings**

Exhibit 1

US 6,552,109 B1

1

# GELATINOUS ELASTOMER COMPOSITIONS AND ARTICLES

## ORIGINS OF INVENTION AND RELATED APPLICATIONS

This application is a continuation-in-part of the following applications: U.S. Ser. Nos. PCT/US94/04278 filed Apr. 19, 1994 (published May 26, 1995 No. WO95/13851); PCT/US94/07314 filed Jun. 27, 1994 (published Jan. 4, 1996 No. WO96/00118); USSN 08/288,690 filed Aug. 11, 1994, now U.S. Pat. No. 5,633,286; USSN 08/581,188 filed Dec. 29, 1995, now abandoned; USSN 08/581,191 filed Dec. 29, 1995, now U.S. Pat. No. 5,760,117; USSN 08/581,125 filed Dec. 29, 1995, now U.S. Pat. No. 5,962,572.

## FIELD OF THE INVENTION

The present invention relates to useful gelatinous elastomer compositions and articles.

## BACKGROUND OF THE INVENTION

This application is based upon subject matters described in earlier filed and copending related applications and patents (see Related Applications above) which are specifically incorporated herein by reference.

As taught in related U.S. Pat. No. 4,369,284, No. 4,618,213 and No. 5,153,254, oil extended thermoplastic block copolymers of the prior art suffer certain poor properties. Shell Technical Bulletin No. SC 65-75 teaches the use of low viscosity poly(styrene-ethylene-butylene-styrene) triblock copolymers (Kraton G 1650 and G 1652) with Brookfield Viscosities of 1,500 and 550 cps (viscosity being measured for a solution of 20 weight percent solids in toluene at 250° C.) plasticized with oil, the compositions obtained trend to rupture and crumble when submitted to moderate shearing stress conditions.

## SUMMARY OF THE INVENTION

The advantages and inherent properties of the gelatinous elastomer compositions (herein interchangeably refer to as "gelatinous compositions" or simply as "gel compositions" or more simply as "gels") and articles of the invention are many. The gel compositions exhibits high dimensional stability, crack, tear, craze, and creep resistance, excellent tensile strength and high elongation, long service life under stress and capable of repeated handling, excellent processing ability for cast molding, non-toxic, nearly tasteless and odorless, extremely soft and strong, highly flexible, possessing elastic memory, substantially with little or no plasticizer bleedout. The gel can also be made transparent. The desirable combination of physical properties are unexpected.

In a first embodiment, the composites of the invention comprises a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat and interlocked with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) and from

(ii) about 300 to about 1,600 parts by weight of a plasticizing oil; said gelatinous elastomer compositions characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said block copolymers have the general configuration A-B-A wherein A is a glassy polymer end block segment of polystyrene and B is an

2

elastomeric polymer center block segment of (ethylene-ethylene-propylene) and said gel being in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly (styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nG_nM_nG_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity of from about 20 to about 800 gram Bloom.

More generally, the invention comprises thermoplastic, heat formable and heat reversible gelatinous elastomer compositions and articles formed from (I) 100 parts by weight of one or more hydrogenated styrene block copolymers having 2-methyl-1,3-butadiene and 1,3-butadiene blocks of the formula poly(styrene-ethylene-ethylene-propylene-styrene) and optionally in combination with (II) a selected amount of one or more selected polymer or copolymer; (III) from about 300 to about 1,600 parts by weight of a plasticizing oil; said gelatinous elastomer compositions being characterized by a gel rigidity of from about 20 to about 800 gram Bloom.

Useful articles can be formed from the gelatinous elastomer compositions of the invention, including molded articles, composites (gel compositions "interlocked" with various substrates), articles having sticking and non-sticking properties, strong oriented gel compositions as view in polarized light etc.

The various aspects and advantages of the invention will become apparent to those skilled in the art upon consideration of the accompanying disclosure.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Gel compositions useful in the present invention are described in my earlier patents Nos. 4,369,284; 4,618,213; 5,153,254; 5,239,723; 5,262,468; 5,324,222; 5,334,646; 5,336,708; 5,475,890; 5,508,334; 5,624,294; 5,633,286; and 5,655,947 which are incorporated herein by reference.

The polymers useful in forming the gel compositions of the invention comprises high viscosity triblock and branched copolymers. The triblock copolymers have the general configuration A-B-A wherein each A is a glassy polymer end block segment of polystyrene and B is a elastomeric polymer center block segment of poly(ethylene-butylene), poly (ethylene-propylene) or poly(ethylene-ethylene-propylene). The useful high viscosity branched copolymers have the general configuration (A-B)$_n$ wherein A is polystyrene and B is (ethylene-butylene), (ethylene-propylene) or (ethylene-

US 6,552,109 B1

3

ethylene-propylene) and the subscript n is an number. The B and A portions of the triblock and branched copolymers are incompatible and form a two-phase system consisting of sub-micron domains of glassy polystyrene interconnected by flexible B chains. These domains serve to crosslink and reinforce the structure. This physical elastomeric network structure is reversible, and heating the polymer above the softening point of polystyrene temporarily disrupt the structure, which can be restored by lowering the temperature.

The most preferred gels can be prepared by melt blending an admixture comprising: (I) 100 parts by weight of one or more of a high viscosity triblock or branched copolymers or a mixture of two or more of poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-propylene-styrene), (styrene-ethylene-propylene)$_n$, (styrene-ethylene-butylene)$_n$, and optionally in combination with (II) a selected amount of one or more polymer or copolymer selected from the group consisting of poly(styrene-butadiene-styrene), poly (styrene-butadiene), poly(styrene-isoprene-styrene), poly (styrene-isoprene), poly(styrene-ethylene-propylene), poly (styrene-ethylene-ethylene-propylene-styrene) poly (styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly (ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, branched or star-shaped, or multiarm copolymer; and (III) from about 300 to about 1,600 parts by weight of a plasticizing oil.

As used herein, the liner triblock copolymers poly (styrene-ethylene-ethylene-propylene-styrene) is denoted by "SEEPS", poly(styrene-ethylene-butylene-styrene) is denoted by "SEBS", poly(styrene-ethylene-propylene-styrene) is denoted by "SEPS"; and the branched copolymers poly(styrene-ethylene-propylene)$_n$ is denoted by "(SEP)$_n$", and poly(styrene-ethylene-butylene)$_n$ is denoted by "(SEB)$_n$". Branched copolymers are often times conventionally referred to as radial or star-shaped polymers.

Gel compositions of the invention are characterized by gel rigidities of from less than about 20 gram Bloom to about 700 gram Bloom and higher. As used herein, the term "gel rigidity" in gram Bloom is determined by the gram weight required to depress a gel a distance of 4 mm with a piston having a cross-sectional area of 1 square centimeter at 23° C.

It should be noted that when the A to B ratio falls substantially below 31:69, various properties such as elongation, tensile strength, tear resistance and the like can decrease while retaining other desired properties, such as gel rigidity, flexibility, elastic memory.

The high viscosity triblock, radial, star-shaped, and multiarm copolymers in (I) which are suitable for use in the present invention has a typical Brookfield Viscosity value of a 20 weight percent solids solution in toluene at 25° C. of at least about 1,800 cps, and preferably about 2,000 cps or higher. Typically, the Brookfield Viscosity values can range from at least about 1,800 to about 16,000 cps and higher. More typically, the Brookfield Viscosity values can range from at least about 1,800 cps to about 40,000 cps and higher. Still more typically, the Brookfield Viscosity values can range from at least about 1,800 cps to about 80,000 cps and higher. Due to structural variations between the triblock, radial, star-shaped, and multiarm copolymers, the high vis-

4

cosity branched copolymers useful in the invention, typically, may exhibit a lower Brookfield Viscosity value than its counterpart triblock copolymers. However, when the triblock copolymers are considered as branched, then at equal branch lengths, the solution viscosities of the triblock copolymers and branched copolymers are about the same or equivalent. In other words, the typical Brookfield Viscosity values for branched copolymers of a 20 weight percent solids solution in toluene at 25° C. can be less than their counterpart triblock copolymers.

In all cases, the molecular chain lengths (molecular weights) of the triblock and branch copolymers must be sufficient to meet the high solution Brookfield Viscosities requirements described herein that is necessary for making the extremely soft and strong gel compositions.

The high viscosity triblock and branched copolymers: SEEPS, SEBS, SEPS, (SEB)$_n$, and (SEP)$_n$ can be measured under varying conditions of weight percent solution concentrations in toluene. The most preferred and useful triblock and branched copolymers selected have Brookfield Viscosity values ranging from about 1,800 cps to about 80,000 cps and higher when measured at 20 weight percent solution in toluene at 25° C., about 4,000 cps to about 40,000 cps and higher when measured at 25 weight percent solids solution in toluene. Typical examples of Brookfield Viscosity values for branched copolymers (SEB)$_n$ and (SEP)$_n$ at 25 weight percent solids solution in toluene at 25° C. can range from about 3,500 cps to about 30,000 cps and higher; more typically, about 9,000 cps and higher. Other preferred and acceptable triblock and branched copolymers can exhibit viscosities (as measured with a Brookfield model RVT viscometer at 25° C.) at 10 weight percent solution in toluene of about 400 cps and higher and at 15 weight percent solution in toluene of about 5,600 cps and higher. Other acceptable triblock and branched copolymers can exhibit about 8,000 to about 20,000 cps at 20 weight percent solids solution in toluene at 25° C. Examples of most preferred high viscosity triblock and branched copolymers can have Brookfield viscosities at 5 weight percent solution in toluene at 30° C. of from about 40 to about 50 cps and higher. While less preferred polymers can have a solution viscosity at 10 weight percent solution in toluene at 30° C. of about 59 cps and higher.

