2013-1452, -1488, 2014-1147, -1426

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ALPS SOUTH, LLC,

*Plaintiff-Cross Appellant*,

v.

THE OHIO WILLOW WOOD COMPANY,

*Defendant-Appellant*.

_____

Appeals from the United States District Court for the
Middle District of Florida in Case No. 08-CV-1893, Judge Mary S. Scriven
_____

### RESPONSE AND REPLY BRIEF OF DEFENDANT-APPELLANT

John D. Luken
Joshua A. Lorentz
Brian S. Sullivan
DINSMORE & SHOHL LLP
255 E. Fifth St., Suite 1900
Cincinnati, Ohio  45202
Tele:  513.977.8564
John.Luken@Dinsmore.com
Joshua.Lorentz@Dinsmore.com
Brian.Sullivan@Dinsmore.com

*Attorneys for Defendant-Appellant*
*The Ohio Willow Wood Company*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
## ALPS SOUTH, LLC v. THE OHIO WILLOW WOOD COMPANY
### Nos. 2013-1452, -1488, 2014-1147, -1426

## CERTIFICATE OF INTEREST

Counsel for Appellant The Ohio Willow Wood Company certifies the following:

1.  The full name of every party or amicus represented by me is: The Ohio Willow Wood Company

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: N/A

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: N/A

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**DINSMORE & SHOHL LLP**
John D. Luken
Brian S. Sullivan
Joshua A. Lorentz
Nita L. Hanson

**STANDLEY LAW GROUP LLP**
Jeffrey S. Standley
F. Michael Speed, Jr.
James Kwak
Michael Stonebrook
Matthew W. Upton

**HILL WARD & HENDERSON P.A.**
Benjamin H. Hill, III
Patrick J. Risch

Date:  September 5, 2014

Respectfully submitted,

*/s/ John D. Luken*
John D. Luken

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………...........iv

TABLE OF ABBREVIATIONS…………………………………………viii

REPLY TO ALPS'S RESPONSE TO OWW'S APPEAL………………….....1

REPLY ARGUMENT……………………………………………………...1

I.    ALPS LACKS PRUDENTIAL STANDING ………………………...1

    A.    Alps Did Not Have Prudential Standing When
        It Filed the Complaint………………………………………..1

    B.    The Amended License Did Not Cure Alps's Lack
        of Prudential Standing……………………………………... 4

II.   THE JURY'S VERDICT THAT THE ASSERTED
    CLAIMS ARE NOT ANTICIPATED IS NOT SUPPORTED
    BY SUBSTANTIAL EVIDENCE…………………………….......8

III.  EVEN IF HAMMOND DID NOT ANTICIPATE, THE
    ASSERTED CLAIMS WOULD BE OBVIOUS OVER THE
    COMBINATION OF HAMMOND AND DEBBAUT……………..14

    A.    The Motivation to Combine Hammond and
        Debbaut is Overwhelming…………………………………15

    B.    Chen's Purported Evidence of Unexpected
        Results Cannot Overcome the Overwhelming *Prima Facie*
        Case of Obviousness…………………………………………17

IV.   THE WILLFULNESS FINDING SHOULD BE REVERSED……..21

    A.    Because OWW's Defenses are at Least Reasonable,
        it Cannot be Liable for Willful Infringement………………22

B.    The Absence of Willful Infringement Requires the District Court's Award of Enhanced Damages to be Reversed…………………………………………………...26

V.    THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A PERMANENT INJUNCTION……………………..28

VI.    THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING OWW IN CONTEMPT………………………………....33

A.    The District Court Erred in Finding That the Advanced Gel Products Were No More Than Colorably Different from the Original Gel Products Adjudged to Infringe at Trial and Proceeding to the Infringement Prong of *TiVo* on That Basis…………………...34

B.    Even if the District Court Did Not Err in Proceeding to the Infringement Prong of *TiVo*, it Erred in Finding That the Advanced Gel Products Infringe Claims 1–3……………………………………………………37

RESPONSE TO ALPS'S CROSS-APPEAL……………………………………..41

INTRODUCTION ………...……………………………………………………...41

STATEMENT OF FACTS RELATING TO ALPS'S CROSS-APPEAL………..42

I.    OWW'S ABSOLUTE INTERVENING RIGHTS…………………..42

II.    POST-TRIAL DAMAGES………………………………………47

SUMMARY OF CROSS-APPEAL ARGUMENT………………………………49

CROSS-APPEAL ARGUMENT………………………………………………50

I.    OWW IS ENTITLED TO ABSOLUTE INTERVENING RIGHTS………………………………………..50

A.    Applicable Law…………………………………………50

B.    The Original Claims Captured Certain Composites
That are No Longer Captured by the Amended Claims......50

C.    The Prosecution History and Written Description
Confirm that the Claims were Substantively Changed.........53

II.    THE DISTRICT COURT DID NOT ABUSE ITS
DISCRETION IN DECLINING TO ENHANCE
THE POST-TRIAL DAMAGES…………………………………56

CONCLUSION……………………………………………………………...59

# TABLE OF AUTHORITIES

## Cases

*A123 Sys. v. Hydro-Quebec*, 626 F.3d 1213 (Fed. Cir. 2010)……………………6

*Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128 (Fed. Cir. 1995)…………………2

*Abraxis Bioscience, Inc. v. Navinta LLC*,
625 F.3d 1359 (Fed. Cir. 2010)……………………………………………………2, 3, 6

*Alcon Research, LTD. v. Apotex Inc.*, 687 F.3d 1362 (Fed. Cir. 2012)…………19

*Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370 (Fed. Cir. 2012)…………29, 32

*Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352 (Fed. Cir. 2013)………………30

*Arachnid, Inc. v. Merit Indus., Inc.*,
939 F.2d 1574 (Fed. Cir. 1991)……………………………………...2, 3, 4, 6

*In re Arkley*, 455 F.2d 586 (CCPA 1972)……………………………………………12

*Automated Bus. Cos. v. NEC Am., Inc.*, 202 F.3d 1353 (Fed. Cir. 2000)…………27

*Bai v. L & L Wings*, 160 F.3d 1350 (Fed. Cir. 1998)……………………………53

*Bard Peripheral Vascular, Inc., v. W.L. Gore & Assoc., Inc.*,
682 F.3d 1003 (Fed. Cir. 2012)...............................................25, 26

*In re Baxter Travenol Labs.*, 952 F.2d 388 (Fed. Cir. 1991)…………………19, 21

*In re Beattie*, 974 F.2d 1309 (Fed. Cir. 1992)……………………………………19

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*,
260 Fed. Appx. 284 (Fed. Cir. 2008)........................................23

*Bloom Eng'g Co. v. North Am. Mfg. Co.*,
129 F.3d 1247 (Fed. Cir. 1997)……………………………………...22, 50

*Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142 (Fed. Cir. 2011)………29

*Convolve, Inc. v. Seagate Tech., LLC*, 552 U.S. 1230 (2008)……………………26

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)………………………29

*Enzo APA & Son, Inc. v. Geapeg A.G.*,
    134 F.3d 1090 (Fed. Cir. 1998)…………………………………………...4, 5, 6

*Grain Processing Corp. v. American Maize-Products Co.*,
    185 F.3d 1341 (Fed. Cir. 1999)…………………………………….........32

*In re Hayes Microcomputer Products, Inc. Patent Litigation*,
    982 F.2d 1527 (Fed. Cir. 2012)……………………………………...56, 58

*Highmark Inc. v. Allcare Health Mgmt. Sys.*,
    134 S. Ct. 1744 (2014)……………………………………………….25, 26

*i4i Ltd.v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010)………………………25

*Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273
    (Fed. Cir. 2007)……...........................................................................1, 2

*Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362 (Fed. Cir. 2000)…………38

*KSR Int'l Co., v. Teleflex, Inc.*, 550 U.S. 398 (2007)……………………………19

*In re Kubin*, 561 F.3d 1351 (Fed. Cir. 2009)…………………………………21

*Laitram Corp. v. NEC Corp.*, 163 F.3d 1342 (Fed. Cir. 1998)………………50, 54

*In re Malagari*, 499 F.2d 1297 (CCPA 1974)…………………………………54

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
    240 F.3d 1016 (Fed. Cir. 2001)……………………………………..........7

*Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011)………………………14

*Minco Inc. v. Combustion Eng'g*, 95 F.3d 1109 (Fed. Cir. 1996)………………3, 4

*nCube Corp. v. Seachange Int'l Inc.*, 732 F.3d 1346 (Fed. Cir. 2013)……….36, 37

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008)………...11, 12

*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989)……………………7

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
     134 S. Ct. 1749 (2014)………………………………………………………26, 28

*Ortho Pharmaceutical Corp. v. Genetics Inst.*,
     52 F.3d 1026 (Fed. Cir. 1995)……………………………………………………5

*Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372 (Fed. Cir. 2000)………………7

*In re Seagate Tech.*, LLC, 497 F.3d 1360 (Fed. Cir. 2011)………22, 23, 25, 26, 42

*Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566 (Fed. Cir. 1996)………………27

*Stryker Corp. v. Davol Inc.*, 234 F.3d 1252 (Fed. Cir 2000)……………………...58

*SynQor, Inc. v. Artesyn Technologies, Inc.*,
     709 F.3d 1365 (Fed. Cir. 2013)……………………………………24, 25, 58

*TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869 (Fed. Cir. 2011) (en banc)………36, 37

*W.L. Gore & Assocs. v. C.R. Bard, Inc.*, 133 S. Ct. 932 (2013)…………………26

*Yarway Corp. v. Eur-Control United States*, 775 F.2d 268 (Fed. Cir. 1985)……26

**Statues, Rules and Other Authorities**
28 U.S.C. § 1653……………………………………………………………………6

35 U.S.C. § 102……………………………………………………13, 41, 45

35 U.S.C. § 103……………………………………………………13, 41, 45

35 U.S.C. § 252………………………………………………………………50

35 U.S.C. § 281……………………………………………………………3, 5

35 U.S.C. § 284………………………………………………………………26, 27

35 U.S.C. § 285…………………………………………………………26, 27, 28

35 U.S.C. § 307(b) …………………………………………………………50

Rule 15, Federal Rules of Civil Procedure………………………………………6

## TABLE OF ABBREVIATIONS

| ABBREVIATION | TERM |
|---|---|
| '109 Patent | United States Patent No. 6,552,109 |
| '254 Patent | United States Patent No. 5,153,254 |
| Advanced Gel | OWW's redesigned gel products |
| Alps | Alps South, LLC |
| Debbaut | European Patent Application Publication No. 0108518 |
| Hammond | International Publication No. WO 93/23472 |
| Original Gel | OWW's original Alpha Liner products accused at trial |
| OWW | The Ohio Willow Wood Company |
| PTO | United States Patent and Trademark Office |
| SEBS | poly(styrene-ethylene-butylene-styrene) block copoloymers |
| SEEPS | poly(styrene-ethylene-ethylene-propylene-styrene) block copolymers |
| SIB | styrene isoprene/butadiene block copolymers |

## <u>REPLY TO ALPS'S RESPONSE TO OWW'S APPEAL</u>

### REPLY ARGUMENT

## I.   ALPS LACKS PRUDENTIAL STANDING.

When Alps filed the complaint, it lacked prudential standing to sue for infringement of the '109 Patent in its own name without joining the patent owner, and the Amended License that was executed after the filing of the complaint could not cure this defect.  (OWW Br. 25–30.)  While Alps now suggests that it had prudential standing all along (Alps Br. 24–25), it does not dispute that the Original License was limited to a specific field of use. This forecloses the argument that Alps had "all substantial rights" to the '109 Patent and means that it lacked prudential standing when it filed the complaint. Similarly, while Alps suggests that the post-complaint Amended License cured its lack of prudential standing (*id.* at 25–26), this Court has made it clear that a post-complaint agreement cannot retroactively cure a lack of prudential standing.  Accordingly, this case should have been dismissed due to Alps's failure to join the patent holder.