The high viscosity triblock, radial, star-shaped, and multiarm copolymer of the invention can have a broad range of styrene end block to ethylene and butylene center block ratio of about 20:80 or less to about 40:60 or higher. Examples of high viscosity triblock copolymers that can be utilized to achieve one or more of the novel properties of the present invention are styrene-ethylene-butylene-styrene block copolymers (SEBS) available from Shell Chemical Company and Pecten Chemical Company (divisions of Shell Oil Company) under trade designations Kraton G 1651, Kraton G 1654X, Kraton G 4600, Kraton G 4609 and the like. Shell Technical Bulletin SC:1393-92 gives solution viscosity as measured with a Brookfield model RVT viscometer at 25° C. for Kraton G 1654X at 10% weight in toluene of approximately 400 cps and at 15% weight in toluene of approximately 5,600 cps. Shell publication SC:68-79 gives solution viscosity at 25° C. for Kraton G 1651 at 20 weight percent in toluene of approximately 2,000 cps. When measured at 5 weight percent solution in toluene at 30° C., the solution viscosity of Kraton G 1651 is about 40. Examples of high viscosity SEBS triblock copolymers includes Kuraray's SEBS 8006 which exhibits a solution viscosity at 5 weight percent at 30° C. of about 51 cps. Kuraray's 4055 SEEPS (styrene-ethylene/ethylene-propylene-styrene) block poly-

5

mer made from hydrogenated styrene isoprene/butadiene block copolymer or more specifically made from hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene which exhibits a viscosity at 5 weight percent solution in toluene at 30° C. of about 90 mPa-S, at 10 weight percent about 5800 mPa-S. Kuraray's 2006 SEPS polymer exhibits a viscosity at 20 weight percent solution in toluene at 30° C. of about 78,000 cps, at 5 weight percent of about 27 mPa-S, at 10 weight percent of about 1220 mPa-S, and at 20 weight percent 78,000 cps. Kuraray SEPS 2005 polymer exhibits a viscosity at 5 weight percent solution in toluene at 30° C. of about 28 mPa-S, at 10 weight percent of about 1200 mPa-S, and at 20 weight percent 76,000 cps. Other grades of SEBS, SEPS, $(SEB)_n$, $(SEP)_n$ polymers can also be utilized in the present invention provided such polymers exhibits the required high viscosity. Such SEBS polymers include (high viscosity) Kraton G 1855X which has a Specific Gravity of 0.92, Brookfield Viscosity of a 25 weight percent solids solution in toluene at 25° C. of about 40,000 cps or about 8,000 to about 20,000 cps at a 20 weight percent solids solution in toluene at 25° C.

The styrene to ethylene and butylene (S:EB) weight ratios for the Shell designated polymers can have a low range of 20:80 or less. Although the typical ratio values for Kraton G 1651, 4600, and 4609 are approximately about 33:67 and for Kraton G 1855X approximately about 27:73, Kraton G 1654X (a lower molecular weight version of Kraton G 1651 with somewhat lower physical properties such as lower solution and melt viscosity) is approximately about 31:69, these ratios can vary broadly from the typical product specification values. In the case of Kuraray's SEBS polymer 8006 the S:EB weight ratio is about 35:65. In the case of Kuraray's 2005, 2006, and 4055 the and S:EEP weight ratios are 20, 35 and 30 respectively. Much like S:EB ratios of SEBS and $(SEB)_n$, the S:EP ratios of very high viscosity SEPS, $(SEP)_n$, copolymers are expected to be about the same and can vary broadly.

The S:EB, S:EP weight ratios of high viscosity SEBS, SEPS, $(SEB)_n$, and $(SEP)_n$ useful in forming the gel compositions of the invention can range from lower than about 20:80 to above about 40:60 and higher. More specifically, the values can be 19:81, 20:80, 21:79, 22:78, 23:77, 24:76, 25:75, 26:74, 27:73, 28:72, 29:71, 30:70, 31:69, 32:68, 33:67, 34:66, 35:65, 36:64, 37:63, 38:62, 39:61, 40:60, 41:59, 42:58, 43:57, 44:65, 45:55, 46:54, 47:53, 48:52, 49:51, 50:50, 51:49 and etc. Other ratio values of less than 19:81 or higher than 51:49 are also possible. Broadly, the styrene block to elastomeric block ratio of the high viscosity triblock, radial, star-shaped, and multiarm copolymers of the invention is about 20:80 to about 40:60 or higher, less broadly about 31:69 to about 40:60, preferably about 32:68 to about 38:62, more preferably about 32:68 to about 36:64, particularly more preferably about 32:68 to about 34:66, especially more preferably about 33:67 to about 36:64, and most preferably about 33:67. In accordance with the present invention, triblock copolymers such as Kraton G 1654X having ratios of 31:69 or higher can be used and do exhibit about the same physical properties in many respects to Kraton G 1651 while Kraton G 1654X with ratios below 31:69 may also be use, but they are less preferred due to their decrease in the desirable properties of the final gel.

Other polymers and copolymers (in major or minor amounts) can be selectively melt blended with one or more of the high viscosity polymers as mentioned above without substantially decreasing the desired properties; these (III) polymers include (SBS) styrene-butadiene-styrene block copolymers, (SIS) styrene-isoprene-styrene block

6

copolymers, (low styrene content SEBS) styrene-ethylene-butylene-styrene block copolymers, (SEP) styrene-ethylene-propylene block copolymers, (SEPS) styrene-ethylene-propylene-styrene block copolymers, $(SB)_n$ styrene-butadiene and $(SEB)_n$, $(SEBS)_n$, $(SEP)_n$, $(SI)_n$ styrene-isoprene multi-arm, branched or star-shaped copolymers and the like. Still, other (III) polymers include homopolymers which can be utilized in minor amounts; these include: polystyrene, polybutylene, polyethylene, polypropylene and the like.

Representative plasticizer oil gels (polymer+oil) of the invention include: (a) Kraton G 1651, G 1654X gels; (b) Kraton G 4600 gels; (c) Kraton G 4609 gels; other suitable high viscosity polymer and oil gels include: (d) Tuftec H 1051 gels; (e) Tuftec H 1041 gels; (f) Tuftec H 1052 gels; (g) Kuraray SEEPS 4055 gel; (h) Kuraray SEBS 8006 gel; (i) Kuraray SEPS 2005 gel; (j) Kuraray SEPS 2006 gel, and (k) Gels made from blends (polyblends) of (a)-(h) with other polymers and copolymers include: (1) SEBS-SBS gels: (2) SEBS-SIS gels; (3) SEBS-(SEP) gels; (4) SEBS-$(SEB)_n$ gels; (5) SEBS-$(SEB)_n$ gels; (6) SEBS-$(SEP)_n$ gels; (7) SEBS-$(SI)_n$ gels; (8) SEBS-(SI) multiarm gels; (9) SEBS-$(SEB)_n$ gels; (10) $(SEB)_n$ star-shaped copolymer gels; (11) gels made from blends of (a)-(k) with other homopolymers include: (12) SEBS/polystyrene gels; (13) SEBS/polybutylene gels; (14) SEBS/polyethylene gels; (14) SEBS/polypropylene gels; (16) SEP/SEBS oil gels (17), SEP/SEPS oil gels (18), SEP/SEPS/SEB oil gels (19), SEPS/SEBS/SEP oil gels (20), SEBS/SEBS (21), EB-EP/SEBS (22), SEBS/EB (23), SEBS/EP (24), (25) $(SEB)_n$ gels, (26) $(SEP)_n$ gels and the like.

Representative examples of commercial elastomers that can be formed with plasticizing oils in combination with the high viscosity triblock and branched copolymers described above into suitable gels for use in making the gel compositions of the invention: Shell Kratons D1101, D1102, D1107, D1111, D1112, D1113X, D1114X, D1116, D1117, D1118X, D1122X, D1125X, D1133X, D1135X, D1184, D1188X, D1300X, D1320X, D4122, D4141, D4158, D4240, G1650, G1652, G1657, G1701X, G1702X, G1726X, G1750X, G1765X, FG1901X, FG1921X, D2103, D2109, D2122X, D3202, D3204, D3226, D5298, D5999X, D7340, G1654X, G2701, G2703, G2705, G1706, G2721X, G7155, G7430, G7450, G7523X, G7528X, G7680, G7705, G7702X, G7720, G7722X, G7820, G7821X, G7827, G7890X, G7940. Kuraray's SEEPS, SEP/SEPS or SEP/SEB/SEPS Nos. 1001, 1050, 2002, 2003, 3023, 2007, 2043, 2063, 2050, 2103, 2104, 2105, 4033 (SEEPS), 4045 (SEEPS), 8004 (SEBS), 8007, and the like.

Plasticizers particularly preferred for use in practicing the present invention are well known in the art, they include rubber processing oils such as paraffinic and naphthenic petroleum oils, highly refined aromatic-free paraffinic and naphthenic food and technical grade white petroleum mineral oils, and synthetic liquid oligomers of polybutene, polypropene, polyterpene, etc. The synthetic series process oils are high viscosity oligomers which are permanently fluid liquid nonolefins, isoparaffins or paraffins of moderate to high molecular weight.