### A.   Alps Did Not Have Prudential Standing When It Filed the Complaint.

Alps does not even address *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1280 (Fed. Cir. 2007), where this Court held that an exclusive patent license that is limited to a particular field of use does not convey "all substantial rights" in the full scope of the patent and therefore does not enable the

licensee to sue without joining the patent owner. Since the claimed subject matter of the '109 Patent—composite articles of gel and various substrates—is far broader than just prosthetic products, yet the license granted to Alps by the pre-complaint Original License was limited to the prosthetics field, JA018364, the license could not convey "all substantial rights" in the full scope of the patent. Alps lacked prudential standing when it filed the complaint.

Alps nevertheless suggests that it had prudential standing at the outset of this case simply because the Original License granted it the exclusive right to "prosecute any third party infringement" in the field of prosthetics. (Alps Br. 24.) However, the right to sue for infringement, while important, is not dispositive as to prudential standing. *See Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995) (finding no prudential standing even though the license conveyed the right to sue for infringement). Where, as here, a license conveys the right to sue for infringement only in a particular field and leaves with the patent owner the right to sue for infringement in other fields, this Court has applied a bright-line rule: the licensee must join the patent owner in order to bring a suit for infringement. *Int'l Gamco*, 504 F.3d at 1278.

Alps cites *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991) and *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359 (Fed. Cir. 2010) (Alps Br. 24), but those cases address whether an assignee of a patent can sue for

infringement that occurs before the assignment, not whether an exclusive licensee whose license is limited to a single field can sue on its own.  While an assignee may sue for infringement occurring *after* the assignment (it is a "patentee" for purposes of 35 U.S.C. § 281 and may bring a "civil action for infringement"), an assignee generally cannot sue for infringement that occurred *before* the assignment, as one lacking exclusionary rights in an invention suffers no injury-in-fact for purposes of Article III standing when others make, use, sell, or offer to sell the invention.  *See Minco Inc. v. Combustion Eng'g*, 95 F.3d 1109, 1117 (Fed. Cir. 1996) ("Infringement . . . harms only the owner of the patent at the time of the infringing acts.")  *Arachnid* and *Abraxis* simply recognize an exception: an assignee can sue for infringement that predates the assignment if the assignment expressly conveys the right to sue for past infringement.  *See Arachnid*, 625 F.3d at 1579 n.7.

Citing *Arachnid* and *Abraxis*, Alps now suggests that it had prudential standing when this suit was filed "because it had been granted the exclusive right to prosecute any infringement action concerning [prosthetic products]," and "the word 'any' necessarily includes past infringement." (Alps Br. 24.)  This misses the point.  Even if the Original License had granted Alps the right to sue for pre-

August 31, 2008 infringement,[1] this right would have been limited to the prosthetics field. Whether the Original License purported to transfer the right to sue only for prospective infringement in the prosthetics field or for past infringement in that limited field as well, the license could not, given this field-of-use limitation, assign all substantial rights to the '109 Patent.

Under the Original License, Alps was a field-of-use licensee at the time of the complaint. Alps thus had fewer than all substantial rights to the '109 Patent and lacked standing to sue alone.

### B.    The Amended License Did Not Cure Alps's Lack of Prudential Standing.

In *Enzo APA & Son, Inc. v. Geapeg A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998), this Court held that "*nunc pro tunc* assignments are not sufficient to confer retroactive standing." Alps nevertheless asserts that its lack of prudential standing when it filed this suit "was cured when AEI and Alps entered into the [post-complaint] Amended License Agreement." (Alps Br. 25.) Alps suggests that *Enzo* addressed a constitutional standing defect and that *Enzo* does not prevent a post-complaint agreement from curing, *nunc pro tunc*, a lack of prudential standing.

---

[1] The Original License did not expressly refer to the right to sue for past infringement and thus did not convey this right. The assignment of the right to sue for past infringement "must be express, and cannot be inferred from an assignment of the patent itself." *Arachnid*, 625 F.3d at 1579 n.7; *see also Minco*, 95 F.3d at 1117.

(Alps Br. 24–25.) Alps misreads *Enzo*; the Amended License did not cure Alps's lack of standing.

*Enzo* addressed prudential standing and did not even mention constitutional standing. In *Enzo*, this Court explained that, under § 281, a suit for infringement must be brought in the patentee's name unless there has been an assignment of legal title or an exclusive license conveying all substantial rights to the patent. 134 F.3d at 1093. This, of course, is the measure of prudential standing. This Court observed that "it [was] clear from the record that there was no writing transferring all substantial rights" under the patent-in-suit to the licensee "at the time it brought suit" and then asked whether "a *nunc pro tunc* license executed after suit is brought [could] confer standing." *Id.* The Court answered the question in the negative, holding that the patent owner had to be joined "in order to confer standing," *id.*, and finding the licensee "to be without standing for failing to join the patentee." *Id.* at 1094.

If, as Alps suggests, *Enzo* addressed constitutional standing, the case would not have been dismissed due to the licensee's "failing to join the patentee." A party lacking constitutional standing has no right to participate at all in an infringement suit, with or without the patent owner. *See Ortho Pharmaceutical Corp. v. Genetics Inst.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995). *Enzo's* holding that the licensee could have proceeded if it had joined the patent owner makes it clear

that it was addressing *prudential* standing.  Moreover, this Court has since cited *Enzo* in the prudential standing context.  *See A123 Sys. v. Hydro-Quebec*, 626 F.3d 1213, 1217 (Fed. Cir. 2010).  *Enzo* controls and rules out Alps's argument that the Amended License cured its lack of prudential standing.

Alps also suggests that *Arachnid* and *Abraxis* recognize "an exception to the rule that a *nunc pro tunc* agreement cannot cure a standing defect."  (Alps Br. 24.)  This too is incorrect.  These cases simply recognize that an assignee may have standing to sue for pre-assignment infringement if the right to sue for such is expressly included in the assignment.  This has nothing to do with whether a party that lacked prudential standing at the inception of a lawsuit may cure that defect after the complaint is filed via a *nunc pro tunc* agreement.

Alps also suggests that its standing depends on the facts as they existed not on September 23, 2008 (when it filed the complaint) but rather as on August 17, 2011 (when it filed a supplement to the complaint reflecting the issuance of the reexamination certificate).  (Alps Br. 26.)  Alps's suggestion is baseless.  While 28 U.S.C. § 1653 (which provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts") and, by extension, Rule 15 of the Federal Rules of Civil Procedure allow the amendment of incorrect statements about jurisdiction where jurisdiction actually exists, they do not allow amendments intended to create jurisdiction where none existed at the time of the

original complaint. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830–31 (1989). Moreover, even if this Court could look to the facts alleged in the August 17, 2011 supplement to determine jurisdiction, it would find nothing there supporting Alps's standing to sue in its own name. The supplement is silent as to the Amended License, mentioning only the August 31, 2008 Original License. JA008003–09.

Finally, Alps's suggestion that it should be allowed to belatedly cure the standing defect by joining AEI on appeal (Alps Br. 26) is also meritless. "The appropriate way of bringing the joinder question before [this Court] is by motion." *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1019 (Fed. Cir. 2001). Alps has not filed a motion. Moreover, joinder to correct jurisdictional defects during an appeal is appropriate only under "rare circumstances." *Mentor*, 240 F.3d at 1019 (citing *Newman-Green*, 490 U.S. at 832, 836). While this Court permitted joinder of the patent owner on appeal in *Mentor*, it stressed that the issue of standing had not been raised below. 204 F.3d at 1373. Where the accused infringer challenged standing in the district court, this Court has declined to permit appellate joinder. *See Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000). OWW challenged Alps's prudential standing shortly after Alps filed the complaint. The district court considered the issue twice: on OWW's motion, then again *sua sponte*. Having revisited prudential standing, the court

expressly urged Alps to join AEI to avoid any uncertainty as to whether the Amended License cured Alps's lack of standing.  JA014135.  Alps did not do so and should be held to the consequences of that decision.

Since Alps lacked standing when it filed this case and the subsequent Amended License did not retroactively cure this defect, the judgments below should be vacated and the case dismissed.

## II.    THE JURY'S VERDICT THAT THE ASSERTED CLAIMS ARE NOT ANTICIPATED IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

Alps does not challenge the district court's holding that PCT Publication No. WO 93/23472 ("Hammond") and European Patent Application 0108518A2 ("Debbaut"), all of which is incorporated in Hammond by reference, constitute a single prior art reference for purposes of anticipation analysis.  Nor does it point to any element of the asserted claims that is missing from the combined disclosures of this single reference.  Instead, in an argument that Alps did not present to the jury, Alps suggests that Hammond does not anticipate because it does not arrange the elements of the claimed invention in the same manner as Chen.  (Alps Br. 30–31.) This is meritless.  Hammond combines the elements of Chen's invention in exactly the same manner as Chen to achieve the very same invention: a composite of SEEPS gel and a substrate, physically interlocked with one another.  The jury's

verdict of no anticipation lacks any factual basis, and the district court's denial of OWW's renewed JMOL motion on anticipation should be reversed.

Alps does not dispute that Hammond's thermoplastic gel, a mixture of a Septon 4055 SEEPS polymer and mineral oil, is the same as the gel recited in the claims of the '109 Patent.[2]  While Alps suggests that Hammond, *in isolation from Debbaut*, does not teach composite articles of the gel and a substrate, it admits that "Figures 4 and 5 of Debbaut show gel-substrate composites."  (Alps Br. 30.) Indeed, as explained by OWW's expert, Dr. Walker, Figures 4 and 5 of Debbaut show cross-sections of composite articles of gel (46, 52) physically interlocked with substrates of foam 44 and fabric 54, respectively, to be used as protective covers for electrical connection enclosures:

---

[2] When Hammond was published, Septon 4055 was referred to in the industry as "SEPS." The nomenclature was later changed to "SEEPS." At trial, the unrebutted testimony of the manufacturer of Septon 4055 established that the chemical structure of Septon 4055 has never changed, and that the change from "SEPS" to "SEEPS" reflected a change in nomenclature only. JA013024. Thus, Alps's suggestion (Alps Br. 29) that Hammond does not anticipate because it still refers to Septon 4055 as SEPS rather than SEEPS is baseless.  In fact, during reexamination Chen himself filed a sworn declaration from the manufacturer of Septon 4055 that stated that Septon 4055 "is and has always been the same polymer." JA021169.