Examples of representative commercially available plasticizing oils include Amoco® polybutenes, hydrogenated polybutenes, polybutenes with epoxide functionality at one end of the polybutene polymer, liquid poly(ethylene/butylene), liquid hetero-telechelic polymers of poly (ethylene/butylene/styrene) with epoxidized polyisoprene and poly(ethylene/butylene) with epoxidized polyisoprene: Example of such polybutenes include: L-14 (320 Mn), L-50

7

(420 Mn), L-100 (460 Mn), H-15 (560 Mn), H-25 (610 Mn), H-35 (660 Mn), H-50 (750 Mn), H-100 (920 Mn), H-300 (1290 Mn), L-14E (27-37 cst @ 100oF Viscosity), H-300E (635-690 cst @ 210oF Viscosity), Actipol E6 (365 Mn), E16 (973 Mn), E23 (1433 Mn), Kraton L-1203, EKP-206, EKP-207, HPVM-2203 and the like. Example of various commercially oils include: ARCO Prime (55, 70, 90, 200, 350, 400 and the like), Duraprime and Tufflo oils (6006, 6016, 6016M, 6026, 6036, 6056, 6206, etc), other white mineral oils include: Bayol, Bernol, American, Blandol, Drakeol, Ervol, Gloria, Kaydol, Litetek, Lyondell (Duraprime 55, 70, 90, 200, 350, 400, etc), Marcol, Parol, Peneteck, Primol, Protol, Sontex, and the like.

The Kuraray SEPTON 4000 series block polymers: 4033, 4055, 4045, and the like useful in making the gels of the instant invention are made from hydrogenated styrene isoprene/butadiene styrene block copolymer or more specifically made from hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene. Such poly (styrene-isoprene/butadiene-styrene) polymers, depending on the butadiene structure, when hydrogenated will result in "(SEB/EPS)" or reading the other way "(SEP/EBS)". In cases where the butadiene structures are controlled, it is appropriate to denote (SEB/EPS) as (SE/EPS) where E/EP is ethylene-ethylene-propylene or more simply as (SEEPS) to indicate that the ethylene (E) of the ethylene-butylene (EB) segment of the midblock (EB/EP) of the (SEB/EPS) block polymer is substantially greater than butylene (B) and the amount of (E) can be sufficient so as to exhibit ethylene crystallinity.

Generally, plasticizing oils with average molecular weights less than about 200 and greater than about 700 may also be used (e.g. H-300 (1290 Mn)).

The gel compositions of the invention can also be made into composites. The gels may be made non-adhering, non-sticking, (non-tacky), by incorporating an advantage amount of stearic acid (octadecanoic acid) or metal stearates (e.g., calcium stearate, magnesium sterate, zinc stearate, etc.).

An advantage of making non-sticking, non-tacky gels is the use of waxes, stearic acid and waxes, metal sterate and waxes, metal sterate and stearic acid. The use of stearic acid alone do not reduce tack. The amount of stearic acid is also important. As an example, ratio of 200 grams stearic acid to 2,000 gram of SEBS (a ratio of 0.1) will result in spotted tack reduction on the surface of the gel. A ratio of 250 to 2,000 will result in spotted crystallized regions on the surface of the gel or spotted tack reduction. A ratio of 300 to 2,000 will result in complete tack reduction with large stearic acid crystallized regions on the surface of the gel. When microcrystalline waxes are incorporated together with stearic acid, the crystallization of stearic acid completely disappears from the surface of the gel. For example excellent result is achieved with 200 grams of stearic acid, 150 grams of microcrystalline wax and 2,000 grams of SEBS. The same excellent results is achieved when SEBS is adjusted to 3,000 grams, 4,000 grams, etc. The same result is achieved with SEPS, $(SEB)_n$, $(SEP)_n$ polymers.

The present invention also provides oriented gels with improved high strength alignment properties as evidenced by optical techniques such as viewing oriented gel in plane-polarized light. Oriented gels exhibit birefringence in the relaxed unextended state. Oriented gels with improved strength are suitable for use as dental floss since they do not break as easily as un-oriented gels of the same rigidity.

The oriented gels can also contain useful amounts of conventionally employed additives such as stabilizers,

8

antioxidants, antiblocking agents, colorants, fragrances, flame retardants, flavors, other polymers in minor amounts and the like to an extend not affecting or substantially decreasing the desired properties of the invention.

Oriented gels aligned by controlled stretching during the gel's transition from a heated, extremely viscous, non melting, non flowing state and the cooled solid gel state produces strong gels which are found to have greater tensile strength than gels of the same rigidity which have not been stretched to a selected degree during its heating and cooling histories. Gels which are selectively stretched during its (non melt flowing) heated state and rapidly cooled by flowing air, cold liquid bath or in contact with a cool surface exhibit optical birefringence when viewed under plane-polarized light. The degree of stretching during the gels cooling history from the heated state can vary. Stretching of at least about 50% to more than about 1000% are of advantage to produce birefringence and stronger gels. Birefringence is not observed in relaxed gels which do not undergo stretching during its heating and cooling histories. Slight to very strong birefringence are observed in relaxed gels which are stretched during their heating and cooling histories. It is evident that stressing the gel during its cooling history as it cools from the heated state produce unexpected stronger oriented gels. We therefore consider oriented gels to be a new and novel composition physically different from the less stronger gels formed without stressing during the gels cooling history and which do not show birefringence in the relaxed state. Oriented gels may be formed in combination with various substrates such as described below. In past situations where in order to obtain stronger gel strength, gels with higher rigidities and lower plasticizer content must be used, it is now possible to make a oriented gel with the same plasticizer content having a higher useful gel strength.

The gel compositions and oriented gel compositions of the invention can be casted unto various substrates, such as open cell materials, metals, ceramics, glasses, and plastics, etc.; the molten gel composition is deformed as it is being cooled. Useful open-cell plastics include: polyamides, polyimides, polyesters, polyisocyanurates, polyisocyanates, polyurethanes, poly(vinyl alcohol), etc. Open-celled Plastic (sponges) suitable for use with the compositions of the invention are described in "Expanded Plastics and Related Products", Chemical Technology Review No. 221, Noyes Data Corp., 1983, and "Applied Polymer Science", Organic Coatings and Plastic Chemistry, 1975. These publications are incorporated herein by reference.

The gel compositions denoted as "G" of the invention can be physically interlocked with a selected material denoted as "M" to form composites as denoted for simplicity by their combinations $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_n$, $G_nM_nG_nG_n$, $G_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, and the like or any of their permutations of one or more $G_n$ with $M_n$ and the like, wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials and the like; wherein when n is a subscript of G, n denotes the same or a different gel rigidity of from about 20 to about 800 gram Bloom). The gel compositions of the composites are formed from I, II, and III components described above.

Sandwiches of gel/material (i.e. gel-material-gel or material-gel-material, etc.) are ideal for use as shock absorbers, acoustical isolators, vibration dampers, vibration

9

10

isolators, and wrappers. For example the vibration isolators can be use under research microscopes, office equipment, tables, and the like to remove background vibrations.

The gelatinous elastomer compositions and oriented gel compositions are prepared by blending together the components including other additatives as desired at about 23° C. to about 100° C. forming a paste like mixture and further heating said mixture uniformly to about 150° C. to about 200° C. until a homogeneous molten blend is obtained. Lower and higher temperatures can also be utilized depending on the viscosity of the oils and amount of SEBS, SEPS, $(SEB)_n$, $(SEP)_n$ or mixtures thereof used. These components blend easily in the melt and a heated vessel equipped with a stirrer is all that is required. Small batches can be easily blended in a test tube using a glass stirring rod for mixing. While conventional large vessels with pressure and/or vacuum means can be utilized in forming large batches of the instant compositions in amounts of about 40 lbs or less to 10,000 lbs or more. For example, in a large vessel, inert gases can be employed for removing the composition from a closed vessel at the end of mixing and a partial vacuum can be applied to remove any entrapped bubbles. Stirring rates utilized for large batches can range from about less than 10 rpm to about 40 rpm or higher.

The oriented gelatinous elastomer composition of the invention is excellent for forming the strong gelatinous elastomer articles of the invention. The gelatinous elastomer articles can be formed by blending, injection molding, extruding and other conventional methods. For example, Shapes having various crossection can be extruded; and as the hot exudate is emerging from the extrusion die, the extradate can be stretched, pulled, twisted or in various manner stressed as it is rapidly placed in contact with cooling air, cool water bath, or other cooling media.

The gel compositions can also be formed directly into articles or remelted in any suitable hot melt applicator and extruded or spun into threads, bands, or other shapes.

The instant compositions is excellent for cast molding and the molded products have various excellent characteristics which cannot be anticipated form the properties of the raw components. Other conventional methods of forming the composition can be utilized.

The basis of this invention resides in the fact that one or more of a high viscosity triblock or branched copolymers or a mixture of two or more of such copolymers having styrene end block to elastomeric block ratio preferably within the contemplated range of from about 20:80 to about 40:60 and higher, more preferably from between about 31:69 to about 40:60 and higher when blended in the melt with an appropriate amount of plasticizing oil makes possible the attainment of gelatinous elastomer compositions having a desirable combination of physical and mechanical properties, notably high elongation at break of at least 1,600%, ultimate tensile strength of about at least $8 \times 10^5$ dyne/cm², low elongation set at break of substantially not greater than about 2%, tear resistance of at least $5 \times 10^5$ dyne/cm², substantially about 100% snap back when extended to 1,200% elongation, and a gel rigidity of substantially from about 20 gram to about 700 gram Bloom and higher.