JA013048–49. Indeed, Alps admits that "[t]he gels described in Hammond are meant to replace the encapsulant [i.e., the gel]" used in Debbaut. (Alps Br. 30.)

Thus, there is no dispute that Hammond discloses the SEEPS gel recited in the claims of the '109 Patent, that it incorporates Debbaut's description of composites of gel physically interlocked with various substrates, and that it expressly directs the reader to substitute the SEEPS gel for the gel used in Debbaut's composites. Dr. Walker's unrebutted testimony established that one of ordinary skill in the art would readily understand how to do that: the skilled artisan would first heat the SEEPS gel to a molten state, then pour it over one of Debbaut's substrates (fabric or a sheet of foam), and then let it solidify by cooling. JA013135–36.

Alps nevertheless asserts that Hammond's incorporation of Debbaut "does not change the anticipation analysis" because the gel shown in Figures 4 and 5 of Debbaut is a thermo*set* (rather than thermo*plastic*) gel. (Alps Br. 30.) This again misses the point. Debbaut alone does not anticipate; the combined disclosures of

Hammond and Debbaut – viewed, as they must be, as a single § 102(a) reference – anticipate. That Debbaut alone does not discuss gels made from SEEPS or other thermoplastic polymers is immaterial, because Hammond indisputably does so. As Dr. Walker's unchallenged testimony established, a skilled artisan would have known how to follow Hammond's explicit directive to substitute SEEPS gel for Debbaut's thermoset gel. JA013135–36.

Alps next cites *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008), asserting that, even if Hammond (incorporating Debbaut) discloses all of the elements of the asserted claims, it does not combine them in the same manner. (Alps Br. 30–31.) In fact, Hammond combines the elements precisely as they are combined in the asserted claims, achieving precisely the same invention: a composite of SEEPS gel physically interlocked with a substrate. *Net MoneyIN* suggests nothing to the contrary.

In *Net MoneyIN*, the claimed invention was directed to a protocol, comprising five so-called "links," for processing Internet credit card transactions. 545 F.3d at 1368–69. A prior art reference disclosed two separate protocols for processing on-line credit card payments. Together, the protocols contained all five links of the claimed invention, but neither independently contained all five. *Id.* at 1369. This Court reversed a summary judgment of invalidity, holding that a claim is not anticipated (though it may be obvious) when a prior art reference discloses

11

merely "part of the claimed invention, which an ordinary artisan might supplement to make the whole" or "multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention." *Id.* at 1371. In *Net MoneyIN*, the district court improperly "combine[d] parts of the separate protocols shown in the [prior art] reference in concluding that [the claim] was anticipated." *Id.*

Unlike the two prior art protocols in *Net MoneyIN*, Hammond and Debbaut are not "distinct" teachings that a skilled artisan would have to combine. Rather, by incorporating Debbaut and expressly directing one to use SEEPS gel in Debbaut's gel-substrate composites, Hammond has done the combining and teaches the complete invention. *See In re Arkley*, 455 F.2d 586, 587 (CCPA 1972) (prior art reference anticipates when it "direct[s] those skilled in the art to the [invention] without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference"). By expressly directing one to apply the SEEPS gel to a substrate such as fabric or foam, Hammond has directed the skilled artisan to the very invention claimed in the '109 Patent.

Also incorrect is Alps's suggestion that, "when Hammond and Debbaut are combined[,] the result is not the physically interlocked composite article formed by heat as claimed in the '109 [P]atent, but Debbaut's electrical enclosure with Hammond's gel squeezed inside it." (Alps Br. 31.) Debbaut does not describe

electrical enclosures—it describes "protective covers" for electrical enclosures, JA026515, and explains that these protective covers comprise composites of gel "adherent to a support member." JA026516. Debbaut's Figures 4 and 5 illustrate such protective covers comprising composites of gel adherent to foam and fabric, respectively. Following Hammond's explicit directive to substitute SEEPS gel for the gel in Debbaut's protective covers results in composites of SEEPS gel and various substrates, the very composites claimed in the '109 Patent.

Finally, Alps notes that both Hammond and Debbaut were considered by the PTO during reexamination. (Alps Br. 28–29.) The PTO issued a final rejection of several claims as *obvious* over the combination of Hammond and Debbaut,[3] concluding that "it would have been obvious to one of ordinary skill in the art . . . to have casted Hammond's [SEEPS] gel onto fabric or foams support material of Debbaut." JA021146–47. Chen later overcame this obviousness rejection by arguing that his demonstration showed unexpected results. (*See infra* at 17–21.) However, it is undisputed that the PTO did not consider the combined disclosures of Hammond and Debbaut as a single *anticipatory* reference. If it had (and Alps does not dispute that they should be so considered), the PTO would have rejected the claims on 35 U.S.C. § 102 (not § 103) grounds. Where the PTO does not

---

[3] The PTO also rejected all claims, including those asserted against OWW, as obvious over the combination of Hammond and Chen's U.S. Patent No. 5,153,254 (the "'254 Patent"). (*See infra* at 44.)

consider all material facts, "its considered judgment may lose significant force." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2240 (2011).

Alps cannot point to any evidence that supports the jury's verdict of no anticipation.  The district court could not do so either. It asserted only that OWW had failed to meet its burden of proof and that the PTO had considered this prior art, without acknowledging that the PTO had not considered Hammond and Debbaut as a single reference, and without identifying any specific limitation that OWW had failed to prove was disclosed in Hammond (incorporating Debbaut). JA000110.  The district court's denial of OWW's renewed JMOL motion should be reversed.

## III.  EVEN IF HAMMOND DID NOT ANTICIPATE, THE ASSERTED CLAIMS WOULD BE OBVIOUS OVER THE COMBINATION OF HAMMOND AND DEBBAUT.

Alps asserts that one art would not have been motivated to combine Hammond and Debbaut to achieve a composite of SEEPS gel and a substrate.[4] (Alps Br. 38.)  Given Hammond's explicit directive to make a composite of SEEPS gel and fabric (or foam) for use as a sealing material "as illustrated in [Debbaut]," Alps's position is simply wrong. Even if Chen recognized an allegedly unexpected quality of such composites (improved shear strength) that made their use desirable

---

[4] Alps also addresses the combination of U.S. Patent No. 5,336,708 and the 1991 MSDS for Septon 4055 SEEPS. (Alps Br. 38–39.) OWW's June 12, 2014 principal brief did not argue that combination.

in prosthetic liners, this does not negate the motivation to combine for reasons provided by Hammond as to other applications also covered by the claims. Moreover, the superior shear strength of Chen's composites was not even unexpected. The district court's denial of OWW's renewed JMOL motion on obviousness should be reversed.

## A. The Motivation to Combine Hammond and Debbaut Is Overwhelming.

Hammond's directive to use SEEPS gel in Debbaut's gel-substrate composites squarely forecloses Alps's argument that "Hammond does not suggest using the disclosed gel material to form a composite article by heat to physically interlock it with another material." (Alps Br. 38.) Hammond identifies the usefulness of SEEPS gel as a sealing material due to "improved ability to conform to surfaces with which [it] is brought into contact," among other reasons, JA026505, and Hammond explicitly advises one to use SEEPS gel to that end "as illustrated in [Debbaut]." JA026500. This provides an overwhelming motivation to combine the teachings of Hammond and Debbaut so as to construct a composite of SEEPS gel physically interlocked with a substrate.

Alps's dismissal of Dr. Walker's testimony regarding the motivation to combine Hammond and Debbaut as "conclusory" (Alps Br. 40) is unfounded. In fact, Dr. Walker highlighted Hammond's discussion of the qualities of SEEPS gel that make it particularly useful for sealing off electrical connection enclosures,

including its elasticity and capacity to conform to a surface upon contact, JA013053, JA013056–57, and stressed that Hammond specifically suggests that the gel be used "as illustrated in [Debbaut]." JA013120. While Alps focuses on whether the shear strength of SEEPS gel-substrate composites makes them useful in prosthetic liners, it has never squarely addressed, much less rebutted, Hammond's explicit suggestion to combine for different reasons.

The portions of Dr. Atwood's testimony cited by Alps (Alps Br. 40–41) do not even begin to rebut Dr. Walker's testimony. Dr. Atwood's statement that "Mr. Chen was the first person to envision and practice this type of composite," JA012299, is a bare conclusion unsupported by articulated reasoning. His statement that "Mr. Chen discovered . . . that using the SEEPS gel, one could actually make a gel which is quite strong and still quite durable, quite strong," JA012300, is irrelevant, since Chen, by his own admission, did not invent SEEPS gel (indeed, even Dr. Atwood admitted that "the gel was not invented by Mr. Chen," JA012301). The last portion of Dr. Atwood's testimony cited by Alps (JA013274) does not even relate to obviousness, but rather addresses OWW's alleged infringement of another Chen patent.[5]    In fact, Dr. Atwood's only testimony regarding the motivation to combine Hammond and Debbaut was a

---

[5] Alps's allegations relating to OWW's infringement of the claims of U.S. Patent No. 6,867,253 (the "'253 Patent") were either withdrawn or dismissed during the trial.

cursory statement that it would not have been obvious to combine Hammond with "any other reference." JA013274. This is completely insufficient to overcome the clear motivation to combine furnished by Hammond and explained by Dr. Walker.

**B.    Chen's Purported Evidence of Unexpected Results Cannot Overcome the Overwhelming *Prima Facie* Case of Obviousness.**

Alps's reliance on the evidence of purportedly unexpected results, which Chen presented to overcome a final rejection during reexamination (Alps. Br. 32–33), is also misplaced. Focusing narrowly on gel-fabric composites used in prosthetic liners, rather than the full scope of the claims, Alps suggests that one skilled in the art "would not have expected composite articles made with the SEEPS-based gels and a substrate like fabric to perform much differently from prior art SEBS gel composites or SEPS gel composites," particularly with respect to resistance to "repeated shear forces, tearing and fatigue." (Alps Br. 35.) Citing Chen, Alps claims that this superior shear resistance of SEEPS gel when used in a composite with fabric "provides a great advantage in making products like prosthetic liners and sleeves." (Alps Br. 34.) This is irrelevant. The claims are not limited to prosthetic liners made of gel and fabric. Even if the improved shear strength of SEEPS gel-fabric composites was unexpected, the purported discovery by Chen of an additional reason to combine SEEPS gel with a substrate does not negate the unrebutted motivation to combine them for the reason explicitly

provided by Hammond—to make an improved sealant for electrical connection enclosures.