More specifically, the gelatinous composition of the present invention exhibit one or more of the following properties. These are: (1) tensile strength of about $8 \times 10^5$ dyne/cm² to about $10^7$ dyne/cm² and greater; (2) elongation of about 1,600% to about 3,000% and higher; (3) elasticity modulus of about $10^4$ dyne/cm² to about $10^6$ dyne/cm² and greater; (4) shear modulus of about $10^4$ dyne/cm² to about $10^6$ dyne/cm² and greater as measured with a 1, 2, and 3 kilogram load at 23° C.; (5) gel rigidity of about less than about 20 gram Bloom to about 700 gram Bloom and higher as measured by the gram weight required to depress a gel a distance of 4 mm with a piston having a cross-sectional area of 1 square cm at 23° C.; (6) tear propagation resistance of at least about $5 \times 10^5$ dyne/cm²; (7) and substantially 100% snap back recovery when extended at a crosshead separation speed of 25 cm/minute to 1,200% at 23° C. Properties (1), (2), (3), and (6) above are measured at a crosshead separation speed of 25 cm/minute at 23° C.

The gelatinous elastomer articles molded from the instant compositions have various additional important advantages in that they do not crack, creep, tear, crack, or rupture in flexural, tension, compression, or other deforming conditions of normal use; but rather the molded articles made from the instant composition possess the intrinsic properties of elastic memory enabling the articles to recover and retain its original molded shape after many extreme deformation cycles as compared to prior art triblock copolymer oil-extended compositions. In applications where low rigidity, high elongation, good compression set and excellent tensile strength are important, the instant gel compositions would be preferred.

The gelatinous elastomer compositions of the present invention are useful in low frequency vibration applications, such as viscoelastic layers in constrained-layer damping of mechanical structures and goods, as viscoelastic layers used in laminates for isolation of acoustical and mechanical noise, as anti-vibration elastic support for transporting shock sensitive loads, as vibration isolators for an optical table, as viscoelastic layers used in wrappings, enclosures and linings to control sound, as compositions for use in shock and dielectric encapsulation of optical, electrical, and electronic components. The compositions are also useful as molded shape articles for use in medical and sport health care, such use include therapeutic hand exercising grips, dental floss, crutch cushions, cervical pillows, bed wedge pillows, leg rest, neck cushion, mattress, bed pads, elbow padding, dermal pads, wheelchair cushions, helmet liner, cold and hot packs, exercise weight belts, traction pads and belts, cushions for splints, slings, and braces (for the hand, wrist, finger, forearm, knee, leg, clavicle, shoulder, foot, ankle, neck, back, rib, etc.), and also soles for orthopedic shoes. Other uses may include as toys, optical uses (e.g. cladding for cushioning optical fibers from bending stresses) and various optical devices, as lint removers, dental floss, as tips for swabs, as fishing bate, as a high vacuum seal (against atmosphere pressure) which contains a useful amount of a mineral oil-based magnetic fluid particles, etc.

As an example of the versatility of use of the instant gel compositions, a hand exerciser can be made in any shape so long as it is suitable for use as a hand exerciser: a sphere shape, a cube shape, a rectangular shape, etc. Likewise, a wheelchair cushion can be made from the composition in any shape, so long as it meets the needs of the user of the cushion. For example, a cushion can be made by forming the composition into a selected shape matching the contours of the specific body part or body region. The composition can be formed into any desired shaped, size and thickness suitable as a cushion; the shaped composition can be additionally surrounded with film, fabric, foam, or any other desired material or combinations thereof. Moreover, the composition can be casted onto such materials, provided such materials substantially maintain their integrity (shape, appearance, texture, etc.) during the casting process. The same applies for brace cushions for the hand, wrist, finger, forearm, knee, leg, etc.

JA000213

US 6,552,109 B1

11

Another versatile use of the composition is dental flossing. The dental floss can be almost any shape so long as it is suitable for dental flossing. A thick shaped piece of the composition can be stretched into a thin shape and used for flossing. A thinner shaped piece would require less stretching, etc.

The instant compositions can be formed in any shape; the original shape can be deformed into another shape (to contact a regular or irregular surface) by pressure and upon removal of the applied pressure, the composition in the deformed shape will recover back to its original shape.

While preferred components and formulation ranges have been disclosed herein persons of skill in the art can extend these ranges using appropriate material according to the principles discussed herein. All such variations and deviations which rely on the teachings through which the present invention has advanced the art are considered to be within the spirit and scope of the present invention. The invention is further illustrated by means of the following illustrative embodiments, which are given for purpose of illustration only and are not meant to limit the invention to the particular components and amounts disclosed.

EXAMPLE I

A comparison was made between a low viscosity poly (styrene-ethylene-butylene-styrene) triblock copolymer having styrene end block to ethylene and butylene center block ratio below the range between 31:69 to 40:60 and a high viscosity poly(styrene-ethylene-butylene-styrene) triblock copolymer of the invention. Three different triblock copolymers were melt blended separately with a paraffinic white petroleum oil. Table I below shows the physical properties obtain with respect to each of the different viscosity and styrene to ethylene and butylene ratio triblock copolymer oil-blends tested.

The properties measured are as follows: Tear Propagation (ASTM D 19938 modified), Cracking (ASTM D 518 Method B modified), Tensile Strength (ASTM D 412 modified), Ultimate elongation (ASTM D 412 modified), Tensile Set (ASTM D 412 Modified), Compression Set (ASTM D 395 modified), Snap Back, and Hand Kneading (60 seconds). The methods of measurement are taught in United States patents Nos. 4,618,213 and 5,153,254; and, as well as, in copending applications Serial Nos. 705,711; 934,027 and 935,540.

TABLE I

| Formulation | S/EB Ratio[1] | Weight Parts | | |
|---|---|---|---|---|
| | | A | B | C |
| SEBS[2] | 28:72 | 100 | | |
| SEBS[3] | 29:71 | | 100 | |
| SEBS[4] | 33:67 | | | 100 |
| Paraffinic oil[5] | | 400 | 400 | 400 |
| Stabilizer[6] | | 2.5 | 2.5 | 2.5 |
| Breaking strength[7], dyne/cm² | | 4 × 10⁵ | 5 × 10⁵ | 4 × 10⁶ |
| Tear propagation[8], dyne/cm² | | 8 × 10⁴ | 7 × 10⁴ | 1 × 10⁶ |

12

TABLE I-continued

| Formulation | S/EB Ratio[1] | Weight Parts | | |
|---|---|---|---|---|
| | | A | B | C |
| Compression set[10] at 24 hours | | 81%ᴿ | 77%ᴿ | 0.0% |
| Rigidity, gram Bloom | | 1,536 | 1,520 | 360 |

[1]Styrene to ethylene and butylene ratio
[2]Shell Kraton G1650 having a Brookfield viscosity of 1,500 cps as measured for a 20% weight solids solution in toluene at 25° C.
[3]Shell Kraton G 1652 having a Brookfield viscosity of 550 cps as measured for a 20% weight solids solution in toluene at 25° C.
[4]Shell Kraton G 1651 having a Brookfield viscosity of 2,000 cps as measured for a 20% weight solids solution in toluene at 25° C.
[5]ARCO prime 200,
[6]Irganox 1010,
[7]ASTM D 412 modified,
[8]ASTM D 1938 modified,
[9]ASTM D 412 modified,
[10]ASTM D 2395 modified,
ᴿruptured completely

The results of Table I show drastically unacceptable poor properties of low viscosity triblock copolymers having styrene to ethylene and butylene ratios and low viscosity which are below the contemplated (preferred) range of the instant invention.

Comparisons of oil extended triblock copolymers have been described in Shell Chemical Company Technical Bulletin SC: 1102-89 (Apr. 1989) "KRATON®THERMOPLASTIC RUBBERS IN OIL GELS" which is incorporated herein by reference.

EXAMPLE II

One hundred parts by weight of a high viscosity poly (styrene-ethylene-butylene-styrene) triblock copolymer (Shell Kraton G 1651) having a styrene end block to ethylene and butylene center block ratio of about 33:67 with 0.1 parts by weight of a stabilizer (Irrganox 1010) was melt blended with various quantities of a naphthenic oil (ARCO Tufflo 6024). Samples having the dimensions of 5 cm×5 cm×3 cm were cut and measured for gel rigidity on a modified Bloom gelometer as determined by the gram weight required to depress the gel a distance of 4 mm with a piston having a cross-sectional area of 1 cm². The average gel rigidity values with respect to various oil concessions are set forth in Table II below.

TABLE II

| Oil per 100 parts of Triblock copolymer | Gel Rigidity, gram Bloom |
|---|---|
| 360 | 500 |
| 463 | 348 |
| 520 | 280 |
| 615 | 240 |
| 635 | 220 |
| 710 | 172 |
| 838 | 135 |
| 1,587 | 54 |

EXAMPLE III

Example II was repeated except about 980 parts oil was used and the gel rigidity found to about 101 gram Bloom. Other properties measured were: tensile strength at break about 4.4×10⁶ dyne/cm², elongation at break about 2,4470%, elasticity modulus about 3.5×10⁴ dyne/cm², and

13

shear modulus about $3.7 \times 10^4$ dyne/cm². The tensile strength, elongation, elasticity modules were measured with cross-head separation speed of 25 cm/minute at room temperature. The shear modulus was measured with a 1, 2, and 3 kilogram load at room temperature.

## EXAMPLE IV

Example II was repeated except about 520 parts of a polybutene (Amoco Indopol H-300) was used and the gel rigidity found to be about substantially unchanged with respect to use of naphthenic oil alone.

## EXAMPLE V

Example II was repeated except about 520 parts of a polypropene (Amoco C-60) was used and the gel rigidity found to be about substantially unchanged with respect to use of naphthenic oil alone.