The asserted claims are extremely broad and are not limited to prosthetic gel liners.   Indeed, the patent explicitly contemplates the use of the claimed composites for the very purpose envisioned by Hammond—as a "dielectric encapsulant of an electrical . . . component."  JA000224–25 (6:65–7:4).  Even if, as Alps suggests, one of ordinary skill in the art would not have expected composites of SEEPS gel and fabric to be as resistant to shear in prosthetic liners as prior art gel-fabric composites, this would not have discouraged the artisan from using SEEPS gel precisely as Hammond urged (as a composite of gel and fabric or foam for sealing off electrical connection enclosures) based on the advantages of SEEPS gel described by Hammond as particularly useful in that application.   While a prosthetic gel liner may be subjected to considerable shear stress due to the amputee's constant movement, Debbaut's composite sealants remain in a static condition during their use and consequently do not endure such stress.  JA013145. Alps never suggests that shear strength has anything to do with the suitability of SEEPS gel as a sealing material in the combination suggested by Hammond.

Alps's assertion that one would not have combined SEEPS gel with a fabric substrate for use in prosthetic gel liners is thus immaterial to whether one would have combined SEEPS gel with a substrate for the reason articulated by Hammond.

"As long as some motivation or suggestion to combine the references is provided by the prior art taken as a whole, the law does not require that the references be combined for the reasons contemplated by the inventor." *In re Beattie*, 974 F.2d 1309, 1312 (Fed. Cir. 1992); *see also KSR Int'l Co., v. Teleflex, Inc.*, 550 U.S. 398, 420 (2007) (explaining that it is error to "look only to the problem the patentee was trying to solve"); *Alcon Research, LTD. v. Apotex Inc.*, 687 F.3d 1362, 1368 (Fed. Cir. 2012) (holding that "the motivation to modify a prior art reference to arrive at the claimed invention need not be the same motivation that the patentee had").

Moreover, the improvement in the durability of SEEPS gel-fabric composites was not unexpected. "[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art." *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991). Here, the closest prior art is Hammond. Chen's own data showed that Hammond's SEEPS gel is almost seven times more shear resistant than the SEBS gel used in Chen's comparison. JA013998. As Dr. Walker explained in her unrebutted testimony, given this data, one would expect a composite of Hammond's SEEPS gel and fabric to be roughly seven times more shear resistant than a composite of prior art SEBS gel and the same fabric. JA013151–52. Chen's demonstration to the PTO, showing a seven-fold improvement in the shear resistance of composited

SEEPS gel relative to composited SEBS gel, JA021376, merely validated this expectation.

Alps suggests in a footnote that "Chen's tests showed that composite articles made with SEEPS-based gel and a fabric substrate significantly outperformed SEEPS based gels with no substrate,"  as some of the stronger composites of SEEPS gel and fabric ruptured after roughly 400 string-pulls of the "Humdinger" device, while samples of non-composited SEEPS gel ruptured after roughly 90 string-pulls. (Alps Br. 33 n.3.) That rupturing the samples of composited SEEPS gel required more string-pulls that rupturing the samples of non-composited SEEPS gel is unremarkable, since the rigid cotton fabric naturally adds to the strength of the composite.  It is also irrelevant. As to the pertinent comparison, the 704 percent improvement in the strength of composited SEEPS gel relative to composited SEBS gel was roughly equivalent to the 630 percent improvement in the strength of the non-composited SEEPS gel relative to the non-composited SEBS gel.  Chen's composites did not "outperform" expectations.

Finally, Alps's conclusory assertion that "[t]here was nothing in the prior art" to indicate that SEEPS gel composites would exhibit superior shear strength relative to other prior art gel composites (Alps Br. 35) is both irrelevant and incorrect.  Most importantly, it does not rebut the clear motivation to combine in the manner and for the reasons urged by Hammond, reasons completely

independent of the desirability of shear strength in prosthetic liners. Moreover, "mere recognition of latent properties in the prior art does not render non-obvious an otherwise known invention." *In re Baxter Travenol Labs*, 952 F.2d 388, 392 (Fed. Cir. 1991); *see also In re Kubin*, 561 F.3d 1351 (Fed. Cir. 2009). Alps attempts to sidestep this by asserting that, although superior shear resistance is an inherent quality of SEEPS gel, the '109 Patent is directed to composites of SEEPS gel and various substrates. (Alps Br. 36–37.) This too is immaterial, since the improvement in the shear strength of the SEEPS-fabric composites is attributable to the inherent shear strength of Hammond's SEEPS gel. Neither Chen nor Alps could show that combining Hammond's SEEPS gel with a piece of fabric produced any unexpected synergistic results.

Because the jury's determination that Chen's claimed invention was non-obvious is wholly unsupported by evidence, the district court should have granted OWW's renewed JMOL motion on obviousness.

## IV.    THE WILLFULNESS FINDING SHOULD BE REVERSED.

Although the trial court never addressed the threshold "objective" prong of *In re Seagate Tech.*, LLC, 497 F.3d 1360 (Fed. Cir. 2011), and the objective strength of OWW's defenses, Alps speculates that the district court made an "implicit" determination of objective recklessness. (Alps Br. 43.) This is incorrect. More importantly, as the preceding discussion makes clear, OWW's

anticipation and obviousness defenses were more than objectively reasonable. Even if the trial court had made an "implicit" determination of objective recklessness, it would have been error.  Indeed, the absence of a substantive discussion of the reasonableness of OWW's invalidity defenses in Alps's brief is itself revealing in this regard.  The district court's denial of OWW's renewed JMOL motion on willfulness (and with it, the subsequent award of enhanced damages) must be reversed.  The award of attorney fees on the basis of the willfulness finding likewise must be reversed in the absence of willful infringement.

### A.    Because OWW's Defenses Are at Least Reasonable, It Cannot Be Liable for Willful Infringement.

Alps's sole challenge to the reasonableness of OWW's invalidity defenses is the suggestion (in its Statement of Facts) that OWW could not reasonably expect to succeed at trial given "the heavy burden [it] would face to overcome the presumption of validity" after the PTO "confirmed the '109 patent's validity" during reexamination.  (Alps Br. 15.)  However, the reexamination did not confirm the validity of the asserted claims.  None of the claims emerged from reexamination without substantive change, which leads to "an irrebuttable presumption that the original claims were materially flawed." *Bloom Eng'g Co. v. North Am. Mfg. Co.*, 129 F.3d 1247, 1249 (Fed. Cir. 1997).  Since the original

claims were "materially flawed," OWW's pre-reexamination conduct could not have been objectively highly likely to constitute infringement of a valid patent.

Indeed, OWW's pre-reexamination conduct could not have been objectively reckless even if the amendments made during reexamination did not, as Alps suggests, amount to a substantive change. (Alps Br. 14.) That the PTO granted OWW's reexamination request, rejected the original claims, rejected the amended claims, and allowed the amended claims only on the basis of purportedly unexpected results demonstrates that OWW's reexamination request, far from being a "delay tactic" (*id.*), raised serious and legitimate questions concerning the patentability of the claims.

Nor does the PTO's allowance of the claims in amended form following reexamination mean that OWW's post-reexamination conduct was objectively reckless. Indeed, the PTO had failed to even consider OWW's lead invalidity position (Hammond and Debbaut as a single anticipatory reference). Even so, the PTO initially rejected the amended claims as obvious and allowed them only after Chen's arguments that he had discovered purportedly unexpected results, JA021572, an argument that, even if true, in no way negated the motivation to combine for the reasons explicitly set forth by Hammond. Moreover, the results of Chen's demonstration were not unexpected, particularly in view of Chen's failure to disclose during the demonstration that the improvement in the shear resistance

of the SEEPS gel-fabric composites was roughly comparable to the improvement in the shear resistance of non-composited SEEPS gel.  OWW's invalidity defenses were clearly more than reasonable.  This precludes a determination of willful infringement.  *See Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed. Appx. 284, 291 (Fed. Cir. 2008) (holding that "credible invalidity arguments demonstrate the lack of [objective recklessness]").

The portions of the district court's orders cited by Alps as evidencing an "implicit" determination of objective recklessness (Alps Br. 43) do not suggest otherwise.  In fact, they focus almost exclusively on OWW's subjective state of mind, which is "not relevant to this objective inquiry."  *Seagate*, 497 F.3d at 1371. The district court's reference in the order denying OWW's renewed JMOL motion on willfulness to OWW's "pattern of behavior" (*id.* at 42–43) and its comment in the order awarding enhanced damages that OWW failed to "take[] any remedial action" following the reexamination (*id.* at 43) do not address the reasonableness of OWW's defenses.  The district court's comment in the order awarding enhanced damages about the issue of infringement (*id.*) speaks only to the strength of OWW's non-infringement positions and does not address (even implicitly) the reasonableness of OWW's invalidity defenses.[6]

---

[6] Citing *SynQor, Inc. v. Artesyn Technologies, Inc.*, 709 F.3d 1365 (Fed. Cir. 2013), Alps suggests that the district court did not need to make a determination of objective recklessness before awarding enhanced damages. (Alps Br. 43–44.)

Finally, Alps's reliance (Alps Br. 47) on the Supreme Court's holding in

*Highmark Inc. v. Allcare Health Mgmt. Sys.*, 134 S. Ct. 1744 (2014) is misplaced.

*Highmark* held that a district court's determination under 35 U.S.C. § 285 to award

attorney fees must be reviewed for abuse of discretion.   It did not address the

determination of willfulness under 35 U.S.C. § 284, much less overrule the holding

of *Bard Peripheral Vascular, Inc., v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003,

1007–08 (Fed. Cir. 2012), that a district court's finding of objective recklessness

(if there had been such a finding here) is reviewed *de novo*.   Under *Seagate* and

*Bard*, willful infringement cannot be found without a determination of objective

recklessness, which is a question of law subject to *de novo* review.

---

However, objective recklessness is clearly a prerequisite for a finding of willful
infringement, *Seagate*, 497 F.3d at 1371, which, in turn, is a prerequisite to the
award of enhanced damages. *i4i Ltd.v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed.
Cir. 2010). *SynQor* suggests nothing to the contrary. There, the district court
enhanced damages based on the infringer's continued infringing sales following
the verdict for the patent owner. On appeal, the infringers argued that enhanced
damages were improper because the trial court had not expressly found willful
infringement and the patent owner had not pursued a willfulness claim before trial,
but this Court affirmed, concluding that the enhanced damages were "squarely
based on a recognition of [the infringers'] willful infringement." *SynQor*, 709 F.3d
at 1377, 1378–79, 1384 (concluding, *inter alia*, that the defendants presented "no
evidence" of a motivation to combine, proposed a claim construction that excluded
the preferred embodiment, and offered "no reason" that the accused products did
not infringe under the construction that included the preferred embodiment).
*SynQor* did not even suggest that *Seagate's* two-part test for willfulness and its
required finding of objective recklessness are not a predicate to awarding enhanced
damages.