## EXAMPLE VI

Example II was repeated except about 520 parts of a polyterpene (Hercules Piccolyte S10) was used and the gel rigidity found to be about substantially unchanged with respect to use of naphthenic oil alone.

## EXAMPLE VII

Example II was repeated except about 360 parts of a combined mixture of: 72 parts of a paraffinic oil (ARCO prime 200), 72 pars of a naphthenic oil (ARCO Tufflo 6014), 72 parts of a polybutene oligomer (Amoco Indopol H-200), 72 parts of a polypropene oligomer (Amoco Polypropene C-60), and 72 parts of a polyterpene oligomer (Hercules Piccolyte S10) was used and the gel rigidity found to be about substantially unchanged with respect to the use of naphthenic oil alone.

## EXAMPLE VIII

Example III was repeated except 933 parts oil with 147 parts by weight of a high viscosity poly(styrene-ethylene-butylene-styrene) triblock copolymer containing 47 parts of a naphthenic process oil (Shell Kraton G 4609) having a styrene to ethylene and butylene ratio of about 33:67 was used and the physical properties were found to be about substantially unchanged with respect to the components used in Example III.

## EXAMPLE IX

Example III was repeated except 933 parts oil with 147 parts by weight of a high viscosity poly(styrene-ethylene-butylene-styrene) triblock copolymer containing 47 parts of a paraffinic white petroleum oil (Shell Kraton G 4609) having a styrene to ethylene and butylene ratio of about 33:67 was used and the physical properties were found to be about substantially unchanged with respect to the components used in Example I.

## EXAMPLE X

Example I was repeated except about 400 parts of oil was used and the properties measured were: tear propagation about $1.4 \times 10^6$ dyne/cm², no crack growth in 180° bend under 50 gram load for 5,000 hours at room temperature, tensile strength about $4 \times 10^6$ dyne/cm², elongation at break about 1,700%, tensile set about 0% at 1,200% elongation, compression set about 0% when tested under 5,000 gram load for 24 hours, and 100% snap back recovery after extension to 1,200%.

14

Examples XI-XIV-t below illustrate other modes of practice contemplated.

## EXAMPLE XI

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer is used having a styrene end block to ethylene and butylene center block ratio of about 32:68 and the gel rigidity is found to be within the range of about 20 to about 700 gram Bloom.

## EXAMPLE XII

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 34:66 and the gel rigidity is found to be within the range of about 20 to about 700 gram Bloom.

## EXAMPLE XIII

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 36:64 and the gel rigidity is found to be within the range of about 20 to about 700 gram Bloom.

## EXAMPLE XIV

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 38:62 and the gel rigidity is found to be within the range of about 20 to about 700 gram Bloom.

## EXAMPE XIV-a

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 31:69 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-b

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 37:63 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-c

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 19:81 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

## EXAMPLE XIV-d

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) triblock copolymer, is used having a styrene end block to

JA000215

US 6,552,109 B1

15

ethylene and butylene center block ratio of about 20:80 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-e

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) tri-block copolymer is used having a styrene end block to ethylene and butylene center block ratio of about 38:62 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-f

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) tri-block copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 29:71 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-g

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) tri-block copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 26:74 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-h

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styeene-ethylene-butylene-styrene) tri-block copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 22:78 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-i

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) tri-block copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 25:75 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-j

The procedure of Example II is repeated except Shell Kraton G 1651, poly(styrene-ethylene-butylene-styrene) tri-block copolymer, is used having a styrene end block to ethylene and butylene center block ratio of about 26:74 and the gel rigidity is found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-k

Example II is repeated except a high viscosity poly (styrene-ethylene-propylene-styrene) polymer having a S:EP ratio of 35:65 and a Brookfield Viscosity at 20 weight percent at 30° C. of about 78,000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-l

Example II is repeated except a high viscosity poly (styrene-ethylene-propylene-styrene) polymer having a

16

S:EP ratio of 20:80 and a Brookfield Viscosity at 20 weight percent at 30° C. of about 76,000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-m

Compositions of Example II are continuously extruded into 1 meter length rod shape articles through a 0.05, a 0.1, a 0.2, a 0.4, a 0.8, a 1.0, a 1.5, a 1.8, a 2.0, a 4.0, a 8.0 cm (inside diameter) pipe and the extruded articles are allowed to cool to room temperature. Light from a Spectra Physics Model 155A laser with a wavelength of about 632.80 nm is introduced at one end of each article and the light transmit-ted therethrough.

### EXAMPLE XIV-n

Example II is repeated except a high viscosity star-shaped poly(styrene-ethylene-butylene) block copolymer having a S:EB ratio of 30:70 and a Brookfield Viscosity at 25 weight percent at 25° C. of about 9000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-o

Example II is repeated except a high viscosity star-shaped poly(styrene-ethylene-propylene) random copolymer hav-ing a S:EP ratio of 35:65 and a Brookfield Viscosity at 25 weight percent at 25° C. of about 20,000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-p

Example II is repeated except the molten composition is casted onto a polyether, a polyester, a surlyn ionomer open cell sponge thereby displacing the air space within the sponge and the gel rigidity is found to be greater than about the sum of the combined rigidity of the composition and sponge alone.

### EXAMPLE XIV-q

Example II is repeated except a high viscosity star-shaped mixed poly(styrene-ethylene-propylene) copolymer having a S:EP ratio of 35:65 and a Brookfield Viscosity at 25 weight percent at 25° C. of about 12,000 cps is used and the gel rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-r

Example II is repeated except a high viscosity star-shaped mixed poly(styrene-ethylene-butylene) block copolymer having a S:EB ratio of 35:65 and a Brookfield Viscosity at 25 weight percent at 25° C. of about 9,000 cps is used and the get rigidity found to be found to be within the range of about 20 to about 800 gram Bloom.

### EXAMPLE XIV-s

The composition of Example XXI is casted unto a SCOT-FOAM® 1/8″ thick: 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 60, 70, 80, 90, 100, and 200 ppi foam sheet.

### EXAMPLE XIV-t

The procedure of Example II is repeated except Shell Kraton G 1855X, poly(styrene-ethylene-butylene-styrene)

17

triblock copolymer is used having a styrene end block to ethylene and butylene center block ratio of about 27:73 and the gel rigidity is found to be within the range of about 10 to about 800 gram Bloom.

EXAMPLE XV

Examples I–XIV, XIV-I,n,o,q,r and t are repeated and the gels are extruded and rapidly stretched up to 800% elongation by hand in a cooled water bath. The resulting gels show birefrigence and greater strength than corresponding unstressed (unstretched) gels.

EXAMPLE XVI

A gelatinous elastomer composition of 100 parts of Kraton G1651 and 400 parts by weight of Duraprime 200 white oil is made according to Example II and extruded and drawn into selected lengths of varying diameters from about 0.01 cm to about 0.25 cm for use as dental floss, the gel rigidity being within the range of about 20 to about 800 gram Bloom.

EXAMPLE XVII

Example XVI is repeated using Kurarary SEPS 2006 copolymer, Kurarary SEEPS 4055 copolymer, a high viscosity (SEB)$_n$ copolymer, and a high viscosity (SEP)$_n$ copolymer, the gel rigidities being within the range of about 20 to about 800 gram Bloom.

While certain features of this invention have been described in detail with respect to various embodiments thereof, it will, of course, be apparent that other modifications can be made within the spirit and scope of this invention, and it is not intended to limit the invention to the exact details shown above except insofar as they are defined in the following claims.

What I claim is:

1. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) and from

(ii) about 300 to about 1,600 parts by weight of a plasticizing oil; and in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly (styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_nM_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_n$, $M_nG_nM_nG_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected

18

from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

2. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil; in combination with or without

(iii) a selected amount of one or more polymer or copolymer of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene), poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, branched, star-shaped, or multiarm copolymer, and n is an integer greater than one; wherein said composite formed from the combination $G_nM_n$ of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

3. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene block copolymer(s) with 2-methyl-1,3-butadiene and 1,3-butadiene and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil: in combination with or without

(iii) a selected amount of one or more selected polymer or copolymer selected from the group consisting of poly (styrene-butadiene-styrene), poly(styrene-butadiene), poly(styrene-isoprene-styrene), poly(styrene-isoprene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly (ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, branched, star-shaped, or multiarm copolymer; and n is an integer greater than one, wherein said gelatinous elastomer compositions characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said composite formed from the combination $G_nM_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_n$, $M_nG_nM_nG_nG_n$,

19

$G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

4. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite article by heat with a selected substrate material M, said gelatinous elastomer composition form from

(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s), wherein at least one of said block copolymer is a high viscosity copolymer having a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 cps and higher which corresponds to a viscosity at 10 weight percent of about 5800 cps and higher which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25° C. of at about 80,000 cps and higher, and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without

(ii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene), poly(styrene-isoprene-styrene), poly(styrene-isoprene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, branched, radial, star-shaped, or multiarm copolymer; and n is an integer greater than one; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $M_nG_nG_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$, wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

5. A composite of claim 1, 2, 3, or 4, wherein said hydrogenated styrene block copolymer is one or more of a block copolymer of poly(styrene-ethylene-ethylene-propylene-styrene).

6. A composite article of claim 1 or 4, wherein a source of said hydrogenated poly(styrene-isoprene/butadiene-styrene) block polymer being Septon 4055.

7. A composite of claim 1, 2, 3, or 4, wherein said one or more (i) block copolymer(s) is poly(styrene-ethylene-ethylene-propylene-styrene) and a source of said block copolymers being Septon® 4033, Septon® 4045 and Septon® 4055.