However, even if this determination were reviewable for abuse of discretion, a trial court necessarily abuses its discretion if it rules on the basis of a "clearly erroneous assessment of the evidence." *Highmark*, 134 S. Ct. at 1748 n.2.  Here, regardless of the standard of review, the record can support only one conclusion—that OWW's defenses were, at a very minimum, objectively reasonable.  The district court's determination of willful infringement should be reversed.

### B.     The Absence of Willful Infringement Requires the District Court's Award of Enhanced Damages to Be Reversed.

Alps's reliance on the Supreme Court's recent decision in *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), in which the Supreme Court held that an award of attorney fees under § 285 does not require a determination that the losing party's positions were both objectively unreasonable and asserted in subjective bad faith, is also misplaced.  Alps suggests that, in light of *Octane*, an award of enhanced damages under § 284 can now be made without a finding that the infringer's conduct was objectively reckless (and thus, without a finding of willful infringement).  (Alps Br. 48–49.)  However, *Octane* does not contemplate such a radical departure from this Court's nearly thirty-year-old precedent requiring a finding of willful infringement before an award of enhanced damages can be made. *See Yarway Corp. v. Eur-Control United States*, 775 F.2d 268, 277 (Fed. Cir. 1985).  In fact, the Supreme Court declined to disturb each of this Court's decisions in *Seagate* and *Bard*.  *See Convolve, Inc. v. Seagate Tech.*,

*LLC*, 552 U.S. 1230 (2008) (denying writ of certiorari); *W.L. Gore & Assocs. v. C.R. Bard, Inc.*, 133 S. Ct. 932 (2013) (same).

Alps's suggestion that *Octane* implicitly overrules this Court's willfulness jurisprudence ignores important differences between § 285 and § 284.  An award of attorney fees under § 285 is compensatory in nature.  *See Automated Bus. Cos. v. NEC Am., Inc.*, 202 F.3d 1353, 1355 (Fed. Cir. 2000) (describing purpose of § 285 as "to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit").  However, "enhanced damages are punitive, not compensatory." *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996).  Alps assumes that the threshold finding required before an infringer can be made to compensate the patent owner for its legal expenses should mirror the threshold level of culpability required before the infringer can be made to incur potentially crippling liability in the form of double or treble damages.  Nothing in *Octane* supports this proposition.

Objective recklessness remains an absolute prerequisite to a finding of willfulness and an award of enhanced damages under § 284.  It is clearly lacking here, and the district court's award of enhanced damages should therefore be

reversed.  Since willfulness was the sole basis for the trial court's award of attorney fees to Alps, that award should be reversed as well.[7]

## V.    THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A PERMANENT INJUNCTION.

Alps does not dispute that the district court failed to address the existence of a causal nexus between OWW's purported infringement and Alps's purported irreparable harm.  The injunction should be vacated on this basis alone.  Instead, Alps argues that this error was essentially harmless and asserts either that the evidence below demonstrated this causal nexus or that it did not even have to prove such because it could be presumed.  (Alps Br. 50–51.)  However, the requisite caused nexus may not be presumed, at least where, as here, the accused infringer does not concede its existence.  Alps had to establish that the patented feature was an important driver of consumer demand for the accused products.

---

[7] Alps does not argue that attorney fees could be awarded here under *Octane* on some basis other than willfulness, nor could it. Under *Octane*, a case is "exceptional" under § 285 when it "stands out from others with respect to [1] the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or [2] the unreasonable manner in which the case was litigated." 134 S. Ct. at 1756. Given the strength of OWW's invalidity positions, the first part of this test cannot be met here.  Here, neither the district court nor Alps could point to anything in the record that even suggests that OWW's invalidity defenses were anything less than reasonable. The second part of the *Octane* test likewise cannot be met here. Indeed, in addressing enhanced damages, the district court specifically determined that "the evidence does not support a finding that . . . OWW's behavior during this litigation was unacceptable beyond the infringement itself." JA000127–28. Thus, the district court's own factual findings preclude an award of attorney fees under the second part of the *Octane* standard.

The portions of the record now cited by Alps provide no support for such a determination; indeed, the district court's own factual findings preclude it. The district court abused its discretion in granting the injunction.

Alps essentially asks this Court to simply presume irreparable harm, asserting that "OWW's infringement is a clear abridgment of [Alps's] property right[s] and irreparably harmed Alps." (Alps Br. 53.) This ignores settled precedent. This Court has confirmed that *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), "jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011). It was thus Alps's burden below to prove irreparable harm, which in turn required it to prove that a "sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("*Apple II*").

Alps now suggests "that the claimed feature[] had a significant impact on the demand for OWW's infringing products" because, it argues, the accused products purportedly have "few" features other than that claimed in the '109 Patent. (Alps Br. 51–52.) This argument rests on false legal and factual premises. Even assuming *arguendo* that the accused products are as uncomplicated as Alps suggests, Alps still had the burden to prove a causal link between OWW's

incorporation of the patented feature and Alps's loss of sales (its purported irreparable harm). "[T]he causal nexus requirement applies regardless of the complexity of the products." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1362 (Fed. Cir. 2013) ("*Apple III*").

Alps did not even attempt to carry that burden below. While Alps now offers the bare assertion that OWW's position "begs common sense" (Alps Br. 51), it is telling that, apart from Alps's CEO's self-serving assertion that the introduction of SEEPS gel liners amounted to a "vast improvement," JA012145, Alps cites to absolutely no testimony (let alone a market study) even suggesting, for example, that any of OWW's customers would have abandoned OWW's gel liners if OWW had replaced SEEPS gel with another thermoplastic gel (such as SEBS gel, which, as Alps's CEO admitted, could also be used to manufacture gel liners, JA012144).

Furthermore, Alps's suggestion that that the accused products have few features other than that claimed in the '109 Patent is unsupported and factually incorrect. For example, the '109 Patent has nothing to say about the quality of the fabric or the thickness of the gel layer, let alone the method of suspending the prosthetic leg or arm. (*See* OWW Br. 49.) Alps addressed none of these factors.

Alps's reliance on the testimony of Bruce Kania, who helped to develop OWW's gel liners, and Robert Arbogast, the co-owner of OWW, is misplaced.

Alps suggests that their testimony indicates that "it was not until OWW and Kania began using [SEEPS] that they were able to develop a commercially viable product." (Alps Br. 51–52.)  Actually, their testimony indicates that their research and development efforts focused primarily on the quality of the fabric, as the problem with existing gel-based products that OWW and Kania were looking to solve was "bleeding through" of the gel to the exterior of the fabric and the difficulties that this caused for users of the liners.  JA012856, 012886. Even Alps's CEO admitted that the development of Alps's own fabric-covered gel liners "all ha[d] to do with pressure and temperature [of the manufacturing process] and the characteristics of the fabric."  JA012219.  Alps "had to experiment with a whole bunch of different fabrics to get a good bond and at the same time no bleed on the other side."  *Id.*  This confirms that demand for these products is driven in large part by features not claimed in the '109 Patent.  Under these circumstances, a causal nexus between the patented feature and the consumer demand cannot be presumed.

Moreover, as explained in OWW's principal brief (OWW Br. 50–51), the district court's grant of OWW's JMOL motion on lost profits precludes a finding of a causal nexus here.  Alps now suggests that its failure to prove lost profits was attributable not to a failure to prove that it lost sales as a result of OWW's purported infringement, but rather to a failure to precisely quantify just how many

sales it lost.  (Alps Br. 53.)  In fact, the evidence did not establish that OWW's purported infringement caused Alps to lose sales that it would have made but for the infringement.  Alps's sole basis for now asserting otherwise is that OWW is a direct competitor.  (*Id.*)  However, direct competition alone is not sufficient to establish either lost profits or a causal nexus between the patented feature and consumer demand.

Proof of lost profits requires proof that the patent owner, and not another competitor, would have made the infringing sales, which requires the patent owner to tie the demand for the infringing products to the patented feature.  *See Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1352 (Fed. Cir. 1999) (explaining that existence of "an acceptable non-infringing substitute often suffice[s] alone to defeat a case for lost profits").  Here, the district court, in granting OWW's JMOL motion on lost profits, found that "there is no way that anyone could conclude how much of the market would go to a [non-infringing] silicone-produced product or stay with a gel-produced product."  JA012805.  Likewise, sales lost to a competing product "cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature."  *Apple II*, 695 F.3d at 1375 (internal citations omitted).  Alps's failure to tie the consumer demand for OWW's products to the inclusion of composited SEEPS gel should

have precluded a permanent injunction, just as it precluded an award of lost profits damages.

## VI.    THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING OWW IN CONTEMPT.

The district court erred in finding that OWW's redesigned Advanced Gel products were no more than colorably different from the Original Gel products adjudged to infringe at trial, notwithstanding that OWW had drastically reduced the amount of SEEPS to well below 100 parts by weight ("pbw") SEEPS to 1,600 pbw oil. JA016938–39. Alps's suggestion that OWW's redesign was insignificant and that the claims at issue require nothing more than a measurable amount of SEEPS (as long as it is in a mixture with enough of other hydrogenated SIBs) is both incorrect and contrary to the position Alps took at trial, when its own expert stated unequivocally that the claims at issue require not simply any measurable amount of SEEPS, but 100 pbw SEEPS to 300–1,600 pbw oil. The district court should not have allowed Alps to advance a different infringement theory during the contempt proceeding. Moreover, the claim construction urged by Alps and adopted during the contempt proceeding below is clearly incorrect.

**A.    The District Court Erred in Finding That the Advanced Gel Products Were No More Than Colorably Different From the Original Gel Products Adjudged to Infringe at Trial and Proceeding to the Infringement Prong of *Tivo* on That Basis.**

Alps proved infringement at trial by showing that the Original Gel products contained a mixture of 100 pbw SEEPS to 300–1,600 pbw oil.  It proved infringement during the contempt proceedings by showing that the redesigned Advanced Gel products contained a mixture of 100 pbw hydrogenated SIBs, only some of which were SEEPS, to 300–1,600 oil.  Alps suggests that this is permissible, as it argues that claims 1–3 do not require that every hydrogenated SIB in the mixture be SEEPS as long as the mixture includes some SEEPS, however little. (Alps Br. 56–57.)   As described below, this construction is incorrect.   Regardless, it was different from Alps's position at trial, and infringement under this new theory should not have been decided in a contempt proceeding.