8. A composite of claim 2, 3, or 6 wherein said thermoplastic, heat formable and heat reversible gelatinous elastomer composition is a dielectric encapsulant of an electrical, or an electronic component(s).

9. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer

20

composition, G, which is formed into a composite article by heat with a selected substrate material M, said gelatinous elastomer composition form from

(i) 100 parts by weight of one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene) block copolymers and a source of said block copolymers being Septon® 4033, Septon® 4045 and Septon® 4055, and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nG_n$, $M_nG_nG_nM_n$, $M_nG_nG_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

10. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of a block copolymer of one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene block copolymers and a source of said block copolymers being Septon® 4033, Septon® 4045 and Septon® 4055, and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nM_n$, $G_nM_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

11. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

(i) 100 parts by weight of one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene)

US 6,552,109 B1

21

block copolymers and a source of said block copolymers being Septon® 4033 and Septon® 4055, and

(ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; wherein said gelatinous elastomer composition characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said composite formed from the combination $G_nM_n$,

22

$G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

12. A composite according to claims **1, 2, 3,** or **4,** wherein said one or more (i) block copolymers is made from poly(styrene-ethylene-ethylene-propylene-styrene) and a source of said block copolymers being Septon® 4033 and Septon® 4055.

* * * * *



US006552109C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8385th)

# United States Patent
### Chen

(10) **Number:** US 6,552,109 C1

(45) **Certificate Issued:** Jul. 5, 2011

(54) **GELATINOUS ELASTOMER COMPOSITIONS AND ARTICLES**

(75) Inventor: **John Y. Chen**, Pacifica, CA (US)

(73) Assignee: **Patent & License Office**, Pacifica, CA (US)

**Reexamination Request:**
No. 90/010,685, Sep. 16, 2009

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **6,552,109** |
| Issued: | **Apr. 22, 2003** |
| Appl. No.: | **08/612,586** |
| Filed: | **Mar. 8, 1996** |

### Related U.S. Application Data

(63) Continuation-in-part of application No. PCT/US94/04278, filed on Apr. 19, 1994, and a continuation-in-part of application No. PCT/US94/07314, filed on Jun. 27, 1994, and a continuation-in-part of application No. 08/288,690, filed on Aug. 11, 1994, now Pat. No. 5,633,286, and a continuation-in-part of application No. 08/581,188, filed on Dec. 29, 1995, now abandoned, and a continuation-in-part of application No. 08/581,191, filed on Dec. 29, 1995, now Pat. No. 5,760,117, and a continuation-in-part of application No. 08/581,125, filed on Dec. 29, 1995, now Pat. No. 5,962,572.

(51) **Int. Cl.**
| | |
|---|---|
| **B61C 15/00** | (2006.01) |
| **C08J 5/02** | (2006.01) |
| **C08K 5/01** | (2006.01) |
| **C08K 5/00** | (2006.01) |

(52) **U.S. Cl.** .................. **524/270**; 428/537.1; 428/688; 428/319.3; 428/319.7; 428/319.9; 428/378; 428/441; 428/462; 428/521; 442/59; 524/474; 524/476; 524/490; 524/505; 132/321; 174/137 A; 174/137 B

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,265,765 | A | 8/1966 | Holden et al. |
| 3,676,387 | A | 7/1972 | Lindlof |
| 3,799,775 | A | * 3/1974 | Petruzzelle .................. 430/63 |
| 3,827,999 | A | 8/1974 | Crossland |
| 4,369,284 | A | 1/1983 | Chen |
| 4,389,587 | A | * 6/1983 | Levine et al. ............... 310/208 |
| 4,618,213 | A | 10/1986 | Chen |
| 4,716,183 | A | 12/1987 | Gamarra et al. |
| 4,798,853 | A | 1/1989 | Handlin |
| 4,842,931 | A | 6/1989 | Zook |
| 4,880,878 | A | 11/1989 | Hines |
| 4,987,194 | A | 1/1991 | Maeda et al. |
| 5,153,254 | A | * 10/1992 | Chen ........................... 524/505 |
| 5,239,723 | A | 8/1993 | Chen |
| 5,262,468 | A | 11/1993 | Chen |
| 5,324,222 | A | 6/1994 | Chen |
| 5,336,708 | A | 8/1994 | Chen |
| 5,436,295 | A | 7/1995 | Nishikawa et al. |
| 5,442,004 | A | 8/1995 | Sutherland et al. |
| 5,475,890 | A | 12/1995 | Chen |
| 5,508,334 | A | 4/1996 | Chen |
| 5,603,122 | A | 2/1997 | Kania |
| 5,618,882 | A | 4/1997 | Hammond et al. |
| 5,624,294 | A | 4/1997 | Chen |
| 5,633,286 | A | 5/1997 | Chen |
| 5,655,947 | A | 8/1997 | Chen |
| 5,728,168 | A | 3/1998 | Laghi |
| 5,760,117 | A | 6/1998 | Chen |
| 5,830,237 | A | 11/1998 | Kania |
| 5,834,559 | A | 11/1998 | Keguchi et al. |
| 5,868,597 | A | 2/1999 | Chen |
| 5,962,572 | A | 10/1999 | Chen |
| 6,033,283 | A | 3/2000 | Chen |
| 5,633,286 | A | 10/2000 | Chen |
| 6,148,830 | A | 11/2000 | Chen |
| 6,406,499 | B1 | 6/2002 | Kania |
| 6,964,688 | B1 | 11/2005 | Kania |
| 7,291,182 | B1 | 11/2007 | Kania |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 108518 | A2 * | 5/1984 |
| EP | 88306357.0 | | 8/1989 |
| EP | 89118513.4 | | 4/1990 |
| EP | 89311603.1 | | 6/1990 |
| EP | 1618858 | B1 | 9/2008 |
| WO | WO 88/00603 | | 1/1988 |
| WO | WO 91/05014 | | 4/1991 |
| WO | WO 93/23472 | * | 11/1993 |
| WO | WO 94/18273 | | 8/1994 |
| WO | WO 96/29033 | | 9/1996 |

OTHER PUBLICATIONS

Septon Technical Information G–3–4 Dec. 3, 1992 Kuraray Co., Ltd., Property of Septon–4055, Septon 8008/oil Compound.

US Securities Exchange Commission Form 10–K Dec. 31, 2004 Langer, Inc. pp. 1,4, & 24.

Kania Declaration in Reexam 90/008,277 From Pair File Dec. 28, 2007 pp. 1–5.

Antec '99 Proceedings Deited by SPE Staff/pp. 1725. PW–90 Oil (1999).

Kraton Typical Property Guide SC 68–79 May 1979.

Technical Bulletin Shell Chemical Co SC:1102–89 Apr. 1989.

Kuraray SEP/SEPS Typical properties of SEP/SEPS Development products Chart: 4055 SEPS (17 sheets: some original page numbers missing) 1991.

High–Performance Thermoplastic Rubber Septon Kuraray Co, Ltd. Typical Properties Chart: 4055 SEPS, Aug. 1995 8.95(4,000).

Material Safety Data Sheet Kuraray Septon No. KIP–110US Feb. 7, 1997 Hydrogenated styrene isoprene/butadiene block copolymer CAS # 132778–07–5.

(Continued)

*Primary Examiner* Alan Diamond

(57) **ABSTRACT**

Novel gelatinous compositions and articles are formed from an intimate melt blend admixture of one or more of a high viscosity poly(styrene-ethylene-butylene-styrene), poly (styrene-ethylene-ethylene-propylene-styrene), poly (styrene-ethylene-butylene)$_n$ and poly(styrene-ethylene-propylene)$_n$ triblock and branched copolymers and high levels of a plasticizing oil.

# US 6,552,109 C1

Page 2

## OTHER PUBLICATIONS

Material Safety Data Sheet Kuraray Septon–4033 No. KIP–107US Feb. 7, 1997 Hydrogenated styrene isoprene/butadiene block copolymer CAS# 132778–07–5.

Material Safety Data Sheet Kuraray Septon–2005 No. KIP–93 Apr. 25, 1991 Hydrogenated styrene isoprene block copolymer.

Material Safety Data Sheet Kuraray Septon–2006 No. KIP–94 Apr. 25, 1991 Hydrogenated styrene isoprene block copolymer.

Material Safety Data Sheet Kuraray Septon–4055 No. KIP–95 Apr. 25, 1991 Hydrogenated styrene isoprene/butadiene block copolymer.

Material Safety Data Sheet Kuraray Septon–8006 No. KIP–106 Jan. 12, 1993 Hydrogenated styrene butadiene block copolymer.

Prosthetics/Orthotics Silipos Advanced Polymer Technology of SEBS tri–block polymer gel product catalogue (4 bi–folds Knit–Rite distribution data of 1993).

Silipos Manual by Robert Mogel & Peter Bickel (26 pages).

Requester (Mark R. Engle) prepared VI List Reference Appendix BB of Reexamination Request 90/010,837 (Bates No. KUR0116–117) of Affidavit of Harum ASA DOI of Oct. 11, 2006.

Septon Technical Information G–18, Sep. 17, 1992, Kuraray Co., Ltd.

Septon Technical Information G–3–4, Dec. 3, 1992, Kuraray Co., Ltd.

Holden, Geoffrey, et al., Thermoplastic Elastomers, 2nd Edition, pp. 1–3 and 48–65, Hanser/Gardner Publications, Inc., Cincinnati, 1996.