Alps's expert, Dr. Atwood, testified at trial that claims 1–3 require a mixture of 100 pbw SEEPS to 300–1,600 pbw oil. JA012290–91.  That every polymer in the mixture of hydrogenated SIBs that was used in the Original Gel products was SEEPS was not mere happenstance, as Alps now suggests, but the essential core part of Alps's infringement proof.  A product having 100 pbw of a mixture of hydrogenated SIBs, only some of which happened to SEEPS, to 300–1,600 pbw oil could not have infringed claims 1–3 in light of Dr. Atwood's trial testimony, in

which Dr. Atwood also described the presence of SEEPS as the "essential feature" and the "essential polymer component" of the claimed invention.  JA012291.[8]

Alps does not now even attempt to reconcile Dr. Atwood's trial testimony with its current position that the claims require only some amount of SEEPS.  Nor does Alps even address the glaring inconsistency between its current position and that which it took during the *Markman* proceedings—that originally issued claims 1–3 (which did not yet even have the "comprising [SEEPS]" language added during reexamination and instead still recited only hydrogenated SIBs) should nonetheless have been construed to require 100 pbw *SEEPS* to 300–1,600 pbw oil. (*See* OWW Br. 54–55.)  Nor does Alps now address Chen's statement during reexamination that the addition of the "comprising [SEEPS]" language to claims 1–3 did not narrow the claims, which could have been true only if he also understood the original claims to already require 100 pbw SEEPS to 300–1,600 pbw oil. (*See* OWW Br. 11, 55.)

The claim construction offered by Alps during the contempt proceedings was not only new but was also plainly inconsistent with Alps's and the inventor's

---

[8] Dr. Atwood's post-reexamination supplemental expert report likewise stated that the "comprising [SEEPS]" amendment to claims 1–3 merely "clarifie[d] that two or more of hydrogenated [SIB] block copolymers are comprised of [SEEPS.]" JA009891. For this to be true, claims 1–3 had to require the same thing both before and after reexamination: 100 pbw SEEPS to 300–1,600 pbw oil. This view was contrary to the district court's construction of the original claims, but that does not change the fact that Dr. Atwood agreed that the amended claims required all of the hydrogenated SIBs to be SEEPS.

past statements regarding the scope of claims 1–3.  That Alps had to offer a new infringement theory to explain why the Advanced Gel products infringed claims 1–3 forecloses any argument that the accused products were no more than colorably different from the Original Gel products.  The colorable-differences standard "focuses on how the patentee in fact proved infringement" at trial, not on whether the patentee can prove infringement under some new theory.  *nCube Corp. v. Seachange Int'l Inc.*, 732 F.3d 1346, 1351 (Fed. Cir. 2013).  Whether the accused product actually infringes is a question that may be addressed only after it is established that the product is no more than colorably different from the product adjudged to infringe at trial.  *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (en banc).

Alps suggests that the district court's ultimate finding of contempt "does not mean that it improperly focused on infringement in performing its analysis of [colorable differences]."  (Alps Br. 55.)  However, Alps does not identify what the district court did actually focus on, if not infringement.  Alps suggests that substituting a non-SEEPS hydrogenated SIB for a significant amount of SEEPS while continuing with a much smaller amount "is not a colorable difference" (Alps Br. 56), but this simply assumes the correctness of the claim construction position that Alps took during the contempt proceedings.  As such, it is nothing more than an infringement analysis.  Alps's contempt infringement theory was clearly

different from the infringement theory offered at trial.  Allowing Alps to proceed

with this new infringement theory during a contempt proceeding violated the

notice and procedural fairness values that underlie the colorable-differences

standard of *TiVo*.  *See nCube*, 732 F.3d at 1351.

**B.      Even if the District Court Did Not Err in Proceeding to the Infringement Prong of *Tivo*, It Erred in Finding That the Advanced Gel Products Infringe Claims 1–3.**

Alps insists that the district court's construction of claims 1–3 finds support

in the "plain language" of the claims. Regarding the phrase "100 parts by weight of

one or a mixture of two or more of a hydrogenated [SIB](s) comprising [SEEPS],"

Alps says that "if there is a mixture of two hydrogenated SIB[s], it [the mixture] is

comprised of SEEPS if only one of the hydrogenated SIB[s] is SEEPS."  (Alps Br.

58.)   However, this incorrectly assumes that "comprising [SEEPS]" modifies

"mixture of two or more" at the beginning of the phrase.  Alps does not even

acknowledge, much less rebut, that the more natural reading is that "comprising

[SEEPS]" modifies the immediately preceding term "hydrogenated [SIB](s),"

requiring every hydrogenated SIB in a mixture to be SEEPS.  (*See* OWW Br. 20.)

In fact, even Chen did not use the language of claims 1–3 to mean what Alps

now argues it means.  During reexamination, Chen used this language ("one or a

mixture of two or more of a hydrogenated [SIB] comprising SEEPS") to describe

*all* of his claims, JA020090, including, notably, claims 5, 9, 10, and 11 that even

Alps concedes "require *each* component of [a] mixture of hydrogenated SIB block copolymers to be SEEPS." (Alps Br. 58 (emphasis added).) Chen could not have used this phrase as to claims 5, 9, 10, and 11 unless he understood it to mean that each hydrogenated SIB in the mixture had to be SEEPS. That was the plain meaning of the phrase when Chen used it to describe claims 5, 9, 10 and 11; it is the plain meaning of the phrase as it is used in claims 1–3.

Alps's reliance on claim differentiation is unfounded. Alps notes that claims 9–11 already expressly require 100 pbw SEEPS to 300–1,600 pbw oil. (Alps Br. 58.) However, as Dr. Atwood explained at trial, the "only major difference" between claims 9–11 and claims 1–3 is that claims 9–11 are limited to the Septon 4055 and Septon 4033 SEEPS polymers manufactured by Kuraray, while claims 1–3 "just want[] the SEEPS polymer regardless" of the manufacturer. JA012337–38. Alps also suggests that claim 5, which is dependent on claims 1–3 and expressly requires 100 pbw SEEPS to 300–1,600 pbw oil (but, unlike claims 9–11, is not limited to Septon-series SEEPS manufactured by Kuraray) requires claims 1–3 to be read more broadly. (Alps Br. 58.) However, the written description and prosecution history can overcome any presumption of claim differentiation. *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1367–68 (Fed. Cir. 2000). Chen's use of the phrase of claims 1–3 to describe claim 5 does so. OWW's principal brief documents other ways in which the written description and prosecution history

lend overwhelming support to OWW's proposed construction of claims 1–3 and rebut any presumption of claim differentiation.  (*See* OWW Br. 59–61.)

Alps's sole challenge to this discussion is its assertion that a remark made by Chen in response to an office action during reexamination suggests that Chen understood his claims to encompass non-SEEPS hydrogenated SIBs, albeit not "in isolation" from SEEPS.  (Alps Br. 59.)  This is plainly incorrect.  The comment which Alps cites does not even refer to the polymer composition of the gel recited in Chen's claims.  Instead, it refers to the relationship of the gel to the substrate material, with Chen arguing that, unlike Hammond's gel, his gel was physically interlocked with, and not "in isolation" from, the substrate. JA003735.[9]  Indeed, in that response, Chen stated clearly that his claims did not encompass the species of non-SEEPS hydrogenated SIBs to which Alps now refers, telling the PTO that his claims "do not recite a block copolymer with the midblock structure -E/P:E/B-" (S**E/P:E/B**S).  JA020087.  Thus, even this portion of the prosecution history confirms that the claims do not encompass hydrogenated SIBs other than SEEPS.

The language of the claims, the written description, and the prosecution history uniformly support OWW's construction of claims 1–3.  The Advanced Gel products do not infringe under this construction, because they contain less than 100

---

[9]  This is incorrect—Hammond *does* disclose composites of gel physically interlocked with various substrates.  (*See supra* at 8–14.)

pbw SEEPS to 1,600 pbw oil.  The district court's contempt claim construction and ultimate finding of infringement was in error.

# RESPONSE TO ALPS'S CROSS-APPEAL

## INTRODUCTION

The district court correctly concluded that the asserted claims of the '109 Patent were substantively changed by amendments made during reexamination and granted OWW absolute intervening rights. Alps now suggests that the limitation added to the claims during reexamination—the requirement that the gel and the substrate of the claimed composites be "physically interlocked"—was inherent in the original claims, so that the amendment was merely clarifying. However, it is clear that a number of composites that would have been captured by the claims as originally issued are no longer captured by the claims after reexamination. Neither below nor in its principal brief has Alps even addressed this issue, much less explained why these composites would have been captured (or not captured) by both sets of claims. This alone establishes that the amendment was substantive.

The prosecution history confirms this. The amendment was made in response to a § 102 rejection and was the sole reason that the examiner withdrew this rejection and instead issued a § 103 rejection (to which Chen responded with his purportedly unexpected results). The amendment was thus critical to the allowance of the claims, because Chen's unexpected results argument would not even have been relevant to a § 102 rejection. The district court's decision to grant OWW absolute intervening rights should be affirmed.

Alps's appeal from the district court's decision not to enhance the damages for post-trial infringement is also meritless. If the two prerequisite elements of willful infringement under *Seagate* are met, the decision whether to enhance damages is within the sound discretion of the district court. Here, the district court considered Alps's requests for enhancement of the post-trial damages, but specifically found that such enhancement was unwarranted considering the other significant penalties that it imposed on OWW for its post-trial infringement. These sanctions included enjoining OWW from making *any* thermoplastic gel liner products (not just those found to infringe) until approval from Alps or the district court, which resulted in OWW being shut out of that market for over four months. In this regard, the district court properly exercised its discretion.

## STATEMENT OF FACTS RELATING TO ALPS'S CROSS-APPEAL

## I.    OWW'S ABSOLUTE INTERVENING RIGHTS.

The originally issued claims recited, in part, "composite article[s] comprising . . . a gelatinous elastomer composition, G, which is **formed** into a composite **by heat** with one or more of a selected substrate material, M." JA000217 (17:36–39) (emphasis added). The specification teaches that gel-substrate composites "can be" formed by "cast[ing]" a "molten gel composition" onto a substrate, JA000212 (8:35–39), and that the gels of the invention "can be physically interlocked" with selected substrates, JA000212 (8:48–50), but nowhere

42

does it indicate either that its claimed composites can be formed *only* by casting molten gel directly onto a substrate or that the gel *must* be physically interlocked with the substrate.

The parties initially disputed the meaning of "formed into a composite by heat" in the original claims. Alps argued in its *Markman* brief that the phrase should be construed as "physically interlocked," which it argued is an inherent result of casting molten gel onto the substrate. JA000887–88. OWW argued that the phrase should be construed to require simply that "[h]eat [be] used in the formation of the composite"—for example, through the "use of hot glue to affix a fabric component to the gel," JA000973–74—citing Dr. Walker's expert testimony that a skilled artisan would understand the phrase to simply require that heat be used in some manner in the formation of the composite. JA002159. Shortly before the *Markman* hearing, Alps withdrew its proposed construction and stipulated to OWW's construction, JA003307, which was then adopted by the magistrate judge and later the district court. JA003274, 000027.