CRC Handbook of Chemistry and Physics, 70th Edition, 1989–1990, pp. C–161–162 and C–329, Chemical Rubber Publishing Company, US.

Material Safety Data Sheet, Kuraray Co., Ltd., Kuraray Septon 4055, Apr. 25, 1991, Tokyo, Japan.

High–Performance Thermoplastic Rubber, Septon™, Kuraray Co., Ltd., Aug. 1995, Tokyo, Japan.

Thermoplastic Elastomer Gels. I Effects of Composition and Processing on Morphology and Gel Behavior, Laurer, et al., J. of Poly. Sci.: Part B. Poly. Phys. V. 36 (1998).

Thermoplastic Elastomer Gels, I Effects of Composition and Temperature on Morphology and Gel Rheology, Laurer, et. al., J. of Poly. Sci.: Part B. Pol. Phys. V. 36 (1998).

Morphology and Rheology of SIS and SEPD Triblock Copolymers in the Presene of a Midblock Selective Solvent, Laurer, et al., Web Sep. 24, 1999.

Viscoelastic and Gelation Studies of SEBS Thermoplastic Elastomer in Different Hydrocarbgon Oils, J. F. Kim, et. al., Macromolecular Rech. V. 14, #3 (2006).

* cited by examiner

US 6,552,109 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

ONLY THOSE PARAGRAPHS OF THE
SPECIFICATION AFFECTED BY AMENDMENT
ARE PRINTED HEREIN.

Column 10, after line 49:

*An example of the above mentioned toy is a Humdinger spinning toy of the related co-pending filed patent application U.S. Ser. No. 08/211,781 filed PCT on Apr. 19, 1994, now U.S. Pat. No. 6,033,283 and incorporated in U.S. Pat. No. 6,552,109 by reference, which describes the structure and operation of Humdinger spinning toy as follows:*

*When a gel body is set into rotation of at least 100 r.p.m. (revolutions per minute) to as high as 1,000 r.p.m. and higher, the forces can be significant. The following examples can best illustrate the forces involved.*

*The inward pulling forces generated by a pair of twisting stings as measured on a spring scale for a 2.00" (5.08 mm) dia. times, 0.50" (12.70 mm) thickness spinning circular gel body can range from an extreme of less than one pound to forty pounds and greater. The typical range for such a spinning gel body may range from between less than five pounds to twenty pounds and greater. As another example, the measured pulling forces for a (smaller) 1.75" (44.46 mm) diameter times 0.60" (15.24 mm) spinning circular gel body can range from an extreme of less than one pound to twenty five pounds and greater. The typical range for such a smaller body is between less than three pounds to about eight pounds and greater.*

*For the purpose of the invention, an indirect measure of the shearing forces generated during play is measured (in pounds) by the inward pulling forces of the twisting strings 5 on a spring balance during dynamic spinning. The typical values can range from less than one pound to fifty pounds and greater. String puling forces for various shapes (large and small) of spinning bodies having measured values of 0.5, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 . . . 40, 50, 60 ,70, 80 pounds and greater can be achieved and such values are typical. During spinning, the measured pulling force is read as a dynamic measurement which starts from a low value and rise as the string(s) are pulled apart forcing the body to reaching a maximum spin rate (i.e. maximum measured pulling force value).*

*The dynamic variables due to the centrifugal force of rotation of the bodies, such as elongation, stress and shear forces, under extreme high torque conditions, and the accelerations and de-accelerations involved are ever changing during play.*

*The bodies of the invention when rotated about an axis of rotation will experience increased deformation from their original shapes with increasing rates of rotation. Irrespective of the original shapes of the bodies, when subjected to rotational forces, the bodies will deform in a highly elastic, predetermined, non-uniform, and non-radial manner.*

**2**

*Because of the high deformations resulting from rotational forces, the bodies will distribute their mass outwardly by elongating perpendicularly with respect to its axis of rotation. The gel material at the extreme outer parts (equator) of the bodies will experience greater and greater centrifugal force as the bodies rotate and elongate more and more. The bodies if not properly designed will be pulled apart by the increasing centrifugal force of rotation. For example, the centrifugal force of a rotating body having a mass of about 50 grams and an elongated mass about the body's equator of about 10 centimeters may produce from less than about 50 to about 250 pound-force or higher.*

*If the hole separation distance is zero, then the torque will also be zero. Therefore, a suitable separation distance is needed to separate the holes from each other and the holes 6 from the selected axis of rotation. The holes should be separated approximately equal distance from the axis of rotation. A suitable distance, x, may be selected based on various factors, including the moment of inertia, axis of rotation, and the necessary torque need to rotate the bodies about its axis of rotation by the action of the twisting string. If the separation between the holes with respect to the axis of rotation is slightly off, then the torque applied to the bodies will be unbalanced. The unbalanced rotation would not be totally disastrous, but may produce a desirable off-balanced effect. While the humdinger may still adequately operate, it will be more difficult to keep the wobbling humdinger rotating in the unbalanced state.*

*As the bodies rotate, the moment of inertia will change and the point of the applied torque will also change. The moment of inertia of the bodies changes because the shape of the bodies changes with increased rate of rotation. Due to the highly elastic nature of the gel bodies, as their shape changes, so will the position of the holes with respect to each other and with respect to their distances from the axis of rotation. Any off-centering of the placement of the holes with respect to the axis of rotation will be greatly magnified by the centrifugal force acting on the body, since the original placement of the holes will also be changed due to elastic stretching. The torque acting on the bodies will greatly vary as the centrifugal force futher separates the holes from each other and from the axis of rotation.*

*Moreover, the overall original shape of a body will also affect the position of the holes, as the body is set into rotation. The change in separations between the holes and the change in distance between the holes and the axis of rotation due to the centrifugal force acting on the body is also affected by the shape of the original body as a whole. In other words, the configuration of the original shape of the elastic body directly affects the amount and direction of the elastic deformation about the holes caused by the centrifugal force. A stretching or elastic deformation of one part of a body will directly affect other parts of the body as well. Therefore, any deformation by an applied force on any part of the body will correspondingly cause deformation to other parts of the body. The holes and the shape of the bodies are always in a state of flux due to the forces generated during rotation. The holes freely move about as the shape of the body is changed by the force of rotation. This is the nature of bodies under dynamic motion as opposed to rigid bodies.*

*The string is passed through the two holes of the gel body and tied into a loop. For gel bodies having three or more holes, the individual strings may be passed through the holes and tied together at opposite ends. The gel body is set into continuous alternating rotating motion with an initial twirl of the body followed by alternately pulling and releasing the string while holding it in opposite directions which keeps it*

US 6,552,109 C1

### 3

*spinning. Between the second and fourth full reversal of rotation of the gel body, the string will have sufficient twist to shear off, and cut into or through the gel material separating the holes. Gel material of low strength cannot resist the tremendous shearing action of the twisting strings between the holes. The twisting action of the strings generated by the spinning gel body can exhibit a first order twist, a second order twist, or higher order twists. A first order twist refers to one or more twists of a pair of strings (i.e. a pair of strings when twisted together forms a small tight binding helix). A second order twist refers to one or more large binding helixes built up by a pair of strings that have been twisted beyond the maximum number of twists which normally produces small tight binding helixes of the first order kind. Similarly, a third order twist refers to a much larger tightly binding helix built up by the maximum number of second order twists produced by the pair of twisting strings. The third order twist may be manifested by the appearance of a branch of two or more twist of the first order twisting strings.*

*The shear force created by the static twisiting of the string, however, is substantially different than the shear force generated under dynamic twisting of the strings. This can be demonstrated by taking a sample of any of the soft gel bodies and subject it to static twisting between a pair of strings under a static spring load of 20, 30, and 40 lbs for twenty four hours and compare the condition of the sample to samples of the same gel body subject under dynamic twist spring load of less than 20 lbs. (e.g. 5, 8, 10, 12, 16, 18, etc.). The results show that the shear force produce by a dynamic twist spring load of less than 20 lbs will easily cut a soft gel body or any low strength material body while the same sample will remain substantially uncut under a higher static twist spring load. Therefore, it is important to take into consideration the drastic effects of the shear force produced by the dynamic twisting of a pair of strings.*

*Suitable interlocking materials (that helps resist the shear force of the twisting strings) for use in the humdingers of the invention include: open cell foams, other polymeric or elastomeric (Kraton) materials, porous materials, multi-layered coatings, and single layered, and composite layered materials. As an example, an opened cell foam when dipped into the instant composition will form an interpenetrating physical networks (interlocking of gel composition and foam composite). Such composite will exhibit greater rigidity and resistance to the shear force generated by a first, a second, a third, or a higher order dynamic twisting of a pair of strings. Furthermore, the interlocking materials surrounding the holes of the gel bodies may be made from flexible materials, such as fibers and fabrics of cotton, flax, and silk. Other flexible materials include: elastomers, fiber-reinforced composites, mohair, and wool. Useful synthetic fibers include: acetate, acrylic, aramid, glass, modacrylic polyethylene, nylon, olefin, polyester, rayon, spandex, carbon, sulfar, polybenzimidazole, and combinations of the above.*

*The following commercial elastomers can be formed with oil and in combination with other polymers into suitable gels for use in making the bodies of the invention, which includes Kuraray (SEP), (SEPS) or (SEB/EPS) Nos. 1001 (SEP), 2002 (SEPS), 2063 (SEPS), 2023 (SEPS), 2043 (SEPS), 2063 (SEPS), 2005 (SEPS), 2006 (SEPS), 2050 (SEPS), 2103 (SEPS), 2104 (SEPS), 2105 (SEPS), and 4055 (SEB/EPS) (styrene-ethylene-butylene/ethylene-propylenestyrene) block polymer made from hydrogenated styrene isoprene/butadiene styrene block copolymer or more specifically made from hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene. Where the ethyl-*