The reexamination of the '109 Patent was underway during the *Markman* briefing. In a non-final office action, the examiner had concluded that Chen's gel-substrate composites were anticipated by Hammond. JA019972. He pointed out that Hammond described the same gel that was recited in Chen's claims. He also pointed out that, insofar as Hammond taught that "a body of the gel is held under

compression against and around [an electrical] connection[] so as to seal against contamination and/or corrosion," it taught a composite of the gel and a metal and plastic substrate (i.e., the electrical wires). JA019972–73. [10] The examiner noted that, while Chen's claims recited composites "formed . . . by heat," this process limitation did not "add any distinguishing product feature over the product taught by Hammond." JA019973.

In response, Chen did not argue for the patentability of the claims as originally issued. Instead, he immediately amended the claims to require "composite article[s] comprising . . . a [gel], which is formed into a composite by heat <u>and physically interlocked</u> with one or more of a [substrate]." JA020058 (emphasis in original). Chen argued that his invention was patentably distinct from Hammond's because Hammond's gel "is being continuously maintained inside the box under pressure," while his claimed composites "need[] no pressure to hold the gel $G_{[]}$ together with the substrates $M_{[]}$," as they "are physically interlocked into one composite article." JA020105. He argued that, due to this physical interlocking, the substrate of the claimed composites could not be separated from the gel "without tearing and/or rupturing the substrate or SEEPS gel or both." JA020101 (quoting Holden declaration).

---

[10] The examiner did not consider the disclosures of Debbaut to be part of Hammond for the anticipation analysis (*see supra* at 13), so he analyzed Hammond's composite as formed by the gel and the electrical connection rather than by the gel and the fabric or foam shown in Figures 4 and 5 of Debbaut.

As a result of this amendment, the examiner withdrew his § 102 rejection, but, in a final office action, rejected the claims under § 103, noting that the original claims "were silent concerning physical interlocking" while the "currently amended claims now recite physical interlocking." JA021166. The examiner concluded that the amended claims were still obvious over the combination of Hammond and Chen's '254 Patent (*see supra* at 13 n.3), which taught composites of SEBS gel physically interlocked with various substrates. JA021141–44. The examiner concluded that it would have been obvious to one of ordinary skill in the art to substitute Hammond's SEEPS gel for Chen's SEBS gel to construct a composite of SEEPS gel physically interlocked with a substrate. JA021142. Chen responded with his showing of purportedly unexpected results.

Following reexamination, OWW moved for summary judgment of absolute intervening rights, arguing that the addition of the "physically interlocked" amendment amounted to a substantive change. JA008385–95. Alps opposed, arguing that this characteristic was an inherent result of heating the gel, pouring it onto the substrate and letting it cool, as the gel penetrates the spaces in the surface of the substrate and becomes physically interlocked with it. JA011027. However, Dr. Walker's expert declaration again pointed out that forming gels into composites by heat does not require "heating the gel and pouring the molten gel on the substrate" (so as to let it penetrate the spaces or irregularities in the surface of

45

the substrate) and that, according to the court's (stipulated) construction, "formed into a composite by heat" requires only that "heat [be] used in the formation of the article." JA008687. As OWW noted in its *Markman* brief and as Alps did not dispute, this construction permits, for example, the use of a hot-melt adhesive to adhere a body of solid gel to a substrate, rather than requiring that molten gel be poured directly over a substrate. (*See supra* at 43.) OWW also stressed that the "physically interlocked" amendment was made in response to a § 102 rejection based on Hammond and permitted Chen to overcome this rejection. JA008393–95.

Shortly before trial, the district court granted OWW's motion. JA000082–83. Construing "physically interlocked" to mean "an inherent result of forming a gel composite article by heating the gel to a molten state and then cooling the gel while it is in contact with a substrate, so that the molten gel penetrates spaces or irregularities in the surface of the substrate and becomes attached to the substrate after it cools to a solid state," JA000075–76, the district court concluded that the amendment was a substantive change. Following the trial, Alps moved the district court to reconsider this decision, repeating the arguments raised in its opposition to OWW's motion for summary judgment. JA013609. The district court denied Alps's motion. JA000200.

## II.    POST-TRIAL DAMAGES.

The jury awarded Alps $3,983,512 in damages for infringement.  JA000314.

On May 9, 2013, 12 months after the trial, the district court enhanced this award by

doubling it.  JA000128.  That same day, the court awarded Alps a 20 percent

royalty on OWW's post-trial sales of Original Gel products (the same royalty that

was awarded by the jury for OWW's pre-trial sales) as supplemental damages for

OWW's post-trial infringement, but it did not enhance this award.  JA000137–38.

The court also issued its permanent injunction.  JA000117.

On November 1, 2013, the district court granted Alps's motion to hold

OWW in contempt of the injunction for its sales of the redesigned Advanced Gel

products.  JA000161.  The court directed Alps to submit a proposed order on

sanctions.  JA017864.  Alps's proposed order requested, *inter alia*, that the

damages for OWW's sales of Advanced Gel products be trebled.  JA017904–05.

At the November 7 sanctions hearing, the district court made clear that it was

going to "consider the extent to which enhanced damages would be . . . appropriate

under the circumstances of this case."  JA018201.  The district court's November

12 order awarded Alps a 20 percent royalty on OWW's sales of Advanced Gel

products, but declined to adopt Alps's request to enhance that award.  JA000190.

However, the order imposed a host of other sanctions.  It appointed a receiver to

oversee OWW, ordered OWW to sequester all Advanced Gel products, required

47

OWW to seek permission from Alps (or failing that, the court) before making any new redesigned products, and directed OWW to pay Alps's attorney fees. JA000188–90. The district court specifically stated that "the remedies it has already imposed upon OWW are sufficient to coerce OWW's compliance with the Court's orders and injunction and to compensate Alps." JA000185.

During the February 24, 2014 hearing on OWW's request to sell liners using no SEEPS but rather using prior art SEBS gels, Alps's counsel again asserted Alps's position that damages for the "post-trial damage period for continuing sales" and for contempt should be enhanced and asked for an increase in the amount of the superseadeas bond that OWW had posted. JA037509. The district court declined this request. JA037511.

On March 5, 2014, the court directed the entry of a Third Amended Judgment, finalizing, *inter alia*, the award of a 20 percent royalty, or $2,932,239.30, in supplemental damages for OWW's post-trial sales of Original Gel products. JA037411. The court also directed the entry of a separate judgment awarding Alps a 20 percent royalty, or $4,560,617, in damages for OWW's sales of Advanced Gel products. JA037414.

Alps subsequently moved the district court to reconsider its decision not enhance the post-trial damages. JA0037415. The district court denied this motion, explaining that it had "already considered the appropriate remedies for OWW's

post-trial infringement conduct, including whether enhanced damages were warranted for OWW's post-trial infringement," but found that "the remedies it ha[d] imposed," including the appointment of a receiver and a lengthy shut-down of OWW's thermoplastic gel liner business, were sufficient to serve as a penalty for OWW's conduct. JA000207.

## SUMMARY OF CROSS-APPEAL ARGUMENT

The district court correctly determined that the "physically interlocked" amendment was substantive and not merely clarifying. There are gel-substrate composites that could be "formed . . . by heat" without physically interlocking the gel and the substrate. These composites would have been captured by the original claims but are no longer captured by the reexamined claims, which specifically require that the gel and the substrate be "physically interlocked." That the amendment was critical to the allowance of the claims further demonstrates its substantive nature.

The district court also did not abuse its discretion in declining to enhance the damages for OWW's post-trial sales. The district court carefully considered Alps's requests that the post-trial damages be enhanced, but found that OWW was sufficiently penalized for its post-trial conduct by the other sanctions that were imposed and, on that basis, concluded that enhancement of post-trial damages was unwarranted in this case. This decision should be affirmed.

## CROSS-APPEAL ARGUMENT

### I.    OWW IS ENTITLED TO ABSOLUTE INTERVENING RIGHTS.

#### A.    Applicable Law.

Under the doctrine of absolute intervening rights, codified in 35 U.S.C. § 252 and made applicable to reexamined patents via 35 U.S.C. § 307(b), there is an "irrebuttable presumption that the original claims were materially flawed" if those claims were substantively changed during reexamination. *Bloom Eng'g*, 129 F.3d at 1249. "Thus the statute relieves those who may have infringed the original claims from liability during the period before the claims are validated." *Id.* When "substantive changes have been made to the original claims, the patentee is entitled to infringement damages only for the period following the issuance of the reexamination certificate." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998). In assessing whether an amendment causes a substantive change, this Court has stated that "it is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment." *Id.* at 1348.

#### B.    The Original Claims Captured Certain Composites That Are No Longer Captured by the Amended Claims.

Alps argues that "when a molten gel made of a SEEPS-based polymer and a plasticizing oil is placed in contact with a substrate, such as fabric, and allowed to cool, the gel and substrate inherently become 'physically interlocked.'" (Alps Br.

61.) Even if this were true, it is irrelevant, because the composites recited in the original claims were not limited to composites made by pouring molten gel directly over a substrate. To the contrary, the composite merely had to be "formed . . . by heat," which, according to the stipulated construction adopted by the court, meant only that heat was involved in the formation of the composite. JA000973–74.

When Alps initially argued that "formed . . . by heat" should be construed as "physically interlocked," JA000887–88, and OWW proposed the construction to which Alps eventually stipulated and which the trial court then adopted, OWW specifically noted that it encompassed the use of a hot-melt adhesive to attach a solid body of gel to a substrate. JA000974. This is consistent with the specification, which states only that molten gel "can be" cast directly over a substrate, but does not suggest that this is only way of employing heat to form the claimed composites. JA000212 (8:35–39). A composite joined together by a hot-melt adhesive would be "formed . . . by heat" but would involve no physical interlocking of SEEPS gel and the substrate (or, for that matter, any direct contact between them). Such a composite would be captured by the original, but not reexamined, claims. When Alps stipulated to OWW's construction, it expressed no reservations about the claims so reading on composites joined together by a hot-melt adhesive, and Alps never explained to the trial court why the original claims would not so read on such composites.

51

In fact, even pouring molten gel directly over a substrate does not always result in physical interlocking.   For example, if the substrate is another thermoplastic material and the temperature of the molten SEEPS gel is at or above the melting point of the thermoplastic substrate, then applying molten SEEPS gel to the substrate may cause the surface of the substrate to also liquefy, leaving no "spaces or irregularities in the surface of the substrate" to "penetrate[]" and grip upon cooling.  Instead, upon cooling, the molten SEEPS gel and the surface of the substrate will fuse, forming one indistinguishable layer.   The original claims certainly contemplated this method of forming composites, as each recited "plastic" as an available substrate.  As pointed out in OWW's summary judgment brief, JA008391, the specification of Chen's '253 Patent (*see supra* at 16 n.5) (which is a continuation-in-part of the '109 Patent and also claims gel-substrate composite) specifically describes this situation in which pouring a molten thermoplastic gel over a plastic substrate results in them becoming fused, not physically interlocked, with Chen stating that "molten [gels] compositions will adhere sufficiently to certain plastic provided the temperature of the molten [gel] is sufficent[ly] high to fuse or nearly fuse with the plastic."  JA008449 (29:1–9).