### 4

*ene (E) of the ethylene-butylene (EB) segment of the midblock (EB/EP) of the (SEB/EPS) block polymer is substantially greater than butylene (B) so as to exhibit ethylene crystallinity, (SEP/EPS) may be denoted as (SE/EPS) or denoted as (SEEPS) block polymer for the sake of simplicity.*

*In the operation of the humdingers of the invention, the string's twisting action imparts rotation to the gel body so as to elongate the gel body during rotation. The elongated gel body will reach a maximum elongation due to centrifugal force of 50% or more. Elongations of 100%, 200%, 300%, 400%, 500%, 600%, 700% and higher are possible depending on the amount of tension of the pull of the humdinger's strings. Gel bodies of the invention can be designed to withstand elongations higher than 1,000%, which can occur at extreme high rates of rotation of 500 r.p.m. and higher. Spinning rates can span from a low of 10 r.p.m. to a high of over 1,000 r.p.m. Spinning rates of 50, 100, 150, 200, 25, 300, 350, 400, 500, 600, 700, 800, 900, 1,000, 1,200, and 1,400 r.p.m. values are routinely achieved.*

*The operation of the humdingers of the invention can be ready observed under strobe light. The number of revolutions per minute may be counted in this way. The changes in radius can be measured. The change in gel body shape can be observed and measured. The centrifugal force acting on the rotating gel body can be likewise determined at any instant of time, at any instant rate of rotation, and at any instant change in gel body shape. The perpendicular-axis elongation effect of the gel body can be viewed under strobe light; its regions of deformation and re-distribution of mass can be viewed, measured and readily determined by ruled grid markings on the gel body.*

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1-11** are determined to be patentable as amended.

Claim **12**, dependent on an amended claim, is determined to be patentable.

New claims **13-16** are added and determined to be patentable.

1. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat *and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) *comprising poly(styrene-ethylene-ethylene-propylene-styrene)* and from (ii) about 300 to about 1,600 parts by weight of a plasticizing oil; and in combination with or without (iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multi-arm copolymer, wherein n is greater than one; and wherein said composite formed from the combination $G_nM_n$, $G_nM_n$, $M_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$,

US 6,552,109 C1

5

$G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nM_nG_nG_nM_nM_nG_n$, $G_nM_nM_nM_nM_n$, $M_nG_nM_nG_nM_nG_nG_n$, $M_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or different gel rigidity.

**2.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat *and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) *comprising poly(styrene-ethylene-ethylene-propylene-styrene)* and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil; in combination with or without (iii) a selected amount of one or more polymer or copolymer of poly(styrene-butadiene-styrene), poly-(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene), poly-(styrene-isoprene)$_n$, poly(strycne-cthylene-propylenc), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radical, branched, star-shaped, or multiarm copolymer, and n is an integer greater than one; wherein said composite formed from the combination $G_nM_n$ of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**3.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite by heat *and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene block copolymer(s) with 2-methyl-1,3-butadiene and 1,3-butadiene *comprising poly(styrene-ethylene-ethylene-propylene-styrene)* and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil: in combination with or without (iii) a selected amount of one or more selected polymer or copolymer selected from the group consisting of poly(styrene-butadiene-styrene), poly(styrene-butadiene), poly(styrene-isoprene-styrene), poly(styrene-isoprene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly-(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, branched, star-shaped, or multiarm copolymer; and n is an integer greater than one, wherein said gelatinous elastomer compositions characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said composite formed from the combination $G_nM_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_n$,

6

$G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_n$, $M_nG_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nM_nG_nG_nM_nM_nG_n$, $M_nM_nM_n$, $M_nG_nM_nG_nM_nG_nG_n$, $M_nG_nM_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**4.** A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite article by heat *and physically interlocked* with a selected substrate material, M, said gelatinous elastomer composition form from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) *comprising poly(styrene-ethylene-ethylene-propylene-styrene)*, wherein at least one of said block copolymer is a high viscosity copolymer having a viscosity value at 5 weight percent solution in toluene at 30° C. of about 90 cps and higher which corresponds to a viscosity at 10 weight percent of about 5800 cps and higher [which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25° C. of about 80,000 cps and higher], and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without (ii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene), poly(styrene-isoprene-styrene), poly(styrene-isoprene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly-(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, branched, radial, star-shaped, or multiarm copolymer; and n is an integer greater than one; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_n-M_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_nG_n$, $G_nM_nM_nM_nM_n$, $M_nG_nM_nG_nM_nG_nG_n$, $M_nG_nM_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$, wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

**5.** A composite of claim **1**, **2**, **3**, or **4**, wherein said [hydrogenated styrene] block [copolymer] *copolymer(s)* is one or more of a block copolymer of poly(styrene-ethylene-propylene-styrene).

**6.** A composite article of claim **1** or **4**, wherein a source of said [hydrogenated poly(styrene-isoprene/butadiene-styrene)] block [polymer] *copolymer(s)* being [Septon] *Septon®* 4055.

**7.** A composite of claim **1**, **2**, **3**, or **4**, wherein said *source of* one or more (i) block copolymer(s) [is] *of* poly(styrene-ethylene-ethylene-propylene-styrene) [and a source of said block copolymers] *being of the group* Septon® 4033, Septon® 4045 and Septon® 4055.

**8.** A composite *article* of claim **2**, **3**, or [**6**] *4* wherein said thermoplastic, heat formable and heat reversible gelatinous elastomer composition is a dielectric encapsulant of an elec-

US 6,552,109 C1

7

trical, or an electronic component(s); *wherein said electrical or said electronic component(s) are not a said substrate material $M_n$ being physically interlocked with said $G_n$ forming said composite article.*

9. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite article by heat *and physically interlocked* with a selected substrate material M, said gelatinous elastomer composition form from (i) 100 parts by weight of one or a mixture of two or more poly(styrene-ehtylene-ethylene-propylene-styrene) block copolymers and a source of said block copolymers being *of the group* Septon® 4033, Septon® 4045 and Septon® 4055, and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without (iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly-(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nM_nG_nM_n$, $M_nG_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$, wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

10. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by [heat] *heat and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from (i) 100 parts by weight of a block copolymer of 45 one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene block copolymers and a source of said block copolymers being *of the group* Septon® 4033, Septon® 4045 and Septon® 4055, and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nM_n$, $G_nM_nG_nM_n$, $M_nG_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_n$, $G_nG_nM_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is subscript of M. n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

11. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat *and physically interlocked* with one or more of a selected substrate material, M, said gelatinous elastomer composition

8

formed from (i) 100 parts by weight of one or a mixture of two or more poly(styrene-ethylene-ethylene-propylene-styrene) block copolymers and a source of said block copolymers being *of the group* Septon® 4033 and Septon® 4055, and (ii) from about 300 to about 1,600 parts by weight of an plasticizing oil, and in combination with or without (iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly-(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein n is greater than one; wherein said gelatinous elastomer composition characterized by a gel rigidity of from about 20 to about 800 gram Bloom; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nM_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel ridigity.

*13. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into said composite article by heat and physically interlocked with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from*

*(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene), and from*

*(ii) about 300 to about 1,200 parts by weight of a plasticizing oil; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different fabric materials of the group cotton, acrylic, nylon, polyester, and spandex; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.*

*14. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into said composite article by heat and interlocked with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from*

*(i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene), and from*

*(ii) about 300 to about 1,200 parts by weight of a plasticizing oil; wherein said composite formed from the combination $G_nM_n$, $M_nG_nM_n$, a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or one or more different fiber materials of the group acrylic, nylon, olefin, polyester, rayon, and spandex; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.*

US 6,552,109 C1

**9**

15. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into said composite article by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

  (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene), and from

  (ii) about 300 to about 1,200 parts by weight of a plasticizing oil; wherein said composite formed from the combination $G_n M_n$, $M_n G_n M_n$, a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different fabric materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

16. A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer

**10**

composition, G, which is formed into said composite article by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from

  (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene), and from

  (ii) about 300 to about 1,200 parts by weight of a plasticizing oil; wherein said composite formed from the combination $G_n M_n$ or a permutation of one or more of said $G_n$ with $M_n$; wherein when n is a subscript of M, n is the same or different materials of the group fabric and synthetic fiber materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I certify that on June 12, 2014, a true and accurate copy of this brief was filed electronically with the Clerk of the Court using CM/ECF, which will automatically serve all counsel registered for CM/ECF.

Ronald A. Christaldi
SHUMAKER, LOOP & KENDRICK, LLP
101 East Kennedy Blvd., Suite 2800
Tampa, FL 33602
Tele: 813.221.7152
rchristaldi@slk-law.com

David W. Wicklund
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson St.
Toledo, OH 43604
Tele: (419) 321-1213
dwicklund@slk-law.com

*/s/ John D. Luken*
John D. Luken
*Attorney for Defendant-Appellant,
The Ohio Willow Wood Company*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)(7)

I certify that I am counsel for Defendant-Appellant The Ohio Willow Wood Company and that the foregoing Brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure 32(a)(7)(B).

The brief contains 13,889 words, excluding the parts of the brief that are exempted under Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: June 12, 2014          */s/ John D. Luken*
                              John D. Luken
                              *Attorney for Defendant-Appellant, The Ohio Willow Wood Company*