Alps never even attempted below to explain why a composite of a solid gel and substrate joined by a hot-melt adhesive or a composite made by a thermoplastic substrate fusing with the molten gel would have fallen outside the

scope of the original claims (that is, why they would not be composites whose formation involved heat).  Both clearly fall outside the scope of the reexamined claims, given the absence of physical interlocking between SEEPS gel and the substrate.  The original claims thus clearly captured composites that are no longer captured by the reexamined claims.

### C.    The Prosecution History and Written Description Confirm That the Claims Were Substantively Changed.

The reexamination history of the '109 Patent confirms that the "physically interlocked" amendment effected a substantive change.  Following the examiner's rejection of the original claims as anticipated by Hammond, Chen did not argue for the patentability of the claims and instead added the "physically interlocked" language to distinguish his invention from Hammond's.  Alps notes that, having made the amendment, Chen asserted that "the physical interlocking between $G_{[]}$ and $M_{[]}$ is inherent" in the original claims.  (JA020112; Alps Br. 62.)  It is telling, however, that, rather than attempting to persuade the examiner that this was indeed the case, Chen immediately amended the claims to expressly require physical interlocking.  *See Bai v. L & L Wings*, 160 F.3d 1350, 1355 (Fed. Cir. 1998) (dismissing inventor's "boilerplate remark" during prosecution that amendment made in response to prior art rejection was merely clarifying as "unpersuasive").[11]

---

[11] Indeed, this boilerplate contradicted other statements by Chen. Shortly after the '109 Patent issued, Chen accused Fellowes, Inc. of infringement. JA008701.

The amendment was the sole reason for the examiner's withdrawing of the § 102 rejection. While this was followed by the examiner's rejection of the amended claims as obvious over the combination of Hammond and the '254 Patent, to which Chen responded with his unexpected results argument, it was a crucial step in getting the claims allowed, as Judge Scriven emphasized in her summary judgment order. JA000082.

Had Chen not been able to overcome the § 102 rejection with this change, he could not have even presented this evidence of purported unexpected results. *See In re Malagari*, 499 F.2d 1297, 1302 (CCPA 1974). Thus, Alps's suggestion that the amendment was "not necessary for the allowance of [the] claims" (Alps Br. 62) is simply incorrect. As this Court has indicated, "it is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment." *Laitram*, 163 F.3d at 1346. This is not such a situation.

Alps's assertion that the examiner "agreed that physical interlocking would inherently occur" (Alps Br. 62) is incorrect. The examiner noted only that

---

Fellowes responded that the gel portion of its wrist rests was not "physically interlocked" with the fabric. Chen replied that Fellowes had "mistakenly interpreted 'formed . . . by heat' to mean 'physically interlocked.'" JA008702. He insisted that "[t]he words 'physically interlocked' are not found in any of the [original] claims," and that "[i]n construing or interpreting the [original] claims . . . one would reasonably conclude that the claims are not limited by such language." *Id.*

"physical interlocking . . . occurs after casting and cooling . . . the molten SEEPS gels of Hammond . . . unto a substrate." JA021143. The examiner did not agree that pouring molten gel on the substrate is the only way to form the claimed composites by heat, and he did not agree that all gel-substrate composites formed by heat are physically interlocked. The original claims were not limited to composites formed by the "casting and cooling" of the gel, however. Alps's reliance on Dr. Walker's testimony (Alps Br. 63) is misplaced for the same reason. She testified only that a composite formed by pouring molten thermoplastic gel over a substrate made of glass would produce physical interlocking. JA013034–35. She did not even remotely suggest that physical interlocking was inherent in all gel-substrate composites formed by heat.

Although Alps's principal brief does not raise this argument, in opposing OWW's motion for summary judgment below, Alps incorrectly suggested that the specification describes physical interlocking of the gel and substrate as an inherent characteristic of the composites of the original claims. JA011024. The specification does not support Alps's position; it states only that the "gel compositions . . . of the invention . . . *can be* physically interlocked with a selected material" but nowhere states that they must be. JA00212 (8:48–50) (emphasis added). Moreover, the portion of the specification cited by Alps below does not even address the relationship between the gel and the substrate, but instead

describes a phenomenon that occurs in the gel irrespective of whether it is contact with any substrate. It describes the inherent "physical elastomeric network structure" of SEEPS, which is "temporarily disrupted" (or unlocked) when the polymer is heated, allowing the gel to flow freely, and becomes "restored" (or locked back into place) when the temperature is lowered, leading to the hardening of the gel. JA000209 (2:58–3:10). As Chen explicitly recognized during reexamination, this phenomenon "occurs independent of the presence of substrates." JA020108. The discussion of it in the specification therefore does not suggest that Chen's original claims required any particular type of contact between the gel and the substrate.

The stipulated construction of the original claims, the prosecution history, and the written description all confirm the conclusion that the claims were substantively changed during reexamination. The district court's decision to grant OWW absolute intervening rights should be affirmed.

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO ENHANCE THE POST-TRIAL DAMAGES.

Where willful infringement has been properly found, the decision to award enhanced damages is squarely within the sound discretion of the district court. *In re Hayes Microcomputer Products, Inc. Patent Litigation*, 982 F.2d 1527, 1545 (Fed. Cir. 2012). Here, the district court made a considered and reasoned decision not to enhance the damages for OWW's post-trial sales. Alps's assertion that the

district court "provided no rationale for not enhancing damages for OWW's post-trial willful infringement" (Alps Br. 70) simply mischaracterizes the record. Alps specifically asked the court to enhance the post-trial damages in its proposed order just before the hearing on contempt sanctions. During the hearing, the court confirmed that it would consider Alps's request. However, as it clearly stated in the November 12 order, it found that the other sanctions it imposed on OWW were sufficient punishment. JA000185.

Considering the severity of these sanctions, this was certainly not an unreasonable determination, let alone an abuse of discretion. Indeed, as a result of having to obtain permission before making any new redesigned product, OWW's entire production of thermoplastic gel liners was shut down for over four months. (OWW obtained the trial court's permission over Alps's vigorous objections to make a redesigned product utilizing a prior art SEBS gel on February 24, 2014. JA037547.) Alps again asked the district court to consider enhancing the post-trial damages on February 24. JA037509. The subsequently issued judgments confirmed the court's decision not to enhance the post-trial damages. JA000202, 000204. As the district court again explained in the order denying Alps's motion for reconsideration, it had found that the other sanctions were "sufficient to serve as a penalty for OWW's conduct." JA000207.

Alps's reliance on *SynQor* and *Stryker Corp. v. Davol Inc.*, 234 F.3d 1252 (Fed. Cir 2000), is misplaced. These cases held that the district court had not abused its discretion in enhancing post-trial damages, but they do not even suggest that post-trial damages must be enhanced in every case, much less that it is an abuse of discretion to decline to enhance such damages.

However, this Court's decision in *In re Hayes* is instructive. The district court doubled the jury's reasonable royalty award. *In re Hayes*, 982 F.2d at 1532. It also issued a permanent injunction and doubled the damages for sales from the date of the verdict through the entry of the injunction. *Id.* The court stayed the injunction pending appeal, requiring the infringer to pay the reasonable royalty set by the jury on subsequent sales while the appeal was pending. However, the court did not enhance this interim royalty. *Id.* at 1545. The patent owner appealed, claiming that, having enhanced other damages, the district court abused its discretion by declining to enhance the interim royalty as well. This Court squarely rejected this argument, pointing out that the trial court had considered this issue and determined that it had already "impos[ed] substantial penalties on defendants for their willful infringement." *In re Hayes*, 982 F.2d at 1545. This Court was satisfied that "the enhanced damages that were granted along with the attorney fee award appear to be all that the court intended to serve as a penalty and deterrent" and, with no further discussion, found no abuse of discretion. *Id.*

The same analysis should apply here.  The district court clearly considered Alps's numerous requests to have the post-trial damages enhanced, but determined that the other substantial sanctions it imposed were sufficient penalties.  This determination was squarely within the discretion of the district court and should be affirmed.

## CONCLUSION

OWW respectfully requests that this Court vacate the judgments for lack of jurisdiction, or, in the alternative, reverse on invalidity and hold the asserted claims to be invalid. Should this Court affirm on jurisdiction and invalidity, it should reverse the judgment of willful infringement and the awards of enhanced damages and attorney fees; reverse the grant of the permanent injunction; and reverse the finding that OWW was in contempt, vacating the associated sanctions and damages award.  If the Court affirms, it should also affirm the trial court's grant of intervening rights and its refusal to further enhance damages.

Dated:  September 5, 2014                    Respectfully submitted,


                                             */s/ John D. Luken*
                                             John D. Luken
                                             Joshua A. Lorentz
                                             Brian S. Sullivan
                                             DINSMORE & SHOHL LLP
                                             255 E. Fifth St., Suite 1900
                                             Cincinnati, Ohio  45202
                                             Tele:  513.977.8564
                                             John.Luken@Dinsmore.com
                                             Joshua.Lorentz@Dinsmore.com
                                             Brian.Sullivan@Dinsmore.com

                                             *Attorneys   for   Defendant-Appellant*
                                             *The   Ohio   Willow   Wood   Company*

## CERTIFICATE OF SERVICE

I certify that on September 5, 2014, a true and accurate copy of this brief was filed electronically with the Clerk of the Court using CM/ECF and was served via electronic mail on counsel of record as listed below.

Ronald A. Christaldi
SHUMAKER, LOOP & KENDRICK, LLP
101 East Kennedy Blvd., Suite 2800
Tampa, FL 33602
Tele: 813.221.7152
rchristaldi@slk-law.com

David W. Wicklund
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson St.
Toledo, OH 43604
Tele: (419) 321-1213
dwicklund@slk-law.com

_/s/ John D. Luken_
John D. Luken
_Attorney for Defendant-Appellant_
_The Ohio Willow Wood Company_

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)(7)

I certify that I am counsel for Defendant-Appellant The Ohio Willow Wood Company and that the foregoing Brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure 32(a)(7)(B).

The brief contains 13,952 words, excluding the parts of the brief that are exempted under Fed. R. App. P. 32(a)(7)(B)(iii).


Dated: September 5, 2014              */s/ John D. Luken*
                                      John D. Luken
                                      *Attorney for Defendant-Appellant*
                                      *The Ohio Willow Wood Company*